**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and AMERICAN PETROLEUM INSTITUTE,<br><br>*Plaintiffs*,<br><br>v.<br><br>JULIE MOORE, in her official capacity as the Secretary of the Vermont Agency of Natural Resources and JANE LAZORCHAK, in her official capacity as the Director of the Vermont Agency of Natural Resources Climate Action Office,<br><br>*Defendants*. | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The Chamber of Commerce of the United States of America and the American Petroleum Institute bring this civil action against Defendants for declaratory and injunctive relief and allege as follows:

### INTRODUCTION

1.    Vermont's legislature has enacted an unprecedented law, becoming the first State in American history to attempt to impose strict liability on companies based in other States for their purported shares of global greenhouse gas emissions. This law—known as the Climate "Superfund" Act, S.259 ("Act" or "Vermont's Act")—does not limit its regulation to greenhouse gas emissions released in Vermont. Rather, it seeks to punish a narrow set of energy producers[1] for global greenhouse gases emitted from all sources in the atmosphere over the course of three prior

---

[1] The Act covers certain entities that engage in "the trade or business of extracting fossil fuel," which includes "coal, petroleum products, and fuel gases," or "refining crude oil," which includes "oil or petroleum of any kind." § 596(9), (12), (22). For ease of reference, these entities are referred to as "energy producers" throughout the Complaint.

decades that allegedly caused damage to the State. Vermont is not home to any of the energy producers it hopes to regulate. Nevertheless, it seeks to impose significant monetary penalties on those producers, potentially subjecting other States to increased energy costs, while reaping the financial benefits for its own "climate change adaptation projects" in Vermont.

2.    Second Circuit precedent prohibits Vermont's Act. *City of New York v. Chevron Corp.*, 993 F.3d 81, 91-99 (2d Cir. 2021). That precedent makes clear that neither our federal constitutional structure nor the Clean Air Act authorizes a State to impose liability or penalties on out-of-state energy producers for harms arising from out-of-state and global greenhouse gas emissions. *Id.* The Act is therefore precluded by federal law.

3.    Vermont has thus exceeded the bounds of its authority, inserting itself into an area of law that is and has historically been controlled only by federal law, upsetting the careful regulatory balance the Clean Air Act establishes, violating the extraterritorial restraints of our federal system, and transgressing the bounds of due process and other constitutional protections. For the reasons explained below, Vermont's Act is unconstitutional and must be enjoined.

4.    Vermont's Act requires large out-of-state energy producers, both domestic and international—termed "responsible parties"—to pay "cost recovery demand[s]" to the State of Vermont to fund Vermont's "climate change adaptation projects." § 598(a)(1), (b).[2] The Act holds energy producers "strictly liable" for their purported share of global greenhouse gas emissions. § 598(a)(1). The Act calculates the penalty that individual energy producers must pay based upon the ratio of the total "cost to the State of Vermont and its residents . . . from the emission of covered greenhouse gas[]" emissions and each "responsible party's" purported global share of covered greenhouse gas emissions over the 30-year period from 1995 to 2024. §§ 596(8), 598(a)(1), (b).

---

[2] Unless otherwise noted, statutory citations are to the 10 V.S.A. chapter 24A.

5.     The Act is unconstitutional and a violation of federal law for multiple reasons.

6.     *First*, the U.S. Constitution precludes the Act. Under our federal constitutional structure and inherent principles of the Constitution, federal law governs "[w]hen we deal with air and water in their ambient or interstate aspects." *Illinois v. City of Milwaukee*, 406 U.S. 91, 103 (1972) ("*Milwaukee I*"); *City of New York*, 993 F.3d at 91-92. In such interstate pollution disputes, there is "an overriding federal interest in the need for a uniform rule of decision" and "basic interests of federalism" demand the application of federal law. *Milwaukee I*, 406 U.S. at 105 n.6. "This is because such quarrels often implicate two federal interests that are incompatible with the application of state law: (i) the 'overriding . . . need for a uniform rule of decision' on matters influencing national energy and environmental policy, and (ii) 'basic interests of federalism.'" *City of New York*, 993 F.3d at 91-92 (citation omitted). Moreover, the inherent structure of the Constitution recognizes the "equal sovereignty" afforded to all States, *see, e.g.*, *Shelby County v. Holder*, 570 U.S. 529, 544 (2013), and due process principles provide that a sovereign cannot legislate "except with reference to its own jurisdiction," *Bonaparte v. Tax Court*, 104 U.S. 592, 594 (1882), which is "co-extensive with its territory," *United States v. Bevans*, 16 U.S. (3 Wheat.) 336, 387 (1818). "[I]t follows from these principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 (1996). And "[o]ur system of government . . . imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Zschernig v. Miller*, 389 U.S. 429, 432 (1968). Thus, the Act's imposition of liability and significant penalties on energy producers for harms allegedly caused by greenhouse gas emissions beyond Vermont's borders—and beyond the borders of the United States—is barred by the federal Constitution.

7.      *Second*, Vermont's Act is preempted by the federal Clean Air Act. "[T]he Supremacy Clause 'invalidates state laws that "interfere with, or are contrary to," federal law.'" *Clean Air Mkts. Grp. v. Pataki*, 338 F.3d 82, 86-87 (2d Cir. 2003) (citation omitted). Moreover, "'resort[ing] to state law' on a question" that has historically been governed by federal law "is permissible only to the extent 'authorize[d]' by federal statute." *City of New York*, 993 F.3d at 99 (quoting *Illinois v. City of Milwaukee*, 731 F.2d 403, 411 (7th Cir. 1984) ("*Milwaukee III*")). Therefore, under the Supremacy Clause, state regulation of greenhouse gas emissions is only permissible as authorized by the Clean Air Act. And under the Clean Air Act, only a "slim reservoir" of state authority remains to regulate greenhouse gas emissions outside of the Clean Air Act's regulatory scheme. *Id.* at 100. Specifically, the Clean Air Act "permit[s] only state lawsuits brought under 'the law of the [pollution's] *source* [s]tate.'" *Id.* (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 497 (1987)). Here, because Vermont's Act seeks to impose liability for global greenhouse gas emissions from sources well beyond Vermont's borders, the Clean Air Act preempts it.

8.      *Third*, the Act violates the Due Process Clause of the Fourteenth Amendment. Economic legislation violates the protections of due process where it is "arbitrary and irrational," *E. Enters. v. Apfel*, 524 U.S. 498, 537 (1998) (plurality opinion) (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976)), or where it is particularly "harsh or oppressive," *Canisius Coll. v. United States,* 799 F.2d 18, 25 (2d Cir. 1986) (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984)). Here, the Act transgresses those protections because it: (i) imposes an overly harsh and oppressive retroactive penalty for greenhouse gas emissions released over 30 years during which energy producers lawfully extracted and refined fossil fuels; (ii) imposes an irrational and arbitrary punishment based on an unfair and flawed calculation method that singles out a handful of disfavored energy producers and attempts to hold them responsible for

global greenhouse gas emissions emitted by others; (iii) imposes an unconstitutionally vague penalty with the amount of that penalty left to the unfettered discretion of state agencies; and (iv) lacks procedural safeguards to avoid the imposition of arbitrary and excessive penalties.

9.      *Fourth*, the Act violates the domestic and foreign Commerce Clauses. *See Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 372-74 (2023); *Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 448-49 (1979). The Act discriminates against the important economic interests of other States by targeting large energy companies located outside of Vermont. In doing so, it negatively impacts energy production and costs in other States and penalizes States like Louisiana and Texas that rely heavily on the energy sector. Likewise, the Act infringes on the foreign Commerce Clause by discriminating against the important economic interests of foreign commerce in the energy trade, negatively impacting U.S. trading partners, and inhibiting the federal government's ability to speak with one voice on the issue of foreign trade of energy products.

10.     *Fifth*, the Act imposes an excessive fine in violation of the Eighth Amendment to the U.S. Constitution. The Constitution prohibits the government from imposing excessive fines as a form of punishment. *See, e.g.*, *Austin v. United States*, 509 U.S. 602, 609-10 (1993). But that is exactly what the Act does—it punishes covered energy producers for greenhouse gas emissions related to the lawful production and use of their products and those emissions' purported impacts on climate change. And the amount of the penalty is unconstitutionally excessive—subjecting energy producers to hundreds of millions or even billions of dollars in penalties for greenhouse gases emitted over the course of three decades.

11.     *Sixth*, the Act effects an unconstitutional taking in violation of the Fifth Amendment to the U.S. Constitution. Even where a law does not involve a physical taking, it can go "too far" so as to amount to an unconstitutional taking. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149

(2021). The Act's retroactive penalties result in a substantial economic impact on covered energy producers, significantly interfere with those producers' investment-backed expectations, and are the result of a targeted effort to unfairly place covered energy producers on the hook for global greenhouse gas emissions and their purported impact on Vermont.

12.    For these reasons and more, this Court should enjoin Defendants from enforcing the Act against Plaintiffs' covered members and declare the Act unlawful.

## PARTIES & STANDING

13.    Plaintiff the Chamber of Commerce of the United States of America ("the Chamber") is the world's largest business federation. The Chamber represents 300,000 direct members and indirectly represents the interests of more than three million businesses and organizations. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly participates in cases that raise issues of vital concern to America's business community.

14.    Plaintiff American Petroleum Institute ("API") is a national, not-for-profit trade association representing all segments of America's oil and natural gas industry. API's approximately 600 members support more than 11.3 million jobs and produce, process, and distribute most of our nation's energy. API's members range from the largest integrated companies to the smallest independent energy producers. API's members include producers, refiners, suppliers, marketers, pipeline operators, and marine transporters, as well as service and supply companies that support the industry. API was formed in 1919 as a standards-setting organization. In its over 100 years, API has developed more than 800 standards to enhance operational and environmental safety, efficiency, and sustainability.

15.    Plaintiffs have associational standing to bring their challenge because: (1) at least one of their members has individual standing to sue in its own right; (2) challenging the Act is

germane to the Plaintiffs' respective purposes; and (3) members' individual participation is unnecessary in this purely legal challenge. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 112 (2d Cir. 2024). An order enjoining Defendants from enforcing the Act against Plaintiffs' covered members would redress the harm to those members of being forced to pay cost recovery demands under the Act.

16.     At least one of Plaintiffs' members has individual standing to sue in its own right. *See Do No Harm*, 96 F.4th at 112-13 (elements of individual standing). Although Plaintiffs' members reserve the right to argue that they owe nothing to Vermont under the Act,[3] it is clear that Vermont intends to seek cost recovery demands from at least some of Plaintiffs' members. For example, Vermont has already filed state law tort suits against ExxonMobil and Shell entities for claims related to greenhouse gas emissions. *See infra* ¶ 55. Moreover, public statements by Vermont officials and the legislative history show that Vermont intends to target other energy producers who are members of Plaintiffs, such as Chevron and BP. *See infra* ¶¶ 57-59. Therefore, the State of Vermont, its leaders, and others supporting the Act have made clear that, among other entities, the Act targets the following energy producers for cost recovery demands: Exxon Mobil Corporation, Shell USA, Inc., Chevron Corporation, and BP America, Inc. Each of these companies is therefore injured by the Act—Vermont has made clear that it will issue them cost recovery demands for hundreds of millions or billions of dollars and they will be forced to expend time and resources to argue that they do not owe any money to Vermont under the unlawful Act in defending against a cost-recovery demand. Each company therefore has standing in its own right. All four of those companies are members of both the Chamber and API.

---

[3] Specifically, Plaintiffs' members expressly reserve the right to argue, among other contentions, that they are not "[r]esponsible part[ies]" under the Act because they "lack[] sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution." § 596(22).

17.    Challenging the Act is germane to the purposes of the Chamber and API. Both the Chamber and API represent their members in challenging laws that negatively impact their members' businesses, including laws related to environmental issues and laws that impose unreasonable and unlawful financial and regulatory burdens upon the private sector. The Chamber, through its Litigation Center, "fights for business at every level of the U.S. judicial system, on virtually every issue affecting business, including . . . energy and environment [and] . . . preemption." Chamber Litigation Center, U.S. Chamber of Com. (2024), https://perma.cc/E3B5-58ZC. For example, the Chamber recently brought a lawsuit against California on behalf of its members, challenging the State's law requiring companies to make statements of opinion about their greenhouse gas emissions. *See* Complaint, *Chamber of Com. of the U.S. v. Cal. Air Res. Bd.*, No. 2:24-cv-00801 (C.D. Cal. Jan. 30, 2024). The Chamber also files amicus briefs in a wide range of suits, including environmental litigation, throughout the country on behalf of its members. *See, e.g.*, Brief for the Chamber of Com. of the U.S. as Amicus Curiae, *Sunoco LP v. City & County of Honolulu*, No. 23-947 (U.S. Apr. 1, 2024). Likewise, API "represents the [energy] industry in legal proceedings." About API, API (2024), https://perma.cc/3P7Q-GH8C. And API also files amicus briefs in climate-related litigation on behalf of its members. *See, e.g.*, Brief for the Am. Petroleum Inst. et al. as Amici Curiae, *Sunoco LP v. City & County of Honolulu*, No. 23-947 (U.S. Apr. 1, 2024).

18.    Plaintiffs bring a purely legal challenge to the Act and are seeking only declaratory and injunctive relief; no individual member participation is necessary.

19.    Defendant Julie Moore is the Secretary of the Vermont Agency of Natural Resources. Defendant Moore is responsible for issuing cost recovery demands to covered energy producers under the Act. § 598(g)(1). Defendant Moore is sued in her official capacity.

20.    Defendant Jane Lazorchak is the Director of the Vermont Agency of Natural Resources Climate Action Office. As the Director of the Vermont Agency of Natural Resources Climate Action Office, Defendant Lazorchak is responsible for administering the Act's Climate Superfund Cost Recovery Program under the Act. § 597. Defendant Lazorchak is sued in her official capacity.

