**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and AMERICAN PETROLEUM INSTITUTE,<br><br>*Plaintiffs*,<br><br>and<br><br>WEST VIRGINIA, et al.,<br><br>*Intervenor-Plaintiffs*,<br><br>v.<br><br>JULIE MOORE, in her official capacity as the Secretary of the Vermont Agency of Natural Resources, and JANE LAZORCHAK, in her official capacity as the Director of the Vermont Agency of Natural Resources Climate Action Office,<br><br>*Defendants*. | Civil Action No. 2:24-cv-1513 |

**COMPLAINT IN INTERVENTION FOR**
**DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs State of West Virginia, State of Alabama, State of Alaska, State of Arkansas, State of Florida, State of Georgia, State of Idaho, State of Indiana, State of Iowa, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Missouri, State of Montana, State of Nebraska, State of North Dakota, State of Ohio, State of Oklahoma, State of South Carolina, State of South Dakota, State of Tennessee, State of Texas, State of Utah, and State of Wyoming bring this civil action against Defendants for declaratory and injunctive relief and allege as follows:

**INTRODUCTION**

1.      The State of Vermont believes it can seize control over the makeup of America's energy industry. Vermont has attempted to impose what could potentially amount to billions of dollars of liability on energy producers disfavored by certain politicians. These energy producers

1

needn't operate in Vermont before becoming a target. And Vermont consumers won't bear the brunt of these crushing new costs. Rather, Vermont intends to wring funds from producers, thus raising prices on consumers, in *other* States to subsidize certain Vermont-based "infrastructure" projects.

2.    Vermont's Climate Superfund Act provides an example of the chaos that can result when States step outside the bounds of their proper jurisdiction. It imposes self-described retroactive fines on traditional energy producers for their purported *past* contributions to greenhouse-gas emissions, which were lawful operations endorsed and even promoted by both federal and State authorities. And rather than focusing on greenhouse-gas emissions released in Vermont, the Act punishes a small group of energy producers for global greenhouse gases emitted from *all* sources into the atmosphere from 1995 to 2024. Yet coal, oil, and natural gas were helping Vermont during that time. Vermont seeks to have its cake and eat it too, by both reaping the benefits of affordable and reliable fuel, yet penalizing the entities that help produce such fuel billions of dollars for their trouble.

3.    This liability could be devastating to traditional energy producers and the consumers who rely on their products to keep the lights on. Imposing billions of dollars in penalties will necessarily result in more expensive energy for the average American. Indeed, the ruinous liability that the Act promises—especially when paired with similar efforts that might arise in other States— could force coal, oil, and natural-gas producers to shutter their doors altogether.

4.    Unfortunately for Vermont, federal law has something to say about the State's retroactive and extraterritorial shakedown. As a matter of structural first principles, States only have authority to regulate within their own territory, which precludes attaching liability to emissions generated in other States. *See, e.g.*, *Hoyt v. Sprague*, 103 U.S. 613, 630 (1880). The Constitution also gives Congress, not Vermont, the power "[t]o regulate commerce . . . among the several states." U.S. CONST. art. I, § 8, cl. 3. The Founders recognized that certain categories of conduct are best

regulated through nationwide rules and thus granted Congress the power to set uniform rules to govern nationwide.

5.    Congress exercised its Commerce Clause power in this context by enacting the Clean Air Act. The Act regulates the emission of pollutants from certain sources into the air in a variety of ways. For instance, the Clean Air Act empowers the Environmental Protection Agency to address greenhouse-gas emissions from fossil-fuel-fired energy facilities through New Source Performance Standards. And EPA imposes requirements for new or substantially modified facilities to use the best available control technology for greenhouse-gas emissions. So while States have "the primary responsibility" to prevent and control "air pollution," 42 U.S.C. § 7401(a)(3), the Clean Air Act gives the federal government the chief role in determining interstate emissions standards.

6.    And that choice makes sense in our system of government. Emissions standards that vary from one State to another would divide the States and counter the goal of promoting interstate trade that helped unite the States under one Constitution. For that reason, decisions about "[t]he basic and consequential tradeoffs involved" in deciding how much fossil-fuel generation there should be in the "coming decades" rest with Congress. *West Virginia v. EPA*, 597 U.S. 697, 729–30 (2022). Even so, Vermont has appointed itself as the country's emissions czar, purporting to establish strict liability for emissions released in all 50 States (and the rest of the world).

7.    The Commerce Clause not only vests Congress with the power to regulate interstate trade, but it also "contain[s] a further, negative command" that effectively forbids the enforcement of "certain state [economic regulations] even when Congress has failed to legislate on the subject." *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995). Vermont cannot ignore the Commerce Clause and impose rules that fall within the Clause's negative implications. And for that matter, Vermont cannot "legislate for, or impose its own policy upon[,] the other" States. *Kansas v. Colorado*, 206 U.S. 46, 95 (1907). Yet the Climate Superfund Act resembles the "state tariffs"

and "other laws that burdened interstate commerce" that constituted "one of the chief evils that led to the adoption of the Constitution" and the Commerce Clause. *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 549 (2015).

8.      The Commerce Clause is hardly the only problem with the Climate Superfund Act. Quite the opposite: the Act violates the U.S. Constitution, federal law, and the Vermont Constitution for a variety of reasons.

9.      *First*, the inherent structure of the U.S. Constitution precludes the Act. The Supreme Court has already recognized that States must tread carefully when regulating interstate emissions at all, at least outside the context of a cooperative federalism scheme imposed by Congress. Interstate disputes over air and water resources "demand[]" federal resolution. *Illinois v. City of Milwaukee*, 406 U.S. 91, 104–05 & n.6 (1972) ("*Milwaukee I*"). If States were instead free to exercise "independent and plenary regulatory authority" over the same emissions—as Vermont purports to do here—the result would be "chao[s]," including "confrontation between sovereign states," "impossible to predict [] standard[s]," and a wholly "irrational system of regulation." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 496 (1987) (internal quotation marks omitted). Such dangerous outcomes are just over the horizon if the Climate Superfund Act is allowed to stand.

10.      The Constitution also recognizes the "equal sovereignty" afforded to all States. *Shelby County v. Holder*, 570 U.S. 529, 544 (2013). "[I]t follows from these principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 (1996). And "[o]ur system of government . . . imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Zschernig v. Miller*, 389 U.S. 429, 442–43 (1968) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941)) (Stewart, J. concurring). Yet the Act imposes significant penalties on energy producers for

harms allegedly caused by greenhouse-gas emissions well beyond Vermont—including emissions from abroad. It shows no regard for equal sovereignty of States and no awareness of the complications that could arise from direct State involvement in the necessarily international problem of climate change. The Constitution forbids Vermont's attempt to legislate extraterritorially.

11.    *Second*, the Clean Air Act preempts the Climate Superfund Act. Under the Supremacy Clause, State laws preempted by a federal statute may not be enforced. And the Second Circuit has found that the Clean Air Act leaves only a "slim reservoir" of state authority to regulate greenhouse-gas emissions outside of the Clean Air Act's regulatory scheme: The Clean Air Act "permit[s] only state lawsuits brought under the law of the pollution's source state." *City of New York v. Chevron Corp.*, 993 F.3d 81, 100 (2d Cir. 2021) (cleaned up). Vermont's Act authorizes the State to impose billions of dollars in fines for greenhouse-gas emissions from sources *beyond* Vermont's borders, where such emissions were wholly legal. That's outside the "slim reservoir" the Clean Air Act left to the States.

12.    *Third*, the Act violates the domestic and foreign Commerce Clauses. By targeting and discriminating against energy companies located outside of Vermont, while leaving out in-state sources, the Act imposes significant barriers to interstate and international trade. Billions of dollars in fines will negatively impact energy production and drive-up energy costs in other States, especially those States that rely heavily on the fossil-fuel-related energy sector, such as West Virginia. And here again, the Act harms the United States' foreign policy by creating contradictory domestic regulatory stances on fossil-fuel extraction and greenhouse-gas emissions. The United States is one of the largest exporters of oil and petroleum products in the world. *See* Alexandra Twin, *The World's 10 Biggest Oil Exporters*, INVESTOPEDIA (Mar. 26, 2024), https://perma.cc/Q9R7-TWB8. Oil and gas exportation not only brings in significant income to the

United States but also serves as a crucial foreign-policy tool in a world where some of our largest geopolitical adversaries, such as Russia and Iran, rely heavily on oil and gas to fund their governments and manipulate other countries. Aside from the foreign-policy implications related to the fuel markets, the Act also interferes with international attempts to curb greenhouse-gas emissions. While the Federal Government attempts to negotiate multilateral emissions treaties with nations like China and India, Vermont is attempting to enter the picture by regulating emissions in those countries.

13.    *Fourth*, the Act violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and the Due Process principles enumerated in Chapter I, Article 4 of the Vermont Constitution. The Due Process Clause protects citizens from "arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). Although *prospective* legislation often need not overcome a great burden to satisfy the Due Process Clause, *retrospective* legislation is different. "It does not follow . . . that what [a legislature] can legislate prospectively it can legislate retrospectively." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16 (1976). The Due Process Clause thus establishes that a State law which may be reasonable prospectively, may be "unreasonable" or "arbitrary" in its retrospective application. *Nebbia v. New York*, 291 U.S. 502, 525 (1934). Here, the Act violates these protections because it imposes a harsh, retroactive penalty against a select few energy producers who lawfully extracted and refined fossil fuels. And it imposes this fine in an unfair and flawed manner with insufficient procedural safeguards.

14.    *Fifth*, the Act violates the Equal Protection Clause of the Fourteenth Amendment and the Equal Protection principles enumerated in Chapter I, Article 7 of the Vermont Constitution. In operation and effect, the Climate Superfund Act aims to protect Vermont energy producers while harming out-of-state ones. Although one in eight Vermont households use wood to keep warm, *Vermont State Profile and Energy Estimates*, *Analysis,* U.S. ENERGY INFO. ADMIN. (last updated

Dec. 19, 2024), https://perma.cc/4T95-DW4B ("Vermont State Profile), and wood burns much dirtier than the targeted fuels, Jim Finley, *Burning Wood? Caring for the Earth?*, PENN STATE COLL. OF AGRIC. SCIS. (Feb. 15, 2021), https://perma.cc/EBC5-9YZ9, Vermont has elected not to include logging operations in its punitive scheme. In contrast, producers targeted by the Climate Superfund Act—oil, natural gas, and coal—are almost non-existent in Vermont. The State has no petroleum reserves, no natural gas reserves, and no coal mines or economically viable coal reserves. Vermont State Profile, *supra*. Thus, the Climate Superfund Act "aim[s] to promote domestic industry" in a "purely and completely discriminatory" way, which "constitutes the very sort of parochial discrimination that the Equal Protection Clause was intended to prevent." *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 878 (1985).

15.     *Sixth*, the Act imposes an excessive fine in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution. The Constitution prohibits the government from imposing excessive fines as a form of punishment. *See*, *e.g.*, *Austin v. United States*, 509 U.S. 602, 609–10 (1993). But the Act does that by punishing covered energy producers for their purported role in greenhouse-gas emissions and their impacts on climate change in Vermont. And the amount of the penalty is unconstitutionally excessive—potentially subjecting energy producers to hundreds of millions or even billions of dollars in penalties for greenhouse gases emitted over 30 years.

16.     *Seventh*, the Act is an unconstitutional taking in violation of the Fifth Amendment to the U.S. Constitution and Chapter I, Article 2 of the Vermont Constitution. A regulatory taking occurs when the government goes "too far" in restricting an owner's ability to use his own property. *74 Pinehurst LLC v. New York*, 59 F.4th 557, 564 (2d Cir. 2023). The Act's retroactive penalties impose substantial economic impact on covered energy producers and significantly interfere with those producers' investment-backed expectations.

17.    *Eighth*, the Act violates the Vermont Constitution's Separation-of-Powers Clause, which reads "[t]he Legislative, Executive, and Judiciary departments, shall be separate and distinct, so that neither exercise the powers properly belonging to the others." VT. CONST. ch. I, § 5. The Supreme Court of Vermont has interpreted this provision, along with the vesting of the "Supreme Legislative power" in the Vermont legislature, to prohibit overly broad delegations of discretion to the executive branch. *See In re Handy*, 171 Vt. 336, 337 (2000). The Climate Superfund Act enacts such a boundless delegation. It authorizes the Vermont Treasurer to calculate the cost of global climate change to the State of Vermont and its residents with no guidance whatsoever, thus opening the door to "'favoritism and discrimination.'" *Id.* at 347 (quoting *Osius v. City of St. Clair Shores*, 344 Mich. 693, 700 (1956)).

18.    Plaintiffs thus file this action to vindicate the interests of States, their citizens who consume traditional fuels, producers within their borders, and employers who will be directly harmed if the Climate Superfund Act is allowed to stand. The Court should enjoin Defendants from enforcing the Act and declare it unlawful.

## PARTIES & STANDING

### PLAINTIFFS

19.    Plaintiff State of West Virginia is a sovereign State of the United States of America. West Virginia is one of America's leading energy-producing States, ranking fifth among all States in total energy production based on the most recent data. Among other things, the State is the second largest coal producer, fifth largest natural-gas producer, and fourteenth largest crude-oil producer. West Virginia seeks to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. John B. McCuskey is the Attorney General of West Virginia. He is authorized to bring legal actions on behalf of the State of West Virginia and its citizens.

20.     Plaintiff State of Alabama is a sovereign State of the United States of America. Alabama is an energy-rich State with deposits of coal, crude oil, and natural gas. Mining and extraction are major economic drivers for its economy. Alabama is also a heavy consumer of traditional energy because some of its major industries, such as the automotive-manufacturing and forestry-product sectors, are particularly energy intensive. The State generates revenue from the production and use of traditional fuels, such as gasoline. Alabama seeks to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Steve Marshall is the Attorney General of Alabama and is authorized to conduct litigation on behalf of the State and its citizens.

21.     Plaintiff State of Alaska is a sovereign State of the United States of America. Treg Taylor is the Attorney General of Alaka. He is authorized to bring legal actions on behalf of the State of Alaska and its citizens.

22.     Plaintiff State of Arkansas is a sovereign State of the United States of America. Arkansas brings this suit through its attorney general, Tim Griffin. General Griffin is authorized to "maintain and defend the interests of the state in matters before the United States Supreme Court and all other federal courts." ARK. CODE § 25-16-703(a).

23.     Plaintiff State of Florida is a sovereign State of the United States of America. James Uthmeier is the Attorney General of Florida. He is authorized to bring legal actions on behalf of the State of Florida and its citizens.

24.     Plaintiff State of Georgia is a sovereign State of the United States of America. Christopher M. Carr is the Attorney General of Georgia. He is authorized to bring legal actions on behalf of the State of Georgia and its citizens.

25.     Plaintiff State of Idaho is a sovereign State of the United States of America. Raúl R. Labrador is the Attorney General of Idaho. He is authorized to bring legal actions on behalf of the State of Idaho and its citizens. As of 2022, the State of Idaho in aggregate spent annually $ 6,750

million on petroleum, $ 1,105 million on natural gas, and $ 5 million on coal. https://www.eia.gov/state/print.php?sid=ID. It further consumed annually 37 million barrels of petroleum, 151 billion cu ft of natural gas, and 49 thousand short tons of coal.

