**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| UNITED STATES OF AMERICA and UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>     *Plaintiffs*,<br><br>     v.<br><br>STATE OF VERMONT, et al.,<br><br>     *Defendants*,<br><br>    and<br><br>NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION,<br><br>     *Intervenor-Defendants.* | No. 2:25-cv-00463 |
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and AMERICAN PETROLEUM INSTITUTE,<br><br>     *Plaintiffs*,<br><br>    and<br><br>STATE OF WEST VIRGINIA, et al.,<br><br>     *Intervenor-Plaintiffs,*<br><br>     v.<br><br>JULIE MOORE, et al.,<br><br>     *Defendants*,<br><br>    and<br><br>NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION,<br><br>     *Intervenor-Defendants.* | No. 2:24-cv-01513 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**INTERVENOR-DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iii

PRELIMINARY STATEMENT......................................................................... 1

BACKGROUND ............................................................................................... 2

    A.    Vermont needs funds to meet the mounting costs of climate
adaptation............................................................................................ 2

    B.    The General Assembly responded by enacting the Vermont
Act...................................................................................................... 3

    C.    The Vermont Act is an exercise of traditional state
sovereign power ................................................................................. 4

ARGUMENT ..................................................................................................... 6

I.    The Government Plaintiffs lack standing ................................................ 7

    A.    The Government Plaintiffs have not adequately pled an
injury-in-fact for proprietary standing ............................................. 8

    B.    The Government Plaintiffs have not adequately pled any
injury to their sovereign interests......................................................11

    C.    The Government Plaintiffs do not have *parens patriae*
standing............................................................................................. 13

II.    The Government Plaintiffs lack a cause of action .......................................... 15

III.    The Vermont Act is facially valid, but in the alternative, Plaintiffs'
claims are not ripe for review ........................................................................ 17

    A.    Plaintiffs' claims are not fit for review ................................................ 20

    B.    Plaintiffs will suffer no hardship from delaying review ....................... 24

IV.    The Vermont Act is not preempted ............................................................... 26

    A.    The Clean Air Act does not preempt the Vermont Act.......................... 27

        1.    The Vermont Act poses no obstacle to the Clean Air
Act's regulation of greenhouse gas emissions ........................... 28

        2.    The Clean Air Act does not occupy the field ............................ 32

i

B.    *City of New York v. Chevron* does not change the
preemption analysis ................................................................. 33

1.    The Vermont Act does not conflict with federal
common law ...................................................................... 34

2.    The Vermont Act does not impose ongoing tort
liability .............................................................................. 37

C.    The Vermont Act complies with the territorial limits set by
the Constitution ........................................................................ 40

D.    The Vermont Act does not implicate foreign affairs
preemption ................................................................................ 41

1.    The Vermont Act does not present a clear conflict
with the federal government's international climate
change policies .................................................................. 41

2.    The federal government cannot displace Vermont's
traditional responsibility to protect its residents
from property, health, and environmental harms ...................... 45

CONCLUSION ........................................................................................... 46

# TABLE OF AUTHORITIES

## Cases

*Abbott Lab'ys v. Gardner,*
    387 U.S. 136 (1967) ........................................................................................ 24, 25

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
    458 U.S. 592 (1982) ........................................................................ 5, 12, 13, 14

*Am. Elec. Power Co., Inc. v. Connecticut,*
    564 U.S. 410 (2011) .................................................................... 34, 35, 36, 37

*Am. Fuel & Petrochemical Mfrs. v. O'Keeffe,*
    903 F.3d 903 (9th Cir. 2018) ............................................................................ 5

*Am. Ins. Ass'n v. Garamendi,*
    539 U.S. 396 (2003) .................................................................... 41, 42, 43, 45

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,*
    576 U.S. 787 (2015) ........................................................................................... 6

*Arizona v. United States,*
    567 U.S. 387 (2012) ........................................................................................ 12

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015) .................................................................................. 15, 16

*Bell v. Cheswick Generating Station,*
    734 F.3d 188 (3d Cir. 2013) .................................................................... 31, 33

*BMW of North America, Inc. v. Gore,*
    517 U.S. 559 (1996) ........................................................................................ 40

*Boyle v. United Techs. Corp.,*
    487 U.S. 500 (1988) .................................................................... 26, 35, 36

*Bronx Household of Faith v. Bd. of Educ. of City of New York,*
    492 F.3d 89 (2d Cir. 2007) ............................................................................. 23

*Calcano v. Swarovski N. Am. Ltd.,*
    36 F.4th 68 (2d Cir. 2022) .............................................................................. 11

*Cascade Health Sols. v. PeaceHealth,*
    515 F.3d 883 (9th Cir. 2008) .......................................................................... 10

*Chevron Corp. v. Camacho Naranjo,*
    667 F.3d 232 (2d Cir. 2012) ........................................................................... 16

*City of Honolulu v. Sunoco LP,*
    537 P.3d 1173 (Haw. 2023), *cert. denied*, 145 S. Ct. 1111 (2025) ................... 33

*City of New York v. Chevron Corp.,*
    993 F.3d 81 (2d Cir. 2021) .......................................................... 33, 35, 37, 38, 39

*City of New York v. Exxon Mobil Corp.,*
    733 F. Supp. 3d 296 (S.D.N.Y. 2024) ............................................................. 36

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................................................ 8, 10

*Cnty. Comm'rs v. Suncor Energy USA, Inc.*,
    -- P.3d --, 2025 CO 21 (Colo. 2025) ............................................................................ 33

*Commonwealth Edison Co. v. Montana*,
    453 U.S. 609 (1981)............................................................................................... 28, 32

*Connecticut v. Cahill*,
    217 F.3d 93 (2d Cir. 2000)............................................................................................ 7

*Connecticut v. Duncan*,
    612 F.3d 107 (2d Cir. 2010) ................................................................................. 20, 25

*Copart Indus., Inc. v. Consol. Edison Co. of New York*,
    362 N.E.2d 968 (N.Y. 1977) ...................................................................................... 39

*D'Amico v. Waste Mgmt. of New York, LLC*,
    No. 6:18-CV-06080 EAW, 2019 WL 1332575 (W.D.N.Y. Mar. 25, 2019)...................... 31

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981)................................................................................................... 42

*Davis v. Passman*,
    442 U.S. 228 (1979)................................................................................................... 15

*Dennis v. Higgins*,
    498 U.S. 439 (1991)................................................................................................... 15

*Diamond Alt. Energy, LLC v. EPA*,
    606 U.S. ---, 145 S. Ct. 2121 (2025)............................................................................. 9

*District of Columbia v. Exxon Mobil Corp.*,
    89 F.4th 144 (D.C. Cir. 2023) .................................................................................... 33

*Empire HealthChoice Assur., Inc. v. McVeigh*,
    396 F.3d 136 (2d Cir. 2005) ...................................................................................... 35

*Entergy Nuclear Vt. Yankee, LLC v. Shumlin*,
    733 F.3d 393 (2d Cir. 2013) ...................................................................................... 22

*Estados Unidos Mexicanos v. DeCoster*,
    229 F.3d 332 (1st Cir. 2000)...................................................................................... 13

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471 (2008)................................................................................................... 31

*Farina v. Metro. Transp. Auth.*,
    409 F. Supp. 3d 173 (S.D.N.Y. 2019) ........................................................................ 21

*FCC v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993)..................................................................................................... 6

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024)....................................................................................................11

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
  386 F.3d 485 (2d Cir. 2004)..................................................................... 9

*George E. Warren Corp. v. U.S. EPA*,
  159 F.3d 616 (D.C. Cir. 1998).................................................................. 10

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
  508 F. Supp. 2d 295 (D. Vt. 2007)............................................................ 45

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991)................................................................................. 16

*Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*,
  471 U.S. 707 (1985).................................................................................. 5

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
  452 U.S. 264 (1981)................................................................................. 22

*Home for Aged of Little Sisters of the Poor v. McDonald*,
  711 F. Supp. 3d 81 (N.D.N.Y. 2024)......................................................... 21

*In re Assicurazioni Generali, S.P.A.*,
  592 F.3d 113 (2d Cir. 2010) ............................................................... 41, 43

*In re Gaston & Snow*,
  243 F.3d 599 (2d Cir. 2001)..................................................................... 34

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
  725 F.3d 65 (2d Cir. 2013) .......................................... 27, 28, 29, 32, 33

*Int'l Paper Co. v. Ouellette*,
  479 U.S. 481 (1987)................................................... 30, 33, 38, 39

*Inyo Cnty. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*,
  538 U.S. 701 (2003)................................................................................. 15

*Lab. Council for Latin Am. Advancement v. EPA*,
  12 F.4th 234 (2d Cir. 2021)............................................................... 19, 20

*LeClair v. Saunders*,
  627 F.2d 606 (2d Cir. 1980) ...................................................................... 5

*Long Island Oil Prods. Co. v. Loc. 553 Pension Fund*,
  775 F.2d 24 (2d Cir. 1985) ........................................................................ 6

*Lugo v. City of Troy*,
  114 F.4th 80 (2d Cir. 2024) ..................................................................... 10

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)............................................................... 7, 19, 24

*Madeira v. Affordable Hous. Found., Inc.*,
  469 F.3d 219 (2d Cir. 2006) .................................................................... 29

*Marcus v. AT&T Corp.*,
  138 F.3d 46 (2d Cir. 1998) ............................................................... 34, 35

*Maryland v. Louisiana*,
   451 U.S. 725 (1981) ................................................................................11, 14

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) .................................................................................. 5

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ................................................................... 13, 17, 26

*Mayor & City Council of Baltimore v. BP P.L.C.*,
   31 F.4th 178 (4th Cir. 2022) ................................................................ 33

*Medellín v. Texas*,
   552 U.S. 491 (2008) ........................................................................ 41, 42

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) .......................................................................... 5, 29

*Merrick v. Diageo Americas Supply, Inc.*,
   805 F.3d 685 (6th Cir. 2015) ......................................................... 31, 33

*Metro. Life Ins. Co. v. Massachusetts*,
   471 U.S. 724 (1985) .................................................................................. 5

*Milwaukee v. Illinois*,
   451 U.S. 304 (1981) ................................................................................ 34

*Minneci v. Pollard*,
   565 U.S. 118 (2012) ................................................................................ 38

*Missouri ex rel. Koster v. Harris*,
   847 F.3d 646 (9th Cir. 2017) ................................................................. 8

*Murphy v. NCAA*,
   584 U.S. 453 (2018) ................................................................................ 28

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
   514 U.S. 645 (1995) ................................................................................ 32

*Nat'l Org. for Marriage v. Walsh*,
   714 F.3d 682 (2d Cir. 2013) ................................................... 19, 20, 24

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
   538 U.S. 803 (2003) .......................................................................... 19, 20

*Nat'l Shooting Sports Found. v. James*,
   144 F.4th 98 (2d Cir. 2025) ..................................................... 27, 32, 38

*New York v. Nat'l Serv. Indus., Inc.*,
   460 F.3d 201 (2d Cir. 2006) ................................................................. 36

*New York v. Niagara-Wheatfield Cent. Sch. Dist.*,
   119 F.4th 270 (2d Cir. 2024) ......................................................... 13, 14

*North Carolina, ex rel. Cooper v. Tenn. Valley Auth.*,
   615 F.3d 291 (4th Cir. 2010) ................................................................ 31

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
    523 U.S. 726 (1998) ............................................................ 24, 25

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976) ................................................................ 15

*Pennsylvania v. West Virginia*,
    262 U.S. 553 (1923) ............................................................ 11, 17

*Rest. L. Ctr. v. City of New York*,
    90 F.4th 101 (2d Cir. 2024) ................................................. 23, 31

*Rhode Island v. Massachusetts*,
    37 U.S. (12 Pet.) 657 (1838) .................................................... 12

*Sensational Smiles, LLC v. Mullen*,
    793 F.3d 281 (2d Cir. 2015) ..................................................... 5

*Simmonds v. I.N.S.*,
    326 F.3d 351 (2d Cir. 2003) ................................................. 19, 20

*Starr Int'l Co. v. Fed. Rsrv. Bank of New York*,
    742 F.3d 37 (2d Cir. 2014) ...................................................... 36

*State by Tong v. Exxon Mobil Corp.*,
    83 F.4th 122 (2d Cir. 2023) ..................................................... 37

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) ................................................................ 41

*State v. Auclair*,
    4 A.2d 107 (Vt. 1939) ............................................................... 5

*State v. Hess Corp.*,
    20 A.3d 212 (N.H. 2011) ......................................................... 14

*Steel Inst. of New York v. City of New York*,
    716 F.3d 31 (2d Cir. 2013) ....................................................... 6

