**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and AMERICAN PETROLEUM INSTITUTE, <br><br> *Plaintiffs*, <br><br> v. <br><br> JULIE MOORE, in her official capacity as the Secretary of the Vermont Agency of Natural Resources and JANE LAZORCHAK, in her official capacity as the Director of the Vermont Agency of Natural Resources Climate Action Office, <br><br> *Defendants*. | Civil Action No. 2:24-cv-01513-MKL |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR**
**<u>PARTIAL SUMMARY JUDGMENT ON COUNTS I AND II</u>**

# Table of Contents

Introduction ................................................................................................................ 1

Background ................................................................................................................ 3

    A. Energy production in the United States is essential to America's national security and economy. ........................................................................................... 3

    B. Greenhouse gases are emitted from a variety of sources and disperse globally once emitted ........................................................................................................ 4

    C. In an attempt to penalize energy producers for global greenhouse gas emissions, Vermont passed S.259, the Climate "Superfund" Act. ........................................ 5

Argument .................................................................................................................. 7

  I. Plaintiffs have associational standing to challenge Vermont's Act. .................................... 8

  II. The U.S. Constitution precludes Vermont's Act. ............................................................ 8

    A. Vermont's Act is unconstitutional because only federal law may govern regulation of pollution originating beyond a State's borders under the U.S. Constitution. ........... 9

    B. The Constitution's guarantees of equal sovereignty, due process, and federal control of foreign affairs further confirm that Vermont's Act is unconstitutional. .... 14

  III. The Clean Air Act preempts Vermont's Act. .................................................................. 19

    A. The Clean Air Act comprehensively regulates air pollutants, including greenhouse gases. ................................................................................................................ 19

    B. Under the Clean Air Act, States may regulate greenhouse gas emissions only if they originate within their borders. ...................................................................... 20

    C. Vermont's Act is preempted because it imposes liability for emissions originating out of state. ..................................................................................................... 23

  IV. Plaintiffs meet all the requirements for a permanent injunction. ....................................... 24

Conclusion ............................................................................................................... 25

## Table of Authorities

**Page(s)**

**Cases**

*725 Eatery Corp. v. City of New York*,
408 F. Supp. 3d 424 (S.D.N.Y. 2019)......................................................................25

*Am. Elec. Power Co. v. Connecticut*,
564 U.S. 410 (2011)................................................................................. *passim*

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003)......................................................................................17

*In re Assicurazioni Generali, S.P.A.*,
592 F.3d 113 (2d Cir. 2010)...........................................................................17

*Banco Nacional de Cuba v. Sabbatino*,
376 U.S. 398 (1964)......................................................................................16

*Bell v. Cheswick Generating Station*,
734 F.3d 188 (3d Cir. 2013)...........................................................................22

*Bonaparte v. Tax Court*,
104 U.S. 592 (1881).................................................................................2, 16

*Bucks County v. BP P.L.C.*,
2025 WL 1484203, at *6 (Pa. Com. Pl. May 16, 2025) ...................................13, 24

*City of Charleston v. Brabham Oil Co.*,
No. 2020-CP-10-03975, 4-5 (S.C. Ct. Com. Pl. Aug. 6, 2025) .............................13

*City of New York v. BP P.L.C.*,
325 F. Supp. 3d 466 (S.D.N.Y. 2018)....................................................................5

*City of New York v. Chevron Corp.*,
993 F.3d 81 (2d Cir. 2021)......................................................................... *passim*

*Clean Air Mkts. Grp. v. Pataki*,
338 F.3d 82 (2d Cir. 2003).............................................................................19

*North Carolina ex rel. Cooper v. Tenn. Valley Auth.*,
615 F.3d 291 (4th Cir. 2010) ..........................................................................22

*Coyle v. Smith*,
221 U.S. 559 (1911).................................................................................2, 15

*Do No Harm v. Pfizer Inc.*,
    96 F.4th 106 (2d Cir. 2024) ..................................................................................8

*Franchise Tax Bd. v. Hyatt*,
    587 U.S. 230 (2019)......................................................................................10, 15

*Fuld v. Palestine Liberation Org.*,
    606 U.S. 1 (2025)........................................................................................15, 16

*Gibbons v. Ogden*,
    22 U.S. 1 (1824) ..............................................................................................8

*Hinderlider v. La Plata River & Cherry Creek Ditch Co.*,
    304 U.S. 92 (1938)...........................................................................................10

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)...........................................................................................17

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)..........................................................................................8

*Illinois v. City of Milwaukee*,
    406 U.S. 91 (1972)........................................................................................1, 10

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987) ................................................................................. *passim*

*State ex rel. Jennings v. BP Am. Inc.*,
    2024 WL 98888 (Del. Super. Ct. Jan. 9, 2024) ....................................................23

*Mallory v. Norfolk S. Ry. Co.*,
    600 U.S. 122 (2023)......................................................................................15, 16

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)....................................................................................2, 5, 19

*Mayor & City Council of Baltimore v. BP P.L.C.*,
    2024 WL 3678699 (Md. Cir. Ct. July 10, 2024)...................................................13

*McCulloch v. Maryland*,
    17 U.S. 316 (1819)............................................................................................9

*Merrick v. Diageo Ams. Supply, Inc.*,
    805 F.3d 685 (6th Cir. 2015) ............................................................................22

*Movsesian v. Victoria Versicherung AG*,
    670 F.3d 1067 (9th Cir. 2012) ..........................................................................17

*N.Y. Life Ins. Co. v. Head*,
    234 U.S. 149 (1914) ........................................................................................15

*N.Y. Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013) ..........................................................................25

*Nat'l Inst. of Health v. Am. Pub. Health Assoc.*,
    No. 25A103 (Aug. 21, 2025) ..........................................................................25

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ........................................................................................16

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................................24

*Platkin v. Exxon Mobil Corp.*,
    2025 WL 604846 (N.J. Super. Ct. Feb. 5, 2025) ...........................................13

*SEC v. Citigroup Glob. Mkts., Inc.*,
    752 F.3d 285 (2d Cir. 2014) ..........................................................................24

*Shelby County v. Holder*,
    570 U.S. 529 (2013) ....................................................................................2, 15

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981) ..................................................................................10, 11

*Treiber & Straub, Inc. v. UPS, Inc.*,
    474 F.3d 379 (7th Cir. 2007) ........................................................................10

*United States v. Locke*,
    529 U.S. 89 (2000) ..........................................................................................21

*United States v. New York*,
    708 F.2d 92 (2d Cir. 1983) ............................................................................25

*United States v. New York*,
    No. 1:25-cv-03656-PKC (S.D.N.Y.) ...............................................................14

*United States v. Rodgers*,
    150 U.S. 249 (1893) ........................................................................................16

*United States v. Vermont*,
    No. 2:25-cv-00463-MKL (D. Vt.) ...........................................................14, 18

*Wachovia Bank, N.A. v. Burke*,
    414 F.3d 305 (2d Cir. 2005) ..........................................................................21

*Watson v. Emps. Liab. Assur. Corp.*,
  348 U.S. 66 (1954) ................................................................................16

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980) ..............................................................................15

*Zschernig v. Miller*,
  389 U.S. 429 (1968) ...............................................................2, 9, 16, 17

