### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF VERMONT

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA and
AMERICAN PETROLEUM INSTITUTE,

*Plaintiffs*,

v.

JULIE MOORE, in her official capacity as
the Secretary of the Vermont Agency of
Natural Resources and JANE LAZORCHAK,
in her official capacity as the Director of the
Vermont Agency of Natural Resources
Climate Action Office,

*Defendants*.

Civil Action No. 2:24-cv-01513-MKL

### PLAINTIFFS' RESPONSE IN OPPOSITION TO
### DEFENDANTS' AND INTERVENOR-DEFENDANTS' MOTIONS TO DISMISS

# Table of Contents

Introduction ................................................................................................................. 1

Background ................................................................................................................... 3

    A. Energy producers provide critical energy resources to the United States. .................. 3

    B. Greenhouse gas emissions are a global phenomenon. .................................... 4

    C. Vermont's Act penalizes energy producers for global greenhouse gas emissions. ...... 5

Legal Standard ............................................................................................................. 6

Argument ...................................................................................................................... 7

  I. Plaintiffs have alleged associational standing to challenge the Act. ................................. 8

  II. Plaintiffs' claims are ripe. ...................................................................................... 12

    A. Prudential ripeness is not an obstacle to this Court's review ....................................... 13

      1. Plaintiffs' claims are fit for judicial review. ......................................................... 13

      2. Plaintiffs will suffer hardship from delayed review. ............................................. 18

  III. Plaintiffs properly plead each of their claims under *Ex parte Young* and Section 1983. 19

  IV. Plaintiffs allege sufficient facts to state a plausible claim for every count in their Complaint ................................................................................................................... 21

    A. Plaintiffs have plausibly alleged that the Act is precluded by the structure of the Constitution ............................................................................................................... 22

      1. Under Second Circuit precedent, the Act is precluded by the Constitution because only federal law may regulate out-of-state emissions. ............................ 23

      2. Structural constitutional limits of equal sovereignty and due process confirm Vermont lacks the authority to legislate beyond its borders. .................. 27

      3. The Act's intrusion upon the federal Government's exclusive authority over foreign affairs supports Plaintiffs' structural argument. ............................... 30

    B. Plaintiffs plausibly allege that the Act is preempted by the Clean Air Act. ............... 31

      1. Under the Clean Air Act, States may regulate only emissions originating within their borders. ............................................................................................. 33

      2. Vermont's Act is preempted by the Clean Air Act because it imposes liability for domestic emissions originating outside of Vermont ......................... 34

      3. To the extent traditional preemption categories apply, Vermont's Act remains preempted by the Clean Air Act ................................................................ 35

    C. Plaintiffs plausibly allege that the Act violates due process ..................................... 38

      1. No legislative purpose justifies the Act's global reach ......................................... 40

      2. The Act's liability scheme is arbitrary and irrational. .......................................... 40

3.    The Act's provisions are unconstitutionally vague and lack adequate guideposts to ensure penalties comply with due process.....................43

D.    Plaintiffs plausibly allege that the Act violates the Commerce Clause. .....................44

1.    The Act discriminates against interstate commerce...............................44

2.    The Act burdens foreign commerce...................................................46

E.    Plaintiffs plausibly allege the Act imposes unconstitutionally excessive fines..........46

F.    Plaintiffs plausibly allege that the Act constitutes a regulatory taking.....................49

Conclusion ......................................................................................................50

## Table of Authorities

**Page(s)**

**Cases**

*Affinity Empowering, Inc. v. Eurofins Sci., Inc.*,
   2022 WL 6734604 (D. Del. Oct. 11, 2022) ........................................................25

*Air Transp. Ass'n of Am., Inc. v. Cuomo*,
   520 F.3d 218 (2d Cir. 2008)....................................................................................20

*Am. Elec. Power Co. v. Connecticut*,
   564 U.S. 410 (2011) ........................................................................................ *passim*

*Antonyuk v. James*,
   120 F.4th 941 (2d Cir. 2024) ...........................................................................11, 14

*Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*,
   950 F.2d 1401 (9th Cir. 1991) .................................................................................21

*Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*,
   88 F.4th 344 (2d Cir. 2023) .....................................................................................13

*Austin v. United States*,
   509 U.S. 602 (1993).................................................................................................47

*Beatty v. Gilman*,
   718 F. Supp. 3d 166 (D. Conn. 2024)......................................................................18

*Beaulieu v. Vermont*,
   2010 WL 3632460 (D. Vt. Aug. 5, 2010) ..................................................................6

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...................................................................................................6

*Bell v. Cheswick Generating Station*,
   734 F.3d 188 (3d Cir. 2013)....................................................................................33

*Bloomberg Fin. L.P. v. UBS AG*,
   358 F. Supp. 3d 261 (S.D.N.Y. 2018)........................................................................8

*BMW of N. Am., Inc. v. Gore*,
   517 U.S. 559 (1996).........................................................................................28, 44

*Canisius Coll. v. United States*,
   799 F.2d 18 (2d Cir. 1986).......................................................................................38

*Carter v. HealthPort Techs., LLC*,
   822 F.3d 47 (2d Cir. 2016)................................................................8

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
   868 F.3d 104 (2d Cir. 2017)............................................................20

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
   364 F. Supp. 3d 253 (S.D.N.Y. 2019)..........................................19

*Church of Scientology v. Cazares*,
   638 F.2d 1272 (5th Cir. 1981) ........................................................21

*City of Evansville, Ind. v. Ky. Liquid Recycling, Inc.*,
   604 F.2d 1008 (7th Cir. 1979) ........................................................25

*City of Milwaukee v. Illinois*,
   451 U.S. 304 (1981)........................................................................25

*City of New York v. Chevron Corp.*,
   993 F.3d 81 (2d Cir. 2021)...................................................... *passim*

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*,
   138 F. Supp. 3d 352 (S.D.N.Y. 2015)..........................................14

*Contractors Ass'n of E. Pa., Inc. v. City of Phila.*,
   945 F.2d 1260 (3d Cir. 1991)..........................................................21

*North Carolina ex rel. Cooper v. Tenn. Valley Auth.*,
   615 F.3d 291 (4th Cir. 2010) ..........................................................33

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000)........................................................................20

*D.C. v. Exxon Mobil Corp.*,
   89 F.4th 144 (D.C. Cir. 2023) ........................................................27

*Do No Harm v. Pfizer Inc.*,
   96 F.4th 106 (2d Cir. 2024) ..............................................................8

*E. Enters. v. Apfel*,
   524 U.S. 498 (1998)..........................................................38-42, 49-50

*Ecogen, LLC v. Town of Italy*,
   438 F. Supp. 2d 149 (W.D.N.Y. 2006)..........................................14

*Entergy Nuclear Vt. Yankee, LLC v. Shumlin*,
   733 F.3d 393 (2d Cir. 2013)......................................................17, 21

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)............................................................................................43

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
    592 U.S. 351 (2021)............................................................................................27

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,
    841 F.3d 133 (2d Cir. 2016)..............................................................................19

*Fuld v. Palestine Liberation Org.*,
    606 U.S. 1 (2025)................................................................................................29

*Gary D. Peake Excavating Inc. v. Town Bd. of Town of Hancock*,
    93 F.3d 68 (2d Cir. 1996)..............................................................................15, 16, 18

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)..............................................................................................30

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
    452 U.S. 264 (1981)............................................................................................17

*Home for Aged of Little Sisters of the Poor v. McDonald*,
    711 F. Supp. 3d 81 (N.D.N.Y. 2024)..............................................................16

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)........................................................................................8, 20

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987).................................................................................. *passim*

*James Square Assocs. LP v. Mullen*,
    993 N.E.2d 374 (N.Y. 2013)..............................................................................42

*Japan Line, Ltd. v. County of Los Angeles*,
    441 U.S. 434 (1979)............................................................................................46

*La Liberte v. Reid*,
    966 F.3d 79 (2d Cir. 2020)...................................................................................7

*Labor Council for Latin Am. Advancement v. EPA*,
    12 F.4th 234 (2d Cir. 2021) ..........................................................................13, 15

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994)............................................................................................39

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)............................................................................................12

*Mallory v. Norfolk S. Ry. Co.*,
  600 U.S. 122 (2023)................................................................................29, 30

*Massachusetts v. EPA*,
  549 U.S. 497 (2007)....................................................................................4, 32

*McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco*,
  496 U.S. 18 (1990).............................................................................................39

*Md. Highways Contractors Ass'n, Inc. v. Maryland*,
  933 F.2d 1246 (4th Cir. 1991) .........................................................................21

*Memphis Am. Fed'n of Teachers v. Board of Educ.*,
  534 F.2d 699 (6th Cir. 1976) ...........................................................................21

*Merrick v. Diageo Ams. Supply, Inc.*,
  805 F.3d 685 (6th Cir. 2015) ...........................................................................33

*In re MTBE Prods. Liab. Litig.*,
  725 F.3d 65 (2d Cir. 2013)................................................................................12

*N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*,
  612 F.3d 97 (2d Cir. 2010)................................................................................21

*Nat'l Fed'n of Blind of Mo. v. Cross*,
  184 F.3d 973 (8th Cir. 1999) ...........................................................................20

*Nat'l Foreign Trade Council v. Natsios*,
  181 F.3d 38 (1st Cir. 1999)...............................................................................46

*Nat'l Org. for Marriage, Inc. v. Walsh*,
  714 F.3d 682 (2d Cir. 2013)..............................................................................12

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003)...........................................................................................14

*Nat'l Pork Producers Council v. Ross*,
  598 U.S. 356 (2023)......................................................................................30, 45

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
  508 U.S. 656 (1993)...........................................................................................20

*New York v. United Parcel Serv., Inc.*,
  942 F.3d 554 (2d Cir. 2019)..............................................................................48

*NRDC v. FDA*,
  710 F.3d 71 (2d Cir. 2013)..................................................................................9

*Pension Benefit Guar. Corp. v. LTV Corp.*,
    467 U.S. 633, 733 (1990) ................................................................38

*Picard v. Magliano*,
    42 F.4th 89 (2d Cir. 2022) ............................................................11

*Retired Chi. Police Ass'n v. City of Chicago*,
    7 F.3d 584 (7th Cir. 1993) ............................................................20

*Revitalizing Auto Cmtys. Envtl. Response Tr. v. Nat'l Grid USA*,
    10 F.4th 87 (2d Cir. 2021) ..............................................12, 13, 18

*S. Lyme Prop. Owners Ass'n, Inc. v. Town of Old Lyme*,
    539 F. Supp. 2d 524 (D. Conn. 2008) ..........................................14

*Schachtler Stone Prods., LLC v. Town of Marshall*,
    2024 WL 4025862 (N.D.N.Y. Sept. 3, 2024) ................................9

*Sharkey v. Quarantillo*,
    541 F.3d 75 (2d Cir. 2008) ............................................................14

*Shaw v. Delta Air Lines, Inc.*,
    463 U.S. 85 (1983) ........................................................................20

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) ................................................................28, 44

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................. *passim*

*Tex. Indus., Inc. v. Radcliff Materials, Inc.*,
    451 U.S. 630 (1981) ......................................................................23

*Texas v. United States*,
    523 U.S. 296 (1998) ......................................................................14

*Tweed-New Haven Airport Auth. v. Tong*,
    930 F.3d 65 (2d Cir. 2019) ............................................................9

*United States v. Bajakajian*,
    524 U.S. 321 (1998) ......................................................................48

*United States v. Carolene Prods. Co.*,
    304 U.S. 144 (1938) ......................................................................21

*United States v. Ferro*,
    681 F.3d 1105 (9th Cir. 2012) ......................................................48

*United States v. Loy*,
    237 F.3d 251 (3d Cir. 2001)............................................................................18

*United States v. Salerno*,
    481 U.S. 739 (1987)......................................................................................21

*United States v. Traficante*,
    966 F.3d 99 (2d Cir. 2020)...........................................................................18

*Usery v. Turner Elkhorn Mining Co.*,
    428 U.S. 1 (1976)..........................................................................................40

*Variscite NY Four, LLC v. N.Y. State Cannabis Control Bd.*,
    2025 WL 2313142 (2d Cir. Aug. 12, 2025)................................................12

*Vermont v. Exxon Mobil Corp.*,
    No. 2:21-cv-00260 (D. Vt. Dec. 17, 2021)................................................27

*Vermont v. Exxon Mobil Corp.*,
    No. 21-CV-02778 (Vt. Super. Ct. Sept. 14, 2021)....................................10

*Vill. of Hoffman Ests. v. Flipside*,
    455 U.S. 489 (1982)......................................................................................43

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
    857 F.2d 55 (2d Cir. 1988)...........................................................................13

*Von Hofe v. United States*,
    492 F.3d 175 (2d Cir. 2007).........................................................................48

*Warth v. Seldin*,
    422 U.S. 490 (1975)......................................................................................20

*Wolff v. McDonnell*,
    418 U.S. 539 (1974)......................................................................................38

*Ex parte Young*,
    209 U.S. 123 (1908)...............................................................................19, 20

**Statutes**

10 V.S.A. § 596....................................................................................................*passim*

10 V.S.A. § 597.................................................................................................6, 50

10 V.S.A. § 598....................................................................................................*passim*

10 V.S.A. § 599........................................................................................6, 44, 47

10 V.S.A. § 599c ................................................................................................6

28 U.S.C. § 1331 ..............................................................................................27

42 U.S.C. § 7416 ..............................................................................................32

42 U.S.C. § 7604 ..............................................................................................32

Clean Air Act, 42 U.S.C. §§ 7401, *et seq.* ........................................................2

Comprehensive Environmental Response, Compensation, and Liability Act, 42
U.S.C. §§ 9601, *et seq.* ..............................................................................1

U.S. Const. amend. VIII, cl. 2 ........................................................................47

**Other Authorities**

BP PLC, Annual Report (Form 20-F March 8, 2024), https://perma.cc/SZG7-
AD2H ........................................................................................................3

Chevron Corp., Annual Report (Form 10-K Dec. 31, 2021),
https://perma.cc/L3ML-9GEY ...................................................................3

*Climate Superfund Act Introduced in Vermont State House; Majorities in Both
Chambers Co-Sponsor the Companion Bills*, VT. Conservation Voters (Jan.
18, 2024) (Statement of Sen. Watson), https://perma.cc/FBA7-TMKN ...............49

Exxon Mobil Corporation, Annual Report (Form 10-K Feb. 28, 2024),
https://perma.cc/PT5G-Q45J ......................................................................3

Senate Comm. on the Judiciary, Senate Judiciary - 2024-02-08 - 9:00AM (Feb. 2,
2024), https://perma.cc/4K9V-WN3F ...................................................48, 50

Shell PLC, Annual Report (Form 20-F March 9, 2023), https://perma.cc/Q2UA-
EKQA ........................................................................................................3

U.S. Bureau of Land Management, https://perma.cc/A64D-6R3S ........................3

Vt. Journal of the House 1171 (May 3, 2024) (statement of Rep. Hinesburg),
https://perma.cc/MNQ5-DX5V. ..................................................................49

Vt. Senate Comm. On Finance, Senate Finance - 2024-03-21 - 3:15PM (Mar. 21,
2024), https://perma.cc/VTL3-MXER .........................................................48

Vt. Senate Comm. on the Judiciary, Senate Judiciary - 2024-03-14 - 9:00AM
(Mar. 14, 2024), https://perma.cc/FR2E-RPSR ..........................................50

## Introduction

Vermont's Climate "Superfund" Act (S.259, Act 122) is unconstitutional for multiple reasons. Critically, the Act is irreconcilable with the Second Circuit's binding precedent in *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021). For that reason alone, the Act is invalid and cannot be enforced.

