**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and AMERICAN PETROLEUM INSTITUTE, Plaintiffs, ) ) ) ) ) | |
| WEST VIRGINIA, et al., Intervenor-Plaintiffs, ) ) ) | |
| v. ) ) | Case No. 2:24-cv-1513 |
| JULIE MOORE, in her official capacity as the Secretary of the Vermont Agency of Natural Resources, and JANE LAZORCHAK, in her official capacity as the Director of the Vermont Agency of Natural Resources Climate Action Office, Defendants, ) ) ) ) ) ) ) ) | |
| NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION, Intervenor-Defendants. ) ) ) ) | |

**INTERVENOR STATES' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AND
<u>OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

PROCEDURAL POSTURE ............................................................................................... 7

LEGAL STANDARD ......................................................................................................... 7

Motion to Dismiss ............................................................................................................. 7

Motion for Summary Judgment ........................................................................................ 8

THE STATES ARE ENTITLED TO SUMMARY JUDGMENT ON COUNTS I AND II ............ 8

    I.     The States' Claims Are Justiciable ................................................................... 9

           A.   The States Have Standing to Sue ........................................................ 9

                 1.     Plaintiff States Are Vindicating Their Proprietary Interests. ......... 10

                 2.     Intervenor States can sue parens patriae. ...................................... 17

           B.   The States' Claims are Ripe for Adjudication .................................. 20

                 1.     Constitutional Ripeness ................................................................... 21

                 2.     Prudential Ripeness .......................................................................... 22

           C.    The States Possess a Cause of Action ............................................... 24

    II.   Federal Common Law and Structural Constitutional Principles Preempt Vermont's Climate Superfund Act ....................................................................................... 25

           A.   Federal Common Law Preempts Vermont's Act ............................... 25

                 1.     Defendants' Counterarguments are Unpersuasive. ......................... 29

                      a.    Federal Common Law Preempts State Statutes .................... 29

                      b.    The Act is Preempted Despite Targeting Producers Instead of Emitters Directly ................................................................. 31

           B.    The Act is an Unconstitutional Extraterritorial Regulation ..................... 34

           C.    The Act Violates the Foreign-Affairs Doctrine .......................................... 40

    III.  The Clean Air Act Preempts the Vermont Climate Superfund Act. ...................... 43

i

A. The Clean Air Act Creates a Comprehensive Scheme for Regulating Carbon Emissions Nationwide.................................44

B. The Clean Air Act Preempts the Climate Superfund Act Based On Both Field and Conflict Preemption. ................................46

 1. The Clean Air Act Preempts the Entire Field of Interstate Air Pollution................................47

 2. The Vermont Climate Superfund Act Obstructs the Clean Air Act .....48

IV. The States are Entitled to Permanent Injunctive Relief............................53

THIS COURT SHOULD DENY DEFENDANTS' MOTIONS TO DISMISS ...........................55

I. The States' Remaining Counts Are Justiciable ..........................................55

 A. Counts III through XI are Ripe ......................................................55

 B. The States Can Bring State-Law Claims Against Vermont Officers ...............56

  1. The States Can Invoke the Vermont Constitution .........................56

  2. *Pennhurst* Does Not Bar the State-Law Claims ...........................57

II. Intervenor States Have Stated a Due Process Claim Under the Federal and Vermont Constitutions. ................................................................58

III. The States Have Stated an Equal Protection Violation under Federal Law and a Violation of the Vermont Common Benefits Clause.................................62

IV. The States have Stated a Dormant Commerce Claim...........................................63

 A. Vermont's Climate Superfund Act Impermissibly Regulates Out-of-State Economic Activities ..........................................................64

 B. The Burden on Interstate Commerce Imposed by Vermont's Climate Superfund Act Clearly Outweighs its Local Benefits ...............................65

 C. The Act Also Violates the Foreign Commerce Clause...............................67

V. The States Have Stated a Claim Under the Excessive Fines Clause. ...............................68

VI. The States have Stated a Claim Under the Federal and Vermont Takings Clauses. ................................................................71

VII. Intervenor States Have Stated a Claim Under the Vermont Constitution's Separation of Powers Clause.................................................74

CONCLUSION................................................................75

# TABLE OF AUTHORITES

**Cases**                                                                                                  **Page(s)**

*A.B. v. S.U.*,
   2023 VT 32, 218 Vt. 123, 298 A.3d 573 .........................................................................58

*Abbott v. Perez*,
   585 U.S. 579 (2018) .........................................................................................................53

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
   458 U.S. 592 (1982)..........................................................................................9, 10, 17, 20

*Altria Grp., Inc. v. Good*,
   555 U.S. 70 (2008).......................................................................................................43, 46

*Am. Elec. Power Co. v. Connecticut* (*AEP*),
   564 U.S. 410 (2011)..........................................................25, 26, 27, 38, 46, 47, 48, 49

*Am. Ins. Ass'n v. Garamendi*,
   539 U.S. 396 (2003)..........................................................................................................40

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)............................................................................................................8

*Arizona v. United States*,
   567 U.S. 387 (2012).........................................................................................................47

*Arkansas-Platte & Gulf P'ship v. Van Waters & Rogers, Inc.*,
   981 F.2d 1177 (10th Cir. 1993) .....................................................................................30

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................................................8

*Athens Sch. Dist. v. Vt. State Bd. of Educ.*,
   2020 VT 52, 212 Vt. 455, 237 A.3d 671 .......................................................................75

*Austin v. United States*,
   509 U.S. 602 (1993)....................................................................................................68, 69

*Bank Markazi v. Peterson*,
   578 U.S. 212 (2016).........................................................................................................62

*Barclays Bank PLC v. Franchise Tax Bd. of Cal.*,
   512 U.S. 298 (1994).........................................................................................................67

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*,
   501 U.S. 1301 (1991) ......................................................................................................54

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)............................................................................................................7

*Bell v. Cheswick Generating Station*,
   734 F.3d 188 (3d Cir. 2013) ......................................................................................28, 51

*Bonaparte v. Appeal Tax Ct. of Baltimore*,
   104 U.S. 592 (1881)....................................................................................................35, 36

*Boyle v. United Techs. Corp.*,
  487 U.S. 500 (1988)................................................25, 27, 31, 32, 34

*Brown v. Daikin Am. Inc.*,
  756 F.3d 219 (2d Cir. 2014) ...........................................................7, 8

*Buckman Co. v. Plaintiffs' Legal Comm.*,
  531 U.S. 341 (2001)......................................................................47

*Buffalo Tchrs. Fed'n v. Tobe*,
  464 F.3d 362 (2d Cir. 2006) ..........................................................71

*Carroll v. Lanza*,
  349 U. S. 408 (1955)......................................................................37

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).........................................................................8

*City of Evansville v. Ky. Liquid Recycling, Inc.*,
  604 F.2d 1008 (7th Cir. 1979) .......................................................30

*City of Hoboken v. Chevron Corp.*,
  45 F.4th 699 (2022) .......................................................................16

*City of Milwaukee v. Illinois*,
  451 U.S. 304 (1981).......................................................................46

*City of New York v. Chevron Corp.*,
  993 F.3d 81 (2d Cir. 2021) ...................................1, 2, 25, 26, 27, 28, 29, 31, 32, 33, 34, 41,
                                                  42, 46, 47, 49, 50, 51, 52, 53

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013).......................................................................21

*Commonwealth Edison Co. v. United States*,
  271 F.3d 1327 (Fed. Cir. 2001) .....................................................59

*Conn. Dep't of Env't Prot. v. OSHA*,
  356 F.3d 226 (2d Cir. 2004) ..........................................................53

*Connecticut v. Cahill*,
  217 F.3d 93 (2d. Cir. 2000) ..............................................9, 24, 57, 58

*Contaner Corp. of Am. v. Franchise Tax Bd.*,
  463 U.S. 159 (1983).......................................................................68

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000)...........................................................49, 67, 68

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019).................................................................13, 15

*Diamond Alt. Energy, LLC v. EPA*,
  145 S. Ct. 2121 (2025)..............................................................10, 11

*District of Columbia v. Trump*,
  141 S. Ct. 1262 (2021)...................................................................19

*District of Columbia v. Trump*,
   291 F. Supp. 3d 725 (D. Md. 2018) ................................................................................. 19

*Douglas ex rel. Douglas v. Hugh A. Stallings, M.D., Inc.*,
   870 F.2d 1242 (7th Cir. 1989) ....................................................................................... 63

*E. Enters. v. Apfel*,
   524 U.S. 498 (1998) ............................................................... 59, 71, 72, 73, 74

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006) ....................................................................................... 53

*English v. Gen. Elec. Co.*,
   496 U.S. 72 (1990) ....................................................................................... 43

*EPA v. EME Homer City Generation*,
   572 U.S. 489 (2014) ....................................................................................... 50

*Erie Railroad Co. v. Tompkins*,
   304 U.S. 64 (1938) ....................................................................................... 25

*Fleet Bank, Nat'l Ass'n v. Burke*,
   160 F.3d 883 (2d Cir. 1998) ....................................................................................... 57

*Franchise Tax Bd. of Cal. v. Hyatt*,
   587 U.S. 230 (2019) ............................................................................... 20, 37

*Gaff v. FDIC*,
   919 F.2d 384 (6th Cir. 1990) ....................................................................................... 31

*Gaff v. FDIC*
   933 F.2d 300 (6th Cir. 1991 ....................................................................................... 31

*Gen. Motors Corp. v. Romein*,
   503 U.S. 181 (1992) ....................................................................................... 58

*Georgia v. Pa. RR. Co.*,
   324 U.S. 439 (1945) ............................................................................... 12, 19

*Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*,
   267 F.3d 1228 (11th Cir. 2001) ....................................................................................... 39

*Hawaii v. Standard Oil Co. of Cal.*,
   405 U.S. 251 (1972) ....................................................................................... 54

*Healy v. Beer Inst.*,
   491 U.S. 324 (1989) ............................................................................... 63, 64, 65

*Hinderlider v. La Plata River & Cherry Creek Ditch Co.*,
   304 U.S. 92 (1938) ............................................................................... 25, 29

*Hoyt v. Sprague*,
   103 U.S. 613 (1881) ............................................................................... 34, 35, 37

*Hudson v. United States*,
   522 U.S. 933 (1997) ....................................................................................... 68

*Huntington v. Attrill,*
    146 U.S. 657 (1892) .......................................................................................35

*Illinois v. City of Milwaukee,*
    406 U.S. 91 (1972) ...................................................................................29, 30

*Image Carrier Corp. v. Beame,*
    567 F.2d 1197 (2d Cir. 1977) ......................................................................13

*In re Gucci,*
    126 F.3d 380 (2d Cir. 1997) ...................................................................13, 14

*In Re Handy,*
    764 A.2d 1226 (Vt. 2000) .................................................................2, 74, 75

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.,*
    725 F.3d 65 (2d Cir. 2013) ....................................................................43, 44

*In re MVP Health Ins. Co.,*
    2016 VT 111, 203 Vt. 274, 155 A.3d 1207 .................................................57

*Int'l Paper Co. v. Ouellette,*
    479 U.S. 481 (1987) .........................................................................28, 49, 51

*Jackson v. Johns-Manville Sales Corp.,*
    727 F.2d 506 (5th Cir. 1984) ..................................................................15, 16

*Japan Line, Ltd. v. County of Los Angeles,*
    441 U.S. 434 (1979) ...............................................................................67, 68

*Kansas v. Garcia,*
    589 U.S. 191 (2020) ...............................................................................43, 48

*Kraft Gen. Foods, Inc. v. Iowa Dep't of Rev. & Fin.,*
    505 U.S. 71 (1992) .................................................................................65, 67

*Kurns v. R.R. Friction Prods. Corp.,*
    565 U.S. 625 (2012) .....................................................................................52

*Landgraf v. USI Film Prods.,*
    511 U.S. 244 (1994) .....................................................................40, 59, 60, 72

*Lowry v. Baltimore & Ohio R.R. Co.,*
    707 F.2d 721 (3d Cir. 1983) .........................................................................30

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ...........................................................................7, 8, 9, 21

*Marsh v. Rosenbloom,*
    499 F.3d 165 (2d Cir. 2007) .........................................................................43

*Maryland v. Louisiana,*
    451 U.S. 725 (1981) ...........................................................3, 11, 17, 18, 19

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) .......................................................................10, 45, 46

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) ........................................................................................21

*Missouri v. Illinois*,
   200 U.S. 496 (1906) ........................................................................................24

*Movsesian v. Victoria Versicherung AG*,
   670 F.3d 1067 (9th Cir. 2012) ..................................................................40, 42

*Murr v. Wisconsin*,
   582 U.S. 383 (2017) ..............................................................................2, 71, 72

*N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*,
   669 F.3d 374 (3d Cir. 2012) ......................................................................30, 31

*N.Y. C.L. Union v. Grandeau*,
   528 F.3d 122 (2d Cir. 2008) ...........................................................................21

*N.Y. Life Ins. Co. v. Head*,
   234 U.S. 149 (1914) .......................................................................................35

*N.Y. Progress & Prot. PAC v. Walsh*,
   733 F.3d 483 (2d Cir. 2013) ...........................................................................54

*N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*,
   612 F.3d 97 (2d Cir. 2010) .............................................................................43

*Nat'l Foreign Trade Council v. Natsios*,
   181 F.3d 38 (1st Cir. 1999) ............................................................................67

*Nat'l Org. for Marriage v. Walsh*,
   714 F.3d 682 (2d Cir. 2013) ...........................................................................21

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
   538 U.S. 803 (2003) ..................................................................................22, 23

*Nat'l Pork Prods. Council v. Ross*,
   598 U.S. 356 (2023) .......................................................1, 2, 35, 36, 37, 38, 64, 65, 66, 67

*Nat'l Shooting Sports Found., Inc. v. James*,
   144 F.4th 98 (2d Cir. 2025) ............................................................................64

*Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*,
   63 F.3d 652 (7th Cir. 1995) ............................................................................64

*New York ex rel. James v. Niagara-Wheatfield Cent. Sch. Dist.*,
   119 F.4th 270 (2d Cir. 2024) ...........................................................17, 18, 19, 20

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015) ...........................................................................54

*New York v. United States Department of Homeland Security*,
   969 F.3d 42 (2d Cir. 2020) ......................................................................13, 15

*NRDC v. NHTSA*,
   894 F.3d 95 (2d Cir. 2018) ......................................................................10, 33

vii

*O'Shea v. Littleton,*
  414 U.S. 488 (1974) ...............................................................................16

*Ohio Forestry Ass'n v. Sierra Club,*
  523 U.S. 726 (1998)...........................................................................23, 56

*Ohio v. EPA,*
  603 U.S. 279 (2024)...............................................................................44

*Ondovchik Fam. Ltd. P'ship v. Agency of Transp.,*
  2010 VT 35, 187 Vt. 556, 996 A.2d 1179 ...........................................2, 71

*Opati v. Republic of Sudan,*
  590 U.S. 418 (2020)...............................................................................59

*Penn Cent. Transp. Co. v. New York City,*
  438 U.S. 104 (1978)...............................................................................71

*Pennhurst State Sch. & Hosp. v. Halderman,*
  465 U.S. 89 (1984).................................................................................57

*Pennsylvania v. West Virginia,*
  262 U.S. 553 (1923)...........................................................3, 11, 12, 21, 22

*Pension Benefit Guar. Corp. v. R.A. Gray Co.,*
  467 U.S. 717 (1984)...............................................................................59

*People of State of N.Y. ex rel. Abrams v. Seneci,*
  817 F.2d 1015 (2d Cir. 1987) ................................................................17

*Peralta-Taveras v. Attorney General,*
  488 F.3d 580 (2d Cir. 2007) ..................................................................36

*Phillips Petroleum Co. v. Shutts,*
  472 U.S. 797 (1985).....................................................................35, 36, 38

*Pike v. Bruce Church, Inc.,*
  397 U.S. 137 (1970)...............................................................................65

*Red Earth LLC v. United States,*
  657 F.3d 138 (2d Cir. 2011) ..................................................................55

*Rhode Island v. Massachusetts,*
  37 U.S. (12 Pet.) 657 (1838) ............................................................24, 58

*Rice v. Santa Fe Elevator Corp.,*
  331 U.S. 218 (1947).....................................................................46, 47, 48

*Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.,*
  547 U.S. 47 (2006)...................................................................................9

*S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exch. Inc.,*
  24 F.3d 427 (2d Cir. 1994) ......................................................................7

*Salinger v. Colting,*
  607 F.3d 681 (2d Cir. 2010) ..................................................................54

*Shelby County v. Holder,*
  570 U.S. 529 (2013) ..................................................................................... 35, 37

*Skiff v. S. Burlington Sch. Dist.,*
  2018 VT 117, 208 Vt. 564, 201 A.3d 969 .................................................... 57

*Sonesta Int'l Hotels Corp. v. Wellington Assocs.,*
  483 F.2d 247 (2d Cir. 1973) ........................................................................ 54

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
  538 U.S. 408 (2003) ................................................................................ 61, 62

*State v. Brunelle,*
  534 A.2d 198 (Vt. 1987) ............................................................................ 2, 62

*State v. King,*
  2016 VT 131, 204 Vt. 228, 165 A.3d 107 ....................................................... 2

*Statharos v. N.Y.C. Taxi & Limousine Comm'n,*
  198 F.3d 317 (2d Cir. 1999) ........................................................................ 53

*Strassheim v. Daily,*
  221 U.S. 280 (1911) ..................................................................................... 38

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) .................................................................... 21, 22, 55, 56

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
  551 U.S. 308 (2007) ....................................................................................... 8

*Tennessee v. Dep't of Educ.,*
  104 F.4th 577 (6th Cir. 2024) .................................................................. 53, 54

*Tex. Indus., Inc. v. Radcliff Materials, Inc.,*
  451 U.S. 630 (1981) ..................................................................................... 25

*Texas v. EPA,*
  829 F.3d 405 (5th Cir. 2016) ....................................................................... 54

*Ticor Title Ins. Co. v. Cohen,*
  173 F.3d 63 (2d Cir. 1999) .......................................................................... 54

*Ting v. AT&T,*
  319 F.3d 1126 (9th Cir. 2003) ................................................................ 43, 44

*Town of Westford v. Kilburn,*
  300 A.2d 523 (Vt. 1973) .............................................................................. 75

*Train v. Nat. Res. Def. Council, Inc.,*
  421 U.S. 60 (1975) ....................................................................................... 44

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ....................................................................................... 9

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) ..................................................................................... 24

*United States v. Bajakajian,*
   524 U.S. 321 (1998) ......................................................................................2, 70

*United States v. Bevans,*
   16 U.S. (3 Wheat.) 336 (1818) ....................................................................1

*United States v. California,*
   921 F.3d 865 (9th Cir. 2019) ................................................................54, 55

*United States v. Locke,*
   529 U.S. 89 (2000) ....................................................................................43, 46

*United States v. Pink,*
   315 U.S. 203 (1942) ....................................................................................1

*United States v. Traficante,*
   966 F.3d 99 (2d Cir. 2020) ......................................................................22, 23

*United States v. Viloski,*
   814 F.3d 104 (2d Cir. 2016) ............................................................68, 69, 70

*Usery v. Turner Elkhorn Mining Co.,*
   428 U.S. 1 (1976) ......................................................................................59, 60

*Util. Air Regul. Grp. v. EPA,*
   573 U.S. 302 (2014) ....................................................................................45

*Uzuegbunam v. Preczewski,*
   592 U.S. 279 (2021) ....................................................................................11, 13

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,*
   535 U.S. 635 (2002) ....................................................................................24

*Village of Waterbury v. Melendy,*
   199 A. 236 (Vt. 1938) ................................................................................74

*VIZIO, Inc. v. Klee,*
   886 F.3d 249 (2d Cir. 2018) ......................................................................65

*Von Saher v. Norton Simon Museum of Art at Pasadena,*
   592 F.3d 954 (9th Cir. 2010) ....................................................................42

*Vt. Home Mortg. Credit Agency v. Montpelier Nat'l Bank,*
   262 A.2d 445 (Vt. 1970) ............................................................................75

*W. Lynn Creamery, Inc. v. Healy,*
   512 U.S. 186 (1994) ....................................................................................64

*Wachovia Bank, N.A. v. Burke,*
   414 F.3d 305 (2d Cir. 2005) ......................................................................43

*Weinberger v. Romero-Barcelo,*
   456 U.S. 305 (1982) ....................................................................................53

*West Virginia v. EPA,*
   597 U.S. 697 (2022) ............................................................................44, 45, 48

*Wheeldin v. Wheeler*,
   373 U.S. 647 (1963)......................................................................................25

