## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA and
AMERICAN PETROLEUM INSTITUTE,
　　　　　　　　Plaintiffs,
　　　and

STATE OF WEST VIRGINIA et al.,
　　　　　　　　Intervenor-Plaintiffs,
　　　v.

JULIE MOORE et al.
　　　　　　　　Defendants,
　　　and

NORTHEAST ORGANIC FARMING
ASSOCIATION OF VERMONT and
CONSERVATION LAW FOUNDATION,
　　　　　　　　Intervenor-Defendants.

Case No. 2:24-cv-01513

## DEFENDANTS' RESPONSE TO INTERVENOR-PLAINTIFFS' RULE 56 STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56(b), Defendants submit the following response to Intervenor-Plaintiffs' Rule 56 Statement of Undisputed Material Facts in Support of Intervenor-Plaintiffs' Motion for Summary Judgment. By responding to the facts set forth below, Defendants do not concede that any fact in Intervenor-Plaintiffs' Rule 56 Statement is material to the legal issues raised in their Motion for Summary Judgment. Moreover, because the pending summary judgment motion seeks resolution of the case prior to discovery, Defendants' characterization of any facts as "undisputed" for purposes of the pending motion is not intended as a waiver of Defendant's right to dispute those facts if further proceedings are necessary.

1.      The Vermont Climate Superfund Act became law on July 1, 2024. *See* S.259 (Act

122).

**Response:**      Disputed. The Climate Superfund Act became law on May 30, 2024.
Vermont General Assembly, S.259 (Act 122), https://perma.cc/2B78-
SRNY. Its effective date was July 1, 2024. *See* 2024 Vt. Acts & Resolves
No. 122, § 7.

2.      Defendant Julie Moore is the Secretary of the Vermont Agency of Natural

Resources.

**Response:**      Undisputed.

3.      Defendant Moore is responsible for issuing cost recovery demands to the covered

energy producers under the Climate Superfund Act. § 598(g)(l).

**Response:**      Insofar as "covered energy producer" is intended to mean "responsible
party," undisputed. Otherwise, the cited authority does not support this
fact.

4.      Defendant Moore is being sued in her official capacity. Compl. ¶ 43.

**Response:**      This is not a fact, but a legal conclusion. Nonetheless, the State does not
dispute that Intervenor-Plaintiffs have sued Defendant Moore in her
official capacity.

5.      Defendant Jane Lazorchak is the Director of the Vermont Agency of Natural

Resources Climate Action Office.

**Response:**      Undisputed except that Defendant Lazorchak's title is Program Manager.

6.      As the Director of the Vermont Agency of Natural Resources Climate Action

Office, Defendant Lazorchak is responsible for administering the Act's Climate Superfund Cost

Recovery Program under the Act. § 597.

**Response:**      Defendant Lazorchak's title is Program Manager. The State does not
dispute that the Agency of Natural Resources Climate Action Office is
responsible for administering the Act's Climate Superfund Cost Recovery
Program. The cited statute does not support that "Defendant Lazorchak" is
responsible for administering the program.

7.      Defendant Lazorchak is being sued in her official capacity. Compl. ¶ 44.

**Response:**      This is not a fact, but a legal conclusion. Nonetheless, the State does not dispute that Intervenor-Plaintiffs have sued Defendant Lazorchak in her official capacity.

8.      Moore and Lazorchak reside in or conduct a substantial proportion of their official business in Vermont.

**Response:**      The State does not dispute that Secretary Moore and Program Manager Lazorchak conduct a substantial proportion of their official business in Vermont. Their residence is irrelevant, and Intervenor-Plaintiffs do not offer any evidence to support the location of their residence.

9.      Vermont has no crude oil reserves or production. *Vermont State Energy Profile*, U.S. ENERGY INFO. ADMIN. (Aug. 21, 2025) (attached as Exhibit A to Declaration of Bradley L. Larson (Sept. 15, 2025)).

**Response:**      Undisputed.

10.      Vermont does not have any petroleum refineries. *Id.*

**Response:**      Undisputed.

11.      Vermont has no natural gas reserves or production. *Id.*

**Response:**       Undisputed to the extent this statement is about fossil gas.

12.      Vermont does not have any coal mines or coal reserves and there are no coal-fired power plants in the state. *Id.*

**Response:**      Undisputed.

## West Virginia

13.      West Virginia was the fourth highest producer of total energy in the United States in 2021. Declaration of Scott A. Adkins (Sept. 8, 2025) ("Adkins Decl.") ¶ 4.

**Response:**      Undisputed to the best of the State's knowledge.

14.     Approximately 85,000 West Virginians are employed in the energy sector. Adkins Decl. ¶ 7.

**Response:**     Undisputed to the best of the State's knowledge.

15.     Employees in West Virginia in the oil and gas field received over $271 million in compensation in 2023. Adkins Decl. ¶ 8.

**Response:**     Undisputed to the best of the State's knowledge.

16.     Employees in West Virginia in the pipeline transportation field received over $170 million in compensation in 2023. *Id.* at ¶ 8.

**Response:**     Undisputed to the best of the State's knowledge.

17.     West Virginia ranks in the top 5 States in the country for energy consumption per capita. *Id.* at ¶ 9.

**Response:**     Undisputed to the best of the State's knowledge.

18.     The industrial sector accounts for about 46% of West Virginia's energy usage. *Id.* at ¶ 9.

**Response:**     Undisputed to the best of the State's knowledge.

19.     West Virginia consistently ranks as one of the poorest States in the country. *Id.* at ¶ 13.

**Response:**     Undisputed to the best of the State's knowledge.

20.     Economic disruption associated with the Climate Superfund Act will hit West Virginia especially hard. *Id.* at ¶¶ 10–13.

**Response:**     The State objects because the material cited cannot be presented in a form that would be admissible in evidence. The cited materials rely on speculation, lacking in foundation, that costs assessed under the Climate Superfund Act will negatively impact fossil fuel employment and capital investments, raise energy costs, and decrease fossil fuel production in West Virginia. The State disputes the assumption that costs assessed under

the Climate Superfund Act are likely to or necessarily will have such effects. Declaration of Don Fullerton, Ph.D. ("Fullerton Decl.") ¶¶ 11-42.

21.     West Virginia spent $9,913,789.41 in 2024 on fuel for State transportation needs. Declaration of Kenneth H. Yoakum (Sept. 9, 2025) ("Yoakum Decl.") ¶ 2.

**Response:**     Undisputed to the best of the State's knowledge.

22.     West Virginia purchased 3,080,514 gallons of fuel in 2024 on behalf of its fleet of vehicles. Yoakum Decl. ¶ 2.

**Response:**     Undisputed to the best of the State's knowledge.

23.     In 2023, the State's fleet purchased 3,086,183 gallons of fuel. The fleet purchased under 6,000 more gallons in 2023 but spent over $11,000,000 on fuel because of gas-price fluctuations. *Id.* at. ¶ 3.

**Response:**     Undisputed to the best of the State's knowledge.

24.     Nine West Virginia state agencies rely on State transportation. The West Virginia State Police, Department of Transportation, and Department of Human Services are among the state's top fuel consumers. *Id.* at. ¶ 4.

**Response:**     Undisputed to the best of the State's knowledge.

25.     West Virgina generated over $1 billion in revenue from severance taxes from coal, natural gas, natural gas liquid, and oil in fiscal year 2023. Declaration of Matthew Irby (Sept. 11, 2025) ("Irby Decl.") ¶ 3.

**Response:**     Undisputed to the best of the State's knowledge.

26.     In fiscal years 2024 and 2025, West Virginia collected over $500 million in revenue from severance taxes each year from fossil fuel extraction. Irby Decl. ¶ 3.

**Response:**     Undisputed to the best of the State's knowledge.

27.     Local governments in West Virginia receive 10% of net proceeds from oil and natural gas severance taxes, and 100% of regular severance tax on natural gas production. Counties receive 5% of state coal severance tax collections. *Id.* at ¶ 4.

> **Response:**     Undisputed to the best of the State's knowledge.

28.     About 90% of all state severance taxes go to the State's General Revenue Fund. This Fund enables the state to provide essential services, including public education, law enforcement and corrections, and the judiciary. *Id.* at ¶ 4.

> **Response:**     Undisputed to the best of the State's knowledge.