## JURISDICTION & VENUE

21.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983 and pursuant to its equity jurisdiction and *Ex parte Young*, 209 U.S. 123 (1908), *see Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016), injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

22.    This Court has personal jurisdiction over Defendants because they reside in or conduct a substantial proportion of their official business in Vermont. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside in, and the Defendants' conduct giving rise to this civil action occurs in, Vermont.

## BACKGROUND

23.    **Energy Production in the United States.** The Chamber's and API's members include the United States' largest energy producers. These members lawfully provide energy that the vast majority of Americans use every day as well as jobs for millions of Americans. *See, e.g.*, U.S. Oil and Natural Gas Report Fact Sheet, U.S. Dep't of Energy (Oct. 2020), https://perma.cc/D3UM-7CSJ; How Many Jobs Has the Oil and Natural Gas Industry Created?, API (2024), https://perma.cc/9YLQ-EP58. Fossil fuels account for approximately 80% of all energy sources in the United States. *See* Monthly Energy Review December 2024 at 3, U.S. Energy Info. Admin. (Dec. 2024), https://perma.cc/8RE2-7YU8.

24.     For example, oil and gas producers provide energy for all manner of transportation in the United States and around the world, ranging from gasoline for motor vehicles to fuel for tractor trailers and aircraft that transport goods throughout the country and globally. *See, e.g.*, Use of Energy Explained: Energy Use for Transportation, U.S. Energy Info. Admin. (Aug. 16, 2023), https://perma.cc/A32J-9MGF.

25.     The refining process that ostensibly will be the subject of Vermont's penalties also creates many important by-products that are used throughout the United States, including smart phones, laptops, clothing (synthetic fibers), glasses, tires, roads, vehicle batteries, sulfur (for lithium mining and fertilizers), plastics (used in medical equipment, toys, and bottles), waxes, asphalt, and lubricants. *See* Products Made From Oil and Natural Gas, U.S. Dep't of Energy, https://perma.cc/URC3-FX2Z; Hydrocarbon Gas Liquids Explained, U.S. Energy Info. Admin. (Dec. 26, 2023), https://perma.cc/5GPK-F6E7; Oil and Petroleum Products Explained, U.S. Energy Info. Admin. (June 20, 2024), https://perma.cc/Y9B4-XSXH. Moreover, natural gas provides cost-effective energy for homes and businesses throughout the country, accounting for 30% of energy used in the United States. Natural Gas Fuel Basics, U.S. Dep't of Energy, https://perma.cc/PFS8-P8J8. "About 40% of the fuel goes to electric power production and the remainder is split between residential and commercial uses, such as heating and cooking, and industrial uses." *Id.* Globally, natural gas accounted for 22.3% of total electricity generation in 2022. World: Natural gas, Int'l Energy Agency https://perma.cc/PJ3Y-3N4U.

26.     Although these energy producers—like any other critical industry in the United States—are subject to a variety of government regulations, the work that they do is not only lawful but encouraged and incentivized by the federal government. *See, e.g.*, Natural Gas Laws and Incentives, U.S. Dep't of Energy, https://perma.cc/9WU7-D7V5; Federal Financial Interventions and

Subsidies in Energy in Fiscal Years 2016-2022, U.S. Energy Info. Admin. (Aug. 2023), https://perma.cc/YL3P-FLKB.

27.    In Vermont, "about 57% of the energy consumed" is "petroleum-based." Vermont State Profile and Energy Estimates, U.S. Energy Info. Admin. (Dec. 19, 2024), https://perma.cc/4T95-DW4B ("Vermont State Profile"). In fact, "Vermont uses more petroleum per capita than almost two-thirds of the states." *Id.* For example, "[a]lmost 6 in 10 Vermont households use fuel oil, kerosene, or propane to heat their homes, a larger share than in all other states except Maine and New Hampshire." *Id.*

28.    The Vermont government has also used (and continues to use) fossil fuels. For example, in fiscal year 2019, 48% of the "energy used to heat" buildings owned by the Vermont Department of Buildings and General Services was from fossil fuels. 2020 Agency Energy Implementation Plan at 14, Vt. Dep't of Buildings & Gen. Servs. (2020), https://perma.cc/K45S-CAA4. Likewise, from fiscal year 2015 to 2020, Vermont's government consumed energy in the form of fossil fuels, including heating oil, propane, natural gas, diesel, and gasoline. *See* State Agency Energy Plan at 7, Vt. Dep't of Buildings & Gen. Servs. (2022), https://perma.cc/FX26-RJR4. "In fiscal year 2015, gasoline accounted for 27% of all energy consumed by state government, more than any other energy resource consumed over the same period." *Id.* Moreover, although Vermont plans to transition its 400 transit vehicles to zero-emissions, it continues to use fossil fuels for transportation as that plan is not projected to be completed until 2050. *See* The Electrification of Vermont's Public Transit Fleet, Vt. Agency of Transp. (2024), https://perma.cc/YG8N-BNEB.

29.    **Greenhouse Gas Emissions and Climate Change.** The climate is changing, and humans are contributing to these changes.

30.    Greenhouse gas emissions are produced by many different sources, including combustion of fossil fuels, deforestation, livestock farming, use of fertilizers, and fluorinated gases found in everyday products like aerosol sprays and air conditioners. *See* Sources of Greenhouse Gas Emissions, EPA (Oct. 22, 2024), https://perma.cc/B4J7-Y9VJ. Greenhouse gas emissions are also produced by many natural sources. For example, methane is "emitted from a number of natural sources," ranging from "[n]atural wetlands" to "termites, oceans, sediments, volcanoes, and wildfires." Overview of Greenhouse Gases, EPA (Nov. 26, 2024), https://perma.cc/Z2QM-KKNZ.

31.    When it comes to fossil fuels, the vast majority of greenhouse gas emissions are the result of fossil fuels' end use, such as combustion emissions from driving a car or flying a plane. *See* Fast Facts on Transportation Greenhouse Gas Emissions, EPA (June 18, 2024), https://perma.cc/Y666-4M2M ("[T]ransportation accounted for the largest portion (28%) of total U.S. GHG emissions in 2022. Cars, trucks, commercial aircraft, and railroads, among other sources, all contribute to transportation end-use sector emissions."); Energy and the Environment Explained: Where Greenhouse Gases Come From, U.S. Energy Info. Admin. (June 18, 2024), https://perma.cc/HTK9-XU2K (explaining that "*[c]onsumption* of fossil fuels accounts for most of the energy-related $CO_2$ emissions of the major energy-consuming sectors: commercial, industrial, residential, transportation, and electric power" (emphasis added)).

32.    The Chamber, API, and their members support actions to help address climate change, including reducing greenhouse gas emissions. *See* The Chamber's Climate Position: 'Inaction is Not an Option', U.S. Chamber of Com. (Oct. 27, 2021), https://perma.cc/9FG4-KGBE ("We support market-based solutions to reduce emissions and support U.S. competitiveness, national security, and American workers."); Climate Change, API (2024), https://perma.cc/PCG5-7Z2Y.

33.     The federal government is actively addressing climate change through the reduction of greenhouse gas emissions in a variety of ways. For example, the Environmental Protection Agency ("EPA") measures and monitors greenhouse gas emissions from emissions sources, and it "works with industry and others to reduce greenhouse gas emissions through regulatory initiatives and partnership programs." What EPA Is Doing About Climate Change, EPA (Dec. 9, 2024), https://perma.cc/227X-8LXV; *see also* Climate Change Regulatory Actions and Initiatives, EPA (Dec. 16, 2024), https://perma.cc/JW2L-U8VN (listing various regulatory actions to monitor or reduce greenhouse gas emissions that EPA is taking or plans to take); Greenhouse Gas Emissions Continue to Decline as the American Economy Flourishes Under the Trump Administration, EPA (Nov. 9, 2020), https://perma.cc/C9PE-6HHJ (touting reduction in greenhouse gas emissions under EPA's Greenhouse Gas Reporting Program).

34.     Greenhouse gases are emitted from billions of individual sources across the globe into the atmosphere. The migration and impact of these emissions, however, are complex issues. Once released, greenhouse gases quickly disperse and "become well mixed in the atmosphere." *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 422 (2011) ("*AEP*") (citation omitted); *see also City of New York v. BP P.L.C.*, 325 F. Supp. 3d 466, 472 (S.D.N.Y. 2018) (climate-change claims "are ultimately based on the 'transboundary' emission of greenhouse gases"), *aff'd sub nom. City of New York*, 993 F.3d at 81.

35.     Therefore, it is impossible to measure accurately and fairly the impact of greenhouse gas emissions from fossil-fuel consumption attributable to a particular entity in a particular location over the course of a specific 30-year period of time based on all worldwide greenhouse gas emissions in the atmosphere. As the Second Circuit has stated, "Greenhouse gas molecules cannot be traced to their source, and greenhouse gases quickly diffuse and comingle in the

atmosphere. However, because of their rapid and widespread global dispersal, greenhouse gas emissions from each of [the Producers'] fossil fuel products are present in the atmosphere in New York State." *City of New York*, 993 F.3d at 92 (internal record citation omitted). That is why, as the Supreme Court has recognized, "emissions in New Jersey may contribute no more to flooding in New York than emissions in China." *AEP*, 564 U.S. at 422.

36.     Further complicating matters is how greenhouse gas emissions are related to climate change. Individual greenhouse gas emissions themselves do not cause climate impacts. Rather, as the Supreme Court has summarized, it is the combined effect of all global greenhouse gas emissions—from many different natural and human sources—that can cause a "greenhouse" effect that warms the earth's atmosphere, contributing to different climate impacts. *See Massachusetts v. EPA*, 549 U.S. 497, 504-05 (2007).

37.     Indeed, it is impossible to attribute the alleged impacts of climate change in specific geographic regions to particular sources or categories of greenhouse gas emissions with any accuracy or fairness (especially when those emissions are confined to a specific, decades-long timeframe). Although some academics attempt to make those connections, they rely upon flawed methodologies that cannot withstand scrutiny. *See generally* Marc Marie of Ctr. for Env't Accountability, Response to Request for Information Development of a Climate Superfund Cost Recovery Program at 55-62, Climate Litig. Watch (2024), https://perma.cc/D2EV-RRTQ (aggregating criticisms of attribution methodology).

38.     As a further illustration of the impossibility of these flawed methodologies, Associate Professor Justin Mankin of Dartmouth College's Geography Department claimed before the Vermont legislature that "scientists can quantify the economic losses a region like Vermont has endured from the impacts of global warming to date." Written Testimony from Dr. Justin Mankin

Before the Vt. Senate Judiciary Comm. on S. 259, at 1 (Feb. 22, 2024), https://perma.cc/N3ND-2LPQ (emphasis omitted). But even if such quantification is possible, it would fail to resolve the critical issue of connecting particular sources during particular times to those losses. *Cf.* David Barker, *Global Non-linear Effect of Temperature on Economic Production: Comment on Burke, Hsiang, and Miguel*, 21 Econ. J. Watch 35-36 (Mar. 2024), https://perma.cc/UFZ7-DXJK (noting that Mankin's methods relied largely on a previous scientific article that has been criticized for "cherrypick[ing]" and using "data with characteristics that are known to create spurious regression results without making proper adjustments or even acknowledging these characteristics."). Even if Vermont could accurately estimate the price of climate mitigation measures it has taken in the past or plans in the future, that does not mean that Vermont can, with any accuracy, assess what greenhouse gas emissions have had an impact on the State, where those emissions originated from, or how much those specific emissions have affected the State, or how much of the impact to the State is attributable to climate change.

39.     This is especially true where Vermont's Act imposes liability for impacts purportedly caused by greenhouse gas emissions over a 30-year period dating back to 1995 but not before. Attempting to isolate greenhouse gas emissions during that timeframe and differentiating between impacts purportedly caused by greenhouse gas emissions before 1995 versus after exacerbates the accuracy problems discussed above, especially when considering that prior to 1995, the technology available and regulatory landscape for greenhouse gas emissions were very different than they were after 1995 (and than they are today).

40.     For these reasons, among others, a State like Vermont cannot, with any accuracy or fairness, attribute impacts on specific geographic areas during a defined 30-year period purportedly caused by climate change to atmospheric greenhouse gases emitted by a particular source.

41. **Vermont Targets Out-of-State Energy Producers for Greenhouse Gas Emissions Liability.** Although Vermont and its residents *consume* large quantities of fossil fuels and are deeply dependent on petroleum products, Vermont is not home to any traditional energy producers or refiners. "Vermont has no crude oil reserves or production, nor does it have any petroleum refineries," it "has no natural gas reserves or production," and it "does not have any coal mines or coal reserves." Vermont State Profile, https://perma.cc/4T95-DW4B. Thus, Vermont must import oil and gas products, and it does so from outside the United States. Specifically, Vermont depends on oil and gas from Canada, *id.*, and, in fact, the closest refinery to Vermont is located across the border in Montreal, Canada, *compare* U.S. Energy Atlas: Petroleum Refineries, U.S. Energy Info. Admin. (Jan. 1, 2024), https://perma.cc/GG9F-XCN8, *with* Canadian Refineries, Oil Sands Mag. (2024), https://perma.cc/Z3J7-ZKG5.

42. Rather, Vermont favors renewable energy producers. For example, "Vermont enacted a renewable energy standard (RES) in 2015," which "requires that the state's retail electricity suppliers obtain 63% of their annual electricity sales from eligible renewable sources by 2025, increasing by at least 4% every three years until reaching 100% by 2030, including a 5.8% carve-out for new, in-state, renewable generation at customer-sited facilities with capacities of 5 megawatts or less." Vermont State Profile, https://perma.cc/4T95-DW4B.