26.     Plaintiff State of Indiana is a sovereign State of the United States of America. Theodore E. Rokita is the Attorney General of Indiana. He is authorized to bring legal actions on behalf of the State of Indiana and its citizens.

27.     Plaintiff Iowa is a sovereign State of the United States of America. Iowa sues to vindicate its sovereign, quasi-sovereign, and proprietary interests. Iowa brings this suit through its Attorney General, Brenna Bird. She is authorized by Iowa law to sue on the State's behalf under IOWA CODE § 13.2.

28.     Plaintiff State of Kansas is a sovereign State of the United States of America. Kris W. Kobach is the Attorney General of Kansas. He is authorized to bring legal actions on behalf of the State of Kansas and its citizens. *See* KAN. STAT. ANN. § 75-702(a).

29.     Plaintiff Commonwealth of Kentucky is a sovereign State of the United States of America. Kentucky is one of America's leading energy-producing States, ranked number five in coal production with some 5% of the nation's output according to the most recent data. Among all sources, Kentucky produced 865 trillion BTUs of energy in 2022. *Kentucky State Profile and Energy Estimates*, *Data,* U.S. ENERGY INFO. ADMIN. (last updated Apr. 17, 2025), https://perma.cc/SRY6-RSGC. Kentucky seeks to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Russell M. Coleman is the duly elected Attorney General of Kentucky. He has constitutional, statutory, and common-law authority to bring suit on behalf of the Commonwealth and its citizens. *See* KY. REV. STAT. § 15.020; *see also Commonwealth ex rel. Beshear v. Commonwealth ex rel. Bevin*, 498 S.W.3d 355, 362–65 (Ky. 2016).

30.     Plaintiff State of Louisiana is a sovereign State of the United States of America. Elizabeth B. Murrill is the Attorney General of the State of Louisiana. She is authorized by Louisiana law to sue on the State's behalf. *See* LA. CONST. art. IV, § 8. Her offices are located at 1885 North Third Street, Baton Rouge, Louisiana 70802.

31.     Plaintiff State of Missouri is a sovereign State of the United States of America. Andrew Bailey is the Attorney General of Missouri. He is authorized to bring legal actions on behalf of the State of Missouri and its citizens. Plaintiff Missouri, its political subdivisions, and its citizens are harmed by Defendants' actions. Coal provides two-thirds of Missouri's electricity output, the fourth highest of any State. Missouri is also a net energy consumer and is greatly harmed by increases in energy prices.

32.     Plaintiff State of Montana is a sovereign State of the United States of America. Montana is an energy-producing state, rich in fossil fuels. Montana ranks 12th in oil production and 20th in natural gas production nationally. Montana is the sixth-largest coal-producing State. Montana seeks to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Austin Knudsen is the Attorney General of Montana. He is authorized to bring legal actions on behalf of the State of Montana and its citizens.

33.     Plaintiff State of Nebraska is a sovereign State of the United States of America. Michael T. Hilgers is the Attorney General of Nebraska. He is authorized to bring legal actions on behalf of the State of Nebraska and its citizens.

34.     Plaintiff State of North Dakota is a sovereign State of the United States of America. North Dakota is an energy-producing powerhouse and obtains a large share of its tax revenue directly and indirectly from the development of natural resources. Among other sources of energy production, North Dakota is ranked third among the States in crude-oil production, seventh among the States in coal production (first in lignite coal production), and ninth among the States in natural-

gas production. Drew Wrigley is the Attorney General of North Dakota and is authorized to "[i]nstitute and prosecute all actions and proceedings in favor or for the use of the state." N.D. CENTURY CODE. § 54-12-01(2).

35.     Plaintiff State of Ohio is a sovereign State of the United States of America. Ohio is one of America's leading energy-producing States, ranking eighth among all States in total electricity production as of 2023. Among other things, Ohio also had the fourth-largest electricity sales in the nation and was the largest oil-producing State east of the Mississippi River. Ohio seeks to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Dave Yost is the Attorney General of Ohio. He is authorized to bring legal actions on behalf of the State of Ohio and its citizens.

36.     Plaintiff State of Oklahoma is a sovereign State of the United States of America. Oklahoma sues to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Oklahoma brings this suit by and through its Attorney General, Gentner Drummond, who is authorized by Oklahoma law to sue on Oklahoma's behalf. *See* OKLA. STAT. tit. 74, § 18b(A)(2)–(3). His offices are located at 313 Northeast 21st Street, Oklahoma City, Oklahoma, 73105.

37.     Plaintiff State of South Carolina is a sovereign State of the United States of America. Alan Wilson is the Attorney General of South Carolina. He is authorized to bring legal actions on behalf of the State of South Carolina and its citizens.

38.     Plaintiff State of South Dakota is a sovereign State of the United States of America. Marty Jackley is the Attorney General of South Dakota. He is authorized to bring legal actions on behalf of the State of South Dakota and its citizens.

39.     Plaintiff the State of Tennessee is a sovereign State of the United States of America. Tennessee is home to a leading coal-production company, among other members of the energy-protection industry, and sues to vindicate its sovereign, quasi-sovereign, and proprietary interests.

Jonathan Skrmetti, the Attorney General and Reporter of Tennessee, is authorized by statute to try and direct "all civil litigated matters . . . in which the state . . . may be interested." TENN. CODE ANN. § 8-6-109(b)(1).

40.     Plaintiff State of Texas is a sovereign State of the United States of America. Texas "leads the nation in energy production, providing about one-fourth of the country's domestically produced primary energy." *Texas State Profile and Energy Estimates, Analysis*, U.S. ENERGY INFO. ADMIN. (last updated July 18, 2024), https://perma.cc/Q8ZB-DY5G ("Texas State Profile"). It "produces more crude oil than any other state and accounted for more than two-fifths (43%) of the nation's production[.]" *Id.* Additionally, "about 30 of the nation's 100 largest natural gas fields are located, in whole or in part, in Texas." *Id.* Although it is primarily known for its oil and gas industries, Texas is also the "second-largest lignite [coal] producer in the United States." *Id.* Texas is not only the country's leader in producing energy, but also the "largest energy-consuming state[.]" *Id.* Texas brings this suit through its attorney general Ken Paxton. He is the chief legal officer of the State of Texas and has the authority to represent Texas in civil litigation. *Perry v. Del Rio*, 67 S.W.3d 85, 92 (Tex. 2011).

41.     Plaintiff State of Utah is a sovereign State of the United States of America and a significant contributor to energy production. According to recent data, Utah is the fourteenth largest coal producer, thirteenth largest natural-gas producer, and ninth largest crude oil producer. Similar to West Virginia, Utah seeks to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests. Derek E. Brown is the Attorney General of Utah. He is authorized to bring legal action on behalf of the State of Utah and its citizens.

42.     Plaintiff State of Wyoming is a sovereign State of the United States of America. Wyoming is one of America's leading energy-producing States, ranking fourth in total energy production based on the most recent data. Wyoming is the largest coal-producing State in the United

States and holds about 30 percent of U.S. recoverable coal reserves at producing mines. Wyoming is also the seventh largest crude oil producer and ranks among the top ten states in both natural-gas reserves and marketed natural-gas production. Wyoming seeks to vindicate its sovereign, quasi-sovereign, financial, and proprietary interests, including its interest in protecting its citizens. Bridget Hill is the Attorney General of Wyoming. She is authorized to bring legal actions on behalf of the State of Wyoming and its citizens.

## DEFENDANTS

43.     Defendant Julie Moore is the Secretary of the Vermont Agency of Natural Resources. Defendant Moore is responsible for issuing cost recovery demands to the covered energy producers under the Climate Superfund Act. § 598(g)(l). Defendant Moore is being sued in her official capacity.

44.     Defendant Jane Lazorchak is the Director of the Vermont Agency of Natural Resources Climate Action Office. As the Director of the Vermont Agency of Natural Resources Climate Action Office, Defendant Lazorchak is responsible for administering the Act's Climate Superfund Cost Recovery Program under the Act. § 597. Defendant Lazorchak is being sued in her official capacity.

## JURISDICTION & VENUE

45.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because this case presents federal questions under the Constitution and laws of the United States.

46.     This Court has supplemental jurisdiction over the State-law claims under 28 U.S.C. § 1367(a) because they "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

47.     The Court has authority to award relief against Defendants under 42 U.S.C. § 1983. *See Am. Auto. Mfrs. Ass'n v. Cahill*, 53 F. Supp. 2d 174, 185 (N.D.N.Y. 1999). The Court also has

equity jurisdiction under *Ex Parte Young*, 209 U.S. 123 (1908); *Friends of the E. Hampton Airport, Inc. v. Town of East Hampton,* 841 F.3d 133, 144 (2d Cir. 2016), may award injunctive relief under 28 U.S.C. § 1651, and can award declaratory relief under 28 U.S.C. § 2201(a).

48.     This Court has personal jurisdiction over Defendants because they reside in or conduct a substantial proportion of their official business in Vermont. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside in Vermont, and the Defendants' conduct giving rise to this civil action occurs in Vermont.

49.     This Court has authority to grant the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2022, and its inherent equitable powers.

## STANDING

50.     Plaintiff States have standing to sue in their sovereign, quasi-sovereign, and proprietary capacities.

51.     Plaintiff States are injured by Defendants' attempt to use the Climate Superfund Act to impose billions of dollars in fines on traditional energy companies for actions taken within Plaintiff States' borders. Doing so will not only interfere "with the autonomy of the individual States within their respective spheres," *Healy v. Beer Inst. Inc.*, 491 U.S. 324, 335–36 (1989), but also impose substantive pecuniary harms on the States themselves and the citizens of the Plaintiff States in the form of higher energy prices.

52.     The Act is a form of regulation. *See City of New York*, 993 F.3d at 91. "State power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute." *BMW*, 517 U.S. at 572 n.17. "The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012) (quoting *San Diego Bldg. Trades Council v.*

*Garmon*, 359 U.S. 236, 247 (1959)). By applying their law seeking retroactive damages extraterritorially, Defendants have offended the sovereignty of the Plaintiff States.

53.    Each Plaintiff State likewise has an "interest in not being discriminatorily denied its rightful status within the federal system." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 607 (1982). A State is denied that equal right when another State tries to exercise jurisdiction over it, its interests, and its citizens in violation of federal law. As further explained below, the Climate Superfund Act does exactly that here.

54.    Plaintiff States also have standing as sovereigns based on their impending loss of tax revenue if the sale of certain energy products in their States is diminished. *Wyoming v. Oklahoma,* 502 U.S. 437, 447–48 (1992); *see also Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (indirect loss of funding suffices for standing). Many Plaintiff States, including West Virginia, derive substantial revenue from severance taxes and other special taxes derived from the energy production that the Vermont law targets. For example, West Virginia brought in around $700 million in severance taxes in 2022. *Severance Taxes* at 3, W. VA. TAX DIV., https://perma.cc/H749-UZSW. That number will surely be diminished if traditional energy producers are forced to spend billions of dollars on fines paid to Vermont instead of capital investments. The Second Circuit has already held that attempts to penalize fossil-fuel producers will "compel" them to change their ways and presumably that does not mean producing *more* oil, coal, and natural gas. *City of New York*, 993 F.3d at 93 (cleaned up).

55.    Plaintiff States also have standing as purchasers of energy. States purchase massive quantities of energy in performing their sovereign duties. The Act will make energy less affordable and less available, *see id.*, harming Plaintiff States' ability to exercise their sovereign functions, *see Maryland v. Louisiana,* 451 U.S. 725, 737 (1981) ("It is clear that the plaintiff States, as major purchasers of natural gas whose cost has increased as a direct result of Louisiana's imposition of

the First-Use Tax, are directly affected in a 'substantial and real' way so as to justify their exercise of this Court's original jurisdiction."); *Orangeburg v. FERC*, 862 F.3d 1071, 1074 (D.C. Cir. 2017) ("[T]he city has demonstrated an imminent loss of the opportunity to purchase a desired product (reliable and low-cost wholesale power).").

56.     Plaintiff States' standing is confirmed by *Pennsylvania v. West Virginia*, in which the Supreme Court exercised original jurisdiction to stop constraints imposed by West Virginia on the commercial flow of natural gas to neighboring states. 262 U.S. 553 (1923). The Court recognized Pennsylvania's standing both "as the proprietor of various public institutions and schools" that use gas for fuel and "as the representative of the consuming public whose supply will be similarly affected." *Id.* at 591.

57.     Likewise, in *Maryland v. Louisiana*, the Supreme Court held that Maryland and other States had standing to sue Louisiana over its tax on pipeline companies, as the plaintiff States asserted "substantial and serious injury to their proprietary interests as consumers of natural gas as a direct result of the allegedly unconstitutional actions of Louisiana." 451 U.S. at 739. The plaintiff States there also had an "interest in protecting [their] citizens from substantial economic injury presented by imposition of the [t]ax." *Id.*

58.     As in each of these prior cases, Plaintiff West Virginia, its political subdivisions, and its citizens are harmed by the Act and Defendants' actions. The country runs on West Virginia energy. In 2021, for instance, West Virginia was the 5th highest producer of total energy in the United States. *West Virginia State Profile and Energy Estimates, Overview*, U.S. ENERGY INFO. ADMIN. (last updated Feb. 20, 2025), https://perma.cc/ZF8Y-FBF6. Coal and natural gas make up the bulk of that production. *Id.* In other words, West Virginia is both a substantial producer and consumer of the energy sources that the Act means to target.

59.     The Bureau of Economic Analysis reports that in 2023, employees in West Virginia working in oil and gas extraction received over $271 million in compensation, and employees in pipeline transportation received over $170 million, thus increasing state income taxes paid to West Virginia. *SAGDP4 Compensation of Employees*, U.S. BUREAU OF ECON. ANALYSIS, https://perma.cc/K9XN-4X7U. These revenue streams would be threatened by the ruinous liability of the Act; substantial economic injury is imminent.

60.     In Fiscal Year 2022, West Virginia received close to $700 million in tax revenue from the State severance tax on coal and natural gas. *Severance Taxes*, *supra*, at 3. Here again, this important source will be diminished by lowered production resulting from the penalties imposed by the Climate Superfund Act.

61.     West Virginia is but one of many States that the Climate Superfund Act injures by increasing energy prices and reducing energy output.

62.     For instance, Plaintiff State of Montana, its political subdivisions, and its citizens are similarly harmed by the Act and Defendants' actions. Montana provides invaluable energy production for the United States. Montana ranks 12th in oil production and 20th in natural gas production nationally. As of 2022, Montana had 45,000 plus total oil wells and 5,000 plus active wells. Montana has the nation's largest recoverable coal reserves, about 30 percent of the U.S. total reserves, accounting for about 5 percent of U.S. coal production. In 2023, Montana mined approximately 28 million tons of coal. The Act improperly targets the State of Montana, both as a producer and consumer of energy.

63.     According to a study by the American Petroleum Institute, the oil and gas industry supported nearly 57,000 jobs, 8 percent of the state's total employment, and contributed over $7 billion toward the state's economy in 2021. *See Impact of the Oil and Natural Gas Industry on the U.S. Economy in 2021*, AM. PETROLEUM INST. (Apr. 2023), https://perma.cc/ZRP2-ZPNW.