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) .................................................................. 7

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) .............................................................. 8, 24

*Tachiona v. United States*,
    386 F.3d 205 (2d Cir. 2004) ...................................................... 7

*Texas v. United States*,
    523 U.S. 296 (1998) ......................................................... 17, 24, 26

*Thomas v. Union Carbide Agric. Prods. Co.*,
    473 U.S. 568 (1985) ................................................................ 20

*Toilet Goods Ass'n, Inc. v. Gardner*,
    387 U.S. 158 (1967) ......................................................... 20, 23, 25

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ............................................................................... 7

*Trump v. CASA, Inc.*,
  606 U.S. __, 145 S. Ct. 2540 (2025) ................................................... 16

*U.S. Dep't of Lab. v. Triplett*,
  494 U.S. 715 (1990) ............................................................................. 12

*United States v. Bass*,
  404 U.S. 336 (1971) ............................................................................... 6

*United States v. Carroll*,
  667 F.3d 742 (6th Cir. 2012) ............................................................... 7

*United States v. City of Philadelphia*,
  644 F.2d 187 (3d Cir. 1980) ............................................................... 16

*United States v. Lopez*,
  514 U.S. 549 (1995) ............................................................................... 5

*United States v. Mattson*,
  600 F.2d 1295 (9th Cir. 1979) ........................................................... 16

*United States v. Morrison*,
  529 U.S. 598 (2000) ............................................................................... 5

*United States v. New York*,
  690 F. Supp. 1201 (W.D.N.Y. 1988) ................................................. 16

*United States v. San Jacinto Tin Co.*,
  125 U.S. 273 (1888) ............................................................................... 7

*United States v. Solomon*,
  563 F.2d 1121 (4th Cir. 1977) ........................................................... 16

*United States v. Traficante*,
  966 F.3d 99 (2d Cir. 2020) ................................................................. 21

*Usery v. Turner Elkhorn Mining Co.*,
  428 U.S. 1 (1976) ................................................................................... 6

*Va. Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019) ............................................................................. 27

*Vermont v. Exxon Mobil Corp.*,
  No. 2:21-CV-260, 2024 WL 446086 (D. Vt. Feb. 6, 2024) ............. 37

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ............................................................... 17, 18, 26

*Washington v. U.S. FDA*,
  108 F.4th 1163 (9th Cir. 2024) ........................................................... 12

*Williamson v. Lee Optical of Oklahoma, Inc.*,
  348 U.S. 483 (1955) ............................................................................... 6

*Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*,
   164 F.3d 123 (2d Cir. 1999) ................................................................ 36

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ........................................................................... 26

*XY Plan. Network, LLC v. U.S. SEC*,
   963 F.3d 244 (2d Cir. 2020) ............................................................ 8, 9

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ............................................................... 41, 42, 45

*Zschernig v. Miller*,
   389 U.S. 429 (1968) ........................................................................... 46

## Statutes

2020 Vt. Acts & Resolves No. 153 .......................................................... 3

2024 Vt. Acts & Resolves No. 122 .......................................................... 3

2025 Vt. Acts & Resolves No. 47 ...................................................... 4, 18

42 U.S.C. § 1997a(b)-(c) ....................................................................... 17

42 U.S.C. § 7401 ................................................................... 12, 29, 33

42 U.S.C. § 7411 ................................................................................. 29

42 U.S.C. § 7416 ........................................................................... 12, 33

42 U.S.C. § 7521 ................................................................................. 29

42 U.S.C. § 7543 ................................................................................. 28

Vt. Stat. Ann. tit. 10, § 596 ............................................................. 4, 18

Vt. Stat. Ann. tit. 10, § 597 ................................................................... 4

Vt. Stat. Ann. tit. 10, § 598 ....................................................... 4, 18, 23

Vt. Stat. Ann. tit. 10, § 599 ................................................................. 18

## Other Authorities

77 Fed. Reg. 49,490 (Aug. 16, 2012) ................................................... 29

89 Fed. Reg. 16,820 (Mar. 8, 2024) ..................................................... 29

90 Fed. Reg. 36,288 (Aug. 1, 2025) ..................................................... 32

90 Fed. Reg. 8,433 (Jan. 20, 2025) ...................................................... 44

Dan B. Dobbs et al., The Law of Torts § 57 (2d ed. 2025) ...................... 38

Fed. R. Civ. P. 12(b) ........................................................................ 6, 7

Jonathan H. Adler, *Displacement and Preemption of Climate Nuisance Claims*,
   17 J.L. Econ. and Pol'y 217  (2022) .................................................. 34

Restatement (Second) of Torts § 821B (1979) ...................................... 39

Restatement (Second) of Torts § 901 (1979) ................................................................. 38

Samuel L. Bray & Paul B. Miller, *Getting Into Equity*,
    97 Notre Dame L. Rev. 1763 (2022).................................................................. 16

## PRELIMINARY STATEMENT

Climate change is harming the health, safety, and well-being of Vermont's residents, including members of Intervenor-Defendants Northeast Organic Farming Association and Conservation Law Foundation. As temperatures rise and extreme weather events become more frequent and severe, the cost of dealing with climate change continues to increase. Vermont is taking steps to reduce the risks of climate change to its communities, infrastructure, and natural resources, but the state lacks sufficient funding to meet its climate adaptation needs.

In May 2024, the General Assembly enacted the Climate Superfund Act (the "Vermont Act" or "Act") to help meet that financial shortfall. The Act requires large fossil fuel companies with a sufficient connection to Vermont to make one-time payments to a fund for climate adaptation projects in proportion to the amount of emissions from fossil fuels they extracted or refined over a discrete 30-year period. The statute thereby shifts part of the mounting cost of climate adaptation from Vermonters to companies that bear significant responsibility for causing the pollution—companies that profited enormously from producing and refining fossil fuels.

Under the rulemaking process set forth in the statute, it will be several years before the state identifies which companies will be responsible for paying into the fund and issues cost assessments to those companies. Despite that timeline, three sets of Plaintiffs—the Chamber of Commerce and American Petroleum Institute (API), a coalition of 24 states led by West Virginia, and the United States—filed lawsuits to invalidate the Act. Plaintiffs' pre-implementation challenges to the statute are misguided. They are also premature. The defining narrative in Plaintiffs' pleadings is that the Vermont Act breaches constitutional boundaries by regulating the emission of greenhouse gases that contribute to climate change. That narrative is false. The Act is not a sweeping effort to regulate global greenhouse gas emissions, punish fossil fuel companies, or set federal policy on climate change. It is a constitutional exercise of

1

Vermont's traditional sovereign authority to raise revenue and protect the health, safety, and well-being of its residents from the ruinous consequences of climate change. The Court should dismiss Plaintiffs' complaints.

## BACKGROUND

### A.    Vermont needs funds to meet the mounting costs of climate adaptation

Vermont has been suffering from climate change for years and continues to suffer today. Rising temperatures, heavier precipitation, and extreme weather events are disrupting all aspects of life in Vermont, harming agriculture, natural resources, the economy, and public health.[1] Climate change exacerbates droughts, floods, and irregular growing conditions, which threaten farms and food systems.[2] Climate-related health impacts—including from air pollution, degraded water quality, heat exposure, and mosquito- and tick-borne diseases—disproportionately harm children, the elderly, and low-income households.[3] Extreme weather events devastate communities, businesses, properties, and lives. In July 2023, record-setting rainfall over two days caused catastrophic river and flash flooding across the state, damaging homes and businesses.[4] That was followed exactly one year later by another severe river and flash flooding event.[5] These floods have severely harmed Intervenor-Defendants' members. *See generally* Defs.-Intervenors' Mot. Intervene Mem., ECF No. 19-1.[6] And the impacts will worsen with time.

---

[1] 2021 Vermont Climate Assessment, Exec. Summary at 3-8, Ex. M to Defs.' Mot. Dismiss, ECF No. 76-15.

[2] *Id.* at 5-6.

[3] *Id.* at 2, 8.

[4] Nat'l Weather Serv., The Great Vermont Flood of 10-11 July 2023: Preliminary Meteorological Summary (Aug. 5, 2023), Declaration of Adeline Rolnick ("Rolnick Decl.") Ex. 1 at 1-2.

[5] Nat'l Weather Serv., The Significant Flooding and Severe Weather Event of 10-11 July 2024 (Aug. 10, 2024), Rolnick Decl. Ex. 2.

[6] When citing to documents filed in both matters, Intervenor-Defendants use the ECF number for *Chamber of Commerce v. Moore*, No. 24-cv-1513.

Vermont is taking measures to reduce the risks of climate impacts to its communities, infrastructure, and natural systems. Separate from the Act at issue here, the General Assembly has enacted binding greenhouse gas reduction requirements that commit the state to reduce emissions to 40 percent below 1990 levels by 2030. *See* Vermont Global Warming Solutions Act of 2020, 2020 Vt. Acts & Resolves No. 153. And the state has identified, and is making progress toward, numerous strategies to reduce its vulnerability to climate change.[7]

But recovering from climate calamities and adapting to climate change is expensive, particularly in a state that experiences so many climate disasters. According to one analysis, from 2011 to 2021, Vermont experienced 17 federally declared climate disasters and received $370 million in post-disaster federal assistance.[8] During that period, Vermont ranked fifth nationally in per capita disaster relief costs.[9] Federal relief resources, even if they continue to be available, will not suffice. A 2021 University of Vermont study predicts $5.29 billion in flood damages to residential and commercial property in Vermont alone over the next century.[10] It is less costly to reduce climate vulnerability now through adaptation and resilience efforts than to repair damage from climate disasters in the future.[11]

## B.    The General Assembly responded by enacting the Vermont Act

In May 2024, recognizing the need to secure funding for critical adaptation and resilience efforts, the General Assembly enacted the Vermont Act. *See* 2024 Vt. Acts & Resolves No. 122;

---

[7] *See generally* 2023 Vermont State Hazard Mitigation Plan, Ex. S to Defs.' Mot. Dismiss, ECF Nos. 76-23, 76-24.
[8] Vermont Atlas of Disaster at 8, Ex. R to Defs' Mot. Dismiss, ECF No. 76-22.
[9] *Id.* at 16.
[10] *Id.* at 10.
[11] U.S. Chamber of Commerce et al., The Preparedness Payoff: The Economic Benefits of Investing in Climate Resilience (June 25, 2024), Rolnick Decl. Ex. 3 (concluding that every $1 of investments in climate resilience and preparedness saves $13 in economic impact and disaster cleanup costs). The Chamber of Commerce, an author of this report, is a plaintiff in this case.

3

*see also* Defs.' Mem. in Supp. Mot. Dismiss 3-9, ECF No. 76-1 ("Defs.' Mem.") (describing the statutory scheme). The Act aims to "provide a source of revenue for climate change adaptation projects" within the state and to identify, prioritize, and implement these projects. Vt. Stat. Ann. tit. 10, § 597(1), (5)-(6). To generate revenue for this effort, the statute calls for the Agency of Natural Resources (ANR) to collect "cost recovery demands" from "responsible parties," meaning a subset of companies that extracted or refined fossil fuels during the 30-year covered period from January 1, 1995, through December 31, 2024. *Id.* § 596(8), (22). The Act limits liability to larger companies connected to Vermont—specifically, those to whom ANR attributes more than one billion metric tons of greenhouse gas emissions during the covered period and that have a "sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution." *Id.* § 596(22). A fossil fuel company's cost recovery demand will be proportional to the amount of greenhouse gas emissions resulting from fossil fuels it extracted or refined during that period. *See id.* § 598(b).

The process for identifying responsible parties and issuing cost recovery demands will take years to unfold. ANR's proposed rules are not due until July 2027, final rules are not due until January 2028, and cost recovery demands will not be served until six months after those rules are promulgated. 2025 Vt. Acts & Resolves No. 47, § 21; Vt. Stat. Ann. tit. 10, § 598(f). The original rulemaking deadlines have already been extended once, by a year. 2025 Vt. Acts & Resolves No. 47, § 21.

### C.    The Vermont Act is an exercise of traditional state sovereign power

The Vermont Act's aim to protect Vermont's residents and resources from the impacts that climate change poses to health, safety, and well-being merits deference: it falls squarely within the state's traditional powers and constitutes social and economic legislation that is presumed constitutional. States have broad police powers to "protect the health and safety of [their]

4

citizens." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996); *see also Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (states have "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort and quiet of all persons" (cleaned up)); *State v. Auclair*, 4 A.2d 107, 112 (Vt. 1939) (the "police power extends to all the great public needs" (cleaned up)). These are "primarily, and historically, . . . matter[s] of local concern." *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 719 (1985).