**Statutes**

10 V.S.A. § 596 .................................................................................... *passim*

10 V.S.A. § 597 ...................................................................................5, 7, 12

10 V.S.A. § 598 .................................................................................... *passim*

10 V.S.A. § 599 ............................................................................................7

10 V.S.A. § 599c ..............................................................................6, 7, 11, 23

26 U.S.C. § 263 ...........................................................................................3

26 U.S.C. § 613 ...........................................................................................3

30 U.S.C. §§ 181-287 ..................................................................................3

33 U.S.C. § 1370 .......................................................................................21

42 U.S.C. §§ 6201-6422 ..............................................................................3

42 U.S.C. § 7410 .......................................................................................20

42 U.S.C. § 7411 .......................................................................................20

42 U.S.C. § 7416 .......................................................................................21

42 U.S.C. §§ 7521 .....................................................................................20

42 U.S.C. § 7547 .......................................................................................20

42 U.S.C. § 7571 .......................................................................................20

42 U.S.C. § 7604 .......................................................................................21

**Other Authorities**

Brief for the United States as Amicus Curiae Supporting Appellees, *Mayor & City Council of Balt. v. BP p.l.c.*,
No. 11, Sept. Term 2024 (Md. Apr. 15, 2025) ........................................................14

*Declaring a National Energy Emergency*, Exec. Order No. 14,156, 90 Fed. Reg. 8,433 (Jan. 30, 2025)........................................................................................18

Oral Arg. Tr., *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230 (2021) ........................................................................................................13

Pet. for Cert., *Sunoco LP v. City & Cnty. of Honolulu*,
145 S. Ct. 1111 (2025) (No. 23-947), 2024 WL 5095299, at *12........................14

Pet. for Reh'g, *City of Oakland v. B.P. p.l.c.*, 969 F.3d 895 (9th Cir. 2020) (No. 18-16663)..................................................................................................13

*Protecting American Energy From State Overreach*, Exec. Order No. 14,260, 90 Fed. Reg. 15,513 (Apr. 8, 2025) ..........................................................18

U.S. Const. amend. X.............................................................................................14

U.S. Const. amend. XIV .......................................................................................16

U.S. Const. art. IV................................................................................................15

U.S. Const. art. VI..................................................................................................8

## Introduction

Vermont's "Climate Superfund" Act is an attempt to do something the United States Constitution precludes, the Clean Air Act ("CAA") preempts, and binding Supreme Court and Second Circuit precedent prohibit. It seeks to hold out-of-state energy producers liable, not for the alleged effects of greenhouse gas emissions released in Vermont, or even in Vermont's neighboring States, but for the alleged effects of *global* greenhouse gas emissions over the last 30 years. The Second Circuit has held that "[s]uch a sprawling case" of liability "is simply beyond the limits of state law." *City of New York v. Chevron Corp.*, 993 F.3d 81, 92 (2d Cir. 2021).

The Second Circuit's decision in *City of New York* controls. Like New York City's claims in that case, Vermont's Act seeks "to hold [energy] Producers liable, under [state] law, for the effects of emissions made around the globe." *Id.* But, as the Second Circuit explained, federal law flatly prohibits that result. The structure of the U.S. Constitution ensures that liability for air pollution outside of a state's borders is controlled by federal law. And although Congress, through the CAA, gives States some authority to address emissions, that authority is "narrowly circumscribed" to emissions originating within a State's own borders. *Id.* at 100. Because Vermont's Act seeks to impose liability under state law based upon global greenhouse gas emissions, it is precluded by the Constitution and preempted by the CAA. Therefore, this Court should declare the Act unlawful under Counts I and II of Plaintiffs' complaint and enjoin Vermont from enforcing the Act against Plaintiffs' members.

The Supreme Court has long held that, under the Constitution's federal structure, interstate pollution issues and the regulation thereof in one State caused by pollution from other States are governed by federal law, not a patchwork of conflicting state rules. *See, e.g.*, *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492-97 (1987); *see also Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 429 (2011) ("*AEP*"); *Illinois v. City of Milwaukee*, 406 U.S. 91, 103-05 (1972). The Second

Circuit applied that precedent when it held that New York City could not hold energy producers liable under its own laws for out-of-state greenhouse gas emissions and global climate change. *City of New York*, 993 F.3d at 91-92. This principle—that there are issues to which only federal law may apply—is inherent in the scheme of the Constitution and is essential to enabling a unified and coordinated approach to national policy issues, including greenhouse gas emissions and global climate change. *See id.* at 90 (federal law "addresses subjects within national legislative power where Congress has so directed or where the basic scheme of the Constitution so demands" (quoting *AEP*, 564 U.S. at 421)). It can be seen, for example, in the Constitution's guarantee of equal sovereignty to each State and the limits imposed by due process on each State's authority to intrude on the jurisdiction of other States. *See Coyle v. Smith*, 221 U.S. 559, 580 (1911); *Shelby County v. Holder*, 570 U.S. 529, 544 (2013); *see also Bonaparte v. Tax Court*, 104 U.S. 592, 594 (1881). This principle of federal exclusivity is particularly applicable when, as here, a State interferes with the federal Government's exclusive authority over foreign policy. *See Zschernig v. Miller*, 389 U.S. 429, 432 (1968); *see also City of New York*, 993 F.3d at 100-03. The Constitution simply bars Vermont's effort to reach far beyond its borders and punish global conduct related to out-of-state greenhouse gas emissions.

Vermont's law is also preempted by the CAA. Through the CAA, Congress supplanted federal common law with a comprehensive regulatory scheme for air pollution, which includes greenhouse gas emissions. *See Massachusetts v. EPA*, 549 U.S. 497, 528-29 (2007); *AEP*, 564 U.S. at 426. Congress contemplated a role for state regulation of emissions, but the CAA narrowly circumscribes that authority and it only applies to in-state sources. *City of New York,* 993 F.3d at 100 (citing *Ouellette*, 479 U.S. at 497). In other words, under the CAA, a State may not regulate greenhouse gases emitted beyond its borders. Because Vermont's Act, on its face, imposes strict

2

liability based upon greenhouse gas emissions originating out of state (and outside the country), the CAA preempts Vermont's law. Allowing fifty different States to try to impose fifty different requirements on the same conduct is simply incompatible with the CAA's comprehensive approach.

Plaintiffs ask that the Court declare Vermont's Act unlawful and enjoin its enforcement against Plaintiffs' members.

## Background

### A.    Energy production in the United States is essential to America's national security and economy.

Plaintiffs' members produce energy from resources across the United States and around the globe. They provide the fossil fuels that power roughly 80% of the total U.S. energy supply and create jobs for millions of Americans. *See* Lehotsky Decl. ¶ 3.[1] The energy that Plaintiffs' members produce is indispensable to the Nation's economy, including the transportation, agriculture, energy, and security sectors. *See, e.g.*, *id.* ¶ 4. Energy producers' petroleum refining activities also yield products that are vital to modern civilization, including medical equipment, fertilizers, tires, and synthetic fibers. *See id.* ¶¶ 6-8. This is why the federal Government encourages and incentivizes the critical energy production these companies provide. *Id.* ¶¶ 3, 5; *see also* 26 U.S.C. §§ 263(c), 613 (tax incentives for oil and gas exploration and production); 42 U.S.C. §§ 6201-6422 (creating Strategic Petroleum Reserve and authorizing President to reduce petroleum imports); 30 U.S.C. §§ 181-287 (authorizing leasing of public lands for fossil-fuel development).