Under the Act, Vermont directs the State Treasurer to calculate what it claims are the State's climate-related costs and then forces out-of-state energy companies to pay those costs based on their alleged share of global greenhouse gas emissions from the past 30 years. Vermont does this by directing the State's Agency of Natural Resources ("ANR") to identify companies that extracted or refined the most fossil fuels anywhere in the world over the past 30 years, calculate each company's percentage of total worldwide emissions during that period, and issue mandatory payment demands for that same percentage of Vermont's claimed climate costs. Because the Act applies only to out-of-state companies (by design, not a single Vermont entity qualifies), it punishes select energy producers for lawful extraction and production activities entirely outside Vermont, while exempting the majority of emitters—including Vermont itself. Indeed, more than half of the State's energy consumption comes from petroleum, and Vermonters continue to rely on fossil fuel to heat their homes, run vehicles and farm equipment, and keep the lights on.

This is an unprecedented imposition of retroactive, punitive liability on out-of-state energy producers for greenhouse gas emissions far beyond Vermont's borders. Vermont tries to pass off the Act as run-of-the-mill liability for environmental remediation by mislabeling it as a "superfund" law, thus appropriating the moniker for the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601, *et seq.* That *real* superfund imposes liability upon *all* parties responsible for hazardous waste on a property, including federal, state, and local governments, and does not single out a narrow category of entities, let

alone impose liability exclusively on out-of-state parties. But here Vermont shields itself and others in the State and instead imposes liability only on a small set of out-of-state targets: "big oil and gas" companies.

The Constitution, however, prohibits Vermont's law. States may not regulate out-of-state greenhouse gas emissions. Doing so intrudes into areas reserved exclusively for the federal Government, and Congress preempted such efforts with the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401, *et seq*. No State has the power to impose penalties for global pollution or regulate emissions originating beyond its borders. Vermont's attempt to do so violates foundational constitutional principles—namely, the structure of federalism and the limits imposed by the Commerce Clause. Yet that is exactly what Vermont purports to accomplish. The CAA provides the sole comprehensive framework for regulating greenhouse gas emissions, and it leaves no room for state laws resembling Vermont's. Moreover, federal common law governs the regulation of foreign greenhouse gas emissions, and it likewise does not permit the kind of extraterritorial regulatory scheme Vermont enacted. These prohibitions are well established under binding Second Circuit and Supreme Court precedent. *See, e.g.*, *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 422 (2011) ("*AEP*"); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 500 (1987); *City of New York*, 993 F.3d at 91-92.

The Act also violates the Due Process Clause of the Fourteenth Amendment by imposing retroactive 30-year liability based on an impossible calculation—attempting to trace untraceable global emissions from decades past. The Act's vague standards grant ANR virtually unfettered discretion to impose penalties in the hundreds of millions or billions of dollars. The Act also directs fines that—even at the lowest possible level—are plainly excessive in violation of the Excessive Fines Clause of the Eighth Amendment. And by confiscating vast sums from companies to fund

Vermont's preferred projects, the Act effects a taking without just compensation in violation of the Constitution's Takings Clause.

The State and the Intervenor-Defendants (collectively "Defendants") have moved to dismiss the Complaint, arguing both that this Court lacks jurisdiction and that Plaintiffs failed to state a claim. They are wrong. This Court has jurisdiction because Plaintiffs' members are staring down the barrel of paying massive fines to Vermont under an Act that is unconstitutional in *all* its applications. Applying the proper legal standard, the claims in Plaintiffs' Complaint are more than adequately pled. This Court should deny the motions to dismiss in their entirety.

## Background

### A.    Energy producers provide critical energy resources to the United States.

Plaintiffs' members include the largest energy producers in the United States, supplying fossil fuels that provide roughly 80% of the nation's energy needs. Compl. ¶¶ 23-26. These companies operate across the United States in States like Texas and Louisiana, *see id.* ¶ 43, and across the world to ensure that the Nation's energy needs are met.[1] Despite their global operations, they are subject to comprehensive federal regulation and longstanding federal policies that promote and incentivize domestic energy production, while requiring compliance with a host of environmental standards. *Id.* ¶ 26.[2] Energy producers' activities support vital industries, including transportation, agriculture, commerce, and national security. *Id.* ¶¶ 24-26. And they produce essential by-products

---

[1] Chevron Corp., Annual Report (Form 10-K Dec. 31, 2021), https://perma.cc/L3ML-9GEY (explaining ongoing production activities in various U.S. states and abroad, but discussing no activities in Vermont); BP PLC, Annual Report (Form 20-F March 8, 2024), https://perma.cc/SZG7-AD2H (detailing oil and gas production operations by geographical area, including Europe, North America, South America, Africa, Asia, Australia, but listing no activities in Vermont); Exxon Mobil Corporation, Annual Report (Form 10-K Feb. 28, 2024), https://perma.cc/PT5G-Q45J (same); Shell PLC, Annual Report (Form 20-F March 9, 2023), https://perma.cc/Q2UA-EKQA (same).

[2] *See* Oil and Gas Statistics, U.S. Bureau of Land Management, https://perma.cc/A64D-6R3S (showing total federal oil and gas leases by State from 2001 to 2021, with 0 for Vermont).

that Americans use every day such as plastics, medical equipment, and lubricants. *Id.* ¶¶ 24-26. Plaintiffs' members literally fuel the American economy.

Vermont itself relies heavily on out-of-state fossil fuels produced by Plaintiffs' members. Indeed, even though no fossil fuels are produced or refined in Vermont, *id.* ¶ 41, about 57% of the energy consumed in Vermont is petroleum-based, *id.* ¶ 27. Most Vermonters use fossil fuels to heat their homes, and the State itself relies on fossil fuels to heat government buildings and power its transportation fleet. *Id.* ¶¶ 27-28. It is this end-use of fossil fuels by Vermont, its residents, and countless others around the globe—not the extraction or refinement of these fossil fuels—that creates the majority of human-generated greenhouse gases. *Id.* ¶¶ 31, 138.

### B.    Greenhouse gas emissions are a global phenomenon.

Greenhouse gases are emitted by countless sources worldwide—both human and natural (including by Vermont and Vermonters). *Id.* ¶¶ 30-31, 34. Although fossil-fuel combustion is one source, agriculture, forestry, and events like wildfires and volcanoes also contribute. *Id.* ¶ 30.

As the Supreme Court and the Second Circuit have recognized, once released, greenhouse gases from all sources rapidly disperse throughout the global atmosphere, making them impossible to trace to any single source. *Id.* ¶¶ 34-35; *AEP*, 564 U.S. at 422 (greenhouse gases quickly "become well mixed in the atmosphere"); *City of New York*, 993 F.3d at 92 ("Greenhouse gas molecules cannot be traced to their source, and greenhouse gases quickly diffuse and comingle in the atmosphere."). And the impact of greenhouse gas emissions on the climate is based on the cumulative total of emissions, not individual or nearby emissions. Compl. ¶ 36. That is why, for example, "emissions in New Jersey may [therefore] contribute no more to flooding in New York than emissions in China." *AEP*, 564 U.S. at 422. In short, climate change is a global, collective phenomenon. *See Massachusetts v. EPA*, 549 U.S. 497, 504-05 (2007).

## C.    Vermont's Act penalizes energy producers for global greenhouse gas emissions.

Despite the global nature of greenhouse gas emissions and climate change—and the innumerable sources contributing to them—Vermont chose to assign legal liability for climate change to a select group of large energy producers. In May 2024, Vermont enacted S.259, Act 122, to impose substantial strict-liability penalties on certain energy producers for their purported share of Vermont's climate disaster-related costs, allocated based on their purported contribution to global greenhouse gas emissions. *See* 10 V.S.A. § 596(7), (8), (22);[3] Compl. ¶¶ 48-49. The Act directs ANR to issue "cost recovery demands" to any responsible party. § 598(f). "Responsible party" means "any entity . . . that during any part of the covered period was engaged in the trade or business of extracting fossil fuel or refining crude oil and is determined by [ANR] attributable to for more than one billion metric tons of covered greenhouse gas emissions." § 596(22). This definition excludes "any person who lacks sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution." *Id.* No entity based in Vermont could be a responsible party under the Act because the State has no in-state fossil-fuel production or refining. *See supra* pp.1, 4. Thus, Vermont deliberately crafted the Act to apply *only* to entities based outside of Vermont.

The Act thus involves the regulation of out-of-state emissions. The Act imposes penalties on out-of-state companies based on worldwide greenhouse gases emitted over a 30-year "[c]overed period," spanning from 1995 through 2024. § 596(8). It defines "[c]overed greenhouse gas emissions" as "the total quantity of greenhouse gases released into the atmosphere"—expressed in metric tons of carbon dioxide equivalent—"resulting from the use of fossil fuels extracted or refined by an entity during the covered period." § 596(7). It then directs ANR to compel the payment of potentially billions of dollars from so-called responsible parties for that activity. § 598(a)(1), (f).

---

[3] Unless otherwise noted, statutory citations are to 10 V.S.A. Chapter 24A.

ANR has no discretion over whether to issue payment demands under the Act. § 598(f) (ANR "shall issue the cost recovery demands"). And the Act provides a formula to calculate each responsible party's cost recovery demand. *First*, the State Treasurer is required to set the purported total "cost to the state of Vermont and its residents of the emission of covered greenhouse gases." § 599c; *see also* § 598(b). *Second*, the Act requires ANR to "determin[e] the amount of covered greenhouse gas emissions attributable to any entity from fossil fuels attributable to the entity" using the Environmental Protection Agency's ("EPA") "Emissions Factors for Greenhouse Gas Inventories." § 598(d). *Third*, each responsible party's "cost recovery demand" is "calculated by the State Treasurer" and must "equal [] an amount that bears the same ratio to the cost to the State of Vermont and its residents . . ., from the emission of covered greenhouse gases during the covered period as the responsible party's applicable share of covered greenhouse gas emissions bears to the aggregate applicable shares of covered greenhouse gas emissions." § 598(b). The calculation methodology mandated by the Act is *not* limited to greenhouse gas emissions that occur *in* Vermont. Rather, it makes energy producers strictly liable for and calculates penalties based upon *global* greenhouse gas emissions. *See id.*

The punitive payments charged to out-of-state energy producers are to be paid into a fund to be used by ANR to finance its preferred "climate change adaptation projects." §§ 597(1), 598(h), 599(a). These wide-ranging, open-ended projects include those "designed to respond to, avoid, moderate, repair, or adapt to negative impacts caused by climate change and to . . . prepar[e] for future climate-change-driven disruptions." § 596(2).

## Legal Standard

"The threshold for a motion to dismiss . . . is high." *Beaulieu v. Vermont*, 2010 WL 3632460, at *2 (D. Vt. Aug. 5, 2010). To prevail, a defendant must establish that a claim for relief is not "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To assess

plausibility, the Court must "constru[e] the complaint liberally, accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *La Liberte v. Reid*, 966 F.3d 79, 85 (2d Cir. 2020) (citation omitted).

## Argument

Plaintiffs have properly invoked this Court's jurisdiction and pleaded plausible claims for relief. Defendants' standing, ripeness, and Section 1983 sufficiency challenges all fail.

The State's attacks on Plaintiffs' standing fail: Plaintiffs alleged that their members face liability in the hundreds of millions or billions of dollars under the Act's plain text. Relying on the prudential ripeness doctrine, Intervenor-Defendants argue this case is unripe because ANR has not yet issued any cost-recovery demands. But there is no question of whether ANR will issue those demands or to whom it will issue them. Therefore, this Court has authority to find that the Act is facially unconstitutional—that it is unconstitutional in *all* its applications—regardless of the facts underlying future demands.

Defendants' attacks on the merits of Plaintiffs' claims fare no better. As alleged in Counts I and II of Plaintiffs' Complaint, under the Constitution and binding precedent (including the Second Circuit's *City of New York* decision), no State may, under its own laws, regulate *or impose liability* on out-of-state emissions. Yet the Act does exactly that. Thus, the Act is precluded under the Constitution and preempted under the CAA. Moreover, as alleged in Count III, the Act imposes an irrational, arbitrary, and overly harsh retroactive liability scheme that targets a select group of energy producers, while shielding from liability countless other emitters of greenhouse gases—including Vermont itself. That liability scheme violates due process. Likewise, as alleged in Count IV, the Act's imposition of liability for activities taking place exclusively in other States and around the world, while reaping the financial benefits only for Vermont, unconstitutionally discriminates against interstate commerce (both domestic and foreign). Finally, as alleged in Counts

V and VI, the Act's retroactive penalties run afoul of the Constitution's prohibition on excessive fines and constitute unconstitutional takings without just compensation.