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001)......................................................................................44

*WHYY, Inc. v. Borough of Glassboro*,
   393 U.S. 117 (1968)................................................................................2, 63

*Wolff v. McDonnell*,
   418 U.S. 539 (1974)................................................................................2, 58

*World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*,
   694 F.3d 155 (2d Cir. 2012)..........................................................................53

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980)..............................................................................37, 38

*Wyoming v. Oklahoma*,
   502 U.S. 437 (1992)..............................................................................12, 24

*Zschernig v. Miller*,
   389 U.S. 429 (1968)......................................................................................40

## Constitutional Provisions, Rules, Statutes, and Laws

16 Tex. Admin. Code § 3.101.............................................................................37

10 Vt. Stat.
   § 596(2)...................................................................................3, 6, 7, 66
   § 596(4)...............................................................................................12
   § 596(7).............................................................................4, 26, 32, 35, 36
   § 596(8).......................................................................................3, 32, 61
   § 596(9)...............................................................................................12
   § 596(10).........................................................................5, 32, 40, 41, 65, 68
   § 596(12)...............................................................................................4
   § 596(22).......................................................................................4, 39, 65
   § 597(1)........................................................................................4, 5, 38
   § 598(a)(1).............................................................................................5
   § 598(b)...................................................................................4, 5, 26, 52, 74
   § 598(g)(l).............................................................................................5
   § 598(g)(2)(C).........................................................................................5
   § 598(h)................................................................................................6
   § 599(a)................................................................................................6
   § 599a(b)..............................................................................................21
   § 599c...........................................................................................3, 4, 36
   § 599c(1)................................................................................4, 5, 61, 74, 75

42 U.S.C.
   § 7401(a)(3).......................................................................................48, 49
   § 7401(b)(2)...........................................................................................48
   § 7408.............................................................................................44, 48
   § 7409.............................................................................................44, 48

§ 7409(b)................................................................................44, 48
§ 7410....................................................................................44, 48
§ 7410(a)(1)....................................................................26, 44, 48, 50
§ 7410(a)(2)(D)...................................................................44, 48, 50
§ 7410(a)(2)(D)(i)(I)...............................................................44, 48
§ 7410(c)(1).........................................................................44, 48, 50
§ 7411(a)...................................................................................34
§ 7411(d)...................................................................................48
§ 7416..................................................................................26, 28, 51
§ 7475(a)(2)..............................................................................26, 44
§ 7521(a)(1)...............................................................................45
§ 7604(e)...............................................................................28, 51
§ 7607(d)(5)............................................................................26, 44

43 U.S.C. § 1802(1).........................................................................27

Fed. R. Civ. P.
    12(b)(1)...............................................................................7
    12(b)(6)...............................................................................7
    56.....................................................................................8
    56(c)..................................................................................8

U.S. Const.
    art. 1 § 8 cl. 3......................................................................67
    art. 6 cl. 2............................................................................30

Vt. Const. ch. I,
    art. 2....................................................................................56
    art. 4....................................................................................56

Vt. Const. ch II,
    § 2.......................................................................................74
    § 5.......................................................................................74

W. Va. Code § 11-13EE-1 ........................................................18, 37

N.D. Cent. Code § 57-39.2-04.8 ...................................................37

Pub. L. No. 100–204, Title XI, § 1102(6), 101 Stat. 1331, 1408 (1987) .............41, 42

N.Y. Env't Conserv. Law
    § 76-0101(3)........................................................................6, 71
    § 76-0101(9)........................................................................6, 71

**Other Authorities:**

David Barker, *Global Non-Linear Effect of Temperature on Economic Production: Comment on Burke, Hsiang, and Miguel*, 21 Econ J. Watch 35 (Mar. 2024), https://perma.cc/UFZ7-DXJK ..............................................................................38, 39

Michael K. Block, *Optimal Penalties, Criminal Law and the Control of Corporate Behavior*, 71 B.U. L. Rev. 395 (1991) ......................................................17

Expert Report of Joseph Stiglitz, *Juliana v. United States*, No. 6:15-cv-01517 (D. Or. June 28, 2018), ECF 266-1 ..................................................................................................16

C. Boyden Gray, *Climate Realism and A Positive Vision for American Energy*, 21 GEO. J.L. & PUB. POL'Y 149 (2023) ..........................................................................................70

*Hydroelectric Power*, DEP'T OF ENV'T CONSERV., https://perma.cc/XDP5-GA7X .......................66

James Joyce, *Bayes' Theorem*, THE STANFORD ENCYCLOPEDIA OF PHILOSOPHY (Fall 2021), https://perma.cc/65TZ-RPPD ........................................................................................16

Louis Kaplow, *An Economic Analysis of Legal Transitions*, 99 HARV. L. REV. 509 (1986) .........33

Tyler Lindley, *The Constitutional Model of Mootness*, 48 B.Y.U. L. REV. 2151 (2023) ..............16

Memorandum from Jeffrey Bossert Calrk, Sr., Acting Adm'r, Off. of Info. and Regul. Affs. to Regul. Pol'y Officers at Dep'ts and Agencies and Managing and Exec. Dirs. of Comm'ns and Bds. (May 5, 2025), https://perma.cc/E9RR-9JW7 ...................................61

Op. & Order Granting Prelim. Inj., *Connecticut v. U.S. Dep't of the Interior*, No. 3:25-cv-00580 (D. Conn. July 10, 2025), ECF No. 48 .......................................................................53

SAGDP4 Compensation of Employees, Regional Data: GDP and Personal Income, U.S. BUREAU OF ECON. ANALYSIS, https://perma.cc/K9XN-4X7U .......................................................18

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) .............................................................................................................51, 52

Steven Shavell, *Strict Liability versus Negligence*, 9 J. LEGAL STUD. 1 (1980) ...........................15

Telephone Interview with Todd Stern, Special Envoy for Climate Change, U.S. DEP'T OF STATE (Oct. 28, 2015), https://perma.cc/8X4Y-4BRH ..............................................................41

Texas Energy Industry, TEX. ECON. DEV. & TOURISM (Revised Dec. 2022), https://perma.cc/E9L4-DG28 .......................................................................................18

*Texas Oil and Natural Gas Industry Direct Employment and Wages See Continued Growth in 2024*, TEX. OIL & GAS ASS'N (Aug. 29, 2024), https://perma.cc/WJ9B-TK5B ...............18

*The Polluter Pays Principle: Definition Analysis Implementation*, ORG. ECON. CO-PERATION & DEV. (2008) ...............................................................................................................10

Vermont Senate Committee on Judiciary, *Senate Judiciary – 2024-02-28 – 10:00 AM* YOUTUBE (Feb. 28, 2024), https://perma.cc/3E8M-73MB ..............................................10

*Vermont: Profile Analysis*, U.S. ENERGY INFO. ADMIN., https://perma.cc/4T95-DW4B ..............66

Vikramaditya S. Khanna, *Should the Behavior of Top Management Matter?*, 91 GEO. L.J. 1215, (2003) ..........................................................................................................................16

VNRC, *Climate Dispatch: Mar. 29: Senate Climate Priorities with Sen. Alison Clarkson* YOUTUBE (Mar. 29. 2024), https://perma.cc/6UPM-F94U .................5, 6, 69, 71

VT. AGENCY OF NAT. RES., CLIMATE SUPERFUND COST RECOVERY PROGRAM REPORT TO THE GENERAL ASSEMBLY 7 (Jan. 15, 2025), https://perma.cc/9B8D-LH7Z ............................39

Wendy E. Wagner, *The Triumph of Technology-Based Standards*, 2000 U. ILL. L. REV 83 (1999) .............................................................................................48

# INTRODUCTION

Vermont is the first state in the country to pass a law like its Climate Superfund Act. That's no accident. The law directly targets the core of our Nation's energy sector. It retroactively imposes strict liability on companies that have extracted or refined traditional fuels—oil, natural gas, and coal—based on otherwise lawful and important activities going as far back as 30 years ago. And it purports to impose onerous fines on conduct across the country—and even the globe. But because Vermont has no appreciable oil wells, natural-gas deposits, or coal mines, every single demand for payment under the Act will be aimed at out-of-State activity.

Vermont's unprecedented law violates our Constitutional structure. Most obviously, the federal common law of interstate air pollution preempts the Act. After all, the Second Circuit has already held that the same federal common law preempted the City of New York's attempt to sue traditional-fuel producers for contributing to global carbon emissions. *See City of New York v. Chevron Corp.*, 993 F.3d 81, 91–99 (2d Cir. 2021). Repackaging those tort claims into a statutory scheme changes nothing. If anything, Vermont's statutory money grab is even worse, as the Act does not even try to identify actions taken within Vermont that give rise to liability. And by dabbling in *global* emissions regulation, Vermont's Act violates not only the Constitution's structural limitation on extraterritorial regulations but also the Constitution's placement of foreign-affairs authority in the federal government. *United States v. Bevans*, 16 U.S. (3 Wheat.) 336, 386–87 (1818); *see Nat'l Pork Prods. Council v. Ross*, 598 U.S. 356, 376 (2023); *United States v. Pink*, 315 U.S. 203, 232–33 (1942).

Even if the Act did not violate the basic precepts of our federalist structure, the Clean Air Act would independently preempt Vermont's roundabout attempt to commandeer regulation of interstate air pollution. The Clean Air Act creates a comprehensive scheme for the regulation of that pollution. And nowhere does it allow States to apply their own laws to out-of-State activities.

As the Second Circuit has explained, the Clean Air Act allows States to apply State law only to emissions that take place within their own borders. *City of New York*, 993 F.3d at 99. Yet Vermont is trying to do much more.

Because federal law preempts Vermont's Act, this Court should grant summary judgment to the Intervenor State Plaintiffs[1] (hereafter, "the States") on Counts I and II. No further factual development is needed to see that the Act violates federal law. The Court should enjoin enforcement of the law now.

Were that not enough, Vermont's Act is unlawful for other reasons, too. Reaching back decades to attach strict liability to lawful activities is "arbitrary" action that both the Federal and Vermont Due Process Clauses forbid. *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974); *State v. King*, 2016 VT 131, ¶¶ 24–29, 204 Vt. 228, 165 A.3d 107. The Act's extraterritorial reach and disparate treatment of in-State and out-of-State businesses also violate the dormant Commerce Clause doctrine, federal Equal Protection Clause, and Vermont Common Benefits Clause. *See Nat'l Pork Prods. Council*, 598 U.S. at 375–76; *WHYY, Inc. v. Borough of Glassboro*, 393 U.S. 117, 119 (1968); *State v. Brunelle*, 534 A.2d 198, 201 (Vt. 1987). Its massive retroactive liability for lawful—indeed, *encouraged*—conduct violates both the State and federal Takings and Excessive Fines Clauses. *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017); *United States v. Bajakajian*, 524 U.S. 321, 327–28 (1998); *Ondovchik Fam. Ltd. P'ship v. Agency of Transp.*, 2010 VT 35, ¶¶ 13–14, 187 Vt. 556, 996 A.2d 1179. And the Act's grant of unfettered discretion to the State Treasurer to determine how much to exact from the traditional-fuel producers violates Vermont's separation-of-powers clause. *In re Handy*, 764 A.2d 1226, 1230 (Vt. 2000).

---

[1] The Intervenor-Plaintiff States are: Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia, and Wyoming.

Vermont and the Intervenor-Defendants mistakenly argue the States lack standing. But the Supreme Court has rejected these arguments for more than a century. *Pennsylvania v. West Virginia*, 262 U.S. 553 (1923). Among other reasons, the States have standing because Vermont's law will invariably raise the prices of coal, oil, natural gas, and electricity, and the States (along with their citizens) purchase copious amounts of all four. *See Maryland v. Louisiana*, 451 U.S. 725, 737 (1981). Nor can the prudential-ripeness doctrine prevent this Court from deciding these issues now. The Act's text demonstrates that it is unlawful, and no facts outside the scope of this case must be developed to adjudicate the claims.

This Court should grant the States summary judgment on Counts I and II and deny the motions to dismiss in full.

## **BACKGROUND**

Vermont's "Climate Superfund Act," S.259, seeks to impose a to-be-determined penalty—certainly to tally into the billions—on coal, oil, and natural-gas producers. The law, which took effect in July 2024, purports to tie these penalties to emissions released by the use of the producers' products between 1995 and 2024. 10 VT. STAT. § 596(8). And Vermont's statute explicitly establishes "retroactive" liability for actions that were legal when they took place. *Id*. § 599c. Vermont believes it can appropriately impose decades of retroactive liability because traditional-fuel producers supposedly did not possess a "reasonable expectation of avoiding responsibility for th[e] harms" to which they allegedly contributed. Mem. in Supp. of Defs.' Mot. to Dismiss at 71, Doc. 76-1 (Aug. 15, 2025) ("Vermont MTD"). The State will then place money raised from the Act into a slush fund to finance various projects in Vermont. 10 VT. STAT. § 596(2).

3

The Act extracts these funds through a multi-step process. First, the Act "establishe[s] the Climate Superfund Cost Recovery Program" to secure "payments from responsible parties based on a standard of strict liability." *Id*. § 597(1). The "responsible parties" who will have to make these strict-liability "payments" include "any entity" that—between 1995 and 2024—"was engaged in the trade or business of extracting fossil fuel or refining crude oil and" and is deemed to have "attribut[ed] . . . more than one billion metric tons of covered greenhouse gas emissions" during the covered period. *Id*. § 596(22); *see also id.* § 596(12) (defining fossil fuels as "coal, petroleum products, and fuel gases"). "Covered greenhouse gas emissions" are "the total quantity of greenhouse gases released into the atmosphere" between 1995 and 2024 "resulting from the use of fossil fuels extracted or refined by an entity." *Id*. § 596(7). In other words, the Act requires past producers and refiners of fossil fuels to make strict-liability payments based on how much coal, oil, or natural gas they produced.

Next, the State Treasurer will decide how much the affected producers must pay. The Treasurer calculates the total "cost to the State of Vermont and its residents" from "the emission of covered greenhouse gases during the covered period." *Id*. § 598(b); *see also id.* § 599c. That is, the Treasurer must somehow determine how much any emissions between 1995 and 2024 have purportedly cost both the State of Vermont and people living in it, both in the past and in the future. Harms caused by emissions before 1995 must be (somehow) excluded from the calculation. In tallying these costs, the Treasurer must consider "effects on public health, natural resources, biodiversity, agriculture, economic development, flood preparedness and safety, [and] housing." *Id*. § 599c(1). In addition to these mandatory criteria, the Treasurer may also include "any other effect that" he "determines is relevant[.]" *Id.*

After the State Treasurer has decided on a figure, the Act requires each "responsible party" to pay to the State a corresponding percentage of the total cost to Vermont and its residents of the that entity's emissions. *Id*. §§ 597(1), 598(a)(1), (b), 599c. For example, if an entity is responsible for 5% of the "covered greenhouse gas emissions" between 1995 and 2024, it will be forced to pay 5% of the Treasurer's calculation of the cost of climate change to Vermont and its residents. The payments are made on a "strict liability" basis without any determination of wrongdoing. *Id*. § 597(1). Vermont's legislature has declared by fiat that the producers of traditional fuels knew by 1995 that climate change was harming the State, so they should have expected to be held liable for those harms. *See* Vermont MTD at 4, 71.

Once the State issues a "cost recovery demand," a responsible party must either pay the demand in full within six months, 10 VT. STAT. § 598(g)(l), or make nine annual installments supplemented by "reasonable interest," *id.* § 598(g)(2)(C). Either way, covered energy producers must start paying huge amounts of money (and passing those costs along to their customers) shortly after receiving notice.

These required payments are not limited to activities that took place in Vermont. Rather, the Act makes energy producers strictly liable for greenhouse-gas emissions no matter where the fossil fuels were produced or consumed. The Act does not require the State to show that the covered parties themselves produced any harm in Vermont; it's assumed. § 598(b). Because no affected producers are based in Vermont, the law only concerns out-of-state conduct and out-of-state actors. Indeed, the Act expressly contemplates that the State will seek payments from American-based companies *and* from "foreign nation[s]." *Id*. § 596(10).

What's more, although Vermont is yet to issue the cost recovery demands, they will range in the billions of dollars. As told by the Vermont Senate Majority Leader, "it's gonna cost a bomb.

Billions and billions of dollars." VNRC, *Climate Dispatch: Mar. 29: Senate Climate Priorities with Sen. Alison Clarkson* at 3:50-57, YOUTUBE (Mar. 29. 2024), https://perma.cc/6UPM-F94U. For example, the only other State that has enacted a climate superfund statute, New York, has set its demands at $75 billion. N.Y. ENV'T CONSERV. LAW § 76-0101(3), (9). Although New York chose to quantify its financial demand up front, there is no reason to suspect that Vermont's demands would be any less massive, at least on a per capita basis. Additionally, Intervenor-Defendants have noted that Vermont purportedly faces over $5 billion in flood-related costs alone over the next century. Mem. in Supp. of Int.-Defs.' Mot. to Dismiss at 3, Doc. 84-1 (Aug. 22, 2025) ("Int.-Defs.' MTD").

Vermont will use the money it extracts from so-called responsible parties to finance public projects and pay private citizens. "The Agency [of Natural Resources] shall deposit cost recovery payments collected under this chapter to the Climate Superfund Cost Recovery Program Fund." 10 VT. STAT. § 598(h). The "Climate Superfund Cost Recovery Program" the Act creates is "administered by the Secretary of Natural Resources" to "provide funding for climate change adaptation projects in the State." *Id.* § 599(a). A climate-change adaptation project is any expenditure purportedly related to climate change in even the most distant way, including:

> a project designed to respond to, avoid, moderate, repair, or adapt to negative impacts caused by climate change and to assist human and natural communities, households, and businesses in preparing for future climate-change-driven disruptions[,] … includ[ing] implementing nature-based solutions and flood protections; home buyouts; upgrading stormwater drainage systems; making defensive upgrades to roads, bridges, railroads, and transit systems; preparing for and recovering from extreme weather events; undertaking preventive health care programs and providing medical care to treat illness or injury caused by the effects of climate change; relocating, elevating, or retrofitting sewage treatment plants and other infrastructure vulnerable to flooding; installing energy efficient cooling systems and other weatherization and energy efficiency upgrades and retrofits in public and private buildings, including schools and public housing, designed to reduce the public health effects of more frequent heat waves and forest fire smoke; upgrading parts of the electrical grid to increase stability and resilience, including

supporting the creation of self-sufficient microgrids; and responding to toxic algae blooms, loss of agricultural topsoil, crop loss, and other climate-driven ecosystem threats to forests, farms, fisheries, and food systems[.]

*Id.* § 596(2).

## PROCEDURAL POSTURE

In December 2024, Plaintiffs Chamber of Commerce and American Petroleum Institute sued Defendants to enjoin enforcement of the Climate Superfund Act. The Court later granted the States leave to intervene, and they filed their complaint in May 2025. That same day, the United States filed a separate suit, and the two cases were later consolidated. In late June 2025, Defendant-Intervenors Northeast Organic Farming Association of Vermont and Conservation Law Foundation were granted leave to intervene.

Both sets of Defendants have moved to dismiss each of the complaints for a lack of jurisdiction and a failure to state a claim. *See* FED. R. CIV. P. 12(b)(1), (6). The States now move for summary judgment on Counts I and II of their complaint.

## LEGAL STANDARD

### Motion to Dismiss

A court must dismiss a complaint under Federal Rule of Civil Procedure 12(b)(1) if the court lacks subject-matter jurisdiction. If all Plaintiffs lack standing, there is no subject-matter jurisdiction. *See S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exch. Inc.*, 24 F.3d 427, 431 (2d Cir. 1994). When determining whether a plaintiff has standing, the court will credit the allegations in the complaint as true and ask whether they plausibly establish that the plaintiff has standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Under Rule 12(b)(6), a complaint also must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

7

reasonable inference that the defendant is liable for the misconduct alleged." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 225 (2d Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court takes factual allegations as true, *see Lujan*, 504 U.S. at 555–56, but "legal conclusions" are not entitled to the same presumption, *Ashcroft*, 556 U.S. at 678. In addition to the facts in the complaint, the district court can also rely on materials that are judicially noticeable. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

**Motion for Summary Judgment**

A plaintiff will be entitled to summary judgment if there is no genuine dispute of material fact, and the plaintiff is entitled to judgment as a matter of law. FED. R. CIV. P. 56. A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is genuine if a reasonable jury "could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, the Court can rely on "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

**THE STATES ARE ENTITLED TO
SUMMARY JUDGMENT ON COUNTS I AND II**

This Court should grant the States summary judgment on Counts I and II of their complaint. They have standing to sue because the Act will cause harm to the States' own pocketbooks and injure their citizens. And their claims are ripe because the Act is inconsistent with the federal common law, the structure of our Constitution, and the Clean Air Act—no matter how Vermont chooses to specifically implement it. Now is the time to decide this case, and the States are entitled to an injunction against enforcement of the Act.