29.     Without severance taxes, West Virginia would face a substantial budget shortfall. *Id.* at ¶ 4.

> **Response:**     The State does not dispute this fact to the best of its knowledge, though adds the full statement from the declaration for context. The declarant has testified that "Without severance taxes, West Virginia would face a substantial budget shortfall that would compel it to either implement cuts in [essential services] spending or impose additional revenue-generating measures."

30.     The state imposes a severance tax of 5% on the production of oil and natural gas. Severance tax is based on production, so a reduction in production means the state generates less severance tax revenue. *Id.* at ¶ 5.

> **Response:**     The State does not dispute, to the best of its knowledge, that a reduction in oil and natural gas production could lead to less severance tax revenue, *see* Fullerton Decl. ¶ 36 (noting that severance tax is based on production *and* price), but notes that nothing in the supporting document supports any suggestion that the Climate Superfund Act would lead to a reduction in oil or natural gas production in West Virginia.

31.     The State of West Virgina purchases massive quantities of energy and electricity to operate and maintain its properties, including to perform its sovereign duties. Declaration of Robert Kilpatrick (Sept. 12, 2025) ("Kilpatrick Decl.") ¶ 5.

**Response:**    Undisputed to the best of the State's knowledge, except disputed to the extent "massive" is an opinion, not a fact, and the cited document does not contain quantitative comparison or analysis of energy and electricity.

32.    At the thirty-three buildings withing the Department of Administration's portfolio, the State spent $5,086,070.69 on electrical power and natural gas from 2024-2025. Kilpatrick Decl. ¶ 6.

**Response:**    Undisputed to the best of the State's knowledge.

## Tennessee

33.    Tennessee obtained $891,035,756.75 in revenue from its gasoline tax from July 2024 – June 2025 at a rate of $0.26 per gallon. Declaration of Amanda McGraw (Sept. 8, 2025) ("McGraw Decl.") ¶ 5.

**Response:**    Undisputed to the best of the State's knowledge.

34.    Tennessee obtained $317,109,678.17 in revenue from its regular diesel tax from July 2024 – June 2025 at a rate of $0.27 per gallon. McGraw Decl. ¶ 6.

**Response:**    Undisputed to the best of the State's knowledge.

35.    Tennessee obtained $52,071,098.28 in revenue from its special petroleum tax from July 2024 – June 2025 at a rate of $.01 per gallon. *Id.* at ¶ 7.

**Response:**    Undisputed to the best of the State's knowledge.

36.    Tennessee obtained $466,796.56 in natural gas and crude oil severance taxes from July 2024-June 2025 at a rate of 3% of the sales price of all natural gas and crude oil removed from the ground in Tennessee. *Id.* at ¶ 8.

**Response:**    Undisputed to the best of the State's knowledge.

## Kansas

37.    The Office of the Attorney General purchased 10,519.56 gallons of gasoline in 2025, a net cost to the State of Kansas of $27,912.84. Declaration of Tabetha Mallonee in

7

Support of Plaintiffs' Motion for Stay and Preliminary Injunction (Sept. 10, 2025) ("Mallonnee Decl.") ¶ 4.

> **Response:**     Undisputed to the best of the State's knowledge.

38.     The Office of the Attorney reimburses employees who, while traveling on Attorney General Business, purchase gasoline with their own funds. Mallonnee Decl. ¶ 5.

> **Response:**     Undisputed to the best of the State's knowledge.

39.     In 2025, the Office of the Attorney General spent $222.08 on reimbursements to agency employees for their gasoline purchase. *Id.* at ¶ 6.

> **Response:**     Undisputed to the best of the State's knowledge.

40.     In 2025, therefore, the Office of the Attorney General spend a total of $28,134.92 on gasoline. *Id.* at ¶ 7.

> **Response:**     Undisputed to the best of the State's knowledge.

41.     If the price of gasoline increases, the Office of the Attorney General will be forced to expend more money on gasoline purchases. *Id.* at ¶ 8.

> **Response:**     Undisputed to the best of the State's knowledge for purposes of the present motion, but the State notes that the declarant has not provided any discussion or consideration of what its travel needs will be over the relevant time period or why other travel options would not be pursued.

### Georgia

42.     Georgia purchases large quantities of energy and petroleum to serve citizens of Georgia through several departments and agencies. Declaration of Jazzmin Randall (Sept. 8, 2025) ("Randall Decl.") ¶ 2.

> **Response:**     Undisputed to the best of the State's knowledge, except disputed to the extent "large" is an opinion, not a fact, and the cited document does not contain quantitative comparison or analysis of energy and petroleum.

43.    Georgia spent more than $43 million in 2024 to purchase fuel, petroleum, and other gas products for State transportation needs. The Georgia State fleet purchased more than 13 million gallons of fuel in 2024. Randall Decl. ¶ 2.

**Response:**    Undisputed to the best of the State's knowledge.

44.    The State's fuel costs are tied to fuel prices, so its costs increase as fuel prices increase. *Id.* at 3.

**Response:**    Undisputed to the best of the State's knowledge.

45.    State transportation is necessary to conduct the work of numerous State agencies. Agencies like the Georgia Department of Public Safety, the Department of Human Services, the Georgia Department of Transportation, and the Georgia State Patrol require large amounts of fuel to maintain the fleet and serve the citizens of the State. The State's ability to provide law enforcement, safe roads, and care to abused and neglected children depends on fuel. *Id.* at 4.

**Response:**    Undisputed to the best of the State's knowledge for purposes of the present motion, except disputed to the extent "large" is an opinion, not a fact, and the cited document does not contain quantitative comparison or analysis of fuel. Moreover, the State notes that the declarant has not accounted for other transportation options.

### South Carolina

46.    From July 1, 2024, to June 30, 2025, the South Carolina Department of Public Safety expended $4,937,807 to purchase 1,778,042 gallons of fuel for motor vehicles including those used by State Troopers in the performance of law enforcement duties. Declaration of Karl Boston – South Carolina Department of Public Safety (Sept. 8, 2025) ("Boston Decl.") ¶ 3.

**Response:**    Undisputed to the best of the State's knowledge.

47.    If the price of fuel were to increase by even $.01 per gallon, this could cost South Caroline Department of Public Safety thousands of dollars in additional fuel costs. Boston Decl. ¶ 3.

**Response:**    Undisputed to the best of the State's knowledge.

48.    From 2024-2025 the Department of Administration for fuel in South Carolina expended $5,651,265 for 2,017,560 gallons of fuel for vehicles used by multiple state agencies. This figure does not included purchase by the Department of Public Sa[f]ety which owns its own vehicles. If the price of fuel were to increase by even $0.01 per gallon, this could cost the Department of Administration thousands of dollars in additional fuel costs. Declaration of Nolan Wiggins (Sept. 12, 2025) ¶ 3.

**Response:**    Undisputed to the best of the State's knowledge.

### Florida

49.    In 2023 Florida's statewide consumption of petroleum products was 362,207,000 barrels. Declaration of Mark Futrell (Sept. 12, 2025) ("Futrell Decl.") ¶ 2.

**Response:**    Undisputed to the best of the State's knowledge.

50.    In 2023 Florida's statewide consumption of natural gas was 1,635 billion cubic feet. Futrell Decl. ¶ 2.

**Response:**    Undisputed to the best of the State's knowledge.

51.    In 2023 Florida's statewide consumption of coal was 5,550,000 short tons. *Id*.

**Response:**    Undisputed to the best of the State's knowledge.

52.    Florida is the third-largest energy consuming state in the nation. *Id*.

**Response:**    Undisputed to the best of the State's knowledge.

53.    Florida is the third-highest consumer of motor gasoline and second highest consumer of jet fuel in the nation, due to a large influx of tourists and the State's large population. *Id*. at ¶ 3.

**Response:**    Undisputed to the best of the State's knowledge.

54.     Based on reports from the online procurement system, in 2024 the State spent at least $18,547,147.69 on oil and gas for State needs. Declaration of Stefanie Higgins (Sept. 11, 2025) ("Higgins Decl.") ¶ 2.

**Response:**     Undisputed to the best of the State's knowledge.

55.     Based on reports from the fuel car system, in 2024 the State spent at least $38,684,586.44 on fuel for State need. Higgins Decl. ¶ 3.

**Response:**     Undisputed to the best of the State's knowledge.

56.     State transportation is necessary to carry out the work of numerous State agencies, such as the State's ability to patrol highways, provided law enforcement, and offer other critical government services. *Id.* at ¶ 4.