43. This makes Vermont quite different from other States that depend largely on production from traditional energy sources like petroleum or natural gas for jobs and economic growth. Texas, for example, "leads the nation in energy production, providing about one-fourth of the country's domestically produced primary energy." Texas State Profile and Energy Estimates, U.S. Energy Info. Admin. (July 18, 2024), https://perma.cc/THR6-9PL5. "Texas produces more crude oil than any other state and accounted for more than two-fifths (43%) of the nation's

production from both onshore and offshore areas in 2023." *Id.* Texas also "has one-fourth of the nation's operable crude oil refineries and about one-third of the total U.S. refining capacity." *Id.* Moreover, "[o]ne-fourth of U.S. proved natural gas reserves and about 30 of the nation's 100 largest natural gas fields are located, in whole or in part, in Texas." *Id.*

44.     To take another example, Louisiana "ranks among the top 10 states in both crude oil reserves and crude oil production and accounts for about 1% of both U.S. total oil reserves and production," and the State's "15 oil refineries account for about one-sixth of the nation's refining capacity and can process almost 3 million barrels of crude oil per calendar day." Louisiana State Profile and Energy Estimates, U.S. Energy Info. Admin. (Aug. 15, 2024), https://perma.cc/K6R2-5PNS. Louisiana also "has the third-highest marketed natural gas production and the seventh-highest natural gas reserves among the states." *Id.*

45.     Despite Vermont having little to no economic connection to traditional energy producers (except insofar as Vermont and its residents consume and use fossil-fuel products), it has decided to target them for significant and costly regulation. Greenhouse gas emissions are a global phenomenon, emitted from many different sources beyond the energy production industry, all of which are used by and benefit the people of Vermont. Thus, although greenhouse gas emissions are impossible to link from a particular source to a particular environmental impact, Vermont has nonetheless laid unique blame for their release (and their effect on climate change) on a select group of out-of-state energy producers.

46.     More than three years ago, Vermont sued multiple out-of-state energy producers in Vermont's own state courts, claiming that the energy producers misled consumers about their products and their impact on climate change. *See* Complaint, *Vermont v. Exxon Mobil Corp.*, No. 21-

CV-02778 (Vt. Super. Ct. Sept. 14, 2021). Among other things, Vermont seeks disgorgement of funds, substantial financial penalties, and other costs. *Id.*

47.     Vermont has now decided to take an additional approach, on top of and effectively duplicating the monetary and injunctive relief they are already seeking in state law claims—namely, targeting select out-of-state energy producers through legislation that imposes costly penalties for operating their lawful businesses.

### VERMONT S.259

48.     The Vermont Legislature has enacted S.259 (Act 122), which it entitled "the Climate Superfund Act."[4] The Governor allowed the bill to become law without his signature on May 30, 2024. The Act took effect on July 1, 2024. S.259 § 7.

49.     The Act "established the Climate Superfund Cost Recovery Program . . . to secure compensatory payments from responsible parties based on a standard of strict liability," and those payments are then paid into a fund to support the Vermont Agency of Natural Resources' ("Agency") "climate change adaptation projects." § 597(1).

---

[4] In enacting S.259, the Vermont Legislature purportedly took some language from the federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA," also known as "Superfund"), 42 U.S.C. §§ 9601 *et seq.* But the Vermont Act is entirely different from CERCLA. CERCLA requires all parties (from a wide variety of industries) who owned or operated a hazardous waste site or transported or disposed of particular hazardous substances to clean up (or pay for) the particular contamination at the particular site affected by their conduct. Moreover, costs recoverable under CERCLA must have been spent consistent with a "National Contingency Plan," which provides administrative processes to determine the safest way to clean up a site. *See* 42 U.S.C. § 9607(a). The Vermont Act is neither site-specific nor tied to specific entities associated with the contamination at a polluted site. Rather, the Act includes a glaring mismatch: it imposes strict liability on a handful of energy producers for impacts to the entire State of Vermont purportedly caused by global greenhouse gas emissions and uses the penalties imposed on those energy producers to fund future climate change adaptation projects. Thus, while CERCLA requires remediation of polluted sites, the Vermont Act punishes a specific handful of energy producers for global emissions and uses the fines levied against those producers to fund a variety of the State's desired projects.

18

50.     **The Act Targets Only the Largest Energy Producers That Satisfy a Jurisdictional "Nexus" with Vermont.** The Act applies to "[r]esponsible parties," which it defines as "any entity or a successor in interest to an entity that during any part of the covered period was engaged in the trade or business of extracting fossil fuel or refining crude oil and is determined by the Agency attributable to for more than one billion metric tons of covered greenhouse gas emissions during the covered period." § 596(22). No entity headquartered in Vermont could be a "responsible party" according to this definition; in other words, the law was crafted to apply *only* to entities based outside Vermont. Also notably, the Act's definition fails to account for the vast majority of emitters of human generated greenhouse gases—global end users.

51.     The Act's coverage definition "does not include any person who lacks sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution." *Id.*

52.     The Act's "[c]overed period" means "the period that began on January 1, 1995 and ended on December 31, 2024." § 596(8).

53.     "Covered greenhouse gas emissions" means "the total quantity of greenhouse gases released into the atmosphere during the covered period, expressed in metric tons of carbon dioxide equivalent, resulting from the use of fossil fuels extracted or refined by an entity." § 596(7). As noted above, the Act does not differentiate between greenhouse gases emitted during extraction and refining of fossil fuels and greenhouse gas emitted by the end users of fossil fuels.

54.     The Act does not list specific covered energy producers, but Vermont's own actions and statements, the Act's legislative history, and responses to the State's requests for information concerning implementation of the Act make clear that Vermont will issue cost recovery demands to one or more of the Chamber's and API's members.

55.     *First*, as noted above, Vermont is currently pursuing climate-related claims against multiple energy producers in litigation. *See supra* ¶¶ 16, 46. In that suit, Vermont asserts that Vermont courts have jurisdiction over ExxonMobil and Shell entities, among others. *See* Complaint ¶ 28, *Vermont v. Exxon Mobil Corp.*, No. 21-CV-02778 (Vt. Super. Ct. Sept. 14, 2021); *see also* Attorney General Donovan Files Consumer Protection Suit Against Fossil Fuel Companies, Off. of the Vt. Att'y Gen. (Sept. 14, 2021), https://perma.cc/MUQ4-49WT ("The lawsuit names as defendants Exxon Mobil Corporation [and] Shell Oil Company.").

56.     *Second*, in allowing the Act to take effect, Vermont Governor Phil Scott acknowledged that the Act is designed to target "Big Oil." Action Taken by Governor Phil Scott on Legislation - May 30, 2024, Off. of Governor Phil Scott (May 30, 2024), https://perma.cc/M4BY-YR23. Moreover, in testifying before House Committee on the Judiciary, Amy Gendron, the Deputy Secretary of the Agency of Natural Resources, in discussing how to implement the Act, said, "This is not a question of if we should pursue Big Oil but rather when and how." Vt. House Comm. on the Judiciary, House Judiciary - 2024-04-11 - 10:10AM, at 43:00 (Apr. 11, 2024), https://perma.cc/87Y3-K5HT.

57.     *Third*, the legislative history of the Act shows that Vermont intends the law to apply to one or more out-of-state energy producers. For example, Richard Heede submitted data to the Legislature purporting to show that the following producers would be sufficiently large to qualify under the Act, assuming that Vermont can exercise jurisdiction over them: ExxonMobil, Shell, BP, and Chevron. *See* Richard Heede, Attributing Emissions to Major Carbon Producers & Holding FF Companies Accountable for Remediation, Vt. Gen. Assembly, Judiciary Comm., Energy & Env't Comm. (Apr. 11, 2024), https://perma.cc/5RFF-AWJP; *see also* Vt. Senate Comm. on Judiciary, Senate Judiciary - 2024-02-22 - 10:30AM, at 14:44 (Feb. 2, 2024), https://perma.cc/SJ9G-

NK6K (similar). That is, according to Mr. Heede's data, "more than one billion metric tons of covered greenhouse gas emissions during the covered period" can purportedly be attributed to these companies. § 596(22).[5]

58.     As to jurisdiction, Michael O'Grady, Legislative Counsel, Office of Legislative Counsel, testified to the Senate Committee for the Judiciary that Vermont could assert jurisdiction

---

[5] The theory behind Vermont's Act—attributing the impacts of global emissions to specific energy producers—is based on Mr. Heede's previous work. Although Mr. Heede's underlying data and methods are flawed and Plaintiffs reserve the right to challenge them, it is clear that Vermont relies upon Mr. Heede's proposed data and methods to identify responsible parties and their purported share of global greenhouse gas emissions. *See, e.g.*, Manuela Andreoni, How to Make Polluters Pay, The New York Times (Apr. 2, 2024), https://perma.cc/SK6P-FVJR ("If the climate superfund bill becomes law in Vermont, the state plans to work with scientists to figure out just how much of the damage was caused by climate change. Then, they will calculate what each oil and gas company contributed to it. For that, they will very likely use a database called 'Carbon Majors.' Richard Heede, the climate researcher who created it, told me he has collected thousands of corporate reports from 122 companies across the world detailing how much fossil fuels they have produced in the last decades."); Adam Aton, Vermont Wants to Make Big Oil Pay. And It's Bringing Receipts., E&E News by POLITICO (May 24, 2024), https://perma.cc/MCS7-P2TA ("'We're in the realm of having full documentation of what each company has contributed,' said Richard Heede, the co-founder of the Climate Accountability Institute and principal investigator for the group's Carbon Majors Project, a dataset of historical emissions that's expected to be a key element of Vermont's effort. 'I'd love to be able to sit down at the table with the leading fossil fuel companies — that Vermont will send a bill to, in due time — and work out any difference of opinion about how much each should contribute, within the realm of relative certainty.'"); Dana Drudmand, Vermont, Other States Push for "Climate Superfund" Bill to Hold Polluting Companies Accountable, Sierra (Feb. 3, 2024), https://perma.cc/7QFB-JBZY?type=standard ("In identifying who those polluters are, the climate Superfund concept draws upon the groundbreaking 'Carbon Majors' research pioneered by Richard Heede."); Jessica Weinkle, Vermont's Fossil Fuel Shakedown, The Breakthrough Institute (Oct. 4, 2024), https://perma.cc/G8SP-J8FM ("Vermont's legislative diagnosis of liability for climate change mirrors the work of Richard Heede, founder of the Climate Accountability Institute. Heede's testimony to the Vermont Judicial Committee included a slide with a list of 10 companies who emitted 1 billion metric tonnes of GHG emissions between 1995 and 2023. The Act indicates that Vermont legislators plan to go head to head with these 10 companies."); Emily Pontecorvo, A Climate Superfund Law Might Be Crazy Enough to Work, Heatmap (Mar. 29, 2024), https://perma.cc/NRK3-VXP8 ("The bill's sponsors also looked to research from Richard Heede."); Alex Brown, Lawmakers Hope to Use This Emerging Climate Science to Charge Oil Companies for Disasters, Washington State Standard (Apr. 18, 2024), https://perma.cc/G3S8-TNJ4 ("If legislature[] in Vermont . . . pass[es] [the] climate Superfund bill[], the state officials who carry [it] out are expected to rely heavily on researcher Richard Heede's 'Carbon Majors' project.").

under the Act over companies such as "Shell" and "Exxon." Vt. Senate Comm. on Judiciary, Senate

Judiciary - 2024-02-08 - 9:00AM, at 17:20 (Feb. 8, 2024), https://perma.cc/RLT9-U3SS. Likewise,

Anthony Iarrapino, Senior Attorney, Conservation Law Foundation, testified to the House Com-

mittee for the Judiciary that "some of the very largest of those that are likely to be responsible

parties under this bill based on their amount of emissions" like "Exxon Mobil, Shell Oil," "the

AG's office has already asserted jurisdiction over these companies" in its climate lawsuit. Vt.

House Comm. on the Judiciary, House Judiciary - 2024-04-24 - 10:05AM, at 1:12:20 (Apr. 4,

2024), https://perma.cc/9VU3-RXVF; *see also* Testimony of Anthony Iarrapino, Esq. to the Ver-

mont House Comm. on Env't & Energy & the House Comm. on Judiciary in Connection with

Their Review of S.259 (Apr. 11, 2024), https://perma.cc/6Z3M-ZBFA.

59.    Responses to Vermont's request for information related to implementing the Act,

*see* Development of a Climate Superfund Cost Recovery Program, Vt. Agency of Nat. Res. (July

23, 2024), https://perma.cc/DYM8-PJJM, confirm that the Act is designed to target at least some

specific energy producers. Richard Heede's response includes a specific list of producers he claims

are "highly likely 'responsible parties,'" including "ExxonMobil," "Shell," "BP," and "Chevron,"

among others. Richard Heede, In Response to Request for Information on: Development of a Cli-

mate Superfund Cost Recovery Program, at 12 (Oct. 1, 2024), https://perma.cc/D2EV-RRTQ.[6]

Notably, Mr. Heede's response and the Act fail to address emissions from end users and other

sources that make up the vast majority of global greenhouse gas emissions.

---

[6] Notably, Defendant Jane Lazorchak, Director of the Vermont Climate Action Office, reached out directly to Mr. Heede to specifically request a response from him to the State's request for information, further demonstrating Vermont's reliance on Mr. Heede. *See* Email from Jane Lazorchak to Richard Heede, at 44 (Aug. 7, 2024, 7:31 AM), https://perma.cc/D2EV-RRTQ.

60.     In sum, without waiving any members' right to challenge that they are responsible parties covered by the Act, the State of Vermont, its leaders, and others supporting the Act have made clear that the Act targets, among other entities, the following energy producers: Exxon Mobil Corporation, Shell USA, Inc., Chevron Corporation, and BP America, Inc. *See supra* ¶ 16 & note 3.

61.     **The Act Imposes a Penalty on Out-of-State Energy Producers.** The Act imposes severe, retroactive, and arbitrary penalties on out-of-state energy producers through what the Act refers to as "cost recovery demands."