64.    In 2024, $77,151,000 in severance taxes was paid by Montana Coal Producers. The coal severance tax funds a variety of programs across the state, including education. In 2023, coal mines also paid approximately $5,105,485 in property taxes to the counties where the mines are located.

65.    Similarly, Plaintiff State of North Dakota, its political subdivisions, and its citizens are harmed by the Act and Defendants' actions. North Dakota is ranked third among the States in crude-oil production, seventh among the States in coal production (first in lignite coal production), and ninth among the States in natural-gas production. *See North Dakota State Profile and Energy Estimates*, *Overview*, U.S. ENERGY INFO. ADMIN. (last updated Aug. 15, 2024), https://perma.cc/7CGY-QXM3. Those industries employ thousands of people in communities large and small across the State, and North Dakota obtains a large share of its State revenues—billions of dollars annually—directly and indirectly from the development of those natural resources. Those jobs, communities, and State revenues will all be severely impacted by the ruinous liability that the Act threatens to impose.

66.    Likewise, Plaintiff State of Oklahoma, its political subdivisions, and its citizens are harmed by the Act and Defendants' actions. Oklahoma is a leader in the nation's production of energy. For example, in 2022, Oklahoma was the 7th highest producer of total energy in the United States. *Oklahoma State Profile and Energy Estimates, Overview*, U.S. ENERGY INFO. ADMIN. (last updated July 18, 2024), https://perma.cc/PNM8-PX9M. Much of the energy production in Oklahoma is in the form of natural-gas and crude-oil production. In 2023, Oklahoma was the nation's 6th largest producer of marketed natural gas and producer of crude oil. *Id.* That same year, Oklahoma's five crude-oil refineries had a combined processing capacity of about 547,000 barrels per calendar day, which is about 3% of the U.S. total refining capacity. *Id.*

67.    The Act will cause significant harm to Oklahoma, including creating risks to Oklahoma's economy. In 2024, Oklahoma's oil and natural gas production contributed over $60 billion annually in total economic impact in Oklahoma. *2024 Economic Impact in Oklahoma*, OKLA. ENERGY RES. BD., https://oerb.com/wp-content/up-loads/2025/01/Economic-Impact_Full-Report.pdf. Oklahoma's oil and natural gas industry impacts twenty-three percent of total statewide economic activity and supports over 255,000 jobs. *Id.*

68.    Further, the Act will deprive the State of Oklahoma of millions of dollars in revenue to support schools, roads, bridges, and other public priorities. The oil and natural gas industry recently contributed $3.2 billion in total taxes, including $132 million to the revenue-stabilization fund in Oklahoma in 2024. *Id.* The Act would threaten this significant source of tax revenue for the State of Oklahoma.

69.    Similarly, Plaintiff State of Utah, its political subdivisions, and its citizens are harmed by the Act and Defendants' actions. Utah provides invaluable energy production for the United States. For example, in 2023, Utah was the ninth largest producer of crude oil in the country. *U.S. Crude Oil Production by State, 1995–2023*, U.S. ENERGY INFO. ADMIN., https://perma.cc/97H2-DPE8. In addition, Utah ranks as a significant producer of natural gas and coal. The Act improperly targets the State of Utah, both as a producer and consumer of energy.

70.    The Utah Division of Oil, Gas and Mining estimates that, for Fiscal Year 2021, Utah received over $260 million in tax revenue and royalty/lease payments related to natural gas, crude oil, coal, and other minerals. Utah's revenues will be diminished based on Vermont's Climate Superfund Act.

71.    Finally, Plaintiff State of Texas, its subdivisions, and its citizens will be harmed by the Act and Defendants' actions. Texas is the top producer of energy in the country by a large

margin. Texas State Profile, *supra*. It is the largest individual producer of oil and natural gas. *Id.* It is also the second largest producer of the primary type of coal used for generating electricity. *Id.*

72.    In Fiscal Year 2022, Texas collected over $6 billion in revenue from severance taxes on oil alone. *Severance Taxes: A Story in Volatility in Revenue and Prices*, COMPTROLLER OF PUB. ACCTS., https://perma.cc/2RHZ-VHDW. It collected over $4 billion in severance taxes from natural gas in the same year. *Id.* One reason that Texas is able to collect so much money in severance taxes is that it promotes the drilling of new wells. *See, e.g.*, 16 TEX. ADMIN. CODE § 3.101 (subsidizing high-cost wells).

73.    The energy industry is also a leading employer in Texas. "[O]il and gas production directly and indirectly supports 1.37 million Texas jobs." *Texas Energy Industry*, TEX. ECON. DEV. & TOURISM (Dec. 2022), https://perma.cc/E9L4-DG28. In the first quarter of 2024 alone, "industry wages eclipsed $20.8 billion." *Texas Oil and Natural Gas Industry Direct Employment and Wages See Continued Growth in 2024*, TEX. OIL & GAS ASS'N (Aug. 29, 2024), https://perma.cc/WJ9B-TK5B.

74.    The Climate Superfund Act will reduce Texas's revenue by stunting the capital investments required to drill new wells. Instead of having money to spend on expanding access to cheap and reliable energy, traditional-fuel producers will be sending this money to Vermont to finance the Climate Superfund.

75.    Because the Plaintiff States will suffer pecuniary injuries in the form of lost taxes and increased expenses, as well as injuries to their sovereignty, they have standing to sue to vindicate their own interests.

76.    "Jurisdiction is also supported by the States' interest as *parens patriae*." *Maryland*, 451 U.S. at 737. A State may act as the "representative of its citizens in original actions where the injury alleged affects the general population of a State in a substantial way." *Id.*

77.    Here, Plaintiff States have an "interest in protecting [their] citizens from substantial economic injury presented by" the Act's attempt to regulate nationwide energy policy. *Id.* at 739. In addition, considering the central role that coal, oil, and natural gas play in producing key industrial products (including petrochemicals and steel), the Act threatens to upend vast swathes of Plaintiff States' economies even beyond the energy sector. Even when "no question of boundary is involved, nor of direct property rights belonging to the complainant state[s], . . . it must surely be conceded that if the health and comfort of the inhabitants of a state are threatened"—and here, as well, their constitutional rights—"the state is the proper party to represent and defend them." *Kansas v. Colorado,* 185 U.S. 125, 141–42 (1902); *see also Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 338 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S. 410 (finding *parens patriae* standing where State's "quasi-sovereign interests involve[d] . . . concern for the health and well-being—both physical and economic—of [their] residents in general" (cleaned up)); *Georgia v. Pa. R.R. Co.*, 324 U.S. 439, 447 (1945) ("The rights which Georgia asserts, parens patriae, are those arising from a[] . . . scheme, it is said, has injured the economy of Georgia.").

78.    There is little doubt that the Act will harm the economic well-being of the citizens in the Plaintiff States. The purpose of the Act is to take billions of dollars from the economies in Plaintiff States and redistribute the money to Vermont and its residents.

79.    In short, these States and their citizens will be harmed by the Act in many capacities and thus have standing to sue.

## BACKGROUND

### Operation, Regulation, and Promotion of Traditional Energy Production

80.    Traditional energy—that is coal, oil, and natural gas—is essential to American prosperity. Today, fossil fuels account for more than 83% of American energy production. *See Monthly Energy Review*, U.S. ENERGY INFO. ADMIN. (Jan. 2025). Fossil-fuel production employs

millions of Americans, contributes billions to the economy each year, and provides the energy reliability and security that's necessary to keep the American economic engine running. Altogether, "energy from generally plentiful and affordable supplies of fossil fuels . . . has been considered one of the important enablers of domestic economic growth." Victor K. Der, *Carbon Capture and Storage: An Option for Helping to Meet Growing Global Energy Demand While Countering Climate Change*, 44 U. RICH. L. REV. 937, 938 (2010). And that's especially true in energy-centric locales like West Virginia.

81.     Coal, one of the oldest and most abundant fossil fuels, has played a central role in industrialization and energy production since the Industrial Revolution. *See Amoco Prod. Co. v. S. Ute Indian Tribe*, 526 U.S. 865, 866 (1999). Its use drives advancements in manufacturing, transportation, and electricity generation. Though coal's exceptional importance in generating steam for electricity generation is perhaps the use that first comes to mind, America is quite literally built on coal. Metallurgical coal is the "raw material for coke, a key ingredient in steel manufacturing," and "[t]here is no present substitute for metallurgical coal." Michael R. Drysdale, *Farewell to Coal?*, 65 ROCKY MT. MIN. L. INST. 17-1, 17-3 (2016).

82.     Even as the sector has evolved in recent years, experts continue to "project[] that coal will remain the nation's largest energy source for, at least, several decades." Sam Kalen, *Coal's Plateau and Energy Horizon?*, 34 PUB. LAND & RES. L. REV. 145, 147 (2013). For good reason: coal (along with natural gas) is essential to maintaining reliability, especially when weather conditions don't allow renewables to generate electricity. *See Miso's Response to the Reliability Imperative* at 1, MISO (last updated Feb. 2024), https://perma.cc/Q3EZ-VFMC (noting the need for "new dispatchable resources"—that is, resources "that can be turned on and off and adjusted as needed"). Because "coal mining operations presently contribute significantly to the Nation's energy requirements," Congress has found that it is "essential to the national interest to [e]nsure the

existence of an expanding and economically healthy underground coal mining industry." 30 U.S.C. § 1201(b); *see also id.* § 1201(j) ("[S]urface and underground coal mining operations affect interstate commerce, contribute to the economic well-being, security, and general welfare of the Nation"). And coal production continues to grow internationally, as countries like China, India, and Indonesia have seen production increase significantly. *See Coal Mid-Year Update*, INT'L ENERGY AGENCY, (July 2024), https://perma.cc/W29L-2JA3.

83.    Natural gas is critical to America's story, too, even as it has come on the scene more recently. Now, it is widely used for electricity generation, home heating, and industrial applications. *See* Josh Lute, *LNG Terminals: Future or Folly?*, 43 WILLAMETTE L. REV. 623, 630–31 (2007). It is also a key component in the production of chemicals. The development of liquefied-natural-gas technology has expanded its accessibility, making it a flexible and globally traded energy resource. In short, "[n]atural gas is one of the most important energy resources in the world today." Lincoln L. Davies & Victoria Luman, *The Role of Natural Gas in the Clean Power Plan*, 49 J. MARSHALL L. REV. 325, 327 (2015). And "[t]he United States Department of Energy predicts that domestic consumption of natural gas will grow steadily and significantly over the next twenty years as the demand for energy in the United States expands." James B. Lebeck, *Liquefied Natural Gas Terminals, Community Decisionmaking, and the 2005 Energy Policy Act*, 85 TEX. L. REV. 243, 246 (2006).

84.    No one doubts oil's importance, either. Along with natural gas, it is one "of our most important natural resources." *Burford v. Sun Oil Co.*, 319 U.S. 315, 320 (1943). Most obviously, oil drives the U.S. transportation sector, which in turn facilitates almost all the nation's economy. *Use of Energy Explained: Energy Use for Transportation*, U.S. ENERGY INFO. ADMIN. (last updated Aug. 16, 2023), https://perma.cc/3WWQ-Q2T7. It's also a key raw material in petrochemical industries. It is thus "essential to modern society." Keith B. Hall, *Hydraulic Fracturing and the*

*Baseline Testing of Groundwater*, 48 U. RICH. L. REV. 857, 858 (2014). And along with natural gas, oil is expected to supply about 60% of the country's—and the world's—energy supply in the years to come. *Id.*; *see also* Mot. for Leave to File Bill of Compl. at 7–13, *Alabama v. California*, 2024 WL 4426505 (U.S. May 22, 2024) (No. 22O158).

85.    Perhaps recognizing benefits like these, "fossil fuels remain the federal government's favorite energy source," Molly Elkins, *Winds of Change: Using the Tax Regime to Facilitate the Renewable Energy Transition*, 22 HOUS. BUS & TAX L. J. 77, 85 (2021), despite vocal opposition from some quarters. In fact, coal, oil, and natural gas have been regulated *and encouraged* by the United States government for years, including during the years in which the Vermont Climate Superfund Act now proposes to impose liability. "The government affirmatively promotes fossil fuel use in a host of ways, including beneficial tax provisions, permits for imports and exports, subsidies for domestic and overseas projects, and leases for fuel extraction on federal land." *Juliana v. United States*, 947 F.3d 1159, 1167 (9th Cir. 2020); *see also Natural Gas Laws and Incentives in Federal*, U.S. DEP'T OF ENERGY, https://perma.cc/9WU7-D7V5; *Federal Financial Interventions and Subsidies in Energy in Fiscal Years 2016–2022*, U.S. ENERGY INFO. ADMIN. (Aug. 1, 2023), https://perma.cc/7ZVD-BNJ4. Quite simply, America relies on traditional energy.

86.    Likewise, the Plaintiff States like West Virginia have policies of promoting the extraction of fossil fuels. For instance, West Virginia gives tax rebates to coal companies "to encourage capital investment in the coal industry." W.VA. CODE § 11-13EE-1. Oklahoma likewise provides for a variety of significant tax breaks for new oil and natural-gas wells. Oklahoma Tax Commission, Gross Production Tax Fact Sheet; 68 OKLA. STAT. tit. 68, § 2357.11 (coal tax credits). Texas also provides tax incentives to promote the extraction of fossil fuels. *See, e.g.*, 16 TEX. ADMIN. CODE § 3.101 (subsidizing high-cost wells). These are only a handful of examples where

Plaintiff States promote the extraction of fossil fuels from their territory. Given that these States rely so heavily on these industries to keep their economies going, it should come as no surprise that they seek to ensure their own industries remain healthy.

87.    Although Vermont is not situated similarly to a State like West Virginia or Oklahoma, "about 57% of the energy [it] consume[s]" is "petroleum-based." Vermont State Profile, *supra*, https://perma.cc/4T95-DW4B. Indeed, "Vermont uses more petroleum per capita than almost two-thirds of the states." *Id.* ("Almost 6 in 10 Vermont households use fuel oil, kerosene, or propane to heat their homes[.]").

88.    The State of Vermont itself also relies upon fossil fuels. For example, in fiscal year 2019, nearly 50% of the "energy used to heat" buildings owned by the government was created from fossil fuels. *2020 Agency Energy Implementation Plan* at 14, VT. DEP'T OF BLDGS. & GEN. SERVS. (2020), https://perma.cc/K45S-CAA4. Additionally, "[i]n fiscal year 2015, gasoline accounted for 27% of all energy consumed by state government, more than any other energy resource consumed over the same period." *See State Agency Energy Plan* at 7, VT. DEP'T OF BLDGS. & GEN. SERVS. (2022), https://perma.cc/FX26-RJR4.