And Vermont, like all sovereign states, has the power "to regulate [its] internal economic affairs." *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 287 (2d Cir. 2015). Thus, "economic regulation concerned with public health is squarely within the state's police power." *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 609 (1982) (recognizing that a state's interests in the well-being of its residents extend to economic and commercial interests). States have a "legitimate interest in combating the adverse effects of climate change on [their] residents." *Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*, 903 F.3d 903, 913 (9th Cir. 2018); *cf. Massachusetts v. EPA*, 549 U.S. 497, 518-23 (2007) (recognizing state's interest in protecting its territory from climate change impacts).

The police power was "reposed in the States" and "denied the National Government" by design. *United States v. Morrison*, 529 U.S. 598, 618-19 (2000); *see also United States v. Lopez*, 514 U.S. 549, 566 (1995) (the Constitution "withhold[s] from Congress a plenary police power"). In recognition of that balance, there is a "strong presumption" that state laws "within the scope of the States' historic police powers" are not preempted "unless it is the clear and manifest purpose of Congress to do so." *Steel Inst. of New York v. City of New York*, 716 F.3d 31,

5

36 (2d Cir. 2013) (citation omitted); *see also United States v. Bass*, 404 U.S. 336, 349 (1971) (to change the balance of state and federal power, Congress must "convey[] its purpose clearly").

When states legislate to "adjust[] the burdens and benefits of economic life," their actions are presumed constitutional. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976). Under that deferential standard, courts may not "judge the wisdom, fairness, or logic" of a state's "legislative choices," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993), or measure a challenged statute "against a particular social or economic philosophy," *Long Island Oil Prods. Co. v. Loc. 553 Pension Fund*, 775 F.2d 24, 27 (2d Cir. 1985). This judicial deference reflects a state legislature's wide latitude to approach a problem incrementally, "tak[ing] one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489 (1955). In exercising their police powers, states may serve as "laboratories for devising solutions to difficult legal problems." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015).

## ARGUMENT

Intervenor-Defendants agree with State Defendants that the Court should dismiss all three complaints under Federal Rule of Civil Procedure 12(b)(6) because Plaintiffs cannot show that the Vermont Act is unconstitutional on its face. *See* Defs.' Mem. 21-75; Compl., *Chamber of Com. v. Moore*, No. 24-cv-1513 (D. Vt. Dec. 30, 2024), ECF No. 1 ("Chamber Compl."); Intervenor Compl., *Chamber of Com. v. Moore*, No. 24-cv-1513 (D. Vt. May 7, 2025), ECF No. 31 ("W. Va. Compl."); Compl., *United States v. Vermont*, No. 25-cv-463 (D. Vt. May 1, 2025), ECF No. 1 ("U.S. Compl.").

To minimize duplication, this brief focuses on the following arguments: the State Plaintiffs and the United States (collectively, "Government Plaintiffs") lack standing to assert all their claims and lack a cause of action; all of Plaintiffs' claims are unripe for judicial review; and

as to Counts I and II of all three complaints and Count V of the United States' complaint, Plaintiffs fail to state a claim that the Vermont Act is preempted by federal law. Intervenor-Defendants adopt the State's discussion of the applicable standards under Fed. R. Civ. P. 12(b)(1) and 12(b)(6). *See* Defs.' Mem. 11-12.

## I. The Government Plaintiffs lack standing

All plaintiffs bear the burden of demonstrating standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citation omitted). To establish standing, a plaintiff must show that: (1) it has "suffered an injury in fact that is concrete, particularized, and actual or imminent;" (2) "the injury was likely caused by the defendant;" and (3) "the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

States "generally bring suit in the federal courts in one of three standing capacities: (1) proprietary suits in which the State sues much like a private party suffering a direct, tangible injury . . . (2) sovereignty suits requesting adjudication of boundary disputes or water rights . . . or (3) *parens patriae* suits in which States litigate to protect 'quasi-sovereign' interests." *Connecticut v. Cahill*, 217 F.3d 93, 97 (2d Cir. 2000) (citations omitted). The State Plaintiffs do not have standing in any of these capacities.

The federal government must also "demonstrate that [it has] standing to invoke the court's jurisdiction." *Tachiona v. United States*, 386 F.3d 205, 210 (2d Cir. 2004); *see also, e.g.*, *United States v. Carroll*, 667 F.3d 742, 745 (6th Cir. 2012); *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 285 (1888) (holding that "the right of the government of the United States to institute . . . suit depends upon the same general principles which would authorize a private

citizen to apply to a court of justice for relief"). Like the State Plaintiffs, the United States has not demonstrated a proprietary, sovereign, or *parens patriae* injury that supports standing.

**A.    The Government Plaintiffs have not adequately pled an injury-in-fact for proprietary standing**

An alleged future injury must be "certainly impending" or there must be a "substantial risk" that it will occur. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up). Plaintiffs cannot rely on a "highly attenuated chain of possibilities," and courts are "reluctan[t] to endorse standing theories that rest on speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 414 (2013). Standing cannot "rest[] too heavily on conclusory statements and speculative economic data," including unsupported economic conclusions about markets that are "driven by countless variables." *XY Plan. Network, LLC v. U.S. SEC*, 963 F.3d 244, 253 (2d Cir. 2020) (cleaned up).

Government Plaintiffs have not met their burden. Their allegations that the Act will somehow increase energy prices and decrease fossil fuel production are conclusory and rely on speculation about a highly attenuated chain of possibilities dependent on the decisions of independent actors. They have not attempted to explain how a one-time assessment on a subset of fossil fuel producers could cause market prices generally to rise, and crediting this allegation would require multiple layers of implausible speculation. *See Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 653 (9th Cir. 2017) (rejecting standing partly due to "the unavoidable uncertainty of the alleged future changes in price").

For this allegation to be plausible, a responsible party would first have to receive a cost recovery demand of such magnitude that it would consider raising its prices. Then the responsible party would have to have the ability to capture more income by raising its prices, despite competitive pressures. *See, e.g., Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386

F.3d 485, 496 (2d Cir. 2004) ("[T]he ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level." (citation omitted)).

The allegation also assumes away all the global variables that influence energy pricing. As Plaintiff API explains, oil prices "are determined by market forces of supply and demand, not individual companies," and "the retail price of gasoline typically track[s] changes in the global crude oil price."[12] The notion that assessing retrospective costs to a subset of fossil fuel businesses will affect global oil prices is both implausible and far too speculative to support an Article III injury. *E.g.*, *XY Plan. Network*, 963 F.3d at 253 (rejecting a standing theory built on unsupported economic conclusions about subjects that are "driven by countless variables").[13]

Government Plaintiffs' allegation that the Act will decrease fossil fuel production levels, thereby decreasing state tax revenues from fossil fuel production, W. Va. Compl. ¶¶ 60, 75, or reducing revenue from fossil fuel leasing on federal lands, U.S. Compl. ¶ 10, also depends on a sequence of unfounded speculation. For each plaintiff, an in-state fossil fuel producer—or a producer from federal leases, for the United States—must be identified as a responsible party. Only a subset of fossil fuel producers will be assessed under the Act, and the administrative process for identifying responsible parties is years away. No plaintiff has identified a fossil fuel producer in their state, or a federal leaseholder, that will be assessed a cost recovery demand. Next, the cost recovery demand to a "responsible party" would have to be substantial enough to

---

[12] Am. Petroleum Inst., Gas Prices Explained, Rolnick Decl. Ex. 4; *see also, e.g.,* U.S. Energy Information Administration, Oil and petroleum products explained: Oil prices and outlook (Aug. 16, 2023), Rolnick Decl. Ex. 5.

[13] Plaintiff States have not attempted to fill in the gaps in their standing allegations with "commonsense economic principles" *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. ---, 145 S. Ct. 2121, 2136 (2025). Nor could they, since, as discussed above, it is a fundamental economic principle that in a competitive market, competitors prevent firms from unilaterally raising prices. *See, e.g., Geneva Pharms. Tech. Corp.*, 386 F.3d at 496.

9

alter its operational decisions. Plaintiffs do not explain how the Act would have such implausible results.[14] *See Lugo v. City of Troy*, 114 F.4th 80, 87 (2d Cir. 2024) (standing allegations must be "plausible" and "nonconclusory" (citations omitted)). The United States does not explain why any federal leaseholder will decrease production; profit-maximizing firms will only limit "additional production when marginal cost exceeds price," *George E. Warren Corp. v. U.S. EPA*, 159 F.3d 616, 628 (D.C. Cir. 1998), but the Vermont Act will not affect any company's marginal cost of production.[15] While some Plaintiff States allege that their tax revenues will decrease because the cost recovery demands will somehow diminish investments in future fossil fuel production, *see, e.g.*, W. Va. Compl. ¶ 74, this requires assuming yet another implausible chain of events that the States do not even allege: that businesses subject to the Act are planning to make profitable new investments in Plaintiff States; that the cost recovery demands would prevent them from making such investments; and that no other firms—including companies not subject to the Act—have capital sufficient to make those investments.

Government Plaintiffs' allegations of injury are therefore too conclusory and improperly rely on a "highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410. They rest on speculation that the Vermont Act would affect the market conduct or pricing of *any* company, and that the Act would affect not only the company but also state and federal revenues. Further, the allegations "rely on speculation about the unfettered choices made by independent actors not before the courts" (e.g., competitors in energy markets), and thus cannot be credited. *FDA v. All.*

[14] To take just one example, ExxonMobil reported net income of over $33 billion in fiscal year 2024, over $36 billion in 2023, and over $55 billion in 2022. ExxonMobil, Form 10-K Annual Report 77 (February 19, 2025), Rolnick Decl. Ex. 6 at 3.
[15] Marginal cost of production is the cost of producing one more unit of a product. *See Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 909 (9th Cir. 2008). Because the assessments under the Act are not tied in any way to forward-looking production, marginal costs are unaffected.

*for Hippocratic Med.*, 602 U.S. 367, 383 (2024) (cleaned up). This Court should not "draw unwarranted inferences in order to find standing." *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 76 (2d Cir. 2022) (citation omitted).

    This case is readily distinguishable from cases recognizing proprietary standing where challenged state laws had direct, unavoidable, and concrete impacts on consumers in other states. In *Pennsylvania v. West Virginia*, 262 U.S. 553 (1923), for example, a West Virginia statute required its natural gas producers to give preference to in-state consumers over out-of-state consumers, effectively "withdraw[ing]" natural gas from interstate commerce. *Id.* at 591, 582 n.1. In contrast, as addressed above, Government Plaintiffs have not plausibly pled that the Act will directly impact energy supply. In *Maryland v. Louisiana*, 451 U.S. 725 (1981), Louisiana taxed natural gas transported through Louisiana to other states and required that costs be passed on only to the ultimate consumers, raising out-of-state prices and making it unavoidable that Maryland would pay more for natural gas. *Id.* at 731-34, 736-37. Not so here. Government Plaintiffs have not plausibly pled that the Act will inevitably raise energy prices (nor could they, for reasons discussed above).

### B.    The Government Plaintiffs have not adequately pled any injury to their sovereign interests

    Although an injury to sovereign interests could support standing, neither the States nor the United States have pled such an injury. At most they have alleged the existence of interests without showing any non-speculative injury to those interests. The United States broadly claims sovereign interests in ensuring that the Act does "not interfere with federal law, including the Clean Air Act, or with the federal government's exclusive authority over interstate and foreign commerce, greenhouse gas regulation, and national energy policy," U.S. Compl. ¶ 10, but none of these interests demonstrate an Article III injury. The United States needs to show an

*impairment* of a sovereign interest, such as a way in which state law will interfere with the enforcement of federal law. *Cf. Washington v. U.S. FDA*, 108 F.4th 1163, 1176 (9th Cir. 2024) (in the reverse context, rejecting a claimed injury to Idaho's "sovereign interest in law enforcement" because nothing in the challenged federal policy "impairs Idaho's sovereign authority to enact or enforce its own laws"). The United States cites *Arizona v. United States*, 567 U.S. 387 (2012), *see* U.S. Compl. ¶ 10, but there the government demonstrated a number of specific ways in which Arizona's law interfered with the careful balance Congress struck regarding the enforcement of federal immigration law. *Id*. at 400-10.

The United States has not made a similar showing here. The United States does not offer any way in which the Vermont Act impairs or interferes with its implementation or enforcement of the Clean Air Act. Nor does it show any interference with interstate or foreign commerce, beyond the implausible and speculative economic claims addressed above. Even if the regulation of greenhouse gases or energy were exclusively federal—which it is not, as states retain significant authority to regulate both emissions and numerous aspects of energy production— nothing in the Vermont Act regulates greenhouse gases or sets energy policy. *See infra* p. 33 (citing 42 U.S.C. §§ 7401(a)(3), 7416 and explaining that the Clean Air Act is a model of cooperative federalism). While the U.S may have asserted interests, it fails to allege anything approaching a specific, concrete, and imminent *injury* to those interests.