The energy that Plaintiffs' members produce benefits the citizens of the entire nation (as well as nations around the world), including the residents of Vermont. Most of Vermont's energy comes from fossil fuels, even though no production or refining occurs within the State. *See*

---

[1] All exhibits referenced in this motion are attached to the same declaration.

Lehotsky Decl. ¶ 9 (for example, petroleum-based sources account for 57% of all energy consumed in Vermont). The State ranks near the top in per capita petroleum use. *Id.* The Vermont government itself is a significant consumer of fossil fuels. For example, the State relies primarily on fossil fuels for its own transportation fleet, and that will continue until at least 2050. *See id.* ¶ 10.

**B.    Greenhouse gases are emitted from a variety of sources and disperse globally once emitted.**

Greenhouse gases are emitted by billions of natural and human sources globally. *See id.* ¶ 23. Human sources include fossil-fuel combustion (from cars, planes, power plants, etc.), agriculture, forestry, and industrial processes. *See id.* Natural sources include wetlands, oceans, wildfires, and volcanoes. *See id.* ¶¶ 26-27. Although emissions from transportation are estimated to account for 15% of global anthropogenic (*i.e.*, human-caused) greenhouse gas emissions, another 22% comes from the cultivation of crops and livestock (both of which are a significant part of Vermont's economy). *See id.* ¶ 27. Indeed, livestock alone are responsible for 14.5% of total global greenhouse gases, nearly the same as the transportation sector. *Id.* ¶ 28. With respect to fossil-fuel emissions, most greenhouse gases are emitted by consumption of fossil-fuel products, not during extraction or refining. *See id.* ¶ 29.

Once emitted, greenhouse gases "become well mixed in the atmosphere." *AEP*, 564 U.S. at 422 (citation omitted); *City of New York*, 993 F.3d at 92 ("[G]reenhouse gases quickly diffuse and comingle in the atmosphere" (record citation omitted)). Thus, greenhouse gases disperse across the globe, crossing state and international boundaries. This is why "[g]reenhouse gas molecules cannot be traced to their source." *City of New York*, 993 F.3d at 92 (record citation omitted). It is also why "emissions in New Jersey may contribute *no more* to flooding in New York than emissions in China." *AEP*, 564 U.S. at 422 (emphasis added). And it is the cumulative effect of all of these global greenhouse gas emissions—from many different natural and human sources—that

creates a "greenhouse" effect, which can warm the earth's atmosphere and impact the climate in various ways. *Massachusetts v. EPA*, 549 U.S. at 504-05; *see also City of New York v. BP P.L.C.*, 325 F. Supp. 3d 466, 472 (S.D.N.Y. 2018) (climate-change claims "are ultimately based on the 'transboundary' emission of greenhouse gases").

### C.    In an attempt to penalize energy producers for global greenhouse gas emissions, Vermont passed S.259, the Climate "Superfund" Act.

In May 2024, the Vermont Legislature enacted the Climate "Superfund" Act, S.259 (Act 122), which penalizes out-of-state energy companies for the cumulative effect of global greenhouse gas emissions.[2] The Act "established the Climate Superfund Cost Recovery Program . . . to secure compensatory payments from responsible parties based on a standard of strict liability." 10 V.S.A. § 597(1).[3] The Act directs the Vermont Agency of Natural Resources ("ANR") to issue "cost recovery demands" to designated "responsible parties," holding them "strictly liable" for their alleged contribution to historical global greenhouse gas emissions. § 597(3). The Act imposes penalties for greenhouse gases emitted over a 30-year "[c]overed period," which extends from "January 1, 1995 [to] December 31, 2024." § 596(8). It defines "[c]overed greenhouse gas emissions" as "the total quantity of greenhouse gases released into the atmosphere, expressed in metric tons of carbon dioxide equivalent, resulting from the use of fossil fuels extracted or refined by an entity during the covered period." § 596(7). The Act directs ANR to compel "responsible parties" to pay millions or billions of dollars as punishment for that purported liability. § 598(a)(1), (f).

The Act was crafted to apply *only* to entities based outside Vermont. "Responsible party" is defined as "any entity . . . that during any part of the covered period [1995 through 2024] was

---

[2] The Governor allowed the bill to become law without his signature on May 30, 2024. S.259 § 7. The Act was amended in 2025 by H.231 (Act 47), but the amendments did not change the substance of the Act. Rather, the amendments changed certain deadlines applicable to the Vermont Agency of Natural Resources to implement the Act and certain stylistic and wording changes.

[3] Unless otherwise noted, statutory citations are to 10 V.S.A. Chapter 24A.

engaged in the trade or business of extracting fossil fuel or refining crude oil and is determined by the [ANR] attributable to for [sic] more than one billion metric tons of covered greenhouse gas emissions." § 596(22). The Act further clarifies that this definition excludes "any person who lacks sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution." *Id.*

Because this definition is limited to entities engaged in the business of extracting fossil fuels or refining crude oil, no entity whose headquarters or principal place of business is in Vermont could be a "responsible party." Vermont has no fossil-fuel production activity and no petroleum refineries. Statement of Undisputed Material Facts ("SUMF") ¶ 23. The State has never produced crude oil and has no proven reserves.[4] *Id.* ¶¶ 24-25. It has no coal mines or coal-fired power plants. *Id.* ¶ 26. Thus, although the Act clarifies that the definition of "responsible parties" excludes "any person who lacks sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution," § 596(22), the Act's aim is entirely extraterritorial. In fact, the State of Vermont, its leaders, and others supporting the Act have made clear that the Act targets out-of-state energy producers like Plaintiffs' members. SUMF ¶¶ 16-22; Durbin Decl. ¶ 15; Meyer Decl. ¶ 15; Torrence Decl. ¶¶ 8-9; Swarup Decl. ¶¶ 13-16; Cochrane Decl. ¶ 11; Martini Decl. ¶¶ 10-11.