Reading the Complaint in the light most favorable to Plaintiffs, as this Court must, the State and Intervenor-Defendants cannot demonstrate that these claims are implausible on their face.

## I.    Plaintiffs have alleged associational standing to challenge the Act.

An associational plaintiff has standing when: (1) its members have individual standing to sue in their own right; (2) challenging the Act is germane to the association's purposes; and (3) its members' individual participation is unnecessary. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 112 (2d Cir. 2024); Compl. ¶¶ 15-18. The State does not dispute the second or third elements.[4] It argues only that Plaintiffs' members do not have standing to sue in their own right because Plaintiffs have not alleged that "their members have suffered an actual injury." Vt. Mem. 13. That is absurd given that the Act specifically targets Plaintiffs' members.[5]

At the motion-to-dismiss stage, Plaintiffs need only "allege[] facts that affirmatively and plausibly suggest that [they have] standing to sue." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016). Plaintiffs need only "plausibly plead" an injury, "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Bloomberg Fin. L.P. v. UBS AG*, 358 F. Supp. 3d 261, 277 (S.D.N.Y. 2018) (citation omitted). A plaintiff meets this requirement through "[a]n allegation of future injury" where "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("*SBA*") (citation

---

[4] As explained in Plaintiffs' motion for partial summary judgment being filed contemporaneously with this response, Plaintiffs clearly establish these elements as well. ECF 100-1 at 8.

[5] Notably, although Intervenor-Defendants argue that Plaintiffs' claims are not prudentially ripe, they do not contest Plaintiffs' Article III standing or ripeness. *See infra* p.13.

omitted). "Even a small financial loss is an injury for purposes of Article III standing." *NRDC v. FDA*, 710 F.3d 71, 85 (2d Cir. 2013). So too are costs due to government "interference with [a plaintiff's] business and attorneys' fees . . . incurred . . . to address the unlawful and unconstitutional actions by Defendants." *Schachtler Stone Prods., LLC v. Town of Marshall*, 2024 WL 4025862, at *4 (N.D.N.Y. Sept. 3, 2024). And where "the plaintiff is . . . an object of the [government] action . . . at issue . . ., there is ordinarily little question that the action . . . has caused [the plaintiff] injury." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 70 (2d Cir. 2019).

Plaintiffs' Complaint alleges in detail how the Act injures Plaintiffs' members. Compl. ¶¶ 16, 55-60. The sole purpose of the Act is to force Plaintiffs' members—large oil and gas companies—to pay money to Vermont for alleged climate change harms. It was designed with specific energy companies in mind, and it gives ANR no discretion in deciding whether to issue cost recovery demands to those companies. *Id.* ¶ 63. In fact, Vermont's own actions and statements, the Act's legislative history, and responses to the State's requests for information foreclose any doubt that there is far more than a "substantial risk that" at least one of Plaintiffs' named members—Exxon Mobil Corporation, Shell USA, Inc., Chevron Corporation, or BP America, Inc.—will receive cost recovery demands. *SBA*, 573 U.S. at 158 (citation omitted).

*First*, Vermont officials made clear that the Act is designed to target large energy producers that include Plaintiffs' named members. *See* Compl. ¶ 56. Governor Phil Scott acknowledged the Act is designed to target "Big Oil." *Id.* And Deputy Secretary of ANR Amy Gendron, in discussing the Act, said, "This is not a question of if we should pursue Big Oil but rather when and how." *Id.* Indeed, the State acknowledges that "ANR will issue 'cost recovery demands' to large fossil fuel companies" under the Act. Vt. Mem. 2. And Intervenor-Defendants admit that "[t]he only directly affected parties here are large corporations." Int. Mem. 15. Plaintiffs' named members are four of

9

the largest oil and gas producers in the world: based on these and other statements, Vermont will target them under the Act. Compl. ¶ 23. Indeed, if not Plaintiffs' named members, it is hard to imagine which oil and gas companies the Act could be targeting for these demands.

*Second*, the notion that Vermont will enforce the Act against at least one of Plaintiffs' members is neither conjectural nor hypothetical: Vermont has already brought climate-related claims against ExxonMobil and Shell entities, asserting that Vermont courts have jurisdiction over them and alleging that these companies are major sources of climate change. *Id.* ¶ 55; *see, e.g.*, Complaint, *Vermont v. Exxon Mobil Corp.*, No. 21-CV-02778, ¶¶ 2, 6, 28, 90, 128-30 (Vt. Super. Ct. Sept. 14, 2021). It is not merely plausible—it is virtually certain that Vermont will assert that those same companies have a constitutional nexus to Vermont and are subject to the Act. *See SBA*, 573 U.S. at 164 ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical." (cleaned up)). Indeed, Vermont officials and those testifying in support of the Act said exactly that. Michael O'Grady, Legislative Counsel, testified that Vermont could assert jurisdiction over companies such as "Shell" and "Exxon." Compl. ¶ 58. And Anthony Iarrapino, appearing on behalf of Intervenor-Defendant Conservation Law Foundation, testified that "the AG's office has already asserted jurisdiction over . . . companies" like "Exxon Mobil [and] Shell Oil," describing them as "some of the very largest [companies] that are likely to be responsible parties under this bill based upon their amount of emissions." *Id.*

*Third*, the Legislature passed the Act based on testimony that assured the Legislature that Plaintiffs' largest members must be designated as responsible parties. For example, Richard Heede, Director of the Climate Accountability Institute, submitted testimony purporting to show that ExxonMobil, Shell USA, BP, and Chevron would be sufficiently large to qualify as responsi- ble parties under the Act. *Id.* ¶ 57. In response to requests for information from ANR, Mr. Heede

10

went further, submitting a list of producers he claims are "highly likely 'responsible parties,'" including "ExxonMobil," "Shell," "BP," and "Chevron," among others. *Id.* ¶ 59. Plaintiffs also allege facts showing that Vermont will rely upon Mr. Heede's proposed data and methods to identify responsible parties and their purported share of global greenhouse gas emissions. *Id.* ¶ 57 n.5. And the State's own motion not only cites Heede's testimony, Vt. Mem. 7 & n.11, but relies upon legislative testimony *specifically naming* Plaintiffs' members.[6]

The State nevertheless faults Plaintiffs for not explicitly alleging that its members are "covered by" the Act. Vt. Mem. 14. But that is not required to plead injury sufficient to support standing. The standard here is a "forgiving" one, such that "if a plaintiff's interpretation of a statute is reasonable enough[,] and under that interpretation, the plaintiff may legitimately fear that it will face enforcement of the statute, then the plaintiff has standing to challenge the statute." *Antonyuk v. James*, 120 F.4th 941, 1008 (2d Cir. 2024) (citation omitted); *Picard v. Magliano*, 42 F.4th 89, 98-99 (2d Cir. 2022) (considering for purposes of standing whether "conduct is 'arguably proscribed' by the challenged statute, not whether" it is "*in fact* proscribed").

Plaintiffs' members thus have a strong basis to "legitimately fear that [they] will face enforcement" of the Act. *Antonyuk*, 120 F.4th at 1008 (citation omitted). Nothing more is required: Plaintiffs need not assert that their members are proper responsible parties under the Act to challenge its legality. *See SBA*, 573 U.S. at 163 ("[A] plaintiff who wishes to challenge the constitutionality of a law [need not] confess that he will in fact violate that law.").

---

[6] *See, e.g.*, ECF 76-6 at 1 (referring to the burning of fossil fuels by "some of the largest and most profitable corporations in the world"); ECF 76-12 at 1 (listing Chevron, Exxon, BP, and Shell USA on slide asserting that these companies have "produced the lion's share of the carbon fuels that cause climate change"); ECF 76-13 at 11 (listing Chevron, Exxon, BP, and Shell USA and their "attributed . . . emissions"); 76-21 at 1 (referring to "large fossil fuel extracting and refining companies").

## II.    Plaintiffs' claims are ripe.

This Court must adjudicate Plaintiffs' claims on the merits because they are ripe. "Ripeness has both a constitutional and a prudential dimension." *Variscite NY Four, LLC v. N.Y. State Cannabis Control Bd.*, 2025 WL 2313142, at *6 (2d Cir. Aug. 12, 2025). Plaintiffs' claims meet both elements. Defendant-Intervenors' prudential ripeness arguments are wrong, but, in any event, this Court should not decline to exercise its constitutional jurisdiction over Plaintiffs' claims based on a prudential ripeness doctrine that may no longer be "good law." *Revitalizing Auto Cmtys. Envtl. Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 102 (2d Cir. 2021).

Constitutional ripeness is simply "a specific application of the actual injury aspect of Article III standing." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013). It "is really just about the first *Lujan* factor—to say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not 'actual or imminent,' but instead 'conjectural or hypothetical.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Accordingly, in "most cases" a determination "that a plaintiff has Article III standing is enough to render its claim constitutionally ripe." *In re MTBE Prods. Liab. Litig.*, 725 F.3d 65, 110 (2d Cir. 2013).

Applying that standard, Plaintiffs' claims are *constitutionally* ripe. Plaintiffs' injuries are concrete and certain. The Act mandates that ANR, without discretion, "shall issue the cost recovery demands required under [the Act]." § 598(f). And as described above, Plaintiffs' members are no doubt in the crosshairs of the State. *See supra* pp.9-11. For example, the Deputy Secretary of ANR stated that it is "not a question of if we should pursue Big Oil but rather when and how." Compl. ¶ 56. The Governor likewise acknowledged the Act targets "Big Oil." *Id*. And testimony in the Legislature, cited by the State in its motion, specifically identified ExxonMobil, Shell USA, BP, and Chevron as exceeding the billion-metric-ton threshold for liability. *Id.* ¶ 57. Accordingly, at least four of Plaintiffs' named members face mandatory penalties of "hundreds of millions" or

12

even "billions of dollars." *Id.* ¶¶ 10, 16, 68, 165, 170. Vermont's climate-related suit against ExxonMobil and Shell entities removes all doubt about Vermont's targets. *Id.* ¶¶ 16, 46, 55.

**A.    Prudential ripeness is not an obstacle to this Court's review.**

Intervenor-Defendants argue only that Plaintiffs' claims are not "prudentially" ripe.[7] This argument is meritless.[8]

Prudential ripeness involves "a two-prong test." *Labor Council for Latin Am. Advancement v. EPA*, 12 F.4th 234, 252 (2d Cir. 2021). "The first prong asks whether the issues are 'fit' for judicial review, which requires consideration of 'whether the court or the agency would benefit from postponing review until the policy in question has sufficiently crystallized.'" *Id.* (citation omitted). "The second prong—the 'hardship' prong—asks 'whether and to what extent the parties will endure hardship if decision is withheld.'" *Id.* (citation omitted). In analyzing these prongs, courts must recognize that prudential ripeness is at most a "narrow exception to the strong principle of mandatory exercise of jurisdiction." *Revitalizing Auto*, 10 F.4th at 102.

**1.    Plaintiffs' claims are fit for judicial review.**

The purpose of the prudential ripeness doctrine "is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Volvo N. Am. Corp. v. Men's*

---

[7] Intervenor-Defendants' acknowledgment that "the record is sufficient to uphold the Vermont Act" without needing to address ripeness (Int. Mem. at 18) is itself an admission that Plaintiffs' claims satisfy Article III.

[8] There is an open question "whether the prudential ripeness doctrine remains good law." *Revitalizing Auto*, 10 F.4th at 102. The Supreme Court has suggested it is not: "[A] federal court's ability to decline jurisdiction on prudential ripeness grounds must be reconciled with the 'virtually unflagging' obligation of a court 'to hear and decide cases within its jurisdiction.'" *Id.* (citation omitted). But there is no meaningful way to reconcile them. "Federal courts have an obligation to adjudicate cases that invoke [their] jurisdiction." *Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*, 88 F.4th 344, 351 (2d Cir. 2023). That is why the Supreme Court in *SBA* expressly questioned the "continuing vitality" of the prudential ripeness doctrine. 573 U.S. at 167. This Court should not decline to resolve the merits of Plaintiffs' claims based on this dubious doctrine.

*Int'l Prof'l Tennis Council*, 857 F.2d 55, 63 (2d Cir. 1988) (citation omitted). But Plaintiffs here present *concrete* challenges to a statute imposing billion-dollar penalties—nothing here is abstract.

Plaintiffs' claims present purely legal issues for this Court to resolve, and thus "are fit for judicial decision." *Sharkey v. Quarantillo*, 541 F.3d 75, 89 (2d Cir. 2008). None of Plaintiffs' claims requires further factual development because every challenge is a facial challenge to a statute that is in effect. It is widely recognized that "facial challenges to legislative acts are ripe by their very nature." *Ecogen, LLC v. Town of Italy*, 438 F. Supp. 2d 149, 155 (W.D.N.Y. 2006) (cleaned up); *see also S. Lyme Prop. Owners Ass'n, Inc. v. Town of Old Lyme*, 539 F. Supp. 2d 524, 536 (D. Conn. 2008) ("[F]acial challenges are generally ripe the moment the challenged regulation . . . is passed." (cleaned up)). That is because a facial challenge does not depend on how the law applies to the plaintiff's specific facts but instead requires the plaintiff to establish that the law is invalid "in all its applications." *Antonyuk*, 120 F.4th at 983. That is what Plaintiffs allege: Vermont's Act is facially unconstitutional in multiple respects and cannot be constitutionally applied to *any* responsible party. Plaintiffs' claims, "by virtue of being facial challenges, are [therefore] ripe and have been ripe from the moment the [Act was] passed." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 384 (S.D.N.Y. 2015) (cleaned up).

The Intervenor-Defendants argue that "[e]ven 'purely legal' claims may benefit from 'further factual development.'" Int. Mem. 20 (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003)). But this applies only where "further factual development would significantly advance [the court's] ability to deal with the legal issues presented." *Nat'l Park Hosp.*, 538 U.S. at 812 (cleaned up); *see also, e.g.*, *Texas v. United States*, 523 U.S. 296, 300-01 (1998) (similar). Here, no further details are necessary to resolve Plaintiffs' claims.