I.       **The States' Claims Are Justiciable**

A.  **The States Have Standing to Sue**

The Intervenor-Defendants—and only the Intervenor-Defendants—challenge the States' standing. Because only one plaintiff needs to have standing for each form of relief sought, *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006), the Court need not even address this argument if it decides that the United States or the associational Plaintiffs have standing. But if the Court does reach the issue, then the States plainly have standing, too.

To establish standing, a plaintiff must demonstrate that: (1) it has "suffered an injury in fact that is concrete, particularized, and actual or imminent;" (2) "the injury was likely caused by the defendant;" and (3) "the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan*, 504 U.S. at 560–61). Intervenor-Defendants challenge only the States' injury in fact. A State can typically show an injury in fact in three different ways. The State can bring "(1) proprietary suits in which the State sues much like a private party . . .; (2) sovereignty suits . . .; or (3) *parens patriae* suits in which States litigate to protect 'quasi-sovereign' interests." *Connecticut v. Cahill*, 217 F.3d 93, 97 (2d. Cir. 2000) (citations omitted). Any one of these three injuries is sufficient to proceed.

The States have standing in each of these capacities. Vermont's worldwide strict-liability scheme based on the extraction of traditional fuels will raise costs to consumers, *see id.*, and the States are large consumers of traditional fuels and the electricity they generate. The States will thus suffer a pecuniary harm in their capacity as proprietors. Likewise, the citizens of the States purchase energy, and the States can sue in a *parens patriae* capacity to stop the harm Vermont is inflicting on their citizens. *Parens patriae* standing likewise lies because Vermont seeks to deny Intervenor States their "rightful status within the federal system" by attempting to extend its

jurisdiction into the States' territory. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 606–08 (1982). Relatedly, the States have standing because the Act directly infringes their sovereignty by regulating conduct that occurred within their own borders. When considering each type of standing, this Court must give States "special solicitude." *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). This requirement is especially strong in interstate disputes because the "sovereign prerogatives" that States possessed before entering into the Constitution were surrendered to the federal government upon entering that compact. *Id.* at 519. Thus, States cannot "invade" each other to cease unlawful (or, as here, lawful) activity or "negotiate an emissions treaty" with each other or foreign nations. *Id.*

### 1. Plaintiff States Are Vindicating Their Proprietary Interests.

The Act's cost recovery demands will raise the price of coal, oil, natural gas, and electricity, depressing production and consumption. *See, e.g.*, *Diamond Alt. Energy, LLC v. EPA*, 145 S. Ct. 2121, 2134 (2025) (explaining that "'predictable' . . . effects of government action" give rise to standing on a pecuniary-harm theory). As the Second Circuit has explained, "basic economics ... tell us that the increased cost of ... conduct," such as producing traditional fuels, "will make that conduct less common," i.e., reduce output. *NRDC v. NHTSA*, 894 F.3d 95, 105 (2d Cir. 2018). The Act does just that by imposing additional costs on the extraction and eventual burning of traditional fuels through a "polluter pay" model. Vermont Senate Committee on Judiciary, *Senate Judiciary – 2024-02-28 – 10:00 AM* at 1:14–35, 2:06–12, YOUTUBE (Feb. 28, 2024) (statement of Attorney General Charity Clark), https://perma.cc/3E8M-73MB. Such an approach forces emitters to internalize the purported costs of climate change and thus disincentivize emitting greenhouse gases. *See The Polluter Pays Principle: Definition Analysis Implementation* at 16, ORG. ECON. CO-OPERATION & DEV. (2008) (explaining that the Polluter Pays principle "provide[s] a continuing incentive for improved pollution abatement"). The downstream effects on consumers, including

States, are sufficient to satisfy an injury in fact. *Cf. Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021) (explaining that even nominal damages are sufficient for standing purposes).

The Supreme Court has had little trouble concluding that States can sue when other States have attempted to disrupt energy markets in a manner that will cause pecuniary harm. In *Maryland v. Louisiana*, a group of States and the federal government challenged a tax imposed on pipeline companies by Louisiana. 451 U.S. 725 (1981). The Louisiana tax required a payment of "seven cents per thousand cubic feet of natural gas" that traveled through Louisiana on its way to other States "to reimburse the people of Louisiana" for damage to "waterbottoms barrier islands[] and coastal areas" caused by the collection of such gas off the Louisiana shore. *Id.* at 731–32. As a defendant, Louisiana argued "that th[e] case should be dismissed for want of standing because the Tax is imposed on the pipeline companies" and not the States challenging the tax. *Id.* at 736. Although the plaintiff States in that case were not the subject of the tax, the tax could be "passed on to" the States, who were "substantial consumers of natural gas." *Id.* at 736–37. And because the States would end up paying more in energy costs, they had standing to challenge the tax despite not being directly obligated to pay it. *Id.*; *see also Diamond Alt. Energy*, 145 S. Ct. at 2136–37 (explaining that nonregulated entities can sue over harmful effects of a law).

This case is no different. The States' "public institutions and governmental agencies . . . long have been and now are using" energy resources like coal, oil, and natural gas. *Pennsylvania*, 262 U.S. at 583–84. For example, West Virginia spends nearly 10 million dollars on fuel for the "State[s] transportation needs" every year. Statement of Undisputed Materials Facts ¶ 21. Other States spend similar amounts. *See id.* ¶ 43 (Georgia spending ~$43 million); *id.* ¶ 46 (South Carolina spending $5 million on gas). And States can sue "as the proprietor of various public institutions" that may be harmed by another State's meddling in fuel markets, and "as the

11

representative of the consuming public" who would be harmed by the same. *Pennsylvania*, 262 U.S. at 591.

Pecuniary standing in this case is even easier than *Maryland v. Louisiana* and *Pennsylvania v. West Virginia*. The States had standing in those cases even though "[t]here [we]re substitute fuels to which the economy of a State might be adjusted" to compensate for the marginally increased price of natural gas. *Georgia v. Pa. RR. Co.*, 324 U.S. 439, 451 (1945); *Pennsylvania*, 262 U.S. at 592 ("To substitute another form of fuel will involve very large public expenditures."). Here, Vermont doesn't just seek to punish producers of natural gas, as in the previous cases. They have also sought to punish producers of coal and oil, 10 Vt. Stat. § 596(4), (9), limiting the States' ability to compensate with other traditional fuels and forcing them to spend additional resources on the kind of alternative resources that Vermont produces and prefers. Those alternative resources are imperfect substitutes, in part because they do not provide the consistency of traditional baseload sources.

Beyond suffering pecuniary harm from the increased price of energy and resources, the States also have standing based on their impending loss of tax revenue. A State has standing when the statute of another causes the "loss of specific tax revenues[.]" *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992). Vermont's Act will inevitably cause the States to lose money from their severance taxes. As explained in the complaint, severance taxes are taxes levied on natural resources exported out of the State. Compl. in Intervention ¶ 54, Doc. 31 (May 7, 2025) ("Intervenor's Compl."). These taxes make up significant sources of income for many of the States. For example, West Virginia brought in around $700 million in severance taxes in 2022. *Id.* ¶¶ 54, 60. Texas brought in $6 billion in severance taxes on oil alone in 2022. *Id.* ¶ 72. When costs for producers go up

because of Vermont's Act, consumption and production will decline. When production drops, severance taxes will drop.

The Second Circuit has held that States have standing to challenge far more attenuated harms. In *New York v. United States Department of Homeland Security*, States (including Vermont) challenged a Department of Homeland Security rule that would have allegedly deterred aliens from seeking public benefits. 969 F.3d 42 (2d Cir. 2020). The Second Circuit held that States could sue because the rule would disincentivize aliens to apply for public benefits, even if they remained eligible under the new DHS rule. And because federal aid dollars are tied to the usage of public benefits, a smaller number of aliens using such benefits would "decreas[e] federal transfer payments to the states, reduc[e] Medicaid revenue, increase[e] overall healthcare costs, and caus[e] general economic harm." *Id.* at 59. These indirect but "predictable effect[s]" on State revenue—"establish[ed] standing" to challenge the DHS rule. *Id.* (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)).

Vermont's Act will deplete the capital reserves of coal, oil, and natural gas producers, which will predictably reduce capital investment and raise energy prices. The predictable cause-and-effect outcomes of national economic policy are enough injury for Article III standing. *See Dep't of Com.*, 588 U.S. at 768; *Cf. Uzuegbunam*, 592 U.S. at 292 (explaining that even nominal damages are sufficient for standing purposes). It would be a sufficient injury even for a private plaintiff—but recall that States enjoy a *lower* standing threshold because courts are supposed to grant them "special solicitude." *See, e.g.*, *Image Carrier Corp. v. Beame*, 567 F.2d 1197, 1201 (2d Cir. 1977) (recognizing "indirect" "loss of business" as an "injury in fact … 'fairly traceable to the defendant's acts or omissions'" (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,

429 U.S. 252, 261 (1977))); *In re Gucci*, 126 F.3d 380, 388 (2d Cir. 1997) ("'[I]njury in fact' . . . does not . . . require direct effect." (citation omitted)).

Defendant-Intervenors and their amici do not appear to disagree with much of the above legal analysis. Instead, they attack standing on a factual basis, arguing that the Vermont Climate Superfund Act will not influence the producers' decisions and thus not change the price of coal, natural gas, oil, or energy. Int.-Defs.' MTD at 8–9. They reason that the Climate Superfund Act will not raise prices because—as a purely retroactive fixed cost—it will not change the marginal cost or marginal revenue per unit of traditional fuel produced. *See id.*; Brief of Economists as Amici at 1, 10–12, Doc. 89 (Aug. 26, 2025). This argument is flawed.

To begin with, the Act will alter future prices even though cost recovery demands are retrospective. Vermont's own justification for enacting the Act explains why. Vermont's self-declared motivation for imposing costs on the traditional fuel producers reaching back 30 years is that "by 1995, there was no serious debate that fossil fuels were a primary contributor to anthropogenic global warming, and that fossil fuel companies knew this to be the case." Vermont MTD at 4. Thus, producers had no "reasonable expectation of avoiding responsibility for th[e] harms" caused between 1995 and 2024. *Id.* at 71. In other words, the State of Vermont's position is that traditional-fuel producers knew they were contributing to a worsening of the climate and knew that they would be held liable for such harms.

If Vermont maintains that entities who contribute to climate change should know that they are going to be held liable for their contribution, then rational producers will not treat the Act as a fixed cost. Producers of traditional fuels will be engaging in the same activities in 2025 and beyond as those on which Vermont imposed liability for the time between 1995 and 2024. And Vermont believes they should expect to be held liable on a pro rata basis. *Id.* at 4, 71. Thus, rational

14

producers will take Vermont at its word and include the prospect of cost recovery demands as a marginal cost of producing coal, oil, or natural gas going forward.

Indeed, the affidavit on behalf of an Exxon Mobil executive affidavit shows that producers of traditional fuels do intend to account for cost recovery demands when making future decisions. As the Exxon Mobil Senior Director of Climate Strategy and Technology explained, the Vermont Act will have "notable consequences" on "projects" and "planning" for the company. Decl. of Vijay Swarup ¶ 27, Doc. 100-6 (Sep. 11, 2025). When Exxon, or any other producer, is forced to pay billions in cost recovery demands, "that payment would have to come from somewhere" else, altering the business decisions related to "capital investments, production volumes, planning, prices, contracts, and personnel." *Id*. Thus, not only would the logic behind Vermont's Act lead a rational decisionmaker to raise prices, reduce production, and reallocate capital, but those very rational actors have also *told the Court themselves* that they will need to account for the cost recovery demands when making future decisions.

If there are any doubts about standing, the Second Circuit's decision in *New York v. Department of Homeland Security* once again resolves them. There, the Second Circuit explained that States have standing even when "predictable" actions of third parties are nonetheless "illogical or unnecessary." *New York*, 969 F.3d at 59; *see also Dep't of Com.*, 588 U.S. at 768. Especially considering the Act's strict liability approach, it is certainly "predictable" that traditional fuel producers would account for cost-recovery demands. Steven Shavell, *Strict Liability versus Negligence*, 9 J. LEGAL STUD. 1, 3 (1980) (explaining how a strict-liability regime will induce producers to change the "product price" to "reflect … losses"); *see also Jackson v. Johns-Manville Sales Corp.*, 727 F.2d 506, 526–27 (5th Cir. 1984) (declining to impose punitive damages because, in part, "[t]he anticipation of multiple litigation for compensation damages serves … as an

effective deterrent to future illicit conduct" and explaining that "strict liability provides the impetus for manufacturers to take affirmative steps to ensure the safety of their products"). Even if such a response was not wholly rational (which it is), that fact would be insufficient to defeat standing.

An amicus brief[2] from a group of economists tries to fill in the gaps of the Intervenor-Defendants' position, but it fails for largely the reasons described above. The economists' brief mistakenly asserts that the Climate Superfund Act will be treated by the traditional-fuel producers as a fixed cost without examining how the rationale for the Act will alter producers' future expectation. But the economists' amicus brief fails to account for Bayes' theorem of conditional probability. *See generally* James Joyce, *Bayes' Theorem*, THE STAN. ENCYC. OF PHIL. (Fall 2021), https://perma.cc/65TZ-RPPD. Bayes' theorem presumes that a rational decisionmaker will account for the occurrence of past events (and what caused them) when determining the likelihood of future events. *See, e.g.*, Tyler Lindley, *The Constitutional Model of Mootness*, 48 BY.U. L. REV. 2151, 2163–66 (2023) (explaining how Bayes' theorem motivates some justiciability doctrines); *cf. also O'Shea v. Littleton*, 414 U.S. 488, 496 (1974) (explaining that past actions "are evidence bearing on whether there is a real and immediate threat of" future actions). "Even those corporations that are not held liable know that they face some risk of a sanction … The added risk of greater liability is then reflected in product prices." Vikramaditya S. Khanna, *Should the Behavior of Top Management Matter?*, 91 GEO. L.J. 1215, 1243 (2003). Applying Bayes' theorem to the actions of the traditional-fuel producers in this case is simple. Because Vermont has attempted to hold

---

[2] Although the brief was ostensibly in support of neither party, each of the economists who signed onto the brief is engaged in one type of climate activism or another. So it is unsurprising that their brief came to its flawed conclusions. For example, the lead economist on the brief, Joseph Stiglitz, is a routine player in climate-change litigation and even wrote a pro bono expert report in support of an ill-fated attempt to have a federal district court in Oregon commandeer the entire federal government to reduce carbon emissions. *See* Expert Report of Joseph Stiglitz, *Juliana v. United States*, No. 6:15-cv-01517 (D. Or. June 28, 2018), ECF 266-1. Likewise, counsel for amici also represents cities, such as Hoboken, who are bringing the exact kind of tort suit that the Second Circuit rejected in *City of New York*. *See, e.g.*, *City of Hoboken v. Chevron Corp.*, 45 F.4th 699 (2022).

producers liable for their past emissions once, Bayes' theorem (and plain-old common sense) indicates that Vermont will still blame them for their post-2025 emissions, and so a rational producer will anticipate future liability for greenhouse-gas contributions and account for the cost-recovery demands in its pricing models. *See, e.g.*, Michael K. Block, *Optimal Penalties, Criminal Law and the Control of Corporate Behavior*, 71 B.U. L. Rev. 395, 402 (1991) ("Excessive fines, designed to punish corporations, will more likely than not hurt consumers by requiring an excessive increase in prices as well as an excessive diversion of resources to prevention activities.").

### 2. Intervenor States can sue parens patriae.

A State has "*parens patriae* standing" to sue for "an injury to [its] general economy." *People of State of N.Y. ex rel. Abrams v. Seneci*, 817 F.2d 1015, 1017 (2d Cir. 1987). That is because "a state has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son*, 458 U.S. at 607. To establish *parens patriae* standing, a State usually "must establish (1) an injury to a sufficiently substantial segment of the state's population; (2) a quasi-sovereign interest; and (3) an inability for individual plaintiffs to obtain complete relief." *New York ex rel. James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 279 (2d Cir. 2024) (cleaned up). A State can also establish *parens patriae* standing when it is "discriminatorily denied its rightful status within the federal system." *Alfred L. Snapp & Son*, 458 U.S. at 607.

Here, the injury to a "substantial" portion of the States' populations is clear. *Id.* As explained above, the Climate Superfund Act will impose huge costs on fuel producers, which will in turn be passed along to consumers in the States. *See Maryland*, 451 U.S. at 739 ("[A] great many citizens in each of the plaintiff States are themselves consumers of natural gas and are faced

with increased costs."). It cannot seriously be argued that the portion of the States' populations that rely on coal, oil, and natural gas is "[in]sufficiently substantial." *Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th at 280. As explained in the declarations from the States, their citizens use substantial amounts of traditional fuels to power their lives. For example, the citizens of Florida in 2023 consumed 362,207,000 barrels of petroleum, 1,635 billion cubic feet of natural gas, and 5,500,000 short tons of coal. Decl. of Mark Futrell ¶ 2 (Sep. 12, 2025). Likewise, Idaho's citizens "spen[d] $5.978 billion to consume 37 million barrels of petroleum, $1.105 billion to consume 151 billion cubic feet of natural gas, and $5 million to consume 49 thousand short tons of coal." Decl. of Kenneth Huston ¶ 4 (Sep. 8, 2025). For the sake of brevity, this brief will not highlight every single State's expenditure, but as the Statement of Undisputed Material Facts and accompanying affidavits show, they are substantial.

Beyond this consumer-side injury, many of the States here place traditional energy sources at the center of their economies. West Virginians working in oil and gas extraction and pipeline transportation alone brought in $391 million in compensation in 2023. SAGDP4 Compensation of Employees, Regional Data: GDP and Personal Income, U.S. BUREAU OF ECON. ANALYSIS, https://perma.cc/K9XN-4X7U; *see also* W. VA. CODE § 11-13EE-1 ("encourag[ing] capital investment in the coal industry in this state and thereby increas[ing] economic development"). And, for example, traditional fuels support over "1.37 million Texas jobs" alone. Texas Energy Industry at 1, TEX. ECON. DEV. & TOURISM (Revised Dec. 2022), https://perma.cc/E9L4-DG28. In the first quarter of 2024, "industry wages eclipsed $20.8 billion." *Texas Oil and Natural Gas Industry Direct Employment and Wages See Continued Growth in 2024*, TEX. OIL & GAS ASS'N (Aug. 29, 2024), https://perma.cc/WJ9B-TK5B. So when a state targets a particular industry—say, coal or oil—then that targeting can give rise to a parens patriae injury. The loss of capital

investment and jobs harms enough people to support *parens patriae* standing wholly aside from the pass-through of increased prices to the citizens of the States. *Cf. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th at 283–84; *District of Columbia v. Trump*, 291 F. Supp. 3d 725, 748 (D. Md. 2018), *vacated as moot*, 141 S. Ct. 1262 (2021) (Mem.) (concluding that States had *parens patriae* standing to protect their hospitality industry).

These harms are the kind of "quasi-sovereign" interest that supports *parens patriae* standing. For example, the Supreme Court allowed Georgia to sue the Pennsylvania Railroad Company on an antitrust theory because the antitrust conspiracy could "limit[] the opportunities of her people, shackle[] her industries, retard[] her development, and relegate[] her to an inferior [sic] economic position among her sister States." *Pa. R.R. Co.*, 324 U.S. at 450–51. These harms were "matters of grave public concern in which Georgia ha[d] an interest apart from that of particular individuals who may be affected." *Id.* at 451. Even more on point is the Supreme Court's explanation that a quasi-sovereign interest lies when a State seeks to "protect[] its citizens from substantial economic injury presented by imposition" of a tax on natural gas. *Maryland*, 451 U.S. at 739. In the simplest of terms, the widespread economic harm caused by the Vermont Climate Superfund Act is the exact kind of quasi-sovereign harm that *parens patriae* exists to address. It will both "limit[] the opportunities" of the States' citizens by harming the traditional-fuel industry upon which the States rely, *Pa. R.R. Co.*, 324 U.S. at 451, and it will pass along an "economic injury" to their citizens in the form of higher prices. *Maryland*, 451 U.S. at 739. Nor is this the kind of case where "individual consumers" could be "expected to litigate" on their own behalf. *Id.* Much like in *Maryland v. Louisiana*, the amount that each citizen will pay will be "relatively small," *id.*, disincentivizing individual suits to recoup each citizen's loss.