**Response:**     Undisputed to the best of the State's knowledge.

57.     If the liability imposed by the Vermont Superfund Act causes the price of energy to rise, making fuel less affordable and less available, it will harm the State's ability to fulfill its sovereign duties. *Id.* at ¶ 5.

**Response:**     The State does not dispute that a significant rise in energy prices could, at some point, harm Florida's ability to fulfill its sovereign duties if Florida did not pursue non-fuel transportation options. The State objects because the material cited cannot be presented in a form that would be admissible in evidence because the supporting declaration poses a hypothetical ("if" liability under the Act "causes the price of energy to rise") based on speculation, and lacks foundation. Moreover, the State disputes any contention that the Act is likely to or necessarily will cause energy prices—including energy prices in Florida—to rise. *See* Fullerton Decl. ¶¶ 11-42; *see also id.* ¶ 41 ("With no changes in prices of fossil fuels, the Act also will have no effect on prices or quantities of final energy goods that are produced using fossil fuels (*e.g.,* electricity or motor fuels).").

58.     In fiscal year 2024, Florida collected $1,178,834.06 in gas and oil severance tax. Florida had imposed severance tax since 1945 and $1,178,834.06 appears to be an average amount in collections since 2014. Declaration of Eric Peate (Sept. 9, 2025) ("Peate Decl.") ¶ 2.

**Response:**    Undisputed to the best of the State's knowledge.

59.    Severance taxes help fund Florida's government; about 75% of all state severance

taxes go into the State's General Revenue Fund. Peate Decl. ¶ 3.

**Response:**    Undisputed to the best of the State's knowledge.

60.    Severance tax is calculated based on production, so a reduction in Florida's

production would reduce its severance tax revenue, and harm Florida's government operations.

*Id.* at ¶ 3.

> **Response:**    The State does not dispute that severance tax is based in part on
> production, *see* Fullerton Decl. ¶ 36 (noting that severance tax is based on
> production *and* price), and that a reduction in production could result in
> the reduction of Florida's severance tax revenue, to the best of the State's
> knowledge. Otherwise, for the remainder of this paragraph, the State
> objects because the material cited cannot be presented in a form that
> would be admissible in evidence because it is based on speculation. The
> declaration lacks sufficient foundation.

### Idaho

61.    Idaho annually derives hundreds of thousands of dollars in revenue from

severance taxes and other special taxes on energy production. Declaration of Paul Woods (Sept.

10, 2025) ("Woods Decl.") ¶ 2.

**Response:**    Undisputed to the best of the State's knowledge.

62.    In Fiscal Year 2023, Idaho generated nearly $1 million in revenue from severance

taxes from natural gas, natural gas liquids, and oil. Woods Decl. ¶ 3.

> **Response:**    The State disputes the characterization that Idaho generated "nearly $1
> million in revenue" from the severance taxes identified in the cited source,
> which suggests that the figure for FY2023 is $889,373. *See* 2024 Annual
> Report, Idaho State Tax Commission at 6 (July 10, 2025) (cited in Woods
> Decl. ¶ 13). Moreover, it is worth noting that the figure for FY2024 is only
> $274,977, a reduction of nearly 70%. *Id*.

63.    Severance tax is calculated based on production; the State currently imposes a

severance tax of 2.5% on the market value of oil and gas produced or sold in Idaho. *Id.* at ¶ 4.

**Response:**    Undisputed to the best of the State's knowledge.

64.    Idaho consumes significant amounts of fossil fuels and in 2023, Idaho spends

$5.978 billion to consume 37 million barrels of petroleum, $1.105 billion to consume 151 billion

cubic feet of natural gas, and $5 million to consume 49 thousand short tons of coal. Declaration

of Kenneth Huston (Sept. 8, 2025) ("Huston Decl.") ¶ 4.

**Response:**    Undisputed to the best of the State's knowledge, except disputed to the
extent "significant" is an opinion, not a fact, and the cited document does
not contain quantitative comparison or analysis of fossil fuels.

65.    Idaho residents consumed 114 trillion British Thermal Units out of the state's total

505 trillion BTU of energy consumption. Huston Decl. ¶ 5.

**Response:**    Undisputed to the best of the State's knowledge.

66.    The majority of Idaho households use natural gas as their primary energy source

for heating. *Id.* at ¶ 6.

**Response:**    Undisputed to the best of the State's knowledge.

67.    In 2023, Idaho produced 2.6 trillion British Thermal Units of natural gas. *Id.* at ¶

7.

**Response:**    This statement is not supported by the source cited in the declaration.

68.    Approximately 34,308 Idahoans are employed in the energy sector. *Id.* at ¶ 8.

**Response:**    Undisputed to the best of the State's knowledge.

**Iowa**

69.    Iowa Department of Transportation spent $8,467,051.32 in 2024 on fuel for State

transportation needs. Declaration of Lee Wilkinson (Sept. 11, 2025) ("Wilkinson Decl.") ¶ 2.

**Response:**    Undisputed to the best of the State's knowledge.

70.    Iowa DOT purchased 2,750,562.89 gallons of fuel in 2024. Wilkinson Decl., ¶ 2.

**Response:**    Undisputed to the best of the State's knowledge.

71.    Iowa DOT fuel costs are tied to fuel prices. In 2023, the Iowa DOT purchased

3,025,236.2 gallons of fuel. The Iowa DOT spent over $10,164,169.88 on fuel in 2023. *Id.* at ¶ 3.

**Response:**    Undisputed to the best of the State's knowledge.

72.    State transportation is necessary to carry out the work of the Iowa DOT. The

DOT's ability to provide a safe, reliable, and innovative transportation system to the traveling

public depends on fuel. *Id.* at ¶ 4.

    **Response:**    Undisputed to the best of the State's knowledge for purposes of the present motion, but the State notes that the declaration does not account for non-fuel-based transportation options. The State disputes this statement to the extent "safe," "reliable, "and "innovative" are opinions or characterizations.

73.    If the liability imposed by the Vermont Superfund Act will cause the price of

energy to rise, making fuel less affordable and less available, Iowa's ability to fulfill its sovereign

duties will be harmed. *Id.* at ¶ 5.

    **Response:**    The State does not dispute for purposes of the present motion that if fuel prices rise sufficiently, Iowa's ability to carry out the work of the Iowa DOT could be impacted. The State notes, however, that the cited document does not address non-fuel transportation options. The State disputes this statement to the extent "harmed" is a legal conclusion. Otherwise, for the remainder of this statement, the State objects because the material cited cannot be presented in a form that would be admissible in evidence. Finally, the State disputes any intended suggestion that the Vermont Superfund Act necessarily will or is likely to cause the price of energy to rise in Iowa. *See generally* Fullerton Decl.; *see also id.* ¶ 41 ("With no change in prices of fossil fuels, the Act also will have no effect on prices or quantities of final energy goods that are produced using fossil fuels (*e.g.*, electricity or motor fuels).").

### Kentucky

74.    In 2023, Kentucky was the 15th highest producer of total energy in the US.

Declaration of the Office of the Kentucky Attorney General (Sept. 12, 2025) ("Thacker Decl.") ¶

5.

    **Response:**    Undisputed to the best of the State's knowledge.

75.     For many years, Kentucky was the third-largest coal-producing state and typically accounted for about one-tenth of the US coal production. Of the coal mined in Kentucky that stays in the US, about half is sent to twenty other states, where it is burned primarily by power plants to generate energy. Thacker Decl. ¶¶ 6–7.

**Response:**     Undisputed to the best of the State's knowledge.

76.     In 2023, Kentucky was the sixth largest coal producer in the country. *Id.* at ¶ 8.

**Response:**     Undisputed to the best of the State's knowledge.

77.     In 2023, Kentucky coal industry produced more than 28 million short tons of coal. *Id.*

**Response:**     Undisputed to the best of the State's knowledge.

78.     Kentucky is the sixteenth largest natural gas producing state in the nation. *Id.* at ¶ 9.

**Response:**     Undisputed to the best of the State's knowledge.

79.     Approximately 156,000 Kentuckians are energy workers. *Id.* at ¶ 10.

**Response:**     Undisputed to the best of the State's knowledge.

80.     In 2023, employees in Kentucky working in mining, quarrying, and oil and gas extraction received over $845 million in compensation. Employees in pipeline transportation received over $130 million in compensation. *Id.* at ¶ 11.