62.     Under the Act, the Agency issues "notices of cost recovery demands"[7] to "responsible part[ies]," holding those responsible parties "strictly liable" for their purported share of greenhouse gas emissions and demanding payment to the State as punishment for that purported liability. § 598(a)(1), (f).[8]

63.     The Act's directive to the Agency to issue cost recovery demands is mandatory; the Agency has no discretion as to whether to issue payment demands under the Act. *See* § 598(f)

---

[7] The Act defines "[n]otice of cost recovery demand" as "the written communication from the Agency informing a responsible party of the amount of the cost recovery demand payable to the Fund." § 596(18).

[8] The Act provides that "entities in a controlled group" are "treated . . . as a single entity" and "are jointly and severally liable for payment of any cost recovery demand owed by any entity in the controlled group." § 598(a)(2). By including this definition of "controlled group" within the definition of responsible parties, the Act attempts to hold energy producers liable for global emissions purportedly attributable to not only those producers, but also their affiliated entities—irrespective of whether the State has jurisdiction over any such affiliated entities within the group. Moreover, it provides that if a "responsible party owns a minority interest of 10 percent or more in another entity, the responsible party's applicable share of covered greenhouse gas emissions shall be increased by the applicable share of covered greenhouse gas emissions for the entity in which the responsible party holds a minority interest multiplied by the percentage of the minority interest held by the responsible party." § 598(c).

("The Agency *shall* issue the cost recovery demands required under this section . . . ." (emphasis added)).

64.    The Act provides a method to calculate each responsible party's cost recovery demand.

65.    First, the State Treasurer calculates a total "cost to the state of Vermont and its residents" from "the emission of covered greenhouse gases during the covered period." § 598(b); *see also* § 599c. Then, each responsible party's "cost recovery demand shall be equal to an amount that bears the same ratio to the cost to the State of Vermont and its residents . . . as the responsible party's applicable share of covered greenhouse gas emissions bears to the aggregate applicable shares of covered greenhouse gas emissions resulting from the use of fossil fuels extracted or refined during the covered period." § 598(b).

66.    In other words, the Act's calculation of responsible parties' cost recovery demands is *not* limited to greenhouse gas emissions in Vermont. Rather, it makes energy producers strictly liable for *global* greenhouse gas emissions, and the penalties are calculated with respect to those global emissions, not emissions originating inside Vermont.

67.    The Act states that the Agency "shall use the U.S. Environmental Protection Agency's Emissions Factors for Greenhouse Gas Inventories" to "determin[e] the amount of covered greenhouse gas emissions attributable to any entity." § 598(d).

68.    Responsible parties must either pay the cost recovery demand in full within six months of receiving notice, § 598(g)(1), or they may elect to pay it in nine annual installments with any "reasonable interest" charged by the Agency, § 598(g)(2). Either way, covered energy producers will be forced to begin paying hundreds of millions or billions of dollars within a matter

of months after receiving notice, which necessitates equitable relief well in advance of that dead-line.

69.     **The Act Uses Penalties Paid by Out-of-State Energy Producers to Subsidize Vermont's Climate Projects.** The Act provides that "[t]he Agency shall deposit cost recovery payments collected under this chapter to the Climate Superfund Cost Recovery Program Fund." § 598(h).

70.     The "Climate Superfund Cost Recovery Program" created by the Act is "adminis-tered by the Secretary" to "provide funding for climate change adaptation projects in the State." § 599(a).

71.     Thus, under the Act, the penalties paid by responsible parties are placed into the fund, and the Agency may use that fund to pay for its "climate change adaptation projects" con-sistent with its "Resilience Implementation Strategy," which includes "criteria and procedures for prioritizing climate change adaptation projects eligible to receive monies from the Climate Super-fund Cost Recovery Program." § 599a(b)(3)(E).

## CLAIMS

### COUNT I
### FEDERAL PRECLUSION UNDER U.S. CONSTITUTION
### 42 U.S.C. § 1983 AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION

72.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

73.     The Supremacy Clause in Article VI of the Constitution of the United States de-clares, "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const. art. VI.

74.     Under the U.S. Constitution, and Supreme Court and Second Circuit precedent, federal law must govern a State's attempt to impose liability for global greenhouse gas emissions

that cross state lines and national borders because such interstate and international issues present uniquely federal interests and implicate competing interests and equal sovereignty of other States.

75.    Applying those constitutional principles and controlling precedent here, Vermont's Act is precluded by federal law and the federal Constitution.

76.    **Federal Law Governs Liability For Harms Arising From Interstate Greenhouse Gas Emissions.** Courts have historically held that state law is not competent to govern interstate disputes that present "uniquely federal interests." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981); *AEP*, 564 U.S. at 421 (acknowledging that federal law "addresses subjects within national legislative power where Congress has so directed or where the basic scheme of the Constitution so demands" (internal quotation marks omitted)); *Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*, 742 F.3d 37, 41 (2d Cir. 2014) (stating that federal law governs where "the relevant federal interest warrants displacement of state law" (internal quotation marks omitted)). That is why courts have applied federal law as the rule of decision in cases ranging from interstate water disputes, *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110 (1938); *City of Evansville v. Ky. Liquid Recycling, Inc.*, 604 F.2d 1008, 1018 (7th Cir. 1979), to interstate air carrier liability, *Treiber & Straub, Inc. v. UPS, Inc.*, 474 F.3d 379, 384 (7th Cir. 2007). "In these instances," the structure of the U.S. Constitution and "our federal system does not permit the controversy to be resolved under state law." *Tex. Indus.*, 451 U.S. at 641.

77.    Therefore, federal law controls state-imposed liability for harms arising from interstate greenhouse gas emissions because such liability implicates "uniquely federal interests." *Rodriguez v. FDIC*, 589 U.S. 132, 136 (2020). As the Second Circuit has already acknowledged, "For over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution." *City of New York*, 993 F.3d at 91; *Milwaukee I*, 406 U.S. at 103

("When we deal with air and water in their ambient or interstate aspects," federal law controls); *Ouellette*, 479 U.S. at 492 ("[T]he control of interstate pollution is primarily a matter of federal law."); *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012) (federal law governs "the general subject of environmental law and specifically includes ambient or interstate air and water pollution."). Such "controvers[ies]" involving interstate greenhouse gas emissions cannot "be resolved under state law." *Tex. Indus.*, 451 U.S. at 641.

78.     Federal law applies to such disputes because they "often implicate two federal interests that are incompatible with the application of state law: (i) the 'overriding . . . need for a uniform rule of decision' on matters influencing national energy and environmental policy, and (ii) 'basic interests of federalism.'" *City of New York*, 993 F.3d at 91-92 (citation omitted) (alteration in original). In other words, federal law must apply to such disputes to avoid the conflicts that would occur if each of the 50 States were permitted to impose their disparate laws on the same interstate (and international) greenhouse gas emissions in their own preferred way. Such a global issue as greenhouse gas emissions, which "implicat[es] the conflicting rights of [s]tates [and] our relations with foreign nations," is "simply beyond the limits of state law." *Id.* (alteration in original) (quoting *Tex. Indus.*, 451 U.S. at 641).[9]

79.     **Constitutional Protections of State Sovereignty Limit States' Ability to Impose Their Laws on Out-of-State Greenhouse Gas Emissions.** Federal law also controls liability for

---

[9] As explained in detail by the Second Circuit in *City of New York*, it is the unique federal interest in governing interstate greenhouse gas emissions under the U.S. Constitution that provided the justification for recognition of federal common law over this area. 993 F.3d at 91-92. Just as those constitutional structural principles provided justification for recognition of federal common law causes of action in areas such as interstate and international pollution where state law is not competent to govern, those same principles continue to dictate that state law is not competent to govern such areas once Congress has chosen to displace federal common law by replacing it with a federal statute. *See id.* at 91-95.

harms arising from interstate greenhouse gas emissions under constitutional principles of state sovereignty. The inherent structure of the Constitution of the United States recognizes the equal sovereignty afforded to all States. *See Shelby County*, 570 U.S. at 544 ("Not only do States retain sovereignty under the Constitution, there is also a 'fundamental principle of *equal* sovereignty' among the States." (emphasis in original) (citation omitted)). This principle of equal sovereignty for each State in the Union is "obvious[]" and the "necessary result of the Constitution" and its establishment of the United States' federal system. *N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914). "The sovereignty of each State, in turn, implie[s] a limitation on the sovereignty of all of its sister States—a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980).

80.    The principle of equal sovereignty limits the ability of a State to "impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *Gore*, 517 U.S. at 571.

81.    Although States have the sovereign authority to legislate within their own borders, there are constitutional limits on their ability to reach beyond their borders and tread on the sovereignty of other States. *See Bonaparte*, 104 U.S. at 594 ("No State can legislate except with reference to its own jurisdiction. . . . Each state is independent of all others in this particular."); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 154 (2023) (Alito, J., concurring in part and concurring in the judgment) (The Supreme Court has "long recognized that the Constitution restricts a State's power to reach out and regulate conduct that has little if any connection with the State's legitimate interests.").

82.    Indeed, the Supreme Court has recently counseled that a State may not "directly regulate[] out-of-state transactions by those with no connection to the State." *Nat'l Pork Producers Council*, 598 U.S. at 376 n.1 (emphasis omitted); *see also Gore*, 517 U.S. at 571.

83.    This limitation on States' abilities to extend their laws beyond their borders is an "'obviou[s]' and 'necessary result' of our constitutional order," even if it is "not confined to any one clause or section" of the Constitution. *Mallory*, 600 U.S. at 154 (Alito, J., concurring in part and concurring in the judgment) (quoting *N.Y. Life Ins. Co.*, 234 U.S. at 161)); *see id.* at 154 n.2 (collecting cases). Rather, principles of extraterritoriality are "expressed in the very nature of the federal system that the Constitution created and in numerous provisions that bear on States' inter-actions with one another." *Id.* at 154.

84.    These principles are expressed in "not only the Commerce Clause, but also poten-tially several other constitutional provisions, including the Import-Export Clause, the Privileges and Immunities Clause, . . . the Full Faith and Credit Clause," and the Due Process Clause. *Nat'l Pork Producers Council*, 598 U.S. at 408 (Kavanaugh, J., concurring in part and dissenting in part); *N.Y. Life Ins. Co.*, 234 U.S. at 161 ("The principle however lies at the foundation of the full faith and credit clause and the many rulings which have given effect to that clause.").

85.    **The Due Process Clause of the Fourteenth Amendment Limits the Extraterri-torial Reach of State Laws.** States violate the Due Process Clause when they impose liability on out-of-state actors for conduct beyond their borders. An important aspect of due process of law is that a sovereign cannot legislate "except with reference to its own jurisdiction," *Bonaparte*, 104 U.S. at 594, which is "co-extensive with its territory," *Bevans*, 16 U.S. (3 Wheat.) at 387; *see Gore*, 517 U.S. at 571; *see also Watson v. Emps. Liab. Assur. Corp.*, 348 U.S. 66, 70 (1954)

(acknowledging "the due process principle that a state is without power to exercise 'extra territorial jurisdiction,' that is, to regulate and control activities wholly beyond its boundaries").

86.    The Due Process Clause is a principal source of protection against extraterritorial extensions of state law. U.S. Const. amend. XIV. The Supreme Court has recently suggested that constitutional principles, including "the Constitution's structure" and "the Due Process Clause," constrain state authority to legislate and enforce law extraterritorially. *Nat'l Pork Producers Council*, 598 U.S. at 376; *see also Mallory*, 600 U.S. at 156 (Alito, J., concurring) (explaining that the Supreme Court's decisions on due process and personal jurisdiction "reflect" a broader principle of "'territorial limitations' on state power"). Other courts too have explained that the Due Process Clause "limits a State's power to extend its law outside its borders"—and in fact is the "most powerful" of the "[t]erritorial limits on lawmaking." *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 380 (6th Cir. 2013) (Sutton, J., concurring). Indeed, the Supreme Court has made clear that States cannot wield tort law to "punish a defendant for conduct that may have been lawful where it occurred." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003); *see Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981) (plurality); *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 818, 821-22 (1985); *see also McCluney v. Jos. Schlitz Brewing Co.*, 649 F.2d 578, 581 (8th Cir. 1981); *Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 435-36 (4th Cir. 1999).

87.    **The Foreign Affairs Doctrine Limits States' Abilities to Interfere with the Federal Government's Foreign Affairs.** State law is also incompetent to govern liability based on international greenhouse gas emissions, which implicate the federal government's exclusive power over foreign affairs. The foreign affairs doctrine provides that under the U.S. Constitution, "[o]ur system of government . . . imperatively requires that federal power in the field affecting foreign

relations be left entirely free from local interference." *Zschernig*, 389 U.S. at 432. Under the doctrine, states may not intrude "into the field of foreign affairs which the Constitution entrusts to the President and the Congress," and therefore, state laws are precluded to the extent they have "more than 'some incidental or indirect effect in foreign countries.'" *Id.* at 432, 434.

88.    Thus, under this doctrine, "[t]he exercise of the federal executive authority means that state law must give way where . . . there is evidence of clear conflict between the policies adopted by the two." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003); *see also In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 117-18 (2d Cir. 2010). Likewise, "when a state law (1) has no serious claim to be addressing a traditional state responsibility and (2) intrudes on the federal government's foreign affairs power, the Supremacy Clause prevents the state statute from taking effect." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1074 (9th Cir. 2012) (en banc) (citing *Garamendi*, 539 U.S. at 426).

89.    **Federal Constitutional Law Precludes Vermont's Act.** For all of these reasons, the U.S. Constitution structurally precludes the Act's imposition of penalties on energy producers for their purported shares of global greenhouse gas emissions. The U.S. Constitution does not permit a single State like Vermont to dictate energy policy for the remainder of the Union through that State's imposition of liability for harms allegedly arising from global greenhouse gas emissions. Controlling Supreme Court and Second Circuit precedent, which recognizes the necessity of the application of federal law to the uniquely federal interests of interstate and international pollution in order to protect the equal sovereignty of States, and due process limits on States' ability to legislate beyond their borders in the U.S. federal system require that the Act be invalidated under federal law.