89.    Although Vermont and its residents consume large quantities of fossil fuels, Vermont is not home to any traditional energy producers or refiners. "Vermont has no crude oil reserves or production, nor does it have any petroleum refineries," it "has no natural gas reserves or production[,]" and it "does not have any coal mines or coal reserves[.]" Vermont State Profile, *supra*. Vermont therefore imports oil and gas products from other States and foreign countries. Primarily, Vermont depends on oil and gas from Canada. *Id.* Indeed, the closest refinery to Vermont is located across the border in Montreal, *compare U.S. Energy Atlas: Petroleum Refineries*, U.S. ENERGY INFO. ADMIN. (Jan. 1, 2024), https://perma.cc/GG9F-XCN8, *with Canadian Refineries*, OIL SANDS MAG. (last updated Dec. 5, 2024), https://perma.cc/Z3J7-ZKG5.

90.    Rather than produce traditional fuels, Vermont explicitly favors in-state renewable-energy producers. For example, Vermont "require[d] that the state's retail electricity suppliers obtain 63% of their annual electricity sales from eligible renewable sources by 2025, increasing by at least 4% every three years until reaching 100% by 2030, including a 5.8% carve-out for new, in-state, renewable generation at customer-sited facilities with capacities of 5 megawatts or less." Vermont State Profile, *supra*.

91.    The energy makeup and promotion of renewable energies make Vermont different from other States that depend largely on production from traditional energy sources like petroleum or natural gas for jobs and economic growth. Texas, for example, "leads the nation in energy production, providing about one-fourth of the country's domestically produced primary energy." Texas State Profile, *supr*a. "Texas produces more crude oil than any other state and accounted for more than two-fifths (43%) of the nation's production from both onshore and offshore areas in 2023." *Id.* Texas also "has one-fourth of the nation's operable crude oil refineries and about one-third of the total U.S. refining capacity." *Id.* Moreover, "[o]ne-fourth of U.S. proved natural gas reserves and about 30 of the nation's 100 largest natural gas fields are located, in whole or in part, in Texas." *Id.*

92.    Despite Vermont having a *de minimis* economic connection to the production of traditional energy, it has decided to target traditional energy producers for significant, costly, and retroactive regulation. Greenhouse-gas emissions are a global issue, emitted from many different natural and manmade sources beyond the energy-production industry. Although greenhouse-gas emissions are impossible to link from a particular source to a particular environmental impact, Vermont has nonetheless laid unique blame for their release (and their effect on climate change) on a select group of out-of-state energy producers.

93.    All of these energy choices—and the benefits that come with them—entail necessary tradeoffs. All energy use, including energy derived from "renewable" sources, creates some pollution or environmental impact. Traditional energy is no different.

94.    Greenhouse-gas emissions contribute to changes in the Earth's climate. When humans burn fossil fuels, cut down forests, raise livestock, use fertilizers, and use fluorinated gases found in everyday products, greenhouse gases are emitted into the atmosphere. *See Sources of Greenhouse Gas Emissions*, U.S. ENV'T PROT. AGENCY (last updated Oct. 22, 2024), https://perma.cc/B4J7-Y9VJ.

95.    Greenhouse-gas emissions can also be emitted into the atmosphere by many natural sources. Indeed, "[n]atural $CO_2$ sources account for the majority of $CO_2$ released into the atmosphere." *Carbon Dioxide 101*, NAT'L ENERGY TECH. LAB'Y, https://perma.cc/ZM6V-NY29. These sources include wildfires, volcanos, oceans, and respiration from animals. *Id.*

96.    Although greenhouse gases are emitted in various manners across the entire world, their effects are not local. Once greenhouse gases are released, they "quickly diffuse and comingle in the atmosphere." *City of New York*, 993 F.3d at 92. Thus, as the Supreme Court has explained, "emissions in New Jersey may contribute no more to flooding in New York than emissions in China." *Am. Elec. Power Co.*, 564 U.S. at 422.

97.    Concerned that these pollutants harmed the environment, Congress used its power under our Constitution to regulate their emissions in the Clean Air Act in 1970. The Act employs a "cooperative federalis[t]" approach, which places "primary responsibility for enforcement on state and local governments." *N.Y. Pub. Int. Rsch. Grp. v. Whitman*, 321 F.3d 316, 319–20 (2d Cir. 2003) (internal quotation marks omitted). But each State only gets to determine "how best to achieve EPA emissions standards *within its domain*." *Am. Elec. Power Co.*, 564 U.S. at 428 (emphasis added). Nothing in the Clean Air Act empowered States to regulate interstate gas emissions emanating from

28

outside their borders. Instead, the Clean Air Act reserves for EPA the role as "primary regulator of [domestic] greenhouse gas emissions." *Id.*

98.    In other words, the Clean Air Act leaves only a "slim reservoir" of state authority to regulate greenhouse-gas emissions *outside* of the Act's regulatory scheme. *City of New York*, 993 F.3d at 100. That means the Clean Air Act "permit[s] only state lawsuits brought under the law of the pollution's *source* state." *Id.* (cleaned up). And Congress's laws concerning interstate emissions trump inconsistent state laws.

### Vermont's Climate Superfund Act

99.    The Vermont Legislature enacted the "Climate Superfund Act," S.259 (Act 122), in 2024. The Governor allowed the bill to become law without his signature, and the Act took effect on July 1, 2024.

100.    The Climate Superfund Act "established the Climate Superfund Cost Recovery Program . . . to secure compensatory payments from responsible parties based on a standard of strict liability." § 597(1). The payments extracted from responsible parties will then be paid into a fund maintained by the Vermont Agency of Natural Resources ("Agency") to support "climate[-]change adaptation projects." *Id.*

101.    The Act defines "[r]esponsible parties" as

> any entity or a successor in interest to an entity that[,] during any part of the covered period[,] was engaged in the trade or business of extracting fossil fuel or refining crude oil and is determined by the Agency [to be] attributable to for more than one billion metric tons of covered greenhouse gas emissions during the covered period.

§ 596(22).[1]

---

[1] The Act's coverage definition "does not include any person who lacks sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution." *Id.*

102.    No Vermont entity could be a "responsible party" according to this carefully crafted definition. The law was thus designed to apply exclusively to entities based in other States or countries. Additionally, the Act's definition conspicuously and intentionally omits other human sources of greenhouse gases, such as industrial-scale farms, logging operations, and, most importantly, end users of fossil fuels.

103.    The Act's "[c]overed period" is defined as "the period that began on January 1, 1995 and ended on December 31, 2024." § 596(8).

104.    "Covered greenhouse gas emissions" means "the total quantity of greenhouse gases released into the atmosphere during the covered period, expressed in metric tons of carbon dioxide equivalent, resulting from the use of fossil fuels extracted or refined by an entity." § 596(7). The Act does not explain how the "carbon dioxide equivalent" of different gases, such as methane, will be calculated. *Id.*

105.    Employing these calculations, the Climate Superfund Act imposes crippling, retroactive, and arbitrary penalties on out-of-state energy producers through what the Act refers to as "cost recovery demands." § 597(3), 598(f). Under the Act, the Agency issues "[n]otice[s] of cost recovery demand[s]," which are "written communications . . . informing a responsible party of the amount . . . payable," and holds those responsible parties "strictly liable" for their purported share of greenhouse-gas emissions. § 596(18), 598(a)(1).

106.    The Act ostensibly provides a method to calculate each responsible party's cost recovery demand, but that method does not meaningfully constrain the amounts in the cost recovery demands.

107.    First, the State Treasurer calculates the total "cost to the state of Vermont and its residents" from "the emission of covered greenhouse gases during the covered period." § 598(b); *see also* §599c.

108.    The Climate Superfund Act gives no guidance to the State Treasurer on how to calculate how much the relevant contributions to global climate change have cost "Vermont and its residents" over a 30-year period. *Id.* § 598(b). There exists no reliable way to calculate the damage done by anthropogenic climate change as a whole, much less isolate the harm caused over a 30-year period by these specific traditional-fuel companies.

109.    Begin with the inherent difficulties of determining the damage caused by the man-made aspects of climate change attributable to greenhouse-gas emissions.

110.    Some environmental activists, including at least one who testified before the Vermont legislature, promote a tool called the "social cost of carbon," *An act relating to climate change cost recovery: Hearing on S.259 Before the Vt. Senate Judiciary Comm.* at 2 (Feb. 22, 2024) (written testimony from Dr. Justin Mankin), https://perma.cc/N3ND-2LPQ ("Mankin Testimony"), to "put[] a dollar figure on every ton of emitted greenhouse gases," *Ala. Mun. Distribs. Grp. v. FERC*, 100 F.4th 207, 214 (D.C. Cir. 2024). But this "tool" is inherently unreliable and cannot serve as a valid basis to determine how much damage Vermont has suffered because of climate change, much less how much specific contributors played a role.

111.    For example, the Federal Energy Regulatory Commission recently attempted to calculate the cost of carbon released into the atmosphere from an infrastructure project using this tool, and its estimates of the cost ranged from $505 million to $5.8 billion. *See Food & Water Watch v. FERC*, 104 F.4th 336, 346 (D.C. Cir. 2024). A tenfold difference between the lowest and highest guess demonstrates the inherent unreliability of attempting to assess the cost of carbon emissions. For this reason, among others, FERC concluded that "the Social Cost of Carbon is not reliable for assessing individual projects." *Id.*

112.    If the social-cost-of-carbon tool, which is promoted by the very "experts" that Vermont purported to rely upon, cannot even accurately calculate the cost of a single project's

emissions, there is no way one can reliably calculate the cost to a specific State of emissions released all over the globe during a 30-year period. *Cf. generally Response to Request for Information Development of a Climate Superfund Cost Recovery Program* at 55–62, MARC MARIE OF CTR. FOR ENV'T ACCOUNTABILITY (2024), https://perma.cc/D2EV-RRTQ (collecting criticisms of attribution methodology and observing that the social cost of carbon "is highly suspect and easy to manipulate"); *see ALSO* JONATHAN D. HASKETT, CONG. RSCH. SERV., R47583, IS THAT CLIMATE CHANGE? THE SCIENCE OF EXTREME EVENT ATTRIBUTION 1–15 (2023) (discussing attribution methodologies and explaining why they contain flaws).

113.    The fluctuation in calculations for the cost per ton of carbon proves this point. In 2009, it was calculated by the EPA at $24 per ton. Four years later it was $52 per ton. A few years after that it was $7. And by 2023 it was recalculated to be $185 per ton. Cass Sunstein, *The high price of scrapping the social cost of carbon*, WASH. POST (Feb. 5, 2025), https://perma.cc/H45F-ZRMW. These wild fluctuations in the price of carbon per ton, largely dependent on who is calculating, demonstrate that any methodology used to calculate the fines levied against traditional fuel producers will necessarily be extremely imprecise and will result in wholly arbitrary penalties.

114.    The same issues with calculating the cost of carbon per ton that apply in the global context also apply when determining the costs created by climate change to specific areas. If anything, these calculations are more difficult because smaller areas have higher variability of extreme weather events and other area-specific factors. Although some incorrectly believe that "scientists can quantify the economic losses a region like Vermont has endured from the impacts of global warming to date," Mankin Testimony, *supra*, at 1(emphasis omitted), they still cannot tie such losses to particular emitters, much less refiners or drillers, *cf.* David Barker, *Global Non-Linear Effect of Temperature on Economic Production: Comment on Burke, Hsiang, and Miguel*, 21 ECON. J. WATCH 35, 35–36 (Mar. 2024), https://perma.cc/UFZ7-DXJK (noting that Mankin's

methods relied largely on a previous scientific article that has been criticized for "cherry-pick[ing]" and using "data with characteristics that are known to create spurious regression results without making proper adjustments or even acknowledging these characteristics").

115.   Tracing the damage caused by specific weather events, such as "heat waves," "storms, droughts, floods, and others" to specific emitters of greenhouse gases, *see* Mankin Testimony, *supra*, at 2, is also impossible. There are good reasons that the Climate Superfund Act did not even attempt to lay out a procedure by which the State Treasurer would make such calculations. No such procedure exists.

116.   As the Congressional Research Service has explained, the science attempting to attribute specific weather events to manmade climate change "is subject to uncertainty. Sources of uncertainty include uncertainty in the observational data, uncertainty in the scientific understanding of natural climate variability, and uncertainty in results produced by climate simulation models." Haskett, *supra*, at Summary, 1–10.

117.   As referenced above, this significant uncertainty makes it difficult, if not impossible, to determine if specific occurrences of extreme weather were influenced at all by climate change. Going two steps further and determining (1) the degree to which the event may have been influenced (2) by specific emitters is pure fantasy.

118.   It is not just the Plaintiff States who know this "science" is little more than dressed-up politics. The Vermont Agency of Natural Resources itself acknowledges that the Climate Superfund Act demands the impossible when it comes to calculating the costs of climate change to the State of Vermont.

119.   In its January 2025 Report to the General Assembly, the Agency acknowledged that "attribution science is key to the development of the cost assessment," yet "it will require further development to address the full scope of climate impacts contemplated by the Act." *Climate*

*Superfund Cost Recovery Program Report to the General Assembly* at 7, VT. AGENCY OF NAT.

RES. (Jan. 15, 2025), https://perma.cc/9B8D-LH7Z**.** In other words, the "nascent character of this

particular area of climate science" precludes the Agency from reliably implementing the Act. *Id.*

at 8. Thus, as the Agency admits, "the Cost Assessment will require significant and consequential

work" of an unknown nature. *Id.*

120.    Despite concluding that more funding for research into attribution science is

"necessary to fulfill the obligations of" the Climate Superfund Act, *id.* at 1, the State Treasurer

apparently intends to "move forward" with assessing the "the costs of flooding and heat on public

and private infrastructure, public health, natural resources, biodiversity, agriculture, economic

development, and any other effect that" he "determines is relevant and feasible," *id.* at 9. The fact

that the Treasurer intends to move forward with an admittedly underdeveloped theory of

calculating costs demonstrates that the Climate Superfund Act imposes no actual limitations on his

discretion.

121.    After the State Treasurer has guessed at the cost to Vermont and its residents, the

Act demands that each responsible party's

> cost recovery demand shall be equal to an amount that bears the same ratio
> to the cost to the State of Vermont and its residents . . . as the responsible
> party's applicable share of covered greenhouse gas emissions bears to the
> aggregate applicable shares of covered greenhouse gas emissions resulting
> from the use of fossil fuels extracted or refined during the covered period.

§ 598(b).

122.    In plain English, the cost recovery demands are not limited to greenhouse-gas

emissions in Vermont. Rather, the Climate Superfund Act makes energy producers strictly liable

for greenhouse-gas emissions anywhere on Earth, and the penalties are calculated with respect to

those global emissions, not just the small fraction of emissions originating inside Vermont.

123.    To calculate the amount of greenhouse-gas emissions to attribute to each covered entity, the Act directs the Agency to "use the U.S. Environmental Protection Agency's Emissions Factors for Greenhouse Gas Inventories" to "determin[e] the amount of covered greenhouse gas emissions attributable to any entity." *Id.* § 598(d).

124.    An "emissions factor" is the amount of greenhouse gases that are released on average when a certain activity—for instance, the burning of gasoline or natural gas—occurs. *See Basic Information of Air Emissions Factors and Quantification*, U.S. ENV'T PROT. AGENCY (last updated May 14, 2024), https://perma.cc/GE5Q-GKNQ. This calculation, however, says nothing about how those gases affect the climate specifically, or Vermont particularly.