Nor have the Plaintiff States pled an injury to any recognized sovereign interest, such as a territorial dispute, *e.g., Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 726-27 (1838); a constraint on their "power to create and enforce a legal code," *Snapp*, 458 U.S. at 601; or a question as to "the validity of [their] law," *U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 719 (1990). Instead, the States simply claim that their sovereignty is "offended," W. Va. Compl. ¶ 52;

*cf. Massachusetts v. Mellon*, 262 U.S. 447, 484–85 (1923) (no justiciable controversy without evidence that state sovereign rights were "actually invaded or threatened"). States' "quasi-sovereign" interest in "not being discriminatorily denied [] rightful status within the federal system" may support standing, but only if they satisfy the other parts of the *parens patriae* test, *Snapp*, 458 U.S. at 607—which, as discussed below, the State Plaintiffs cannot do.

### C.    The Government Plaintiffs do not have *parens patriae* standing

Both the States and the United States also claim *parens patriae* standing. W. Va. Compl. ¶¶ 76-77; U.S. Compl. ¶ 10. Neither claim survives scrutiny. At the outset, it is not clear that the United States can assert *parens patriae* standing at all. The Supreme Court has never affirmed a *parens patriae* theory for the federal government to sue a state, and there are good reasons to doubt that this theory is available. The justification for recognizing *parens patriae* standing in the states springs in part from the need for states to be able to resolve interstate disputes in an independent forum. *Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 337-38 (1st Cir. 2000). This justification does not apply to the federal government, and this Court should not adopt a novel theory of federal standing here.

Even if the United States could assert *parens patriae* standing to sue a state, Government Plaintiffs do not have *parens patriae* standing here. First, Government Plaintiffs have not plausibly alleged that a sufficiently substantial segment of their populations will be harmed by the Vermont Act, *New York v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 279 (2d Cir. 2024), let alone that "the injury 'carr[ies] a universal sting,'" *id. at* 282 (quoting *Snapp*, 458 U.S. at 609). The States claim that the Act will "upend vast swathes of Plaintiff States' economies even beyond the energy sector," W. Va. Compl. ¶ 77, and the United States claims that the Act "will raise energy costs for consumers nationwide," U.S. Compl. ¶ 10, but these wildly

speculative and conclusory claims rest on the same implausible assumptions addressed above.[16]
There is no plausible, non-speculative allegation that the Act will increase energy prices or
reduce fossil fuel production.

Second, Government Plaintiffs cannot assert *parens patriae* standing because they are not
asserting a quasi-sovereign interest and, aside from the speculative claims discussed above, have
not "articulate[d] an interest apart from the interests of particular private parties." *Snapp*, 458
U.S. at 607; *see Niagara-Wheatfield*, 119 F.4th at 279. "[A] State has a quasi-sovereign interest
in the health and well-being—both physical and economic—of its residents in general." *Snapp,*
458 U.S. at 607. Here, once the Government Plaintiffs' implausible claims about impacts on
prices or production are set aside, they assert standing based on nothing more than the interests
of fossil fuel companies. "Interests of private parties are obviously not in themselves sovereign
interests, and they do not become such simply by virtue of the State's aiding in their
achievement." *Id.* at 602. This is not a case where *parens patriae* standing is appropriate because
a state seeks to remedy (for example) broadly felt "environmental harm," *State v. Hess Corp.*, 20
A.3d 212, 216 (N.H. 2011), or to "secur[e] residents from the harmful effects of discrimination,"
*Snapp,* 458 U.S. at 609, or where it is impractical for children passing through a school to obtain
"meaningful relief" without government intervention, *Niagara-Wheatfield*, 119 F.4th at 279 &
n.3, or where consumer protection injuries might be widely felt but are not sufficiently costly for
each consumer to seek individual relief, *see Maryland*, 451 U.S. at 739. Nor is this a case where

---

[16] The United States also claims that it has *parens patriae* standing because the Act will "disrupt
the uniform regulation of fossil fuel production," U.S. Compl. ¶ 10, but this conclusory
allegation does not explain how the Act *regulates* fossil fuel production, how it would disrupt the
supposed uniformity of such regulation, or how any alleged disruption would harm a substantial
segment of the U.S. population.

a state has alleged damage to natural resources or public property, or has plausibly alleged proprietary injury. *See supra* pp. 8-11, 12.

The only directly affected parties here are large corporations fully capable of protecting their interests, *see infra* p. 23 (discussing availability of administrative and judicial review in the Vermont Act), and with an incentive to do so. Plaintiffs' *parens patriae* theory boils down to their desire to "merely litigat[e] as a volunteer the personal claims of" fossil fuel producers, which cannot support standing. *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976) (per curiam).

## II.    The Government Plaintiffs lack a cause of action

The Government Plaintiffs' federal claims should also be dismissed for failure to identify a cause of action authorizing either the United States or the individual States to sue Vermont in the circumstances presented here: to enjoin the operation of a state law that applies only to private parties, based on an allegation of sovereign interests. *See* U.S. Compl. ¶ 9, W. Va. Compl. ¶ 47.

Even when a plaintiff establishes Article III standing, it still must identify a cause of action authorizing suit in federal court to seek redress of that injury. *See Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979). Simply identifying a law the defendant has allegedly violated, as the United States does, is insufficient. The Supremacy Clause itself does not provide an implied cause of action, *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), and Section 1983 does not provide a cause of action to enforce the Supremacy Clause, *see Dennis v. Higgins*, 498 U.S. 439, 450, 450 n.8 (1991), or to protect "sovereign" rights, *Inyo Cnty. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701, 712 (2003).[17]

---

[17] To the extent State Plaintiffs assert a Section 1983 cause of action to vindicate their alleged personal rights as purchasers of energy, that claim fails for lack of standing. *See supra* pp. 8-11.

Nor does the Declaratory Judgment Act provide a cause of action. *See, e.g.*, *Chevron Corp. v. Camacho Naranjo*, 667 F.3d 232, 244-45 (2d Cir. 2012).

In *Armstrong* the Supreme Court recognized that equitable tradition may provide a basis for entertaining a suit "to enjoin unconstitutional actions by state and federal officers." 575 U.S. at 327.[18] But the Supreme Court has recently clarified that, absent a specific statute, the federal courts have only such equitable authority as was "'traditionally accorded by courts of equity' at the time of our founding." *Trump v. CASA, Inc.*, 606 U.S. __, 145 S. Ct. 2540, 2560 (2025) (citation omitted). Intervenor-Defendants are unaware of any founding-era antecedent for either the Federal Government or sister States to enjoin operation of a state law that only applies to private parties.

Courts are reluctant to conclude that Congress has authorized a significant intrusion on state sovereignty, or a change in the federal balance, absent clear indication from the national legislature. *See, e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 460-70 (1991). Indeed, courts have rejected the idea that the United States has an implied cause of action to vindicate private parties' rights under the Fourteenth Amendment. *United States v. City of Philadelphia*, 644 F.2d 187, 199-203 (3d Cir. 1980); *see also United States v. Mattson*, 600 F.2d 1295 (9th Cir. 1979) (same conclusion on standing grounds); *United States v. Solomon*, 563 F.2d 1121 (4th Cir. 1977) (same). To provide such a cause of action relating to the rights of prisoners, Congress enacted the Civil Rights of the Institutionalized Persons Act (CRIPA) in 1980. *See United States v. New York*, 690 F. Supp. 1201, 1204 (W.D.N.Y. 1988). And Congress crafted that cause of action carefully,

---

[18] Although that authorization would not have been referred to as a "cause of action," a term specific to the courts of law, the difference is simply semantic. *See* Samuel L. Bray & Paul B. Miller, *Getting Into Equity*, 97 Notre Dame L. Rev. 1763, 1764, 1772-75 (2022) (explaining that courts of equity historically lacked "causes of action" but that "equitable jurisdiction" defined "situations in which equity would act").

including by allowing attorneys' fees to be awarded against the United States and requiring the Attorney General to "personally sign any complaint filed" under CRIPA, 42 U.S.C. § 1997a(b)-(c), underscoring the importance of Congress' role in creating such a cause of action.

Nor do Government Plaintiffs have the right to sue to vindicate abstract questions of sovereignty. *See, e.g.*, *Mellon*, 262 U.S. at 485. States can sue to vindicate their own proprietary interests and *parens patriae* interests, *see Pennsylvania v. West Virginia*, 262 U.S. at 592, but they cannot act as "mere volunteers attempting to vindicate the freedom of interstate commerce or to redress purely private grievances," *id.* at 591. That is what the Government Plaintiffs are here: mere volunteers attempting to vindicate abstract interests in interstate commerce, or to litigate the fossil fuel industry's private commercial grievances. Whether framed as lack of standing, lack of a cause of action, or lack of equitable jurisdiction, their claims are deficient. Federal courts do not have equitable authority to issue an injunction to remedy these abstract or third-party commercial interests.

## III. The Vermont Act is facially valid, but in the alternative, Plaintiffs' claims are not ripe for review

Intervenor-Defendants agree with the State Defendants that Plaintiffs' facial claims should be dismissed as a matter of law for failure to state a claim because Plaintiffs have not, and cannot, establish that "no set of circumstances exists under which the Act would be valid." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (citation omitted); *see* Defs.' Mem. 21-23. We will not echo those arguments here, but should the Court deny Defendants' motion as to any of Plaintiffs' claims, it should dismiss Plaintiffs' challenges as unripe for the reasons set forth below. *See Texas v. United States*, 523 U.S. 296, 301 (1998) (dismissing as unripe Texas's request to declare that "under no circumstances" would its law affect voting and trigger Voting Rights Act preclearance review because "[w]e do not have

17

sufficient confidence in our powers of imagination to affirm such a negative"). Either result allows the court to avoid "formulat[ing] a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Washington State Grange*, 552 U.S. at 450 (citation omitted). In a nutshell, since Plaintiffs rely on speculation about how the Act *may* be implemented and the impacts it *may* have, and since Plaintiffs' facial attacks fail as a matter of law, the record is sufficient to uphold the Vermont Act but not to strike it down.

Plaintiffs' pre-implementation, pre-enforcement challenges to the Act—which imposes no legal obligations on any responsible party until 2028, has no present effect on any Plaintiff, and defers to future agency action questions about how (if at all) the Act will be applied to any individual fossil fuel business—are not ripe. No state agency has the authority even to identify responsible parties at this point, much less authority to impose liability. Instead, the Act sets forth a multi-year administrative process to implement its mandate.

The State Treasurer's assessment of costs of covered greenhouse gas emissions is not due until January 2027, Vt. Stat. Ann. tit. 10, § 599c, and the Agency's *proposed* rules necessary to implement the Act are not due until July 2027, 2025 Vt. Acts & Resolves No. 47, § 21. Final implementing rules are not due until January 2028. *Id.* These rules will cover the methodologies needed to identify responsible parties—which, by definition, exclude those who "lack[] sufficient connection with the State," Vt. Stat. Ann. tit. 10, § 596(22)—and determine their applicable share of covered greenhouse gas emissions. *Id.* § 599a(b)(1)-(2). Cost recovery demands will not be issued until six months after the rulemaking, *id.* § 598(f), and affected companies can challenge the demands administratively and in court, *id.* § 598(i). The original rulemaking deadlines have already been extended once, by a year. 2025 Vt. Acts & Resolves No. 47, § 21.

Though the Act provides standards for its implementation, until the rulemaking process is complete, the following elements are unknown: the number of responsible parties; the identity of responsible parties; the specific methodology for identifying responsible parties; the magnitude of the overall cost recovery the state will seek to collect; the specific methodology for calculating covered greenhouse emissions; and the specific methodology for determining each responsible party's share of those emissions.

These contingencies render Plaintiffs' claims unripe. The ripeness doctrine—which is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction"—is designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies" and to protect agencies "from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (citations omitted).[19] This tool allows courts to "enhance the accuracy of their decisions" by avoiding adjudications that "may require premature examination of, especially, constitutional issues that time may make easier or less controversial." *Simmonds v. I.N.S.*, 326 F.3d 351, 357 (2d Cir. 2003). A claim is not ripe if plaintiffs' asserted injuries are not "'actual or imminent,' but instead 'conjectural or hypothetical,'" *Nat'l Org. for Marriage v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) (quoting *Lujan*, 504 U.S. at 560), or "if it depends upon 'contingent future events

---

[19] While acknowledging that the Supreme Court has not addressed the "continuing vitality of the prudential ripeness doctrine," *Lab. Council for Latin Am. Advancement v. EPA*, 12 F.4th 234, 253 n.2 (2d Cir. 2021) (cleaned up), the Second Circuit has continued to dismiss cases on prudential ripeness grounds, *id.* at 254.

that may not occur as anticipated, or indeed may not occur at all,'" *id.* at 687 (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985)).