In addition, ANR has no discretion over whether to issue payment demands under the Act. *See* § 598(f) (ANR "shall issue the cost recovery demands"). The Act instead provides a mathematical formula to calculate each responsible party's cost recovery demand. *First*, the State Treasurer is required to assess the purported total "cost to the state of Vermont and its residents of . . . covered greenhouse gas emissions." § 599c; *see also* § 598(b). That assessment takes into account (1) "the various cost-driving effects of covered greenhouse gas emissions on the State,"

---

[4] Six exploratory wells were drilled in Vermont between 1957 and 1984 (before the Act's covered period), but they did not result in production. *See* SUMF ¶¶ 23-26. There are no producing oil or gas wells in Vermont. *See id.*

(2) "a categorized calculation of the costs that have been incurred and are projected to be incurred in the future within the State of Vermont of each of the effects identified" by the Treasurer, and (3) "a categorized calculation of the costs that have been incurred and are projected to be incurred in the future within the State of Vermont to abate the effects of covered greenhouse gas emissions." § 599c. *Second*, the Act instructs ANR to use EPA's "Emission Factors for Greenhouse Gas Inventories" to "determin[e] the amount of covered greenhouse gas emissions attributable to any entity [across the entire globe] from the fossil fuels attributable to the entity." § 598(d). *Third*, the Act requires ANR to demand payments from entities that ANR determines are "responsible parties," *see supra* pp.4-5, in proportion to that party's share of greenhouse gas emissions, as measured against the State Treasurer's calculation of Vermont's total climate-related costs. § 598(b). The calculation formula makes clear that the liability imposed under the Act is *not* based upon greenhouse gas emissions originating *in* Vermont. Rather, the Act makes energy producers strictly liable for and assesses penalties based upon *global* greenhouse gas emissions. *See id.*

The Act channels punitive payments imposed on out-of-state energy producers into a fund controlled by ANR for its preferred "climate change adaptation projects." §§ 597(1), 598(h), 599(a). This grab bag of initiatives includes those "designed to respond to, avoid, moderate, repair, or adapt to negative impacts [of] climate change and to assist human and natural communities, households, and businesses in preparing for future climate-change-driven disruptions." § 596(2).

## Argument

Vermont's attempt to impose substantial financial penalties on out-of-state energy producers based on a theory of strict liability for global greenhouse gas emissions is both precluded by the U.S. Constitution and preempted by the CAA.[5] The Second Circuit's decision in *City of New*

---

[5] As outlined in Counts III through VI of Plaintiffs' Complaint, the Act is constitutionally deficient for myriad other reasons, which Plaintiffs reserve for further proceedings, if necessary.

*York* and decades of Supreme Court precedent confirm that, in the United States' federal system, States like Vermont cannot create their own regimes imposing liability for out-of-state emissions or interfere with the comprehensive federal framework Congress established with the CAA.

### I.    Plaintiffs have associational standing to challenge Vermont's Act.

Plaintiffs have associational standing to bring this challenge because, as explained in greater detail in Plaintiffs' Opposition to Defendants' Motion to Dismiss: (1) at least one of Plaintiffs' members has individual standing to sue in its own right; (2) challenging the Act is germane to Plaintiffs' respective purposes; and (3) members' individual participation is unnecessary in this purely legal challenge. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 112 (2d Cir. 2024). Plaintiffs are national trade associations that are committed to defending the rights of their members and that represent a broad range of businesses, including major energy producers such as ExxonMobil, Shell USA, Chevron, and BP, among others. SUMF ¶¶ 1, 6; Durbin Decl. ¶¶ 6-10; Meyer Decl. ¶¶ 4-8. In fact, Vermont has made clear that it intends to target these specific energy producers under the Act. *See supra* p.4-5. An order declaring the Act unlawful and enjoining Defendants from enforcing the Act against Plaintiffs' covered members would redress the harm to those members of being forced to respond to cost recovery demands under the Act. *See* Durbin Decl. ¶ 20; Meyer Decl. ¶ 18; Torrence Decl. ¶ 21; Swarup Decl. ¶ 28; Cochrane Decl. ¶ 21; Martini Decl. ¶ 19.

### II.    The U.S. Constitution precludes Vermont's Act.

In our federal system, the U.S. Constitution stands as "the supreme Law of the Land." U.S. Const. art. VI. State laws cannot stand when they conflict with the Constitution's allocation of authority, whether between the federal Government and the States or among the States themselves. *See, e.g.*, *Gibbons v. Ogden*, 22 U.S. 1, 210-11, 240 (1824) ("The nullity of any act[,] . . . inconsistent with the constitution, is produced by the declaration, that the constitution is supreme law.");

*McCulloch v. Maryland*, 17 U.S. 316, 326-27 (1819) ("The constitution . . . declares, that the constitution itself . . . shall be the supreme law of the land, and shall control all state legislation and state constitutions, which may be incompatible therewith."). Put differently, just as federal laws enacted by Congress preempt contrary state laws under the Supremacy Clause, the Constitution itself precludes state laws that run afoul of its delineation of authority, including state laws that exceed the limits of state power. *See, e.g.*, *Zschernig*, 389 U.S. at 432, 440-41.

Vermont's Act is unconstitutional because it seeks to regulate matters that the U.S. Constitution commits exclusively to the federal Government and otherwise exceeds the territorial bounds of the State's constitutional authority. Binding Second Circuit precedent confirms that no State can reach beyond its borders to impose liability for out-of-state and global greenhouse gas emissions. Yet that is precisely what Vermont's Act attempts to do. It targets major energy producers whose extraction and refining activities occur exclusively outside Vermont—in places like Texas and West Virginia, and indeed around the globe—and seeks to hold them strictly liable for the global climate-related effects of the release of greenhouse gas emissions. This ambitious effort exceeds the Constitution's core structural limits on state authority and violates foundational limits on state power.

### A.    Vermont's Act is unconstitutional because only federal law may govern regulation of pollution originating beyond a State's borders under the U.S. Constitution.

Vermont's Act purports to legislate in an area that federal law governs exclusively: interstate pollution emitted beyond a State's borders. Decades of Supreme Court precedent and recent Second Circuit precedent recognize that the Constitution reserves this fundamentally interstate and international matter exclusively to the federal Government. By reaching beyond its own borders to impose hundreds of millions or billions of dollars in liability on out-of-state energy producers for activities in other States (and countries) resulting in global greenhouse gas emissions, Vermont

has trespassed into the federal Government's exclusive authority. The Act is therefore precluded by the supremacy of the U.S. Constitution.

There are certain areas of law in this country's constitutional system that may be addressed only by federal law. In such areas of "uniquely federal interests," "our federal system does not permit the controversy to be resolved under state law." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640-41 (1981) (citation omitted). For example, courts have held that federal law must govern discrete issues like interstate water disputes, *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110 (1938), and interstate air carrier liability, *Treiber & Straub, Inc. v. UPS, Inc.*, 474 F.3d 379, 384 (7th Cir. 2007). In such areas, "the interstate or international nature of the controversy makes it inappropriate for state law to control." *Tex. Indus.*, 451 U.S. at 640-41. Therefore, in these federal areas, "the Constitution implicitly forbids" States from "apply[ing] their own law," and disputes within these areas must "turn on federal 'rules of law.'" *Franchise Tax Bd. v. Hyatt*, 587 U.S. 230, 246-47 (2019) (citation omitted). In sum, "the basic scheme of the Constitution" "demands" a federal rule of decision in these inherently federal areas. *AEP*, 564 U.S. at 421.

Disputes involving out-of-state greenhouse gas emissions are one such area. In *City of New York*, the Second Circuit recognized that "[f]or over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air . . . pollution." 993 F.3d at 91; *see also Milwaukee I,* 406 U.S. at 103 ("When we deal with air . . . in [its] ambient or interstate aspects," federal law controls). That is because these areas "implicate two federal interests that are incompatible with the application of state law: (i) the 'overriding . . . need for a uniform rule of decision' . . . on matters influencing national energy and environmental policy, and (ii) 'basic interests of federalism.'" *City of New York*, 993 F.3d at 91-92 (cleaned up). Applying this longstanding

10

precedent, the Second Circuit rejected New York City's attempt to impose state tort liability on out-of-state energy companies for the alleged effects of global greenhouse gas emissions. *See id.* at 92. The city sought to hold those companies liable for emissions "made around the globe over the past several hundred years," not just in New York. *Id.* The Second Circuit held that such a sweeping claim of liability "is simply beyond the limits of state law." *Id.* The court explained that the city's suit would have regulated emissions from every State and every foreign country, violating the rights of other States and intruding on the federal Government's authority over foreign relations. *Id.* (quoting *Tex. Indus.*, 451 U.S. at 641).