That ANR has not formally determined who is a responsible party is irrelevant.

14

Constitutional challenges are "ready for judicial determination" when they present issues that are "primarily legal, and not factual, in nature." *Gary D. Peake Excavating Inc. v. Town Bd. of Town of Hancock*, 93 F.3d 68, 72 (2d Cir. 1996) (citation omitted). This is because, "the more the matter to be placed before the court involves a pure issue of law, unaffected by factual considerations, the less the concern that judicial review might interfere inappropriately with full, effective administrative consideration." *Labor Council*, 12 F.4th at 253. Adjudicating Plaintiffs' claims now will not affect any administrative consideration because Vermont has already identified its targets. *See supra* pp.9-11. The Act is in effect, and cost recovery demands are mandatory, so it is not a question of *whether* they will be issued but *when*. And it is implausible that Vermont will not submit cost recovery demands to at least one of ExxonMobil, Shell USA, BP, and Chevron. Plaintiffs are not required to wait until after Vermont sends demands to challenge the Act mandating them. *See SBA*, 573 U.S. at 158.

Intervenor-Defendants nevertheless suggest that before ANR has officially determined the identities of specific (or all) responsible parties, "the Court cannot evaluate whether those entities have a 'substantial nexus' or 'sufficient connection' to Vermont." Int. Mem. 22. But this misunderstands Plaintiffs' claims. Count I challenges Vermont's authority to "impose liability for global greenhouse gas emissions that cross state lines and national borders" regardless of whether those companies have a nexus to Vermont. Compl. ¶ 74. The Act "does not seek to impose liability for only those emissions released in Vermont," Compl. ¶ 119, but rather makes energy producers "strictly liable for *global* greenhouse gas emissions." Compl. ¶ 66. "[N]o traditional energy producers are headquartered in Vermont or otherwise conduct extraction or refining activities in the State." *Id.* ¶ 103. Thus, any company qualifying as a responsible party necessarily engaged in extraction or refining *outside* of Vermont. And because the Act's extraterritorial reach violates

federal law regardless of whether any particular company could be said to have a nexus to Vermont, Vermont need not officially announce the precise set of responsible entities for Plaintiffs' claims to be ripe—at least four of Plaintiffs' members will inevitably suffer harm under the Act.

Courts do not require the specificity that Intervenor-Defendants demand for ripeness. For example, the Second Circuit found a challenge to a landfill ordinance ripe even though the plaintiff lacked permits necessary to operate a landfill, reasoning that the "issues presented by the [p]laintiffs' claims are fit for judicial review because they are purely legal and may be decided without further factual development." *Gary D. Peake*, 93 F.3d at 72. So too here. That the precise liability and the range of responsible parties are not known does not prevent adjudication; among other things, there is no question that *some* of Plaintiffs' members will receive demands.

Intervenor-Defendants also argue that Plaintiffs' vagueness, excessive fines, commerce clause, and takings claims are unripe because they turn on the amount of the specific penalty. *See* Int. Mem. 20-24. Not so. *Every* cost recovery demand will issue in an amount that is unconstitutional. And the Act's legislative history and statements in Defendants' motions confirm that Vermont's penalties will be in the hundreds of millions or billions of dollars. *See infra* p.48.

Consider Plaintiffs' excessive fines claim. Intervenor-Defendants argue that the Court would be "unable to engage in the requisite proportionality analysis" without knowing specific amounts. Int. Mem. 21. And in most cases, that is true. *See Home for Aged of Little Sisters of the Poor v. McDonald*, 711 F. Supp. 3d 81, 113 (N.D.N.Y. 2024) (cited at Int. Mem. 21). But not here. The Act imposes retroactive penalties for 30 years of lawful conduct, and Plaintiffs allege that the penalties will reach into the hundreds of "millions or billions of dollars," Compl. ¶¶ 165, 170, which the Act's legislative history confirms. Therefore, this is the rare case where the specific amount of the fine does not have to be announced to determine that it will be excessive.

The same is true for Plaintiffs' takings claim. This claim does not require proving the precise cost recovery amount because any demand "substantially interfere[s]" with "reasonable investment-backed expectations" by imposing "severe retroactive penalties on previously (and currently) lawful conduct." Compl. ¶ 182. Intervenor-Defendants rely on *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 297 (1981), for the proposition that a takings claim is not ripe until "the extent to which the regulation has interfered with distinct investment-backed expectations" is known. Int. Mem. 22 (quoting the various complaints). But in *Hodel*, the Court rejected a facial challenge because there were questions about the extent of the challenged law's application to—and effect on—the plaintiffs' property for purposes of the takings claim. 452 U.S. at 294-97. Here, the Act necessarily harms Plaintiffs' members' investment-backed expectations.

As for Plaintiffs' Commerce Clause claim, Intervenor-Defendants suggest that the Court needs a "factual record concerning incidental effects . . . on interstate commerce." Int. Mem. 21. But this is a motion to dismiss—not summary judgment. Plaintiffs' Complaint sufficiently alleges facial discrimination: Vermont "discriminates against the important economic interests of other States by specifically targeting energy producers headquartered in other States with excessive penalties." Compl. ¶ 151. "By penalizing energy producers located outside of Vermont with massive fines, Vermont will encumber domestic energy production with significant costs that could harm the entire nation, but only Vermont will reap financial benefits." *Id.* This is a far cry from *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 430-31 (2d Cir. 2013), on which Intervenor-Defendants rely. Int. Mem. 22. In that appeal, decided following a bench trial, the court could not "determine whether the [Purchase Power Agreement] Vermont [] sought [would] have a direct impact on commerce in other states." *Entergy Nuclear*, 733 F.3d at 430. Here, by contrast, the procedural posture is far different. Plaintiffs have plausibly alleged that the Act dictates cost

recovery demands that impose significant costs in states other than Vermont.

Finally, Intervenor-Defendants' argument that Plaintiffs' due process claims "would benefit from understanding the magnitude of liability overall and for any given responsible party," Int. Mem. at 21, is misplaced. Plaintiffs allege that the Act is "unconstitutionally vague because it fails to give adequate notice to energy producers of what they will have to pay under the Act" and provides "seemingly unfettered discretion" to "Vermont agencies" to impose penalties potentially exceeding billions. Compl. ¶ 141; *see also id*. ¶¶ 131-32. Vagueness and arbitrariness exist in the statute itself, and thus no further factual development is required for the claim to be fit for review. And *United States v. Traficante*, on which Intervenor-Defendants rely, is not to the contrary. 966 F.3d 99, 106 (2d Cir. 2020) (cited at Int. Mem. 21). There, a vagueness challenge was not ripe because there was no reason to believe that the allegedly vague provisions would ever be invoked. *Id*. Here, the Act is already in effect and will be enforced. Whether it is unconstitutionally vague is thus fit for judicial resolution. *See United States v. Loy*, 237 F.3d 251, 258 (3d Cir. 2001) (vagueness challenge ripe because "nothing about this contention [of vagueness] will change").

### 2. Plaintiffs will suffer hardship from delayed review.

Withholding review imposes immediate and substantial hardship on Plaintiffs' members. No specific form of harm is required for the prudential ripeness hardship inquiry. For example, the need to spend additional funds if review is delayed qualifies as hardship. *See Gary D. Peake*, 93 F.3d at 72 (recognizing hardship where plaintiff had already spent "considerable sums" pursuing permits and needed to decide whether to continue pursuing permits). The delay in recovering funds already spent is also a hardship. *See Revitalizing Auto*. 10 F.4th at 101 (recognizing hardship where plaintiff "would still be required to wait, possibly for years, before a court conclusively determines whether [it] could seek repayment for costs it has already incurred"). And not all hardship is economic—a changed litigation position from delay may also constitute hardship. *See Beatty v.*

*Gilman*, 718 F. Supp. 3d 166, 183 (D. Conn. 2024) (recognizing hardship because the plaintiff's "litigating position will be adversely affected if an adjudication is delayed").

Here, Plaintiffs' members face substantial hardship from delayed review. Companies facing "hundreds of millions or even billions of dollars in penalties" must make pressing strategic decisions. Compl. ¶¶ 68, 192. Not only must they plan how to satisfy any penalty, but also many business decisions they make will be affected—directly and indirectly—by the risk that Vermont will soon force companies to pay hundreds of millions or billions of dollars to Vermont. Moreover, because the timeline for compliance after receiving a demand is so short—a few months, *id.* ¶ 68—companies must litigate in a substantially worse position after Vermont issues its cost recovery demand. Rather than proceed in orderly fashion, companies must litigate in an emergency posture, and then potentially still have to try to claw back any payments if emergency relief does not issue. These are substantial hardships that support this Court's review now.

## III.   Plaintiffs properly plead each of their claims under *Ex parte Young* and Section 1983.

Relying upon cases "unique to the Second Circuit," *Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 272 n.17 (S.D.N.Y. 2019), the State asserts that Plaintiffs cannot bring Section 1983 claims on behalf of their members. *See* Vt. Mem. 15-17.

But this argument ignores that Plaintiffs alternatively pleaded these claims under this Court's federal equity jurisdiction under *Ex parte Young*, 209 U.S. 123, 159-60 (1908). Compl. pp.9, 25, 38, 43, 55, 58. Vermont does not dispute that Plaintiffs' claims are proper under this Court's federal equity jurisdiction, nor could it. The Supreme Court and the Second Circuit have consistently held that Section 1983 claims are appropriate regardless of whether they are brought by representative entities or individuals. *See Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016) (affirming relief granted to representative entity under *Ex parte Young* and explaining that "the Supreme Court has consistently recognized federal

jurisdiction over declaratory- and injunctive-relief actions to prohibit the enforcement of state . . . orders alleged to violate federal law"); *see Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 370-71, 388 (2000) (granting "nonprofit corporation representing companies" injunctive relief against unconstitutional and preempted state statute); *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 221-22 (2d Cir. 2008) (granting airline trade organization declaratory and injunctive relief against preempted state regulatory statute); *see also Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) ("It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights.").[9]

In addition, the Supreme Court has recognized that associational standing *is proper* for Section 1983 claims. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975) (explaining, in Section 1983 action, that "[e]ven in the absence of injury to self, an association may have standing solely as the representative of its members"); *Hunt*, 432 U.S. at 342-43 (citing *Warth* and stating associational standing test); *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (explaining, for Section 1983 claim, that "[t]o establish standing, [the representative organization] need only demonstrate that its members are able and ready to bid on contracts," i.e., that members were sufficiently injured); *see also Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 124 (2d Cir. 2017) (Jacobs, J., dissenting) (noting that the line of Second Circuit precedent Defendants invoke "may be . . . contradicted by subsequent Supreme Court authority").[10] Consequently, Plaintiffs properly asserted claims for

---

[9] The State separately argues that the Court should dismiss Plaintiffs' "preemption/preclusion" claims brought under Section 1983. Vt. Mem. 17. Once again, these claims are proper—and were pleaded—under *Ex parte Young*. *See Air Transp. Ass'n of Am., Inc.*, 520 F.3d at 221-22 (granting relief on preemption grounds); *Crosby*, 530 U.S. at 370-71, 88 (same).

[10] *See also, e.g.*, *Nat'l Fed'n of Blind of Mo. v. Cross*, 184 F.3d 973, 981 (8th Cir. 1999) (applying *Hunt* test for associational standing in Section 1983 case); *Retired Chi. Police Ass'n v.*

injunctive relief under Section 1983, and the State's motion to dismiss must be denied.

## IV.    Plaintiffs allege sufficient facts to state a plausible claim for every count in their Complaint.

Plaintiffs have sufficiently stated a claim with respect to each count in their Complaint.

Contrary to the State's Rule 12(b)(6) arguments, no speculation is required to determine that the

Act is facially unlawful because "no set of circumstances exists under which the Act would be

valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Although a presumption of constitutionality generally applies to statutes, Vt. Mem. 21, the

Supreme Court recognized long ago that "there may be narrower scope for operation of the pre-

sumption of constitutionality when legislation appears on its face to be within a specific prohibition

of the Constitution." *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 n.4 (1938). And

with respect to Plaintiffs' constitutional preclusion and statutory preemption claims, no such pre-

sumption of constitutionality applies here because Vermont is attempting to legislate "in an area

where there has been a history of significant federal presence." *N.Y. SMSA Ltd. P'ship v. Town of

Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (cleaned up); *see also Entergy Nuclear*, 733 F.3d at

426-27 (rejecting Vermont's presumption against preemption arguments).[11] Finally, to the extent

---

*City of Chicago*, 7 F.3d 584, 600-07 (7th Cir. 1993) (same); *Contractors Ass'n of E. Pa., Inc. v. City of Phila.*, 945 F.2d 1260, 1264-66 (3d Cir. 1991) (same); *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251-53 (4th Cir. 1991) (same); *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1405-09 (9th Cir. 1991) (same); *Church of Scientology v. Cazares*, 638 F.2d 1272, 1276-77 (5th Cir. 1981) (recognizing organizations possess standing to sue under § 1983 for violations of the rights of their members), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989); *Memphis Am. Fed'n of Teachers v. Board of Educ.*, 534 F.2d 699, 702 (6th Cir. 1976) (same).

[11] Intervenor-Defendants are wrong that "[t]he presumption against preemption is 'particularly strong' where, as here, the challenged state law 'falls well within the state's historic powers to protect the health, safety, and property rights of its citizens.'" Int. Mem. 27 (citation omitted). The Act falls within no such area of historic State power. Indeed, the Second Circuit has already concluded otherwise. *See City of New York*, 993 F.3d at 98 (imposing liability for global greenhouse gas emissions is an area "which the states have traditionally *not* occupied").

the presumption applies to any claims, Plaintiffs allege sufficient facts to plead a *prima facie* case

that the presumption will be overcome.