19

"Distinct from . . . the general well-being of its residents, the State has an interest in securing observance of the terms under which it participates in the federal system." *Alfred L. Snapp & Son*, 458 U.S. at 607–08. Thus, a State will have *parens patriae* standing whenever it is "discriminatorily denied its rightful status within the federal system." *Id.* at 607. Such discrimination itself inflicts an injury to a "sufficiently substantial segment of the state's population," infringes on a State's sovereignty, and cannot be remedied solely by private suits. *Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th at 280.

Intervenor States have properly alleged that Vermont's Act denies them their "rightful status within the federal system." *Alfred L. Snapp & Son*, 458 U.S. at 607. When entering the Union, States gave up their ability to defend their interests through the use of "traditional diplomatic and military tools." *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 245 (2019). In exchange, the new federal Constitution guaranteed the States both equal treatment as sovereigns and provided the federal courts as a place to resolve disputes between them. *See id.* at 241. Thus, when a State attempts to apply its own law where the federal common law is supreme, expand its jurisdiction beyond its own borders, or regulate in a preempted field, for example, it denies its coequal State their "rightful status" in our federal system and repudiates "the terms under which [States] participate[]" in that system. *Alfred L. Snapp & Son*, 458 U.S. at 607–08. States have *parens patriae* standing as an alternative to "diplomatic and military tools." *Franchise Tax Bd.*, 587 U.S. at 245.

### B.  The States' Claims are Ripe for Adjudication.

Each count the States bring is also ripe for adjudication. Neither the doctrine of Article III ripeness nor its cousin, prudential ripeness, prevents this Court from adjudicating whether the Vermont Climate Superfund Act is lawful.

20

1. **Constitutional Ripeness**

"[T]he best way to think of constitutional ripeness is as a specific application of the actual injury aspect of Article III standing." *Nat'l Org. for Marriage v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013). A claim that a plaintiff's injury is not ripe boils down to the assertion that it is "not 'actual or imminent,' but instead 'conjectural or hypothetical.'" *Id.* (quoting *Lujan*, 504 U.S. at 560–61). Thus, the injury-in-fact inquiry and the constitutional ripeness inquiry "overlap." *N.Y. C.L. Union v. Grandeau*, 528 F.3d 122, 130 n.8 (2d Cir. 2008); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007). To establish that a future harm is not "conjectural or hypothetical," *Nat'l Org. for Marriage*, 714 F.3d at 688 (quoting *Lujan*, 504 U.S. at 560–61), a party bringing a pre-enforcement challenge must show that "there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013).

There's more than a "substantial risk" that Vermont's Act will harm the States—it is statutorily guaranteed. The Act requires the Agency of Natural Resources to issue cost recovery demands by 2028 and does not leave the agency any discretion to decline to do so. 10 Vᴛ. Sᴛᴀᴛ. § 599a(b). All the material terms are found in the Act: the types of producers subject to fines, the manner in which fines will be calculated, and the consequences of those calculations. And Vermont has never suggested some surprise avenue by which it will *not* impose liability on the targeted industries.

In this respect, the ripeness inquiry largely approximates *Pennsylvania v. West Virginia*. There, West Virginia adopted a law requiring that natural gas be supplied to West Virginia before being supplied out-of-state to Pennsylvania and Ohio, who sued to enjoin the law. West Virginia argued the suit was "brought prematurely" because "[n]o order under [the Statute] had been made

by the Public Service Commission" of West Virginia, nor had the act "been tested in actual practice." *Pennsylvania*, 262 U.S. at 592–93. But the Supreme Court recognized that the act there set out a course of action which would harm Pennsylvania and Ohio. *Id.* Thus, their injury was "certainly impending," and a claim to enjoin enforcement of the act was ripe. *Id.* This suit is indistinguishable. Although Vermont has not yet enforced the Climate Superfund Act or issued regulations to enforce it, the Act violates federal law on its face, obviating the need for further development before a challenge can be brought.

### 2. Prudential Ripeness

In addition to Article III's requirement that a claim be constitutionally ripe, the Supreme Court has crafted a non-constitutional prudential-ripeness doctrine. *See Susan B. Anthony List*, 573 U.S. at 158. To determine if a case is prudentially ripe, a court must examine (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding" review. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). If a claim is not fit for decision and the plaintiff would not suffer any hardship from withholding review, then the court may decline to hear it. Because the prudential-ripeness doctrine is in "tension" with the federal courts' "virtually unflagging" "'obligation to hear and decide' cases within its jurisdiction," courts apply it narrowly. *Susan B. Anthony List*, 573 U.S. at 167 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S 118, 125–26 (2014)).

Whether the issues are "fit for judicial consideration" depends on whether they are a "purely legal question" that can be resolved immediately or whether the issues in the suit turn on "factual disputes 'beyond the prescience of [the] court,'" *United States v. Traficante*, 966 F.3d 99, 106 (2d Cir. 2020) (quoting *United States v. Balon*, 384 F.3d 38, 46 (2d Cir. 2004)). Here, each of

the relevant questions turn on purely legal disputes that can be decided without any additional factual development.

The States have moved for summary judgment on two counts that do not turn on any factual questions "beyond the prescience of [the] court." *Id.* (quoting *Balon*, 384 F.3d at 46). They involve high-level questions about the relationship between federal common law, principles of structural federalism, and the Clean Air Act. No additional factual development is needed to decide this kind of purely legal question.

Defendant-Intervenors raise a handful of purported factual issues that they believe muddy the waters. For example, they assert that this case cannot be decided until Vermont declares which entities will be subject to cost recovery demands, the total amount of money demanded, and the apportionment of the costs amongst traditional-fuel producers. Int.-Defs.' MTD at 18–19. But none of these facts prevent this Court from deciding whether the Climate Superfund Act's attempt to impose liability on the out-of-State production of traditional fuels is preempted by either the Constitution, federal common law, or the Clean Air Act. The answers to those legal questions do not turn on which particular producers will fall victim to the Act. Some *will*, and that's enough to cause sovereign and pecuniary injury *now*.

The States will also suffer hardship without review. *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808. The Supreme Court has explained that inflicting "practical harm upon the interests" of the plaintiff is sufficient to satisfy this prong. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). As explained above, the practical effect of Vermont claiming that traditional-fuel producers are responsible for greenhouse-gas emissions will be to increase the price of these resources and the energy they create. These increased prices will immediately harm the States and their citizens without any way to recoup the losses.

### C.  The States Possess a Cause of Action

Defendant-Intervenors claim that both the States and the United States lack a cause of action to sue. Int.-Defs.' MTD at 15. But equity allows injured parties to sue for equitable relief when a State officer violates federal law, whether it be constitutional, statutory, or federal common law. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43, 645–46 (2002). And the Supreme Court has allowed States to "pursu[e] the same declaratory and injunctive relief that a private plaintiff might have sought in an action grounded on *Ex parte Young*." *Cahill*, 217 F.3d at 98; *see Wyoming v. Oklahoma*, 502 U.S. 437, 451–52 (1992). Putting these two points together, the States can sue Vermont's officers to enjoin their unlawful activities just like private parties can.

Defendant-Intervenors nonetheless argue that the States cannot sue because "the federal courts have only such equitable authority as was 'traditionally accorded by courts of equity' at the time of our founding." Int.-Defs.' MTD at 16 (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 856 (2025)). Fair enough, but the Supreme Court in *CASA* also explained that suits under *Ex parte Young* were consistent with this history-focused inquiry. *CASA*, 606 U.S. at 846 n.9. And this circuit allows *Ex parte Young* suits to be brought by States in the same manner as *Ex parte Young* suits by private individuals. *Cahill*, 217 F.3d at 98. Thus, *CASA* does not present an issue for the States. And that makes perfect sense as a matter of first principles. The Supreme Court has allowed States to sue in equity to vindicate their interests since even before *Ex parte Young* was decided. *See Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 659 (1838) (allowing Rhode Island to file a bill in equity); *Missouri v. Illinois*, 200 U.S. 496, 518 (1906). Even *CASA* recognized that States stand in a special position that can warrant broader relief than private parties. 606 U.S. at 853. Because State equitable suits predate *Ex parte Young*, *CASA* does not present a problem.

## II.    Federal Common Law and Structural Constitutional Principles Preempt Vermont's Climate Superfund Act.

### A. Federal Common Law Preempts Vermont's Act.

Although no *general* federal common law lives on after *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), *specific* pockets of federal common law remain, *see Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110 (1938) (applying federal common law to an interstate dispute the day *Erie* was decided); *Wheeldin v. Wheeler*, 373 U.S. 647, 651 (1963). This specific federal common law applies when "a federal rule of decision is 'necessary to protect uniquely federal interests.'" *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 426 (1964)). Interstate pollution is one of those pockets. Indeed, a largely "unbroken string of cases has applied federal law to disputes involving interstate air or water pollution." *City of New York*, 993 F.3d at 91 (collecting cases). In cases involving interstate air pollution, such as that caused by greenhouse-gas emissions, "federal interests . . . are incompatible with the application of state law[.]" *Id.*; *Am. Elec. Power Co. v. Connecticut* (*AEP*), 564 U.S. 410, 421 (2011). And because the Supremacy Clause declares federal law supreme, the federal common law preempts State law, *City of New York*, 993 F.3d at 91, if the State law impedes "an identifiable federal policy or interest." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 500 (1988). Any conflict of policies need not be "intractably severe before federal common law may spring into action" and preempt State law. *City of New York*, 993 F.3d at 90.

In a field where federal common law exists, it applies unless displaced by a federal statute. In this sense, federal common law is like "duct tape[,]" *id.*, applying until Congress decides to replace it with something sturdier. But even when Congress has displaced federal common law with a comprehensive statutory scheme, the preempted "state law does not suddenly become presumptively competent to address issues that demand a unified federal standard simply because

25

Congress saw fit to displace a federal court-made standard with a legislative one[.]" *Id.* at 98. In other words, displaced federal common law retains its preemptive effect. *Id.* Congress may still decide to "grant states the authority to operate in an area of national concern" where federal common law has operated, but doing so "is permissible only to the extent 'authorize[d]' by federal statute." *Id.* at 99 (quoting *Illinois. v. City of Milwaukee*, 731 F.2d 403, 411 (7th Cir. 1984)).

In the field of interstate air pollution, Congress has at least partially displaced the federal common law with the Clean Air Act. *AEP*, 564 U.S. at 428; *City of New York*, 993 F.3d at 95 ("[T]he Clean Air Act displaces federal common law claims concerned with domestic greenhouse gas emissions."). Although the Clean Air Act appoints the EPA, not States, as the primary regulator of greenhouse-gas emissions, it leaves States a narrow but important role to play in the regulatory scheme. In particular, in some instances, States can regulate emissions that come from within their own borders. 42 U.S.C. § 7416. But when it comes to emissions outside of their borders, States are limited to commenting on EPA's rules or each other's implementation plans or suing under the laws of the emitting State. *Id.* §§ 7607(d)(5), 7475(a)(2), 7410(a)(1).

These preemption principles apply to the Vermont Climate Superfund Act in a straightforward manner. The Climate Superfund Act seeks to impose liability on entities that produce oil, coal, and natural gas based on the interstate emissions those products create. 10 Vᴛ. Sᴛᴀᴛ. §§ 596(7), 598(b) (establishing liability for "covered greenhouse gas emissions"). Precisely like the lawsuit in *City of New York*, Vermont "does not seek to hold the Producers liable for the effects of emissions released in" Vermont. 993 F.3d at 92. "Instead, [Vermont] intends to hold the Producers liable, under [Vermont] law, for the effects of emissions made around the globe over the past" 30 years. *Id.* Indeed, Vermont does not have a single producer of oil, coal, or natural gas to which the law could even apply. And even if Vermont did have in-state production, the cost-

recovery demands would still primarily cover activities from out-of-State, making every single cost recovery demand preempted. In short, the Climate Superfund Act regulates the kind of interstate emissions subject to the federal common law of interstate pollution and the Clean Air Act.

Although the producers of traditional fuel are one step in the supply chain before the actual emission of greenhouse gases, federal common law still preempts the regulation of the "production, promotion, and sale of fossil fuels" if the "emi[ssion of] greenhouse gases" is "a link in the causal chain." *Id.* at 91 (cleaned up). That's true here. Vermont is using greenhouse-gas emissions as a link in the chain of establishing liability, and it does not argue otherwise.

Because Vermont is regulating interstate air pollution, its Act is preempted if it hinders "an identifiable federal policy or interest." *Boyle*, 487 U.S. at 500. And "where the federal interest requires a uniform rule, the entire body of state law applicable to the area conflicts and is replaced by federal rules." *Id.* at 508. Here, the Second Circuit has already explained that "national standards" are required to balance economic and environmental goals in the fight against climate change. *City of New York*, 993 F.3d at 93. Because "states will invariably differ in their assessment of the proper balance between these national and international objectives, there is a real risk that subjecting the Producers' global operations to a welter of different states' laws could undermine important federal policy choices." *Id.*; *AEP*, 564 U.S. at 427; 43 U.S.C. § 1802(1). Thus, State attempts to regulate the "production, promotion, and sale of fossil fuels" are preempted when they rely on the interstate emission of greenhouse gases as part of the chain of liability. *City of New York*, 993 F.3d at 91 (cleaned up).

Because the federal common law applies and conflicts with it, Vermont's Act is preempted unless the Clean Air Act affirmatively authorizes it. *See id.* at 98–99. But it does not. Only two

provisions of the Clean Air Act are even distantly relevant, but neither greenlights an interstate emissions law like the Act. *Id.*

First is the "states' rights" savings clause, which establishes that "nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution." 42 U.S.C. § 7416. Yet this clause permits States only to impose additional "standard[s] or limitation[s]" on sources *within their own borders*. *City of New York*, 993 F.3d at 99 (quoting 42 U.S.C. § 7416); *Bell v. Cheswick Generating Station*, 734 F.3d 188, 195–96 (3d Cir. 2013) (same). Any doubt about that is dispelled by *Ouellette*, in which the Supreme Court interpreted the same clause in the Clean Water Act to save only State regulation of in-state pollution sources. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 497 (1987).

The second potentially relevant clause is the "citizen-suit savings clause," which states that "[n]othing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief." 42 U.S.C. § 7604(e). Like the states' rights savings clause, however, the citizen-suit clause "permit[s] only state lawsuits brought under 'the law of the [pollution's] *source* [s]tate." *City of New York*, 993 F.3d at 100 (quoting *Ouellette*, 479 U.S. at 497). Thus, neither of the savings clauses shows that the Clean Air Act has "authorize[d]" the Vermont Climate Superfund Act. *Id*. The cost recovery demands in Vermont's law will always apply Vermont law to production and emission activities that occurred across State (or national) lines.

With the savings clauses providing no help, Vermont has nowhere to turn. The federal common law of interstate air pollution retains its preemptive force despite being displaced (at least

in part) by the Clean Air Act, and State laws that use greenhouse-gas emissions as a link in a chain to establish liability are preempted under the federal common law. *City of New York*, 993 F.3d at 89–100.

### 1. Defendants' Counterarguments are Unpersuasive.

Although Vermont and the Intervenor-Defendants devote plenty of time and attention to *City of New York*, they ultimately just disagree with it and want it overturned. *See* Vermont MTD at 34 n.25 ("The State reserves the right to argue that *City of New York* was wrongly decided insofar as it relied on federal common law."). They can ask the Second Circuit to do so en banc, but this Court must apply *City of New York* as written.

#### a. Federal Common Law Preempts State Statutes

Vermont and the Intervenor-Defendants first argue that "federal common law does not supplant state *statutory* law," Vermont MTD at 33 (emphasis in original); Defs.' Int. MTD at 34. In their view, then, the Climate Superfund Act is not preempted under *City of New York* because it is a state statute. The Supreme Court has already rejected this argument, which also makes little sense as a matter of first principles.

In *Illinois v. City of Milwaukee*, the Supreme Court decided a pollution dispute involving an interstate body of water, Lake Michigan. According to the State of Illinois, the City of Milwaukee was dumping around "200 million gallons of raw or inadequately treated sewage and other waste materials" into Lake Michigan every day, poisoning the water in nearby Chicago. 406 U.S. 91, 93 (1972). When deciding what law should apply, the Supreme Court explained that disputes involving interstate bodies of water "have been recognized" by the Supreme Court "as presenting federal questions." *Id.* at 105 (quoting *Hinderlider*, 304 U.S. at 110). And because the federal common law is *federal*, "state statutes or decisions are not conclusive" when it applies. *Id*.

Note the key phrase: state *statutes*—not just State judicial decisions expounding on the common law. *Id.*

*City of Milwaukee*'s outcome flows naturally from the Supremacy Clause, which establishes that "the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Federal common law is, as its name suggests, federal law. And it constitutes the "Law[] of the United States" no less than federal statutes or the Constitution. *Id.*; *City of Evansville v. Ky. Liquid Recycling, Inc.*, 604 F.2d 1008, 1017 (7th Cir. 1979) (explaining that "laws" for the purpose of federal-question jurisdiction include federal common law); *Arkansas-Platte & Gulf P'ship v. Van Waters & Rogers, Inc.*, 981 F.2d 1177, 1179 (10th Cir. 1993). Nowhere does the Supremacy Clause differentiate between the preemptive effect of federal law versus common law over State statutes. What matters for preemption purposes is not whether the law is written or unwritten, but whether it is a *state law* subordinate to a *federal* one. Any other rule would have strange and deleterious consequences. For instance, a State-law tort suit would be preempted, but the same suit would survive if the tort suit were codified in a Statute.

Vermont has failed to produce a single case in which a federal court held that federal common law does not preempt State statutory law. In contrast, opinions holding that federal common law preempts State statutes are legion. *See, e.g.*, *Lowry v. Baltimore & Ohio R.R. Co.*, 707 F.2d 721, 728 (3d Cir. 1983) ("[F]ederal common law, not *state statutes or decisional law*, governs whether causes of action under the federal securities laws run with the affected securities and hence are automatically assigned to subsequent purchasers of those securities." (emphasis added)); *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 392 (3d Cir. 2012)

(explaining in a case that involved a New Jersey statute that "state law can be preempted by federal common law"); *Gaff v. FDIC*, 919 F.2d 384 (6th Cir. 1990) (deciding that a substantive rule of federal common law applied and preempted state regulation in a commercial law case), *opinion modified on reh'g*, 933 F.2d 400 (6th Cir. 1991) (mem.).

### b. The Act is Preempted Despite Targeting Producers Instead of Emitters Directly

Vermont and the Intervenor Defendants also argue that no actual conflict exists between the Climate Superfund Act and "federal policy or interest." *Boyle*, 487 U.S. at 500. As they tell it, unlike the City of New York's tort suit, Vermont's Act is not "seeking to abate a nuisance originating in another state." Vermont MTD at 33–34. The Act is only seeking "a one-time" charge based on contributions to climate change. Int.-Defs.' MTD at 29–30.

But *City of New York* already rejected these too-cute-by-half arguments. There, New York's theory was that "the production, promotion, and sale of fossil fuels" was harming the City by contributing to climate change. *City of New York*, 993 F.3d at 91 (cleaned up). New York believed that it could avoid the preemptive effect of the federal common law of interstate air pollution by disclaiming any intent "to directly penalize emitters," instead going after the parties who produced traditional fuels further up the supply chain. *Id*. New York admitted that "emissions" were "a link in 'the causal chain' of the City's damages" but claimed that this line was insufficient to invoke the federal law of interstate air pollution. *Id.* (cleaned up). The Second Circuit disagreed, concluding that "[a]rtful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse gas emissions." *Id.* Because New York sought to remedy "harms caused by global greenhouse gas emissions" using "New York law," it did not matter that carbon emissions were merely a link in the chain; federal common law still preempted the law. *Id.* The

31

case's "essence" was about global carbon emissions, so it had to proceed, if at all, under federal common law. *Id.*

Vermont's own "artful" attempt to circumvent the federal common law of interstate pollution fares no better than New York's. *Id.* Although Vermont is going after producers of traditional fuels (just like New York), it is ultimately seeking to remedy "global greenhouse gas emissions." *Id.* Just look to the Act: it explicitly ties the amount of liability to "covered greenhouse gas emissions." 10 VT. STAT. § 596(7), (8), (10). Greenhouse gas emissions are thus a link in the chain of liability that Vermont seeks to establish, and that link makes the "substance" of Vermont's law about interstate emissions. *City of New York*, 993 F.3d at 97.