**Response:**     The State does not dispute that in 2023, employees in Kentucky working in mining, quarrying, and oil and gas extraction received over $845 million in compensation, to the best of the State's knowledge. The remainder of this paragraph—i.e., that employees in pipeline transportation received "over" $130 million in compensation—is not supported by the cited material.

81.     Kentucky ranks in the top ten states in the amount of energy used per dollar of GDP. *Id.* at ¶ 12.

**Response:**    Undisputed to the best of the State's knowledge.

82.    Industry and transportation sectors of the economy account for about 65% of total end-use energy consumption. *Id.* at ¶ 13.

**Response:**    Undisputed to the best of the State's knowledge.

83.    Kentucky also ranks in the top ten states in the nation for coal consumption. *Id.* at ¶ 14.

**Response:**    Undisputed to the best of the State's knowledge.

84.    The Vermont Superfund Act will harm Kentucky consumers as citizens will feel pain at the pump, grocery store, and home in costs for energy. *Id.* at ¶ 17.

**Response:**    The State objects because the material cited cannot be presented in a form that would be admissible in evidence because the statements in the supporting declaration are speculative and otherwise lack adequate foundation. Moreover, the State disputes the allegation that citizens necessarily will or are likely to "feel pain at the pump, grocery store, and home in costs for energy" because of the Vermont Superfund Act. *See* Fullerton Decl. ¶¶ 11-42; *see also id.* ¶ 41 ("With no change in prices of fossil fuels, the Act also will have no effect on prices or quantities of final energy goods that are produced using fossil fuels (*e.g.*, electricity or motor fuels).").

85.    Kentucky is one of the poorest states in the country, so increased prices and decreased employment in a major sector of the economy is harmful to the commonwealth. *Id.* at ¶ 18.

**Response:**    Please see the State's response to paragraph 84 as to any suggestion in this paragraph that the Vermont Superfund Act will harm Kentucky. The State does not dispute, however, that increased prices and decreased employment in a major sector of Kentucky's economy could have an adverse impact on the Commonwealth.

86.    Kentucky imposes severance taxes of 4.5% on coal, natural gas, and crude petroleum. *Id.* at ¶ 19.

**Response:**    Undisputed to the best of the State's knowledge.

16

87.    In fiscal year 2024 Kentucky generated approximately $117 million in revenue from severance tazes from coal, natural gas, natural gas liquids, and oil. *Id.* at ¶ 20.

**Response:**    Undisputed to the best of the State's knowledge.

88.    Half of the tax collected annually from the severance of coal is directed to the Local Government Economic Development Fund. *Id.* at ¶ 21.

**Response:**    Undisputed to the best of the State's knowledge.

89.    Half of the tax collected from sales of minerals other than coal is directed to the Local Government Economic Assistance Fund. *Id.*

**Response:**    Undisputed to the best of the State's knowledge.

90.    In addition, $7.5 million of coal severance and processing fees collected annually are directed to the Kentucky Coal Fields Endowment Authority. *Id.*

**Response:**    Undisputed to the best of the State's knowledge.

91.    These funds help support economic development, public infrastructure, vocational education, workforce training, and other social services. *Id.*

**Response:**    Undisputed to the best of the State's knowledge.

92.    Severance taxes play a crucial role in generating substantial revenue for Kentucky, and that role would be negatively affected if fossil fuel extraction declines in the Commonwealth. *Id.* at ¶ 22.

**Response:**    The State does not dispute that severance taxes play some role in generating revenue for Kentucky to the best of the State's knowledge. Disputed to the extent "crucial" and "substantial" are opinions, not facts, and are not quantified or analyzed in comparison to other revenue. The State disputes any intended suggestion that the Climate Superfund Act necessarily will or is likely to cause fossil fuel extraction to decline in Kentucky. *See* Fullerton Decl. ¶¶ 11-42; *see also id.* ¶ 36 (noting that Act "will not change the quantity of extraction").

93.    To purchase fuel for the Commonwealth's transportation needs, the Department of Agriculture spent $423,317.66 on 145,696 gallons of fuel in fiscal year 2024-2025. The Department's fleet drove 2,223,425 miles that year. Declaration of Jason Glass (Sept. 9, 2025) ("Glass Decl.") ¶ 2.

Response:    Undisputed to the best of the State's knowledge.

94.    The department's fuel costs are tied to fuel prices. In fiscal year 2022-2023 the Department purchased 144,129 gallons of fuel to drive 2,127,625 miles for a total purchase amount of $491,628.04. While the total gallons purchased in 2022-2023 was 1,567 less than the most recent fiscal year, the department spent $68,310.38 more in the fiscal year 2022-2023 due to lower fuel prices in the most recent fiscal year. Glass Decl. ¶ 3.

Response:    Undisputed to the best of the State's knowledge.

95.    The department's regulatory duties, which include traveling across the rural state and network of 79,676 miles of roads in the state, require Department employees to spend significant time on the road. The Department's ability to serve the commonwealth citizens hinges on gasoline consumption. *Id.* at ¶ 4.

Response:    Undisputed to the best of the State's knowledge for purposes of the present motion, but the State notes that the declarant does not discuss the availability of other transportation options.

96.    The liability imposed by the Vermont Superfund Act will cause the price of energy to rise, making fuel less affordable and less available, harming Kentucky's ability to fulfill its sovereign duties. *Id.* at ¶ 5.

Response:    The State objects because the cited material cannot be presented in a form that would be admissible in evidence. The statements in the supporting declaration lack adequate foundation. Moreover, the State disputes the unsupported assertion that "[t]he liability imposed by the Vermont Superfund Act" necessarily will or is likely to "cause the price of energy to rise," including in Kentucky. *See* Fullerton Decl. ¶¶ 11-42; *see also id.* ¶ 41 ("With no change in prices of fossil fuels, the Act also will have no

18

effect on prices or quantities of final energy goods that are produced using fossil fuels (*e.g.*, electricity or motor fuels).").

**Oklahoma**

97.    The oil and gas industry form a central part of the State's energy infrastructure. Declaration of Dr. Nicholas W. Hayman (Sept. 10, 2025) ("Hayman Decl.") ¶ 5.

**Response:**    Undisputed to the best of the State's knowledge.

98.    Oklahoma produces about three times more total energy than it consumes and is a major exporter of energy. Hayman Decl. ¶ 5.

**Response:**    Undisputed to the best of the State's knowledge.

99.    Oklahoma relies heavily on fossil fuels for in-state electricity and energy needs. *Id.*

**Response:**    Undisputed to the best of the State's knowledge.

100.    In 2024-2025, fossil fuels accounted for over 56% of Oklahoma's electricity generation, about 48-50% from gas and 6-8% from coal. *Id.*

**Response:**    Undisputed to the best of the State's knowledge.

101.    Coal accounted for 6-8% of Oklahoma's electricity generation in 2024. Oklahoma is the nation's 6th largest natural gas producer and typically produced 3-4 times more natural gas than it consumes internally, making it a net exporter. *Id.*

**Response:**    Undisputed to the best of the State's knowledge.

102.    Oklahoma produces about 406,000 barrels of oil per day. *Id.*

**Response:**    Undisputed to the best of the State's knowledge.

103.    In fiscal year 2024 the State oil and gas severance tax revenue was $1,082,661,078.81 which is an important cushion to tax revenue swings between years. *Id.* at ¶ 7.

**Response:**    Undisputed to the best of the State's knowledge.

104.    The Oklahoma Municipal Power Authority (OMPA) provides electric power and energy to Oklahoma municipalities and public trusts operating municipal electric systems. Declaration of David Osburn (Sept. 11, 2025) ("Osburn Decl.") ¶ 4.

**Response:**    Undisputed to the best of the State's knowledge.

105.    OMPA sells wholesale electric power to forty-three member cities in Oklahoma. These members sell power to retail customers in Oklahoma who are the end users of OMPA electricity. Osburn Decl. ¶ 6.

**Response:**    Undisputed to the best of the State's knowledge.

106.    OMPA relies on generators that are powered by fossil fuel sources including natural gas and coal. The purchase of fossil fuels are a significant portion of OMPA's budget each fiscal year. *Id.* at ¶ 7.