90.     To start, the "interstate or international nature of" global greenhouse gas emissions "makes it inappropriate for" Vermont's Act "to control" that issue. *Tex. Indus.*, 451 U.S. at 640-41 & n.13 (citation omitted). The Second Circuit's holding in *City of New York* makes this clear.

91.     Regardless of whether the Act's penalties are referred to as "cost recovery demands," fines, or fees, the purpose of the Act is straightforward: it is a state effort to impose liability for "global greenhouse gas emissions," *City of New York*, 993 F.3d at 91, by declaring energy producers "strictly liable," § 598(a)(1), for those emissions. In other words, "[i]t is precisely because fossil fuels emit greenhouse gases," which "collectively" impact climate change, that Vermont is seeking penalties against energy producers. *City of New York*, 993 F.3d at 91.

92.     Just as a "nuisance suit seeking to recover damages for the harms caused by global greenhouse gas emissions may [not] proceed under [state] law," a State may not attempt to recover such damages for alleged harms arising from global greenhouse gas emissions through statutory penalties. *City of New York*, 993 F.3d at 91. Vermont's Act "does not seek to hold the Producers liable for the effects of emissions released in [Vermont], or even in [Vermont's] neighboring states." *Id.* at 92. Rather, Vermont "intends to hold the Producers liable, under [Vermont] law, for the effects of emissions made around the globe over the past" three decades. *Id.* "In other words," the Act seeks to impose statutory penalties "for the cumulative impact of conduct occurring simultaneously across just about every jurisdiction on the planet." *Id.*

93.     The expansive international reach of Vermont's Act is especially problematic. For example, under the Act, oil could be extracted in Asia, refined in Europe, and combusted as gasoline in South America—without ever coming close to the United States. Yet Vermont will attempt to penalize both the extractor and the refiner for any and all of the emissions purportedly associated with that oil upon its conclusion that the extractor and refiner are "responsible parties" under the

Act. Even more troubling, Vermont will attempt to penalize those energy producers for any and all global emissions by any source—regardless of those emissions' connection to Vermont. The Act's "nexus" requirement, § 596(22), may make that difficult, but foreign companies may not want to take the risk of being associated at all with the United States at the potential cost of Vermont attempting to force them to pay massive penalties for operating their businesses.

94.     Allowing a single State like Vermont to enact a law that interferes with the federal government's response to a global policy challenge like greenhouse gas emissions "sow[s] confusion and needlessly complicate[s] the nation's foreign policy, while clearly infringing on the prerogatives of the political branches." *City of New York*, 993 F.3d at 103. Here, the Act intrudes upon the federal government's foreign affairs power by "bypass[ing] the various diplomatic channels that the United States uses to address this issue, such as the U.N. Framework and the Paris Agreement." *Id.* For example, the Paris Agreement is an international agreement that resulted from collaboration between the United States and other countries around the world and one that the United States joined with the support of many energy producers. *See, e.g.*, Lamar Johnson, ExxonMobil Urges Trump Not to Withdraw from Paris Agreement Again, ESG Dive (Nov. 13, 2024), https://perma.cc/864J-2DJY; Samantha Raphelson, Energy Companies Urge Trump to Remain in Paris Climate Agreement, NPR (May 18, 2017), https://perma.cc/BKB9-2T6Q. Although different Presidents have held different views about whether to remain a party to the Paris Agreement, those presidential decisions highlight the foreign-affairs issues implicated in the federal government's approach to addressing global climate change.

95.     Indeed, as the Second Circuit has noted, "the United States' longstanding position in international climate-change negotiations is to oppose the establishment of liability and compensation schemes at the international level." *City of New York*, 993 F.3d at 103 n.11 ("[The United

States] obviously [does] have [a] problem with the idea, and [doesn't] accept the idea, of compensation and liability and never accepted that and we're not about to accept it now." (quoting Todd Stern, Special Envoy for Climate Change, Special Briefing (Oct. 28, 2015), https://perma.cc/W9YX-ARPR)); *see also* Oliver Slow, US Refuses Climate Reparations for Developing Nations, BBC (July 13, 2023), https://perma.cc/WF3U-HQ9J; Nathan Layne, Trump Says He Would Renege on $3 Billion US Pledge for Green Climate Fund, Reuters (Dec. 14, 2023), https://perma.cc/33SW-5ZVQ (suggesting incoming administration will continue this policy and has already signaled that it may pull other climate-related funding). Yet, Vermont's Act attempts to do exactly that—establish a punitive liability and compensation scheme based on the (speculatively calculated) impact to Vermont from global greenhouse gas emissions, contrary to the policy goals of the federal government as reflected in international climate negotiations. Therefore, the Act presents a "clear conflict" with an "express federal policy," which is "alone enough to require state law to yield" to federal law. *Garamendi*, 539 U.S. at 425. In holding that New York City could not impose its law on international greenhouse gas emissions through a nuisance action, the Second Circuit explained that "condoning an extraterritorial nuisance action here would not only risk jeopardizing our nation's foreign policy goals but would also seem to circumvent Congress's own expectations and carefully balanced scheme of international cooperation on a topic of global concern" under the Clean Air Act. *City of New York*, 993 F.3d at 103. The same concerns apply here—allowing Vermont to attempt to impose liability based on foreign emissions could upset foreign policy goals, interfere with international climate change discussions, and upset trade with foreign countries. "Because it therefore 'implicat[es] the conflicting rights of [s]tates [and] our relations with foreign nations,'" the Act and its penalties for global greenhouse gas emissions

"pose[] the quintessential example of when" federal law "is most needed." *Id.* at 92 (quoting *Tex. Indus.*, 451 U.S. at 641).

96.    A single State like Vermont cannot dictate greenhouse gas emissions liability rules for the entire United States or other countries across the world. But that is the purpose and effect of the Act—to attempt to "regulate," via significant penalties, energy producers' "behavior far beyond [Vermont's] borders." *Id*. Although the Act imposes a retroactive penalty for past emissions, much like the tort liability for past actions at issue in *City of New York,* there is no limiting principle to what Vermont has done. If the Act is permitted to stand, then Vermont (or other States) could hold current and future energy producers strictly liable and penalize them for hundreds of millions or billions of dollars going forward. And if energy producers attempt to "mitigate" such future liability, whatever actions they would take "must undoubtedly take effect across every state (and country)." *Id.* Indeed, because the Act's penalties are tied to responsible parties' "shares" of global greenhouse gas emissions, § 598(b), a covered energy producer could only avoid or limit liability for future conduct from similar legislative penalties by ceasing operations globally. In this way, Vermont is single-handedly dictating nationwide and global emissions policy, contrary to the principles and structure of the United States Constitution and federal system.

97.    Therefore, Vermont's "sprawling" scheme that targets greenhouse gas emissions emitted in all 50 States and in countries around the globe "is simply beyond the limits of state law." *Id.*

98.    It does not matter that the Act imposes a penalty as opposed to "a standard of care or emission restrictions." *Id.* That is because its "cost recovery demand" scheme is "even more ambitious: to effectively impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released." *Id.* at 93. Thus, even if the Act tries to

"regulate cross-border emissions in an indirect and roundabout manner, it . . . regulate[s] them nonetheless." *Id.*

99.    At bottom, Vermont's imposition of penalties against energy producers will "upset[] the careful balance that has been struck between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other." *Id.*; *see also AEP*, 564 U.S. at 427.

100.    The Act also invades the equal sovereignty of other States and thus transgresses the structural constitutional and due process limits on States' abilities to extend their laws beyond their borders by unconstitutionally imposing liability and penalties on energy companies outside of Vermont for global greenhouse gas emissions produced by lawful activities outside of Vermont's borders.

101.    The greenhouse gas emissions for which Vermont seeks to penalize energy producers have no direct connection to Vermont, and indeed have no more connection to Vermont than to any other State in the United States or to any other country in the entire world. Thus, Vermont is attempting to "directly regulate[] transactions which take place . . . wholly outside the State." *Edgar v. MITE Corp.*, 457 U.S. 624, 641 (1982) (plurality op.). In doing so, Vermont is imposing liability on wholly *extraterritorial* activity and impermissibly "project[ing]" its "regulatory regime into the jurisdiction" of other States. *Healy v. Beer Inst. Inc.*, 491 U.S. 324, 337 (1989); *see Gore*, 517 U.S. at 571-72 ("[A] State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States.").

102.    Other States and their citizens are directly affected by Vermont's Act. By penalizing energy producers with massive fines, Vermont is essentially dictating greenhouse gas emission

liability rules and energy policy for the other 49 States. Its Act will likely negatively affect energy production and could increase energy costs that could be borne by citizens of all States, not just Vermont. Although Vermont would reap the benefits of millions of dollars to fund its preferred climate change adaptation projects, citizens of other States would receive no benefits, only costs.

103.    Moreover, Vermont's Act attempts to impose liability upon refining and extracting operations that have no presence within its borders but are a critical industry for other States. As explained above, no traditional energy producers are headquartered in Vermont or otherwise conduct extraction or refining activities in the State. *See supra* ¶ 41. Because a "responsible party" must be in the business of extracting or refining fossil fuels, the Act applies *only* to companies engaged in extracting and refining *in other States*. *See* Oil and Gas, Vt. Agency of Nat. Resources Dep't of Env'l Conservation (2024), https://perma.cc/NS27-LWTV; Vermont State Profile, , https://perma.cc/4T95-DW4B. For example, States like Louisiana and Texas are home to large energy producers who not only provide energy for their citizens but also support those States' economies with jobs, revenue, and other benefits. *See supra* ¶¶ 43-44. Those benefits enjoyed by other sovereigns like Louisiana and Texas will be negatively affected by Vermont's Act, despite the fact that Vermont lacks any such relationship with the energy production industry.

104.    Indeed, the Solicitor General of the United States recently acknowledged the limits on States' abilities to regulate greenhouse gas emissions outside their borders. In the United States' amicus brief in *Sunoco LP v. City & County of Honolulu*, the Solicitor General noted that the energy-producer defendants in that case had raised arguments that the plaintiffs' tort claims involving greenhouse gas emissions "are barred by the Interstate and Foreign Commerce Clauses, the Due Process Clause, and federal primacy in foreign affairs," and acknowledged that "[t]hose constitutional arguments may ultimately be held to foreclose [plaintiffs'] state-law claims to the

extent they are based *on emissions or other conduct outside Hawaii.*" Brief for the United States as Amicus Curiae at 7, *Sunoco LP v. City & County of Honolulu*, Nos. 23-947 (U.S. Dec. 10, 2024) (emphasis added); *see id.* at 12 (recognizing that defendants "may ultimately prevail on their contention that respondents' claims are barred by the Constitution . . . to the extent the claims rely on conduct occurring outside Hawaii."); *id.* at 13-14 (noting that "courts could conclude that the Constitution bars the state-law claims to the extent they rely on conduct occurring outside Hawaii"). In short, Vermont "has attempted, in essence, to unilaterally impose its moral and policy preferences for" energy production "on the rest of the Nation," demanding money from energy producers to fund its own preferred climate projects while the rest of the Nation foots the bill. *Nat'l Pork Producers Council*, 598 U.S. at 407 (Kavanaugh, J., concurring in part and dissenting in part). "[Vermont's] approach undermines federalism and the authority of individual States by forcing individuals and businesses in one State" to bear costs and changes to energy products due to the "law[] of a *different* State." *Id.*

\*     \*     \*

105.     The Act unconstitutionally extends state law into an area that is governed exclusively by federal law and invades the equal sovereignty of the other States in the Union through its unconstitutionally extraterritorial reach. Therefore, under the structure of the U.S. Constitution and controlling precedent, the Act is precluded by federal law, and it may not be enforced against the Chamber's and API's covered members.

106.     If the Act is not declared invalid and enjoined, the Act's significant penalties will cause irreparable harm to the Chamber's and API's covered members.

## COUNT II
## FEDERAL PREEMPTION UNDER THE CLEAN AIR ACT
## 42 U.S.C. § 1983 AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION

107.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

108.    "[T]he Supremacy Clause 'invalidates state laws that interfere with, or are contrary to, federal law.'" *Clean Air Mkts. Grp.*, 338 F.3d at 86-87.

109.    The federal Clean Air Act preempts Vermont's Act because the Vermont Act's imposition of penalties for global greenhouse gas emissions falls outside the "slim reservoir" of remaining state authority to independently regulate greenhouse gas emissions outside the parameters of the Clean Air Act.

110.    In *Massachusetts v. EPA*, the Supreme Court held that greenhouse gas emissions are "pollutants" covered by the Clean Air Act and thus subject to regulation by the EPA. 549 U.S. at 528-29. Therefore, under the Clean Air Act, EPA decides on "[t]he appropriate amount of regulation in any particular greenhouse gas-producing sector" through an "informed assessment of competing interests." *AEP*, 564 U.S. at 427. "Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance." *Id.* In the first instance, "[t]he Clean Air Act entrusts such complex balancing to EPA." *Id.*

111.    Pursuant to its authority under the Clean Air Act, for example, EPA has promulgated New Source Performance Standards that address greenhouse gas emissions from oil and gas operations, among other sources. *See* 40 C.F.R. §§ 60.5360a-60.5439a. Moreover, EPA imposes mandatory greenhouse gas reporting requirements on various entities. *See* 40 C.F.R. §§ 98.1, *et seq.* And EPA imposes procedures for new or substantially modified facilities to use the best available control technology for greenhouse gas emissions. *See* 40 C.F.R § 51.166(j).

112.    As explained above, by virtue of the overarching constitutional principle that state law is not competent to govern out-of-state or international emissions, federal law—initially federal common law—has always governed interstate disputes involving emissions of air pollutants.