125.    Responsible parties must either pay the cost recovery demand in full within six months, § 598(g)(l), or in nine annual installments supplemented by "reasonable interest," § 598(g)(2)(c). Either way, covered energy producers will be forced to begin paying hundreds of millions or billions of dollars, and thus passing increased costs along to their customers, shortly after receiving notice, which necessitates equitable relief in advance of that deadline.

126.    Vermont intends to use the money it takes from responsible parties to finance its own climate projects, including subsidizing competitors to traditional fuel.

127.    The Climate Superfund Act provides that "[t]he Agency shall deposit cost recovery payments collected under this chapter to the Climate Superfund Cost Recovery Program Fund." *Id.* § 598(h).

128.    The "Climate Superfund Cost Recovery Program" created by the Act is "administered by the Secretary of Natural Resources" to "provide funding for climate change adaptation projects in the State." *Id.* § 599(a).

129.    The penalties paid by responsible parties are placed into the fund, and the Agency may use that fund to pay for its "climate change adaptation projects" consistent with its "Resilience

Implementation Strategy," which includes "criteria and procedures for prioritizing climate change adaptation projects eligible to receive monies from the Climate Superfund Cost Recovery Program." *Id.* § 599(b)(3)(E).

## CLAIMS

## COUNT I

### Federal Preemption Under the U.S. Constitution

130.    All allegations above are incorporated by reference.

131.    The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. CONST. art. VI. In ratifying the Supremacy Clause, the States "surrendered to congress, and its appointed Court, the right and power of settling their mutual controversies." *Rhode Island v. Massachusetts*, 37 U.S. 657, 737 (1838).

132.    The Constitution also ensures that States co-exist with "equal sovereignty." *Shelby County*, 570 U.S. at 544. The Constitution requires comity—the respect each State must give to each other State's right to self-govern. *See Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 245 (2019) (observing that the Constitution incorporates some forms of comity between the states). To preserve this balance, each State may legislate only within its own jurisdiction. *See Bonaparte v. Tax Court*, 104 U.S. 592, 594 (1881) ("No State can legislate except with reference to its own jurisdiction."). The result is that "the statutes of Missouri" cannot be the governing authority in "the State of New York." *See N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914).

133.    One way a State violates "equal sovereignty" is by "impos[ing] economic sanctions" intended to change out-of-state conduct that is lawful where it occurred. *See BMW*, 517 U.S. at 572. A State is entitled to regulate only "persons and property within the limits of its own territory." *Hoyt v. Sprague*, 103 U.S. 613, 630 (1880); *see also Bonaparte*, 104 U.S. at 594.

134.    The Act invades the equal sovereignty of other States by attempting to impose liability and penalties on energy companies outside of Vermont for greenhouse-gas emissions produced by lawful activities outside of Vermont's borders. Other than acknowledging that a responsible party must "satisfy the nexus requirements of the United States Constitution," § 596(22), the Act applies to "the *total* quantity of greenhouse gases released into the atmosphere" over a 30-year period. § 596(7) (emphasis added). The emissions are not said to originate from Vermont. The decisions that led to those emissions are not said to have occurred in Vermont. The results of those emissions are not said to have unique effects on the State of Vermont. So the greenhouse-gas emissions Vermont seeks to penalize have no direct connection to the State. Vermont is thus attempting to "directly regulate[] transactions which take place . . . wholly outside the State." *Edgar v. MITE Corp.*, 457 U.S. 624, 641 (1982) (plurality op.).

135.    On top of that, Plaintiff States and their citizens are directly affected by Vermont's Act. Massive fines will inevitably lead to increased energy costs and decreased energy production. The Act does not identify any in-state laws, out-of-state laws, or federal laws violated during the covered period. Instead, it imposes strict liability based on flawed estimates concerning how much each responsible party has contributed to climate change. The only conceivable way for these producers to avoid facing similar levies seriatim for other periods will be for them to change their behavior worldwide. This approach effectively regulates *intrastate* energy production elsewhere, even though regulation of intrastate energy matters is a core state function. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983).

136.    Because the Act regulates out-of-state energy producers that operate lawfully within their respective states, the Act violates the principles of comity and equal sovereignty that the Constitution protects.

137.    In crafting the Constitution, the "Framers split the atom of sovereignty" between federal and state governments. *U.S. Term Limits Inc., v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring).

138.    The Act directly undermines principles of federalism by inserting state law into an area where there is a strong "need for a uniform rule of decision," *Milwaukee I*, 406 U.S. at 105 n.6. Federal law must "remain[] unimpaired for dealing . . . with essentially federal matters," *United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 307 (1947), that is, those matters implicating "uniquely federal interests . . . committed by the Constitution and laws of the United States to federal control," *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1998) (cleaned up). Uniquely federal interests exist where the application of state law "would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states." *Clearfield Tr. Co. v. United States*, 318 U.S. 363, 367 (1943).

139.    The U.S. Supreme Court has already recognized that laws and litigation purporting to address climate issues do in fact implicate a "special federal interest," *Am. Elec. Power Co.*, 564 U.S. at 424, such that applying "the law of a particular State would be inappropriate," *id.* at 422. Federal law addresses subjects "where the basic scheme of the Constitution so demands," *id.* at 421, including "air and water in their ambient or interstate aspects." *Id.* (quoting *Milwaukee I*, 406 U.S. at 103); *accord City of New York*, 993 F.3d at 91. And federal authorities maintain exclusive control over the interstate energy markets, another subject necessarily implicated here. *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016). Were States entitled to go their own way on such subjects, energy companies would face tremendous "vagueness" and "uncertainty," and States would risk "chaotic confrontation" with each other. *Ouellette*, 479 U.S. at 496 (internal quotation marks omitted).

140.    Despite this need for federal control and national uniformity, the Climate Superfund Act purports to assume control over these issues. It imposes a unique and atypical means of regulating interstate air and the production of interstate energy. It decides that greenhouse-gas emissions must be punished and assigns liability for them based on a *global* perspective. "A state may mandate that products for sale in the state meet certain specifications; it may not, however, as a condition of doing business in the state, require that the manufacturer meet those specifications everywhere." Tyler L. Shearer, *Locating Extraterritoriality: Association for Accessible Medicines and the Reach of State Power*, 100 B.U. L. REV. 1501, 1543 (2020).

141.    As Judge Henry Friendly observed, "'[e]nvironmental protection is undoubtedly an area 'within national legislative power,'" *Am. Elec. Power*, 564 U.S. at 421 (quoting Henry Friendly, *In Praise of Erie—And of the New Federal Common Law*, 39 N.Y.U. L. REV. 383, 421-22 (1964)). In other words, "[t]he[] sovereign prerogatives" that Vermont purports to exercise in the Act are "lodged in the Federal Government." *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007).

142.    In short, Vermont's "attempt to set national energy policy through its own . . . laws would effectively overrule the policy choices made by the federal government and other [S]tates." *Minnesota ex rel. Ellison v. Am. Petroleum Inst.*, 63 F.4th 703, 719 (8th Cir. 2023) (internal quotation marks omitted) (Stras, J., concurring). If allowed to stand, the Act would "scuttle the nation's carefully created system for accommodating the need for energy production and the need for clean air. The result would be a balkanization of clean air regulations and a confused patchwork of standards, to the detriment of industry and the environment alike." *N.C. ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 296 (4th Cir. 2010).

143.    The Constitution also prohibits and preempts state actions that interfere with foreign federal relations. *See Zschernig*, 389 U.S. at 432–33. "Our system of government . . . imperatively requires that federal power in the field affecting foreign relations be left entirely free from local

39

interference." *Id.* at 442–43 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) (Stewart, J., concurring)). This "field of foreign affairs" is entrusted to "the President and the Congress," not individual States. *Id.* at 432. So while States may interact with other nations, they cannot do so in a way "where… there is evidence of clear conflict [with] the policies" adopted by the federal government. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003). Likewise, "when a state law (1) has no serious claim to be addressing a traditional state responsibility and (2) intrudes on the federal government's foreign affairs power, the Supremacy Clause prevents the state statute from taking effect." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1074 (9th Cir. 2012) (en banc).

144.    The Climate Superfund Act launches such an intrusion by expanding its reach internationally. Though the Act has an ill-defined "nexus" requirement, it expressly contemplates demanding money from "foreign nation[s]." § 596(10). Potential targets included companies in the United Kingdom, France, Brazil, Australia, Russia, Switzerland, Norway, Spain, South Africa, Colombia, and Italy—including some sovereign-controlled producers.

145.    Allowing a single State like Vermont to interfere with the federal government's response to a global policy challenge like greenhouse-gas emissions "sow[s] confusion and needlessly complicate[s] the nation's foreign policy, while clearly infringing on the prerogatives of the political branches." *City of New York*, 993 F.3d at 103. Here, the Act is designed to impose billions of dollars in after-the-fact sanctions on energy companies for the very conduct, based on the same theory of harm, that is the focus of national diplomatic efforts.

146.    This effort intrudes upon the federal government's foreign affairs power by "bypass[ing] the various diplomatic channels that the United States uses to address this issue, such as the U.N. Framework and the Paris Agreement." *Id.* That's especially the case where "the United States' longstanding position in international climate-change negotiations is to oppose the

establishment of liability and compensation schemes at the international level." *Id.* at 103 n.11; *See* Telephone Interview with Todd Stern, Special Envoy for Climate Change, U.S. DEP'T OF STATE (Oct. 28, 2015), https://perma.cc/E2SM-NT8R (stating that "[w]e obviously do have [a] problem with the idea, and don't accept the idea, of compensation and liability and never accepted that and we're not about to accept it now").

147.    Not only does the Climate Superfund Act interfere with the negotiating positions of the Federal Government with respect to greenhouse-gas treaties, but it also inhibits the Federal Government's foreign-policy objectives when it comes to international energy production and regulation.

148.    It is no secret that some of the United States' foreign adversaries use their fossil-fuel reserves to both fund their governments and to influence other nations. For instance, Russia exports a tremendous amount of natural gas to Europe, which gives it leverage over the importing nations that rely on Russian gas to keep the heat on in the winter. *See* Loveday Morris & Vanessa Guinan-Bank, *Amid summer heat wave, Germany worries about having enough gas for winter*, WALL ST. J. (July 20, 2022), https://perma.cc/A5FF-5VBV. Whether or not to continue to purchase cheap Russian natural gas became (and remains) a flashpoint issue in Europe after the invasion of Ukraine. *See, e.g.*, Hannah Arhirova & Joanna Kozlowska, *Ukraine halts transit of Russian gas to Europe after a prewar deal expired*, ASSOCIATED PRESS (Jan. 1, 2025), https://perma.cc/8L6Q-5YYY. Increasing the price of natural gas by enacting billions of dollars in retroactive penalties on both domestic and foreign producers will harm American efforts to get Europe to stop using Russian gas. This is especially true as the Climate Superfund not only intends to punish extraction of gas domestically but also from "foreign nation[s]." § 596(10).

149.    Iran, which finances Hamas and other terrorist organizations, is a major player in the oil markets. Iran exports the "vast majority" of its oil to China because it is under serious sanctions

from the United States. *See* Ryosuke Hanafusa et al*., Iran's oil exports reach 5-year high, with China as top buyer*, NIKKEI ASIA (Jan. 31, 2024), https://perma.cc/FZ9J-2G6U. If Vermont succeeds in raising costs on domestic and friendly foreign oil producers, it will allow foreign adversaries like Iran to undercut these producers. This result would undermine the stated foreign-policy objective of the Federal Government to "reduce Iran's oil exports to zero." *Treasury Imposes Additional Sanctions on Iran's Shadow Fleet as Part of Maximum Pressure Campaign*, U.S. DEP'T OF TREASURY (Feb. 24, 2025), https://perma.cc/4F88-93AC.

150.    The United States has affirmative policies of weakening the influence of our adversaries through the use of energy deregulation and sanctions. *Id.* When individual States attempt to step in and regulate the foreign and domestic production of traditional fuels, they step outside of their own jurisdiction and harm federal foreign-affairs interests. When doing so, they have "no serious claim to be addressing a traditional state responsibility," as States' "traditional [] responsibilit[ies]" only include regulating within their own borders. *Movsesian*, 670 F.3d at 1074.

151.    Because the Act violates Constitutional law protecting equal sovereignty and the foreign policy of the United States, it is preempted under the Supremacy Clause.

152.    Plaintiffs are therefore entitled to prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201 and this Court's equitable powers, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

### COUNT II

### Preemption Under the Clean Air Act

153.    All allegations above are incorporated by reference.

154.    State laws that are expressly preempted by a federal statute may not be enforced under the Supremacy Clause. U.S. CONST. art. VI, cl. 2.

155.    When a State attempts to insert itself in a regulatory field expressly reserved for the federal government, those state laws are preempted. Indeed, "[i]t is a familiar and well-established principle that the Supremacy Clause . . . invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 712–13 (1985) (internal quotation marks omitted). Even when federal law does not explicitly preempt state laws, *see Ouellette*, 479 U.S. at 491, unconstitutional interference arises when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough County*, 471 U.S. at 713 (citation omitted).

156.    Congress enacted the Clean Air Act to address a national concern over air pollution. *See* 42 U.S.C. § 7401(b)(1) (the purpose of the Clean Air Act was to "protect and enhance the quality of the Nation's air resources"). While States have "the primary responsibility" to prevent and control "air pollution . . . *at its source*" under the Clean Air Act, 42 U.S.C. § 7401(a)(3) (emphasis added), the Act deems EPA to be the "best suited [entity] to serve as primary regulator of greenhouse gas emissions," *Am. Elec. Power Co.*, 564 U.S. at 428. And because greenhouse gases present a "national question," any regulatory decisions must be informed by "our Nation's energy needs and the possibility of economic disruption must weigh in the balance." *Id*. at 427.

157.    In implementing the Clean Air Act, EPA must engage in a "complex balancing" act that considers "the appropriate amount of regulation in any particular greenhouse gas-producing sector," along with "our Nation's energy needs and the possibility of economic disruption." *Id.* To achieve this balance, the Act grants EPA the authority to categorize which entities fall under the Act's regulatory scheme. *See* 42 U.S.C. § 7411(b), (d). Under this authority, EPA has placed coal, oil, and natural gas producers under Clean Air Act jurisdiction. *See Clean Air Act Standards and Guidelines for the Oil and Natural Gas Industry*, U.S. ENV'T PROT. AGENCY (last updated Feb. 28, 2025), https://perma.cc/L636-QFWQ. Indeed, although the lawfulness of particular measures is still

a matter of some dispute, the past administration purported to aggressively employ its Clean Air Act powers to regulate greenhouse-gas emissions and fossil-fuel-related activities. *See Biden-Harris Administration Finalizes Suite of Standards to Reduce Pollution from Fossil Fuel-Fired Power Plants*, U.S. ENV'T PROT. AGENCY (Apr. 25, 2024), https://perma.cc/T5QP-F6JV.