In evaluating ripeness, courts consider two factors: (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding review. *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808. Neither factor is present here.

### A.    Plaintiffs' claims are not fit for review

While the Court has sufficient information to dismiss Plaintiffs' complaints for their failure to establish that the Vermont Act would be unconstitutional in every application, the claims Plaintiffs raise are otherwise unfit for adjudication now. They are not fit because they call on the Court to adjudicate issues that "are contingent on future events or may never occur," *Simmonds*, 326 F.3d at 359 (citation omitted), and because facts developed during the administrative process would "'significantly advance [the court's] ability to deal with the legal issues presented,'" *Nat'l Park Hosp. Ass'n v*, 538 U.S. at 812 (citation omitted); *see also Connecticut v. Duncan*, 612 F.3d 107, 114 (2d Cir. 2010) (case was not fit for review where court "would benefit from a more developed administrative record"). Even "purely legal" claims may benefit from "further factual development," making them unfit for review. *Nat'l Park Hosp. Ass'n v*, 538 U.S. at 812 (citation omitted); *see also Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 163-64 (1967) (though petitioners framed a "purely legal question" for review, the dispute was unripe because "judicial appraisal . . . is likely to stand on a much surer footing in the context of a specific application" of the challenged law). This Court would "benefit from postponing review" until the Act's scope and impacts have "sufficiently crystallized" through the state's administrative process. *Lab. Council for Latin Am. Advancement*, 12 F.4th at 252 (citation omitted).

20

Critically, Vermont has not yet determined, among other things, the overall cost recovery it will seek to collect, which companies have sufficient contacts with the state, and how to apportion the overall amount among responsible parties. The Court's evaluation of Plaintiffs' due process claims under the U.S. and Vermont constitutions, which allege that the Act imposes "harsh" and "arbitrary" liability, would benefit from understanding the magnitude of liability overall and for any given responsible party.[20] *See, e.g.*, *United States v. Traficante*, 966 F.3d 99, 106 (2d Cir. 2020) (vagueness challenge was unripe because while it "clearly raises a question of law, the inquiry, at this point, is surely just an abstraction"). The same applies to Plaintiffs' claims that the unknown future cost recovery demands will be "disproportional to the gravity of the offense" in violation of the Eighth Amendment's excessive fines clause,[21] because the Court will be "unable to engage in the requisite proportionality analysis" until it knows the magnitude of liability. *Home for Aged of Little Sisters of the Poor v. McDonald*, 711 F. Supp. 3d 81, 113 (N.D.N.Y. 2024); *see also Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 195 (S.D.N.Y. 2019) ("Challenges under the Excessive Fines Clause are generally not ripe until the actual, or impending, imposition of the challenged fine." (cleaned up)). Likewise, Plaintiffs allege that the Act's burdens on interstate commerce are "clearly excessive in relation to the putative local benefits,"[22] but until the Court has a "factual record concerning incidental effects . . . on interstate commerce"—which may depend in part on the magnitude of liability assessed under

---

[20] *See* Chamber Compl. ¶¶ 128-29, 140, 142 (Count III, U.S. Constitution due process); W. Va. Compl. ¶¶ 185-86, 189 (Count IV, U.S. Constitution due process), ¶¶ 196-97 (Count V, Vermont Constitution due process).

[21] *See* W. Va. Compl. ¶¶ 219-20 (Count VIII, excessive fines) (citation omitted); Chamber Compl. ¶¶ 158 (Count V, excessive fines).

[22] U.S. Compl. ¶ 80 (Count III, interstate commerce clause) (citation omitted); W. Va. Compl. ¶ 172 (Count III, commerce clause) (citation omitted); *see also* Chamber Compl. ¶ 151 (Count IV, commerce clause).

the Act—the "analysis required under the dormant Commerce Clause may not be performed."

*Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 430-31 (2d Cir. 2013).

Plaintiffs' takings claims under the U.S. and Vermont constitutions are not fit for review

for similar reasons: the Court can better assess the "economic impact of the regulation on the

claimant" and "the extent to which the regulation has interfered with distinct investment-backed

expectations"[23] once it knows the magnitude of liability in the aggregate and as to specific

responsible parties. *See Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 297

(1981) (takings challenge "simply is not ripe for judicial resolution" where challengers "cannot

at this juncture legitimately raise complaints . . . about the manner in which the challenged

provisions of the [statute] have been or will be applied in specific circumstances, or about their

effect on particular . . . operations").

Without knowing the identity of responsible parties, the Court cannot evaluate whether

those entities have a "substantial nexus" or "sufficient connection" to Vermont, consistent with

due process limits.[24] Likewise, information about the number and identity of responsible

parties—combined with information about the magnitude of liability—would enhance the

Court's ability to determine whether the Act "imposes a disproportionate burden on foreign

commerce."[25] For example, it is unknown at this time whether any "foreign entities" will even be

liable under the Act—they would have to have a "sufficient connection" to the state, Vt. Stat.

Ann. tit. 10, § 596(22)—to say nothing of whether the Act will "substantially affect the United

---

[23] Chamber Compl. ¶ 180 (Count VI, U.S. Constitution takings) (citation omitted); W. Va.
Compl. ¶¶ 227 (Count IX, U.S. Constitution takings) (citation omitted), 237 (Count X, Vermont
Constitution takings).
[24] U.S. Compl. ¶¶ 68-69 (Count II, extraterritoriality); W. Va. Compl. ¶ 134 (Count I, federal
preemption); Chamber Compl. ¶¶ 81-82, 85-86 (Count I, federal preclusion).
[25] U.S. Compl. ¶ 92 (Count IV, foreign commerce clause).

States' foreign policy,"[26] "interfere[] with international trade,"[27] or "undermine the United States' ability to speak with one voice in international relations."[28] Speculation cannot substitute for substantive pleading.

Judicial resolution of Plaintiffs' claims is therefore "likely to stand on a much surer footing in the context of a specific application" after the administrative process unfolds than in the "framework" of the pre-enforcement "generalized challenge" presented here. *Toilet Goods*, 387 U.S. at 164. And the Act specifically contemplates an application-specific approach: a responsible party aggrieved by a cost recovery demand can request agency reconsideration and subsequently seek judicial review. *See* Vt. Stat. Ann. tit. 10, § 598(i). Responsible parties thus have ample opportunity to present—in the context of a concrete application of the Act—the claims Plaintiffs seek to press now, as well as any additional defense to liability. *See* Chamber Compl. ¶ 16 n.3 (reserving the right to argue that Plaintiffs' members are not responsible parties because they lack a "sufficient connection" to the state). And nothing precludes future as-applied challenges to the Act after the rulemaking process has unfolded. *Cf. Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 118 (2d Cir. 2024) (rejecting facial preemption challenge and noting that "nothing would prohibit a successor from raising the preemption issue in a future as-applied challenge"). The fact that Plaintiffs' claims present constitutional questions also weighs in favor of deferring resolution of their pre-enforcement challenges. *See Bronx Household of Faith v. Bd. of Educ. of City of New York*, 492 F.3d 89, 114 (2d Cir. 2007) (Leval, J., concurring) (the "principle of constitutional avoidance is an integral part of the ripeness analysis" and "tilts the balance in favor of finding a constitutional issue unripe for review"). Evaluating Plaintiffs'

---

[26] W. Va. Compl. ¶ 174 (Count III, commerce clause).
[27] Chamber Compl. ¶ 153 (Count IV, commerce clause).
[28] U.S. Compl. ¶ 108 (Count V, foreign affairs preemption).

claims at this stage—when the rulemaking process has just begun, and many elements of the

Act's implementation critical to Plaintiffs' claims are still unknown—involves "too remote and

abstract an inquiry for the proper exercise of the judicial function." *Texas*, 523 U.S. at 301

(citation omitted).

**B.    Plaintiffs will suffer no hardship from delaying review**

Plaintiffs will not suffer hardship from delaying review because the Act itself does not

"create adverse effects of a strictly legal kind"; that is, it does not command any Plaintiff to "do

anything or to refrain from doing anything." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S.

726, 733 (1998). As discussed above, it will be several years before ANR determines which

entities will be assessed and in what amount. Until these uncertainties are resolved, Plaintiffs

cannot show that their asserted injuries are "actual or imminent." *Nat'l Org. for Marriage*, 714

F.3d at 688 (quoting *Lujan*, 504 U.S. at 560-61). The Act does not currently "subject anyone to

any civil or criminal liability" or create "legal rights or obligations" for Plaintiffs, their members,

or their constituents. *Ohio Forestry Assn*, 523 U.S. at 733.

Nor is this a case where a statute or rule imposes "direct and immediate" consequences

on Plaintiffs by forcing them to incur compliance costs now. *Contra Abbott Lab'ys v. Gardner*,

387 U.S. 136, 152 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99

(1977). And it is not a case where "threatened enforcement [is] sufficiently imminent," *Susan B.*

*Anthony List*, 573 U.S. at 159, because the Act cannot be enforced against anyone for years, and

at this juncture no state agency has authority to identify responsible parties or impose liability.

Plaintiffs Chamber of Commerce and API have not conceded that any specific member of their

organizations qualifies as a responsible party, s*ee* Chamber Compl. ¶ 16 & n.3, but even if they

had, there is no way in which the Act "could now force [Plaintiffs] to modify [their] behavior in

order to avoid future adverse consequences." *Ohio Forestry Ass'n*, 523 U.S. at 734. That is

because—as Plaintiffs Chamber of Commerce and API admitted in a challenge to a comparable New York statute[29]—nothing a responsible party does today could alter the amount of its liability, which will derive from its historical production of fossil fuels from 1995 to 2024. Because the Act does not threaten enforcement or require any plaintiff to modify its behavior now, "no irremediable adverse consequences flow from requiring a later challenge" to its validity. *Toilet Goods*, 387 U.S. at 164; *see also Duncan*, 612 F.3d at 115 (no hardship where the plaintiff "faces no imminent enforcement action").

Similarly, Government Plaintiffs cannot claim hardship from delaying review. The Act does not regulate them at all, let alone command them "do anything" or "refrain from doing anything." *Ohio Forestry Ass'n*, 523 U.S. at 733. All of their alleged economic injuries— decreased tax revenue, W. Va. Compl. ¶ 54; increased fossil fuel costs, W. Va. Compl. ¶ 55, U.S. Compl. ¶ 10; decreased leasing revenue, U.S. Compl. ¶ 10; and economic harm to their citizens, W. Va. Compl. ¶ 77; U.S. Compl. ¶ 10—are speculative. Even if they were not, these supposed downstream economic injuries would not be felt for many years, unless and until responsible parties pay cost recovery demands, which are not due until 2028 (a deadline that has already been extended once). These are not the sorts of "direct and immediate" consequences that constitute hardship. *Abbott Lab'ys*, 387 U.S. at 152.

To the extent the Government Plaintiffs purport to assert immediate hardship from a threat to their sovereignty, W. Va. Compl. ¶¶ 51-52; U.S. Compl. ¶ 10, "that is an abstraction— and an abstraction no graver than the 'threat to personal freedom' that exists whenever an agency regulation is promulgated, which [is] inadequate to support suit unless the person's primary

---

[29] Compl. ¶ 161, *Chamber of Com. v. James*, No. 1:25-cv-1738-MKV (S.D.N.Y. Feb. 28, 2025), ECF No. 1 ("Nothing energy producers can do today can affect their liability under the [New York Climate Superfund] Act.").

conduct is affected." *Texas*, 523 U.S. at 302; *see also id.* (rejecting Texas's claim that it "suffers the immediate hardship of a 'threat to federalism'"); *cf. Mellon*, 262 U.S. at 482, 488 (dismissing challenge to statute that allegedly intruded "within the field of local powers reserved exclusively to the states" where state failed to show that it "has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement").

To the contrary, it is Vermont's interests that are threatened: the state is in the early stages of assessment and rulemaking to implement a statute duly enacted by the legislature to protect the health, safety, and well-being of its residents. *Supra* pp. 4-6. The Vermont Legislature directed a careful, thoughtful, and fair process to address the costs faced by Vermonters from the impacts of climate change. Plaintiffs' premature claims "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented" and denying Vermont the opportunity to implement the Act "in a manner consistent with the Constitution." *Washington State Grange*, 552 U.S. at 451.

If the Court does not dismiss Plaintiffs' claims on the merits, it should dismiss them as unripe and allow the administrative process to unfold.