*City of New York* controls this case. Although Vermont has contended that the Act does not regulate emissions, its attempt to recover penalties based upon global greenhouse gas emissions is no different than the City of New York's attempt to do so via state tort claims. The Act requires payment to the state, not based upon greenhouse gases emitted in Vermont, but rather, based upon "the total quantity of greenhouse gases release[d] into the atmosphere during the covered period . . . resulting from the use of fossil fuels extracted or refined by an entity." § 596(7). Those worldwide "covered greenhouse gas emissions" are the basis for liability, § 598(a); for assessing each responsible party's share of attributable emissions, § 598(b); and for assessing the total cost to the state, § 599c(3), all of which will in turn determine Vermont's recovery from each responsible party, § 598(b). Put differently, the Act imposes penalties for damages purportedly caused by climate change in Vermont, but the basis for liability, like the claims that *City of New York* determined to be precluded, is the cumulative "effects of emissions made around the globe" over 30 years. 993 F.3d at 92. Vermont is imposing penalties "for the cumulative impact of conduct occurring simultaneously across just about every jurisdiction on the planet." *Id*.

Vermont's contention that the Act does not directly limit emissions is irrelevant. The City

made the same argument in *City of New York*, and the Second Circuit rejected it. *See id.* (rejecting argument that City's tort claims sought "damages—not abatement or the imposition of pollution standards" and therefore do not "regulate emissions at all"). There, the Second Circuit held that even though the City's claims did not "expressly seek[] to impose a standard of care or emission restrictions" on energy producers, "the goal of its lawsuit is perhaps even more ambitious: to effectively impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)." *Id.* at 93. The same is true here: the Act imposes strict liability for global greenhouse gas emissions. §§ 598(a)(1), 597(1). And like a damages award, the substantial financial penalties that will be imposed under the Act will inevitably influence future business decisions. *See City of New York*, 993 F.3d at 93 ("significant damages award" itself would impact energy producers' behavior).

Thus, it does not matter that *City of New York* involved tort claims and that the Vermont Act is a statutory liability and compensation scheme—under *City of New York*, each is a regulation of greenhouse gas emissions. As the Second Circuit explained, "the obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Id.* at 92 (cleaned up). Thus, even if the Act "would regulate cross-border emissions in an indirect and roundabout manner, it would regulate them nonetheless." *Id.* at 93.

The Second Circuit's decision and its application here are bolstered by other courts that have followed its holding that States cannot impose liability under their own laws for the purported impacts of global greenhouse gas emissions. As one court joining "the 'growing chorus of state and federal courts across the United States,'" put it, "the U.S. Supreme Court has long made clear [that] the federal Constitution's structure generally precludes and preempts states from using their own laws to resolve disputes involving interstate and international emissions because under 'the

basic scheme of the Constitution,' these disputes are not 'matters of substantive law appropriately cognizable by the states.'" *City of Charleston v. Brabham Oil Co.*, No. 2020-CP-10-03975, 4-5 (S.C. Ct. Com. Pl. Aug. 6, 2025) (first quoting *Bucks County v. BP P.L.C.*, 2025 WL 1484203, at *6 (Pa. Com. Pl. May 16, 2025), and then quoting *AEP*, 564 U.S. at 421-22); *Platkin v. Exxon Mobil Corp.*, 2025 WL 604846, at *5 (N.J. Super. Ct. Feb. 5, 2025) ("[O]nly federal law can govern Plaintiffs' interstate and international emissions claims because 'the basic scheme of the Constitution so demands.'" (citation omitted)); *Mayor & City Council of Baltimore v. BP P.L.C.*, 2024 WL 3678699, at *6 (Md. Cir. Ct. July 10, 2024) ("[T]he Constitution's federal structure does not allow the application of state law to claims like those presented by Baltimore."). Like the claims in *City of New York* and the penalties imposed by the Act here, the claims in those cases were based on a theory of liability grounded in the impacts of global, out-of-state greenhouse gas emissions, which the courts correctly held could only be governed by federal law.

Likewise, the Second Circuit's controlling decision is supported by the federal Government's long-held position that climate-change claims are "inherently federal in nature" and that global greenhouse gas emissions cannot "be subjected to potentially conflicting regulations by every state and city affected by global warming." Oral Arg. Tr. at 31, *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230 (2021). Indeed, the United States during both the Trump and Biden administrations has acknowledged that plaintiffs may not hold energy companies liable under state law for alleged injuries from climate change. For example, in 2020, the United States explained that "[a]s a matter of constitutional structure, any claims asserted in th[e] area [of transboundary emissions] are inherently federal." Brief for United States as Amicus Curiae in Support of Pet. for Reh'g at 5, *City of Oakland v. B.P. p.l.c.*, 969 F.3d 895 (9th Cir. 2020) (No. 18-16663). Similarly, in 2024, the United States recognized that energy producer defendants sued by Honolulu

for climate-related claims "may ultimately prevail on their contention that respondents' claims are barred by the Constitution . . . to the extent the claims rely on conduct occurring outside Hawaii." Brief for the United States as Amicus Curiae in Support of Pet. for Cert. at 12, *Sunoco LP v. City & Cnty. of Honolulu*, 145 S. Ct. 1111 (2025) (No. 23-947), 2024 WL 5095299, at \*12. Most recently, the United States reiterated to the Maryland Supreme Court that state-law claims seeking to regulate out-of-state emissions intrude on authority the Constitution assigned exclusively to the federal Government. *See* Brief for the United States as Amicus Curiae Supporting Appellees, *Mayor & City Council of Balt. v. BP p.l.c.*, No. 11, Sept. Term 2024 (Md. Apr. 15, 2025). And the United States has filed a parallel suit citing these same principles in challenging Vermont's law. *See United States v. Vermont*, No. 2:25-cv-00463-MKL (D. Vt.); *see also United States v. New York*, No. 1:25-cv-03656-PKC (S.D.N.Y.) (challenging New York's similar law).

In sum, Vermont's Act flouts the settled rule—confirmed by binding Second Circuit precedent—that the Constitution reserves to federal law alone the power to address out-of-state and global greenhouse gas emissions and is therefore constitutionally precluded.

### B.    The Constitution's guarantees of equal sovereignty, due process, and federal control of foreign affairs further confirm that Vermont's Act is unconstitutional.

Specific constraints in the Constitution preclude Vermont's attempt to impose liability for greenhouse gases emitted across the United States and the world. These constraints include the Constitution's federal structure establishing a perpetual union of equal, sovereign States, as well as the Fourteenth Amendment's Due Process Clause and the allocation of foreign affairs authority to the federal Government, and not the States.