> **A.    Plaintiffs have plausibly alleged that the Act is precluded by the structure of the Constitution.**

The Second Circuit's decision in *City of New York* dooms Defendants' motion to dismiss

Count I of Plaintiffs' Complaint, which alleges that the Act exceeds the limits of state power under

the Constitution and invades areas reserved exclusively to the federal Government. Compl. ¶¶ 72-

106. Although Vermont's Act was the first of its kind, the theory of liability advanced in it was

not. That theory was soundly rejected when the Second Circuit found that "[f]or over a century, a

mostly unbroken string of cases has applied federal law to disputes involving interstate air . . . pol-

lution," and held that liability for out-of-state greenhouse gas emissions and global climate change

must be governed by federal law, not a patchwork of conflicting state rules. *City of New York*, 993

F.3d at 91-92. Count I easily states a claim based upon this controlling precedent.

Even in the absence of the Second Circuit's decision, Count I would be well supported by

decades of precedent on which *City of New York* relies. In addition, Count I is well supported by

other precedent recognizing the Constitution's guarantee of equal sovereignty to each State and

concomitant due-process limits on each State's authority to intrude upon the jurisdiction of the

others, along with the restrictions on State interference with the federal Government's exclusive

foreign policy authority. Compl. ¶¶ 76-88. Plaintiffs have thus plausibly alleged that Vermont's

Act, by seeking to impose liability for global greenhouse gas emissions on producers operating

entirely outside Vermont's borders, is precluded by the structure of the Constitution.[12]

---

[12] Plaintiffs are filing contemporaneously a motion for partial summary judgment. In their motion, Plaintiffs make the affirmative case for why they are entitled to summary judgment on Counts I & II of their Complaint, ECF 100, and Plaintiffs incorporate by reference their motion for partial summary judgment. Here, Plaintiffs' arguments will focus on responding to the specific

1.  **Under Second Circuit precedent, the Act is precluded by the Constitution because only federal law may regulate out-of-state emissions.**

Defendants brush aside Plaintiffs' claims as policy arguments, *see* Vt. Mem. 24, but the Second Circuit has already concluded otherwise in *City of New York.* There, the court did not focus myopically on "specific statutory or constitutional texts," Vt. Mem. 24, that reinforce the structure of our federal system—though Plaintiffs have identified several. Instead, it focused on the supremacy of federal law and "the basic scheme of the Constitution." *City of New York*, 993 F.3d at 90 (quoting *AEP*, 564 U.S. at 421). Decades of precedent confirm that certain areas of law exist where only federal law can govern. *See Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640-41 (1981); *AEP*, 564 U.S. at 422; *City of New York*, 993 F.3d at 91. The State acknowledges that out-of-state air pollution is one such area. *See* Vt. Mem. 32 ("[T]he Supreme Court has historically found it necessary to apply federal 'common law' to certain claims involving interstate pollution." (citation omitted)). Thus, it is federal law *only* that controls out-of-state and international greenhouse gas emissions, including when and whether companies can be held liable for them.

The *City of New York* decision, which considered a similar attempt by New York City to regulate out-of-state and international greenhouse gas emissions, reached the same conclusion urged by Plaintiffs here: regulation of such emissions falls exclusively within the domain of federal law. 993 F.3d at 91-93. There, the City brought a state-law nuisance action against oil companies, seeking to hold them liable for damages caused to the City by global greenhouse gas emissions. *Id.* The Second Circuit explained that because the City's claims involved cross-border or interstate emissions, they fell within the exclusive domain of federal law. *Id.* at 91-92 (holding that a "sprawling" case over harm for global greenhouse gas emissions "is simply beyond the limits of

---

arguments raised by the State and Intervenor-Defendants in their motions to dismiss. ECF 100-1 at 8-54.

state law"). It further explained that the federal common law, which had at one time been used to address such cross-border issues, had been displaced by the CAA, which did not authorize resort to state law in its place. This left regulation of and liability for domestic greenhouse gas emissions exclusively to the regulatory scheme created by Congress. *Id.* at 95.[13] At the same time, it held that under the long-recognized history of exclusive federal authority over out-of-state pollution and the CAA's comprehensive scheme, the City could not impose liability on energy producers for global greenhouse gas emissions originating outside of New York.

Nevertheless, the State argues that *City of New York* and the case law underlying it do not apply because those cases involved attempts to abate pollution and the Act here does not seek abatement. Vt. Mem. 32, 34. The plaintiffs in *City of New York* made the same claim: "[B]ecause it is not seeking to directly penalize emitters, and because it seeks damages rather than abatement, the City argues that its claims will not result in the regulation of global emissions." 993 F.3d at 91; *see also id.* at 92 ("The City [posits] that because it seeks damages—not abatement or the imposition of pollution standards—its claims do not threaten to regulate emissions at all, let alone beyond New York's borders."). The Second Circuit rejected this argument. *Id.* at 91*; see id.* at 92 (city's argument that claims for damages "do not threaten to regulate emissions . . . ignores economic reality"). That binding decision means this Court must reject it too.

The State also says that the Act simply "imposes a one-time charge rationally founded on a responsible party's contributions to the State's climate-related costs." Vt. Mem. 34. But the Act's entire basis for imposing strict liability for "climate-related costs" is the global greenhouse gas emissions purportedly attributable to a party and the impacts those emissions have on global

---

[13] Although the CAA governs only domestic emissions, the Second Circuit held that the City could not impose liability for foreign emissions because federal common law likewise precludes claims based on foreign emissions. *City of New York*, 993 F.3d at 95 n.7, 100-03.

climate change. §§ 596(7), (22); 598(b). Just as "[a]rtful pleading [could not] transform the City's complaint into anything other than a suit over global greenhouse gas emissions," the State's creative briefing cannot change the fact that "[i]t is precisely *because* fossil fuels emit greenhouse gases—which collectively 'exacerbate global warming'—that [Vermont] is seeking" penalties under the Act. *City of New York*, 993 F.3d at 91.[14] As the Second Circuit held, an attempt "to effectively impose strict liability for the damages caused by [global] fossil fuel emissions" is an effort to "regulate cross-border emissions," which is precluded by federal law. *Id.* at 93.

Vermont further argues that *City of New York* does not control because federal common law cannot displace state *statutory* law. Vt. Mem. 33. The State provides no support for this bald assertion, which is foreclosed by precedent. *See, e.g.*, *City of New York*, 993 F.3d at 89 ("Whether the water of an interstate stream must be apportioned between the two States is a question of federal common law upon which neither the statutes nor the decisions of either State can be conclusive." (cleaned up)).[15] *City of New York* would have been decided the same way if the City had sued under a statute, rather than bringing state common law nuisance claims.

Intervenor-Defendants argue that *City of New York* does not apply because the Act does not impose ongoing tort liability impacting future decisions. Int. Mem. 37-39. But this misreads

---

[14] Intervenor-Defendants also attempt to distinguish *City of New York* and the precedent it relied upon as concerning only nuisance actions. Int. Mem. 35. But this is just another form of the argument the State makes: the Act "does not prescribe, enforce, or implicate a pollution standard and thus does not conflict with the federal common law of nuisance applied to some interstate pollution." *Id.* The Second Circuit squarely rejected this argument. *See City of New York*, 993 F.3d at 92.

[15] *See also City of Milwaukee v. Illinois*, 451 U.S. 304, 310 n.4 (1981) ("The Court of Appeals ruled that it is federal common law and not state statutory or common law that controls in this case." (cleaned up)); *City of Evansville, Ind. v. Ky. Liquid Recycling, Inc.*, 604 F.2d 1008, 1021 (7th Cir. 1979) (similar); *Affinity Empowering, Inc. v. Eurofins Sci., Inc.*, 2022 WL 6734604, at *2 (D. Del. Oct. 11, 2022) ("Federal common law displaces state statutes where necessary to protect uniquely federal interests." (cleaned up)).

*City of New York*, which holds that States cannot regulate out-of-state greenhouse gas emissions regardless of the specific legal mechanism the State applies. The Court pointed out "regulation can be effectively exerted through an award of damages, and the obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *City of New York*, 993 F.3d at 92 (cleaned up) (quoting *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012)). It held that "while the City is not expressly seeking to impose a standard of care or emission restrictions on the Producers, the goal of its lawsuit is perhaps even more ambitious: to effectively impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)." *Id.* at 93. The same is true here: the Act imposes strict liability for global greenhouse gas emissions. §§ 598(a)(1); 597(1). And like damages, the substantial financial penalties imposed under the Act will inevitably influence future business decisions.[16] *See City of New York*, 993 F.3d at 93 ("significant damages award" itself would impact energy producers' behavior).

Intervenor-Defendants cite multiple inapposite cases purporting to "recognize[] the limits of *City of New York*." Int. Mem. 36. But these cases involve a separate issue not relevant here— removal to federal court based on the complete preemption doctrine. *Id.* at 36-37 (collecting cases). As the Second Circuit observed in *City of New York*, that issue involves a separate, "heightened standard unique to the removability inquiry." 993 F.3d at 94 (enumerating and distinguishing

---

[16] This is all the truer because nothing prevents Vermont from amending the Act to extend the covered period and impose additional liability at any time. Compl. ¶ 96. Intervenor-Defendants dismiss this concern as "imaginary," Int. Mem. 38, but their opinion does not mean that businesses can ignore that possibility (much like they cannot ignore the threat of future damages awards). That concern is magnified by the fact that other states have enacted or are considering enacting similar "superfund" laws. *Cf. City of New York*, 993 F.3d at 93 ("If the Producers want to avoid all liability [under a strict liability regime], then their only solution would be to cease global production altogether.").

26

numerous decisions on removability issue). Here, however, Plaintiffs have "filed suit in federal court in the first instance," so the Court is "free to consider" the preclusive effect of federal law "on its own terms." *id.*; *see also D.C. v. Exxon Mobil Corp.*, 89 F.4th 144, 153 n.5 (D.C. Cir. 2023) ("[T]he Second Circuit expressly did not decide 'whether the defendants' anticipated defenses could singlehandedly create federal-question jurisdiction under 28 U.S.C. § 1331 in light of the well-pleaded complaint rule.'" (quoting *City of New York*, 993 F.3d at 93).[17]

### 2. Structural constitutional limits of equal sovereignty and due process confirm Vermont lacks the authority to legislate beyond its borders.

Even if *City of New York* did not control this case, well-established constitutional principles of equal sovereignty and due process preclude States from regulating out-of-state greenhouse gas emissions. Compl. ¶¶ 79-86, 100-04. Defendants' arguments to the contrary miss the forest for the trees, as they fail to recognize the broad structural principles set forth in Supreme Court precedent.

To start, this is not a case where a State applies its law to "out-of-state actors when their actions have in-state consequences." Vt. Mem. 25. It is true that a State may apply its law to an out-of-state manufacturer that sells products into the State that cause harm to residents within the State. *See, e.g.*, *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (explaining that to satisfy due process requires a meaningful connection between the defendant, the forum, and the cause of action). But that is not what the Act does. It imposes strict liability on fossil-fuel companies without establishing any causal nexus between their conduct and specific harms occurring within Vermont. Instead, the Act applies extraterritorially to oil extracted, refined, transported through, and used in States and countries all over the world.

---

[17] Indeed, Vermont is well aware of this distinction—it previously made the same point before this Court. *See* Mem. of Law in Support of Pl.'s Br. to Remand at 20, *Vermont v. Exxon Mobil Corp.*, No. 2:21-cv-00260 (D. Vt. Dec. 17, 2021) (arguing that cases "filed in federal court in the first instance" did not support removal based upon complete preemption standard).

Vermont cannot argue that those wholly out-of-state emissions caused in-state conse-
quences because, as the Supreme Court has held, emissions are a global phenomenon, and it is
impossible to isolate the effect of particular emissions on a particular State. *See AEP*, 564 U.S. at
422 (explaining that "emissions in New Jersey may contribute no more to flooding in New York
than emissions in China"). Nor can it rely on fossil-fuel products sold and used in Vermont to
justify the Act because the entire basis for liability under the Act depends on percentages of *global*
greenhouse gas emissions caused by the *global* use of these products. The Act in no way estab-
lishes a liability determination or penalty calculation based on activities within its borders. Compl.
¶¶ 53, 66. The Act, on its face, turns on wholly out-of-state conduct.

That is why the Supreme Court's decisions discussing the limits that equal sovereignty and
due process place on States' ability to impose punitive damages are instructive. *Id.* ¶¶ 80, 82, 86,
101. *Contra* Vt. Mem. 25-26; Int. Mem. 40-41. Like the damages in those cases, Vermont's Act
aims to punish "conduct that may have been lawful where it occurred," including lawful extraction
and refining in other States and around the world. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538
U.S. 408, 421 (2003); *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 (1996). Thus, like
a punitive damages award seeking to "condemn[]" a company for "its nationwide policies rather
than for conduct directed toward" Vermont, *Campbell*, 538 U.S. at 420, the Act penalizes energy
producers for global actions that have no relation to Vermont.

The State says these cases are distinguishable because the Act's "purpose is compensatory"
and it "does not seek to punish or alter *any* conduct, let alone lawful conduct in other jurisdictions."
Vt. Mem. 26. But, again, the plaintiff made this same argument in *City of New York*: "positing that
because it seeks damages—not abatement or the imposition of pollution standards—its claims do
not threaten to regulate emissions at all, let alone beyond New York's borders." 993 F.3d at 92.

The Second Circuit rejected that argument.

The State can neither avoid Second Circuit precedent nor disregard Supreme Court precedent discussing due process limits on extraterritorial regulation as limited to the context of personal jurisdiction. Vt. Mem. 26. The Supreme Court's personal jurisdiction cases are based on a broader constitutional principle that due process means that a State generally cannot legislate beyond its own jurisdiction unless specifically authorized by Congress. *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 156 (2023) (Alito, J., concurring) (noting that the Court's due process decisions "have continued to recognize that constitutional restrictions on state court jurisdiction . . . reflect 'territorial limitations' on state power" (citation omitted)). Indeed, the Supreme Court recently explained, in a personal jurisdiction case, that "due process limitations imposed by the Fourteenth Amendment" are "driven by" the principles of "protecting interstate federalism" and that as a necessary part of those "principles of interstate federalism embodied in the Constitution[,]" "State sovereign authority is bounded by the States' respective borders." *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 13-14 (2025) (citation omitted). Those same due process principles confirm that Vermont's attempt to impose liability on global emissions beyond its borders is unlawful.