And it makes no difference that Vermont is seeking a "one-time retroactive assessment" for climate-related harms. *See* Int.-Defs.' MTD at 29–30. If anything, the Act's retroactive nature makes it even more egregious. When the traditional producers mined, fracked, drilled, and refined their fuels to use in service of our nation's economy, the federal common law of interstate air pollution did not make them liable for any of that. Nor did the Clean Air Act prohibit them. Vermont's choice to retroactively regulate emissions is even *more* inconsistent with "federal interest[s]," *Boyle*, 487 U.S. at 507–08, as New York's suit at least pretended to seek damages for actions that were tortious at the time they were done. Vermont demands money based on emissions that complied with both the federal common law and the Clean Air Act, completely decoupling a legal violation and the demand for payment.

Lastly, Vermont's insistence that it is not seeking to "abate a nuisance" through injunctive relief, Vermont MTD at 33–34, again runs directly into the teeth of *City of New York*. Indeed, New York argued there that its suit was not preempted because it sought "damages rather than abatement." *City of New York*, 993 F.3d at 91. But the Second Circuit concluded it did not matter

that "the City [wa]s not expressly seeking to impose a standard of care or emission restrictions on the Producers," as the damages award would plausibly influence the Producers' future behavior. *Id.* at 93. After all, Second Circuit precedent, and the laws of basic economics, clearly establish that "[t]he notion that financial incentives deter environmental misconduct is hardly novel . . . . [as] common sense and basic economics . . . tell us that the increased cost of . . . conduct will make that conduct less common." *NRDC*, 894 F.3d at 104–05 (cleaned up).

Vermont's only counter is that the Act will not influence the traditional-fuel producers' behavior because it is purely retroactive. Vermont MTD at 34. Thus, according to Vermont, the Act will not affect future prices or emissions because it does not "impose any ongoing duty requiring a responsible party to change its production, marketing, or consumption practices." *Id.* The argument echoes Vermont's unsuccessful standing arguments. And it again fails for three reasons.

First, the Act is premised on the notion that the producers of traditional fuels should have been aware since 1995 that their actions could result in strict liability for the harms caused by climate change. *Id.* at 4, 71. Vermont said as much in its own motion. *Id.* But Vermont never explains why, if producers should have expected to be held liable from 1995 through 2024, they should not expect to be held liable in the future for the emissions that they help produce. That future expectation will in turn affect production choices. *See, e.g.*, Louis Kaplow, *An Economic Analysis of Legal Transitions*, 99 HARV. L. REV. 509, 600 (1986) ("[T]he expectation that future evolution in the law will be made applicable to harms arising, and factories built, prior to the announcement of new rules will have a[n] … effect on behavior."). Vermont's attempt to gerrymander the Climate Superfund Act to apply only retroactively does not make it any less of

an attempt to "regulate cross-border emissions in an indirect and roundabout manner." *City of New York*, 993 F.3d at 93. The Act's retroactive application does not foreclose prospective effects.

Second, it is clear that the Climate Superfund Act *will* alter the behavior of the producers. As the declaration of Exxon executive Vijay Swarup explains, the entities that Vermont is targeting will be forced to adjust their "capital investments, production volumes, planning, prices, contracts, and personnel" to account for the Climate Superfund Act' cost recovery demands. Swarup Decl. ¶ 27. Alterations to "production volumes" and "prices" demonstrate that the Act is just a roundabout attempt to regulate emissions, as lower production (and associated higher prices) means lower emissions. *See City of New York*, 993 F.3d at 93.

Third, the Act is unlawful even if it does not constrain traditional-fuel producers' decisions in the future. Both the federal common law and the Clean Air Act reflect a policy choice to regulate emissions at their source and to allow States to do the same within their borders. If an entity violated those regulations, it could be held liable. The Act reflects a wholly different "policy" and projects it into the past. *Boyle*, 487 U.S. at 507–08. According to Vermont, the producers of the fuels should have been strictly liable for climate change, even if federal law permitted their activities. The law is blind to any justification, while federal law has traditionally considered factors like "cost" and "energy requirements" in evaluating what measures an energy producer must bear. *See, e.g.*, 42 U.S.C. § 7411(a). The Act's retroactive strict-liability scheme is inconsistent with federal law at the time, and Vermont can cite no case where a State avoided preemption by regulating through a retroactive statute.

**B. The Act is an Unconstitutional Extraterritorial Regulation**

States can only regulate with respect to their own jurisdiction. The "legislative power of a State to act upon persons and property within the limits of its own territory," *Hoyt v. Sprague*, 103

34

U.S. 613, 630 (1881), does not extend to "person and property" outside of its territory, *id.* This "feature of our constitutional order . . . allows 'different communities' to live 'with different local standards.'" *Nat'l Pork Prods. Council*, 598 U.S. at 375 (quoting *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989)). The rule against extraterritorial regulation does not spring from a single clause in our Constitution but rests on the "original and historical understandings of the Constitution's structure and the principles of 'sovereignty and comity' it embraces," *id.* at 376 (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 (1996)), in addition to "the Due Process Clause and the Full Faith and Credit Clause." *Id.* (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985)).

The oldest manifestation of this rule is perhaps that "[o]ne State cannot exempt property from taxation in another." *Bonaparte v. Appeal Tax Ct. of Baltimore*, 104 U.S. 592, 594 (1881). Doing so would infringe on the latter State's right to control the property within its own State and deny that State's sovereignty, which the Constitution disallows in a system of equally sovereign States. *See Shelby County v. Holder*, 570 U.S. 529, 544 (2013); *see N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914) ("[I]t would be impossible to permit the statutes of Missouri to operate beyond the jurisdiction of that State."); *Huntington v. Attrill,* 146 U.S. 657, 669 (1892) ("Laws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have extraterritorial effect only by the comity of other states.").

This prohibition on extraterritorial regulation applies in full force to Vermont's Act. The Act purports to impose liability on actions, such as the production and burning of traditional fuels, that were taken wholly outside "the limits of [Vermont's] own territory." *Hoyt*, 103 U.S. at 630. Not even one of the potential "covered entities" produces traditional fuels in Vermont, and the Act purports to attach liability to activities across the entire globe. 10 Vᴛ. Sᴛᴀᴛ. § 596(7) (defining

"covered greenhouse gas emissions"). Indeed, if a ton of coal is mined in Wyoming by a covered entity, transported to Texas, and produces greenhouse gases when it is burned there, Vermont will hold the covered entity strictly liable for the emissions that coal created. The Act thus violates the extraterritoriality doctrine in the same way that the doctrine is violated when "[o]ne State" attempts to "exempt property from taxation in another." *Bonaparte*, 104 U.S. at 594. In the latter case, the State where the property is located has its sovereignty breached by an attempt to nullify its laws related to taxation. One State wishes to exercise its traditional taxing power within its own domain, and an interloper State attempts to disrupt that power.

Because the extraterritoriality doctrine emanates not only from the structure and history of our Constitution, but also the principles underlying the "the Due Process Clause and the Full Faith and Credit Clause," *Phillips Petroleum Co.*, 472 U.S. at 818, the doctrine often borrows from the principles those clauses promote, *Nat'l Pork Prods. Council*, 598 U.S. at 375–76. Two such principles help demonstrate why the Vermont Climate Superfund is an especially egregious violation of the extraterritoriality doctrine.

First, the Vermont Climate Superfund Act not only attempts to exert Vermont's legislative power outside of Vermont but also does so on a retroactive basis. 10 VT. STAT. § 599c. Retroactive laws are suspect because they do not give notice to regulated parties of how to conduct their affairs, *Peralta-Taveras v. Attorney General*, 488 F.3d 580, 584 n.2 (2d Cir. 2007), and a retroactive law that applies outside of a State's own territory only compounds those issues. If a State proposes an extraterritorial prospective law, regulated parties can at least conform their conduct to minimize liability or seek protection from their home State. But a retroactive extraterritorial law deprives them of that opportunity, requiring payment for past acts that were legal under the jurisdiction of the home State.

36

Second, the Act imposes a retroactive exaction on conduct in States that affirmatively promoted the very conduct that Vermont seeks to punish. That effort is the kind of "policy of hostility to the public Acts" of another State, *Carroll v. Lanza*, 349 U. S. 408, 413 (1955), that the Constitution was enacted to prevent, *see also Nat'l Pork Prods. Council*, 598 U.S. at 409 (Kavanaugh, J., concurring in part). As the complaint and declarations explain, the States "expressly authorized" and even affirmatively promoted such activities for the benefit of their economies. *Id.* For instance, Texas subsidizes the creation of high-risk wells, *see* 16 Tex. Admin. Code § 3.101, while North Dakota exempts "machinery or equipment used to produce coal from a new mine" from sales tax, N.D. CENT. CODE § 57-39.2-04.8. West Virginia's official policy— between 1995 and 2024 and also today—is to "encourage capital investment in the coal industry in this state and thereby increase economic development." W. VA. CODE § 11-13EE-1. The States have their own policies supporting the extraction of traditional fuels within their borders, and Vermont cannot decide that it knows better and penalize the same activities. *Hoyt*, 103 U.S. at 630.

Vermont wrongly questions whether the extraterritorial-regulation doctrine even exists. *See* Vermont MTD at 25 (doubting the legitimacy of a "stand-alone" extraterritoriality "preclusion" doctrine). This critique is a strange one. The Supreme Court has reaffirmed as recently as 2023 that the "original and historical understandings of the Constitution's structure" limit "the reach of one State's power." *Nat'l Pork Prods. Council*, 598 U.S. at 376. Much like sovereign immunity outside of the Eleventh Amendment, the Constitution's prohibition on extraterritorial legislation is inherent in having "equal[ly] sovereign[]" States. *Franchise Tax Bd. of Cal.*, 587 U.S. at 246 (quoting *Holder*, 570 U.S. at 544) (emphasis omitted). Each State's equal sovereignty under the Constitution creates certain constitutional "limitation[s] on the sovereignty of all of its sister

37

States." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980). If Vermont contends

no freestanding extraterritorial-regulation doctrine exists, the Supreme Court disagrees.

Vermont further faults the States for citing "either due process cases" or "dormant

Commerce Clause analyses" as part of the extraterritoriality analysis. Vermont MTD at 25. But

once again, the States are following the Supreme Court's commands. In *National Pork Producers

Council*, the Supreme Court explained that it historically "has invoked . . . a number of the

Constitution's express provisions—including 'the Due Process Clause and the Full Faith and

Credit Clause'" when determining if a regulation violates the extraterritorial-regulations doctrine.

598 U.S. at 376 (quoting *Phillips Petroleum Co.*, 472 U.S. at 818). If using these Clauses and the

cases that interpret them to flesh out the contours of the extraterritorial-regulations doctrine is good

enough for the Supreme Court, then it must be good enough for this Court, too.

On the merits of the extraterritoriality claim, Vermont's main defense is that it may regulate

out-of-State conduct if that conduct has *any* effect within the State. But the Supreme Court has

explained that States can only regulate out-of-State conduct when the conduct was "intended to

produce and produc[ed] detrimental effects within it." *Strassheim v. Daily*, 221 U.S. 280, 285

(1911). Thus, the test is plainly conjunctive. An out-of-State individual must both intend to have

his conduct reach across the border, and it must do so and cause harm. Both factors are absent here.

The Act creates a strict-liability standard that ignores intent entirely (let alone the specific intent

to cause harm in Vermont), 10 VT. STAT. § 597(1), and it is impossible to determine whether any

particular emission actually caused harm in Vermont, *see AEP*, 564 U.S. at 422. As the Supreme

Court has explained, "emissions in New Jersey may contribute no more to flooding in New York

than emissions in China." *Id.* Vermont's brief alludes to the use of so-called "attribution science"

to link specific emissions to specific harms within the State, but that "science" relies on widely

38

criticized methodologies. *See* David Barker, *Global Non-Linear Effect of Temperature on Economic Production: Comment on Burke, Hsiang, and Miguel*, 21 ECON J. WATCH 35, 35–36 (Mar. 2024), https://perma.cc/UFZ7-DXJK. And Vermont's own Department of Natural Resources has concluded that it is not reliable enough to actually implement. *See* VT. AGENCY OF NAT. RES., CLIMATE SUPERFUND COST RECOVERY PROGRAM REPORT TO THE GENERAL ASSEMBLY 7 (Jan. 15, 2025), https://perma.cc/9B8D-LH7Z.

The illusory "nexus" requirement in the Act does not save it. The Act excludes from the definition of "responsible party" "any person who lacks sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution." 10 VT. STAT. § 596(22). This "nexus" requirement, however, applies to a "person['s]" connections to Vermont and not the activities that are being punished. *Id.* Thus, a corporation may have sufficient connection to Vermont under the Act and yet be punished for activities wholly outside of the State. Indeed, because Vermont does not produce any traditional fuels, the Act will *only* be applied to such entities. Thus, every single cost recovery demand that Vermont issues will be demanding payment for activities wholly outside of Vermont. *Cf. Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1236–37 (11th Cir. 2001).

In its final move, Vermont argues that the Act is not subject to the extraterritorial-regulations doctrine because it "does not seek to punish or alter *any* conduct" and its "purpose is compensatory." Vermont MTD at 26. But even if one accepts the dubious contention that Vermont is not seeking to "alter *any* conduct," *id.*, that fact does not somehow *expand* the territorial reach of Vermont's legislature. The extraterritorial-regulations doctrine is not concerned with States regulating conduct in other States; it is concerned with the scope of State power. It would make little sense for a State to have jurisdiction to inflict retroactive liability within the territory of its

sister States but not have the ability to attach prospective liability. Such a situation would be purely backward, allowing States to extend their jurisdiction only if they also *reject* the "[e]lementary" principle "of fairness" that legislation should be prospective. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).

### C.  The Act Violates the Foreign-Affairs Doctrine

The Constitution places the foreign-affairs powers in the federal government, preempting State actions that interfere with those powers. *See Zschernig v. Miller*, 389 U.S. 429, 442–43 (1968). "Our system of government . . . imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Id.* (Stewart, J., concurring) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941)). In other words, the Constitution entrusts the "field of foreign affairs" to "the President and the Congress," not individual States. *Id.* at 432. Although States may interact with other nations, they cannot do so when "there is evidence of clear conflict [with] the policies" adopted by the federal government. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003). And beyond preempting State laws that conflict with the federal government's foreign-affairs positions, the foreign-affairs doctrine also preempts all State laws that concern foreign affairs "when a state law . . . has no serious claim to be addressing a traditional state responsibility." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1074 (9th Cir. 2012) (en banc). In those situations, an outright conflict is not necessary because a State had no power to regulate to begin with.

The foreign-affairs doctrine preempts the Act for both reasons. First, the Act is contrary to the foreign-policy positions of the federal government. *Zschernig*, 389 U.S. at 432–33; *Garamendi*, 539 U.S. at 419 n.11 ("[T]he Constitution entrusts foreign policy exclusively to the National Government."). The Act expressly contemplates demanding money from "foreign

40

nation[s]" for their extraction of traditional fuels. 10 VT. STAT. § 596(10). Potential targets include companies all over the globe and even some companies owned by foreign sovereigns. And even if the Act did not attempt to secure payments from foreign nations themselves, it nonetheless regulates activities in foreign jurisdictions because it applies to the production of traditional fuels worldwide, regardless of their connection to Vermont. Thus, production activities that take place exclusively in foreign nations (and where the fuels are burned in those same nations) give rise to liability under the Act.

This effort to impose liability on foreign activities intrudes upon the federal government's foreign affairs power by "bypass[ing] the various diplomatic channels that the United States uses to address" climate change, "such as the U.N. Framework and the Paris Agreement." *City of New York*, 993 F.3d at 103. The bypass is especially egregious where "the United States' longstanding position in international climate-change negotiations is to oppose the establishment of liability and compensation schemes at the international level." *Id.* at 103 n.11; *see* Telephone Interview with Todd Stern, Special Envoy for Climate Change, U.S. DEP'T OF STATE (Oct. 28, 2015), https://perma.cc/8X4Y-4BRH (stating that "[w]e obviously do have [a] problem with the idea, and don't accept the idea, of compensation and liability and never accepted that and we're not about to accept it now").

As more fully explained in the United States' brief, Vermont's attempt to unilaterally impose fines on foreign production of traditional fuels runs contrary to both federal foreign-affairs statutes and the official policy of the United States. For instance, the Global Climate Protection Act declared that the United States should "work toward multilateral agreements" on greenhouse gas emissions, with a "coordinated national policy," including in the international arena. *See* Pub. L. No. 100–204, Title XI, § 1102(6), 101 Stat. 1331, 1408 (1987) (re-printed as note to 15 U.S.C.

41

§ 2901). Multilateral agreements to establish an international framework to regulate greenhouse-gas emissions are wholly inconsistent with State-by-State regulation of foreign traditional-fuel production. And more generally, the scheme directs liability towards foreign entities—including arms of sovereign governments—without meeting the strict requirements of laws like the Foreign Sovereign Immunities Act.

Allowing a single State like Vermont to interfere with the federal government's response to a global policy challenge like greenhouse-gas emissions "sow[s] confusion and needlessly complicate[s] the nation's foreign policy, while clearly infringing on the prerogatives of the political branches." *City of New York*, 993 F.3d at 103. Here, the Act is designed to impose billions of dollars in after-the-fact sanctions on energy companies for the very conduct, based on the same theory of harm, that is the focus of national diplomatic efforts.

Even if the Act did not conflict with the United States' policy to refrain from imposing retroactive penalties on private producers of traditional fuels, it would still be preempted. *See Movsesian*, 670 F.3d at 1072. The Act will touch upon international relations while having "no serious claim to be addressing a traditional state responsibility." *Id.* at 1074. Again, interstate air pollution is an area traditionally reserved for the federal government. *See City of New York*, 993 F.3d at 103. That proposition is even truer for *international* air pollution. *Id.* (explaining that the fight against climate change requires a "carefully balanced scheme of international cooperation"). Vermont insists it is not actually regulating foreign conduct and is simply attempting to generate revenue, which is a traditional state function. Vermont MTD at 29. But Vermont cannot raise revenue in a manner outside its traditional authority. "Courts have consistently struck down state laws which purport to regulate an area of traditional state competence, but in fact, affect foreign affairs." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 964 (9th Cir. 2010).

42

### III.    The Clean Air Act Preempts the Vermont Climate Superfund Act.

Because federal law is supreme over State law, "state and local laws that conflict with federal law are 'without effect.'" *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103–104 (2d Cir. 2010) (quoting *Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008)). Federal statutes can "conflict" with a State law, and thus preempt it, in multiple ways. *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 313 (2d Cir. 2005). First, a federal statute may "expressly" preempt State law. *Id.* In those cases, Congress has explicitly told the court to what extent State law cannot be applied, and the only relevant question is interpreting the scope of the preemption clause. *Id.* State laws may also be "impliedly preempted" "by virtue of restrictions or rights that are inferred from statutory law." *Kansas v. Garcia*, 589 U.S. 191, 203 (2020). For example, Congress may enact a statute so comprehensive that it excludes all State regulation on the subject, creating field preemption. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990) (describing field preemption). Laws may also be preempted when "federal restrictions or rights … conflict with state law." *Garcia*, 589 U.S. at 202; *see also Marsh v. Rosenbloom*, 499 F.3d 165, 177 (2d Cir. 2007).

Under each species of preemption, "[t]he key to the . . . inquiry is the intent of Congress." *N.Y. SMSA Ltd. P'ship*, 612 F.3d at 104. In addition to using an express-preemption clause, "Congress may manifest its intent to preempt state or local law . . . through the scope, structure, and purpose of the federal law." *Id.* The Supreme Court has traditionally applied a presumption against the preemption of State law when the area being regulated is within the traditional province of the State's police power. *Altria Group, Inc.*, 555 U.S. at 77. But when the area of regulation is one where "there has been a history of significant federal presence," as here, that presumption does not apply. *United States v. Locke*, 529 U.S. 89, 108 (2000); *see Ting v. AT&T*, 319 F.3d 1126, 1136

(9th Cir. 2003); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 725 F.3d 65, 101–02 (2d Cir. 2013).