**Response:**    Undisputed to the best of the State's knowledge.

107.    OMPA purchased 11,300,956 mmbtus of natural gas at a cost of $26,823,995 in 2024. *Id.* at ¶ 8.

**Response:**    Undisputed to the best of the State's knowledge.

108.    OMPA's power supply program included power supply resources acquired by the Authority through joint ownership in three generating units: a 23% ownership interest in the McClain Generating Facility (a natural gas power plant), a 13% undivided ownership in Redbud Generating Facility (a natural gas power plant), and a 6.66% ownership in the John W. Turk Jr. Coal Plant (an electric generating unit). *Id.* at ¶ 9.

**Response:**    Undisputed to the best of the State's knowledge.

109.    In 2024 OMPA expended $4,757,888 to contribute to the purchase of coal for generating electricity. *Id.* at ¶ 11.

**Response:**    Undisputed to the best of the State's knowledge.

110.    OMPA relies on continued use of fossil fuels as a fuel source for the generation of electricity to meet OMPA's future contractual requirements with its members. *Id.* at ¶ 12.

**Response:**    Undisputed to the best of the State's knowledge.

111.    The Oklahoma Corporation Commission develops and enforces regulations that affect approximately 359 public utilities, 8,400 motor carriers and 4.5 million trucks, 2,524 oil and gas operators, and 4,200 motor fuel facilities. The agency oversees the operation of 154,391 active oil, gas, and underground injection wells, 50,000 miles of natural gas and hazardous liquid pipelines, 13 underground natural gas storage facilities, 170,000 miles of electric distribution lines, 10,5000 petroleum storage tanks, and 45,000 motor fuel dispensers. Declaration of Trent A. Campbell (Sept. 11. 2025) ("Campbell Decl.") ¶ 5.

> **Response:**    Undisputed to the best of the State's knowledge, except that the cited declaration does not support the statement the agency oversees "10,5000 petroleum storage tanks."

112.    Oklahoma regulated utilities companies sold 262,648,656 mmbtu of natural gas, 3,162,296 tons of coal, and 4,443,424 gallons of fuel oil to Oklahoma consumers in 2024. Campbell Decl. ¶ 7.

**Response:**    Undisputed to the best of the State's knowledge.

### Texas

113.    In 2024, Texas accounted for 43% of the US crude oil production and 28% of its natural gas gross withdrawals. Declaration of Leslie Savage (Sept. 12, 2025) ("Savage Decl.") ¶ 4.

**Response:**    Undisputed to the best of the State's knowledge.

114.    Texas consumes more petroleum than any other state and is 3rd in per capita petroleum use. Savage Decl. ¶ 5.

**Response:**    Undisputed to the best of the State's knowledge.

115.    Texas has the most petroleum refineries and the most refining capacity in the US. *Id.* at ¶ 6.

>    **Response:**    Undisputed to the best of the State's knowledge.

116.    Energy production is one of Texas' largest business sectors with 936,476 energy workers statewide in 2022, 11.5% of all US energy jobs. *Id.* at ¶ 7.

>    **Response:**    Undisputed to the best of the State's knowledge.

117.    Texas is a substantial producer and consumer of energy sources. *Id.* at ¶ 8.

>    **Response:**    Undisputed to the best of the State's knowledge, except to the extent that "substantial" is an opinion, not a fact, and the cited material does not contain quantitative comparison or analysis of other producers and consumers.

118.    The Vermont Superfund Act will impact revenue streams from fossil fuel employment in Texas as energy producers will be forced to spend billions of dollars on liability paid to Vermont instead of making capital investments. *Id.* at ¶ 9.

>    **Response:**    The State objects because the material cited cannot be presented in a form that would be admissible in evidence. The declarant is a geologist, not an economist, and does not provide any evidence suggesting that the declarant is qualified to opine on the Act's impacts on energy producers' capital investments (or revenue streams from fossil fuel employment). Moreover, the State disputes the suggestion that the Act necessarily will or is likely to impact energy producers' capital investments. *See* Fullerton Decl. ¶¶ 11-42; *see also id.* ¶ 34 ("the Act will not change any company's incentive to invest in innovation, physical infrastructure, or any other form of investment").

119.    Texas has a gas severance tax of 7.5% and a 4.6% oil severance tax. The State receives billions of dollars from these severances each year, which are crucial to funding the government and providing social services. *Id.* at ¶ 11.

>    **Response:**    The State does not dispute that Texas has a gas severance tax of 7.5% and a 4.6% oil severance tax, or that Texas receives billions of dollars from these taxes each year, to the best of the State's knowledge. Otherwise, for the remainder of this statement, the State objects because the material

22

cited cannot be presented in a form that would be admissible in evidence because it lacks adequate foundation.

**Wyoming**

120.    Wyoming is the largest coal producer in the country, accounting for about 40 percent of US coal production in 2024. Declaration of Jason Wolfe (Sept. 11, 2025) ("Wolfe Decl.") ¶ 5.

**Response:**    Undisputed to the best of the State's knowledge.

121.    In 2023, Wyoming coal industry produced more than 237 million short tons of coal. Wolfe Decl. ¶ 5.

**Response:**    Undisputed to the best of the State's knowledge.

122.    Wyoming is the seventh largest crude oil producing state and tenth largest natural gas producing state in the nation. *Id.* at ¶ 6.

**Response:**    Undisputed to the best of the State's knowledge.

123.    In May 2025, Wyoming's crude oil production was 291 thousand barrels per day. In 2023 Wyoming's total annual gross production of natural gas approached 1 trillion cubic feet. *Id.*

**Response:**    Undisputed to the best of the State's knowledge.

124.    Approximately 45,992 Wyomingites, or 16.5% of the state workforce are employed in the energy sector. *Id.* at ¶ 7.

**Response:**    Undisputed to the best of the State's knowledge.

125.    In 2023, employees in Wyoming working in oil and gas extraction received over $417 million in compensation. Employees in pipeline transportation received over $118 million. *Id.* at ¶ 8.

**Response:**    Undisputed to the best of the State's knowledge.

126.    Wyoming is in the top five states in the nation for energy consumption per capita. The industrial sector accounts for the largest share, about 55%, of the State's energy consumption. Wyoming economy relies on the energy industry to provide employment opportunities and to provide the power necessary for businesses to operate in other sectors. *Id.* at ¶ 9.

> **Response:**    Undisputed to the best of the State's knowledge for purposes of the present motion, but the State notes that the declaration does not define "energy industry" or discuss energy options.

127.    Regulations or laws that may lead to increased prices and decreased employment in the energy sector are harmful to Wyoming and its businesses and citizens. *Id.* at ¶ 10.

> **Response:**    The State does not dispute that regulations or laws that lead to increased prices and decreased employment could have an adverse economic effect on Wyoming and its businesses and citizens. For the remainder of this statement—including any suggestion that the Climate Superfund Act necessarily will or is likely to lead to increased prices or decreased employment—the State objects because the material cited cannot be presented in a form that would be admissible in evidence. Moreover, the State disputes any such suggestion. *See* Fullerton Decl. ¶¶ 11-42; *see also id.* ¶¶ 34 (Act will not affect investment incentives), 41 (Act will not increase prices).

128.    To purchase fuel for State transportation needs, Wyoming Motor Vehicle Management System (MVMS) spent $1,427,783.99 in 2024. MVMS purchased 522,369.27 gallons of fuel in 2024. Declaration of Andrew Kuhlman (Sept. 12, 2025) ("Kuhlman Decl.") ¶ 2.

> **Response:**    Undisputed to the best of the State's knowledge.

129.    The State's fuel costs are tied to fuel prices. In 2023, MVMS purchased 492,751.26 gallons of fuel. While it purchased less fuel in 2023, MVMS spent $1,589,452.92 on fuel. Kuhlman Decl. ¶ 3.

> **Response:**    Undisputed to the best of the State's knowledge.

130.    State transportation is necessary to carry out the work of numerous State agencies. The Department of Health, the Department of Family Services, the Department of State Parks and Cultural Resources, and the State Engineer's Office are among the MVMS's top fuel consumers. The State's ability to protect the health and welfare of its residents, provide care to abused and neglected children, and manage its natural resources depends on fuel. *Id.* at ¶ 4.

> **Response:**    The State does not dispute that transportation is necessary to carry out the work of the Wyoming Department of Health, Department of Family Services, Department of State Parks and Cultural Resources, and the State Engineer's offices to the best of the State's knowledge. The remaining statements are not "facts" but opinions based on speculation and the State objects because the material cited cannot be presented in a form that would be admissible in evidence. The State also notes that the declarant does not discuss non-fuel options.