*See supra* ¶¶ 76-78. But the Supreme Court has held that the Clean Air Act displaces any claim grounded in federal common law involving interstate greenhouse gas emissions. *AEP*, 564 U.S. at 425-26. In other words, the Clean Air Act is now the federal standard governing any claims involving interstate greenhouse gas emissions. Thus, because the Clean Air Act "provides a means to seek limits on emissions" there is no other "room for a parallel track" of regulation. *Id.* at 425. Now that the Clean Air Act governs regulations of greenhouse gas emissions in the United States, States like Vermont may regulate emissions only as permitted by the Clean Air Act. This is because "'resort[ing] to state law' on a question previously governed by federal common law is permissible only to the extent 'authorize[d]' by federal statute." *City of New York*, 993 F.3d at 96 (alterations in original) (quoting *Milwaukee III*, 731 F.2d at 411).

113.    Here, "the Clean Air Act does not authorize the state-law" penalties Vermont's Act "seeks to" impose on energy producers. *Id.*

114.    The Clean Air Act "anoints the EPA as the 'primary regulator of [domestic] greenhouse gas emissions.'" *Id.* (alteration in original) (quoting *AEP*, 564 U.S. at 428). Although the Clean Air Act includes savings clauses that allow "states to create and enforce their own emissions standards applicable to in-state polluters," *id.* at 99 (citing 42 U.S.C. §§ 7416, 7604(e)), that "authorization is narrowly circumscribed," *id.* at 100.

115.    In *International Paper Co. v. Ouellette*, the Supreme Court held that the Clean Water Act "pre-empts state law to the extent that the state law is applied to an out-of-state point source." 479 U.S. at 509. The Court explained that "the only state suits that remain available are those specifically preserved by the Act," and that "[a]n interpretation of the saving[s] clause that preserved actions brought under an affected State's law would disrupt th[e] balance of interests" under the Clean Water Act. *Id.* at 492, 495. Specifically, an interpretation of the statute that would

permit one state to apply its laws to regulate out-of-state emissions of pollutants would "upset[] the balance of public and private interests so carefully addressed by the Act." *Id.* at 494. "The application of affected-state laws would be incompatible with the Act's delegation of authority and its comprehensive regulation of water pollution." *Id.* at 500. The same statutory features are present in the Clean Air Act, and the same preemption analysis governs.

116.    Under the Clean Air Act, only a "slim reservoir" of state authority remains to independently regulate emissions outside the Clean Air Act's regulatory scheme. *Id.*[10] Specifically, consistent with *Ouellette*, the Clean Air Act "has been interpreted to permit only state lawsuits brought under 'the law of the [pollution's] *source* [s]tate.'" *City of New York*, 993 F.3d at 100 (alterations in original) (quoting *Ouellette*, 479 U.S. at 497); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 197 (3d Cir. 2013) ("[T]he Clean Air Act does not preempt state common law claims based on the law of the state where the source of the pollution is located."); *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 693 (6th Cir. 2015) (noting that "claims based on the common law of the source State" are "not preempted by the Clean Air Act," whereas "claims based on the common law of a non-source State . . . are preempted by the Clean Air Act").

117.    State laws that seek to impose monetary consequences—whether through common law tort damages or statutory monetary penalties—on "emissions emanating simultaneously from all 50 states and the nations of the world" do not fit within the "slim reservoir" of state authority under the Clean Air Act. *City of New York*, 993 F.3d at 100. To permit such state action "would

---

[10] Although States play a critical role in implementing the Clean Air Act's regulation of air pollution, *see generally* EPA, Government Partnerships to Reduce Air Pollution (Aug. 6, 2024), https://perma.cc/Z93U-G2BZ (providing examples of how local, state, federal, and tribal governments are working together to reduce pollution), they have no authority to regulate emissions beyond their borders outside of that national regulatory scheme, *see City of New York*, 993 F.3d at 100.

undermine this carefully drawn statute through a general savings clause" and would "serious[ly] interfere[ ] with the achievement of the full purposes and objectives of Congress." *Id.* (alterations in original) (quoting *Ouellette*, 479 U.S. at 493-94).

118.    Here, the Clean Air Act preempts Vermont's Act because it imposes liability on energy producers for greenhouse gas emissions emitted *outside* of Vermont. It imposes cost recovery demands for *global* greenhouse gas emissions. § 596(7) (defining "[c]overed greenhouse gas emissions" as "the total quantity of greenhouse gases released into the atmosphere during the covered period"). It does not purport to impose liability only for emissions released in Vermont.

119.    Indeed, the theory behind Vermont's Act is that once greenhouse gas emissions have been released into the atmosphere, those emissions collectively contribute to changes in the Earth's climate, and those changes to climate result in the purported harms to the State of Vermont. The Act does not seek to impose liability for only those emissions released in Vermont: any such emissions would be miniscule compared to emissions around the rest of the globe. Yet, Vermont seeks to impose liability for all such greenhouse gas emissions. The Clean Air Act preempts its attempt to do so.

120.    Permitting States like Vermont to penalize energy producers for out-of-state emissions would "undermine [the] regulatory structure" provided by the Clean Air Act and would "lead to chaotic confrontation between sovereign states." *Ouellette*, 479 U.S. at 496-97.

121.    Because the Clean Air Act preempts Vermont's Act, it may not be enforced against the Chamber's and API's covered members.

122.    If Vermont's Act is not declared invalid and enjoined, the Act's significant penalties will cause irreparable harm to the Chamber's and API's covered members.

## COUNT III
### VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMEND-MENT TO THE U.S. CONSTITUTION
### 42 U.S.C. § 1983 AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION

123.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

124.    The Act's imposition of significant retroactive penalties based on an arbitrary and irrational method of attributing to specific energy producers the purported costs of climate change to Vermont from three decades of global greenhouse gas emissions (emitted primarily by other people and entities) violates the Due Process Clause of the Fourteenth Amendment. U.S. Const. amend. XIV.

125.    "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974); *see also E. Enters.*, 524 U.S. at 537 (plurality opinion) (holding that to succeed on due-process claim, moving party must "establish that its liability under the Act is 'arbitrary and irrational'" (quoting *Usery*, 428 U.S. at 15)). Moreover, due process protects individuals from overly "harsh and oppressive" "economic legislation." *Pension Benefit Guar. Corp.*, 467 U.S. at 733; *see also Canisius Coll.*, 799 F.2d at 25 (The "'harsh and oppressive' test does not differ from the test of constitutionality applicable to economic legislation generally, namely, that such legislation is constitutional unless Congress has acted in an arbitrary and irrational way.").

126.    That protection includes prohibiting governments from "retroactive[ly]" imposing financial penalties that are arbitrary and irrational or "so harsh and oppressive as to transgress the constitutional limitation" of due process. *McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco, Dep't of Bus. Regul. of Fla.*, 496 U.S. 18, 41 & n.43 (1990) (citation omitted); *E. Enters.*, 524 U.S. at 547 (Kennedy, J., concurring in the judgment and dissenting in part) ("[D]ue process requires an inquiry into whether in enacting the retroactive law the legislature acted in an arbitrary

and irrational way."). The Supreme Court has recognized that "retroactive lawmaking is a particular concern for the courts because of the legislative 'tempt[ation] to use retroactive legislation as a means of retribution against unpopular groups or individuals.'" *E. Enters.*, 524 U.S. at 547 (Kennedy, J., concurring in the judgment and dissenting in part) (alteration in original) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994)); *Opati v. Republic of Sudan*, 590 U.S. 418, 425 (2020) ("The principle that legislation usually applies only prospectively . . . protects vital due process interests, ensuring that 'individuals . . . have an opportunity to know what the law is' before they act, and may rest assured after they act that their lawful conduct cannot be second-guessed later." (citation omitted)). Therefore, "[t]he retrospective aspects of [economic] legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." *E. Enters.*, 524 U.S. at 547-48 (Kennedy, J., concurring in the judgment and dissenting in part) (alteration in original) (citation omitted).

127.    Here, the Act transgresses due process in several ways.

128.    *First*, it imposes a harsh and oppressive retroactive penalty on energy producers for global greenhouse gas emissions emitted over the past *30 years*.[11] Nothing about that period of liability is "modest," "short," or "limited." *See, e.g.*, *id.* at 528. On the contrary, it imposes liability on energy companies for actions taken as long as *three decades ago*. *See id.* at 549-50 (Kennedy, J., concurring in the judgment and dissenting in part) (concluding that a law that "create[ed]

---

[11] Although CERCLA also imposes retroactive, strict liability, it is different from Vermont's Act. CERCLA permits retroactive liability related to the costs of cleaning up specific pollutants at sites that meet specific criteria. That liability may be imposed only upon potentially responsible parties who have specific connections to—such as one who "disposed" of hazardous waste at—a specific site at issue. The Vermont Act, on the other hand, penalizes only a handful of energy producers for three decades of greenhouse gas emissions resulting from the collective conduct of billions of people, and uses the proceeds from the penalties imposed to fund unknown future climate-related projects. *See supra* note 4.

liability for events which occurred 35 years ago" violated due process); *James Square Assocs. LP v. Mullen*, 993 N.E.2d 374, 383 (N.Y. 2013) (holding that state law with a 16-month retroactivity period was unconstitutional because the sole state purpose offered—"raising money for the state budget"—was "insufficient to warrant [such] retroactivity"). Vermont's law punishes energy companies for lawful actions taken long ago, with no opportunity to know what the law is before they acted and subjecting them to Vermont's second-guessing of their actions many years after the fact. *See Opati*, 590 U.S. at 418. Such a significant and far-reaching retroactive law is dissimilar to the types of laws the Court has previously upheld.

129.    *Second*, the Act imposes an arbitrary and irrational punishment on energy producers. To start, the Act's punishment is arbitrary because the coverage period defining producers' liability provides no basis for selecting the date range of January 1, 1995, to December 31, 2024, as opposed to a shorter time period. The Act's coverage period is particularly arbitrary given that carbon dioxide emissions, for example, remain in the atmosphere for centuries. MIT Climate Portal Writing Team, How Do We Know How Long Carbon Dioxide Remains in the Atmosphere?, MIT Climate Portal (Jan. 17, 2023), https://perma.cc/D3NV-AMSM. Moreover, carbon dioxide molecules, "once they enter the air, follow different paths and can last for radically different amounts of time." *Id.* Thus, Vermont has no sound basis for choosing thirty years as its coverage period, and even within that coverage period, Vermont cannot fairly and accurately attribute specific impacts in Vermont to specific greenhouse gas emissions (out of all global greenhouse gas emissions).

130.    The Act's coverage period also fails to reflect changes in research regarding climate change and industry changes in response to scientific developments, such as ways to burn fuel more efficiently and cleanly.

131.     Furthermore, the Act uses an irrational and arbitrary method to calculate energy producers' punishment for global greenhouse gases. The Act provides that responsible parties will be liable for cost recovery demands based on an amount "that bears the same ratio to the cost to the State of Vermont . . . from the emission of covered greenhouse gases during the covered period as the responsible party's applicable share of covered greenhouse gas emissions bears to the aggregate applicable shares of covered greenhouse gas emissions resulting from the use of fossil fuels extracted or refined during the covered period." § 598(b). But calculating the purported impact of global greenhouse gas emissions on Vermont and attributing global greenhouse gas emissions that caused that impact to each responsible party is impossible. "Greenhouse gases once emitted 'become well mixed in the atmosphere,'" *AEP*, 564 U.S. at 422 (citation omitted)), and after that point, "[g]reenhouse gas molecules cannot be traced to their source," *City of New York*, 993 F.3d at 92 (internal record citation omitted). Thus, as the Supreme Court has recognized, "emissions in New Jersey may contribute no more to flooding in New York than emissions in China." *AEP*, 564 U.S. at 422.

132.     Indeed, Vermont's attempt to pin blame on specific energy producers for the purported impacts to the State from climate change caused by global greenhouse gas emissions is vastly different from attributing pollution in a river to an upstream facility or leaching from a particular waste site. The theory behind Vermont's Act is that global greenhouse gas emissions collectively have caused changes to the climate, such as warming the atmosphere, and those changes have harmed Vermont. But there is no fair and accurate way to attribute to specific energy producers the purported impacts to Vermont caused by climate change due to 30 years of global greenhouse gas emissions in the atmosphere resulting from the collective conduct of billions of people all around the world. Likewise, Vermont also cannot accurately and fairly determine what

purported impacts and costs to the State were caused by greenhouse gas emissions during the 30-year coverage period versus those caused before that period or by environmental factors unrelated to greenhouse gas emissions, such as acid rain.

133.    For these reasons, the Act cannot with any accuracy or fairness calculate the purported impact to Vermont from global greenhouse gas emissions, nor can it accurately or fairly attribute such impact from global greenhouse gas emissions to specific energy producers.

134.    The Act will also impose a punishment that unfairly and arbitrarily overestimates energy producers' purported impacts on climate change. Through its definition of "responsible parties" and its calculation method, §§ 596(22), 598(b), the Act targets a small handful of large energy producers and singles them out as the sole contributors to climate change by attributing all the purported impacts in Vermont to greenhouse gas emissions solely to fossil fuels (and solely to that small handful of energy producers). But it ignores greenhouse gas emissions from many other sources across the globe, including fossil fuel activities conducted by the United States and foreign governments, national owned fossil fuel companies, wood-fuel burning,[12] forest fires and deforestation, methane from farm animals, agriculture, other land-use activities, transportation, and many others.

135.    For example, the World Economic Forum has stated that almost a quarter of "global greenhouse gas emissions in 2007-2016 came from agriculture and land-use change,

_____

[12] Indeed, "[m]ore than one in eight Vermont households use wood for their primary heating source, more than 10 times the national average and the largest share of any state." Vermont State Profile, https://perma.cc/4T95-DW4B. And according to one scholar, "some smokestack emission tests show burning wood results in carbon emissions 2.5 times higher than natural gas and 30 percent higher than coal." Jim Finley, Burning Wood? Caring for the Earth?, PennState Coll. of Agric. Scis. (Feb. 15, 2021), https://perma.cc/EBC5-9YZ9. Yet the Act omits any liability for Vermont's own contribution to greenhouse gas emissions in the atmosphere.

approximately half of which is due to deforestation." To Tackle Deforestation We Need to Focus on Land Use. Here's Why., World Econ. Forum (Sept. 13, 2022), https://tinyurl.com/2s3dm6kp.