158.    The Clean Air Act does not tolerate Vermont's Climate Superfund Act. The Second Circuit has already held that the Clean Air Act "permit[s] only state lawsuits brought under the law of the pollution's source state." *City of New York*, 993 F.3d at 100 (cleaned up). Thus, an attempt by a State to regulate pollutants released outside its boundaries is prohibited, whether through direct attempts like an "imposition of pollution standards" or indirect methods like imposing an "obligation to pay" or an "award of damages." *Id.* at 92 (internal quotation marks omitted). In other words, the Clean Air Act reflects the national, federal-level solution to the problem of interstate pollution. There is "no room for a parallel track." *Am. Elec. Power*, 564 U.S. at 425; *see also Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 693 (6th Cir. 2015) (collecting authorities establishing that claims based on the "law of a non-source state" are preempted by the Clean Air Act).

159.    The Clean Air Act preempts Vermont's Act because the latter imposes liability on energy producers for greenhouse-gas emissions emitted outside of Vermont. The Act demands "recovery" from "responsible parties"—i.e., any business involved in "extracting fossil fuel or refining crude oil"—based on the "strict liability" the Act imposes on energy producers for their role in global warming. § 596(22), 597(1). The statute will affect any "responsible party" provided they have a "sufficient connection" to Vermont under the "nexus requirements of the U.S. Constitution." § 596(22). It does not limit itself to the production or emission of greenhouse gases within the State of Vermont. It imposes the law of a non-source State around the world.

160.    Allowing Vermont to penalize energy producers for out-of-state emissions would "undermine [the] regulatory structure" provided by the Clean Air Act and would "lead to chaotic confrontation between sovereign states." *Ouellette*, 479 U.S. at 496–97 (internal quotation marks omitted).

161.    Because the Clean Air Act preempts the Climate Superfund Act, it may not be enforced against Plaintiffs and Plaintiffs' citizens.

162.    Plaintiffs are therefore entitled to prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

## COUNT III

### Violation of the Commerce Clauses

163.    All allegations above are incorporated by reference.

164.    The Commerce Clause of the United States Constitution gives Congress the power "[t]o regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8, cl. 3. This affirmative grant of power also supplies a "dormant" limitation on States' ability to affect interstate commerce. *Healy*, 491 U.S. at 326 n.1. Under the dormant Commerce Clause doctrine, a State may not regulate in a way designed to "benefit in-state economic interests by burdening out-of-state competitors." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 192 (1994). "[T]he Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy*, 491 U.S. at 336 (cleaned up). Indeed, a "long line of cases" confirms that "the Court will not hesitate to strike down a state law shown to have extraterritorial scope and an adverse impact on commerce occurring wholly outside the enacting state." *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 658–59 (7th Cir. 1995).

165.    A State violates the dormant Commerce Clause when it "discriminat[es] against interstate commerce." *Nw. Airlines, Inc. v. County of Kent*, 510 U.S. 355, 373 n.18 (1994). Such discrimination "invite[s] a multiplication of preferential trade areas destructive of the very purpose of the Commerce Clause." *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 356 (1951).

166.    The Climate Act violates the dormant Commerce Clause doctrine because it discriminates against the economic interests of other States by specifically targeting energy producers in other States with clearly excessive penalties. *See Nat'l Pork Prods. Council v. Ross*, 598 U.S. 356, 364 (2023). The Act discriminates against the economic interests of every other State by raising the costs of energy production by imposing massive fines on energy producers. As explained above, none of the targeted entities are located in Vermont, and Vermont contains practically no fossil-fuel deposits.

167.    Although Vermont produces no traditional fuels, it has "approximately 85 hydroelectric generation facilities in Vermont and on waters bordering other states." *Hydroelectric Power*, VT. DEP'T OF ENV'T CONSERVATION, https://perma.cc/K759-SRNW. These facilities produce about 57% of Vermont's in-state electricity generation. Vermont State Profile, *supra*. Vermont also has five utility-scale wind farms that account for about 13% of in-state energy created in Vermont, a larger percentage than two thirds of States. *Id.* It also generates about 16% of its in-state electricity from solar units. *Id.*

168.    All in all, "Vermont has the largest share of in-state electricity net generation from renewable resources of any state[.]" *Id.*

169.    The Act discriminates against production in other States by imposing crushing retroactive fines on fossil fuel producers while leaving Vermont's own preferred sources untouched. For instance, it punishes traditional-fuel providers while exempting loggers, who provide a dirty-burning fuel that warms around one in eight Vermont homes.

170.    The discrimination is even more obvious when one considers that Vermont intends to use the money taken from traditional fuel producers and invest it in Vermont's alternative-energy producers. The "[c]limate change adaptation project[s]" eligible to receive funding include those that will help "avoid" the "negative impacts caused by climate change." § 596(2), such as alternative-fuel operations. Thus, Vermont seeks to bilk out-of-state energy producers out of billions of dollars to subsidize its own in-state energy producers.

171.    What's more, the Act's imposition of retroactive strict liability means no out-of-state energy producer deemed responsible can escape payment. By the Act's plain terms, the Act causes substantial harm to interstate commerce. *Cf. Nat'l Pork Prods. Council*, 598 U.S. at 386–87 (noting that out-of-state pork producers' choice to be subject to California's law disfavors a finding of substantial harm to interstate commerce).

172.    Overall, the Act's burdens on interstate commerce—upending the national energy markets, engendering hostility among the States, and raising costs to out-of-state persons—are "clearly excessive in relation to the putative local benefits," which consist only of a sum of money. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). That disproportionality reveals Vermont's true purpose of attacking disfavored industries elsewhere for the benefits of domestic industry.

173.    The Foreign Commerce Clause also restricts States from enacting laws that burden or discriminate against foreign commerce. U.S. CONST. art. I, § 8, cl. 3. This doctrine safeguards the federal government's exclusive authority to regulate international trade and ensures that the United States speaks with one voice to foreign countries. *See Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434 (1979). A unified approach is essential to maintain diplomatic consistency and avoid fragmented or conflicting state-level policies that could undermine national interests. *See id.* The "scope of the foreign commerce power" is "greater" than the interstate commerce power. *Id.* at 448. This doctrine does not permit state laws to "excessive[ly] interfere[]" with foreign affairs.

47

*Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 66 (1st. Cir. 1999), *aff'd sub nom.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000). In particular, the Foreign Commerce Clause prohibits state laws that "impos[e] a different, state system of economic pressure" against a foreign entity than what the federal government would impose. *Crosby*, 530 U.S. at 376.

174.    The Act violates the Foreign Commerce Clause. The United States deals with 86 different countries to import close to 9 million petroleum barrels daily. *How much petroleum does the United States import and export?*, U.S. ENERGY INFO. ADMIN., https://perma.cc/8B4P-DTB7. The United States also works cooperatively with foreign governments to "coordinate a global response to climate change and greenhouse gas emissions." *City of New York*, 993 F.3d at 88. But because the Act covers any producer with "sufficient connection" to the State, it could easily cover foreign oil and gas producers. § 596(22). Indeed, the Act expressly lists "foreign nation[s]" as potential "responsible part[ies]." § 596(10), (18). A foreign entity then would face payment demands to the tune of billions, thus impacting their local costs, and bringing harm to their countries. This antagonism, in turn, will substantially affect the United States' foreign policy on coordinating efforts to combat greenhouse gas emissions.

175.    Antagonism over greenhouse-gas policy is not the only way that Vermont's interference in foreign commerce will harm American interests. Congress and the President have imposed strict limitations on the sale of oil from countries like Iran. Press Release, U.S. Dep't of Treasury, Treasury Imposes Additional Sanctions on Iran's Shadow Fleet as Part of Maximum Pressure Campaign (Feb. 24, 2025), https://perma.cc/Z5GM-NDH3. Although Vermont's effort to increase the price of oil includes "foreign nation[s]," § 596(10), the sanctions guarantee that no Iranian company has sufficient contacts to the State of Vermont to satisfy the Fourteenth Amendment's Due Process Clause, thus allowing Iran and other rogue nations to take advantage of higher global prices to peddle their sanctioned oil.

176.    For similar reasons, imposing billions in liability for past emissions will increase the price of natural gas sold by companies with a connection to the United States, to the benefit of Russia. Since the breakout of the war in Ukraine, the United States has done all it can to rush natural gas to European nations with the goal of reducing dependance on Russian gas. *See* Ben Cahill et al., *Geopolitical Significance of U.S. LNG*, CTR. FOR STRATEGIC & INT'L STUD. (Feb. 7, 2024), https://perma.cc/9PZN-ETU2 (describing American efforts to replace Russian liquified natural gas with American gas). Yet the Climate Superfund Act will increase the costs on American natural-gas producers, reducing their ability to compete with Russian producers, who will not be subject to fines by the State of Vermont.

177.    The point is not necessarily that Vermont affirmatively intends to upset the Federal Government's complicated relations with other countries. But by attempting to regulate the holdings of "foreign nation[s]," it is doing exactly that. § 596(10).

178.    The Act violates the dormant Commerce Clause and Foreign Commerce Clause.

179.    Plaintiffs are therefore entitled to prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

### COUNT IV

### Violation of the Due Process Clause of the
### Fourteenth Amendment to the U.S. Constitution

180.    All allegations above are incorporated by reference.

181.    The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.

182.    The Due Process Clause's "touchstone" principle is protecting individuals against "arbitrary action of government." *Wolff*, 418 U.S. at 558. In serving this principle, the Due Process Clause demands that state law shall not be "unreasonable" nor "arbitrary" and serve a "real and

substantial relation to the object sought to be attained." *Nebbia*, 291 U.S. at 525. In other words, "a legitimate legislative purpose furthered by rational means" must exist. *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992).

183.    With "fundamental fairness" as its polestar, *Lassiter v. Dep't of Soc. Servs. of Durham Cnty.*, 452 U.S. 18, 24 (1981), the Clause is particularly concerned with retroactive laws because "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). And the "principle that legislation usually applies only prospectively . . . protects vital due process interests, ensuring that individuals . . . have an opportunity to know what the law is before they act, and may rest assured after they act that their lawful conduct cannot be second-guessed later." *Opati v. Republic of Sudan*, 590 U.S. 418, 425 (2020) (internal quotation marks omitted). That's especially important for "unpopular groups or individuals" who may be targeted by retroactive laws. *See Landgraf*, 511 U.S. at 266.

184.    The Vermont Act violates the Due Process Clause because its retroactive application is fundamentally unfair. It does so in multiple ways.

185.    *First*, the Act imposes a harsh retroactive penalty on energy producers for greenhouse-gas emissions emitted as long as 30 years ago. So rather than confining the penalties to a "short and limited" period, *E. Enters. v. Apfel*, 524 U.S. 498, 526 (1998) (internal quotation marks omitted) (plurality opinion), the Act punishes energy companies for lawful actions taken long ago with no opportunity to know what the law was before they acted. *See id.* at 549–50 (Kennedy, J., concurring in the judgment and dissenting in part) (concluding that a law that "create[ed] liability for events which occurred 35 years ago" violated due process). Especially considering how climate science has evolved over time, and the fact that activities during the relevant period were actually *encouraged* by relevant governmental authorities, it is not the case that the targeted companies

"could have reasonably expected to be liable for a share of the remediation costs" over the course of this period. *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1330 (Fed. Cir. 2001).

186.    *Second*, the Act imposes an arbitrary and irrational punishment on energy producers that indicates the Act is ultimately "a means of retribution." *See Landgraf*, 511 U.S. at 266. Start with the Act's coverage period, starting 30 years before its passage. Vermont has no sound basis for choosing this period.

187.    Not only does the Act lack a sound basis for choosing this 30-year period, it does not (and cannot) fairly attribute specific impacts in Vermont to specific greenhouse-gas emissions. "Greenhouse gases, once emitted, become well mixed in the atmosphere, meaning U.S. emissions can affect not only the U.S. population and environment, but other regions of the world as well." Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66496, 66514 (Dec. 15, 2009). The converse is true, too: emissions from other regions of the world can affect Vermont. So the Act's attempt to blame specific energy producers for the purported impacts to Vermont from climate change caused by greenhouse-gas emissions can't be done in a scientific way. It is even more arbitrary and unreasonable to assume that specific emissions from specific places caused specific weather events that then gave rise to a need for remediation.

188.    As the Act acknowledges, Vermont targets only a small number of large traditional-energy producers—it ignores greenhouse-gas emissions from agriculture, farm animals, transportation, and more. End users are entirely excluded from the calculus unless those end users also happen to be producers. So ultimately, the energy producers are the sacrificial lamb for *all* greenhouse-gas emissions—whether they caused them or not. The Act unfairly targets a small, disfavored group of energy producers for lawful actions taken over thirty years ago while ignoring the emissions produced from other sources.

189.    *Third*, the Act imposes significant liability in an "imprecise manner" with none of the "protections" that are ordinarily afforded before punitive measures like these are imposed. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003). The Act tasks the Vermont Agency of Natural Resources with determining whether a party is somehow responsible "for more than one billion tons of covered greenhouse gas emissions." § 596(22). The Act does not explain when a party becomes "responsible" for emissions, how such emissions are to be measured, what sources will be used to determine responsibility, and how proportions will then be assigned. Additionally, it gives the State Treasurer practically unlimited authority to calculate the total amount that the responsible parties will be forced to contribute.

190.    *Fourth*, even aside from the length of the covered period and the problems with attributing climate harms to certain emissions, the Act's retroactive application standing alone violates the Due Process Clause. The Clause "protects the interests in fair notice and repose that may be compromised by retroactive legislation; a justification sufficient to validate a statute's prospective application under the Clause 'may not suffice' to warrant its retroactive application." *Bank Markazi v. Peterson*, 578 U.S. 212, 229 (2016) (quoting *Landgraf*, 511 U.S. at 266–67). Generally, due process "does not permit the retroactive application of a statute if it has especially harsh and oppressive consequences." *Greenberg v. Comptroller of the Currency*, 938 F.2d 8, 11 (2d Cir. 1991). "The determination of whether a statute is impermissibly retroactive looks to whether application of the statutory provision attaches a new disability, in respect to transactions or considerations already past and should be informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations." *Peralta-Taveras v. Attorney General*, 488 F.3d 580, 584 n.2 (2d Cir. 2007) (internal quotation marks omitted).

191.    All the relevant factors here show that the Act's retroactivity offends the U.S. Constitution. Producers had no warning that they would be held monetarily responsible for any

perceived effects from the lawful emissions of greenhouse gases, particularly in a State with which they might have no connection whatsoever. The federal government, for instance, did not even state a concern with greenhouse-gas emissions under the Clean Air Act until 2009. Nothing suggests that even Vermont's environmental regulators raised objections to the intrastate emission of greenhouse gases in Vermont. Instead, producers operated under the assumption that they were providing a useful product that produced substantial value for consumers, including government end-users. By conforming with the Clean Air Act and other environmental regulations, the producers had a reasonable expectation that they would not face additional liability. But now, they face ruinous costs, especially if other States accept Vermont's invitation to follow its "precedent" and impose additional retroactive sanctions based on the same emissions that Vermont purports to penalize. None of this is lawful. *See Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451, 462 (D.C. Cir. 2017) (Kavanaugh, J.) ("[E]ven if EPA has statutory authority to retroactively disapprove the replacement of an ozone-depleting substance with [hydrofluorocarbons], EPA plainly may not impose civil or criminal penalties on a manufacturer based on the manufacturer's past use of HFCs at the time when EPA said it was lawful to use HFCs.").