## IV.    The Vermont Act is not preempted

In all preemption cases, courts must "start with the assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted). While typically only acts of Congress may preempt state law, *see id.* (the "purpose of Congress is the ultimate touchstone in every preemption case" (citation omitted)), the Supreme Court has also recognized narrow circumstances in which federal common law may preempt state law, *see Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988).

The presumption against preemption is "particularly strong" where, as here, the challenged state law "falls well within the state's historic powers to protect the health, safety, and property rights of its citizens." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013). Plaintiffs therefore bear a heavy burden to establish preemption. *See id.* at 96, 101-02. To meet that burden, they may not "[i]nvok[e] some brooding federal interest or appeal[] to a judicial policy preference"; instead, they "must point specifically to a constitutional text or a federal statute" that displaces or conflicts with the state act. *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality op.) (cleaned up).

Plaintiffs have not met their burden. As we detail below, the Vermont Act is not preempted by the Clean Air Act or any other federal law; the Second Circuit's decision in *City of New York* does not govern the preemption analysis of the non-tort state statute challenged here; and the Act is neither an unconstitutional extraterritorial regulation nor preempted because it interferes with the conduct of foreign affairs.

A.    **The Clean Air Act does not preempt the Vermont Act**

Congress may preempt state law in three ways: (1) express preemption, (2) field preemption, where Congress "occupies an entire field of regulation and leaves no room for state law"; or (3) conflict preemption, where state law makes compliance with both federal and state law "impossible" or poses "an obstacle to the achievement of federal objectives." *Nat'l Shooting Sports Found. v. James*, 144 F.4th 98, 108 (2d Cir. 2025) (citation omitted). Plaintiffs allege that the Vermont Act is preempted because it poses an obstacle to implementation of the Clean Air Act (conflict preemption), U.S. Compl. ¶¶ 52-56; W. Va. Compl. ¶¶ 155-60; Chamber Compl. ¶¶ 109-120, and because Congress has occupied the field of interstate air pollution regulation

27

(field preemption), U.S. Compl. ¶ 50.[30] Both theories fail for the same reason: the Clean Air Act directs the United States Environmental Protection Agency (EPA) to set pollution control standards for greenhouse gas emissions at certain sources, and the Vermont Act sets no emission standards at all. Plaintiffs have not identified a single pollution source that would have to change its emission controls because of the Vermont Act.

Plaintiffs' argument is that because the Act *may* have an indirect effect on greenhouse gas emissions at some point in the future, the Clean Air Act must preempt it. Putting to one side the speculative, unsupported nature of this allegation, preemption requires more: there must be an actual conflict between the state law and rights or restrictions created by federal law. *See Murphy v. NCAA*, 584 U.S. 453, 477-78 (2018). If the Clean Air Act preempted every state law with potential ancillary effects on greenhouse gas emissions, myriad state policies with that potential—such as gasoline taxes, highway tolls, tax credits for renewable energy sources, and energy efficiency standards for buildings—may be preempted as well. There is no evidence that Congress intended such an extreme result. *See Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 633 (1981) (rejecting argument that congressional policy favoring the use of coal over other fuels "demonstrate[s] a congressional intent to pre-empt all state legislation that may have an adverse impact on the use of coal").

1.    **The Vermont Act poses no obstacle to the Clean Air Act's regulation of greenhouse gas emissions**

To show that the Vermont Act poses an obstacle to implementation of the Clean Air Act, Plaintiffs must establish that it presents an "actual" and "sharp" conflict with "the overriding federal purpose and objective" of the federal statute. *MTBE*, 725 F.3d at 101 (cleaned up). "The

---

[30] Plaintiffs do not (and could not) allege that the Clean Air Act expressly preempts the Vermont Act. The Clean Air Act has only two express preemption provisions, both of which concern state emission standards for motor vehicles. *See* 42 U.S.C. §§ 7543 (a), 7543(e)(1).

mere fact of tension between federal and state law" is insufficient. *Id*. The "repugnance or conflict" must be "so direct and positive that the two acts cannot be reconciled or consistently stand together." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006). Since Congress's purpose is the "ultimate touchstone," *Medtronic*, 518 U.S. at 485, courts must "examin[e] the federal statute as a whole and identif[y] its purpose and intended effects." *MTBE*, 725 F.3d at 101 (cleaned up).

The Clean Air Act's "overriding federal purpose and objective," *MTBE*, 725 F.3d at 101-02 (cleaned up), is to "prevent and control air pollution." 42 U.S.C. § 7401. It does not provide a regime for addressing harms from greenhouse gas emissions or adaptation to climate change. Even with respect to controlling emissions, the Clean Air Act does not direct EPA to identify and achieve an overall level of national greenhouse gas emissions. *Contra* Chamber Compl. ¶ 110, W. Va. Compl. ¶ 157, U.S. Compl. ¶¶ 50-52. Instead, it directs EPA to identify stationary and mobile sources that, in EPA's judgment, contribute to harmful air pollution, and set pollution control standards for some of those sources.[31] *See* 42 U.S.C. §§ 7411, 7521.

The purpose of the Vermont Act is not to control air pollution; it is to address its effects inside Vermont. The state needs funds to pay for infrastructure, health, and safety projects to protect its people and natural resources from damage from climate change. It accomplishes this by collecting a one-time retroactive assessment from particular fossil fuel companies that have a

---

[31] Clean Air Act standards that apply to some fossil fuel production facilities, *see* W. Va. Compl. ¶ 157, Chamber Compl. ¶ 111, do not regulate greenhouse gas emissions from the use of fossil fuels. Instead, they set standards to limit leaks of methane from some oil and gas production facilities, and for some facilities' emissions of non-greenhouse gas pollutants. *See* Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review, 89 Fed. Reg. 16,820 (Mar. 8, 2024); Oil and Natural Gas Sector: New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants Reviews, 77 Fed. Reg. 49,490 (Aug. 16, 2012).

sufficient connection to the state and are prime contributors to the problem. Nothing in the Vermont Act imposes pollution control standards, let alone on sources regulated by the Clean Air Act. While the Vermont Act looks to emissions attributable to the fossil fuels produced and refined by responsible parties to determine the amount of each assessment, that is not pollution control; it is a rational legislative choice concerning how to calculate and allocate responsibility for a pressing problem the state must address.

Plaintiffs' reliance on the source-state rule—the principle that the Clean Air Act preempts the application of state common law claims to limit pollution from out-of-state sources, Chamber Compl. ¶ 116, W. Va. Compl. ¶ 158, U.S. Compl. ¶ 53—does not help their case. This rule is not an independent preemption doctrine, but merely an application of settled obstacle preemption principles when federal and state law seek to apply different pollution control standards to the same source. The rule originated in *International Paper Co. v. Ouellette*, in which Vermont residents brought a nuisance suit under Vermont law over a New York paper mill's discharges into interstate waters. 479 U.S. 481, 483-84 (1987). The mill was operating under the terms of a Clean Water Act permit that set limits on how much waste it could release. *Id*. at 489, 490 n.10. Looking to the text, structure, and purpose of the Clean Water Act, the Court concluded that Congress intended to permit only two pollution control standards for the mill and other point sources it regulated: a federal standard set pursuant to the Clean Water Act and a standard enforced by the law of the source state. *Id*. at 490-99. The residents' nuisance suit, by seeking to apply a third standard (Vermont nuisance law) to the same point source, would have interfered with Congress's intent to permit only two standards and was thus preempted. *Id*. at 495-96. Notably, the relief requested in *Ouellette* included punitive damages and injunctive relief that would have forced the defendant to restructure part of its water treatment system. *Id*. at 484.

Courts that have expanded *Ouellette's* source-state rule to the Clean Air Act have followed the same reasoning. Those cases recognize that, as in the Clean Water Act, Congress intended only two permissible pollution control standards for Clean Air Act-regulated sources: the federal standard and the source-state standard. *See Bell v. Cheswick Generating Station*, 734 F.3d 188, 196-97 (3d Cir. 2013); *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 690-92 (6th Cir. 2015); *North Carolina, ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 306 (4th Cir. 2010); *D'Amico v. Waste Mgmt. of New York, LLC*, No. 6:18-CV-06080 EAW, 2019 WL 1332575, at *9-*11 (W.D.N.Y. Mar. 25, 2019). In these cases, the out-of-state law at issue had the same purpose as the Clean Air Act—to limit pollution from a certain point source—and sought to use the same means—imposing a pollution control standard. The federal and state laws thus could not be reconciled. By contrast, the Vermont Act does not "threaten similar interference with federal regulatory goals." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 489 n.7 (2008), because it does not impose standards to limit pollution from *any* source.

Plaintiffs' final volley is to allege that, despite not placing any limit on emissions or imposing pollution control standards, the Vermont Act somehow "regulates" greenhouse gas emissions because it may indirectly lead to lower greenhouse gas emissions in the future. U.S. Compl. ¶¶ 48, 54; Chamber Compl. ¶¶ 96, 101, 109, 117; W. Va. Compl. ¶¶ 135, 158. Their theory appears to be that the Act may indirectly increase the cost of fossil production and decrease the amount of greenhouse gas emissions at some undefined point in the future. *See, e.g.*, U.S. Compl. ¶¶ 10, 56; W. Va. Compl. ¶¶ 51, 74, 135; Chamber Compl. ¶ 102. These allegations rely on multiple layers of implausible speculation and should not be credited, particularly in the context of a facial preemption challenge. *See supra* pp. 8-11; *see also Rest. L. Ctr.*, 90 F.4th at 117 (declining to find facial preemption based on a speculative application of the challenged

31

law); *Nat'l Shooting Sports Found.*, 144 F. 4th at 112 (cautioning against "speculating about hypothetical or imaginary cases in which a law might be" preempted). The Supreme Court has rejected broad theories of federal preemption that would disturb swaths of traditional state authority due to potential indirect, downstream effects. *See, e.g., N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 661-62, 664 (1995).

In *MTBE*, the Second Circuit found that even a state law that increased the cost of complying with a specific Clean Air Act provision posed no obstacle to the Clean Air Act's pollution reduction goals. *MTBE*, 725 F.3d at 102-03. Here, Plaintiffs merely allege that owners of EPA-regulated sources may make choices as independent economic actors that result in fewer fossil fuel emissions. But Congress did not intend for the Clean Air Act to preempt every state law—from zoning standards to highway tolls—with the potential to have ancillary effects on the emission of greenhouse gases. *See Commonwealth Edison,* 453 U.S. at 633 (Congress did not intend to preempt "all state legislation that may have an adverse impact on the use of coal").[32] Since the core issue for any preemption claim is Congress's intent, *see MTBE*, 725 F.3d at 101, Plaintiffs' conflict preemption claim fails.

### 2.    The Clean Air Act does not occupy the field

Plaintiffs' field preemption theory rests on the premise that the Clean Air Act "occup[ies] the field of interstate air pollution regulation." U.S. Compl. ¶ 50. That is not a basis for preemption because, as described above, the Vermont Act does not set pollution control standards or limit emissions at all. *Supra* pp. 29-30. In any event, Plaintiffs' underlying premise is wrong

---

[32] In a recent proposed rule—and contrary to the position it takes here—EPA has questioned its statutory authority to regulate greenhouse gases. Proposed Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards, 90 Fed. Reg. 36,288 (Aug. 1, 2025). Intervenor-Defendants reserve the right to address any impact of this effort when the rule is finalized.

for an additional reason: the Clean Air Act does not occupy the field of emissions regulation such that courts "may infer from the federal legislation that Congress intended to preempt state law in that entire subject area." *MTBE*, 725 F.3d at 97; *see also, e.g.*, *Bell*, 734 F.3d at 197; *Merrick,* 805 F.3d at 695; *Ouellette*, 479 U.S. at 492 (finding that the Clean Water Act, which contains an identical reservation of state authority as the Clean Air Act, does not preempt all state regulation of emissions). To the contrary, the Clean Air Act is a model of cooperative federalism: it explicitly retains a significant role for states in the regulation of air pollution sources. *See*, *e.g.*, 42 U.S.C. § 7401(a)(3) ("air pollution control at its source is the primary responsibility of States and local governments"); *id*. § 7416 (explicitly retaining state authority to set pollution standards more stringent than those set under the Clean Air Act). There is no field preemption here.