The Constitution guarantees that all States are equal and sovereign within their own borders. *See*, *e.g.*, U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the

people."). Indeed, numerous provisions of the Constitution rest on the fundamental assumption of meaningful state borders that limit the territorial scope of state authority. *See, e.g.*, U.S. Const. art. IV, § 1 (Full Faith and Credit Clause); art. IV, § 2 (Privileges and Immunities Clause). This fundamental principle reflects that "the constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Coyle*, 221 U.S. at 580; *Shelby County*, 570 U.S. at 544 (same). That "equality" of sovereign powers delimits a State's power to dictate or dominate another's sovereign authority. *See, e.g.*, *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 14 (2025) (describing the "limits imposed" on States "by their status as coequal sovereigns in a federal system" (citation omitted)); *Hyatt*, 587 U.S. at 246-47.

Equal sovereignty necessarily limits the ability of one State to extend its laws into another's territory. A State cannot exercise authority over conduct that takes place entirely elsewhere "without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority." *N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914); *see also World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 293 (1980) ("The sovereignty of each State, in turn, implied a limitation on the sovereignty of all of its sister States—a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment."); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 154 (2023) (Alito, J., concurring) ("We have long recognized that the Constitution restricts a State's power to reach out and regulate conduct that has little if any connection with the State's legitimate interests."). That rule inheres in the federalist structure of the Constitution itself. *See N.Y. Life Ins. Co.*, 234 U.S. at 161 (the "obviously . . . necessary result of the Constitution" is that a State's sovereignty is limited by the sovereignty of other States). As a result, States may only regulate within the territorial bounds indicated by the "original and

15

historical understandings of the Constitution's structure and the principles of sovereignty and comity it embraces." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 & 377 n.1 (2023).

The Due Process Clause of the Fourteenth Amendment to the Constitution, U.S. Const. amend XIV, § 1, likewise forbids a State from legislating beyond its own jurisdiction unless specifically authorized by Congress. *Fuld*, 606 U.S. at 14; *see also Nat'l Pork Producers*, 598 U.S. at 376; *Mallory*, 600 U.S. at 156 (2023) (Alito, J., concurring) (noting that the Court's Due Process decisions "have continued to recognize that constitutional restrictions on state court jurisdiction . . . reflect 'territorial limitations' on state power" (citation omitted)). In *Fuld*, the Court explained that "due process limitations imposed by the Fourteenth Amendment" are "driven [in relevant part] by" the principle of "protecting interstate federalism" and that as a necessary part of those "principles of interstate federalism embodied in the Constitution[,]" "State sovereign authority is bounded by the States' respective borders." *Fuld*, 606 U.S. at 14 (citation omitted). This decision is built on decades of precedent that explained the due process limits on a state's power to regulate conduct beyond its borders. *See Bonaparte v. Tax Ct.*, 104 U.S. 592, 594 (1881) (state may not legislate "except with reference to its own jurisdiction"); *United States v. Rodgers*, 150 U.S. 249, 282 (1893) (state authority is "coextensive with its territory" (citing *United States v. Bevans*, 16 U.S. (3 Wheat.) 336, 387 (1818), approvingly to define U.S. jurisdiction); *Watson v. Emps. Liab. Assur. Corp.*, 348 U.S. 66, 70 (1954) (acknowledging "the due process principle that a State is without power to exercise 'extra territorial jurisdiction,' that is, to regulate and control activit[i]es wholly beyond its boundaries").

The Constitution also limits state authority to act on matters of foreign affairs, for it is well settled that foreign policy "must be treated exclusively as an aspect of federal law." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964); *see Zschernig*, 389 U.S. at 442-43

16

("Our system of government . . . imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference.") (Stewart, J., concurring); *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941) ("[T]he supremacy of the national power in the general field of foreign affairs . . . is made clear by the Constitution."). Where "a state law (1) has no serious claim to be addressing a traditional state responsibility and (2) intrudes on the federal government's foreign affairs power, the Supremacy Clause prevents the state statute from taking effect." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1074 (9th Cir. 2012) (en banc); *accord In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 117-18 (2d Cir. 2010) ("state law 'must give way' to the foreign policy of the United States" (citation omitted)). That is why the Supreme Court has ruled that state laws are constitutionally precluded where "there is evidence of clear conflict between the policies adopted by the [state and federal Government]," *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003), or to the extent they have "more than 'some incidental or indirect effect in foreign countries,'" *Zschernig*, 389 U.S. at 434.

Vermont's Act strays from all of these constitutional limitations on state authority. It would impose liability based upon emissions associated with fossil-fuel extraction and refining that occurred entirely in other States and that bear only an attenuated connection to the harm Vermont alleges—climate-related disaster events in Vermont as a result of global greenhouse gas emissions. *See* § 596(7); *see supra* pp.5-6. Vermont is, for example, targeting oil extracted in Texas, refined in Louisiana, purchased in Virginia, and used in New Jersey, based on that oils contribution to a global phenomenon. By imposing these penalties based on allocated emissions, Vermont seeks to control lawful activities in other States and effectively override the energy policies of sister States, as well as of the federal Government. *See City of New York*, 993 F.3d at 92 (explaining that a

"substantial damages award . . . would effectively regulate" energy producers' "behavior far beyond New York's borders").

Indeed, Vermont's Act would "needlessly complicate the nation's foreign policy, while clearly infringing on the prerogatives of the political branches," *City of New York*, 993 F.3d at 103. For example, the Act undermines the ability of the federal Government to decide whether to join (or to not join or to withdraw from) various international agreements involving greenhouse gas emissions, balancing efforts to address climate change with the country's critical energy production needs. It also conflicts directly with "the United States' longstanding position in international climate-change negotiations . . . to oppose the establishment of liability and compensation schemes at the international level." *City of New York*, 993 F.3d at 103 n.11 (citation omitted). And it conflicts with the current Administration's national-security priorities and policies. *See, e.g.*, *Declaring a National Energy Emergency*, Exec. Order No. 14,156, 90 Fed. Reg. 8,433 (Jan. 30, 2025); *Protecting American Energy From State Overreach*, Exec. Order No. 14,260, 90 Fed. Reg. 15,513 (Apr. 8, 2025). Indeed, one recent Executive Order finds that laws like Vermont's "weaken our national security" and "try to dictate interstate and international disputes over air, water, and natural resources," which makes the laws "fundamentally irreconcilable with" the federal Government's energy objectives. Exec. Order No. 14,260, 90 Fed. Reg. at 15,513-14. Consistent with that Executive Order, the United States has filed its own suit against Vermont's Act, asserting that the Act interferes with its exclusive authority over foreign affairs and undermines its international policies on climate change and energy production. *See United States v. Vermont*, No. 2:25-cv-00463-MKL (D. Vt.). Because Vermont's Act "implicates the conflicting rights of states and our relations with foreign nations," the Act "poses the quintessential example of when" federal law "is most needed." *City of New York*, 993 F.3d at 92 (cleaned up) (citation omitted).