Defendants suggest that these due process principles are inapplicable because the Act covers only "responsible parties" that have a "sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution." Vt. Mem. 26 (quoting § 596(22)); Int. Mem. 40. But simply invoking the term "nexus" does not render the Act constitutionally sound. Notably, the Act fails to tie its nexus requirement to the penalties it imposes. Not a single company that meets, or could meet, the definition of responsible party produces or refines any fossil fuels in Vermont. Compl. ¶¶ 41, 50. Thus, for the law to have any effect, Vermont will need to argue that a company qualifies as a "responsible party" merely by having done business in the state—even if its fossil-fuel

extraction activities occurred entirely in other states and on other continents. This expansive interpretation stretches the bounds of due process and state authority beyond constitutional limits.

The State also criticizes Plaintiffs for relying upon Dormant Commerce Clause cases, arguing that a law "does not run afoul of the dormant Commerce Clause simply because it has 'extraterritorial effects.'" Vt. Mem. 27 (quoting *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374-75 (2023)). That's true. However, *Pork Producers* also makes clear that laws that "directly regulate" conduct "wholly outside the State" violate "the territorial limits of state authority under the Constitution's horizontal separation of powers." *Pork Producers*, 598 U.S. at 376 n.1. Likewise, whether under the Due Process Clause, Dormant Commerce Clause, or the structural principles of federalism, "the Constitution restricts a State's power to reach out and regulate conduct that has little if any connection with the State's legitimate interests." *Mallory*, 600 U.S. at 154 (Alito, J., concurring). Thus, these cases support Plaintiffs' structural constitutional argument.

### 3.    The Act's intrusion upon the federal Government's exclusive authority over foreign affairs supports Plaintiffs' structural argument.

Vermont's action also violates the constitutional command that "[o]ur system of government . . . imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941); Compl. ¶ 87. Vermont concedes that "the United States Constitution . . . vest[s] power over foreign affairs exclusively with the federal government," and that that power "preempt[s] state laws that intrude on the federal government's exclusive power over foreign affairs by 'disturb[ing] foreign relations.'" Vt. Mem. 27-28 (quoting *Zschernig v. Miller*, 389 U.S. 429, 440-41 (1968)). Yet the State mistakenly asserts that the Act does not intrude upon this exclusively federal authority because the Act regulates "a traditional, domestic concern that does not implicate foreign affairs." Vt. Mem. 29; Int. Mem. 45-46.

The Second Circuit squarely rejected this argument in *City of New York*, dismissing the City's attempt to frame its claims as a local dispute over shoreline erosion with no broader implications. 993 F.3d at 91. Vermont makes the same move here, characterizing the Act as a mechanism to fund "climate change adaptation within Vermont's borders." Vt. Mem. 29. But just as in *City of New York*, the Act's reach is far broader—it seeks to impose liability for "global greenhouse gas emissions." 993 F.3d at 91. And as the Second Circuit concluded, allowing such liability under state law is impermissible, as it "would further risk upsetting the careful balance that has been struck between the prevention of global warming—a project that necessarily requires national standards and global participation—and energy production, economic growth, foreign policy, and national security." *Id.* at 93. A single state cannot legislate in this domain without risking a patchwork of conflicting state laws that undermine coherent federal policy. *Id.*

What's more, Vermont's Act also conflicts with foreign policy decisions of the federal Government. Compl. ¶¶ 87-88, 93-97. Defendants dismiss Plaintiffs' reliance upon international treaties and other agreements, Vt. Mem. 30-31; Int. Mem. 43-44, but the Second Circuit found those same treaties sufficient to establish a conflict between federal foreign policy decisions and liability under state law for global emissions. *See City of New York*, 993 F.3d at 103. As the court explained, holding producers liable for foreign activity would "bypass the various diplomatic channels that the United States uses to address this issue [of global greenhouse gas emissions], such as the U.N. Framework and the Paris Agreement." *Id.* Defendants argue that the Act does not conflict with these agreements because it does not directly regulate fossil-fuel production or emissions. Vt. Mem. 29. But the same was true in *City of New York*, 993 F.3d at 92. That (false) distinction did not work there and cannot save the Act here.

### B.    Plaintiffs plausibly allege that the Act is preempted by the Clean Air Act.

Plaintiffs have adequately stated a well-pleaded claim that Vermont's Act is preempted by

the CAA. Compl. ¶¶ 108-22. Courts have long recognized that federal law applies to disputes involving out-of-state pollution, including greenhouse gas emissions. *See supra* pp.23-27. And in an area where federal law has historically controlled, application of state law "is permissible only to the extent authorized by federal statute." *City of New York*, 993 F.3d at 99 (cleaned up).[18] Here, the federal statute that would need to authorize Vermont's Act is the CAA, which establishes a comprehensive scheme for regulating air pollutants—including greenhouse gases—across the United States. *AEP*, 564 U.S. at 427. Greenhouse gases are "pollutants" covered by the CAA and are thus subject to that federal statute's comprehensive scheme. *Massachusetts v. EPA*, 549 U.S. at 528-29. Although the CAA includes a role for States, that role is specifically limited to express delegations of authority for specific types of regulation—such as developing and enforcing implementation plans for stationary sources within their borders—and authority provided by the CAA's savings clauses. 42 U.S.C. §§ 7604(e), 7416.

The only authority that States have under the CAA to regulate greenhouse gas emissions is to regulate those emissions originating from *within* their own borders; the States have no authority to regulate or impose liability for emissions originating outside their borders. This rule is grounded in binding Supreme Court and Second Circuit precedent interpreting the CAA's savings clauses against the background history of federal authority over out-of-state emissions. *See Ouellette*, 479 U.S. at 500; *City of New York*, 993 F.3d at 100. The CAA thus preempts Vermont's attempt to regulate extraterritorial emissions. These precedents do not neatly apply the traditional preemption categories. But even within those categories, the Act is preempted because Congress has occupied the field of out-of-state pollution and the Act conflicts with the purposes of the CAA.

---

[18] Relatedly, as noted above, there is no presumption against preemption in areas of historical federal control. *See supra* p.21.

1.    **Under the Clean Air Act, States may regulate only emissions originating within their borders.**

Under the CAA, a State may regulate greenhouse gas emissions only to the extent they originate within a State's own borders. That is because regulation of out-of-state emissions is an area of exclusive federal authority, and the CAA's savings clauses provides only a "slim reservoir" of state authority. *City of New York*, 993 F.3d at 100. That "slim reservoir" is limited to emissions originating *within* the State's borders, and States have no authority to create liability for or regulate emissions in another State. *Id.*; *accord AEP*, 564 U.S. at 426-27; *Ouellette*, 479 U.S. at 500.

This *in-state* rule flows from the Supreme Court's decision in *Ouellette*. There, the Court held that the Clean Water Act "pre-empts state law to the extent that the state law is applied to an out-of-state point source." 479 U.S. at 500. It explained that, given the history of federal control over interstate water pollution, "the only state suits that remain available are those specifically preserved by the [Clean Water] Act." *Id.* at 492. And under the Clean Water Act's savings clauses, it held that the Clean Water Act did not preserve "actions brought under an affected [downstream] State's law" because that would "upset[] the balance of public and private interests so carefully addressed by the [Clean Water] Act," and "would be incompatible with the [Clean Water] Act's delegation of authority and its comprehensive regulation of water pollution." *Id.* at 494, 500.

The Second Circuit, and other courts,[19] have applied *Ouellette*'s holding to the CAA's "nearly identical savings clauses." *City of New York*, 993 F.3d at 99. Applying *Ouellette*, the Second Circuit held in *City of New York* that a State's authority under the CAA is "narrowly circumscribed" and "permit[s]" imposition of liability under state law only "under the law of the pollution's *source* state." *Id.* at 100 (cleaned up) (quoting *Ouellette*, 479 U.S. at 497). Based upon that

---

[19] *See, e.g.*, *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 693 (6th Cir. 2015); *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 301, 308 (4th Cir. 2010); *cf. Bell v. Cheswick Generating Station*, 734 F.3d 188, 197 (3d Cir. 2013).

rule, the Second Circuit held that the City's state-law claims seeking damages based upon global greenhouse gas emissions went beyond the "slim reservoir" permitted by the CAA. *Id.*

## 2. Vermont's Act is preempted by the Clean Air Act because it imposes liability for domestic emissions originating outside of Vermont.

*City of New York* also makes clear the CAA preempts Vermont's Act because it seeks to impose liability for domestic emissions originating from other states. Like the state-law claims in *City of New York*, Vermont's Act, § 596(7), imposes liability based upon "emissions emanating simultaneously from all 50 States." 993 F.3d at 100. The Act therefore "does not seek to take advantage of" the "slim reservoir" of state law allowed by the CAA and thus is "barred" in its entirety. *Id.* Therefore, under binding Second Circuit precedent, Plaintiffs have stated a claim that the CAA preempts Vermont's Act.

Defendants fail to distinguish *Ouellette* and *City of New York*'s application of *Ouellette*'s holding to the CAA. *See supra* pp.23-28 (explaining why *City of New York* applies here). Indeed, Vermont does not even mention *Ouellette* in its motion.

Intervenor-Defendants assert that *Ouellette*'s holding is "not an independent preemption doctrine, but merely an application of settled obstacle preemption principles when federal and state law seek to apply different pollution control standards to the same source." Int. Mem. 30. That is not an accurate characterization. The Supreme Court's holding must be read in light of the exclusive federal authority over interstate pollution issues and the fact that, based on that exclusive authority, States may apply their laws to those issues only as permitted by Congress. The Supreme Court and lower courts have interpreted the Clean Water Act and CAA to permit States to impose liability under their laws only on emissions originating within their borders.[20]

---

[20] And even under Intervenor-Defendants' interpretation of *Ouellette*—that state law is barred where "federal and state law seek to apply different pollution control standards to the same

Critically, *City of New York* has already decided how this Court should interpret *Ouellette*. In *City of New York*, the Second Circuit applied *Ouellette*'s reasoning to the CAA to bar "the City's state-law claims" based upon the idea that they necessarily sought to impose liability for greenhouse gas emissions originating beyond New York's borders. 993 F.3d at 100. Consequently, applying *City of New York*'s interpretation of *Ouellette* here, Plaintiffs have more than adequately met their pleading burden showing that the CAA bars Vermont from imposing liability for domestic emissions originating beyond Vermont's borders because, like the claims in *City of New York*, Vermont's liability scheme would "undermine this carefully drawn statute through a general savings clauses and would seriously interfere with the achievement of the full purposes and objectives of Congress." *Id.* (cleaned up).

### 3. To the extent traditional preemption categories apply, Vermont's Act remains preempted by the Clean Air Act.

As explained above, Plaintiffs' CAA preemption claim is grounded in the long-established federal authority over out-of-state emissions, the CAA's comprehensive scheme that now governs that area with regard to domestic emissions, and the "slim reservoir" of authority the CAA delineates for States that elect to address emissions originating within their borders. Because of the exclusive authority federal law historically has held over out-of-state pollution, this topic does not fit neatly with the traditional categories of preemption doctrine. Rather, the preemption doctrine governing the specific domain of national and global air pollution control, reflected in Second Circuit precedent that controls the outcome in this case, is best summarized as follows: (1) as the courts have long held, only federal law could govern out-of-state emissions, *see supra* pp.23-27; (2) Congress displaced the federal common law that used to control domestic emissions with the

---

source," Int. Mem. 41, that is exactly what Vermont's Act does. It imposes liability for emissions in other States, even if those emissions occurred in connection with activity that complied with all applicable state (i.e., law of the State in which the source is located) and federal law.

comprehensive CAA, *see AEP*, 564 U.S. at 424; and (3) the CAA provided that States still possess some limited authority over emissions sources solely within their borders, but did not authorize States to control or impose liability for emissions emanating from other States, *see City of New York*, 993 F.3d at 99-100; and (4) federal law leaves no role for States to control or impose liability for emissions emanating from other nations, *see id.* at 100-03. But if the Court were to leave that governing precedent aside and simply apply the traditional preemption categories, this Court would still be obliged to conclude that the CAA preempts Vermont's law.

Start with field preemption. Here, the relevant "field" that Congress has occupied is out-of-state air pollution. Although States have authority to regulate emissions originating from within their borders, federal law has never permitted States to address emissions emanating outside state borders. This is consistent with *Ouellette*. There, the Supreme Court held, "[i]n light of [the] pervasive regulation and the fact that the control of interstate pollution is primarily a matter of federal law, it is clear that the only state suits that remain available are those specifically preserved by the [Clean Water Act]." 479 U.S. at 492 (citation omitted). The Court acknowledged that "[a]lthough Congress intended to dominate the field of pollution regulation, the [Clean Water Act's] saving clause negates the inference that Congress 'left no room' for state causes of action." *Id.* But the Court rejected the plaintiffs' contention that for pollution that originates in one State (the source State) and travels to another State (an affected State), the savings clauses "preserve[s] the right to bring suit under the law of any affected State." *Id.* at 493. Instead, the Court concluded that the Clean Water Act "precludes a court from applying the law of an affected State against an out-of-state source." *Id.* at 494.

Similarly, the CAA preempts a State from applying its law to an out-of-state source of greenhouse gas emissions. Or, in terms of field preemption, federal law occupies the field of

interstate pollution, even if the CAA's savings clauses means that Congress has carved out limited exceptions to the entire field of pollution control. *Contra* Vt. Mem. 36-38; Int. Mem. at 32-33.

Conflict preemption also applies. In *Ouellette*, the Court held that permitting an affected State to apply its law to pollution from another State would "disrupt [the] balance of interests" that Congress had weighed in enacting the comprehensive Clean Water Act regulatory scheme and would "undermine the important goals of efficiency and predictability" in the Clean Water Act's permitting scheme. 479 U.S. at 495-96; *see City of New York*, 993 F.3d at 100.