### A. The Clean Air Act Creates a Comprehensive Scheme for Regulating Carbon Emissions Nationwide

To understand the Clean Air Act's preemptive reach, one must understand how the Clean Air Act regulates interstate air pollution and, more specifically, the emission of greenhouse gases. EPA regulates interstate air pollution in a myriad of ways. First, EPA sets National Ambient Air Quality Standards (NAAQS). 42 U.S.C. §§ 7408–10. These Standards determine "the maximum airborne concentration of [the] pollutant that the public health can tolerate." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 465 (2001); 42 U.S.C. § 7409(b). EPA itself, however, does not determine exactly how States will stay below this maximum level. Instead, the Clean Air Act requires States "to submit to the [EPA] a plan designed to implement and maintain such standards within its boundaries." *Train v. NRDC*, 421 U.S. 60, 65 (1975); 42 U.S.C. § 7410. Each State generates its own plan, although States may comment on the plans proposed by other States. 42 U.S.C. §§ 7607(d)(5), 7475(a)(2), 7410(a)(1). And because air pollutants do not respect State lines, the Clean Air Act contains what is called a "Good Neighbor Provision." *See Ohio v. EPA*, 603 U.S. 279, 284 (2024); 42 U.S.C. § 7410(a)(2)(D)(i)(I). That provision requires that a State not allow for pollution that will "'. . . contribute significantly to nonattainment in, or interfere with maintenance by, any other State' of the relevant air-quality standard." *Ohio*, 603 U.S. at 284 (quoting 42 U.S.C. § 7410(a)(2)(D)(i)(I)).

In addition to the NAAQS, the Clean Air Act also instructs EPA to regulate air pollution from stationary sources like power plants. The New Source Performance Standards program requires "EPA to list 'categories of stationary sources' that it determines 'cause[], or contribute[] significantly to, air pollution which may reasonably be anticipated to endanger public health or

44

welfare.'" *West Virginia v. EPA*, 597 U.S. 697, 709 (2022) (quoting 42 U.S.C. § 7411(b)(1)(A)). Under this section of the Clean Air Act, EPA develops emissions targets for each relevant category of stationary sources, based on the best available pollution-reducing technology, and then leaves room for those sources to determine how best to comply with the targets. This scheme allows stationary sources to innovate in ways that can reduce emissions and gain a competitive advantage by being more efficient than other sources. *See id.* ("[A] source may achieve that emissions cap any way it chooses.").

The Clean Air Act does not stop at stationary sources of air pollution. It also says EPA may regulate emissions from "new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7521(a)(1); *Massachusetts*, 549 U.S. at 528. This authority is immense, as "the United States transportation sector emits an enormous quantity of carbon dioxide into the atmosphere." *Id.* at 524; *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 310 (2014) (describing EPA's regulation of carbon emissions from automobiles as "the single largest expansion in the scope of the [Act] in its history" (quoting CLEAN AIR ACT HANDBOOK at xxi (J. Domike & A. Zacaroli eds., 3d ed. 2011)).

In *Massachusetts v. EPA*, the Supreme Court held that the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, authorized EPA to regulate greenhouse gases as a category of "air pollutant[s]," 549 U.S. at 528–29. Because the EPA thereafter found that greenhouse gases, such as carbon dioxide, "cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare," 42 U.S.C. § 7521(a)(1), EPA began to regulate greenhouse-gas emissions. *See Util. Air Regul. Grp.*, 573 U.S. at 308. EPA has continued to regulate carbon emissions ever since, though it is now reevaluating whether carbon dioxide triggers the statute's endangerment requirement. *See West Virginia*, 597 U.S. at 706–11 (discussing EPA's regulation of carbon emissions).

**B. The Clean Air Act Preempts the Climate Superfund Act Based On Both Field and Conflict Preemption.**

The Clean Air Act is a delicately crafted statute that comprehensively regulates the emission of air pollution between States, which the Supreme Court has determined may include greenhouse gases. *See Massachusetts*, 549 U.S. at 528–29; *AEP*, 564 U.S. at 416 ("[T]he Clean Air Act . . . authorizes federal regulation of emissions of carbon dioxide and other greenhouse gases."). This scheme does not leave room for State regulation of out-of-State emissions outside of its parameters. Thus, Vermont's Climate Superfund Act is preempted under both a field-preemption theory and a conflict-preemption theory.

At the threshold, the Supreme Court's presumption against preemption of State law does not apply to the Climate Superfund Act. That interpretive guide only applies when a State is regulating a subject "traditionally occupied by the States." *Altria Grp., Inc.*, 555 U.S. at 77; *Locke*, 529 U.S. at 108 ("[T]here is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers" if it is outside the traditional subjects of State regulation). As should be clear by now, the Climate Superfund Act is not regulating a field traditionally occupied by the States. It is regulating the production and release of greenhouse gases across State lines, which is a classic area where "state law cannot be used." *City of Milwaukee v. Illinois*, 451 U.S. 304, 313 n.7 (1981); *City of New York*, 993 F.3d at 98 (explaining that interstate air pollution is "not . . . a field in which the states have traditionally occupied" (cleaned up)). Thus, instead of starting with a presumption that the Climate Superfund Act is valid, this Court should start with the presumption that it is beyond the State legislature's reach. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

### 1. The Clean Air Act Preempts the Entire Field of Interstate Air Pollution

A field of regulation will be foreclosed to the States if Congress enacts a statute that evinces an intent to occupy an entire field. "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive ... that Congress left no room for the States to supplement it' or where there is a 'federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Rice*, 331 U.S. at 230). In such a case, States cannot regulate even if their regulations are not inconsistent with the federal statutory scheme. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347–48 (2001).

The first step is identifying the proper field of regulation. It is unusually easy to define the relevant "field" here because Congress passed the Clean Air Act to take the place of an existing field of regulation: the federal common law of interstate air pollution. *See AEP*, 564 U.S. at 423–24.

The question then becomes whether Congress has so thoroughly regulated the field of interstate air pollution that it left no room for States to do the same. The answer is "yes" for two reasons. First, the intent to occupy a field is demonstrated by the "framework of regulation" Congress established in the Clean Air Act, *Arizona*, 567 U.S. at 399, being "so pervasive" that a court can infer it was meant to be exclusive, *Rice*, 331 U.S. at 230. As the Second Circuit has already held, the Clean Air Act is a "comprehensive statutory scheme that anoints the EPA as the 'primary regulator of [domestic] greenhouse gas emissions.'" *City of New York*, 993 F.3d at 99 (quoting *AEP*, 564 U.S. at 428).

Second, in addition to being sufficiently "comprehensive," the Clean Air Act regulates an area wherein the "federal interest is so dominant that the federal system will be assumed to

preclude enforcement of state laws on the same subject." *Rice*, 331 U.S. at 230. The States will not belabor the point again; it's obvious by this point that the federal interest is paramount. So when Congress enacted a "comprehensive" regulatory scheme in an area where the federal government has such a strong interest that it justifies the creation of federal common law, the federal interest is "so dominant" that the statute will be "assumed to preclude" State laws. *Id.*

### 2.  The Vermont Climate Superfund Act Obstructs the Clean Air Act

Even if this Court concludes that the Clean Air Act does not occupy the entire field of interstate air pollution, Vermont's Climate Superfund Act is still preempted because it "frustrate[s] … federal interests" in a manner inconsistent with "the text and structure of the statute at issue." *Garcia*, 589 U.S. at 208, 212.

The Clean Air Act reflects a variety of carefully balanced "purposes and objectives." *Id.* In implementing it, Congress had to make an "informed assessment of competing interests." *AEP*, 564 U.S. at 427. The Clean Air Act protects our air by, among other things, setting targets on how much pollution can be present and imposing limits on pollution. 42 U.S.C. §§ 7408–10. The Act also seeks "to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution," 42 U.S.C. § 7401(b)(2), often, through the use of technology-forcing standards, *West Virginia*, 597 U.S. at 708, 726–27; Wendy E. Wagner, *The Triumph of Technology-Based Standards*, 2000 U. ILL. L. REV 83, 84 n.4 (1999). In addition to these substantive goals, the Clean Air Act intentionally respects federalism by declaring that "air pollution control *at its source* is the primary responsibility of States and local governments," 42 U.S.C. § 7401(a)(3) (emphasis added), and reserving States' discretion to create their own implementation plans within the CAA framework, *id.* § 7411(d).

48

Allowing States to impose retroactive, extraterritorial strict liability based on contributions to carbon emissions would scuttle Congress' "carefully drawn" regulatory scheme. *City of New York*, 993 F.3d at 100 (quoting *Ouellette*, 479 U.S. at 494). Instead of EPA serving as the "primary regulator of [domestic] greenhouse gas emissions,'" *id.* at 99 (quoting *AEP*, 564 U.S. at 428), States would assume that role by linking greenhouse gas emissions to liability. The entire supposition of the Clean Air Act is that the best way to control pollution is at its source through the setting of standards, such as the NAAQS, New Source Standards, or Existing Source Standards. 42 U.S.C. § 7401(a)(3). Doing so incentivizes private industry to create new methods of technology to reduce emissions, thus allowing the entities with the best emission-reducing technology to produce more energy. The Climate Superfund Act would upset this model by establishing a second level of liability on the producers of fossil fuels even when those fuels are burned at levels approved by both States and the EPA within the confines of the Clean Air Act.

Vermont raises a handful of counter-arguments, but none carry the Climate Superfund Act beyond the Clean Air Act's preemptive reach. First, Vermont contends that the "cooperative federalism" approach of the Clean Air Act demonstrates that State regulation cannot conflict with the Clean Air Act. Vermont MTD at 40; *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). But Vermont seeks to destroy that cooperative-federalism approach. For example, Vermont relies on the findings of Congress in the Clean Air Act that state that "air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3). But the Second Circuit has already explained that the phrase "at its source" in the findings of the Clean Air Act refers to the States' regulation of polluters within their own borders. *City of New York*, 993 F.3d at 88 ("[S]tates are given a meaningful role in regulating greenhouse gases and other emissions from sources *within their borders*.") (emphasis added). Thus, this "purpose" provision

does not establish that an attempt to regulate emissions *in a different State* would be consistent with the Clean Air Act.

Vermont also points to the authorization for States to create a "State Implementation Plan" to ensure that the NAAQS is met within their State. Vermont MTD at 40 (citing 42 U.S.C. § 7410). But those State Implementation Plans only allow States to implement the NAAQS "within such State." 42 U.S.C. § 7410(a)(1); *City of New York*, 993 F.3d at 88 ("The Clean Air Act gives states a much more limited role in regulating pollution sources beyond their borders."). And more obviously, the Act is not an effort to regulate emissions by way of an EPA-approved State Implementation Plan that's consistent with CAA standards.

When it comes to dealing with emissions from outside their borders, the Clean Air Act leaves States a much more modest role. The Act allows "[S]tates to comment[] on proposed EPA rules or on another [S]tate's emission plan." *City of New York*, 993 F.3d at 88. Moreover, the Clean Air Act explicitly addresses how to ensure that one State does not harm another State through interstate pollution. The "Good Neighbor Provision" requires State Implementation Plans to "contain adequate provisions . . . prohibiting . . . emissions activity *within the State* from emitting any air pollutant in amounts which will . . . contribute significantly to nonattainment in, or interfere with maintenance by, any other State." 42 U.S.C. § 7410(a)(2)(D) (emphasis added). If the State Implementation Plan fails to sufficiently protect its neighbor State from air pollution, then EPA will impose its own Plan unless the State corrects the error first. *Id*. § 7410(c)(1); *EPA v. EME Homer City Generation*, 572 U.S. 489, 498 (2014). But even then, the Act contemplates that *EPA* will take control; it doesn't license States to engage in a destructive form of self-help.

In short, the Clean Air Act requires States to regulate emissions within their own borders to fix the problem of interstate pollution. The existence of State Implementation Plans thus does not demonstrate that Vermont's Climate Superfund Act is authorized by the EPA.

The Clean Air Act's savings clauses do not remove the Climate Superfund Act's frustration of federal regulation of interstate pollution. Recall that the States' rights savings clause protects State interests by establishing that "nothing in this chapter shall preclude or deny the right of any State . . . to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution." 42 U.S.C. § 7416. Additionally, the citizen-suit savings clause establishes that "[n]othing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief." *Id.* § 7604(e). But neither of these provisions establishes that the Climate Superfund Act is consistent with the Clean Air Act. They only protect the ability of States to impose limitations stricter than those required by EPA within their own jurisdiction. *City of New York*, 993 F.3d at 99; *see Bell*, 734 F.3d at 195–96; *Ouellette*, 479 U.S. at 497. Thus, the States' rights savings clause does not authorize Vermont to regulate out-of-State pollution under Vermont law. Likewise, the citizen-suit savings clause only allows a suit under the law of the source State. Neither clause allows one State to extend its laws to activities that took place in another State.

If anything, the Clean Air Act's cooperative federalism scheme confirms that the Vermont Climate Superfund Act conflicts with the implementation of the Clean Air Act. The Clean Air Act carefully circumscribes the role that States play in regulating interstate air pollution. Conspicuously absent in the Clean Air Act is any provision allowing States to apply their own laws to the emissions released from another State. This omission is telling. If Congress intended for

States to apply their own law to out-of-State actions, the Clean Air Act surely would have contained a provision establishing how such a mechanism would work. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107–11 (2012) (explaining the negative-implication canon). At a minimum, Congress would have addressed such a situation in a savings clause. By setting up a painstakingly detailed statutory scheme to regulate air pollution—that specifically addressed interstate pollution—Congress confirmed that it did not leave room for States to apply their own law across borders.

Vermont also maintains the Climate Superfund Act does not obstruct the goals of the Clean Air Act because the Climate Superfund Act does not "regulate pollution at all"; in Vermont's view, the law simply seeks to "recover a portion of Vermont's climate adaptation costs." Vermont MTD at 40. That description creates a false dichotomy. Vermont may wish to spend the money from the cost recovery demands on "climate adaptation" projects. *Id.* But ultimately, it is also regulating pollution—imposing liability based on the very same emissions that the Clean Air Act targets. Laws may serve multiple purposes, and Vermont can be angling to collect money for its own coffers while also regulating disfavored activity. (Just ask anyone who has ever paid a parking ticket.) And at bottom, Vermont's Climate Superfund Act *does* "regulate pollution." *See id*. The Act establishes liability for contributions to "covered greenhouse gas" emissions. 10 VT. STAT. § 598(b). And "[t]he obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012) (quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959)). New York made identical argument in *City of New York*, and the Second Circuit rejected it. Although "the City [wa]s not expressly seeking to impose a standard of care or emission

restrictions," it would nonetheless influence the actions of the producers it sought to hold liable. *See* 993 F.3d at 93.

## IV.    The States are Entitled to Permanent Injunctive Relief

The States are entitled to a permanent injunction against enforcement of the Act. For a party to be entitled to a permanent injunction, it "must satisfy a four-factor test before a court may grant such relief." *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 160–61 (2d Cir. 2012) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). The court must analyze whether the plaintiff has 1) "suffered an irreparable injury," 2) whether "remedies available at law" are "inadequate," 3) whether the "balance of hardships" favors an injunction, and 4) and whether "the public interest would not be disserved by a permanent injunction." *eBay Inc.*, 547 U.S. at 391; *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–13 (1982).

*First*, the Climate Superfund Act inflicts irreparable injury for which damages are inadequate. The Second Circuit has long said violations of the Constitution constitute irreparable harm. *Conn. Dep't of Env't Prot. v. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004) ("[T]he alleged violation of a constitutional right triggers a finding of irreparable injury." (quoting *Conn. Dep't of Env't Prot. v. OSHA*, 138 F. Supp. 2d 285, 291 (D. Conn. 2001))); *Statharos v. N.Y.C. Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) (same). Similarly, "[i]nterference with a sovereign's rights has long been held to constitute irreparable harm." Op. & Order Granting Prelim. Inj. at 25, *Connecticut v. U.S. Dep't of the Interior*, No. 3:25-cv-00580 (D. Conn. July 10, 2025), ECF No. 48; *accord Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State."). That is because "[I]nvasions of state sovereignty . . . likely cannot be economically quantified, and thus cannot be monetarily

53

redressed." *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (quoting *Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (2022)). And "unlawful interference with state tax collection always entails" "the likelihood of irreparable harm" because damages do not substitute for a "State's orderly management of its fiscal affairs." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1304 (1991) (Scalia, J., in chambers). Likewise, "the inversion of the federalism principles enshrined in the Clean Air Act" and the federal common law constitute "irreparable injury." *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016). The Climate Superfund Act threatens those sovereign interests and more.

Additionally, economic losses across the Intervenor States will be "difficult to measure" because of their dispersed nature. *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010); *see, e.g.*, *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) ("[I]t would be very difficult to calculate monetary damages that would successfully redress the loss of . . . an indeterminate amount of business in years to come."); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 661 (2d Cir. 2015) (cleaned up) ("[C]ompensating the approximately 500,000 Alzheimer's patients who take Namenda IR tablets . . . would impose the task of disentangling overlapping damages claims which is not lightly to be imposed . . . upon the judicial system."). Without an injunction, "it becomes difficult, and sometimes virtually impossible, for a court to 'unscramble the eggs.'" *Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 483 F.2d 247, 250 (2d Cir. 1973). For that reason, federal courts routinely grant injunctions to stop widespread harms to the citizens of a plaintiff State. *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 258 (1972) (collecting cases).

*Second*, the balance of hardship and the public interest favor relief. "The Government does not have an interest in the enforcement of an unconstitutional law." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (citation omitted, cleaned up); *see also United States v.*

*California*, 921 F.3d 865, 893 (9th Cir. 2019) (same for preemption). Once this Court decides the Climate Superfund Act is illegal, it follows that enforcing the law contravenes the public interest. And, unlawfulness aside, the public will pay billions of dollars in fines passed down to them through higher prices. The "threatened economic impact" of compliance with the Climate Superfund Act, including that some will "go out of business if the statute were enforced," "favors injunctive relief." *Red Earth LLC v. United States*, 657 F.3d 138, 146 (2d Cir. 2011). In sum, the public interest counsels equitable relief.

## THIS COURT SHOULD DENY DEFENDANTS' MOTIONS TO DISMISS

The Court should deny Defendants' motion to dismiss. As explained above, the States have standing to bring this suit, and the Defendants' justiciability arguments are no more persuasive with respect to the remaining Counts in the Complaint. On the merits, the States have plausibly stated a claim that the Act violates a myriad of State and federal constitutional provisions because of its significant, retroactive, and extraterritorial characteristics.

## I. The States' Remaining Counts Are Justiciable

The lion's share of the Defendants' justiciability arguments in their motions to dismiss have already been dealt with in the summary-judgment portion of this brief; the States incorporate their arguments on standing, ripeness, and cause of action here. To the extent that Defendants make justiciability arguments specific to Counts III through XI of the Complaint, they fail. Counts III through XI are ripe, and this Court has jurisdiction to make Vermont abide by its own Constitution when such a violation harms another State.

### A. Counts III through XI are Ripe

Counts III through XI are ripe for adjudication. Recall that for a claim to be constitutionally ripe, there must be "a 'substantial risk' that the [relevant] harm will occur." *Susan B. Anthony List*,

573 U.S. at 158 (citation omitted). Here, the risk to the States is not merely "substantial" but guaranteed because the Act does not give any discretion to decline to issue a cost recovery demand. *Id.* For all of the reasons that the States are entitled to summary judgment on constitutional ripeness with respect to Counts I and II, they are entitled to summary judgment on constitutional ripeness on the remaining Counts. Likewise, Counts III through XI are prudentially ripe because they all involve purely legal questions, and delaying review would result in hardship to the States because it would both increase fuel costs and deny their sovereignty. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).

Defendants raise a handful of arguments about why Counts III through XI are prudentially unripe, but they that all boil down to the argument that the Court needs a specific dollar amount attached to the cost-recovery demands to determine whether they violate the Due Process, Takings, Commerce, or Excessive Fines Clauses. But any nontrivial cost recovery demand would violate these clauses because of its unfair, arbitrary, and retroactive nature. And as demonstrated by the Intervenor-Defendants' brief, the cost recovery demands will amount to billions of dollars. That is all that this Court needs to know to decide not to dismiss Counts III through XI. *See* Int.-Defs.' MTD at 3.

### B. The States Can Bring State-Law Claims Against Vermont Officers

#### 1. The States Can Invoke the Vermont Constitution

Vermont argues that the Vermont Constitution only "applies to inhabitants of the State." Vermont MTD at 18. *But see* VT. CONST. ch. I, art. 4 (guaranteeing "every person" due process); VT. CONST. ch. I, art. 2 (guaranteeing compensation "whenever any person's property is taken for the use of the public"). Thus, according to Vermont, noninhabitants do not have constitutional

rights to speak, assemble, or benefit from the due process of law. This extraordinary argument cannot be right.