131.    If the liability imposed by the Vermont Superfund Act causes the price of energy to rise—making fuel less affordable and less available, Wyoming's ability to fulfill its sovereign duties will be harmed. *Id.* at ¶ 5.

> **Response:**    The State does not dispute that a significant rise in energy prices could, at some point, impact Wyoming's ability to fulfill its sovereign duties. The State objects because the material cited cannot be presented in a form that would be admissible in evidence, to suggest that the Vermont Superfund Act will likely cause energy prices in Wyoming to rise, because the supporting declaration poses a hypothetical based on speculation and lacks foundation. Moreover, the State disputes any contention that the Act necessarily will or is likely to cause energy prices—including energy prices in Wyoming—to rise. *See* Fullerton Decl. ¶¶ 11-42; *see also id.* ¶ 41 ("With no change in prices of fossil fuels, the Act also will have no effect on prices or quantities of final energy goods that are produced using fossil fuels (*e.g.*, electricity or motor fuels).").

132.    Wyoming's severance tax is imposed on the privilege of extracting minerals throughout the State. This tax is based upon statutorily established valuation methods and associated tax rates for various minerals. County ad valorem taxes are likewise based upon the same statutory valuations and are applied at a tax rate set by the local County Commissioners. Declaration of Matthew Sachse (Sept. 12, 2025) ("Sachse Declaration") ¶ 4.

**Response:**    Undisputed to the best of the State's knowledge.

133.    Wyoming annually derives hundreds of millions of dollars in revenue from these types of taxes. Over the last three years, the State of Wyoming generated revenue of $682,975,144 in calendar year 2024; $843,268,503 in calendar year 2023; and $819,951,379 in calendar year 2022 from severance taxes on extracted fossil fuel minerals. Additionally, the various counties of Wyoming received $726,695,544 in 2024, $871,115,486 in 2023, and $1,040,299,432 in 2022 in ad valorem taxes related to the production of fossil fuel minerals. Sachse Declaration ¶ 5.

**Response:**    Undisputed to the best of the State's knowledge.

134.    These tax revenues are distributed to a wide range of state and local entities, including a permanent mineral trust fund for long-term investment, the State's General Fund for operating expenses, and various accounts for education, highways, and local government operations. Since Wyoming does not impose personal or corporate income taxes, the collection of tax revenue from mineral and fossil fuels enables the State and its counties to provide essential governmental services to its citizens. If mineral extraction declines, Wyoming will face considerable budget shortfalls which will negatively affect the State's ability to provide these essential services. *Id.* at ¶ 6.

**Response:**    Undisputed to the best of the State's knowledge, except the State disputes any implication that the Climate Superfund Act necessarily will or is likely to decrease fossil fuel extraction, including in Wyoming. *See* Fullerton Decl. ¶¶ 11-42; *see also id.* ¶ 36 ("The Act would not affect a state's revenue from severance taxes. . . . In addition, the Act will not change the behavior of those firms, so it will not change the quantity of extraction.").

**Utah**

135.    Utah annually derives hundreds of millions of dollars in revenue from severance

taxes and special taxes on oil, gas, and coal production. Declaration of John Rogers (Sept. 12,

2025) ("Rogers Decl.") ¶ 2.

**Response:**    Undisputed to the best of the State's knowledge.

136.    In fiscal year 2024 Utah generated approximately $73.3 million from State oil and

gas severance tax, $7.8 million from oil and gas conservation fee, $451.9 million from motor

fuel tax, $197 million from special fuel tax, $2.7 million from state corporate tax liability, $16.8

million from sales and use tax, $40.2 million from centrally assess natural resource property tax

on oil, gas, and coal, $93.7 million from Utah's portion of federal lease royalty, $4.5 million to

SITLA from oil and gas royalty and leases, and $.02 million to FFSL from oil and gas, totaling

approximately $958 million from state and federal taxation, realties, and lease payments on oil,

gas, NGL, and coal production. Rogers Decl. ¶ 3.

**Response:**    Undisputed to the best of the State's knowledge, except that the cited
declaration does not support the statement that Utah generated $73.3
million from State oil and gas severance tax, or that $.02 million went to
FFSL from oil and gas.

137.    Severance taxes help the state government. Without these revenues from fossil

fuel extraction, Utah would be compelled to implement cuts in spending or impose additional

revenue-generating measures. *Id.* at ¶ 4.

**Response:**    The State does not dispute that severance taxes help the Utah state
government, to the best of the State's knowledge. The State objects
because the second sentence is not supported by material that can be
presented in a form that would be admissible in evidence, as the
declarant—who is an Environmental Program Manager—does not explain
how he is qualified to opine on the consequences of the loss of fossil fuel
revenues from severance taxes, or that such consequences would be
certain.

138.    Severance tax is calculated based on production. A reduction in production means

the state generates less severance tax revenue. *Id.* at ¶ 5.

**Response:**    Undisputed that severance tax is based in part on production, *see* Fullerton Decl. ¶ 36 (noting that severance tax is based on production *and* price), but the State disputes any implication that the Climate Superfund Act necessarily will or is likely to decrease oil, gas, and coal production, including in Utah. *See id.* ¶ 36 ("The Act would not affect a state's revenue from severance taxes. . . . In addition, the Act will not change the behavior of those firms, so it will not change the quantity of extraction.").

139.    Utah consumed significant amounts of fossil fuels; 2023 consumer expenditures on fossil fuels products totaled $11,912.4 million. *Id.* at ¶ 7.

**Response:**    Undisputed to the best of the State's knowledge.

140.    Utah's oil and gas industry contributed an estimated $17 billion and supported approximately 77,970 jobs, generating about $5.8 billion in labor income. *Id.* at ¶ 8.

**Response:**    Undisputed to the best of the State's knowledge.

141.    Utah's coal industry generated about $508 million in production value and over $1.3 billion in broader economic ripple effects in 2024, supporting thousands of jobs. *Id.*

**Response:**    Undisputed to the best of the State's knowledge.

142.    State citizens will feel increased transportation and energy costs at the pump, grocery store, and home. *Id.* at ¶ 11.

**Response:**    The State objects because this statement is not supported by material that can be presented in a form that would be admissible in evidence. The declarant, an Environmental Program Manager, has not established that he is qualified to opine as to whether the Climate Superfund Act will increase transportation and energy costs in Utah, or provided any explanation as to the reasoning behind or support for his opinion. Moreover, the State disputes any suggestion that the Climate Superfund Act necessarily will or is likely to lead to increased transportation and energy costs, including in Utah. *See* Fullerton Decl. ¶¶ 11-42; *see also id.* ¶ 41 ("With no change in prices of fossil fuels, the Act also will have no effect on prices or quantities of final energy goods that are produced using fossil fuels (*e.g.*, electricity or motor fuels).").

**Arkansas**

28

143.    The severance tax on oil is 4% of market value when the production average is 10 barrels of less per well per day. The tax goes up to 5% of the market value when the production average is more than 10 barrels per well per day. There is a $.005 collected on each barrel of oil severed, which is deposited as special revenues, and an additional $.02 per barrel severed as general revenues. Declaration of Todd Cockrill (Sept. 12, 2025) ("Cockrill Decl.") ¶ 3.

**Response:**    Undisputed to the best of the State's knowledge.

144.    The severance tax on natural gas is 1.25%, 1.5%, or 5% depending on if the Arkansas Oil and Gas Commission deems its newly discovered gas, marginal gas, or other, respectively. Cockrill Decl ¶ 4.

**Response:**    Undisputed to the best of the State's knowledge.

145.    From Fiscal Year 2021 to Fiscal Year 2025, Arkansas collected approximately $64,900,384 from its Oil Tax. *Id.* at ¶ 6.

**Response:**    Undisputed to the best of the State's knowledge.

146.    From Fiscal Year 2021 to Fiscal Year 2025, Arkansas collected approximately $193,057,379 from its Natural Gas Tax. *Id.* at ¶ 7.

**Response:**    Undisputed to the best of the State's knowledge.

147.    For fiscal year 2025, Arkansas had gross oil revenues of $11,212,384. From 2010-2024, the gross oil revenue accumulated to $235,852,967. *OIL REVENUE-FYE 2025,* STATE OF ARK. DEP'T OF FIN. AND ADMIN., (attached as Exhibit B to Cockrill Decl.)