136.    Yet, those responsible for such agricultural and land-use activities are not covered by Vermont's Act. Worse, covered energy producers will bear the punishment for the greenhouse gas emissions emitted by those non-fossil fuel sources. Although the Act defines "[c]overed greenhouse gas emissions" to mean the total emissions in the atmosphere "resulting from the use of fossil fuels extracted or refined by an entity," § 596(7) Vermont cannot determine which greenhouse gas molecules were emitted by fuels extracted by energy producers or establish that those molecules (as opposed to emissions from other non-fossil fuel sources) caused specific climate change impacts on the State of Vermont.

137.    The Act also targets mainly energy producers operating in the United States even though many other companies and consumers across the globe have contributed to global greenhouse gas emissions. For one, energy producers from countries around the world extract and refine fossil fuels and then consumers across the globe use those fuels in a wide variety of ways in everyday life. *See* Report: China Emissions Exceed All Developed Nations Combined, BBC (May 7, 2021), https://perma.cc/CV5J-XUF6.

138.    Moreover, in the context of fossil fuels, it is the end users, not energy producers, who emit the majority of greenhouse gas emissions. *See supra* ¶ 31. Companies from a host of different industries beyond energy production emit greenhouse gases when they independently combine fossil fuels with their machines, equipment, and operations. Likewise, consumers emit greenhouse gases from the transportation and utilities they choose to use. Thus, there is no way to accurately or fairly pin liability on a handful of domestic energy producers for the purported impact of greenhouse gas emissions released when fuel is extracted or refined versus those released by

other companies and individuals across the globe, especially when it is other entities who emit the vast majority of greenhouse gases.

139.    The Act also arbitrarily and unlawfully imposes joint and several liability on entities in a "controlled group," requiring that such entities "be treated by the Agency as a single entity for the purposes of identifying responsible parties" and making them "jointly and severally liable for payment of any cost recovery demand owed by any entity in the controlled group." § 598(a)(2). Lumping separate corporate entities together and making them jointly and severally liable for payment of the Act's severe penalties is arbitrary because it does not distinguish between worldwide emissions purportedly attributable to one entity over another, and in failing to do so, it disregards corporate separateness principles and protections—not to mention the jurisdictional limitations of the State.

140.    *Third*, the Act's imposition of a penalty on energy producers is unconstitutionally vague as it provides seemingly unfettered discretion to Vermont agencies to determine how much energy producers' penalties should be. Due Process "requires the invalidation of laws that are impermissibly vague," meaning that they "fail[] to provide a person of ordinary intelligence fair notice of what is prohibited, or [are] so standardless that [they] authorize[] or encourage[] seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted). Thus, the Due Process Clause ensures "that regulated parties should know what is required of them so they may act accordingly" and requires "precision and guidance . . . so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* Moreover, when civil penalties are "prohibitory" and have a "stigmatizing effect," courts apply a "strict" vagueness test. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

141.    Here, the Act is subject to a "strict" vagueness test because "the prohibitory and stigmatizing effects of the [law] are clear," *id.* at 499 n.16—it punishes energy producers for their products and labels them as the culprits for climate change. Under that test, the Act is unconstitutionally vague because it fails to give adequate notice to energy producers of what they will have to pay under the Act. The Act leaves that decision to Vermont agencies, who must determine the purported cost to the State from greenhouse gas emissions and each energy producers' purported share of global emissions. §§ 598(b), 599c. Thus, Vermont agencies have seemingly "unfettered discretion" to subject energy producers to penalties in the hundreds of millions or billions of dollars. *Hayes v. N.Y. Att'y Grievance Comm. of the Eight Jud. Dist.*, 672 F.3d 158, 169 (2d Cir. 2012) (citation omitted). That discretion "encourages seriously discriminatory enforcement." *Fox Television Stations, Inc.*, 567 U.S. at 253.

142.    *Fourth*, the Act imposes significant penalties on energy producers without sufficient procedural safeguards, which will lead to arbitrary and excessive penalties in violation of the Due Process Clause. "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm*, 538 U.S. at 416; *see also Gore*, 517 U.S. at 562 (similar). Just as the Due Process Clause places both "procedural and substantive constitutional limitations" on the amount of punitive damages that can be awarded against a defendant, *State Farm*, 538 U.S. at 416, it places the same limits on the amount for which a State may penalize individuals or businesses for other forms of liability. In *State Farm*, for example, the Supreme Court was concerned about the lack of "protections" to defendants in civil cases from the "imprecise manner" in which punitive damages were calculated and the "wide discretion" juries had in calculating them. 538 U.S. at 417 (citation omitted). To address that lack of

protections, the Court imposed specific "guideposts" to ensure that punitive damage awards did not run afoul of due process protections.

143.    Vermont's Act contains no such guideposts. Rather, energy producers have no notice of "the severity of the penalty that a State may impose," *Gore*, 517 U.S. at 574, as nothing in the Act limits or constrains how far Vermont may go. The lack of procedural safeguards ensuring that the Act's penalties comply with due process are made worse by the fact that the Act imposes liability for global emissions that cannot be accurately attributed to energy producers or purported impacts to Vermont and that the Act covers a period of 30 years. Just as punitive damages "[i]mposed indiscriminately" and without proper procedural "protections" "pose an acute danger of arbitrary deprivation of property," *State Farm*, 538 U.S. at 417, the Act's imposition of undefined penalties based on global emissions, calculated in Vermont agencies' discretion, poses an acute risk of substantial harm to energy producers and the individuals and businesses who rely on them.

144.    Because the Act violates the Constitution's due process protections, it cannot be enforced against the Chamber's and API's covered members.

145.    If the Act is not declared invalid and enjoined, the Act's significant penalties will cause irreparable harm to the Chamber's and API's covered members.

**COUNT IV**
**VIOLATION OF THE COMMERCE CLAUSE OF THE U.S. CONSTITUTION**
**42 U.S.C. § 1983 AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION**

146.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

147.    The Constitution vests Congress with the power to "regulate Commerce with foreign Nations, and among the several States." U.S. Const., Art. I, § 8, cl. 3.

148.    Within the Constitution's Commerce Clause, the Supreme Court has recognized a "dormant Commerce Clause," under which "state laws offend the Commerce Clause when they seek to 'build up . . . domestic commerce' through 'burdens upon the industry and business of other States,' regardless of whether Congress has spoken." *Nat'l Pork Producers Council*, 598 U.S. at 369 (alteration in original) (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1880)). Thus, "[g]enerally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 337.

149.    A State violates the dormant Commerce Clause when it "discriminat[es] against interstate commerce." *Nw. Airlines, Inc. v. Cnty. of Kent*, 510 U.S. 355, 373 n. 18 (1994); *Nat'l Pork Producers Council*, 598 U.S. at 369 ("[The] antidiscrimination principle lies at the 'very core' of our dormant Commerce Clause jurisprudence." (citation omitted)).

150.    The foreign Commerce Clause also restricts states from enacting laws that burden or discriminate against foreign commerce. U.S. Const. art. I, § 8, cl. 3. This doctrine safeguards the federal government's exclusive authority to regulate international trade and ensures that the United States presents a unified and coherent voice in its dealings with foreign nations. *See Japan Line, Ltd.*, 441 U.S. at 448 ("Foreign commerce is pre-eminently a matter of national concern."); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 66 (1st Cir. 1999) ("[T]he Foreign Commerce Clause . . . restrains the states from excessive interference in foreign affairs."), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000). Such a unified approach is essential to maintain diplomatic consistency and avoid fragmented or conflicting state-level policies that could undermine national interests. *See id.* For these reasons, the Supreme Court considers "the

scope of the foreign commerce power" of the federal government to be "greater" than the interstate commerce power. *Japan Line, Ltd.*, 441 U.S. at 448.

151.     The Vermont Act violates the dormant Commerce Clause because it discriminates against the important economic interests of other States by specifically targeting energy producers headquartered in other States with excessive penalties. *See Nat'l Pork Producers Council*, 598 U.S. at 364 ("[N]o State may use its laws to discriminate purposefully against out-of-state economic interests."). *First*, Vermont discriminates against the economic interests of every other State by unilaterally impacting energy production and cost throughout the country. By penalizing energy producers located outside of Vermont with massive fines, Vermont will encumber domestic energy production with significant costs that could harm the entire nation, but only Vermont will reap financial benefits from this statutory scheme (through payment for its future climate projects). *Second*, by discriminating against out-of-state energy producers, Vermont harms other States that depend largely on energy production like Louisiana and Texas, penalizing those means of energy production but not others that Vermont may prefer like wind or solar or other renewable energy sources. Indeed, there are no energy producers that conduct extracting or refining of fossil fuels in Vermont, and no company targeted by Vermont's law is based in Vermont. *See supra* ¶ 41. In either case, Vermont exceeds the bounds of its authority and trespasses upon "the principles of 'sovereignty and comity'" with other States. *Nat'l Pork Producers Council*, 598 U.S. at 376.

152.     Vermont's law also violates the foreign Commerce Clause because it interferes with and discriminates against a vital area of foreign commerce—energy production and trade. The United States imports "about 8.51 million barrels per day (b/d) of petroleum from 86 countries" and exports "about 10.15 million b/d of petroleum to 173 countries and 3 U.S. territories." How Much Petroleum Does the United States Import and Export?, U.S. Energy Info. Admin. (Mar. 29,

2024), https://perma.cc/ANE8-L7SD. Likewise, "the United States is . . . one of the top exporters of liquefied natural gas (LNG) in the world." Natural Gas Explained, U.S. Energy Info. Admin. (June 30, 2023), https://perma.cc/U9E7-3RRS.

153.    Vermont's law interferes with international trade in such resources by imposing penalties on domestic energy producers who export energy products internationally and on foreign energy producers who import energy products into the United States for those companies' share of global greenhouse gas emissions. In doing so, it discriminates against the economic interests of the United States' key trade partners, potentially increasing costs for them and their citizens while Vermont reaps the financial benefits from this statutory scheme (through payment for its future climate projects). It also discriminates against foreign energy producers and domestic energy producers that operate overseas by penalizing them for global greenhouse gas emissions, thereby harming those companies and countries that rely on their international business. *See Nat'l Foreign Trade Council*, 181 F.3d at 68 ("When the Constitution speaks of foreign commerce, it is not referring only to attempts to regulate the conduct of foreign companies; it is *also* referring to attempts to restrict the actions of American companies overseas."). Indeed, the Act penalizes foreign entities, including foreign affiliates of domestic entities, that are in a "controlled group" as defined by the Act, irrespective of whether Vermont has jurisdiction over any such affiliated entities within the group.

154.    Thus, the Act risks disrupting international trade in the energy industry by potentially increasing costs for both domestic and international consumers and interferes with the federal government's exclusive authority over international trade by potentially negatively affecting energy policy with foreign trade partners, preventing the federal government from speaking with one voice in this area of international commerce. Indeed, the U.S. Solicitor General recently

acknowledged the limits on States' abilities to regulate greenhouse gas emissions outside their

borders under the Commerce Clause. Brief for the United States as Amicus Curiae at 6-7, *Sunoco*

*LP v. City & County of Honolulu*, Nos. 23-947 (U.S. Dec. 10, 2024) (emphasis added); *see supra*

¶ 104.

155.     Because the Act violates the Constitution's dormant Commerce Clause and foreign

Commerce Clause, it cannot be enforced against the Chamber's and API's covered members.

156.     If the Act is not declared invalid and enjoined, the Act's significant penalties will

cause irreparable harm to the Chamber's and API's covered members.

**COUNT V**
**VIOLATION OF THE EXCESSIVE FINES CLAUSE OF THE EIGHTH AMENDMENT**
**TO THE U.S. CONSTITUTION**
**42 U.S.C. § 1983 AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION**

157.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

158.     The Act imposes an excessive fine in violation of the Eighth Amendment to the

U.S. Constitution. U.S. Const. amend. VIII.

159.     The Eighth Amendment provides, "[e]xcessive bail shall not be required, nor ex-

cessive fines imposed, nor cruel and unusual punishments inflicted." *Id.*

160.     This protection "traces its venerable lineage back to at least 1215," to the Magna

Carta. *Timbs v. Indiana*, 586 U.S. 146, 151 (2019). The "Magna Carta required that economic

sanctions 'be proportioned to the wrong' and 'not be so large as to deprive [an offender] of his

livelihood.'" *Id.* (alteration in original) (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Dis-*

*posal, Inc.*, 492 U.S. 257, 271 (1989)).

161.     Following from this ancient tradition, the Eighth Amendment prohibits the govern-

ment from imposing excessive fines as a form of punishment. *See Austin*, 509 U.S. at 609-10; *see*

*also United States v. Bajakajian*, 524 U.S. 321, 327-28 (1998). This prohibition applies in criminal

proceedings and civil proceedings that "advance punitive as well as remedial goals." *Austin*, 509 U.S. at 610, 621-22.

162.    "The Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, as *punishment* for some offense." *Id.* at 609-10 (cleaned up). Punishment "cuts across the division between the civil and the criminal law." *Id.* at 610 (cleaned up).

163.    The Act imposes a penalty that constitutes an excessive fine in violation of the Eighth Amendment. That penalty punishes energy producers for greenhouse gas emissions related to the use of all fossil fuels and the purported impacts on climate change. The Act's punishment targets only a select number of largely domestic energy producers, pinning the blame for climate change impacts on those select producers who were lawfully operating while ignoring the myriad end users across the world who emit the majority of greenhouse gas emissions (and many of whom fail to mitigate their own emissions). This selective targeting of a handful of energy producers, while ignoring a host of other producers, businesses, and consumers, demonstrates a mismatch between the Act's provisions and its purported goal of mitigating the impacts of climate change, suggesting that the true purpose of the Act is to punish those energy producers disfavored by Vermont.