192.    Because the Act violates the Constitution's due process protections, it cannot be enforced against energy producers in the Plaintiff States, on whose behalf Plaintiffs bring this claim *parens patriae*.

193.    Plaintiffs are therefore entitled to prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

## COUNT V

### Violation of the Due Process Clause of Chapter I,
### Article 4 of the Vermont Constitution

194.    All allegations above are incorporated by reference.

195.    The Vermont Constitution guarantees that

> Every person within this state ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which one may receive in person, property or character; every person ought to obtain right and justice, freely, and without being obliged to purchase it; completely and without any denial; promptly and without delay; comformably to the laws.

VT. CONST. ch. I, art. 4. This clause has been interpreted to guarantee due process of law. *State v. King*, 204 Vt. 228, 240–41 (2016).

196.    Like the federal constitution, the Vermont Constitution protects against certain retroactive applications of state law. *See A.B. v. S.U.*, 218 Vt. 123, 132–33 (2023). If anything, the Vermont Constitution is *stricter* regarding retroactive regulation of vested rights. *See Bates v. Kimball*, 2 D. Chip. 77, 89 (Vt. 1824) ("The act in question is therefore retrospective . . . and is for that reason, void. It is a settled principle of the common law, that a statute shall not have a retrospective operation, so as to take away a vested right."). The fact that the Act here targets specific oil companies only makes the retroactive application worse under the Vermont Constitution. *See Town of Bradford v. Brooks*, 2 Aik. 284, 287 (Vt. 1827) (discussing "general" rules). The mere fact that this Act divests the covered entities of their vested rights in their property should be enough to conclude that it violates the Vermont Constitution.

197.    Even if some sort of balancing test should apply under the Vermont Constitution, the Climate Superfund Act still fails it for the reasons described in Count V.

198.    As noted, the covered energy producers lacked any warning of a change in legislation, and it was entirely reasonable for them to rely on existing law covering their emissions during the covered period. They had no suggestion that they would be on the hook for billions of dollars to upgrade Vermont's infrastructure. What's more, during that period, "attribution science" (science connecting extreme weather events to climate change) was in its infancy and still is subject to uncertainty. *See* Haskett, *supra*, at 1–10.

199.    Vermont's Act violates its constitution and causes significant and irreparable harm to energy producers in the Plaintiff States, on whose behalf Plaintiffs bring this claim *parens patriae*.

200.    Plaintiffs are therefore entitled to prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

**COUNT VI**

**Violation of the Equal Protection Clause of the
Fourteenth Amendment to the U.S. Constitution**

201.    All allegations above are incorporated by reference.

202.    The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

203.    The Supreme Court "has consistently held that while a State may impose conditions on the entry of foreign corporations to do business in the State, once it has permitted them to enter, 'the adopted corporations are entitled to equal protection with the state's own corporate progeny." *WHYY, Inc. v. Borough of Glassboro*, 393 U.S. 117, 119 (1968) (internal quotation marks omitted). Unjustified differential treatment violates the Equal Protection Clause.

204.    Vermont has not offered any legitimate purpose for distinguishing between large producers of three specific fuel types (all based outside of Vermont) and all other greenhouse-gas emitters (many of which are based inside Vermont).

205.    If the aim of the statute were actually remediation, then legislation would be rationally related to such a purpose if it actually sought remediation from all the relevant emitters. Yet Vermont obviously did not take such an approach. The only reasonable supposition, then, is that Vermont defined "responsible" companies in such a way as to avoid placing any burden on any

Vermont citizens. "[T]he purpose of [this] legislation . . . was discrimination itself." *Douglas ex rel. Douglas v. Hugh A. Stallings, M.D., Inc.*, 870 F.2d 1242, 1247 (7th Cir. 1989).

206.    Plaintiffs therefore seek, *parens patriae* on behalf of energy producers in their respective States, prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

## COUNT VII

### Violation of the Common Benefits Clause
### of the Vermont Constitution

207.    All allegations above are incorporated by reference.

208.    The Common Benefits Clause of the Vermont Constitution declares that "That government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or community, and not for the particular emolument or advantage of any single person, family, or set of persons, who are a part only of that community. . . ." VT. CONST. ch. I, art. 7.

209.    The Vermont Supreme Court has interpreted this provision as protecting against improper classifications in a similar, but not identical manner, as the federal Equal Protection Clause. *State v. Brunelle,* 148 Vt. 347, 351 (1987) (stating that the Vermont Clause is often "more stringent"). Vermont courts are "broadly deferential to the legislative prerogative to define and advance governmental *ends*, while vigorously ensuring that the *means* chosen bear a just and reasonable relation to the governmental objective." *Baker v. State*, 170 Vt. 194, 203 (1999) (emphasis in original).

210.    In prior cases, the Vermont Supreme Court has "concluded that the State's justifications for the disparate treatment of large and small businesses failed to withstand constitutional scrutiny." *Id.*

211.    The Climate Superfund Act cannot withstand review under the Common Benefits Clause. The "purpose" being pursued here is to limit the impacts of climate change, but the statute

pursues that goal in a wholly irrational manner for the reasons described above. It seeks a local solution for an inherently global problem. And it does so by targeting a specific set of entities that it seeks to scapegoat through retroactive punishments.

212.    Plaintiffs therefore seek, *parens patriae* on behalf of energy producers in their respective States, prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

## COUNT VIII

### Violation of the Excessive Fines Clause of the Eighth Amendment to the U.S. Constitution

213.    All allegations above are incorporated by reference.

214.    The Act imposes an excessive fine in violation of the Eighth Amendment of the U.S. Constitution. U.S. CONST. amend. VIII.

215.    The Eighth Amendment provides in its Excessive Fines Clause that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." *Id.* It is incorporated against the states under the Fourteenth Amendment's Due Process Clause. *Timbs v. Indiana*, 586 U.S. 146, 150 (2019).

216.    The "Excessive Fines Clause limits the government's power to extract payments . . . as punishment for some offense." *Austin*, 509 U.S. at 609–10 (internal quotation marks omitted). Because the "notion of punishment . . . cuts across the division between" civil and criminal law, the Clauses' protections extend to any statute that "serve[s] in part to punish." *Id.* at 610 (internal quotation marks omitted). This includes civil sanctions that are not solely remedial but also serve "either retributive or deterrent purposes." *Id.* (internal quotation marks omitted). In other words, the Clause also "protects against excessive civil fines." *Hudson v. United States*, 522 U.S. 93, 103 (1997).

217.    Courts use a two-step inquiry when determining whether a financial penalty is excessive under the Eighth Amendment. *United States v. Viloski*, 814 F.3d 104, 108 (2d Cir. 2016).

At the first stage, the court determines whether the Excessive Fines Clause applies. *Id.* If it does, then the court looks at whether the fine is unconstitutionally excessive.

218.    Here, the Excessive Fines Clause applies to the Act. The key inquiry is whether the fine could be characterized, "at least in part, as punitive." *Id.* at 109 (cleaned up). "[P]urely 'remedial'" fines do not count. *Id.* The Act serves a retributive purpose. It punishes a small group of energy producers for their alleged role in climate-change impacts while ignoring other producers, businesses, and consumers. This mismatch between the Act's provisions and its purported goal of mitigating the impacts of climate change shows that the Act's purpose, at least in part, is to punish large energy producers. Likewise, the Act makes no earnest effort to tie the sum of money assigned to these producers to the costs of climate change that the Act is intended to address.

219.    The penalty is also unconstitutionally excessive. A penalty "is unconstitutionally excessive if it is grossly disproportional to the gravity of a defendant's offense." *Id.* at 110 (internal quotation marks omitted). Courts use four factors to test for gross disproportionality:

> (1) the essence of the [offense] of the [wrong-doer] and its relation to other [bad acts], (2) whether the [wrong-doer] fits into the class of persons for whom the statute was principally designed, (3) the maximum . . . fine that could have been imposed, and (4) the nature of the harm caused by the [wrong-doer's] conduct.

*Id.* These factors are non-exhaustive. *Id.*

220.    The Act's punishment is grossly disproportionate. The Act punishes a select group of energy producers over their lawful activities. The penalty is also based on lawful greenhouse-gas emissions. As discussed above, it is impossible to determine which specific impacts in Vermont were caused by climate change and impossible to trace those impacts back to specific greenhouse-gas emissions from a particular source. *See City of New York*, 993 F.3d at 92 (noting that the gases causing global warming "cannot be traced to their source"). So the Act imposes penalties that

overestimate and arbitrarily attribute greenhouse-gas emissions to covered energy producers while ignoring the emissions from other sources or other causes of climate change.

221.    The resulting fine, likely billions of dollars, is grossly disproportionate and violates the Excessive Fines Clause.

222.    Plaintiffs therefore seek prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

### COUNT IX

### Violation of the Takings Clause of the Fifth
### Amendment to the U.S. Constitution

223.    All allegations above are incorporated by reference.

224.    The Act effects a regulatory taking by imposing "cost recovery demands" that require energy producers to hand over funds to Vermont. § 597(3). Vermont then uses those funds for its "climate change adaptation projects" without providing just compensation to energy producers. § 597(1). The Court can prospectively enjoin these types of unlawful takings.

225.    The Takings Clause of the Fifth Amendment states in part that private property may not "be taken for public use, without just compensation." U.S. CONST. amend. V. This Clause was "made applicable to the States through the Fourteenth Amendment." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005).

226.    While "takings problems are more commonly presented . . . as a physical invasion by the government," "economic regulation[s]" can also be considered to "effect a taking." *E. Enters.*, 524 U.S. at 522–23 (internal quotation marks omitted).

227.    "Regulatory takings analysis requires an intensive *ad hoc* inquiry into the circumstances of each particular case." *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 375 (2d Cir. 2006). Courts consider three factors in determining whether a regulatory taking has occurred: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has

interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017).

228.    For the first factor, the economic burden here is significant. A select group of energy producers are forced to pay what will likely be billions of dollars to fund climate change adaptation projects. Those penalties will have a severe economic impact on energy producers, consumers and businesses, and States throughout the country. As in *Eastern Enterprises* where a plurality of the Supreme Court found a "considerable financial burden" where a plaintiff had to make a retroactive payment of $50 to $100 million, Plaintiffs face a significant economic burden. 524 U.S. at 529 (plurality opinion). Indeed, in terms of dollars and cents, this statute promises to be a much greater burden than the one at issue in that case.

229.    The Act also "substantially interferes" with Plaintiffs' "reasonable investment-backed expectations." *Id*. at 532 (plurality opinion). The key inquiry is whether the regulated entity had "sufficient notice." *Id.* at 535–36 (plurality opinion). The Takings Clause "provides a . . . safeguard against retrospective legislation concerning property rights." *Id.* at 533–34 (plurality opinion). And in *Eastern Enterprises*, the plurality found this factor met primarily because the statute applied retroactively, "attach[ing] new legal consequences to [an employment relationship] completed before its enactment." *Id.* at 532 (quoting *Landgraf*, 511 U.S. at 270) (plurality opinion). Here, the Act also applies retroactively—a 30-year period running from 1995 to 2024. § 596(8). And like *Eastern Enterprises*, the covered energy producers lacked sufficient notice they would be on the hook for billions to Vermont. As stressed already, energy producers were already complying with federal law and could not have reasonably expected that they would be punished for their lawful behavior. Further, producers made expensive capital expenditures—opening mines, producing energy, building refineries—with the expectation that these substantial outlays would be recovered *without* a multi-billion-dollar outlay piled on top. So the second factor is met here.

230.    The third factor, the character of the government's action, may be strengthened in favor of the regulated entity when the "nature of the governmental action . . . is quite unusual." *E. Enters.*, 524 U.S. at 537 (plurality opinion). And the Act is quite unusual, targeting a small subset of energy producers and holding them strictly liable for damage to which every other greenhouse gas producer contributes—including cows. Amy Quinton, *Cows and Climate Change*, UNIV. CAL. DAVIS (June 27, 2019), https://perma.cc/FY4Z-T9NH (observing that cows are the number one agricultural source of greenhouse gases). What's more, the plurality in *Eastern Enterprises* noted this factor was met when a "solution singles out certain employers to bear a burden that is substantial in amount, based on the employers' conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused" because this "implicates fundamental principles of fairness underlying the Takings Clause." 524 U.S. at 537 (plurality opinion). Likewise, the Act singles out energy producers to bear a substantial financial burden based on past conduct unrelated to any commitment Plaintiffs made to Vermont. Only one other State has even attempted such a task, and that State (New York) is facing multiple legal challenges of its own.

231.    For these reasons, the Act affects an unconstitutional regulatory taking.

232.    Because the Act violates the Takings Clause, it cannot be enforced against Plaintiffs.

233.    If the Act is not declared invalid and enjoined, its significant penalties will cause irreparable harm to the Plaintiffs.

234.    Plaintiffs therefore seek prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

## COUNT X

### Violation of the Takings Clause of the Vermont Constitution

235.    All allegations above are incorporated by reference

236.    Like its federal counterpart, the Vermont Constitution declares that "whenever any person's property is taken for the use of the public, the owner ought to receive an equivalent in money." VT. CONST. ch. I, art. 2.

237.    "Virtually" the same test applies under both constitutions. *Ondovchik Fam. P'ship v. Agency of Transp.*, 187 Vt. 556, 564 (2010) (cleaned up). As outlined in Count X, the Act is an unconstitutional taking of the Plaintiff's property in violation of Chapter I, Article 2 of the Vermont Constitution.

238.    Plaintiffs are therefore entitled to prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

## COUNT XI

### Violation of the Vermont Separation-of-Powers Clause

239.    All allegations above are incorporated by reference.

240.    The Vermont Constitution declares that "[t]he Supreme Legislative power shall be exercised by a Senate and a House of Representatives." VT. CONST. ch II, § 2. It further states that "[t]he Legislative, Executive, and Judiciary departments, shall be separate and distinct, so that neither exercise the powers properly belonging to the others." *Id.* § 5.

241.    The Vermont Supreme Court has explained that when a statute provides "no standards to limit the exercise of" the person or agency implementing it, the statute is unenforceable. *In Re Handy*, 171 Vt. 336, 337 (2000). Thus, grants of "unfettered discretion" amount to a grant of legislative power, which only the Vermont legislature can exercise. *Id.* at 344.

242.    The Climate Superfund Act grants the State Treasurer such "unfettered discretion" to determine how much to penalize out-of-state traditional-energy producers. *Id.* The State Treasurer is tasked with determining how much global climate change has cost the State of Vermont and its residents but is given no guidance as to how to go about such a monumental undertaking.

243.    Section 599(c) of the Act directs the Treasurer to include costs related to "public health, natural resources, biodiversity, agriculture, economic development, flood preparedness and safety, housing, *and any other effect that the State Treasurer . . . determines is relevant*." § 599(c)(1) (emphasis added). The Act gives no guidance whatsoever on how to assess these costs, nor is there any cap on liability. Indeed, the Act explicitly authorizes the Treasurer to add his own categories of costs that he "determines [are] relevant." *Id.* This standardless delegation to take money from traditional energy companies thus allows the Treasurer to exercise legislative power in contravention of the Vermont Constitution.

244.    Plaintiffs are therefore entitled to prospective injunctive relief and declaratory relief under 28 U.S.C. § 2201.