### B. *City of New York v. Chevron* **does not change the preemption analysis**

For the reasons just given, the Vermont Act is not preempted under longstanding preemption standards established by the Supreme Court. Plaintiffs nonetheless assert that the Second Circuit's decision in *City of New York v. Chevron* dictates a different analysis. In *City of New York*, the court concluded that New York City's state tort claims for nuisance and trespass against five fossil fuel companies were preempted by federal common law historically applied in certain disputes between states over interstate pollution. *City of New York v. Chevron Corp.*, 993 F.3d 81, 91-93, 99, 100, 103 (2d Cir. 2021). It then concluded that the federal common law was in turn displaced by the Clean Air Act, which did not "authorize" the state tort claims. *Id.* at 99.[33]

---

[33] *City of New York*'s departure from settled statutory preemption law has been widely criticized and Intervenor-Defendants contend it was wrongly decided. *See, e.g.*, *Mayor of Baltimore v. BP P.L.C.*, 31 F.4th 178, 203 (4th Cir. 2022) (explaining *City of New York*'s "legal flaw"); *District of Columbia v. Exxon Mobil Corp.*, 89 F.4th 144, 153 (D.C. Cir. 2023) (*City of New York's* reasoning "cannot be squared" with Supreme Court precedent); *City of Honolulu v. Sunoco LP*, 537 P.3d 1173, 1199-200 (Haw. 2023), *cert. denied*, 145 S. Ct. 1111 (2025); *Cnty. Comm'rs v. Suncor Energy USA, Inc.*, -- P.3d --, 2025 CO 21, ¶ 57 (Colo. 2025); Jonathan H. Adler,

*City of New York*'s holding does not control this case. The decision addressed only the preemption of state *tort* claims in an area historically governed by a narrow body of federal common law created to address actions by one state to abate pollution in another. The case did not involve the preemption of a *non-tort state statute* focused on economic concerns never previously addressed by federal common law. Nor does the decision's rationale apply here. First, the Vermont Act does not conflict with the federal common law of nuisance that historically governed some disputes over interstate pollution. Second, the Vermont Act does not create any ongoing tort liability, and thus the Second Circuit's concerns about the consequences of allowing courts to grant relief in tort cases related to fossil fuel production are not present here.

### 1.    The Vermont Act does not conflict with federal common law

Courts rarely invoke federal common law to displace or preempt state law. "The Supreme Court has cautioned against the broad use of federal common law," *Marcus v. AT&T Corp.*, 138 F.3d 46, 53 (2d Cir. 1998), and "[t]he ability of the federal courts to create federal common law and displace state-created rules is severely limited." *In re Gaston & Snow*, 243 F.3d 599, 606 (2d Cir. 2001). This is because "[t]he enactment of a federal rule in an area of national concern, and the decision whether to displace state law in doing so, is generally made not by the federal judiciary, purposefully insulated from democratic pressures, but by the people through their elected representatives in Congress." *Milwaukee v. Illinois*, 451 U.S. 304, 312-13 (1981) (*Milwaukee II*). Federal common law thus applies only in highly "limited situations." *Marcus*,

---

*Displacement and Preemption of Climate Nuisance Claims*, 17 J.L. Econ., and Pol'y 217, 253-57 (2022). As the decision's critics have pointed out, the federal common law previously applicable to some interstate pollution has been displaced by the Clean Air Act, and the Supreme Court has clearly held that the availability of state law to address such issues now depends "on the preemptive effect of the federal [Clean Air] Act." *AEP*, 564 U.S. at 429; *see also supra* pp. 28-33 (explaining that, under ordinary statutory preemption principles, the Clean Air Act does not preempt the Vermont Act). But even assuming *City of New York* was correctly decided, this section explains why it does not govern the preemption question here.

138 F.3d at 53. Without a "significant conflict" between federal common law and "the [operation] of state law," federal common law cannot displace state law. *See Boyle*, 487 U.S. at 507-08 (alteration in original).

Accordingly, courts narrowly define the scope of federal common law and its consequent preemption of state law. The limited federal common law of interstate pollution relied on in *City of New York*, 993 F.3d at 91-92, applies in a specific context: nuisance actions "brought by one State to abate pollution emanating from another State." *Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 421 (2011) ("*AEP*"). The Vermont Act, which does not abate pollution at all, presents no conflict with this body of law. Federal common law nuisance creates a duty not to pollute; state common law nuisance, at issue in *City of New York*, creates the same duty. The Vermont Act does not impose a duty not to pollute; it requires payment of a one-time retroactive assessment. It does not prescribe, enforce, or implicate a pollution standard and thus does not conflict with the federal common law of nuisance applied to some interstate pollution.

Nor is there any reason to create *new* federal common law to displace the Vermont Act. This would require "the operation of state law" to "(1) significantly conflict with (2) uniquely federal interests." *Empire HealthChoice Assur., Inc. v. McVeigh*, 396 F.3d 136, 140-41 (2d Cir. 2005), *aff'd*, 547 U.S. 677 (2006) (cleaned up). Thus, where the "state-imposed duty of care" for design defects in military equipment would have conflicted with the federal policy of insulating the government and its contractors from tort liability, federal common law precluded the application of state tort law. *Boyle*, 487 U.S. at 509, 512. Similarly, federal common law preempted the application of a state fiduciary duty law to the Federal Reserve Bank of New York because holding the Bank to that state duty would have created "a significant and direct conflict with [the Bank's] obligation to act in the public interest as a fiscal agent of the United States."

*Starr Int'l Co. v. Fed. Rsrv. Bank of New York*, 742 F.3d 37, 42 (2d Cir. 2014). There is no similar basis for creating a new body of preemptive federal common law here.

Plaintiffs assert that because climate change is of "federal interest," W. Va. Compl. ¶ 139 (quoting *AEP*, 564 U.S. at 424); Chamber Compl. ¶ 77, the Vermont Act must conflict with federal common law. Even assuming that this is the sort of *uniquely* federal interest required for the creation of federal common law,[34] "a mere federal interest in uniformity is insufficient to justify displacing state law in favor of a federal common law rule." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 208 (2d Cir. 2006) (cleaned up). There must be a "significant conflict" with state law. *Boyle*, 487 U.S. at 507. Plaintiffs allege a single conflict between the Act and federal interests: that "conflicts . . . would occur" if states were permitted to each regulate the same greenhouse gas emissions. Chamber Compl. ¶ 78, U.S. Compl. ¶ 57. But the Vermont Act does not regulate emissions, and Plaintiffs do not explain what these conflicts would be, how they would arise, or how Vermont's collection of a one-time fee would create a "significant conflict" with the purported federal interest. *See Boyle*, 487 U.S. at 507-08. In the absence of such conflict, "vague assertions about the need for uniformity" are insufficient. *Woodward Governor Co. v. Curtiss Wright Flight Sys., Inc.*, 164 F.3d 123, 129 (2d Cir. 1999).

Subsequent decisions in this Circuit have recognized the limits of *City of New York*. *See, e.g.*, *City of New York v. Exxon Mobil Corp.*, 733 F. Supp. 3d 296, 307 (S.D.N.Y. 2024) (finding that there was "simply no conflict" between federal common law and state consumer protection

---

[34] "'Uniquely federal interests' are not merely national interests, and the existence of national interests, no matter their significance, cannot by themselves give federal courts the authority to supersede state policy. . . . It is well-established instead that to be 'uniquely federal' and thus a sufficient predicate for the imposition of a federal substantive rule, an interest must relate to an articulated congressional policy or directly implicate the authority and duties of the United States as sovereign." *Jackson v. Johns-Manville Sales Corp.*, 750 F.2d 1314, 1324-25 (5th Cir. 1985).

claims against fossil fuel companies for their alleged deception about the link between their products and climate change); *Vermont v. Exxon Mobil Corp.*, No. 2:21-CV-260, 2024 WL 446086, at *7-*8 (D. Vt. Feb. 6, 2024) (similar); *accord State by Tong v. Exxon Mobil Corp.*, 83 F.4th 122, 138 n.4 (2d Cir. 2023) (noting that *City of New York* did not establish that federal common law nuisance gives rise to complete jurisdictional preemption over state nuisance claims). There is no reason to extend *City of New York's* holding to a non-tort state statute that creates no conflict with federal common law.

## 2.    The Vermont Act does not impose ongoing tort liability

Even if the narrow federal common law applicable to some interstate pollution could displace state laws beyond the historically recognized "suits brought by one State to abate pollution emanating from another State," *AEP*, 564 U.S. at 421, it would not displace the Vermont Act because of fundamental differences between the Act and the tort action in *City of New York*. The panel in *City of New York* did not hold that *any* financial liability for past fossil fuel production amounts to a de facto regulation of emissions. *Contra* Chamber Compl. ¶ 117. Rather, it held that *tort* liability (which imposes ongoing duties) may be tantamount to imposing pollution control standards. By contrast, the Vermont Act cannot be considered a de facto emissions regulation: It does not seek the abatement of emissions and imposes no ongoing duty, much less the imposition of a vague nuisance standard. The *City of New York* court's animating concern is not present here.

Notably, the *City of New York* plaintiffs sought both damages and an injunction to abate the nuisance and trespass in the event defendants failed to pay any court-awarded damages. *City of New York*, 993 F.3d at 88. The Second Circuit relied on this fact as part of its finding that the City's claims sought to "regulate emissions." *Id*. at 92-93 & n.5. By contrast, the Vermont Act only seeks to recover a one-time payment. This is a material difference.

Nor does the Act's imposition of a retroactive assessment indirectly regulate emissions. *See supra* pp. 29-32. In *City of New York*, the court observed that the only way for the defendants to avoid future tort liability for their fossil fuel production "would be to cease global production altogether." *City of New York*, 993 F.3d at 93. But here, liability under the Act is entirely retroactive: there is no future liability to avoid. As Plaintiffs Chamber of Commerce and API concede, *supra* p. 25 & n.29, whatever responsible parties choose to do going forward in response to the Act's assessment—whether it is to increase production, decrease production, or keep production the same—will have no effect on their liability under the Act, which will derive from historical production of fossil fuels from 1995 to 2024. Plaintiffs suggest that Vermont may seek to hold responsible parties liable going forward as well, Chamber Compl. ¶ 96, but courts do not consider "hypothetical or imaginary cases" in deciding a facial preemption challenge. *Nat'l Shooting Sports Found.*, 144 F.4th at 112. *See also supra* p. 17 (Plaintiffs must show there is "no set of circumstances" under which the Act would be valid).

The court in *City of New York* observed that retroactive *tort* damages can have an effect on behavior going forward. *City of New York*, 993 F.3d at 92-93. That is because an award of tort damages necessarily means a legal duty was violated. Once found liable for a nuisance, a tortfeasor can only "avoid the threat of ongoing liability" by "chang[ing] its methods of doing business and controlling pollution" or in some cases "ceas[ing] operations" altogether. *Ouellette*, 479 U.S. at 495; *see also* Dan B. Dobbs et al., The Law of Torts § 57 (2d ed. 2025) (after a trespass plaintiff recovers damages once, "she may sue again for damages that have occurred since the first suit"). Tort law thus has a deterrent as well as compensatory purpose. *See, e.g.*, *Minneci v. Pollard*, 565 U.S. 118, 127 (2012); Restatement (Second) of Torts § 901 cmt. c (1979) ("[U]nlike the law of contracts or of restitution, the law of torts . . . has within it elements of . . .

38

deterrence."). New York City conceded that the damages it sought could work "production-side changes." *City of New York*, 993 F.3d at 93. By contrast, a one-time statutory assessment based on past activity does not impose an ongoing duty and does not subject responsible parties to future liability if they continue to produce fossil fuels.

Finally, unlike the tort claims in *City of New York*, the Act does not require the courts to apply any "vague" or "indeterminate standards" to adjudge liability. *See id.* at 97 (quoting *Ouellette*, 479 U.S. at 496). The *City of New York* court was concerned that courts were ill-suited to enforce a state nuisance remedy related to greenhouse gas emissions. *Id*. at 97-98. But unlike tort law, the Vermont Act does not require courts to balance the reasonableness of emissions, the impact of those emissions on other parties, or to craft a remedy, much less to engage in this type of analysis on an ongoing basis. *See Copart Indus., Inc. v. Consol. Edison Co. of New York*, 362 N.E.2d 968, 971 (N.Y. 1977) (court assessing private nuisance claim must determine whether conduct was intentional and unreasonable, negligent or reckless, or abnormally dangerous); Restatement (Second) of Torts § 821B (1979) (public nuisance requires an "unreasonable" interference with public rights).

*        *        *

A backward-looking, one-time statutory assessment within a state's traditional sovereign authority is distinct from the creation of ongoing tort liability in an area that was once governed by federal common law. The Vermont Act does not conflict with federal common law nuisance, does not seek the abatement of emissions, and imposes no ongoing liability. *City of New York* therefore provides no basis for this Court to depart from standard statutory preemption analysis, under which Plaintiffs have failed to meet their heavy burden. *See supra* Argument IV.A.