### III.    The Clean Air Act preempts Vermont's Act.

"The Supremacy Clause invalidates state laws that interfere with, or are contrary to, federal law," absent explicit congressional authority to the contrary. *Clean Air Mkts. Grp. v. Pataki*, 338 F.3d 82, 86-87 (2d Cir. 2003) (cleaned up). The CAA establishes a comprehensive scheme for regulating air pollutants—including greenhouse gases—across the United States. Although Congress defined the states' role under the CAA, their authority to regulate greenhouse gas emissions is "narrowly circumscribed." *City of New York*, 993 F.3d at 100. The Second Circuit, applying the Supreme Court's interpretation of nearly identical language in the Clean Water Act, has held that a State's authority to regulate or impose liability for domestic greenhouse gas emissions under the CAA is limited to the "slim reservoir" of emissions within the State's own borders. *Id.* at 100. Because Vermont's Act imposes liability for *global* greenhouse gas emissions originating far beyond its borders, the Act is definitively preempted by the CAA.

### A.    The Clean Air Act comprehensively regulates air pollutants, including greenhouse gases.

Congress created a comprehensive scheme to regulate air pollution through the CAA, *AEP*, 564 U.S. at 427, which preempts Vermont's Act. Greenhouse gases are "pollutants" covered by the CAA and are thus subject to regulation by EPA. *Massachusetts v. EPA*, 549 U.S. at 528-29; *see also id.* at 532 (holding that "greenhouse gases fit well within the Clean Air Act's capacious definition of 'air pollutant'" under the Act-wide definition in Section 302(g)). The CAA "delegate[s]" authority to EPA to "deci[de] whether and how to regulate" greenhouse gas emissions, and "entrusts" to EPA the "complex balancing" of "competing interests" from "environmental benefit[s]" of regulation to "our Nation's energy needs and the possibility of economic disruption." *AEP*, 564 U.S. at 426-27. Thus, Congress delegated broad authority to EPA under the CAA,

including the authority to decide "to decline to regulate [greenhouse gas] emissions altogether" if EPA concluded such a policy was warranted. *Id.* at 426.

Under this scheme, EPA has authority to choose levels of emissions reduction (and thus the level of permissible emissions) for many emissions sources. Title II of the CAA gives EPA authority to determine whether to establish emissions standards for the transportation sector, including vehicles, aircraft, locomotives, motorcycles, and nonroad engines and equipment. 42 U.S.C. §§ 7521(a)(1)-(2), (a)(3)(E), 7571(a)(2)(A), 7547(a)(1), (5). The CAA also provides EPA with authority to determine whether emissions of a pollutant from "stationary sources," such as power plants, refineries, and oil and gas wells, should be regulated and at what levels. *AEP*, 564 U.S. at 426; *see also* 42 U.S.C. § 7411(b)(1)(A)-(B), (d). Even when EPA chooses not to regulate that is "no less an exercise of the Legislature's 'considered judgment' concerning the regulation of air pollution" than the alternative. *AEP*, 564 U.S. at 426.

Congress included a role for the States under some of these programs. States are responsible for developing "state implementation plans," for example, delineating how various stationary sources within their borders will comply with standards adopted by EPA. *See* 42 U.S.C. § 7410(a). And States also play an important role in enforcing those standards. *See, e.g.*, *id.* § 7411(c)(1), (d)(1), 7521(m)(3). But a State's displeasure with out-of-state pollution may be addressed only through the CAA in cooperation with EPA. "If EPA does not set emissions limits for a particular pollutant or source of pollution, States and private parties may petition [EPA] for a rulemaking on the matter . . . [but there is] no room for a parallel track." *AEP*, 564 U.S. at 425.

### B.    Under the Clean Air Act, States may regulate greenhouse gas emissions only if they originate within their borders.

The CAA preempts state attempts to impose liability based upon emissions originating from outside their borders. As explained above, state regulation of greenhouse gas emissions is

permissible only as authorized by the CAA's comprehensive scheme. That is because interstate air pollution has historically been governed exclusively by federal law (originally as part of federal common law). *City of New York*, 993 F.3d at 89-95.[6] And "'resort[ing] to state law' on a question" that has historically been governed by federal common law "is permissible only to the extent 'authorize[d]' by federal statute." *Id.* at 99 (citation omitted). Here, under the CAA, the Act's liability scheme would be "permissible only to the extent" it was limited to liability for emissions originating within the State.

That rule flows from the Supreme Court decision in *International Paper Co. v. Ouellette*, where the Court held that the Clean Water Act "pre-empts [Vermont] state law to the extent that the state law is applied to an out-of-state point source." 479 U.S. at 500. Plaintiffs in that case were property owners on Vermont's shore of Lake Champlain who brought a nuisance claim against a paper mill on the New York shore of the same lake that discharged pollutants affecting plaintiffs' property. 479 U.S. at 484. Much like the CAA, the Clean Water Act establishes a "comprehensive" regulatory scheme and charges EPA with primary authority to balance the "costs and benefits" of regulation. *Id.* at 492, 494-95. Both Acts include nearly identical savings clauses that preserve a state's ability to create standards that are at least as "stringent" as EPA's and to enforce requirements respecting the control and abatement of pollution. *Compare* 33 U.S.C. § 1370, *with* 42 U.S.C. §§ 7604(e), 7416. The plaintiffs argued that Vermont's nuisance law fell within the savings clause because it respected the control and abatement of pollution.

---

[6] For this same reason, there is no presumption against preemption in this area. *See, e.g.*, *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005) ("The presumption against federal preemption disappears, however, in fields of regulation that have been substantially occupied by federal authority for an extended period of time."); *United States v. Locke*, 529 U.S. 89, 108 (2000) (similar); *City of New York*, 993 F.3d at 98; *see supra* p.2, 9-14, 19-20.

Rejecting application of Vermont nuisance law to sources in New York, the Supreme Court explained that "the only state suits that remain available are those specifically preserved by the [CWA]." *Ouellette*, 479 U.S. at 492. "An interpretation of the saving clause that preserved actions brought under an affected [downstream] State's law" would "upset[] the balance of public and private interests so carefully addressed by the Act," and "would be incompatible with the Act's delegation of authority and [] comprehensive regulation of water pollution." *Id.* at 494-95, 500. A State's nuisance laws reach only emissions that originate within its own borders. *Id.*

Courts, including the Second Circuit, have consistently held that *Ouellette*'s interpretation of the Clean Water Act applies equally to the CAA. The Second Circuit held in *City of New York* that "[l]ike the nearly identical savings clauses in the Clean Water Act," the CAA's savings clauses, "plainly permit states to create and enforce their own emissions standards applicable to *in-state* polluters." 993 F.3d at 99 (emphasis added). But this "authorization is narrowly circumscribed, and has been interpreted to permit only state lawsuits brought under 'the law of the [pollution's] *source* [s]tate.'" *Id.* at 100 (quoting *Ouellette*, 479 U.S. at 497).[7]

Therefore, under *Ouellette* and *City of New York*, state laws that seek to impose monetary consequences—whether through common law liability or statutory penalties—on "emissions emanating simultaneously from all 50 states and the nations of the world" do not fit within the "slim reservoir" of state authority under the CAA. *City of New York*, 993 F.3d at 100.

---

[7] *See also, e.g.*, *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 693 (6th Cir. 2015) ("[C]laims based on the common law of a non-source state . . . are preempted by the [CAA]."); *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 301, 308 (4th Cir. 2010) ("[O]nly *source state* law . . . could impose more stringent emission rates than those required by federal law on plants located in those two jurisdictions." (emphasis added)); *cf. Bell v. Cheswick Generating Station*, 734 F.3d 188, 197 (3d Cir. 2013) ("[T]he [CAA] does not preempt state common law claims based on the law of the state where the source of the pollution is located.").