The same is true under the CAA. Congress designed the CAA to be comprehensive for out-of-state emissions. For those pollutants, Congress delegated authority to EPA to determine "whether and how" they should be regulated. *AEP*, 564 U.S. at 426. States that are displeased with EPA's decisions can petition EPA and Congress. *Id.* But they cannot take matters into their own hands. As the Supreme Court said, "[i]f EPA does not set emissions limits for a particular pollutant or source of pollution, States and private parties may petition [EPA] for a rulemaking on the matter . . . [but there is] no room for a parallel track." *Id.* at 425. Allowing States to impose their own liability regimes (with substantial penalties) that target energy producers for out-of-state pollution would lead to a chaotic 50-state quagmire where producers must adjust their financial and strategic business decisions according to differing state laws, even if they are fully compliant with both the law of the State in which they are located and the CAA. *See Ouellette*, 479 U.S. at 495-96.

Defendants claim that Vermont's Act poses no obstacle to the CAA because the purpose of Vermont's Act "is not to regulate pollution at all, but to recover a portion of Vermont's climate adaptation costs." Vt. Mem. 40; Int. Mem. 29-30. But even if Vermont's Act at the very least "would regulate cross-border emissions in an indirect and roundabout manner, it would regulate them nonetheless." *City of New York*, 993 F.3d at 93; *see supra* pp.23-27. By imposing substantial

financial penalties on out-of-state energy producers for global greenhouse gas emissions, Vermont is regulating those emissions. *See City of New York*, 993 F.3d at 92 ("[T]he obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."). Indeed, the Act is a clear obstacle to the CAA's nationwide scheme because it seeks to penalize emissions originating in other states that resulted from activities that were lawful and compliant with federal and source-state law. The Supreme Court recognized that such liability could impermissibly force an out-of-state company "to change its methods of doing business and controlling pollution," *Ouellette*, 479 U.S. at 495, which is equally true of the liability imposed by Vermont's Act. Thus, the "inevitable result of" Vermont's law "would be that Vermont and other States could do indirectly what they could not do directly—regulate the conduct of out-of-state sources," contrary to the comprehensive scheme of the CAA. *Id.*

### C.    Plaintiffs plausibly allege that the Act violates due process.

The Act's retroactive liability scheme imposes substantial penalties upon a select group of energy producers based on the conceit that Vermont can somehow accurately attribute to specific energy producers the purported costs of climate change to Vermont from three decades of global greenhouse gas emissions and can show that actions of those specific producers directly led to damages in Vermont purportedly caused by world-wide emissions. The Act's arbitrary, irrational, and overly harsh liability scheme violates the Due Process Clause. Compl. ¶¶ 124-45.

The Fourteenth Amendment's Due Process Clause prevents States from imposing arbitrary and irrational laws. "The touchstone of due process is protection . . . against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974); *see E. Enters. v. Apfel*, 524 U.S. 498, 537 (1998) (plurality opinion) (due process requires a party to "establish that its liability under the Act is 'arbitrary and irrational'" (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976)). Due process also protects against overly "harsh and oppressive" "economic legislation."

*Pension Benefit Guar. Corp. v. LTV Corp.*, 467 U.S. 633, 733 (1990); *see also Canisius Coll. v. United States*, 799 F.2d 18, 25 (2d Cir. 1986) ("Th[e] 'harsh and oppressive' test does not differ from the test of constitutionality applicable to economic legislation generally, namely, that such legislation is constitutional unless Congress has acted in an arbitrary and irrational way."). Such legislation also includes laws that impose "retroactive" penalties—that is, retroactivity is one way in which a law can be so arbitrary or otherwise "so harsh and oppressive as to transgress the constitutional limitation" of due process. *McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco*, 496 U.S. 18, 41 & n.23 (1990) (citation omitted).[21]

The Complaint plausibly alleges that the Act violates due process in four ways. *First*, the Act's 30-year retroactive penalty is harsh and oppressive. Compl. ¶¶ 128-30. *Second*, the Act's liability scheme is irrational and arbitrary in multiple ways, including its coverage period, its calculation method, and its targeting of select energy producers while ignoring major emitters of greenhouse gases. *Id.* ¶¶ 129-39. *Third*, the Act is unconstitutionally vague as it vests state agencies with open-ended discretion to set the amounts of penalties imposed. *Id.* ¶¶ 140-41. *Fourth*, the Act imposes significant penalties on energy producers without sufficient safeguards. *Id.* ¶¶ 142-43. In its motion, the State fails to establish a legitimate legislative purpose or convincingly rebut any of the Complaint's allegations that the Act violates due process.

---

[21] *See also E. Enters.*, 524 U.S. at 547 (Kennedy, J., concurring in the judgment and dissenting in part) ("[D]ue process requires an inquiry into whether in enacting the retroactive law the legislature acted in an arbitrary and irrational way."); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994) ("[T]he antiretroactivity principle finds expression in several provisions of our Constitution," like the "Due Process Clause, [which] protects the interests in fair notice and repose that may be compromised by retroactive legislation; a justification sufficient to validate a statute's prospective application under the Clause 'may not suffice' to warrant its retroactive application." (quoting *Usery*, 428 U.S. at 17)).

**1.      No legislative purpose justifies the Act's global reach.**

To start, Vermont argues that the Act's "legitimate legislative purpose" is to fund climate projects and protect Vermonters' health. Vt. Mem. 44. Even assuming that purpose is valid, a legitimate purpose does not license irrational means to achieve it, such as imposing penalties on out-of-state companies for global emissions. *See Usery*, 428 U.S. at 15. Vermont has *no* valid interest in addressing wholly out-of-state activity that is not directed to that State or imposing strict liability for greenhouse gas emissions emanating from other jurisdictions. Nor can Vermont use the health of its citizens—a state issue—to manufacture a legitimate legislative purpose for regulating an area of law that must be governed exclusively by federal law. *See supra* pp.23-27.

**2.      The Act's liability scheme is arbitrary and irrational.**

Plaintiffs have sufficiently pleaded that Vermont's law is arbitrary and irrational. The State says the Act is rational because it "assigns payments to responsible parties based on their proportional share of the State's costs to adapt to climate change." Vt. Mem. 44. Not so.

*First*, the Act's calculation method is arbitrary. It cannot with any accuracy or fairness calculate the purported impact of global greenhouse gas emissions upon Vermont and attribute emissions that caused that impact to each responsible party. Compl. ¶¶ 131-32. "Greenhouse gases once emitted 'become well mixed in the atmosphere,'" *AEP*, 564 U.S. at 422 (citation omitted)), and after that point, "[g]reenhouse gas molecules cannot be traced to their source," *City of New York*, 993 F.3d at 92 (citation omitted). Moreover, the Act's 30-year coverage period makes it nearly impossible to accurately determine liability: Vermont must attribute to specific energy producers purported impacts to Vermont caused by climate change over 30 years of global emissions resulting from the collective conduct of billions of people all around the world. Compl. ¶¶ 131-32. And it must do so while distinguishing impacts to the State caused by emissions before that 30-year period from those caused within the 30-year period, and those caused by something other than

fossil-fuel greenhouse gas emissions (like acid rain) from those caused by fossil-fuel activities. *Id.* ¶ 132. Such speculative calculations cannot be squared with due process.

The State says Plaintiffs' claim that it "cannot reliably do this work and that it is impossible" is itself "speculative, not plausible, and cannot support a facial challenge." Vt. Mem. 46 (cleaned up). But at this stage, Plaintiffs' allegations must be accepted as true. Plaintiffs have sufficiently alleged that what the Act purports to do, on its face, is not possible—at least not with any semblance of accuracy. Compl. ¶¶ 131-33.

*Second*, the Act arbitrarily singles out a subset of energy producers while ignoring other major sources of greenhouse gas emissions. Compl. ¶¶ 134-38; *contra* Vt. Mem. 45-46. The Act places blame for worldwide greenhouse gas concentrations on certain energy producers and holds them responsible for the entirety of alleged harm in Vermont, but it ignores emissions from many other sources, including governments, nationally owned fossil-fuel companies, burning of wood for fuel, forest fires, methane from farm animals, agriculture, other land-use activities, and transportation. Compl. ¶¶ 134-36. Critically, the Act does not impose liability on the largest emitter of fossil-fuel based greenhouse gas emissions—end users. The activities of companies from numerous industries, governmental entities (like Vermont), and ordinary consumers cause the majority of greenhouse gas emissions. *Id.* ¶ 138. To be sure, "[a] Legislature need not address all aspects of a problem." Vt. Mem. 45. But that is not the issue—the problem is that exempting *countless* emitters from the law, which purports to assign liability based on the cumulative effect of greenhouse gas emissions on climate change impacts, necessarily (and unfairly) inflates covered companies' role in climate change in order to force them to foot the bill. Compl. ¶ 133.

*Third*, the retroactive nature of the Act's strict liability scheme is overly harsh and oppressive. *Id.* ¶ 128. Plaintiffs' Complaint explains why the Act's three-decade coverage period is

extraordinary and oppressive when matched with strict liability and speculative attribution for global emissions. *See id.* ¶ 128 & n.11. Nothing about that period of liability is "modest," "short," or "limited" in a way that can satisfy due process. *E. Enters.*, 524 U.S. at 528. Indeed, courts have invalidated laws of similar and even shorter lengths of retroactive liability as violating due process. *See id.* at 549-50 (Kennedy, J., concurring in the judgment and dissenting in part) (35 years);[22] *James Square Assocs. LP v. Mullen*, 993 N.E.2d 374, 382-83 (N.Y. 2013) (16 months). The Act's lengthy retroactive coverage period only exacerbates the arbitrariness concerns discussed above.

The State says there is no way to know if the Act's retroactive penalties are overly harsh because no penalties have been issued. Vt. Mem. 46-47. But it is clear from the face of the Act, the legislative history, and Defendants' own briefs that they intend to seek hundreds of millions or billions of dollars from responsible parties. *See infra.* p.48. Even without knowing the specific penalties, it is the combination of retroactive liability mixed with the inability to mitigate that liability and an arbitrary penalty methodology that results in the clear due process violation here.

The State also says energy producers "anticipated liability and government action based on their emissions." Vt. Mem. 48. But there are at least two problems with this argument. *First*, energy producers had no way to know 30 years ago that an individual State would attempt to place them on the hook for *global* climate change through a retroactive penalty regime—especially considering the history of federal authority over out-of-state emissions. Second, to support this point, the State cites a 2021 complaint from Vermont's suit against certain energy producers in another case. Vt. Mem. 48 n.36. But the allegations in that complaint cannot negate allegations in Plaintiffs'

---

[22] The State argues that there is no controlling opinion in *Eastern Enterprises*. Vt. Mt. 43 n.28. That is true in this Circuit. However, both the plurality opinion under the Takings Clause and Justice Kennedy's concurrence discussing due process are highly relevant, persuasive authority that the Court should consider here.

Complaint in this case at the motion to dismiss stage.

*Fourth*, Vermont has no sound basis for selecting the covered period from 1995 through 2024. Compl. ¶¶ 129-30. *Contra* Vt. Mem. 45. As alleged in Plaintiffs' Complaint, Vermont had no rational basis for selecting this period as opposed to a shorter period. Compl. ¶ 129. This coverage period is particularly arbitrary given that carbon dioxide emissions remain in the atmosphere for centuries and follow different paths. *Id.* Accordingly, whether "the link between fossil fuel production and climate change was clear" by 1995 is irrelevant because emissions from long before 1995 remained in the atmosphere after that date. Vt. Mem. 45. This coverage period also fails to account for different industries' improvements in burning fuel more efficiently over time.

*Fifth*, the Act arbitrarily requires that entities in a "controlled group" be treated as a single responsible party and makes them "jointly and severally liable" for "any cost recovery demand owed by any entity in the controlled group." § 598(a)(2); Compl. ¶ 139. This disregards corporate separateness principles and the State's jurisdictional limits for entities with no nexus to Vermont. Compl. ¶ 139. The State says it "is impossible for Plaintiffs to know" whether the Act will be applied in this manner. Vt. Mem. 49. But this provision should not be read in isolation. Rather, it is one more arbitrary piece in the larger irrational scheme set up by the law, which is clear even before Vermont has identified responsible parties.

### 3.    The Act's provisions are unconstitutionally vague and lack adequate guideposts to ensure penalties comply with due process.

The State argues the Act is not vague because it "does not prohibit any conduct" and provides guidance regarding its requirements. Vt. Mem. 49-51. That missed the point. Due process requires "fair notice" of the severity of the deprivation and "precision and guidance" to prevent arbitrary or discriminatory penalties. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Where actions are prohibitory and stigmatizing, courts apply a stricter vagueness test. *Vill.*

*of Hoffman Ests. v. Flipside*, 455 U.S. 489, 499 & n.16 (1982). Plaintiffs allege that the Act gives agencies "seemingly unfettered discretion" to compute enormous strict-liability penalties without objective, constraining standards for the final amounts. Compl. ¶ 140. Plaintiffs' members had no notice, let alone fair notice, that their lawful activities would incur massive strict liability in Vermont. That allegation is sufficient to support a proper unconstitutional vagueness claim.

The State says there is no procedural due process problem because the Act provides for reconsideration of a cost-recovery demand and judicial review. Vt. Mem. 51. But those post-hoc review mechanisms are insufficient to police the imposition of massive penalties at the front end, particularly those based on strict liability without any nexus between the companies and Vermont. Where a scheme authorizes immense deprivations without standards to cabin the amount—no benchmarks, ratios, or caps—post-hoc hearings cannot supply the missing "guideposts" the Due Process Clause demands to prevent arbitrary deprivations of property. *Campbell*, 538 U.S. at 416-18; *BMW*, 517 U.S. at 574-85; Compl. ¶¶ 142-43. *BMW* and *Campbell* make clear that where the government authorizes massive financial exactions without clear limits or standards, it crosses the constitutional line. 517 U.S. at 562-63; 538 U.S. at 416. The Act does that. Compl. ¶¶ 142-43.

### D.    Plaintiffs plausibly allege that the Act violates the Commerce Clause.

The State argues in support of its motion to dismiss Plaintiffs' Commerce Clause claims that the Act "treats all entities with a nexus to Vermont equally." Vt. Mem. 61. That argument misreads case law, and regardless, Plaintiffs have met their pleading burden at this stage.