To begin with, Vermont cannot find a single case in which a State or federal court concluded that a person was not entitled to the protection of the Vermont Constitution because he was not an inhabitant of the State. The closest Vermont can come is *Skiff v. S. Burlington Sch. Dist.*, 2018 VT 117, ¶¶ 25–28, 208 Vt. 564, 201 A.3d 969. But that case involved only the question of whether the right to petition was "an individual right" or a "collective" right. *Id.* To answer that question, the Court observed that the header of the Vermont Bill of Rights referenced the rights of "inhabitants," indicating that the rights were individual in nature. *Id.* A right can be individual in nature while still extending to those beyond the State's borders.

When noninhabitants have claimed rights under the Vermont Constitution, the Vermont Supreme Court has not dismissed their claims because of that fact. Within the last decade, it entertained a "New York corporation['s]" separation-of-powers and due-process claims under the Vermont Constitution, even though the New York corporation could not plausibly be deemed an inhabitant of Vermont. *In re MVP Health Ins. Co.*, 2016 VT 111, ¶¶ 2, 11, 17 n.3, 203 Vt. 274, 155 A.3d 1207. Accepting the defendants' logic, those claims should have been dismissed out of hand.

## 2. *Pennhurst* Does Not Bar the State-Law Claims

Typically, a plaintiff cannot utilize the *Ex parte Young* exception to sovereign immunity in federal court to seek an injunction against State officers. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); *Fleet Bank, Nat'l Ass'n v. Burke*, 160 F.3d 883, 891 (2d Cir. 1998) ("*Pennhurst* made clear that the Eleventh Amendment prevents a federal court from granting injunctive relief against a state official on the basis of state law."). As the Second Circuit has explained, however, "a State does not enjoy sovereign immunity from suit by another State in

federal court." *Cahill*, 217 F.3d at 101. Nor can a State's officers take advantage of sovereign immunity on its behalf. "[P]laintiff-State may opt to name that State's enforcement officers alone, or to name the State itself." *Id.* at 102. Because no sovereign immunity applies, the States need not overcome the *Pennhurst* doctrine here.

Defendants admit that the Eleventh Amendment's text does not cover suits by one State against another (or the officers thereof). Vermont MTD at 20. Yet they contend that the broader principles of sovereign immunity outside the Eleventh Amendment still bar this suit. The scope of sovereign immunity extends beyond the four corners of the Eleventh Amendment, but it's not limitless. And they can cite nothing for the proposition that it extends to a suit where the plaintiff is a coequal sovereign State—for how can that be so when the Constitution expressly contemplates suits between States in the Supreme Court, for instance? The most they can muster is a mention in *Alden v. Maine* that allowing certain anti-state suits might "upset the 'proper balance between the supremacy of federal law and the separate sovereignty of the States.'" *Id.* (quoting *Alden v. Maine*, 527 U.S. 706, 757 (1999)). But the federal courts have been entertaining suits between sovereign States for well over a century, *see, e.g.*, *Rhode Island*, 37 U.S. at 659, so there is little to "upset" here.

## II. Intervenor States Have Stated a Due Process Claim Under the Federal and Vermont Constitutions.

Vermont's scheme to exact billions of dollars from traditional energy producers is a quintessential "arbitrary action of government" that violates the Due Process Clause. *Wolff*, 418 U.S. at 558; *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992) (explaining that due process requires "a legitimate legislative purpose furthered by rational means"). And because the Vermont Due Process standard mirrors the federal one, it violates that state clause, too. *See A.B. v. S.U.*, 2023 VT 32, ¶ 10, 218 Vt. 123, 298 A.3d 573.

58

The Due Process Clause applies with special force to retroactive laws because "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf*, 511 U.S. at 265. And the "principle that legislation usually applies only prospectively . . . protects vital due process interests, ensuring that individuals . . . have an opportunity to know what the law is before they act, and may rest assured after they act that their lawful conduct cannot be second-guessed later." *Opati v. Republic of Sudan*, 590 U.S. 418, 425 (2020) (internal quotation marks and citation omitted). Retroactive legislation is suspect because legislatures can use "retroactive legislation as a means of retribution against unpopular groups or individuals," *Landgraf*, 511 U.S. at 266, and retribution is not a legitimate legislative goal.

A myriad of traits in the Climate Superfund Act cause it to violate the Due Process Clause. First, the Act imposes significant penalties that attach to conduct occurring up to 30 years ago. *See Pension Benefit Guar. Corp. v. R.A. Gray Co.*, 467 U.S. 717, 729 (1984). So rather than confining the penalties to a "short and limited" period, *E. Enters. v. Apfel*, 524 U.S. 498, 526 (1998) (plurality op.), the Act punishes energy companies for lawful actions taken generations ago, *see id.* at 549–50 (Kennedy, J., concurring in the judgment and dissenting in part) (concluding that a law that "create[d] liability for events which occurred 35 years ago" violated due process). Given how climate science has evolved over time, and given how the activities Vermont now attacks were actually *encouraged* by relevant governmental authorities through the use of tax incentives and official policy statements, *see supra*, at 18, during the relevant period, the targeted companies could not "have reasonably expected to be liable for a share of the remediation costs" over the course of this period. *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1330 (Fed. Cir. 2001). This scheme differs from the one the Supreme Court upheld

in *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976). There, the Supreme Court explained that a Congressional scheme requiring coal companies to compensate miners for Black Lung disease was constitutional, even though no such compensation requirement existed during some miners' period of employment. *Id.* at 17. In *Usery*, however, the mines' argument was not that the liability imposed was necessarily unforeseen or excessively harsh; it was that the method of calculating retroactive liability was unfair to more-established mines. *Id.* at 18 ("In essence the Operators contend that competitive forces will prevent them from effectively passing on to the consumer the costs of compensation for inactive miners' disabilities, and will unfairly leave the burden on the early operators alone."). *Usery* concerned the fairness of a specific mining-related compensatory scheme that bears no relation to Vermont's Act.

Next, the Act's scope demonstrates that it imposes an arbitrary and irrational punishment on traditional energy producers as "a means of retribution." *See Landgraf*, 511 U.S. at 267. It targets the politically disfavored out-of-State industries of coal, oil, and natural gas production while leaving out other polluters. For example, the logging industry here is immune, even though Vermont heavily relies on dirty-burning wood for fuel, and deforestation is a major contributor to climate change. Intervenor Compl. ¶¶ 102, 169. Relevantly, Vermont's Act targets only one part of the energy-production industry, to the exclusion of all others. Although Vermont contends that the harms of climate change were widely known during the covered period, Vermont MTD at 4, Vermont has placed all the blame—and corresponding liability—on the producers of traditional fuels. The Act refuses to recognize that individuals, including citizens of Vermont, have demanded traditional fuels to power their lives. Yet Vermont elects to only attack one half of the equation by ignoring the contributions that its own citizens have made to greenhouse-gas

emissions. Such selective attribution demonstrates the arbitrary manner in which the Climate Superfund Act attributes liability.

The Act further imposes significant liability in an "imprecise manner" with none of the "protections" that are ordinarily afforded when States impose liability. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003). The Climate Superfund Act directs the State Treasurer to calculate the past and future cost to Vermont of emissions released by covered entities between 1995 and 2024 and then charge each entity on a pro rata basis. 10 VT. STAT. § 596(8). But calculating the cost to Vermont of specific emissions over a 30-year period to any degree of certainty is scientifically impossible. Indeed, the Act does not even try to create a reliable way to calculate the cost, as it delegates to the Treasurer the ability to "determine[]" what the "relevant" costs of climate change are. *Id.* § 599c(1). Vermont hints in its briefing, Vermont MTD at 5, that it may use the social-cost-of-carbon tool to calculate the bill it will send to each covered entity. But the social cost of carbon is too malleable to adequately determine retroactive liability. As explained in the Intervenor States' complaint, the EPA itself has calculated the cost of carbon as ranging anywhere from $7 per ton to $185 per ton over the past decade. Compl. ¶ 113. Because these wild fluctuations demonstrate that the social cost of carbon is unreliable, the Office of Information and Regulatory Affairs has recently declared that "it is no longer Federal government policy to maintain a uniform estimate of the monetized impacts of greenhouse gas emissions." Memorandum from Jeffrey Bossert Calrk, Sr., Acting Adm'r, Off. of Info. and Regul. Affs. to Regul. Pol'y Officers at Dep'ts and Agencies and Managing and Exec. Dirs. of Comm'ns and Bds. (May 5, 2025), https://perma.cc/E9RR-9JW7. Basing an enormous retroactive fine on a metric that yields a twenty-five-fold margin for error and has now been rejected by the federal

government is the exact kind of "imprecise" liability that the Due Process Clause forbids. *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 417.

The due process concerns here are only amplified because none of the relevant activities took place in Vermont. It is highly unlikely that any of the producers had "fair notice" that they may be subject to liability in Vermont for activities not occurring in Vermont. *Bank Markazi v. Peterson*, 578 U.S. 212, 229 (2016). Not only were the actions of the traditional-fuel producers legal when they were taken, those actions were *encouraged* by the States wherein they took place. As explained above, *supra*, at 37, Intervenor States affirmatively promoted the use of their natural resources. Thus, producers in Intervenor States expected they would be rewarded for their efforts, not hit with a retroactive penalty from a different State.

Once more, Defendants defend their openly retroactive statute by insisting producers should have expected to be held retroactively liable for the emissions they helped create. That kind of contrary *factual* assertion is no reason to grant a motion to dismiss, which focuses on the pleadings. But even if the producers knew of climate change by 1995, it is unclear why they would have expected to be held responsible for the emissions of third parties. Even more when the federal government has long taken the position that a liability for past emissions is contrary to our foreign policy. Todd Stern, *supra*, ("We obviously do have [a] problem with the idea, and don't accept the idea, of compensation and liability and never accepted that and we're not about to accept it now.").

### III. The States Have Stated an Equal Protection Violation under Federal Law and a Violation of the Vermont Common Benefits Clause.

The Climate Superfund Act inflicts the kind of unequal treatment that both the U.S. and Vermont Constitution are supposed to prohibit. *See Brunelle*, 534 A.2d at 201 (explaining that the Vermont Constitution's Common Benefit Clause tracks the federal Equal Protection Clause).

Once a State has allowed a corporation to do business within its borders, the corporation is "entitled to equal protection with the state's own corporate progeny." *WHYY, Inc.*, 393 U.S. at 119. Unjustified differential treatment between in-state and out-of-state corporations violates the Equal Protection Clause. *Id.*

Vermont has not offered any legitimate purpose for distinguishing between large producers of coal, oil, and natural gas—who all operate outside of Vermont—and all other greenhouse-gas emitters, including those based within Vermont. If the aim of the statute was to remediate harms caused by climate change, it would have included all parties who shared some of the purported blame. Yet Vermont exclusively targeted large producers of coal, oil, and natural gas. Again: Vermont is unusually reliant on dirty-burning wood—and thus the lumber industry— for its own energy, yet it ignored that sector. Even worse, Vermont omitted the parties that burn the traditional fuels that power its economy, including power plants and end-user citizens. Intervenor Compl. ¶¶ 102, 188. The only reasonable conclusion, then, is that Vermont defined "responsible" companies in such a way as to avoid placing any burden on any Vermont taxpayers. "[T]he purpose of [this] legislation . . . was discrimination itself." *Douglas ex rel. Douglas v. Hugh A. Stallings, M.D., Inc.*, 870 F.2d 1242, 1247 (7th Cir. 1989). Vermont cannot intentionally place burdens on out-of-state businesses while exempting Vermont's own, more culpable businesses.

### IV. The States have Stated a Dormant Commerce Claim.

The Constitution's Commerce Clause both grants Congress the power to regulate commerce amongst the several States and imposes a limitation on the ability of States to do the same. The dormant Commerce Clause doctrine "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce

has effects within the State." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989) (citation omitted); *Nat'l Solid Wastes Mgmt. Ass'n v. Meyer*, 63 F.3d 652, 658–59 (7th Cir. 1995) (explaining that a "long line of cases" confirm that federal courts "will not hesitate to strike down a state law shown to have extraterritorial scope and an adverse impact on commerce occurring wholly outside the enacting state"). The doctrine also precludes a State from regulating in-State conduct in a way designed to "benefit in-state economic interests by burdening out-of-state competitors." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 192 (1994). The States have stated a claim under both dormant Commerce Clause varieties.

### A.  Vermont's Climate Superfund Act Impermissibly Regulates Out-of-State Economic Activities

Vermont cannot apply its Climate Superfund Act in a way that comports with the dormant Commerce Clause doctrine's prohibition on purely extraterritorial economic regulation. *Healy*, 491 U.S. at 336. Remember, Vermont does not contain a single coal mine, oil refining facility, or natural-gas well. Vermont's Climate Superfund Act not only attaches liability to actions that took place wholly outside of the State of Vermont, but it will also never attach liability to an action that took place in Vermont. The Act is thus unconstitutional in all its applications under the dormant Commerce Clause doctrine. *See Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 113 (2d Cir. 2025).

Vermont's various attempts to rescue its Act from the Commerce Clause's prohibition on extraterritorial regulation fall flat. Vermont first argues that a mere "extraterritorial effect" is insufficient to state a claim under the dormant Commerce Clause doctrine. Vermont MTD at 55–56. But the problem is not that the Climate Superfund Act creates an indirect extraterritorial effect, such as when California required pigs to be treated in particular ways before pork from those pigs could be sold *within* California. *See Nat'l Pork Prods. Council*, 598 U.S. at 371–77. California's

regulation operated within the State; it determined what pork was sold on the shelves in California grocery stores. *Id*. It did not penalize any actions that took place outside of California. Vermont's Climate Superfund Act operates exclusively out of State, attaching liability to the extraction of traditional fuels wherever it took place, whether it be another State or even another country. 10 VT. STAT. § 596(10). It is thus not comparable to a territorial regulation that may alter conduct outside of the State's territory.

The Act's "nexus" requirement also cannot save it from violating the dormant Commerce Clause doctrine. The Act applies only to companies that have "sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution." *Id*. § 596(22). But this "nexus" requirement applies to *companies* not the activities those companies undertake. And because the regulated activities can only take place outside of Vermont, the "nexus" requirement would not somehow make regulating them lawful. The "nexus" requirement may, in theory, reduce the number of companies covered under the Statute, but it would still not stop the Act from having a wholly extraterritorial effect. Every single cost recovery demand will include wholly out-of-State activity, so the Climate Superfund Act violates the dormant Commerce Clause Doctrine. *See Healy*, 491 U.S. at 336.

### B. The Burden on Interstate Commerce Imposed by Vermont's Climate Superfund Act Clearly Outweighs its Local Benefits

A law that imposes a burden on interstate commerce that is "clearly excessive" when compared to its local benefits violates the dormant Commerce Clause doctrine under *Pike v. Bruce*. *See VIZIO, Inc. v. Klee*, 886 F.3d 249, 258 (2d Cir. 2018) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). When laws fail this test, they evince the kind of discriminatory intent that the dormant Commerce Clause doctrine prohibits. *See Nat'l Pork Prods. Council*, 598 U.S. at 377; *Kraft Gen. Foods, Inc. v. Iowa Dep't of Rev. & Fin.*, 505 U.S. 71, 81 (1992).

The Climate Superfund Act violates the dormant Commerce Clause doctrine because it discriminates in practice against the economic interests of other States. *See Nat'l Pork Prods. Council*, 598 U.S. at 364. Vermont does not produce any oil, coal, or natural gas, and the Act targets the producers of these products knowing that they are all out-of-State corporations. Although Vermont produces no traditional fuels, it has "approximately 85 hydroelectric generation facilities." *Hydroelectric Power*, DEP'T OF ENV'T CONSERV., https://perma.cc/XDP5-GA7X. These facilities produce about 57% of Vermont's in-state electricity. *Vermont: Profile Analysis*, U.S. ENERGY INFO. ADMIN., https://perma.cc/4T95-DW4B. Vermont also has five large-scale wind farms that account for about 13% of in-state energy created in Vermont, *Id.*, and solar units account for about 16% of its in-State electricity. All told, "Vermont has the largest share of in-state electricity net generation from renewable resources of any state." *Id.* Given Vermont's unusually heavy reliance on renewables to generate energy, the burden of the Climate Superfund Act would fall outside of the State.

The discrimination is even more apparent when one considers that Vermont intends to use the money taken from traditional fuel producers and invest it in Vermont's alternative-energy producers. The "climate change adaptation projects" eligible to receive funding include those that will help "avoid" the "negative impacts caused by climate change." 10 VT. STAT. § 596(2), such as alternative-fuel operations. Thus, Vermont seeks to bilk out-of-state energy producers out of billions of dollars to subsidize its own in-state energy producers.

The "local" benefits to Vermont pale in comparison to the burdens on interstate commerce. To be sure, the Act will raise money, certainly in the billions of dollars. But that benefit is directly tied to the interstate burden, which this Court should not credit. If acquiring a pile of money is the kind of "putative local benefit[]" that can rebut a dormant Commerce Clause

66

challenge, *Pike*, 397 U.S. at 142, then the doctrine has no meaning. Under Vermont's view, States could tax goods only made in other States and claim that the resulting revenue frees them from the strictures of the dormant Commerce Clause doctrine. Given this absurdity, the proper question must be what benefits Vermont obtains other than money, and the answer is simply none.

Overall, the Act's burdens on interstate commerce—upending the national energy markets, engendering hostility among the States, and raising costs to out-of-state persons—are "clearly excessive in relation to the putative local benefits," which consist only of a sum of money. *Id.* That disproportionality reveals Vermont's true purpose of attacking disfavored industries elsewhere for the benefits of domestic industry. *Nat'l Pork Prods. Council*, 598 U.S. at 371.

### C. The Act Also Violates the Foreign Commerce Clause

Located next to the Interstate Commerce Clause, U.S. CONST. art. I, § 8, cl. 3, the Foreign Commerce Clause both grants Congress the power to regulate commerce with foreign nations and restricts the power of the States to do the same. *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 310 (1994). And because foreign commerce is less of a State-level concern than domestic commerce, the preemptive force of the Foreign Commerce Clause's negative command is "greater." *See Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448 (1979); *Kraft Gen. Foods*, 505 U.S. at 79. This doctrine does not permit state laws to "excessive[ly] interfere[]" with foreign affairs in a similar manner as the foreign-affairs doctrine. *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 66 (1st Cir. 1999), *aff'd sub nom. Crosby*, 530 U.S. 363.

If a State law "prevents the Federal Government from speaking with one voice when regulating commercial relations with foreign governments," it violates the Foreign Commerce Clause. *Japan Line*, 441 U.S. at 451 (quotation marks omitted). A State law "will violate the 'one

voice' standard if it . . . implicates foreign policy issues which must be left to the Federal Government." *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 194 (1983). In particular, the Foreign Commerce clause prohibits state laws that "impos[e] a different, state system of economic pressure" against a foreign entity than what the federal government would impose. *Crosby*, 530 U.S. at 376.

As explained above, the States have stated a claim that Vermont's Climate Superfund Act violates the Foreign Commerce Clause by attempting to regulate international production and consumption of traditional fuels. 10 Vt. Stat. § 596(10) (seeking liability against "foreign nation[s]"). Given that the Foreign Commerce Clause creates an even more stringent standard than the domestic Commerce Clause, it follows a fortiori that the Vermont Climate Superfund Act violates the Foreign Commerce Clause. *See Japan Line*, 441 U.S. at 451.

## V.    The States Have Stated a Claim Under the Excessive Fines Clause.

The Eighth Amendment's "Excessive Fines Clause limits the government's power to extract payments . . . as punishment for some offense." *Austin v. United States*, 509 U.S. 602, 609–10 (1993) (internal quotation marks and emphasis omitted). The clause's protections extend to any statute that "serve[s] in part to punish," including civil statutes like the Vermont Climate Superfund Act. *Id.* at 610. This includes civil sanctions that are not solely remedial but also serve "either retributive or deterrent purposes." *Id.* In other words, the Clause also "protects against excessive civil fines." *Hudson v. United States*, 522 U.S. 93, 103 (1997).

Courts use a two-step inquiry when determining whether a financial penalty is excessive under the Eighth Amendment. *United States v. Viloski*, 814 F.3d 104, 108–09 (2d Cir. 2016). First, the court determines whether the Excessive Fines Clause applies to the State's attempt to take

money from the plaintiff. *Id.* If the Clause applies, then the court looks at whether the fine is unconstitutionally excessive. *Id.*

The Excessive Fines Clause applies to the Act. The key inquiry is whether the fine could be characterized, "at least in part, as punitive." *Id.* at 109 (internal quotation marks omitted). Only if a fine is "*purely* remedial" will it be exempted from the Eighth Amendment's reach. *Id.* at 109 n.7 (emphasis added). But the Act serves a retributive purpose, at least in part. It targets a small group of energy producers for their alleged role in climate-change impacts while ignoring other producers, businesses, and consumers. *See* VNRC, *Climate Dispatch*, *supra*, at 3:46–50 (Senate Majority Leader bragging that "[m]aking Big Oil pay… [is] on the [senate] floor today"). This mismatch between the Act's provisions and its purported goal of mitigating the impacts of climate change shows that the Act's purpose, at least in part, is to punish large energy producers. Indeed, Vermont admits that it chose the 1995 through 2024 period because it concluded that the producers of traditional fuels knew that climate change was occurring by 1995. Vermont's decision to select a period based on perceived moral culpability suggests that it was intending to use these fines as "retributi[on]" for the producers' contributions to climate change. *Austin*, 509 U.S. at 609–10. Vermont contends that the Act "cannot be punitive" because the fines it levies "do not arise from any violation of law." Vermont MTD at 65. But Vermont never explains how the lack of a violation of law makes its fines any less punitive. A State can punish by fiat just as easily—and perhaps more destructively—than when it greenlights a payment after a finding of a violation. That Vermont seeks to selectively fine disfavored industries without a violation of law does not somehow *help* their excessive-fines argument.

If anything, the lack of a legal violation proves that these fines are excessive because they require billions of dollars in payments for lawful conduct. A penalty "is unconstitutionally

excessive if it is grossly disproportional to the gravity of a defendant's" conduct. *Viloski*, 814 F.3d at 110 (internal quotation marks omitted). Courts use four nonexhaustive factors to test for gross disproportionality: "(1) the essence of the [offense] of the [wrong-doer] and its relation to other [bad acts], (2) whether the [wrong-doer] fits into the class of persons for whom the statute was principally designed, (3) the maximum . . . fine that could have been imposed, and (4) the nature of the harm caused by the [wrong-doer's] conduct." *Id.*

The Act's punishment is grossly disproportionate. To begin, the producers are being punished for activities that were lawful or even encouraged at the time. There was no "crime," "offense," or even immoral act to earn such a punishment. *Bajakajian*, 524 U.S. at 333–34. The second and third factors are also inapposite because they are primarily designed to be applied to a *court*'s determination of a fine. If anything, Vermont's choice to levy a fine through its Legislature demonstrates the unusual nature of the Climate Superfund Act. Finally, the nature of the harm here does not support fining the producers. Vermont's legislature apparently perceives that climate change in general may have caused some harms to the State. But traditional energy has produced tremendous benefits associated with modernity. Indeed, traditional energy has "enabled unprecedented quality of life improvements." C. Boyden Gray, *Climate Realism and A Positive Vision for American Energy*, 21 GEO. J.L. & PUB. POL'Y 149, 154 (2023). And beyond that, any alleged harms are not merely caused by the producers; indeed, Vermont has not tied any specific harm to any specific producer at all. Instead, any harms would stem from those who use traditional fuels, including Vermont itself and its own citizens.

Vermont pushes back by arguing that this Court could not rule on the constitutionality of its Act until Vermont starts enforcing these fines against producers of traditional fuels. But again, the Court need not wait until the producers are standing on the edge of the knife. Given that

Vermont is seeking to 1) punish lawful conduct, 2) that Vermont's own residents participated in, there is almost no fine that could possibly satisfy the Excessive Fines Clause. And Vermont will seek billions of dollars in fines from the producers under the Act. The Act seeks money for well over a dozen categories of projects that range from building new sewer systems to paying for the citizens of Vermont's healthcare. New York's similar climate superfund law put the price tag at $75,000,000,000. *See* N.Y. ENV'T CONSERV. LAW § 76-0101(3), (9). If Vermont demands even a similar per capita number, it will issue fines in the billions of dollars. As the Senate Majority Leader herself asserted, it will cost "[b]illions and billions of dollars." VNRC, *Climate Dispatch*, *supra*, at 3:50–57.

## VI.    The States have Stated a Claim Under the Federal and Vermont Takings Clauses.

While "takings problems are more commonly presented . . . as a physical invasion by the government," "[e]conomic regulation[s]" can also be considered to "effect a taking." *E. Enters.*, 524 U.S. at 522–23 (plurality op.); *see also Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124 (1978). "Regulatory takings analysis requires an intensive *ad hoc* inquiry into the circumstances of each particular case." *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 375 (2d Cir. 2006). Courts consider three factors in determining whether a regulatory taking has occurred: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 582 U.S. at 393. When applied to the Vermont Climate Superfund Act, each of these factors demonstrates that the Act constitutes a taking without just compensation under both the federal and statute constitutions. *See Ondovchik Fam. Ltd. P'ship*, 2010 VT 35, ¶¶ 13–14 (explaining that the Vermont Takings Clause tracks the federal Takings Clause).

First, the economic burden here is significant. A select group of energy producers are forced to pay what will certainly be billions of dollars to fund climate change adaptation projects. As discussed above, New York has set its related assessment amount at $75 billion, and the Senate Majority Leader in Vermont brags that it will "cost a bomb." *See* VNRC, *Climate Dispatch*, *supra*, at 3:50–57. That is, "[b]illions and billions" of dollars. *Ibid.* Those penalties will have a severe economic impact on energy producers, consumers and businesses, and States throughout the country. In *Eastern Enterprises*, a plurality of the Supreme Court found a "considerable financial burden" was imposed when a plaintiff had to make a retroactive payment between $50 and $100 million. 524 U.S. at 529 (plurality op.). Vermont's Act promises an even larger burden. Although the cost recovery demands are yet to issue, the Intervenor-Defendants note that Vermont's residents are expected to incur "$5.29 billion in flood damages" alone over the next century. Int.-Defs.' MTD at 3. Likewise, Vermont has already received $370 million dollars from the federal government for "federally declared climate disasters." *Id.* Flood damages are only a small part of what the Act will attempt to cover, demonstrating that the sum of the cost recovery demands will be much greater than the already-massive $5 billion price tag.

Second, the Act "substantially interferes" with Plaintiffs' "reasonable investment-backed expectations." *E. Enters.*, 524 U.S. at 532 (plurality op.); *Murr*, 582 U.S. at 393, 397. The key inquiry is whether the regulated entity had "sufficient notice" that it would be required to make such a payment. *E. Enters.*, 524 U.S. at 535–36 (plurality op.). The States can find no greater example of having reasonable expectations dashed than in the case of retroactive legislation. In *Eastern Enterprises*, the plurality found the investment-expectations prong met because the statute "attache[d] new legal consequences to [an employment relationship] completed before its enactment." *See id.* at 532 (quoting *Landgraf*, 511 U.S. at 270) (plurality op.). And like *Eastern*

72

*Enterprises*, the energy producers covered under Vermont's Climate Superfund Act lacked sufficient notice they would be on the hook for billions of dollars to Vermont. As stressed already, energy producers were complying with the laws of the drilling and mining States when they undertook their extraction activities between 1995 and 2024. Likewise, they were complying with federal law and could have had no expectation that Vermont would find a way to circumvent federal regulation of interstate pollution. Further, producers made expensive capital expenditures—opening mines, producing energy, building refineries—with the expectation that these substantial outlays would be recovered *without* a multi-billion-dollar outlay piled on top. So the second factor is met here.

The third factor—the character of the government's action—favors the challengers. A retroactive strict liability regime for producers of traditional fuels "is quite unusual." *E. Enters.*, 524 U.S. at 537 (plurality op.). Indeed, no court has ever deemed a similar scheme lawful. The plurality in *Eastern Enterprises* noted this factor was met when a legislative "solution singles out certain employers to bear a burden that is substantial in amount, based on the employers' conduct far in the past," because this "implicates fundamental principles of fairness underlying the Takings Clause." 524 U.S. at 537 (plurality op.). Likewise, the Climate Superfund Act singles out energy producers to bear a substantial financial burden based on past conduct and thus "implicates" the same "fundamental principles" as in *Eastern Enterprises*. *Id.*

Vermont contests this takings analysis by arguing that an obligation to pay money cannot constitute a taking. Vermont MTD at 68–69. But Vermont acknowledges no Supreme Court or Second Circuit precedent immunizes an obligation to pay money from the usual regulatory taking analysis. *Id.* Indeed, the Supreme Court's only relevant pronouncement on the issue was a four-Justice plurality opinion in *Eastern Enterprises*, which concluded that a retroactive obligation to

pay money could constitute a regulatory taking. 524 U.S. at 522–23. Allowing a regulatory takings claim when the State demands payment for past legal activities also makes intuitive sense. Vermont admits that a person can bring a takings claim when the government physically appropriates an identified sum of money, such as in a bank account or physical currency. Vermont MTD at 68–70. It would make little sense if a State law requiring the payment of the exact same amount of money was exempted from the takings analysis.

### VII. Intervenor States Have Stated a Claim Under the Vermont Constitution's Separation of Powers Clause.

The Vermont Constitution vests the "separate and distinct" "Supreme Legislative power" in the State legislature, VT. CONST. ch II, §§ 2, 5, and it explicitly affirms that the other branches cannot "exercise the powers properly belonging" to it. *Id.* § 5. The Act violates this command. The Act grants "unfettered discretion" to the Treasurer to determine how much money to extract from traditional fuel producers. *Handy*, 764 A.2d at 1234.

The Climate Superfund Act "has given no rule of standard by which" the past and future costs of climate change caused by the relevant emissions "are to be determined and the assessments made." *Village of Waterbury v. Melendy*, 199 A. 236, 242 (Vt. 1938). Nowhere does the Act create a methodology to determine which costs to "Vermont and its residents" are attributable to climate change. 10 VT. STAT. § 598(b). Instead, the Treasurer "determines" what "is relevant" when it comes to cost calculations. *Id.* § 599c(1). To be sure, the Treasurer must consider "effects on public health, natural resources, biodiversity, agriculture, economic development, flood preparedness and safety, [and] housing." *Id.* But those requirements do not actually limit the Treasurer in any way because he can still include "any other effect that [he] . . . determines is relevant." *Id.* Because the Treasurer can decide what the traditional fuel producers must pay for, he "must say what the law shall be, and not merely exercise discretion as to its execution." *Melendy*, 199 A. 236 at 242; *accord*

*Athens Sch. Dist. v. Vt. State Bd. of Educ.*, 2020 VT 52, ¶ 39, 212 Vt. 455, 237 A.3d 671, 686 (citations omitted) ("[A] delegation of the power to make the law . . . cannot be done.").

Gesturing at general welfare does not "establish reasonable standards to govern" executive discretion. *Vt. Home Mortg. Credit Agency v. Montpelier Nat'l Bank*, 262 A.2d 445, 449 (Vt. 1970); *but see* Vermont MTD at 74 (arguing the effect "must still be a 'cost-driving effect[] of covered greenhouse gas emissions'" and the Treasurer must assess "the types of projects Vermont will need to implement to respond to climate change" (quoting 10 VT. STAT. § 599c(1))). Take *Town of Westford v. Kilburn*, 300 A.2d 523 (Vt. 1973). There, the Vermont Supreme Court considered whether "the public health, safety, convenience and welfare of" town inhabitants, "the most appropriate use of land," and "property value" conservation limited the Board of Adjustment's discretion. *Id.* at 525. The standards were insufficient. "[T]he special exception provision failed 'to prescribe appropriate conditions and safeguards' and delegated authority . . . 'with . . . no standards to govern its use.'" *Handy*, 764 A.2d at 1235 (quoting *Kilburn*, 300 A.2d at 527). That case exemplifies the "constitutional rule." *Id.*

It also does not matter, *contra* Vermont MTD at 74, that the Treasurer must "consult[] with the Climate Action Office" when setting the assessment. 10 VT. STAT. § 599c(1). But a requirement to consult with another part of the executive branch does not make the delegation of authority any less legislative. Indeed, after consulting with the Climate Action Office, the Treasurer could choose to wholly ignore its advice. After all, the Act does not require that the Treasurer follow the Climate Action Office's directions.

## CONCLUSION

This Court should enter summary judgment for the States on Counts I and II and deny the Defendants' motion to dismiss.

Dated: September 15, 2025                    Respectfully submitted,

/s/ Brady C. Toensing                          JOHN B. MCCUSKEY
Brady C. Toensing                              ATTORNEY GENERAL OF WEST VIRGINIA
DIGENOVA & TOENSING
1775 Eye Street NW                             /s/ Michael R. Williams
Suite 1150                                     Michael R. Williams*
Washington, DC 20006                             Solicitor General
(202) 297-4245                                 Caleb B. David*
Brady@digtoe.com                                 Deputy Solicitor General
                                               Spencer J. Davenport*
/s/ Michael W. Kirk                              Assistant Solicitor General
Michael W. Kirk*
Adam P. Laxalt*                                Office of the Attorney General
Megan M. Wold*                                 of West Virginia
Brian W. Barnes*                               State Capitol Complex
COOPER & KIRK, PLLC                            Building 1, Room E-26
1523 New Hampshire Ave., N.W.                  1900 Kanawha Blvd. E
Washington, D.C., 20036                        Charleston, WV 25301
Telephone: (202) 220-9600                      (304) 558-2021
Facsimile: (202) 220-9601                      michael.r.williams@wvago.gov
mkirk@cooperkirk.com                           caleb.a.david@wvago.gov
alaxalt@cooperkirk.com                         spencer.j.davenport@wvago.gov
mwold@cooperkirk.com
bbarnes@cooperkirk.com

*Counsel for State of West Virginia*

STEVE MARSHALL                                 TREG TAYLOR
  ATTORNEY GENERAL OF ALABAMA                    ATTORNEY GENERAL OF ALASKA

/s/ Robert M. Overing                          /s/ Thomas Mooney-Myers
Robert M. Overing*                             Thomas Mooney-Myers*
  Deputy Solicitor General                       Assistant Attorney General

Office of the Attorney General                 Alaska Department of Law
of Alabama                                     1031 W. 4th Ave., Ste. 200
501 Washington Avenue                          Anchorage, AK 99501
Montgomery, AL 36130                           (907) 269-5100
(334) 242-7300                                 thomas.mooney-myers@alaska.gov
Robert.Overing@AlabamaAG.gov

*Counsel for State of Alabama*                 *Counsel for State of Alaska*

TIM GRIFFIN
  ATTORNEY GENERAL OF ARKANSAS

*/s/ Autumn Hamit Patterson*
Autumn Hamit Patterson*
  *Solicitor General*

Office of the Arkansas Attorney General
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-3661
Autumn.Patterson@Arkansasag.Gov

*Counsel for the State of Arkansas*


CHRISTOPHER M. CARR
  ATTORNEY GENERAL OF GEORGIA

Stephen J. Petrany
  *Solicitor General*

*/s/ Elijah O'Kelley*
Elijah O'Kelley*
  *Assistant Solicitor General*

Office of the Attorney General of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334
(470) 816-1342
eokelley@law.ga.gov

*Counsel for State of Georgia*


JAMES UTHMEIER
  ATTORNEY GENERAL OF FLORIDA

Jeffrey Paul DeSousa*
  *Acting Solicitor General*

*/s/ Christine Pratt*
Christine Pratt (FBN 0100351)*
  *Assistant Solicitor General*

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
christine.pratt@myfloridalegal.com

*Counsel for State of Florida*


RAÚL R. LABRADOR
  ATTORNEY GENERAL OF IDAHO

*/s/ Michael A. Zarian*
Michael A. Zarian #12418ID*
  *Deputy Solicitor General*

Office of the Idaho Attorney General
700 W. Jefferson St., Suite 210,
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
michael.zarian@ag.idaho.gov

*Counsel for the State of Idaho*

77

THEODORE E. ROKITA
  ATTORNEY GENERAL OF INDIANA

/s/ *James A. Barta*
James A. Barta*
  *Solicitor General*

Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

*Counsel for State of Indiana*

KRIS W. KOBACH
  ATTORNEY GENERAL OF KANSAS

LIZ MURRILL
  ATTORNEY GENERAL OF LOUISIANA

ANDREW BAILEY
  ATTORNEY GENERAL OF MISSOURI

BRENNA BIRD
  ATTORNEY GENERAL OF IOWA

/s/ *Eric H. Wessan*
Eric H. Wessan*
  *Solicitor General*

1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

RUSSELL COLEMAN
  ATTORNEY GENERAL OF KENTUCKY

/s/ *Victor B. Maddox*
Victor B. Maddox (KBA No. 43095)*
Jason P. Woodall (KBA No. 95013)*

Kentucky Office of the Attorney General
310 Whittington Parkway, Suite 101
Louisville, KY 40222
(502) 696-5300
Victor.Maddox@ky.gov
Jason.Woodall@ky.gov

*Counsel for Commonwealth of Kentucky*

78

AUSTIN KNUDSEN
  ATTORNEY GENERAL OF MONTANA

/s/ *Christian B. Corrigan*
Christian B. Corrigan*
  *Solicitor General*
Peter M. Torstensen, Jr.
  *Deputy Solicitor General*

Montana Department of Justice
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Counsel for State of Montana*

MICHAEL T. HILGERS
  ATTORNEY GENERAL OF NEBRASKA

/s/ *Zachary A. Viglianco*
Zachary A. Viglianco*
  *Acting Solicitor General*

Nebraska Department of Justice
2115 State Capitol
Lincoln, Nebraska 68509
Tel.: (402) 471-2683
Fax: (402) 471-3297
zachary.viglianco@nebraska.gov

*Counsel for State of Nebraska*

DREW H. WRIGLEY
  ATTORNEY GENERAL OF NORTH DAKOTA

/s/ *Philip Axt*
Philip Axt*
  *Solicitor General*

600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Phone: (701) 328-2210
Email: pjaxt@nd.gov

*Counsel for the State of North Dakota*

DAVE YOST
  ATTORNEY GENERAL OF OHIO

/s/ *Mathura J. Sridharan*
Mathura J. Sridharan*
  *Solicitor General*

30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
614-466-5087 fax
mathura.sridharan@ohioago.gov

*Counsel for the State of Ohio*

79

GENTNER DRUMMOND
  ATTORNEY GENERAL OF OKLAHOMA

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II*
  *Solicitor General*

Office of the Attorney General of
Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for State of Oklahoma*


MARTY J. JACKLEY
  ATTORNEY GENERAL OF SOUTH DAKOTA

*/s/ Jonathan Van Patten*
Jonathan Van Patten*
  *Assistant Attorney General*

South Dakota Attorney General's Office
1302 E. Highway 14, Suite 1
Pierre, South Dakota 57501
Telephone: 605-773-3215
E-mail: jonathan.vanpatten@state.sd.us

*Counsel for State of South Dakota*


ALAN WILSON
  ATTORNEY GENERAL OF SOUTH CAROLINA

*/s/ J. Emory Smith, Jr.*
J. Emory Smith, Jr.*
  *Solicitor General*

Office of the Attorney General of
South Carolina
Post Office Box 11549
Columbia, South Carolina 29211
(803) 734-3680
esmith@scag.gov

*Counsel for State of South Carolina*


JONATHAN SKRMETTI
  ATTORNEY GENERAL AND REPORTER OF
  TENNESSEE

*/s/ James M. Rice*
James M. Rice*

Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 532-6026
matt.rice@ag.tn.gov

*Counsel for State of Tennessee*

80

KEN PAXTON
  ATTORNEY GENERAL OF TEXAS

Brent Webster
*First Assistant Attorney General*

Ralph Molina
*Deputy First Assistant Attorney General*

Ryan D. Walters
*Deputy Attorney General for Legal Strategy*

*/s/ Ryan G. Kercher*
Ryan G. Kercher*
  *Chief, Special Litigation Division*
Texas Bar No. 24060998

Kathleen Hunker*
  *Deputy Chief, Special Litigation Division*
Tex. State Bar No. 24118415

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Ryan.Kercher@oag.texas.gov
Kathleen.hunker@oag.texas.gov

*Counsel for State of Texas*

DEREK E. BROWN
  ATTORNEY GENERAL OF UTAH

*/s/ Gary T. Wight*
Gary T. Wight (Utah Bar No. 10994)*
  *Assistant Attorney General*

1594 West North Temple, Suite 300
Salt Lake City, Utah 84116
(801) 538-7227
gwight@agutah.gov

*Counsel for State of Utah*

81

BRIDGET HILL
  ATTORNEY GENERAL OF WYOMING

*/s/ Ryan Schelhaas*
Ryan Schelhaas*
  *Chief Deputy Attorney General*

Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for State of Wyoming*


*admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of September, 2025, that Intervenor-Plaintiffs' Memorandum in Support of their Motion for Summary Judgement and Opposition to Defendants' Motions to dismiss was served on Defendants' counsel via CM/ECF system that will forward copies to all Counsel of Record.

*/s/ Michael W. Kirk*
Michael W. Kirk

*Attorney for Intervenor States*