**Response:**    Undisputed to the best of the State's knowledge.

148.    In fiscal year 2024 the Gross Natural Gas Severance Tax Revenue in Arkansas was $19,207,300. *Gross Natural Gas Severance Tax Revenue,* STATE OF ARK. DEP'T OF FIN. AND ADMIN., (attached as Exhibit A to Cockrill Decl.).

**Response:**    Undisputed to the best of the State's knowledge.

29

149.    The Arkansas State Police purchases diesel and gasoline as part of its regular course of business. Without purchases of diesel and gasoline, the Arkansas State Police cannot perform its duties. Declaration of Karen Perry (Sept. 12, 2025) ("Perry Decl.") ¶ 3.

**Response:**    Undisputed to the best of the State's knowledge for purposes of the present motion, but the State notes that the statement that the Arkansas State Police "cannot" perform its duties without diesel and gasoline is not supported by any discussion of other transportation options.

150.    The state Police's fuel costs are tied to fuel prices. When the price of energy rises, fuel becomes less affordable, and the state police must spend more money on fuel. Perry Decl. ¶ 4.

**Response:**    Undisputed to the best of the State's knowledge, except the State disputes any suggestion that the Climate Superfund Act necessarily will or is likely to increase the price of energy. *See* Fullerton Decl. ¶¶ 11-42; *see also id*. ¶ 41 ("With no change in prices of fossil fuels, the Act also will have no effect on prices or quantities of final energy goods that are produced using fossil fuels (*e.g.*, electricity or motor fuels).").

151.    From Fiscal Year 2021 to fiscal year 2025, Arkansas State Police spent $357,609 on diesel fuel. *Id.* at ¶ 5.

**Response:**    Undisputed to the best of the State's knowledge.

152.    From Fiscal Year 2021 to fiscal year 2025, Arkansas State Police spend $14,084,104 on gasoline. *Id.* at ¶ 6.

**Response:**    Undisputed to the best of the State's knowledge.

### Indiana

153.    In fiscal year 2025, Indiana purchased not less than 8,411,910 gallons of fuel and spent not less than $25,751,712.00 on fuel. Declaration of Nathan Oliver (Sept. 8, 2025) ("Oliver Decl.") ¶ 2.

**Response:**    Undisputed to the best of the State's knowledge.

154.    Indiana's fuel costs are ties to fuel prices. In fiscal year 2024, Indiana's fleet purchased not less than 7,868,277 gallons of fuel, and Indiana spent not less than $26, 130, 226.00 on fuel. Oliver Decl. ¶ 3.

> **Response:**    Undisputed to the best of the State's knowledge.

155.    State transportation is necessary to carry out the work of numerous State agencies including the Indiana State Police, the Department of Correction, and others. The State's ability to provide law enforcement, safe roads, protection to natural resources and certain healthcare, social and support services depend on fuel. *Id.* at ¶ 4.

> **Response:**    Undisputed to the best of the State's knowledge for purpose of the present motion, but the State notes that the declarant has not accounted for other transportation options.

156.    The liability imposed by the Vermont Superfund Act will inevitably cause the price of energy to rise, making fuel less affordable and less available, and harming Indiana's ability to fulfill its sovereign duties. *Id.* at ¶ 5.

> **Response:**    The State objects because this statement is not supported by material that can be presented in a form that would be admissible in evidence. The opinion expressed in the supporting declaration—by a declarant whose background appears to be in fleet management and vehicle maintenance and management, not economics—about the economic impacts of the Climate Superfund Act lacks foundation. Moreover, the State disputes the unsupported assertion that "[t]he liability imposed by the Vermont Superfund Act will inevitably cause the price of energy to rise," including in Indiana. *See* Fullerton Decl. ¶¶ 11-42; *see also id*. ¶ 41 ("With no change in prices of fossil fuels, the Act also will have no effect on prices or quantities of final energy goods that are produced using fossil fuels (*e.g.*, electricity or motor fuels).").

157.    Indiana imposes a petroleum severance tax on the severance of petroleum, oil, and natural gas from Indiana land. Entities responsible for this tax are also required to pay Indiana's state income tax. Declaration of Sherry Queen (Sept. 15, 2025) ("Queen Decl.") ¶ 2–3.

> **Response:**    Undisputed to the best of the State's knowledge.

158.    From fiscal year 2022 through 2025, Indiana collected $5.5 million in petroleum severance tax. Of these entities that pay petroleum severance tax, it is estimated that they paid a combined $2.2 million in income tax (individual and corporate). Queen Decl. ¶ 4.

**Response:**    Undisputed to the best of the State's knowledge.

159.    Indiana's petroleum severance tax is deposited in the state's oil and gas fund which goes towards further research pertaining to exploration for, development of, and wise use of petroleum resources in Indiana. *Id.* at ¶ 5.

**Response:**    Undisputed to the best of the State's knowledge, except "wise use" is an opinion not explained or supported in the cited material.

160.    Severance taxes are a small but reliable source of generating revenue for the State of Indiana, and that role would be negatively affected if fossil fuel extraction declines in the state. *Id.* at ¶ 7.

**Response:**    Undisputed to the best of the State's knowledge, except the State disputes any suggestion that the Climate Superfund Act necessarily will or is likely to lead to a decline in fossil fuel extraction, including in Indiana. *See* Fullerton Decl. ¶ 36 ("The Act would not affect a state's revenue from severance taxes. . . . In addition, the Act will not change the behavior of those firms, so it will not change the quantity of extraction.").

161.    In fiscal year 2025, large state agencies in Indiana purchased not less than 52,214,069 kilowatt hours of electricity at a cost of not less than $21,888,249.95 for their respective government functions. In fiscal year 2024, the large state agencies purchased not less than 50,606,936 kilowatt hours of electricity at a cost of not less than $20,842,635.45 for their respective government functions. Declaration of Kirk E. Grable (Sept. 15, 2025) ("Grable Decl.") ¶ 2.

**Response:**    Undisputed to the best of the State's knowledge.

162.    The liability imposed by the Vermont Superfund Act will inevitably cause the price of electricity to rise, making it less affordable and less available, and harming Indiana's ability to fulfill its sovereign duties. Grable Decl. ¶ 4.

> **Response:**    The State objects because this statement is not supported by material that can be presented in a form that would be admissible in evidence. The opinion expressed in the supporting declaration—by a declarant whose background does not appear to be in any relevant field—about the economic impacts of the Climate Superfund Act lacks foundation. Moreover, the State disputes the unsupported assertion that "[t]he liability imposed by the Vermont Superfund Act will inevitably cause the price of electricity to rise" in Indiana. *See* Fullerton Decl. ¶¶ 11-42; *see also id.* ¶ 41 ("With no change in prices of fossil fuels, the Act also will have no effect on prices or quantities of final energy goods that are produced using fossil fuels(*e.g.*, electricity or motor fuels).").

163.    Indiana purchases massive quantities of electricity in performing its sovereign duties. Indiana purchased not less than 14,327,744 kilowatt hours of electricity at a cost of not less than $1,797,000.00 for its State House and government center complex in the City of Indianapolis in fiscal year 2024. In fiscal year 2025, Indiana purchased not less than 15,053,300 kilowatt hours of electricity at a cost of not less than $1,888,000.00 for its State house and government center complex in the City of Indianapolis. Declaration of Brian Renner (Sept. 9, 2025) ("Renner Decl.")

> **Response:**    The facts are undisputed to the best of the State's knowledge, except to the extent Indiana's characterization of the quantity of electricity it purchases as "massive" is an opinion, not a fact, and the cited material does not contain quantitative comparison or analysis.

164.    Such electrical usage is necessary to carry out the functions of the work of the Governor, the General Assembly, and numerous state agencies. The liability imposed by the Vermont Superfund Act will inevitably cause the price of electricity to rise, making it less affordable and less available, and harming Indiana's ability to fulfill its sovereign duties. Renner Decl. at ¶¶ 3–4.

33

**Response:**    The State does not dispute that Indiana needs to use electricity to carry out the work of the Governor, General Assembly, and state agencies, to the best of the State's knowledge. The State objects because the remainder of the statement is not supported by material that can be presented in a form that would be admissible in evidence. The opinion expressed in the supporting declaration—by a declarant whose background does not appear to be in any relevant field—about the economic impacts of the Climate Superfund Act lacks foundation and is based entirely upon speculation. Moreover, the State disputes the unsupported assertion that "[t]he liability imposed by the Vermont Superfund Act will inevitably cause the price of electricity to rise" in Indiana. *See* Fullerton Decl. ¶¶ 11-42; *see also id.* ¶ 41 ("With no change in prices of fossil fuels, the Act also will have no effect on prices or quantities of final energy goods that are produced using fossil fuels (*e.g.*, electricity or motor fuels).").

165.    The Indiana Department of Transportation purchases massive quantities of gas and diesel fuel in performing its sovereign duties. The Department purchased not less than 3,938,713.76 gallons of diesel and gas fuel at a cost of not less than $13,139,920.09 for its transportation and related purposes in calendar year 2024. In calendar year 2023, the State purchased not less than 3,332,281.06 gallons of gas and diesel fuel at a cost of not less than $11,888,064.24 for its transportation and related purposes. Declaration of Greg Bright (Sept. 15, 2025) ("Bright Decl.") ¶ 2.

**Response:**    The State does not dispute the facts in this paragraph to the best of the State's knowledge, except to the extent the declarant's characterization of the quantities of gas and diesel fuel purchased by the Department of Transportation as "massive" is an opinion, not a fact, and the cited material does not contain quantitative comparison or analysis.

166.    The State also purchases massive quantities of electricity in performing its sovereign duties. In particular, the Department purchased electricity at a cost of not less than $7,569,056.95 for its transportation and related purposes in fiscal year 2025. In fiscal year 2024, the State purchased electricity at a cost of not less than $6,973,574.51 for its transportation and related purposes. Bright Decl. ¶ 4.

**Response:**    The State does not dispute the facts in this paragraph to the best of the State's knowledge, except to the extent the declarant's characterization of

the quantities of electricity purchased by Indiana as "massive" is an opinion, not a fact, and the cited material does not contain quantitative comparison or analysis.

167.    The liability imposed by the Vermont Superfund Act could inevitably cause the price of energy to rise - making fuel less affordable and less available, and harming Indiana's ability to fulfill its sovereign duties. Bright Decl. ¶ 6.

> **Response:**    The State objects because this statement is not supported by material that can be presented in a form that would be admissible in evidence. The opinion expressed in the supporting declaration—by a declarant whose background does not appear to be in any relevant field—about the economic impacts of the Climate Superfund Act lacks foundation and is based entirely upon speculation. Moreover, the State disputes the unsupported assertion that "[t]he liability imposed by the Vermont Superfund Act could inevitably cause the price of energy to rise" in Indiana. *See* Fullerton Decl. ¶¶ 11-42; *see also id*. ¶ 41 ("With no change in prices of fossil fuels, the Act also will have no effect on prices or quantities of final energy goods that are produced using fossil fuels (*e.g.*, electricity or motor fuels).").

168.    The Indiana Department of Natural Resources purchases massive quantities of electricity in performing its sovereign duties. In particular, the Department purchased not less than 37,160,769 kilowatt hours of electricity at a cost of not less than $9,163,895.00 for its protection of natural resources and related purposes in fiscal year 2025. In fiscal year 2024, the Department purchased not less than 36,279,192 kilowatt hours of electricity at a cost of not less than $8,924,799.94 for its protection of natural resources and related purposes. Declaration of Gregory A. Sorrels (Sept. 10, 2025) ("Sorrels Decl.") ¶ 2.

> **Response:**    The State does not dispute the facts in this paragraph to the best of the State's knowledge, except to the extent the declarant's characterization of the quantities of electricity purchased by the Department of Natural Resources as "massive" is an opinion, not a fact, and is not supported in the cited material with any quantitative comparison or analysis.

169.    Such electrical usage is necessary to carry out the functions of the work of the Department and the liability imposed by the Vermont Superfund Act will inevitably cause the

price of electricity to rise—making it less affordable and less available, and harming Indiana's

ability to fulfill its sovereign duties. Sorrels Decl. ¶¶ 3–4.

> **Response:**    The State does not dispute that the Department of Natural Resources needs electricity to carry out its work, to the best of the State's knowledge. The State objects because the remainder of the statement is not supported by material that can be presented in a form that would be admissible in evidence. The opinion expressed in the supporting declaration—by a declarant whose background does not appear to be in any relevant field—about the economic impacts of the Climate Superfund Act lacks foundation and is based entirely upon speculation. Moreover, the State disputes the unsupported assertion that "[t]he liability imposed by the Vermont Superfund Act will inevitably cause the price of electricity to rise" in Indiana. *See* Fullerton Decl. ¶¶ 11-42; *see also id*. ¶ 41 ("With no change in prices of fossil fuels, the Act also will have no effect on prices or quantities of final energy goods that are produced using fossil fuels (*e.g.*, electricity or motor fuels).").

170.    The Indiana Family and Social Services Administration purchased not less than

$3,267,298 electricity in fiscal year 2025 and $3,147,261 in SFY2024. Such electrical usage is

necessary to carry out the functions of the work of the Department. Declaration of Paul M.

Bowling (Sep. 11, 2025) ("Bowling Decl.") ¶ 2.

> **Response:**    Undisputed to the best of the State's knowledge, but the State notes that the statement "such" electrical usage is "necessary" is an opinion, not a fact.

171.    The liability imposed by the Vermont Superfund Act will inevitably cause the

price of electricity to rise making it less affordable and less available, and harming Indiana's

ability to fulfill its sovereign duties. Bowling Decl. ¶ 3.

> **Response:**    The State objects because this statement is not supported by material that can be presented in a form that would be admissible in evidence. The opinion expressed in the supporting declaration—by a declarant whose background does not appear to be in any relevant field—about the economic impacts of the Climate Superfund Act lacks foundation and is based entirely upon speculation. Moreover, the State disputes the unsupported assertion that "[t]he liability imposed by the Vermont Superfund Act could inevitably cause the price of electricity to rise" in Indiana. *See* Fullerton Decl. ¶¶ 11-42; *see also id*. ¶ 41 ("With no change in prices or

quantities of final energy goods that are produced using fossil fuels (*e.g.*, electricity or motor fuels).").

**Nebraska**

172.    Nebraska imposes severance taxes on the mining and/or removal of nonrenewable resources from the earth. The severance tax is imposed on oil, natural gas, and uranium. Nebraska also imposes an additional "conservation tax" on the extraction of oil and natural gas. Declaration of Christopher Ayotte (Sept. 15, 2025) ("Ayotte Decl.") ¶ 2.

**Response:**    Undisputed to the best of the State's knowledge.

173.    In 2023-2024 Fiscal Year, Nebraska collected Total $2,839,986.92 in natural resource severance tax. Nebraska also collected $879,764.93 in conservation tax levied on oil and natural gas. Ayotte Decl. ¶ 3.

**Response:**    Undisputed to the best of the State's knowledge.

174.    Both severance tax and conservation tax are calculated on the value of resource collected/extracted. Although value fluctuates based on market forces, a reduction in the amount of extraction is likely to cause a reduction in the severance and collection tax revenue ultimately collected by Nebraska. *Id.* at ¶ 4.

**Response:**    Undisputed to the best of the State's knowledge, except the State disputes any implication that the Climate Superfund Act is likely to or necessarily will reduce fossil fuel extraction. *See* Fullerton Decl. ¶ 36 ("The Act also would not affect a state's revenue from severance taxes. . . . In addition, the Act will not change the behavior of those firms, so it will not change the quantity of extraction.").

DATED November 17, 2025                    Respectfully submitted,

                                           STATE OF VERMONT

                                           CHARITY R. CLARK
                                           ATTORNEY GENERAL

                                    By:    */s/ Jonathan T. Rose*
                                           JONATHAN T. ROSE

*Solicitor General*
LAURA B. MURPHY
*Director, Environmental Protection Unit*
HANNAH W. YINDRA
PATRICK T. GAUDET
*Assistant Attorneys General*
SAMUEL B. STRATTON*
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-3186
jonathan.rose@vermont.gov
laura.murphy@vermont.gov
hannah.yindra@vermont.gov
patrick.gaudet@vermont.gov
sam.stratton@vermont.gov

*\*Vermont Bar Attorney-Applicant
Admission before this Court pending*