164.    The punishment is also in the form of legislatively determined "strict[] liability," § 598(a)(1)—punishing energy producers for simply operating their lawful businesses. That is, it does not hold energy producers liable for violating some standard of care in their operations; it punishes them for producing energy.

165.    Likewise, the severe nature of the penalty imposed by the Act on energy producers—hundreds of millions or billions of dollars—suggests that the Act is punitive in nature.

166.    The fine imposed by the Act is unconstitutionally excessive. A fine is unconstitutionally excessive if it is grossly disproportional to the gravity of the offense. *Bajakajian*, 524 U.S. at 334.

167.    Courts evaluate four factors to determine whether a fine is constitutionally excessive: "(1) the essence of the [offense] of the [purported wrong-doer] and its relation to other [bad acts], (2) whether the [purported wrong-doer] fits into the class of persons for whom the statute was principally designed, (3) the maximum . . . fine that could have been imposed, and (4) the nature of the harm caused by the [purported wrong-doer's] conduct." *United States v. George*, 779 F.3d 113, 122 (2d Cir. 2015) (cleaned up). But these factors are not exhaustive. *See United States v. Viloski*, 814 F.3d 104, 110-11 (2d Cir. 2016).

168.    Here, the Act is retroactively punishing lawful business activities—the production of energy, whether to support domestic energy needs or energy around the globe. *See Bajakajian*, 524 U.S. at 337-38. To make it worse, that retroactive punishment stretches back three decades.

169.    The penalty is also based on global greenhouse gas emissions, and for the reasons explained above, *see supra* ¶¶ 34-40, 131-33, attributing specific impacts in Vermont to climate change and tracing those impacts back to specific greenhouse gas emissions from a particular source will be impossible. Thus, there is significant risk that the Act will impose penalties that overestimate and arbitrarily attribute greenhouse gas emissions to covered energy producers, and that overestimation of liability makes the penalty excessive. *See New York v. United Parcel Serv., Inc.*, 942 F.3d 554, 600 (2d Cir. 2019) (fine was excessive when it "double count[ed]" the party's liability). Even worse, the Act does not differentiate between the impacts of climate change purportedly caused by greenhouse gas emissions from fossil fuels versus emissions from other sources

or other causes of climate change; in failing to do so, it imposes all the purported costs of climate change onto a select group of energy producers.

170.    The maximum possible fine here is significant and seemingly unlimited. The Act puts no limit on the State Treasurer's calculation of the total cost to the State, §§ 598(b), 599c, and therefore no limit on the Agency's calculation of each "responsible party's" cost recovery demand, § 598(b). Vermont thus intends to fine energy producers for millions or billions of dollars under the Act's scheme.

171.    For these reasons, the Act violates the Eighth Amendment to the U.S. Constitution by creating a scheme for the imposition of fines that will be grossly disproportional to the gravity of any purported offense committed.

172.    Because the Act violates the Constitution's protections against excessive fines, it cannot be enforced against the Chamber's and API's covered members.

173.    If the Act is not declared invalid and enjoined, the Act's significant penalties will cause irreparable harm to the Chamber's and API's covered members.

**COUNT VI**
**VIOLATION OF THE TAKINGS CLAUSE OF THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION**
**42 U.S.C. § 1983 AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION**

174.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

175.    The Act constitutes an unconstitutional taking in violation of the Fifth Amendment to the U.S. Constitution. U.S. Const. amend. V.

176.    The federal Takings Clause provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Fourteenth Amendment incorporates the Takings Clause against the States. *Sheetz v. County of El Dorado*, 601 U.S. 267, 276 (2024).

177.    Plaintiffs may bring a claim for prospective injunctive relief against state officials in their official capacity for violations of the Takings Clause. *See, e.g.*, *Greater Chautauqua Fed. Credit Union v. Marks*, 600 F. Supp. 3d 405, 420-21 (S.D.N.Y. 2022) (citing *Hutto v. Finney*, 437 U.S. 678, 690 (1978)); *Ex parte Young*, 209 U.S. at 123.

178.    The Act imposes "cost recovery demands" that require energy producers to hand over funds—their property—to Vermont. § 598(b), (f). Vermont then uses those funds for its preferred "climate change adaptation projects" within the State without providing just compensation to energy producers. § 598(a).

179.    The Act effects a regulatory taking, requiring the imposition of penalties on covered energy producers that go "too far" in regulating those companies so as to amount to an unconstitutional taking. *Cedar Point Nursery*, 594 U.S. at 149 (2021). The magnitude of these penalties, coupled with their retroactive application, effectively confiscates a portion of covered energy producers' past and present assets. *See E. Enters.*, 524 U.S. at 528-29 (plurality opinion) (holding that legislation can be "unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience.").[13]

180.    In considering whether a regulatory taking has occurred, courts consider "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has

---

[13] The Second Circuit has held that "no 'common denominator' can be said to exist among the Court's opinions" in *Eastern Enterprises*, and therefore, "[t]he only binding aspect of such a splintered decision is its specific result, and so the authority of *Eastern Enterprises* is confined to its holding that the Coal Act is unconstitutional as applied to Eastern Enterprises." *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003). Nevertheless, the plurality's Takings Clause analysis in *Eastern Enterprises* is persuasive authority that should be applied to the Vermont Act here.

interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017).

181.    The Act has a substantial economic impact on covered energy producers. It imposes a substantial and disproportionate penalty—potentially in the hundreds of millions or billions of dollars—on a select group of covered energy producers, requiring them to pay for climate change adaptation projects. *E. Enters.*, 524 U.S. at 529 (plurality opinion) (holding that there was "no doubt that the Coal Act has forced a considerable financial burden upon" the plaintiff where it had to make retroactive payments "on the order of $50 to $100 million"). Those penalties will have a severe economic impact not only on energy producers, but also potentially on consumers and businesses throughout the United States.

182.    The Act also upsets the reasonable, investment-backed expectations of covered energy producers by imposing severe retroactive penalties on previously (and currently) lawful conduct. The Takings Clause "provides a . . . safeguard against retrospective legislation concerning property rights." *Id.* at 533-34. Here, the Act holds energy producers strictly liable for 30 years of lawful energy producing operations. *See id.* at 532 (plurality opinion) (holding that Coal Act "substantially interfere[d]" with party's reasonable investment-backed expectations where the "Act's beneficiary allocation scheme reaches back 30 to 50 years to impose liability"). Those retrospective penalties punish energy producers for actions taken decades before Vermont ever considered imposing such liability, all while energy producers were subject to and complying with the federal and state laws in force at the time. Such "retroactive liability is substantial and particularly far reaching," *id.* at 534, upsetting energy producers' reasonable investment-backed expectations. In short, the Act turns the investment-backed expectations of covered energy producers on their heads, wrongly punishing them for legally operating their businesses for 30 years.

183.    The Act essentially imposes strict tort liability via statute on covered energy pro-
ducers to pay for Vermont's desired climate change adaptation projects. In other words, it places a
targeted and specific group of covered energy producers on the hook for global greenhouse gas
emissions and the impacts of climate change stretching back 30 years, imposing penalties on those
companies while ignoring others that also contributed to such emissions. *See id.* at 537 (plurality
opinion) (holding that "the nature of the governmental action" was "quite unusual" where the gov-
ernment's "solution singles out certain employers to bear a burden that is substantial in amount,
based on the employers' conduct far in the past, and unrelated to any commitment that the employ-
ers made or to any injury they caused," and therefore, such "governmental action implicates fun-
damental principles of fairness underlying the Takings Clause"). In doing so, the Act runs afoul of
the Takings Clause, which "prevent[s] the government 'from forcing some people alone to bear
public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Id.* at
522 (citation omitted).

184.    For these reasons, the Act unconstitutionally effects a regulatory taking without
providing just compensation.

185.    Because the Act violates the Fifth Amendment's Takings Clause, it cannot be en-
forced against the Chamber's and API's covered members.

186.    If the Act is not declared invalid and enjoined, the Act's significant penalties will
cause irreparable harm to the Chamber's and API's covered members.

## COUNT VII
## EQUITABLE RELIEF

187.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

188.    The Act—both as a whole and its individual challenged provisions—violates fed-
eral law and deprives Plaintiffs' covered members of enforceable federal rights. Federal courts

have the power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

189.    This Court can and should exercise its equitable power to enter an injunction prohibiting Defendants from enforcing the Act and all the challenged provisions of the Act against Plaintiffs and their covered members.

190.    Injunctive relief is proper where a plaintiff demonstrates "actual success on the merits," *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2011), and establishes the standard factors for obtaining equitable relief—"(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *U.S.S.E.C. v. Citigroup Glob. Mkts., Inc.*, 752 F.3d 285, 296 (2d Cir. 2014) (citation omitted).

191.    *First*, on the merits, Plaintiffs will succeed in proving that the Act is barred under the U.S. Constitution and under federal statutes like the Clean Air Act and that the Act violates the constitutional rights of Plaintiffs' covered members.

192.    *Second*, Plaintiffs' covered members face irreparable injury absent an injunction and remedies available at law are inadequate to compensate for that injury. Here, energy producers will either be forced to pay hundreds of millions or even billions of dollars in penalties to Vermont under the Act or be forced to expend time and resources proving that they are not covered by the Act because they do not have a substantial nexus to the State.

193.    Although "[m]onetary loss alone will generally not amount to irreparable harm," where "the movant provides evidence of damage that cannot be rectified by financial compensation," there is irreparable harm. *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991)

(citation omitted). Further, where a plaintiff cannot recover damages due to sovereign immunity, irreparable harm may be presumed. *See United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (affirming the district court's finding that the plaintiffs "injury was irreparable even though [its] losses were only pecuniary because a suit in federal court against [the defendant,] New York[,] to recover the damages sustained by [the plaintiff] would be barred by the Eleventh Amendment"); *Regeneron Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 510 F. Supp. 3d 29, 39 (S.D.N.Y. 2020); *John E. Andrus Mem'l, Inc. v. Dainers*, 600 F. Supp. 2d 563, 572 n.6 (S.D.N.Y. 2009).

194.    Here, any monetary relief Plaintiffs seek would be barred by sovereign immunity. Without a preliminary injunction, Vermont can impose penalties through what the Act refers to as "cost recovery demands." Responsible parties who receive notices of cost recovery demands are then "strictly liable" for their purported share of greenhouse gas emissions, and Vermont may demand payment to the State as punishment for that purported liability. § 598(a)(1), (f).

195.    *Third*, the equities favor an injunction. When the government is the opposing party, the third and fourth factors, "harm to the opposing party and weighing the public interest," merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[T]he Government does not have an interest in the enforcement of an unconstitutional law." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (citation omitted); *see also Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d 2020) ("No public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal."). Enjoining Defendants from unlawfully regulating greenhouse gas emissions beyond Vermont's borders and burdening energy producers is in the public interest.

196.    For the foregoing reasons, the Court should exercise its equitable power to enter an injunction prohibiting Defendants from enforcing the Act and all the challenged provisions of the Act against Plaintiffs' covered members.

## COUNT VIII
### 42 U.S.C. § 1983 AND 28 U.S.C. § 2201
### DECLARATORY RELIEF

197.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

198.    Vermont's Act is precluded by the federal Constitution and preempted by the Clean Air Act and violates the Due Process Clause of the Fourteenth Amendment to the Constitution, as well as other constitutional provisions incorporated against the States under the Due Process Clause. Vermont's Act therefore deprives Plaintiffs and their covered members of enforceable federal rights.

199.    The precluded, preempted, unconstitutional, and unlawful portions of the Act are not severable from the rest of the Act. The entire Act is therefore unlawful and unenforceable against Plaintiffs' covered members.

200.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

201.    This Court can and should exercise its equitable power to enter a declaration that the entire Act is precluded, preempted, unconstitutional, and otherwise unlawful as applied to Plaintiffs' covered members.

## PRAYER FOR RELIEF

Plaintiffs request an order and judgment:

    a.   declaring that the Act, S.259, is unlawful;

    b.   declaring that the Act, S.259, is precluded by the United States Constitution;

c.  declaring that the Act, S.259, is preempted by the Clean Air Act;

d.  declaring that the Act, S.259, violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

e.  declaring that the Act, S.259, violates the Commerce Clause of the United States Constitution;

f.  declaring that the Act, S.259, violates the Excessive Fines Clause of the Eighth Amendment to the United States Constitution as incorporated against the States;

g.  declaring that the Act, S.259, violates the Takings Clause of the Fifth Amendment to the United States Constitution as incorporated against the States;

h.  enjoining Defendants and their agents, employees, and all persons acting under their direction or control from taking any action to enforce the Act or the challenged portions of the Act against Plaintiffs' covered members;

i.  entering judgment in favor of Plaintiffs;

j.  awarding Plaintiffs their attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

k.  awarding Plaintiffs all other such relief as the Court deems proper and just.

Dated: December 30, 2024

Respectfully submitted,

/s/ Matthew B. Byrne

Matthew B. Byrne
GRAVEL & SHEA PC
76 St. Paul Street, 7th Floor
Burlington, VT 05402-0369
Telephone: (802) 658-0220
Fax: (802) 658-1456
Email: mbyrne@gravelshea.com

Jennifer B. Dickey*
Kevin R. Palmer*
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
Telephone: (202) 463-5337

*Counsel for Plaintiff the Chamber of Commerce of the United States of America*

Ryan Meyers*
John Wagner*
American Petroleum Institute
200 Massachusetts Avenue, NW, Suite 1200
Washington, DC 20001
Telephone: (202) 682-8000

*Counsel for Plaintiff American Petroleum Institute*

Steven P. Lehotsky*
Scott A. Keller*
Michael B. Schon*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: steve@lkcfirm.com
Email: scott@lkcfirm.com
Email: mike@lkcfirm.com

Matthew H. Frederick*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: matt@lkcfirm.com

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: jared@lkcfirm.com

*Counsel for Plaintiffs the Chamber of Commerce of the United States of America and American Petroleum Institute*

*\*pro hac vice forthcoming*