## COUNT XII

## Equitable Relief

245.    All allegations above are incorporated by reference.

246.    Federal courts have the power to enjoin state officials' unlawful actions. *Armstrong v. Exceptional Child Ctr, Inc.*, 575 U.S. 320, 326 (2015).

247.    To decide if injunctive relief is proper, Plaintiffs must "demonstrate . . . actual success on the merits." *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2011). Once that's shown, a court considers four factors to determine whether granting injunctive relief is in the public interest. First, the court considers whether the plaintiff has "'suffered an irreparable injury.'" *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 160 (2d Cir. 2012) (quoting *eBay Inc. v. MercExchange*, LLC., 547 U.S. 388, 391 (2006)). Second, it determines whether the "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *Id.* at 160–61. Third, it decides whether, "considering the balance of hardships between

the plaintiff and defendant, a remedy in equity is warranted." *Id.* at 161. And fourth, it must

conclude "that the public interest would not be disserved by a permanent injunction." *Id.*

248.    As explained above, Plaintiffs will succeed in claims that the Act is barred under the

United States Constitution, federal statutes, and the Vermont Constitution.

249.    All the factors support injunctive relief, too.

250.    Plaintiffs face an irreparable injury, satisfying the first factor. Irreparable harm can

be shown if a plaintiff "provides evidence of damage that cannot be rectified by financial

compensation." *Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 934 F.2d 30, 34 (2d Cir. 1991)

(internal quotation marks omitted). And the damage alleged must exist "during the interim between

the request for an injunction and final disposition of the case on the merits." *Jayaraj v. Scappini*,

66 F.3d 36, 40 (2d. Cir. 1995).

251.    The injury to Plaintiff States' sovereignty is a harm that cannot be rectified by

"financial compensation" after it occurs. *Borey*, 934 F.2d at 34 (internal quotation marks omitted).

When a State suffers an injury to its sovereignty, such as having one of its officers enjoined from

enforcing a State law, "'it suffers a form of irreparable injury.'" *Maryland v. King*, 567 U.S. 1301,

1303 (2012) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351

(1977) (Rehnquist, J., in chambers)); *see Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace

Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021) (collecting cases). The same

principles demonstrate that when one State violates the sovereignty of another by regulating within

the latter's territory, it inflicts an irreparable injury upon the other State. *Cf. Conn. Dep't of Env't

Prot. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004) ("[T]he alleged violation of a constitutional right

triggers a finding of irreparable injury."); *Statharos v. N.Y.C. Taxi & Limousine Comm'n*, 198 F.3d

317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate

showing of irreparable harm is necessary."). A State that is denied its "equal sovereignty" within our federal system cannot be made whole by dollars and cents. *Shelby County*, 570 U.S. at 544.

252.    The effects on the citizenry of Plaintiff States, who Plaintiff States represent in a *parens patriae* capacity, will also be irreparable after the fact. When the Climate Superfund Act forces traditional fuel companies to redirect funds from capital investments to Vermont's climate infrastructure, it will result in countless citizens losing their jobs and businesses being forced to close. These are the kinds of harms that money judgments cannot fix after they occur. *See Borey*, 934 F.2d at 34 (requiring a person to be "fully compensated" for irreparable harm not to exist); *see also Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) (shuttering of a business constitutes irreparable harm).

253.    The harm to energy producers, even those who manage to keep their doors open, will also be irreparable. Although "[m]onetary loss alone will generally not amount to irreparable harm," *Borey*, 934 F.2d at 34, a plaintiff can show irreparable harm if sovereign immunity may bar his recovery, *see United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (per curiam) (affirming irreparable injury exists where Eleventh Amendment barred monetary relief for an unconstitutional state action). There is no doubt that the energy producers themselves could not surmount Vermont's sovereign immunity to claw back whatever of their money is left after Vermont doles it out for climate infrastructure projects. *Id.* And even if States could potentially initiate a lawsuit, *parens patriae*, attempting to obtain damages on behalf of their energy producers, *cf. Connecticut v. Cahill*, 217 F.3d 93, 101 (2d Cir. 2000), there is no guarantee that the resulting damages would flow to the producers or fully compensate them. After all, the damage caused by the Act is much broader than just producers of energy. States suffer their own losses in the form of lost tax revenue, and a State that obtains a judgment would need to use the money to remedy the harm caused to all of its citizens, not just the producers.

65

254. All in all, the harm created by the Climate Superfund Act is a bell that cannot be unrung. It damages the sovereignty of Vermont's sister States in intangible, non-pecuniary ways, *see Maryland*, 567 U.S. at 1303, and will immediately harm the health and wellness of their citizens in ways that cannot be fixed by a check years from now.

255. For those same reasons, Plaintiffs satisfy the second factor because monetary damages are inadequate to compensate for the injury.

256. The final two factors—the balance of hardship and the public interest— support Plaintiffs. These factors merge when the government is the opposing party because the interests of the State are aligned with those of the public. *Nken v. Holder*, 556 U.S. 418, 435 (2009). And the "Government does not have an interest in the enforcement of an unconstitutional law." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (internal quotation marks omitted)). What's more, if the injunction were not granted, the billions of dollars in fines would be passed on to the public, and energy reliability could well be threatened as targeted companies are forced to make cuts in recognition of these new costs. An injunction is thus in the public's interest.

257. For the reasons given, the Court should enjoin Defendant's enforcement of the Act.

## COUNT XIII

### Declaratory Relief

258. All allegations above are incorporated by reference.

259. For the reasons stated in Counts I through XII, Vermont's Act is preempted by federal statutes and violates the United States Constitution and Vermont Constitution.

260. The unlawful portions of the Act are not severable from any other portion that remains. Thus, the entire Act should be rightfully declared unenforceable and void.

261.    In any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

262.    This Court should use its equitable power to enter a declaration that the entire Act is unlawful.

## PRAYER FOR RELIEF

An actual controversy exists between the parties that entitles Plaintiffs to declaratory and injunctive relief. Plaintiffs request that this Court:

A.    Declare the Act preempted by federal statutes, otherwise violative of the United States and Vermont Constitutions, and unenforceable under 28 U.S.C. § 2201;

B.    Enjoin Defendants from taking any action to implement or enforce the Act;

C.    Award Plaintiffs the costs of the action and reasonable attorney's fees; and

D.    Grant the Plaintiffs any other relief as may be necessary and appropriate or as the Court deems just and proper.

Respectfully submitted,

JOHN B. MCCUSKEY
  ATTORNEY GENERAL OF WEST VIRGINIA

/s/ Brady C. Toensing
Brady C. Toensing
DIGENOVA & TOENSING
1775 Eye Street NW
Suite 1150
Washington, DC 20006
(202) 297-4245
Brady@digtoe.com

/s/ Michael W. Kirk
Michael W. Kirk*
Adam P. Laxalt*
Megan M. Wold*
Brian W. Barnes*

Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C., 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
mkirk@cooperkirk.com
alaxalt@cooperkirk.com
mwold@cooperkirk.com
bbarnes@cooperkirk.com

/s/ Michael R. Williams
Michael R. Williams*
  Solicitor General
Caleb B. David*
  Deputy Solicitor General
Spencer J. Davenport*
  Assistant Solicitor General

Office of the Attorney General
of West Virginia
State Capitol Complex
Building 1, Room E-26
1900 Kanawha Blvd. E
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov
caleb.a.david@wvago.gov
spencer.j.davenport@wvago.gov

*Counsel for State of West Virginia*

STEVE MARSHALL
  ATTORNEY GENERAL OF ALABAMA

/s/ Robert M. Overing
Robert M. Overing*
  Deputy Solicitor General

Office of the Attorney General
of Alabama
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
Robert.Overing@AlabamaAG.gov

*Counsel for State of Alabama*

TREG TAYLOR
  ATTORNEY GENERAL OF ALASKA

/s/ Thomas Mooney-Myers
Thomas Mooney-Meyers*
  Assistant Attorney General

Alaska Department of Law
1031 W. 4th Ave., Ste. 200
Anchorage, AK 99501
(907) 269-5100
thomas.mooney-myers@alaska.gov

*Counsel for State of Alaska*

TIM GRIFFIN
  ATTORNEY GENERAL OF ARKANSAS

*/s/ Autumn Hamit Patterson*
Autumn Hamit Patterson*
  *Solicitor General*

Office of the Arkansas Attorney General
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-3661
Autumn.Patterson@Arkansasag.Gov

*Counsel for the State of Arkansas*

CHRISTOPHER M. CARR
  ATTORNEY GENERAL OF GEORGIA

Stephen J. Petrany
  *Solicitor General*

*/s/ Elijah O'Kelley*
Elijah O'Kelley*
  *Assistant Solicitor General*

Office of the Attorney General of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334
(470) 816-1342
eokelley@law.ga.gov

*Counsel for State of Georgia*

JAMES UTHMEIER
  ATTORNEY GENERAL OF FLORIDA

Jeffrey Paul DeSousa*
  *Acting Solicitor General*

*/s/ Christine Pratt*
Christine Pratt (FBN 0100351)*
  *Assistant Solicitor General*

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
christine.pratt@myfloridalegal.com

*Counsel for State of Florida*

RAÚL R. LABRADOR
  ATTORNEY GENERAL OF IDAHO

*/s/ Michael A. Zarian*
Michael A. Zarian #12418ID*
  *Deputy Solicitor General*

Office of the Idaho Attorney General
700 W. Jefferson St., Suite 210,
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
michael.zarian@ag.idaho.gov

*Counsel for the State of Idaho*

THEODORE E. ROKITA
  ATTORNEY GENERAL OF INDIANA

/s/ James A. Barta
James A. Barta*
  Solicitor General

Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

Counsel for State of Indiana

KRIS W. KOBACH
  ATTORNEY GENERAL OF KANSAS

/s/ Anthony J. Powell
Anthony J. Powell*
  Solicitor General

Office of the Kansas Attorney General
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Tel.: (785) 368-8539
Fax: (785) 296-3131
Anthony.Powell@ag.ks.gov

Counsel for State of Kansas

BRENNA BIRD
  ATTORNEY GENERAL OF IOWA

/s/ Eric H. Wessan
Eric H. Wessan*
  Solicitor General

1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

Counsel for State of Iowa

RUSSELL COLEMAN
  ATTORNEY GENERAL OF KENTUCKY

/s/ Victor B. Maddox
Victor B. Maddox (KBA No. 43095)*
Jason P. Woodall (KBA No. 95013)*

Kentucky Office of the Attorney General
310 Whittington Parkway, Suite 101
Louisville, KY 40222
(502) 696-5300
Victor.Maddox@ky.gov
Jason.Woodall@ky.gov

Counsel for Commonwealth of Kentucky

LIZ MURRILL
  ATTORNEY GENERAL OF LOUISIANA

/s/ *J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga*
  *Solicitor General*

Office of the Louisiana Attorney General
1885 N. Third Street
Baton Rouge, LA 70802
(225) 326-6705
AguinagaB@ag.louisiana.gov

*Counsel for State of Louisiana*


AUSTIN KNUDSEN
  ATTORNEY GENERAL OF MONTANA

/s/ *Christian B. Corrigan*
Christian B. Corrigan*
  *Solicitor General*
Peter M. Torstensen, Jr.
  *Deputy Solicitor General*

Montana Department of Justice
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Counsel for State of Montana*


ANDREW BAILEY
  ATTORNEY GENERAL OF MISSOURI

/s/ *Joshua M. Divine*
Joshua M. Divine*
  *Solicitor General*

Missouri Attorney General's Office
207 West High St.
Jefferson City, MO 65101
(573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for State of Missouri*


MICHAEL T. HILGERS
  ATTORNEY GENERAL OF NEBRASKA

/s/ *Zachary A. Viglianco*
Zachary A. Viglianco*
  *Acting Solicitor General*

Nebraska Department of Justice
2115 State Capitol
Lincoln, Nebraska 68509
Tel.: (402) 471-2683
Fax: (402) 471-3297
zachary.viglianco@nebraska.gov

*Counsel for State of Nebraska*

DREW H. WRIGLEY
  ATTORNEY GENERAL OF NORTH DAKOTA

/s/ Philip Axt
Philip Axt*
  Solicitor General

600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Phone: (701) 328-2210
Email: pjaxt@nd.gov

Counsel for the State of North Dakota


GENTNER DRUMMOND
  ATTORNEY GENERAL OF OKLAHOMA

/s/ Garry M. Gaskins, II
Garry M. Gaskins, II*
  Solicitor General

Office of the Attorney General of
Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

Counsel for State of Oklahoma


DAVE YOST
  ATTORNEY GENERAL OF OHIO

/s/ T. Elliot Gaiser
T. Elliot Gaiser*
  Solicitor General

30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
614-466-5087 fax
thomas.gaiser@ohioago.gov

Counsel for the State of Ohio


ALAN WILSON
  ATTORNEY GENERAL OF SOUTH CAROLINA

/s/ J. Emory Smith, Jr.
J. Emory Smith, Jr.*
  Solicitor General

Office of the Attorney General of
South Carolina
Post Office Box 11549
Columbia, South Carolina 29211
(803) 734-3680
esmith@scag.gov

Counsel for State of South Carolina

MARTY J. JACKLEY
  ATTORNEY GENERAL OF SOUTH DAKOTA

*/s/ Jonathan Van Patten*
Jonathan Van Patten*
 *Assistant Attorney General*

South Dakota Attorney General's Office
1302 E. Highway 14, Suite 1
Pierre, South Dakota 57501
Telephone: 605-773-3215
E-mail: jonathan.vanpatten@state.sd.us

*Counsel for State of South Dakota*

KEN PAXTON
  ATTORNEY GENERAL OF TEXAS

Brent Webster
*First Assistant Attorney General*

Ralph Molina
*Deputy First Assistant Attorney General*

Ryan D. Walters
*Deputy Attorney General for Legal Strategy*

*/s/ Ryan G. Kercher*
Ryan G. Kercher*
 *Chief, Special Litigation Division*
Texas Bar No. 24060998

Kathleen Hunker*
 *Deputy Chief, Special Litigation Division*
Tex. State Bar No. 24118415

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Ryan.Kercher@oag.texas.gov
Kathleen.hunker@oag.texas.gov

*Counsel for State of Texas*

JONATHAN SKRMETTI
  ATTORNEY GENERAL AND REPORTER OF
TENNESSEE

*/s/ Whitney D. Hermandorfer*
Whitney D. Hermandorfer*
 *Director of Strategic Litigation*

Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-8726
Whitney.Hermandorfer@ag.tn.gov

*Counsel for State of Tennessee*

DEREK E. BROWN
  ATTORNEY GENERAL OF UTAH

*/s/ Gary T. Wight*
Gary T. Wight (Utah Bar No. 10994)*
 *Assistant Attorney General*

1594 West North Temple, Suite 300
Salt Lake City, Utah 84116
(801) 538-7227
gwight@agutah.gov

*Counsel for State of Utah*

BRIDGET HILL
  ATTORNEY GENERAL OF WYOMING

*/s/ Ryan Schelhaas*_____
Ryan Schelhaas*
  *Chief Deputy Attorney General*

Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for State of Wyoming*


*motion for pro hac vice admission filed or
forthcoming*


Dated: May 7, 2025