39

**C.      The Vermont Act complies with the territorial limits set by the Constitution**

Plaintiffs cobble together disparate doctrines to argue that the Vermont Act violates the "Constitution's structure and provisions, including the Due Process Clause." U.S. Compl. ¶ 60; *see also* W. Va. Compl. ¶¶ 132-36, Chamber Compl. ¶¶ 79-86. Despite pleadings littered with case citations, Plaintiffs do not cite a single case recognizing an independent claim for "unconstitutional extraterritorial regulation." Even if such a claim were cognizable, Plaintiffs' argument boils down to the accusation that Vermont will impermissibly regulate conduct beyond its borders. *See* W. Va. Compl. ¶ 136; Chamber Compl. ¶ 89; U.S. Compl. ¶ 70. But that is not what the Act will do. It will not *regulate conduct*, including out-of-state conduct, at all. *See supra* pp. 29-32.

To the extent Plaintiffs contend the Act will apply to entities with insufficient contacts with the state, the Act belies that concern, defining a "responsible party" to exclude "any person who lacks sufficient connection with the state to satisfy the nexus requirements of the U.S. Constitution." Vt. Stat. Ann. tit. 10, § 596(22). This ensures that the Act will not exceed constitutional limits, including those embodied in the Due Process Clause. *See* Chamber Compl. ¶ 93 (admitting that the "'nexus' requirement, § 596(22), may make" applying the Act beyond constitutional limits "difficult").

Plaintiffs' reliance on the line of punitive damages cases following *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), is also misplaced. Those cases clarify that a state's authority does not reach out-of-state events "that had no impact on [the state] or its residents." *Id.* at 572-73. Those cases are inapposite here because the whole point of the Act is to address the impacts of climate change on Vermont and its residents. Indeed, the Court in *Gore* confirmed that a state court can award damages—even punitive damages—designed to compensate or punish for the in-state impacts of out-of-state conduct. *Id.*; *see also State Farm Mut. Auto. Ins. Co. v.*

40

*Campbell*, 538 U.S. 408, 422 (2003) (states may award damages for out-of-state conduct with "a nexus to the specific harm" suffered in the state). The impacts addressed by the Act are calamitous, ongoing, local, and real, and nothing in the Constitution prohibits Vermont from exercising its core authority and responsibility to protect its citizens, economy, and natural resources from harm.

### D.    The Vermont Act does not implicate foreign affairs preemption

Courts have found state laws unconstitutional for interference in the federal government's foreign policy powers in only two situations. First, where there is an exercise of federal power that is "fit to preempt" state law, "state law must give way where . . . there is evidence of clear conflict between the policies adopted by the two." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 416, 421 (2003). Second, even in the absence of a conflict, preemption may apply if a state law "take[s] a position on a matter of foreign policy" and is not "addressing a traditional state responsibility." *Id*. at 419 n.11. Plaintiffs' claims of foreign policy preemption fail because the Vermont Act is an exercise of traditional state responsibility that does not conflict with United States foreign policy.

### 1.    The Vermont Act does not present a clear conflict with the federal government's international climate change policies

Although state law must "yield" to "[a]n express federal policy" that creates "a clear conflict," the executive branch cannot create a conflict simply through its say-so. *In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 119 (2d Cir. 2010) (cleaned up). The executive branch may have broad powers to represent the country internationally, but to be fit to preempt state law, the federal foreign policy "must stem either from an act of Congress or from the Constitution itself." *Medellín v. Texas*, 552 U.S. 491, 524 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). In the latter scenario, the executive's power must

be found in Article II of the Constitution or, in a "narrow set of circumstances," when there is a "systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned." *Id.* at 531 (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981)); *see, e.g.*, *Garamendi*, 539 U.S. at 415 (finding the executive branch had power to unilaterally settle U.S. residents' wartime claims based on the practice dating back "as early as 1799" and "congressional acquiescence throughout [the practice's] history"). But the mere fact that a state law could have consequences for foreign policy or national security is not enough to give the executive roaming unilateral authority to make, or unmake, *domestic* law. *See Medellín*, 552 U.S. at 530-32 (finding a presidential pronouncement made to effectuate a ruling of the International Court of Justice could not preempt state law when there was no independent source of executive authority); *cf. Youngstown*, 343 U.S. at 582 (finding no independent executive authority to seize steel mills, which would presumably override state property law, despite the President's concern a labor dispute would "immediately jeopardize our national defense").

Because an executive branch policy has preemptive force only when it is grounded in a delegated statutory or Constitutional power, the executive branch's opposition to the Vermont Act—through its filing of its lawsuit and statements in Executive Order 14,260—on its own does not support preemption. If a mere statement by the executive branch disapproving of a state policy were sufficient, then courts would have no need to extensively analyze the source of specific powers and the degree of conflict. *See Medellín*, 552 U.S. at 530-32; *Garamendi*, 539 U.S. at 415-16. Plaintiffs therefore must point to specific policies made pursuant to specific delegated powers with which the Vermont Act clearly conflicts. They have failed to do so.

The specific policies cited by Plaintiffs are far afield from the limited instances in which the Supreme Court or Second Circuit has found a conflict between a federal foreign policy and a

state law. For example, courts have found conflict preemption where state law conflicted with the President's approach to diplomacy within the framework of the International Commission on Holocaust Era Insurance Claims. Where a state law required European insurance companies to publicly disclose "far more information about far more [insurance] policies" issued during the Holocaust than was required under international agreements supported by the President, the Supreme Court found that state law was in conflict with and preempted by executive foreign policy prerogatives. *See Garamendi*, 539 U.S. at 423. Addressing the same federal policy, the Second Circuit held that a state law right for individuals to "seek enforcement of [their] claimed contract rights" against European insurers was preempted because such "lawsuits are *directly* in conflict with the Government's policy that claims should be resolved exclusively" before the International Commission. *Generali*, 592 F.3d at 118.

The crux of Plaintiffs' argument is that the Vermont Act is contrary to the federal government's reluctance to commit to lowering U.S. greenhouse gas emissions, which Plaintiffs contend is evidenced by the absence of emissions targets in the U.N. Framework Convention on Climate Change and the government's decisions to either not join or leave international agreements with targets. *See* Chamber Compl. ¶ 94; W. Va. Compl. ¶ 145-46; U.S. Compl. ¶¶ 40-43, 107-08. The purported conflict rests on the incorrect premise that the Act regulates emissions in other countries. *See, e.g.*, W. Va. Compl. ¶¶ 12, 144-45; Chamber Compl. ¶ 96. But the Vermont Act does not regulate emissions—domestic or foreign. *See supra* pp. 29-32.

Moreover, these international agreements and negotiations concern *governmental* obligations regarding emissions; even if the Act did affect future emissions by a subset of companies (and it does not), it would not bind *countries* to reduce their emissions. For similar reasons, Plaintiffs' claim of a conflict because the United States opposes "the establishment of

liability and compensation schemes at the international level" also fails. *See* Chamber Compl.

¶ 95 (quoting *City of New York*, 993 F.3d at 103 n.11); W. Va. Compl. ¶ 146. The underlying

statements Plaintiffs cite concern the federal government compensating foreign governments for

the impacts of the United States' historical emissions. The Vermont Act neither targets

governments for payments nor bases its calculations on country-specific emissions.[35] None of

the climate change-specific policies cited by Plaintiffs addresses, let alone conflicts with, the

Vermont Act's narrow focus on securing payments from fossil fuel producers, based on their

prior actions, to help fund critical state adaptation projects.

Other policies cited by Plaintiffs are even further afield. Although Plaintiffs claim the

Vermont Act may affect several federal policies promoting national security and global alliances,

at bottom these policies simply favor low energy prices and production costs. For instance, West

Virginia claims that the Act would undermine the federal government's efforts to weaken and

isolate Russia and Iran economically. The sole explanation West Virginia provides for *how* the

Act would do this is by "raising costs on domestic and friendly foreign oil producers." W. Va.

Compl. ¶¶ 148, 149. Similarly, citing the declaration of a (dubious) "national energy emergency"

in Executive Order 14,156, 90 Fed. Reg. 8,433 (Jan. 20, 2025), the United States claims that

"state restrictions and burdens on energy production" will make the country less able to defend

itself. *See* U.S. Compl. ¶¶ 2-3. At an even higher level of generality, the United States claims the

Act conflicts with a range of policies favoring lower energy prices, from its decision to withdraw

---

[35] Plaintiffs note in their complaints that some foreign governments could incur obligations under the Act if they themselves hold an ownership interest in a fossil fuel business. W. Va. Compl. ¶ 144; U.S. Compl. ¶ 22. But without identifying a specific country, a claim that the Act would make demands on foreign governments is purely speculative.

from the Paris Agreement due to economic concerns to exempting energy imports from reciprocal tariffs. *See* U.S. Compl. ¶¶ 43-44, 106.

Even if it weren't purely speculative and implausible that the Vermont Act could raise energy prices or lower fossil fuel supplies (let alone to a degree that would have macroeconomic and international consequences), *see supra* pp. 8-11, these downstream effects are a far cry from the preemption cases where state law compelled foreign entities to take actions that the federal government had told their home government it would prevent, *see supra* p. 43 (describing conflicts in *Garamendi* and *Generali*). Treating mere market effects as a "clear conflict" would give the executive branch power to preempt any number of state laws that may influence energy production, from workplace safety to consumer protection law. Such expansive authority would run counter to the vesting of domestic lawmaking authority in Congress. *Cf. Youngstown*, 343 U.S. at 587 ("[T]he President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.").[36]

### 2. The federal government cannot displace Vermont's traditional responsibility to protect its residents from property, health, and environmental harms

In the absence of a clear conflict, foreign affairs preemption is appropriate only if a state law "take[s] a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility." *Garamendi*, 539 U.S. at 419 n.11. But the state through the Vermont Act does not attempt to set its "own foreign policy." *Zschernig v. Miller*, 389 U.S. 429,

---

[36] It is also unclear whether any of the policies cited by Plaintiffs beside the U.N. Framework Convention are "fit" to preempt state law. The executive branch's ability to negotiate international emission limitations does not mean it has unilateral independent authority to decide whether and to what extent any part of the United States will reduce its greenhouse gas emissions, let alone fund adaptation costs based on fossil fuel production. *Cf. Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 395 (D. Vt. 2007) (rejecting argument that Vermont law reducing its greenhouse gas emissions would intrude on foreign affairs).

441 (1968). Rather, the Act puts foreign-owned companies on the same footing as domestic ones: if they have a constitutionally sufficient connection to the state, and meet other prescribed criteria, they are responsible for payments. Application of these objective criteria leaves little room for Vermont to interject "foreign policy attitudes" or "criticism[s]" of foreign governments into its calculation of a responsible party's liability. *Id.* at 437, 440. The facially neutral Vermont Act is far afield from the limited circumstance in which the Supreme Court found foreign affairs preemption justified in the absence of a conflict.

The Vermont Act addresses a traditional state responsibility. The Act serves to protect Vermont residents from harms to their property and health, as well as harm to the state's natural resources, from severe weather events caused by climate change. Protecting the physical and economic well-being of its citizens, as well as the vitality of its natural resources, is as traditional an exercise of state power as there is. *See supra* pp. 4-6. The Vermont Act does not "adversely affect the power of the central government to deal with [foreign relations]." *Zschernig*, 389 U.S. at 441. Finding preemption, though, would harm the state's ability to protect its people.

## CONCLUSION

For the foregoing reasons, and pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), the Court should dismiss Plaintiffs' complaints.

Dated: August 22, 2025                          Respectfully submitted,

*/s/ Bridget Asay*
Bridget Asay
Michael Donofrio
STRIS & MAHER LLP
15 East State Street, Suite 2
Montpelier, VT 05602
Phone: (802) 858-4285

basay@stris.com

*Counsel for Northeast Organic Farming*
*Association of Vermont*


/s/ Adeline S. Rolnick
Adeline S. Rolnick
Natural Resources Defense Council, Inc.
1152 15th Street, Suite 300
Washington, DC 20005
Phone: (202) 513-6240
arolnick@nrdc.org

Mitchell S. Bernard
Natural Resources Defense Council, Inc.
40 West 20th Street, 11th Floor
New York, NY 10011
Phone: (212) 727-4469
mbernard@nrdc.org

*Counsel for Northeast Organic Farming*
*Association of Vermont and Conservation*
*Law Foundation*


/s/ Elena M. Mihaly
Elena M. Mihaly
Conservation Law Foundation, Inc.
15 East State Street, Ste. 4
Montpelier, VT 05602
Phone: (802) 622-3012
emihaly@clf.org

*Counsel for Conservation Law Foundation*