### C.    Vermont's Act is preempted because it imposes liability for emissions originating out of state.

Here, the CAA preempts Vermont's law because, like the damages suits in *City of New York*, Vermont's law clearly extends well beyond the "slim reservoir" of state authority to address emissions from sources within its own borders and instead seeks to impose liability for emissions released outside Vermont. On its face, Vermont's Act does not confine itself to emissions from sources located within Vermont. It targets exclusively out-of-state energy producers, *see supra* pp.3, 5-6, and its liability scheme and penalties are based upon "the total quantity of greenhouse gases released into *the atmosphere* . . . resulting from the use of fossil fuels extracted or refined by an entity," without any geographic limitation. § 596(7) (emphasis added). Specifically, those worldwide "covered greenhouse gas emissions" in the "atmosphere" are used to calculate the total "cost to the State of Vermont and its residents," §599c, and determine the greenhouse gas emissions attributable to a responsible party and that responsibility party's cost recovery demand penalty without any determination that these particular emissions caused damage to Vermont, § 598(b). Therefore, the Act, by design, imposes hundreds of millions or billions of dollars in liability on a select group of companies in a single industry for greenhouse gas emissions originating from every other State in the Union—not to mention countries across the world.

As the Second Circuit has held, permitting States like Vermont to impose this kind of nationwide, indeed global, liability would supplant carefully calibrated federal rules under the CAA with a patchwork of state-level determinations. 993 F.3d at 100; *see Ouellette*, 479 U.S. at 496-97 (permitting States to regulate out-of-state pollution "undermine[s] [the] regulatory structure" provided by the Clean Water Act and "lead[s] to chaotic confrontation between sovereign states"); *see also State ex rel. Jennings v. BP Am. Inc.*, 2024 WL 98888, at *9 (Del. Super. Ct. Jan. 9, 2024) ("[The] claims in this case seeking damages for injuries resulting from out-of-state or global

23

greenhouse emissions and interstate pollution, are preempted by the CAA"); *Bucks County*, 2025 WL 1484203, at *7 (similar). Under *Ouellette* and *City of New York*, the CAA preempts Vermont's attempt to impose its own state law on emissions originating outside its borders.

## IV.    Plaintiffs meet all the requirements for a permanent injunction.

Plaintiffs are entitled to an injunction barring enforcement of the Act against their covered members because (1) their members will suffer "an irreparable injury," (2) "remedies available at law . . . are inadequate" due to Vermont's sovereign immunity from suit, and (3) the "balance of the hardships" and the "public interest," which merge where state officials are defendants, support enjoining Vermont's unconstitutional law. *SEC v. Citigroup Glob. Mkts., Inc.*, 752 F.3d 285, 296 (2d Cir. 2014) (citation omitted); *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Absent an injunction, the Act will irreparably harm Plaintiffs' members. The Act is in effect, and Plaintiffs' members will incur substantial unrecoverable costs under the Act in the coming months if the Act is not enjoined. For example, well before Vermont issues cost recovery demands, Plaintiffs' members will have to consider whether they must report certain public disclosures to the U.S. Securities and Exchange Commission regarding liability under the Act. *See* Cochrane Decl. ¶ 15; Torrence Decl. ¶¶ 14-16; Martini Decl. ¶¶ 12-14. Members will have to spend resources on time and personnel to complete that process, including hiring outside counsel, consultants, and others to assist in compiling and submitting the disclosures. *See* Swarup Decl. ¶ 23; Cochrane Decl. ¶ 16; Torrence Decl. ¶ 15; Martini Decl. ¶ 16. Members will also have to expend resources to analyze and validate the State's complex assessments measuring worldwide extraction volume for all companies of any size and the determination of future costs related to climate. *See* Swarup Decl. ¶¶ 17, 23-24; Cochrane Decl. ¶ 16; Torrence Decl. ¶¶ 11-13. They will also spend resources to submit comments on any proposed regulations issued by ANR. *See* Swarup Decl. ¶ 24; Cochrane Decl. ¶ 16; Torrence Decl. ¶ 17. And in general, the fact that the law is in effect now with cost

recovery demands looming injures members' reputations among consumers, investors, and other businesses. *See* Cochrane Decl. ¶¶ 14-15, 19; Torrence Decl. ¶ 19; Martini Decl. ¶ 18. That damage is already done and will continue until the Act is declared unlawful and enjoined.

None of these costs are recoverable, and there is no adequate remedy at law because Vermont enjoys sovereign immunity from suit. *See, e.g.*, *United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (affirming the district court's finding that "[the plaintiff's] injury was irreparable even though [its] losses were only pecuniary because a suit in federal court against [the defendant,] New York[,] to recover the damages sustained by [the plaintiff] would be barred by the Eleventh Amendment"); *Nat'l Inst. of Health v. Am. Pub. Health Assoc.*, No. 25A103, at 1 (Aug. 21, 2025) (slip op. granting in part and denying in part application for stay) ("[W]hile the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped' and are thus 'irrevocably expended.' (citation omitted)).

Finally, the equities favor an injunction. Vermont "does not have an interest in the enforcement of an unconstitutional law." *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 470 (S.D.N.Y. 2019) (quoting *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013)). Nor does it have an interest in imposing liability on entirely out-of-state energy producers when it is home to *no* extraction or refining of fossil fuels.

## Conclusion

The Court should grant Plaintiffs' Motion, declare the Act to be unlawful, and enjoin Defendants from implementing or enforcing the Act in any way against Plaintiffs' members.

Dated: September 15, 2025

Matthew B. Byrne
GRAVEL & SHEA PC
76 St. Paul Street, 7th Floor
Burlington, VT 05402-0369
Telephone: (802) 658-0220
Fax: (802) 658-1456
Email: mbyrne@gravelshea.com

Jennifer B. Dickey*
Kevin R. Palmer*
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
Telephone: (202) 463-5337

*Counsel for Plaintiff the Chamber of Commerce of the United States of America*

Ryan Meyers*
American Petroleum Institute
200 Massachusetts Avenue, NW,
  Suite 1200
Washington, DC 20001
Telephone: (202) 682-8000

*Counsel for Plaintiff American Petroleum Institute*

Respectfully submitted,

*/s/ Steven P. Lehotsky*

Steven P. Lehotsky*
Scott A. Keller*
Michael B. Schon*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW,
  Suite 700
Washington, DC 20001
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: steve@lkcfirm.com
Email: scott@lkcfirm.com
Email: mike@lkcfirm.com

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: jared@lkcfirm.com

Meredith R. Pottorff*
LEHOTSKY KELLER COHN LLP
8513 Caldbeck Drive
Raleigh, NC 27615
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: meredith@lkcfirm.com

*Counsel for Plaintiffs the Chamber of Commerce of the United States of America and American Petroleum Institute*

*admitted pro hac vice*

26

**Certificate of Service**

I, Steven P. Lehotsky, certify that on September 15, 2025, the foregoing was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

<u>*/s/ Steven P. Lehotsky*</u>
Steven P. Lehotsky