### 1.    The Act discriminates against interstate commerce.

Vermont's Act does precisely what the Commerce Clause forbids. It assigns liability for fossil-fuel extraction and refining in many other states and nations and then redistributes the proceeds to fund Vermont's programs. *Id.* ¶ 103; *see, e.g.*, § 596(15); § 598(a)(1), (h); § 599(a). That is not incidental effect; it is direct regulation of external conduct for Vermont's internal gain.

44

Indeed, the statute is discriminatory in its purest form: it exports costs onto companies and States outside of Vermont. This constitutional defect is not hypothetical because the Act mandates this discrimination. In fact, the Act is designed to apply only to out-of-state producers because the Act's definition of responsible parties does not target any Vermont companies. *See supra* pp.4-5. In sum, at this stage, the Court should credit Plaintiffs' allegations that this blatant discrimination will have detrimental effects on other States and their residents. *See* Compl. ¶¶ 41-47, 50, 103.

Vermont misreads *Pork Producers*, which it cites for the proposition that there is no longer a "extraterritoriality" doctrine under the Commerce Clause. *See* Vt. Mem. 55-56. *Pork Producers* rejected a freestanding rule that *any* state law with "extraterritorial effects" is invalid. 598 U.S. at 373, 375. But that decision did not disturb the settled principle that a State cannot directly regulate commerce occurring outside its borders. The distinction is clear: States may enact laws that incidentally affect interstate commerce but may not regulate wholly out-of-state conduct. *Id.* at 369.

This is perhaps best demonstrated by the contrast between the law at issue in *Pork Producers* and the Act here. There, California issued husbandry requirements for all pork sold in-state, regardless of its origin. *See id.* at 370. Producers in California were subject to those requirements, and producers in other States had a choice whether or not to comply based on whether they wanted to sell in California. Here, Vermont is seeking to impose its Act directly on out-of-state companies' operations. *See* § 596(22). This reach is not incidental. It is a direct attempt to control out-of-state conduct. The statute targets interstate and foreign producers with burdens that Vermont does not impose on in-state producers of fossil fuels (because there are none). The Act is thus not only discriminatory in operation, but also facially discriminatory by its design. *See* Compl. ¶¶ 151-52.

The State's reliance on the Act's "nexus requirement" to shield the Act from this challenge fails. The statutory nexus requirement is a jurisdictional precondition, not a substantive limitation

on the scope of the Act. The Act defines "responsible parties" to include companies with a sufficient connection to Vermont to satisfy due process. § 596(22). That language merely anticipates constitutional challenges to personal jurisdiction and attempts to forestall them. It does nothing to change the fact that the law regulates conduct occurring wholly outside Vermont.

### 2.    The Act burdens foreign commerce.

The Act also burdens foreign commerce. On its face, the Act applies to global greenhouse gas emissions. §§ 596, 598(a)(1). It therefore conflicts with a vital area of foreign commerce—energy production and trade. *Contra* Vt. Mem. 61-63. The law reaches foreign producers, foreign affiliates of domestic producers, and U.S. exporters, threatening to distort international energy markets. The consequence of the Act is that it significantly penalizes companies that are active in U.S. markets while benefiting foreign companies that have ignored Vermont.

The federal Government's foreign commerce power is even broader than its interstate power because the nation must speak with "one voice" abroad. *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448-49 (1979); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 66 (1st Cir. 1999). The Act undermines that principle by creating state-specific penalties that conflict with federal trade and climate policy. It also interferes with foreign commerce by imposing penalties on domestic energy producers that export internationally and on foreign energy producers that import into the country. In doing so, the Act affects the economic interests of the United States' key trade partners, potentially increasing costs for them and their citizens. The Act also affects certain energy producers that operate overseas by penalizing them for global emissions while preferring other companies that do not do business in the State. Compl. ¶¶ 151-54.

### E.    Plaintiffs plausibly allege the Act imposes unconstitutionally excessive fines.

Plaintiffs also adequately allege that the Act imposes excessive punitive sanctions that fail Eighth Amendment scrutiny. Compl. ¶¶ 153-73. *Contra* Vt. Mem. 64-68.

Vermont argues that the Act cannot be "punitive" because of the Act's self-described "compensatory" nature. Vt. Mem. 64. But labeling the Act as compensatory does not insulate it from constitutional scrutiny—particularly where its structure and effect suggest a punitive purpose or consequence. The Supreme Court has recognized that governmental "sanctions frequently serve more than one purpose," and held that even if the purpose of the sanction is only "*in part* to punish," the Eighth Amendment applies. *Austin v. United States*, 509 U.S. 602, 610 (1993) (emphasis added). Here, Plaintiffs allege that, for numerous reasons, the "compensatory" payments are intended to punish a select few oil companies. Compl. ¶¶ 163-65, 168, 170-72, 182, 194.

The Complaint details how the Act is punitive in both design and effect. *First*, the Act targets a narrow class of select major fuel producers that have sufficient contacts with the State. There is no purpose in singling out these companies—and not other emitters—except to fit the State's false narrative that these companies are the primary culprits for climate change, and to unfairly fine and punish those companies alone. *Id.* ¶¶ 163, 170. *Second*, the size of penalties imposed by the Act is untethered from any individual company's emissions in Vermont or any lawful adjudicated liability and instead dwarfs any actual connection to in-state conduct. *Id.* ¶¶ 164-65. *Third*, the Act uses these penalties to subsidize Vermont's projects, demonstrating that the scheme is not merely remedial but rather redistributive punishment extracted from select out-of-state entities targeted by the Vermont Legislature. *See, e.g.*, § 596(15); § 598(a)(1), (h); § 599(a). *Fourth*, legislative sponsors repeatedly described the Act as a way to hold "Big Oil" accountable. *See* Compl. ¶ 56. Indeed, the State recognizes some of this legislative history targeting certain large fossil-fuel companies in the Exhibits to their Motion to Dismiss. *See supra* n.6.

These allegations, accepted as true on a motion to dismiss, state a valid Eighth Amendment claim. Vermont's unsupported assertion that "punitive" fines subject to Eighth Amendment

scrutiny can only "arise from any violation of law" is incorrect. Vt. Mem. 65. Nothing in the Eighth Amendment text or precedent interpreting it so limits excessive-fine claims. U.S. Const. amend. VIII, cl. 2. And the Second Circuit has sustained successful Eighth Amendment claims even when the plaintiff was not accused of violating the law. *See Von Hofe v. United States*, 492 F.3d 175, 188-89, 191 (2d Cir. 2007) (punishing plaintiff for actions of spouse was unconstitutionally excessive); *see also United States v. Ferro*, 681 F.3d 1105, 1115-17 (9th Cir. 2012) (similar).

Further, Plaintiffs sufficiently plead that the cost-recovery demands are "excessive" in nature. A fine is excessive when it is "grossly disproportional" to the gravity of the offense. *See United States v. Bajakajian*, 524 U.S. 321, 334 (1998). Vermont does not rebut Plaintiffs' allegation that Vermont intends to charge "big oil" companies hundreds of millions or billions of dollars in cost recovery demands. Compl. ¶¶ 10, 16, 68, 96, 141, 165, 170, 192. Such a high fine surpasses the "excessive" threshold because it is "grossly disproportional" to the gravity of the offense. *Bajakajian*, 524 U.S. at 334. After all, there is no "offense" at all. The State admits that the millions to billions of dollars in fines "do not arise from any violation of law." Vt. Mem. 65. Rather, the fines are in response to lawful business activity. Compl. ¶ 167. The excessiveness is made worse by the Act's pinning all the purported costs of climate change—caused by countless sources—onto a select group of energy producers, Compl. ¶ 169. *See New York v. United Parcel Serv., Inc.*, 942 F.3d 554, 600 (2d Cir. 2019) (fine was excessive when it "double count[ed]" the party's liability).

Plaintiffs do not have to wait until ANR issues cost-recovery demands to assert this claim. *Contra* Vt. Mem. 65-66. Many lawmakers have asserted that the impending fines—for *lawful* behavior—will be significant, stretching into the hundreds of millions or billions of dollars.[23]

---

[23] *See* Senate Comm. on the Judiciary, Senate Judiciary - 2024-02-08 - 9:00AM, at 57:00-57:45, 58:50-59:05 (Feb. 2, 2024), https://perma.cc/4K9V-WN3F ("significant liability" will

**F.      Plaintiffs plausibly allege that the Act constitutes a regulatory taking.**

Plaintiffs properly allege that the Act effectuates an unconstitutional taking in violation of the Fifth Amendment. *See* Compl. ¶¶ 174-86. As a plurality of the Supreme Court has recognized, "legislation might be [an] unconstitutional [taking] if it imposes *severe retroactive liability* on a *limited class* of parties that *could not have anticipated* the liability, and the extent of that liability is *substantially disproportionate* to the parties' experience." *E. Enters.*, 524 U.S. at 528-29 (emphases added). Plaintiffs allege that precise scenario. Compl. ¶¶ 174-86. Even so, Vermont urges this Court to depart from the Supreme Court's *Eastern Enterprises* plurality opinion and instead follow out-of-circuit precedent and read in a limitation upon takings claims not found in the text of the Fifth Amendment. *See* Vt. Mem. 68-69. Because (as the State admits) this limitation—a requirement that the taking affect "a specific property interest" rather than a general property interest in money—has not been adopted in this Circuit, *see* Vt. Mem. 69, this Court should follow the Supreme Court's plurality holding in *Eastern Enterprises*.

Vermont's assertion that the Act's cost recovery demands will only "potentially" result in a substantial penalty on responsible parties is baseless. *See* Vt. Mem. 70. The Act's economic impact and interference with companies' distinct investment-backed expectations are obvious. The Act is designed to elicit large punitive fines from select energy producers. *See* Compl. ¶¶ 163-65, 168, 170-72, 182, 194. This purpose is reflected in numerous features of the Act—the strict liability

---

attach to covered entities; fines could be "a hundred billion dollars"); Vt. Senate Comm. On Finance, Senate Finance - 2024-03-21 - 3:15PM, at 23:14-25:28 (Mar. 21, 2024), https://perma.cc/VTL3-MXER (damages from climate change to Vermont are a "really big number"; even split among "responsible" parties, damages are a "significant number" in terms of the "kind of money [Vermont is] going to see"); *Climate Superfund Act Introduced in Vermont State House; Majorities in Both Chambers Co-Sponsor the Companion Bills*, VT. Conservation Voters (Jan. 18, 2024) (Statement of Sen. Watson), https://perma.cc/FBA7-TMKN (noting climate change is "costing [Vermont] billions of dollars"); Vt. Journal of the House 1171 (May 3, 2024) (statement of Rep. Hinesburg), https://perma.cc/MNQ5-DX5V (calling Vermont's cost burden related to climate change "huge") .

scheme, the lack of a cap on fines, retroactive condemnation of entirely lawful business activities, and the singular focus on select oil companies' contributions to climate change (as determined by Vermont) while ignoring the contributions of myriad other entities. §§ 596(22), 597. As lawmakers—as well as Intervenor-Defendants—have acknowledged time and again, these penalties will be substantial, stretching into the hundreds of millions and billions. *See supra* p.48. Lawmakers knew the Act would face significant legal battles, all because the ramifications on select oil companies would be substantial. *See, e.g.*, Senate Comm. on the Judiciary, Senate Judiciary - 2024-02-08 - 9:00AM, at 57:00-57:45 (Feb. 2, 2024), https://perma.cc/4K9V-WN3F (discussing chances of defending inevitable suit and noting that because of the Act's "significant liability," "those that are covered are going to litigate"); Vt. Senate Comm. on the Judiciary, Senate Judiciary - 2024-03-14 - 9:00AM, at 25:54-26:47 (Mar. 14, 2024), https://perma.cc/FR2E-RPSR (noting state "expect[s] litigation on this").

For these same reasons, Plaintiffs have sufficiently alleged that the character of the governmental action supports a taking claim. *See* Compl. ¶ 183; *contra* Vt. Mem. 72. The Act places a targeted and specific group of covered energy producers on the hook for global greenhouse gas emissions stretching back 30 years, those emissions' impacts on the climate, and the specific purported climate change impacts in Vermont as determined by the state. In doing so, it imposes penalties on those companies while ignoring others that also contributed to such emissions. *E. Enters.*, 524 U.S. at 537 (plurality opinion) (government's action a taking where it "singles out certain [entities] to bear a burden that is substantial in amount, based on the employers' conduct far in the past, and unrelated to any commitment that the [entities] made or to any injury they caused").

## Conclusion

The Court should deny both the State's and Intervenor-Defendants' Motions to Dismiss.

Dated: September 15, 2025

Matthew B. Byrne
GRAVEL & SHEA PC
76 St. Paul Street, 7th Floor
Burlington, VT 05402-0369
Telephone: (802) 658-0220
Fax: (802) 658-1456
Email: mbyrne@gravelshea.com

Jennifer B. Dickey*
Kevin R. Palmer*
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
Telephone: (202) 463-5337

*Counsel for Plaintiff the Chamber of Commerce of the United States of America*

Ryan Meyers*
American Petroleum Institute
200 Massachusetts Avenue, NW,
   Suite 1200
Washington, DC 20001
Telephone: (202) 682-8000

*Counsel for Plaintiff American Petroleum Institute*

Respectfully submitted,

*/s/ Steven P. Lehotsky*

Steven P. Lehotsky*
Scott A. Keller*
Michael B. Schon*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW,
   Suite 700
Washington, DC 20001
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: steve@lkcfirm.com
Email: scott@lkcfirm.com
Email: mike@lkcfirm.com

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: jared@lkcfirm.com

Meredith R. Pottorff*
LEHOTSKY KELLER COHN LLP
8513 Caldbeck Drive
Raleigh, NC 27615
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: meredith@lkcfirm.com

*Counsel for Plaintiffs the Chamber of Commerce of the United States of America and American Petroleum Institute*

*\*Admitted pro hac vice*

**Certificate of Service**

I, Steven P. Lehotsky, certify that on September 15, 2025, the foregoing was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky