**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and AMERICAN PETROLEUM INSTITUTE,<br><br>*Plaintiffs*,<br><br>and<br><br>STATE OF WEST VIRGINIA, et al.,<br><br>*Intervenor-Plaintiffs,*<br><br>v.<br><br>JULIE MOORE, et al.,<br><br>*Defendants*,<br><br>and<br><br>NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION,<br><br>*Intervenor-Defendants.* | No. 2:24-cv-01513 |

**INTERVENOR-DEFENDANTS' RESPONSE TO STATE PLAINTIFFS' RULE 56 STATEMENT OF UNDISPUTED MATERIAL FACTS AND STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56(b), Intervenor-Defendants submit the following response to State Plaintiffs' Rule 56 Statement of Undisputed Material Facts in Support of State Plaintiffs' Motion for Summary Judgment, and Intervenor-Defendants' separate Statement of Additional Undisputed Material Facts. By responding to the facts set forth below, Intervenor-Defendants do not concede that any fact in State Plaintiffs' Rule 56 Statement is material to the legal issues raised in the cross motions for summary judgment. Moreover, because the pending summary judgment motions seek resolution of the case prior to discovery, Intervenor-Defendants' characterization of any facts as "undisputed" for purposes of

1

the pending motions is not intended as a waiver of Intervenor-Defendants' right to dispute those facts if further proceedings are necessary.

1.      The Vermont Climate Superfund Act became law on July 1, 2024. *See* S.259 (Act 122).

> **Response:**    Disputed. The Climate Superfund Act became law on May 30, 2024. Bill Status, S.259 (2023-24 Bien.) at https://legislature.vermont.gov/bill/status/2024/S.259. Its effective date was July 1, 2024. *See* 2023 Vt. Acts & Resolves No. 122 (adj. sess.), § 7.

2.      Defendant Julie Moore is the Secretary of the Vermont Agency of Natural Resources.

> **Response:**    Undisputed.

3.      Defendant Moore is responsible for issuing cost recovery demands to the covered energy producers under the Climate Superfund Act. § 598(g)(l).

> **Response:**    Undisputed to the extent that "covered energy producer" means "responsible party." Otherwise, the cited authority does not support this fact.

4.      Defendant Moore is being sued in her official capacity. Compl. ¶ 43.

> **Response:**    The statement asserts a legal conclusion and not a material fact capable of being admitted or denied. Accordingly, Intervenor-Defendants object. Intervenor-Defendants do not dispute that Intervenor-Plaintiffs have sued Defendant Moore in her official capacity.

5.      Defendant Jane Lazorchak is the Director of the Vermont Agency of Natural Resources Climate Action Office.

> **Response:**    Undisputed except that Defendant Lazorchak's title is Program Manager.

6.      As the Director of the Vermont Agency of Natural Resources Climate Action Office, Defendant Lazorchak is responsible for administering the Act's Climate Superfund Cost Recovery Program under the Act. § 597.

2

**Response:** Defendant Lazorchak's title is Program Manager. Undisputed that the Climate Action Office is responsible for administering the Climate Superfund Cost Recovery Program under Act 122.

7. Defendant Lazorchak is being sued in her official capacity. Compl. ¶ 44.

**Response:** The statement asserts a legal conclusion and not a material fact capable of being admitted or denied. Accordingly, Intervenor-Defendants object. Intervenor-Defendants do not dispute that Intervenor-Plaintiffs have sued Director Lazorchak in her official capacity.

8. Moore and Lazorchak reside in or conduct a substantial proportion of their official business in Vermont.

**Response:** Undisputed that Secretary Moore and Program Manager Lazorchak conduct a substantial portion of their official business in Vermont.

9. Vermont has no crude oil reserves or production. *Vermont State Energy Profile*, U.S. ENERGY INFO. ADMIN. (Aug. 21, 2025) (attached as Exhibit A to Declaration of Bradley L. Larson (Sept. 15, 2025)).

**Response:** Undisputed at this time to the best of Intervenor-Defendants' knowledge.

10. Vermont does not have any petroleum refineries. *Id.*

**Response:** Undisputed at this time to the best of Intervenor-Defendants' knowledge.

11. Vermont has no natural gas reserves or production. *Id.*

**Response:** Undisputed at this time to the best of Intervenor-Defendants' knowledge, to the extent this statement is about fossil gas.

12. Vermont does not have any coal mines or coal reserves and there are no coal-fired power plants in the state. *Id.*

**Response:** Undisputed at this time to the best of Intervenor-Defendants' knowledge.

### West Virginia

13. West Virginia was the fourth highest producer of total energy in the United States in 2021. Declaration of Scott A. Adkins (Sept. 8, 2025) ("Adkins Decl.") ¶ 4.

3

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

14.    Approximately 85,000 West Virginians are employed in the energy sector. Adkins Decl. ¶ 7.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

15.    Employees in West Virginia in the oil and gas field received over $271 million in compensation in 2023. Adkins Decl. ¶ 8.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

16.    Employees in West Virginia in the pipeline transportation field received over $170 million in compensation in 2023. *Id.* at ¶ 8.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

17.    West Virginia ranks in the top 5 States in the country for energy consumption per capita. *Id.* at ¶ 9.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

18.    The industrial sector accounts for about 46% of West Virginia's energy usage. *Id.* at ¶ 9.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

19.    West Virginia consistently ranks as one of the poorest States in the country. *Id.* at ¶ 13.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

20.    Economic disruption associated with the Climate Superfund Act will hit West Virginia especially hard. *Id.* at ¶¶ 10–13.

**Response:**    Intervenor-Defendants object to this statement pursuant to Fed. R. Civ. P. 56(c)(2) and (c)(4) and D. Vt. L.R. 56(d) because: i) it cannot be presented in a form that would be admissible in evidence; ii) the declaration passages cited in support of this statement were not made on personal knowledge; and iii) the declaration does not show that the declarant is

competent to testify on the matters stated. The declarant is employed by the State's "leading employment agency" and is not competent to testify as to how the Vermont Act will affect fossil fuel producers or have any of the effects discussed in the declaration. The portions of the declaration cited, including assertions that the Vermont Act will cause employment effects in West Virginia, harm the state's consumers, affect the state's revenue streams, affect fossil fuel producers' capital investments and production in the state, and affect energy prices in the state, rely on speculation about the actions of third parties and are lacking in foundation.

To the extent a further response is required, Intervenor-Defendants dispute that the Vermont Act will affect fossil fuel industry employment, investments, production, or pricing or affect energy prices. *See* Declaration of Don Fullerton ("Fullerton Decl.") ¶¶ 27-42, ECF No. 109-3 (*Chamber* case), ECF No. 53-2 (*United States* case).

21.    West Virginia spent $9,913,789.41 in 2024 on fuel for State transportation needs. Declaration of Kenneth H. Yoakum (Sept. 9, 2025) ("Yoakum Decl.") ¶ 2.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

22.    West Virginia purchased 3,080,514 gallons of fuel in 2024 on behalf of its fleet of vehicles. Yoakum Decl. ¶ 2.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

23.    In 2023, the State's fleet purchased 3,086,183 gallons of fuel. The fleet purchased under 6,000 more gallons in 2023 but spent over $11,000,000 on fuel because of gas-price fluctuations. *Id.* at. ¶ 3.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

24.    Nine West Virginia state agencies rely on State transportation. The West Virginia State Police, Department of Transportation, and Department of Human Services are among the state's top fuel consumers. *Id.* at ¶ 4.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

25.    West Virgina generated over $1 billion in revenue from severance taxes from coal, natural gas, natural gas liquid, and oil in fiscal year 2023. Declaration of Matthew Irby (Sept. 11, 2025) ("Irby Decl.") ¶ 3.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

26.    In fiscal years 2024 and 2025, West Virginia collected over $500 million in revenue from severance taxes each year from fossil fuel extraction. Irby Decl. ¶ 3.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

27.    Local governments in West Virginia receive 10% of net proceeds from oil and natural gas severance taxes, and 100% of regular severance tax on natural gas production. Counties receive 5% of state coal severance tax collections. *Id.* at ¶ 4.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

28.    About 90% of all state severance taxes go to the State's General Revenue Fund. This Fund enables the state to provide essential services, including public education, law enforcement and corrections, and the judiciary. *Id.* at ¶ 4.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

29.    Without severance taxes, West Virginia would face a substantial budget shortfall. *Id.* at ¶ 4.

**Response:**    Intervenor-Defendants, to the best of their knowledge, do not dispute the cited statement that "[w]ithout severance taxes, West Virginia would face a substantial budget shortfall that would compel it to either implement cuts in [essential services] spending or impose additional revenue-generating measures."

30.    The state imposes a severance tax of 5% on the production of oil and natural gas. Severance tax is based on production, so a reduction in production means the state generates less severance tax revenue. *Id.* at ¶ 5.

6

**Response:**    Disputed because to the best of Intervenor-Defendants' knowledge, severance taxes in West Virginia are based on the value of what was produced, *see, e.g.*, W. Va. Code Ann. § 11-13A-3(b) (West), so a reduction in production would not necessarily result in less severance tax revenue to the state. Intervenor-Defendants further dispute any implication that the Act will or is likely to reduce fossil fuel production. Fullerton Decl. ¶¶ 27-42.

31.    The State of West Virgina purchases massive quantities of energy and electricity to operate and maintain its properties, including to perform its sovereign duties. Declaration of Robert Kilpatrick (Sept. 12, 2025) ("Kilpatrick Decl.") ¶ 5.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

32.    At the thirty-three buildings withing [sic] the Department of Administration's portfolio, the State spent $5,086,070.69 on electrical power and natural gas from 2024-2025. Kilpatrick Decl. ¶ 6.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

### Tennessee

33.    Tennessee obtained $891,035,756.75 in revenue from its gasoline tax from July 2024 – June 2025 at a rate of $0.26 per gallon. Declaration of Amanda McGraw (Sept. 8, 2025) ("McGraw Decl.") ¶ 5.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

34.    Tennessee obtained $317,109,678.17 in revenue from its regular diesel tax from July 2024 – June 2025 at a rate of $0.27 per gallon. McGraw Decl. ¶ 6.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

35.    Tennessee obtained $52,071,098.28 in revenue from its special petroleum tax from July 2024 – June 2025 at a rate of $.01 per gallon. *Id.* at ¶ 7.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

7

36. Tennessee obtained $466,796.56 in natural gas and crude oil severance taxes from July 2024-June 2025 at a rate of 3% of the sales price of all natural gas and crude oil removed from the ground in Tennessee. *Id.* at ¶ 8.

**Response:** Undisputed to the best of Intervenor-Defendants' knowledge.

### Kansas

37. The Office of the Attorney General purchased 10,519.56 gallons of gasoline in 2025, a net cost to the State of Kansas of $27,912.84. Declaration of Tabetha Mallonee in Support of Plaintiffs' Motion for Stay and Preliminary Injunction (Sept. 10, 2025) ("Mallonnee Decl.") ¶ 4.

**Response:** Undisputed to the best of Intervenor-Defendants' knowledge.

38. The Office of the Attorney [sic] reimburses employees who, while traveling on Attorney General Business, purchase gasoline with their own funds. Mallonnee Decl. ¶ 5.

**Response:** Undisputed to the best of Intervenor-Defendants' knowledge.

39. In 2025, the Office of the Attorney General spent $222.08 on reimbursements to agency employees for their gasoline purchase. *Id.* at ¶ 6.

**Response:** Undisputed to the best of Intervenor-Defendants' knowledge.

40. In 2025, therefore, the Office of the Attorney General spend a total of $28,134.92 on gasoline. *Id.* at ¶ 7.

**Response:** Undisputed to the best of Intervenor-Defendants' knowledge.

41. If the price of gasoline increases, the Office of the Attorney General will be forced to expend more money on gasoline purchases. *Id.* at ¶ 8.

**Response:** Intervenor Defendants do not dispute that if the price of gasoline increases, all other things being equal, the Office of the Kansas Attorney General would spend more money on gasoline purchases.

**Georgia**

42.    Georgia purchases large quantities of energy and petroleum to serve citizens of Georgia through several departments and agencies. Declaration of Jazzmin Randall (Sept. 8, 2025) ("Randall Decl.") ¶ 2.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

43.    Georgia spent more than $43 million in 2024 to purchase fuel, petroleum, and other gas products for State transportation needs. The Georgia State fleet purchased more than 13 million gallons of fuel in 2024. Randall Decl. ¶ 2.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

44.    The State's fuel costs are tied to fuel prices, so its costs increase as fuel prices increase. *Id.* at 3.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

45.    State transportation is necessary to conduct the work of numerous State agencies. Agencies like the Georgia Department of Public Safety, the Department of Human Services, the Georgia Department of Transportation, and the Georgia State Patrol require large amounts of fuel to maintain the fleet and serve the citizens of the State. The State's ability to provide law enforcement, safe roads, and care to abused and neglected children depends on fuel. *Id.* at 4.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

**South Carolina**

46.    From July 1, 2024, to June 30, 2025, the South Carolina Department of Public Safety expended $4,937,807 to purchase 1,778,042 gallons of fuel for motor vehicles including those used by State Troopers in the performance of law enforcement duties. Declaration of Karl Boston – South Carolina Department of Public Safety (Sept. 8, 2025) ("Boston Decl.") ¶ 3.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

47.     If the price of fuel were to increase by even $.01 per gallon, this could cost South Caroline [sic] Department of Public Safety thousands of dollars in additional fuel costs. Boston Decl. ¶ 3.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

48.     From 2024-2025 the Department of Administration for fuel in South Carolina expended $5,651,265 for 2,017,560 gallons of fuel for vehicles used by multiple state agencies. This figure does not included [sic] purchase by the Department of Public Saftery [sic] which owns its own vehicles. If the price of fuel were to increase by even $0.01 per gallon, this could cost the Department of Administration thousands of dollars in additional fuel costs. Declaration of Nolan Wiggins (Sept. 12, 2025) ¶ 3.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

### Florida

49.     In 2023 Florida's statewide consumption of petroleum products was 362,207,000 barrels. Declaration of Mark Futrell (Sept. 12, 2025) ("Futrell Decl.") ¶ 2.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

50.     In 2023 Florida's statewide consumption of natural gas was 1,635 billion cubic feet. Futrell Decl. ¶ 2.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

51.     In 2023 Florida's statewide consumption of coal was 5,550,000 short tons. *Id*.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

52.     Florida is the third-largest energy consuming state in the nation. *Id*.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

53. Florida is the third-highest consumer of motor gasoline and second highest consumer of jet fuel in the nation, due to a large influx of tourists and the State's large population. *Id*. at ¶ 3.

**Response:** Undisputed to the best of Intervenor-Defendants' knowledge.

54. Based on reports from the online procurement system, in 2024 the State spent at least $18,547,147.69 on oil and gas for State needs. Declaration of Stefanie Higgins (Sept. 11, 2025) ("Higgins Decl.") ¶ 2.

**Response:** Undisputed to the best of Intervenor-Defendants' knowledge.

55. Based on reports from the fuel car system, in 2024 the State spent at least $38,684,586.44 on fuel for State need. Higgins Decl. ¶ 3.

**Response:** Undisputed to the best of Intervenor-Defendants' knowledge.

56. State transportation is necessary to carry out the work of numerous State agencies, such as the State's ability to patrol highways, provided [sic] law enforcement, and offer other critical government services. *Id.* at ¶ 4.

**Response:** Undisputed to the best of Intervenor-Defendants' knowledge.

57. If the liability imposed by the Vermont Superfund Act causes the price of energy to rise, making fuel less affordable and less available, it will harm the State's ability to fulfill its sovereign duties. *Id.* at ¶ 5.

**Response:** Intervenor-Defendants object to this statement and to the cited declaration passage because they are speculative, lacking in foundation, and cannot be presented in a form that would be admissible in evidence. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); D. Vt. L.R. 56(d). The statements discuss only hypothetical impacts of the Vermont Act, without foundation. The statements are also speculative and lack foundation because they do not address how any level of increase in the price of energy, however minimal, would make fuel less available. The declarant does not explain, for example, how a hypothetical $.01 increase in the price of gasoline would make it "less available" or "harm the State's ability to fulfill its sovereign duties." Intervenor-Defendants further object to this statement and the

11

declaration because they do not define "sovereign duties." If a further response is required, Intervenor-Defendants dispute paragraph 57 to the extent it is intended to suggest that the Vermont Act will or is likely to cause the price of energy to rise or make energy less available in Florida. *See* Fullerton Decl. ¶¶ 27-42. Intervenor-Defendants do not dispute that if fuel prices rise significantly, all other things being equal, the State's ability to carry out some functions might be impacted.

58.     In fiscal year 2024, Florida collected $1,178,834.06 in gas and oil severance tax. Florida had [sic] imposed severance tax since 1945 and $1,178,834.06 appears to be an average amount in collections since 2014. Declaration of Eric Peate (Sept. 9, 2025) ("Peate Decl.") ¶ 2.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

59.     Severance taxes help fund Florida's government; about 75% of all state severance taxes go into the State's General Revenue Fund. Peate Decl. ¶ 3.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

60.     Severance tax is calculated based on production, so a reduction in Florida's production would reduce its severance tax revenue, and harm Florida's government operations. *Id.* at ¶ 3.

**Response:**     Intervenor-Defendants dispute that severance tax is calculated based on production because, to the best of Intervenor-Defendants' knowledge, severance taxes in Florida are based on the value of what is produced, *see, e.g.*, https://floridarevenue.com/taxes/taxesfees/Pages/severance.aspx. Intervenor-Defendants therefore dispute this paragraph because a reduction in production would not necessarily result in less severance tax revenue to the state. Intervenor-Defendants object to the remainder of this paragraph because it is not supported by admissible, non-speculative evidence and because it lacks sufficient foundation. Intervenor-Defendants further dispute any implication that the Act will or is likely to reduce fossil fuel production. Fullerton Decl. ¶¶ 27-42.

### Idaho

61.     Idaho annually derives hundreds of thousands of dollars in revenue from severance taxes and other special taxes on energy production. Declaration of Paul Woods (Sept. 10, 2025) ("Woods Decl.") ¶ 2.

12

**Response:**   Undisputed to the best of Intervenor-Defendants' knowledge.

62.   In Fiscal Year 2023, Idaho generated nearly $1 million in revenue from severance taxes from natural gas, natural gas liquids, and oil. Woods Decl. ¶ 3.

**Response:**   Intervenor-Defendants do not dispute that Idaho generated $889,373 in revenue from severance taxes in FY 2023. *See* 2024 Annual Report, Idaho State Tax Commission at 6 (July 10, 2025) (cited in Woods Decl. ¶ 3).

63.   Severance tax is calculated based on production; the State currently imposes a severance tax of 2.5% on the market value of oil and gas produced or sold in Idaho. *Id.* at ¶ 4.

**Response:**   Undisputed to the best of Intervenor-Defendants' knowledge, except to clarify that severance tax is calculated based on the value of production, not the volume of production without regard to its value.

64.   Idaho consumes significant amounts of fossil fuels and in 2023, Idaho spends [sic] $5.978 billion to consume 37 million barrels of petroleum, $1.105 billion to consume 151 billion cubic feet of natural gas, and $5 million to consume 49 thousand short tons of coal. Declaration of Kenneth Huston (Sept. 8, 2025) ("Huston Decl.") ¶ 4.

**Response:**   Undisputed to the best of Intervenor-Defendants' knowledge.

65.   Idaho residents consumed 114 trillion British Thermal Units out of the state's total 505 trillion BTU of energy consumption. Huston Decl. ¶ 5.

**Response:**   Undisputed to the best of Intervenor-Defendants' knowledge.

66.   The majority of Idaho households use natural gas as their primary energy source for heating. *Id.* at ¶ 6.

**Response:**   Undisputed to the best of Intervenor-Defendants' knowledge.

67.   In 2023, Idaho produced 2.6 trillion British Thermal Units of natural gas. *Id.* at ¶ 7.

**Response:**   Undisputed to the best of Intervenor-Defendants' knowledge.

68.   Approximately 34,308 Idahoans are employed in the energy sector. *Id.* at ¶ 8.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

**Iowa**

69.    Iowa Department of Transportation spent $8,467,051.32 in 2024 on fuel for State transportation needs. Declaration of Lee Wilkinson (Sept. 11, 2025) ("Wilkinson Decl.") ¶ 2.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

70.    Iowa DOT purchased 2,750,562.89 gallons of fuel in 2024. Wilkinson Decl., ¶ 2.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

71.    Iowa DOT fuel costs are tied to fuel prices. In 2023, the Iowa DOT purchased 3,025,236.2 gallons of fuel. The Iowa DOT spent over $10,164,169.88 on fuel in 2023. *Id.* at ¶ 3.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

72.    State transportation is necessary to carry out the work of the Iowa DOT. The DOT's ability to provide a safe, reliable, and innovative transportation system to the traveling public depends on fuel. *Id.* at ¶ 4.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

73.    If the liability imposed by the Vermont Superfund Act will cause the price of energy to rise, making fuel less affordable and less available, Iowa's ability to fulfill its sovereign duties will be harmed. *Id.* at ¶ 5.

**Response:**    Intervenor-Defendants object to this statement and to the cited declaration passage because they are speculative, lacking in foundation, and cannot be presented in a form that would be admissible in evidence. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); D. Vt. L.R. 56(d). The statements discuss only hypothetical impacts of the Vermont Act, without foundation. The statements are also speculative and lack foundation because they do not address how any level of increase in the price of energy, however minimal, would make fuel less available. The declarant does not explain, for example, how a hypothetical $.01 increase in the price of gasoline would make it "less available" or harm the State's ability to fulfill its sovereign duties. Intervenor-Defendants further object to this statement and the declaration because they do not define "sovereign duties." If a further response is required, Intervenor-Defendants dispute paragraph 73 to the

14

extent it is intended to suggest that the Vermont Superfund Act will or is likely to cause the price of energy to rise or make energy less available in Iowa. *See* Fullerton Decl. ¶¶ 27-42. Intervenor-Defendants do not dispute that if fuel prices rise significantly, all other things being equal, the State's ability to carry out some functions might be impacted.

### Kentucky

74.     In 2023, Kentucky was the 15th highest producer of total energy in the US. Declaration of the Office of the Kentucky Attorney General (Sept. 12, 2025) ("Thacker Decl.") ¶ 5.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

75.     For many years, Kentucky was the third-largest coal-producing state and typically accounted for about one-tenth of the US coal production. Of the coal mined in Kentucky that stays in the US, about half is sent to twenty other states, where it is burned primarily by power plants to generate energy. Thacker Decl. ¶¶ 6–7.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

76.     In 2023, Kentucky was the sixth largest coal producer in the country. *Id.* at ¶ 8.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

77.     In 2023, Kentucky coal industry produced more than 28 million short tons of coal. *Id.*

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

78.     Kentucky is the sixteenth largest natural gas producing state in the nation. *Id.* at ¶ 9.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

79.     Approximately 156,000 Kentuckians are energy workers. *Id.* at ¶ 10.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

15

80.    In 2023, employees in Kentucky working in mining, quarrying, and oil and gas extraction received over $845 million in compensation. Employees in pipeline transportation received over $130 million in compensation. *Id.* at ¶ 11.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

81.    Kentucky ranks in the top ten states in the amount of energy used per dollar of GDP. *Id.* at ¶ 12.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

82.    Industry and transportation sectors of the economy account for about 65% of total end-use energy consumption. *Id.* at ¶ 13.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

83.    Kentucky also ranks in the top ten states in the nation for coal consumption. *Id.* at ¶ 14.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

84.    The Vermont Superfund Act will harm Kentucky consumers as citizens will feel pain at the pump, grocery store, and home in costs for energy. *Id.* at ¶ 17.

**Response:**    Intervenor-Defendants object to this statement pursuant to Fed. R. Civ. P. 56(c)(2) and (c)(4) and D. Vt. L.R. 56(d) because: i) it cannot be presented in a form that would be admissible in evidence; ii) the declaration passages cited in support of this statement were not made on personal knowledge; and iii) the declaration does not show that the declarant is competent to testify on the matters stated. The declarant is employed as General Counsel at Kentucky's Attorney General Office and is not competent to testify as to how the Vermont Act will affect fossil fuel producers or have any of the effects discussed in the declaration. The portions of the declaration cited, including assertions that the Vermont Act will harm Kentucky's consumers, affect costs for energy producers, and affect energy prices in the state, rely on speculation about the actions of third parties and are lacking in foundation.

To the extent a further response is required, Intervenor-Defendants dispute that the Vermont Act will affect fossil fuel industry employment,

16

investments, production, or pricing or affect energy prices. *See* Fullerton Decl. ¶¶ 27-42.

85.    Kentucky is one of the poorest states in the country, so increased prices and decreased employment in a major sector of the economy is harmful to the commonwealth. *Id.* at ¶ 18.

**Response:**    Intervenor-Defendants object to this statement as speculative and because it cannot be presented in a form that would be admissible in evidence. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); D. Vt. L.R. 56(d). The statement also lacks foundation because it fails to discuss any specific price or employment change or specific sector of the economy. The declarant does not explain, for example, how an increase in price for a product that has substantial out-of-state sales would necessarily harm the commonwealth, or how a minuscule change in employment would harm the commonwealth. To the extent a further response is required, Intervenor-Defendants do not dispute that some level of price increases or decreased employment in a major sector of the Kentucky economy could harm the commonwealth. Intervenor-Defendants dispute that the Vermont Act will or is likely to affect prices of energy or goods in Kentucky or otherwise harm the commonwealth. *See* Fullerton Decl. ¶¶ 27-42.

86.    Kentucky imposes severance taxes of 4.5% on coal, natural gas, and crude petroleum. *Id.* at ¶ 19.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

87.    In fiscal year 2024 Kentucky generated approximately $117 million in revenue from severance tazes [sic] from coal, natural gas, natural gas liquids, and oil. *Id.* at ¶ 20.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

88.    Half of the tax collected annually from the severance of coal is directed to the Local Government Economic Development Fund. *Id.* at ¶ 21.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

89.    Half of the tax collected from sales of minerals other than coal is directed to the Local Government Economic Assistance Fund. *Id.*

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

17

90.     In addition, $7.5 million of coal severance and processing fees collected annually are directed to the Kentucky Coal Fields Endowment Authority. *Id.*

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

91.     These funds help support economic development, public infrastructure, vocational education, workforce training, and other social services. *Id.*

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

92.     Severance taxes play a crucial role in generating substantial revenue for Kentucky, and that role would be negatively affected if fossil fuel extraction declines in the Commonwealth. *Id.* at ¶ 22.

**Response:**     Intervenor-Defendants do not dispute that severance taxes play a role in generating revenue for Kentucky, to the best of Intervenor-Defendants' knowledge. Intervenor-Defendants otherwise object to this statement as speculative and because it cannot be presented in a form that would be admissible in evidence. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); D. Vt. L.R. 56(d). The statement also lacks foundation by failing to discuss any specific change in the quantity of extraction or any other variables that affect severance taxes such as the value of the material extracted. To the extent a further response is required, Intervenor-Defendants dispute any intended suggestion that the Vermont Act will or is likely to cause fossil fuel extraction to decline in Kentucky. *See* Fullerton Decl. ¶¶ 27-42.

93.     To purchase fuel for the Commonwealth's transportation needs, the Department of Agriculture spent $423,317.66 on 145,696 gallons of fuel in fiscal year 2024-2025. The Department's fleet drove 2,223,425 miles that year. Declaration of Jason Glass (Sept. 9, 2025) ("Glass Decl.") ¶ 2.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

94.     The department's fuel costs are tied to fuel prices. In fiscal year 2022-2023 the Department purchased 144,129 gallons of fuel to drive 2,127,625 miles for a total purchase amount of $491,628.04. While the total gallons purchased in 2022-2023 was 1,567 less than the

most recent fiscal year, the department spent $68,310.38 more in the fiscal year 2022-2023 due to lower fuel prices in the most recent fiscal year. Glass Decl. ¶ 3.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

95.    The department's regulatory duties, which include traveling across the rural state and network of 79,676 miles of roads in the state, require Department employees to spend significant time on the road. The Department's ability to serve the commonwealth citizens hinges on gasoline consumption. *Id.* at ¶ 4.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

96.    The liability imposed by the Vermont Superfund Act will cause the price of energy to rise, making fuel less affordable and less available, harming Kentucky's ability to fulfill its sovereign duties. *Id.* at ¶ 5.

> **Response:**    Intervenor-Defendants object to this statement pursuant to Fed. R. Civ. P. 56(c)(2) and (c)(4) and D. Vt. L.R. 56(d) because: i) it cannot be presented in a form that would be admissible in evidence; ii) the declaration passages cited in support of this statement were not made on personal knowledge; and iii) the declaration does not show that the declarant is competent to testify on the matters stated. The declarant is employed by the Kentucky Department of Agriculture and is not competent to testify as to how the Vermont Act will affect fossil fuel producers or have any of the effects discussed in the declaration. The portions of the declaration cited, including assertions that the Vermont Act will affect energy prices in Kentucky and reduce the availability of energy, rely on speculation about the actions of third parties and are lacking in foundation.
>
> To the extent a further response is required, Intervenor-Defendants dispute that the Vermont Act will affect fossil fuel industry employment, investments, production, or pricing, affect energy prices, or affect the availability of energy. *See* Fullerton Decl. ¶¶ 27-42.

### Oklahoma

97.    The oil and gas industry form a central part of the State's energy infrastructure. Declaration of Dr. Nicholas W. Hayman (Sept. 10, 2025) ("Hayman Decl.") ¶ 5.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

19

98.     Oklahoma produces about three times more total energy than it consumes and is a major exporter of energy. Hayman Decl. ¶ 5.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

99.     Oklahoma relies heavily on fossil fuels for in-state electricity and energy needs. *Id.*

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

100.    In 2024-2025, fossil fuels accounted for over 56% of Oklahoma's electricity generation, about 48-50% from gas and 6-8% from coal. *Id.*

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

101.    Coal accounted for 6-8% of Oklahoma's electricity generation in 2024. Oklahoma is the nation's 6th largest natural gas producer and typically produced 3-4 times more natural gas than it consumes internally, making it a net exporter. *Id.*

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

102.    Oklahoma produces about 406,000 barrels of oil per day. *Id.*

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

103.    In fiscal year 2024 the State oil and gas severance tax revenue was $1,082,661,078.81 which is an important cushion to tax revenue swings between years. *Id.* at ¶ 7.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

104.    The Oklahoma Municipal Power Authority (OMPA) provides electric power and energy to Oklahoma municipalities and public trusts operating municipal electric systems. Declaration of David Osburn (Sept. 11, 2025) ("Osburn Decl.") ¶ 4.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

105.    OMPA sells wholesale electric power to forty-three member cities in Oklahoma. These members sell power to retail customers in Oklahoma who are the end users of OMPA electricity. Osburn Decl. ¶ 6.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

106.    OMPA relies on generators that are powered by fossil fuel sources including natural gas and coal. The purchase of fossil fuels are a significant portion of OMPA's budget each fiscal year. *Id.* at ¶ 7.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

107.    OMPA purchased 11,300,956 mmbtus of natural gas at a cost of $26,823,995 in 2024. *Id.* at ¶ 8.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

108.    OMPA's power supply program included power supply resources acquired by the Authority through joint ownership in three generating units: a 23% ownership interest in the McClain Generating Facility (a natural gas power plant), a 13% undivided ownership in Redbud Generating Facility (a natural gas power plant), and a 6.66% ownership in the John W. Turk Jr. Coal Plant (an electric generating unit). *Id.* at ¶ 9.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

109.    In 2024 OMPA expended $4,757,888 to contribute to the purchase of coal for generating electricity. *Id.* at ¶ 11.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

110.    OMPA relies on continued use of fossil fuels as a fuel source for the generation of electricity to meet OMPA's future contractual requirements with its members. *Id.* at ¶ 12.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

21

111.    The Oklahoma Corporation Commission develops and enforces regulations that affect approximately 359 public utilities, 8,400 motor carriers and 4.5 million trucks, 2,524 oil and gas operators, and 4,200 motor fuel facilities. The agency oversees the operation of 154,391 active oil, gas, and underground injection wells, 50,000 miles of natural gas and hazardous liquid pipelines, 13 underground natural gas storage facilities, 170,000 miles of electric distribution lines, 10,5000 [sic] petroleum storage tanks, and 45,000 motor fuel dispensers. Declaration of Trent A. Campbell (Sept. 11. 2025) ("Campbell Decl.") ¶ 5.

    **Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

112.    Oklahoma regulated utilities companies sold 262,648,656 mmbtu of natural gas, 3,162,296 tons of coal, and 4,443,424 gallons of fuel oil to Oklahoma consumers in 2024. Campbell Decl. ¶ 7.

    **Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

**Texas**

113.    In 2024, Texas accounted for 43% of the US crude oil production and 28% of its natural gas gross withdrawals. Declaration of Leslie Savage (Sept. 12, 2025) ("Savage Decl.") ¶ 4.

    **Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

114.    Texas consumes more petroleum than any other state and is 3rd in per capita petroleum use. Savage Decl. ¶ 5.

    **Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

115.    Texas has the most petroleum refineries and the most refining capacity in the US. *Id.* at ¶ 6.

    **Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

116.    Energy production is one of Texas' largest business sectors with 936,476 energy workers statewide in 2022, 11.5% of all US energy jobs. *Id.* at ¶ 7.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

117.    Texas is a substantial producer and consumer of energy sources. *Id.* at ¶ 8.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

118.    The Vermont Superfund Act will impact revenue streams from fossil fuel employment in Texas as energy producers will be forced to spend billions of dollars on liability paid to Vermont instead of making capital investments. *Id.* at ¶ 9.

**Response:**    Intervenor-Defendants object to this statement pursuant to Fed. R. Civ. P. 56(c)(2) and (c)(4) and D. Vt. L.R. 56(d) because: i) it cannot be presented in a form that would be admissible in evidence; ii) the declaration passages cited in support of this statement were not made on personal knowledge; and iii) the declaration does not show that the declarant is competent to testify on the matters stated. The declarant is employed as a geologist for the Railroad Commission of Texas and is not competent to testify as to how the Vermont Act will affect fossil fuel producers or have any of the effects discussed in the declaration. The portions of the declaration cited, including assertions that the Vermont Act will cause employment effects in Texas, affect revenue streams from fossil fuel employment, and affect fossil fuel producers' capital investments, rely on speculation about the actions of third parties and are lacking in foundation.

To the extent a further response is required, Intervenor-Defendants dispute that the Vermont Act will affect fossil fuel industry employment, investments, production, or pricing. *See* Fullerton Decl. ¶¶ 27-42.

119.    Texas has a gas severance tax of 7.5% and a 4.6% oil severance tax. The State receives billions of dollars from these severances each year, which are crucial to funding the government and providing social services. *Id.* at ¶ 11.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

**Wyoming**

120.    Wyoming is the largest coal producer in the country, accounting for about 40 percent of US coal production in 2024. Declaration of Jason Wolfe (Sept. 11, 2025) ("Wolfe Decl.") ¶ 5.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

121.    In 2023, Wyoming coal industry produced more than 237 million short tons of coal. Wolfe Decl. ¶ 5.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

122.    Wyoming is the seventh largest crude oil producing state and tenth largest natural gas producing state in the nation. *Id.* at ¶ 6.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

123.    In May 2025, Wyoming's crude oil production was 291 thousand barrels per day. In 2023 Wyoming's total annual gross production of natural gas approached 1 trillion cubic feet. *Id.*

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

124.    Approximately 45,992 Wyomingites, or 16.5% of the state workforce are employed in the energy sector. *Id.* at ¶ 7.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

125.    In 2023, employees in Wyoming working in oil and gas extraction received over $417 million in compensation. Employees in pipeline transportation received over $118 million. *Id.* at ¶ 8.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

126.    Wyoming is in the top five states in the nation for energy consumption per capita. The industrial sector accounts for the largest share, about 55%, of the State's energy

consumption. Wyoming economy [sic] relies on the energy industry to provide employment opportunities and to provide the power necessary for businesses to operate in other sectors. *Id.* at ¶ 9.

       **Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

127.    Regulations or laws that may lead to increased prices and decreased employment in the energy sector are harmful to Wyoming and its businesses and citizens. *Id.* at ¶ 10.

       **Response:**    Intervenor-Defendants object to this statement as speculative and because it cannot be presented in a form that would be admissible in evidence. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); D. Vt. L.R. 56(d). The statement lacks foundation because it fails to discuss any specific regulations, laws, or prices. To the extent a further response is required, Intervenor-Defendants do not dispute that some regulations or laws that lead to increased prices or decreased employment in the energy sector could possibly harm Wyoming, its businesses, or citizens. Intervenor-Defendants dispute that any law or regulation that may lead to increased prices and decreased employment in the energy sector would necessarily harm Wyoming, its businesses, or citizens. For example, a high percentage of Wyoming's energy generating products are exported, https://wyoenergy.org/energy-strategy-energy-generation/, and the declaration does not explain how increased prices for those products would harm the state, its businesses, or citizens. Similarly, the declaration does not address how any type of law that may have any effect on prices or employment (e.g., health and safety regulations) would necessarily harm the state, its business, and citizens. Intervenor-Defendants further dispute any intended suggestion that the Vermont Act will cause increased prices or decreased employment in the Wyoming energy sector. *See* Fullerton Decl. ¶¶ 27-42.

128.    To purchase fuel for State transportation needs, Wyoming Motor Vehicle Management System (MVMS) spent $1,427,783.99 in 2024. MVMS purchased 522,369.27 gallons of fuel in 2024. Declaration of Andrew Kuhlman (Sept. 12, 2025) ("Kuhlman Decl.") ¶ 2.

       **Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

129.    The State's fuel costs are tied to fuel prices. In 2023, MVMS purchased 492,751.26 gallons of fuel. While it purchased less fuel in 2023, MVMS spent $1,589,452.92 on fuel. Kuhlman Decl. ¶ 3.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

130.    State transportation is necessary to carry out the work of numerous State agencies. The Department of Health, the Department of Family Services, the Department of State Parks and Cultural Resources, and the State Engineer's Office are among the MVMS's top fuel consumers. The State's ability to protect the health and welfare of its residents, provide care to abused and neglected children, and manage its natural resources depends on fuel. *Id.* at ¶ 4.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

131.    If the liability imposed by the Vermont Superfund Act causes the price of energy to rise—making fuel less affordable and less available, Wyoming's ability to fulfill its sovereign duties will be harmed. *Id.* at ¶ 5.

**Response:**    Intervenor-Defendants object to this statement and to the cited declaration passage because they are speculative, lacking in foundation, and cannot be presented in a form that would be admissible in evidence. *See* Fed. R. Civ. P. 56(c)(2), (c)(4); D. Vt. L.R. 56(d). The statements discuss only hypothetical impacts of the Vermont Act, without foundation. The statements are also speculative and lack foundation because they do not address how any level of increase in the price of energy, however minimal, would make fuel less available. The declarant does not explain, for example, how a hypothetical $.01 increase in the price of gasoline would make it "less available" or harm the State's ability to fulfill its sovereign duties. Intervenor-Defendants further object to this statement and the declaration because they do not define "sovereign duties." To the extent a further response is required, Intervenor-Defendants dispute paragraph 131 to the extent it is intended to suggest that the Vermont Superfund Act will or is likely to cause the price of energy to rise or make energy less available in Wyoming. *See* Fullerton Decl. ¶¶ 27-42. Intervenor-Defendants do not dispute that if fuel prices rise significantly, all other things being equal, the State's ability to carry out some functions might be impacted.

132.    Wyoming's severance tax is imposed on the privilege of extracting minerals throughout the State. This tax is based upon statutorily established valuation methods and associated tax rates for various minerals. County ad valorem taxes are likewise based upon the

same statutory valuations and are applied at a tax rate set by the local County Commissioners. Declaration of Matthew Sachse (Sept. 12, 2025) ("Sachse Declaration") ¶ 4.

> **Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

133.    Wyoming annually derives hundreds of millions of dollars in revenue from these types of taxes. Over the last three years, the State of Wyoming generated revenue of $682,975,144 in calendar year 2024; $843,268,503 in calendar year 2023; and $819,951,379 in calendar year 2022 from severance taxes on extracted fossil fuel minerals. Additionally, the various counties of Wyoming received $726,695,544 in 2024, $871,115,486 in 2023, and $1,040,299,432 in 2022 in ad valorem taxes related to the production of fossil fuel minerals. Sachse Declaration ¶ 5.

> **Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

134.    These tax revenues are distributed to a wide range of state and local entities, including a permanent mineral trust fund for long-term investment, the State's General Fund for operating expenses, and various accounts for education, highways, and local government operations. Since Wyoming does not impose personal or corporate income taxes, the collection of tax revenue from mineral and fossil fuels enables the State and its counties to provide essential governmental services to its citizens. If mineral extraction declines, Wyoming will face considerable budget shortfalls which will negatively affect the State's ability to provide these essential services. *Id.* at ¶ 6.

> **Response:**    Intervenor-Defendants do not dispute the first two sentences of this paragraph. Intervenor-Defendants object to the last sentence of the paragraph because the cited declaration does not provide foundation for a claim that any amount of reduced mineral extraction (e.g., a single barrel of crude oil) will cause "considerable budget shortfalls which will negatively affect the State's ability to provide" essential services. Intervenor-Defendants dispute any implication that the Vermont Act will or is likely to decrease fossil fuel extraction. *See* Fullerton Decl. ¶¶ 27-42.

**Utah**

135.    Utah annually derives hundreds of millions of dollars in revenue from severance taxes and special taxes on oil, gas, and coal production. Declaration of John Rogers (Sept. 12, 2025) ("Rogers Decl.") ¶ 2.

      **Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

136.    In fiscal year 2024 Utah generated approximately $73.3 million from State oil and gas severance tax, $7.8 million from oil and gas conservation fee, $451.9 million from motor fuel tax, $197 million from special fuel tax, $2.7 million from state corporate tax liability, $16.8 million from sales and use tax, $40.2 million from centrally assess [sic] natural resource property tax on oil, gas, and coal, $93.7 million from Utah's portion of federal lease royalty, $4.5 million to SITLA from oil and gas royalty and leases, and $.02 million to FFSL from oil and gas, totaling approximately $958 million from state and federal taxation, realties, and lease payments on oil, gas, NGL, and coal production. Rogers Decl. ¶ 3.

      **Response:**    Undisputed to the best of Intervenor-Defendants' knowledge, except that the cited declaration does not support the statement that Utah generated $73.3 million from State oil and gas severance tax, that $4.5 million went to SITLA from oil and gas royalty and leases, or that $.02 million went to FFSL from oil and gas.

137.    Severance taxes help the state government. Without these revenues from fossil fuel extraction, Utah would be compelled to implement cuts in spending or impose additional revenue-generating measures. *Id.* at ¶ 4.

      **Response:**    Intervenor-Defendants do not dispute that severance taxes help the Utah state government, to the best of Intervenor-Defendants' knowledge. The second sentence is not supported by material that can be presented in a form that would be admissible in evidence, is speculative, and lacks foundation, as the declarant—who is an "Environmental Program Manager"—does not explain how he is qualified to opine on the consequences of the loss of fossil fuel revenues from severance taxes, or the factual basis for his opinion, including whether in all years where severance tax revenues were lower than previous years the state cut

28

spending or imposed additional revenue-generating measures. To the extent a further response is required, Intervenor-Defendants do not dispute that if Utah lost all revenues from fossil fuel extraction it would likely have to cut spending or impose additional revenue-generating measures.

138. Severance tax is calculated based on production. A reduction in production means the state generates less severance tax revenue. *Id.* at ¶ 5.

**Response:** Disputed because to the best of Intervenor-Defendants' knowledge, severance taxes in Utah are based on the value of what was produced, see https://ogm.utah.gov/og-production-tax-description-summary/, so a reduction in production would not necessarily result in less severance tax revenue to the state. Intervenor-Defendants further dispute any implication that the Act will or is likely to reduce fossil fuel production. Fullerton Decl. ¶¶ 27-42.

139. Utah consumed significant amounts of fossil fuels; 2023 consumer expenditures on fossil fuels products totaled $11,912.4 million. *Id.* at ¶ 7.

**Response:** Undisputed to the best of Intervenor-Defendants' knowledge.

140. Utah's oil and gas industry contributed an estimated $17 billion and supported approximately 77,970 jobs, generating about $5.8 billion in labor income. *Id.* at ¶ 8.

**Response:** Undisputed to the best of Intervenor-Defendants' knowledge.

141. Utah's coal industry generated about $508 million in production value and over $1.3 billion in broader economic ripple effects in 2024, supporting thousands of jobs. *Id.*

**Response:** Undisputed to the best of Intervenor-Defendants' knowledge.

142. State citizens will feel increased transportation and energy costs at the pump, grocery store, and home. *Id.* at ¶ 11.

**Response:** To the extent this paragraph intends to imply that state citizens will feel such effects as a result of the Vermont Act, Intervenor-Defendants object to this statement pursuant to Fed. R. Civ. P. 56(c)(2) and (c)(4) and D. Vt. L.R. 56(d) because: i) it cannot be presented in a form that would be admissible in evidence; ii) the declaration passages cited in support of this statement were not made based on personal knowledge; and iii) the declaration does not show that the declarant is competent to testify on the matters stated. The declarant is employed as an Environmental Program

Manager and is not competent to testify as to how the Vermont Act will affect fossil fuel producers or have any of the effects discussed in the declaration. The portions of the declaration cited, including assertions that the Vermont Act will harm Utah's consumers, affect fossil fuel producers' costs and production, and affect energy prices in the state, rely on speculation about the actions of third parties and are lacking in foundation.

To the extent a further response is required, Intervenor-Defendants dispute that the Vermont Act will affect fossil fuel industry employment, investments, production, or pricing or affect energy prices. *See* Fullerton Decl. ¶¶ 27-42.

### Arkansas

143.    The severance tax on oil is 4% of market value when the production average is 10 barrels of [sic] less per well per day. The tax goes up to 5% of the market value when the production average is more than 10 barrels per well per day. There is a $.005 collected on each barrel of oil severed, which is deposited as special revenues, and an additional $.02 per barrel severed as general revenues. Declaration of Todd Cockrill (Sept. 12, 2025) ("Cockrill Decl.") ¶ 3.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

144.    The severance tax on natural gas is 1.25%, 1.5%, or 5% depending on if the Arkansas Oil and Gas Commission deems its newly discovered gas, marginal gas, or other, respectively. Cockrill Decl. ¶ 4.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

145.    From Fiscal Year 2021 to Fiscal Year 2025, Arkansas collected approximately $64,900,384 from its Oil Tax. *Id.* at ¶ 6.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

146.    From Fiscal Year 2021 to Fiscal Year 2025, Arkansas collected approximately $193,057,379 from its Natural Gas Tax. *Id.* at ¶ 7.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

147. For fiscal year 2025, Arkansas had gross oil revenues of $11,212,384. From 2010-2024, the gross oil revenue accumulated to $235,852,967. *OIL REVENUE-FYE 2025,* STATE OF ARK. DEP'T OF FIN. AND ADMIN., (attached as Exhibit B to Cockrill Decl.)

**Response:** Undisputed to the best of Intervenor-Defendants' knowledge.

148. In fiscal year 2024 the Gross Natural Gas Severance Tax Revenue in Arkansas was $19,207,300. *Gross Natural Gas Severance Tax Revenue,* STATE OF ARK. DEP'T OF FIN. AND ADMIN., (attached as Exhibit A to Cockrill Decl.).

**Response:** Undisputed to the best of Intervenor-Defendants' knowledge.

149. The Arkansas State Police purchases diesel and gasoline as part of its regular course of business. Without purchases of diesel and gasoline, the Arkansas State Police cannot perform its duties. Declaration of Karen Perry (Sept. 12, 2025) ("Perry Decl.") ¶ 3.

**Response:** Undisputed, except to the extent the statement is intended to mean that the Arkansas State Police cannot perform *any* of its duties without diesel and gasoline; the cited material does not support that assertion.

150. The state Police's fuel costs are tied to fuel prices. When the price of energy rises, fuel becomes less affordable, and the state police must spend more money on fuel. Perry Decl. ¶ 4.

**Response:** Undisputed to the best of Intervenor-Defendants' knowledge, except Intervenor-Defendants dispute any suggestion that the Vermont Act necessarily will or is likely to lead to an increase in the price of energy. *See* Fullerton Decl. ¶¶ 27-42.

151. From Fiscal Year 2021 to fiscal year 2025, Arkansas State Police spent $357,609 on diesel fuel. *Id.* at ¶ 5.

**Response:** Undisputed to the best of Intervenor-Defendants' knowledge.

152. From Fiscal Year 2021 to fiscal year 2025, Arkansas State Police spend [sic] $14,084,104 on gasoline. *Id.* at ¶ 6.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

## Indiana

153.    In fiscal year 2025, Indiana purchased not less than 8,411,910 gallons of fuel and spent not less than $25,751,712.00 on fuel. Declaration of Nathan Oliver (Sept. 8, 2025) ("Oliver Decl.") ¶ 2.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

154.    Indiana's fuel costs are ties [sic] to fuel prices. In fiscal year 2024, Indiana's fleet purchased not less than 7,868,277 gallons of fuel, and Indiana spent not less than $26, 130, 226.00 on fuel. Oliver Decl. ¶ 3.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge.

155.    State transportation is necessary to carry out the work of numerous State agencies including the Indiana State Police, the Department of Correction, and others. The State's ability to provide law enforcement, safe roads, protection to natural resources and certain healthcare, social and support services depend on fuel. *Id.* at ¶ 4.

**Response:**     Undisputed to the best of Intervenor-Defendants' knowledge that the State's ability to provide those services depends in part on fuel.

156.    The liability imposed by the Vermont Superfund Act will inevitably cause the price of energy to rise, making fuel less affordable and less available, and harming Indiana's ability to fulfill its sovereign duties. *Id.* at ¶ 5.

**Response:**     Intervenor-Defendants object to this statement pursuant to Fed. R. Civ. P. 56(c)(2) and (c)(4) and D. Vt. L.R. 56(d) because: i) it cannot be presented in a form that would be admissible in evidence; ii) the declaration passages cited in support of this statement were not made on personal knowledge; and iii) the declaration does not show that the declarant is competent to testify on the matters stated. The declarant, who is Director of Fleet Services for Indiana's Department of Transportation and whose background is in vehicle maintenance and management, is not competent to testify as to how the Vermont Act will affect fossil fuel producers or have any of the effects discussed in the declaration. The portions of the

32

> declaration cited, including assertions that the Vermont Act will affect energy prices and energy availability in the state, rely on speculation about the actions of third parties and are lacking in foundation.
>
> To the extent a further response is required, Intervenor-Defendants dispute that the Vermont Act will affect fossil fuel industry employment, investments, production, or pricing, affect energy prices, or affect the availability of energy. *See* Fullerton Decl. ¶¶ 27-42.

157.    Indiana imposes a petroleum severance tax on the severance of petroleum, oil, and natural gas from Indiana land. Entities responsible for this tax are also required to pay Indiana's state income tax. Declaration of Sherry Queen (Sept. 15, 2025) ("Queen Decl.") ¶ 2–3.

> **Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

158.    From fiscal year 2022 through 2025, Indiana collected $5.5 million in petroleum severance tax. Of these entities that pay petroleum severance tax, it is estimated that they paid a combined $2.2 million in income tax (individual and corporate). Queen Decl. ¶ 4.

> **Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

159.    Indiana's petroleum severance tax is deposited in the state's oil and gas fund which goes towards further research pertaining to exploration for, development of, and wise use of petroleum resources in Indiana. *Id.* at ¶ 5.

> **Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

160.    Severance taxes are a small but reliable source of generating revenue for the State of Indiana, and that role would be negatively affected if fossil fuel extraction declines in the state. *Id.* at ¶ 7.

> **Response:**    Intervenor-Defendants do not dispute that "[s]everance taxes are a small but reliable source of generating revenue for the State of Indiana," but object to the second part of the statement as lacking foundation. The declaration does not explain, for example, how any minimal reduction in extraction volume will impact the state or has affected the state in the past, and whether there would be any impact at all if the value of the extraction did not decrease, even if the volume of production declined. Intervenor-Defendants dispute any suggestion that the Vermont Act will or is likely to

33

lead to a decline in fossil fuel extraction in Indiana. *See* Fullerton Decl. ¶¶ 27-42.

161.    In fiscal year 2025, large state agencies in Indiana purchased not less than 52,214,069 kilowatt hours of electricity at a cost of not less than $21,888,249.95 for their respective government functions. In fiscal year 2024, the large state agencies purchased not less than 50,606,936 kilowatt hours of electricity at a cost of not less than $20,842,635.45 for their respective government functions. Declaration of Kirk E. Grable (Sept. 15, 2025) ("Grable Decl.") ¶ 2.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

162.    The liability imposed by the Vermont Superfund Act will inevitably cause the price of electricity to rise, making it less affordable and less available, and harming Indiana's ability to fulfill its sovereign duties. Grable Decl. ¶ 4.

**Response:**    Intervenor-Defendants object to this statement pursuant to Fed. R. Civ. P. 56(c)(2) and (c)(4) and D. Vt. L.R. 56(d) because: i) it cannot be presented in a form that would be admissible in evidence; ii) the declaration passages cited in support of this statement were not made on personal knowledge; and iii) the declaration does not show that the declarant is competent to testify on the matters stated. The declarant is employed as General Counsel for Contract Compliance in Indiana's Department of Administration and is not competent to testify as to how the Vermont Act will affect fossil fuel producers or have any of the effects discussed in the declaration. The portions of the declaration cited, including assertions that the Vermont Act will affect energy prices and energy availability in the state, rely on speculation about the actions of third parties and are lacking in foundation.

To the extent a further response is required, Intervenor-Defendants dispute that the Vermont Act will affect fossil fuel industry employment, investments, production, or pricing, affect energy prices, or affect the availability of energy. *See* Fullerton Decl. ¶¶ 27-42.

163.    Indiana purchases massive quantities of electricity in performing its sovereign duties. Indiana purchased not less than 14,327,744 kilowatt hours of electricity at a cost of not less than $1,797,000.00 for its State House and government center complex in the City of

34

Indianapolis in fiscal year 2024. In fiscal year 2025, Indiana purchased not less than 15,053,300 kilowatt hours of electricity at a cost of not less than $1,888,000.00 for its State house and government center complex in the City of Indianapolis. Declaration of Brian Renner (Sept. 9, 2025) ("Renner Decl.")

> **Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

164.    Such electrical usage is necessary to carry out the functions of the work of the Governor, the General Assembly, and numerous state agencies. The liability imposed by the Vermont Superfund Act will inevitably cause the price of electricity to rise, making it less affordable and less available, and harming Indiana's ability to fulfill its sovereign duties. Renner Decl. at ¶¶ 3–4.

> **Response:**    Intervenor-Defendants object to this statement pursuant to Fed. R. Civ. P. 56(c)(2) and (c)(4) and D. Vt. L.R. 56(d) because: i) it cannot be presented in a form that would be admissible in evidence; ii) the declaration passages cited in support of this statement were not made on personal knowledge; and iii) the declaration does not show that the declarant is competent to testify on the matters stated. The declarant is employed in facilities maintenance, management, and construction in Indiana's Department of Administration and is not competent to testify as to how the Vermont Act will affect fossil fuel producers or have any of the effects discussed in the declaration. The portions of the declaration cited, including assertions that the Vermont Act will affect energy prices and energy availability in the state, rely on speculation about the actions of third parties and are lacking in foundation.
>
> To the extent a further response is required, Intervenor-Defendants dispute that the Vermont Act will affect fossil fuel industry employment, investments, production, or pricing, affect energy prices, or affect the availability of energy. *See* Fullerton Decl. ¶¶ 27-42.

165.    The Indiana Department of Transportation purchases massive quantities of gas and diesel fuel in performing its sovereign duties. The Department purchased not less than 3,938,713.76 gallons of diesel and gas fuel at a cost of not less than $13,139,920.09 for its transportation and related purposes in calendar year 2024. In calendar year 2023, the State

purchased not less than 3,332,281.06 gallons of gas and diesel fuel at a cost of not less than $11,888,064.24 for its transportation and related purposes. Declaration of Greg Bright (Sept. 15, 2025) ("Bright Decl.") ¶ 2.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

166.    The State also purchases massive quantities of electricity in performing its sovereign duties. In particular, the Department purchased electricity at a cost of not less than $7,569,056.95 for its transportation and related purposes in fiscal year 2025. In fiscal year 2024, the State purchased electricity at a cost of not less than $6,973,574.51 for its transportation and related purposes. Bright Decl. ¶ 4.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

167.    The liability imposed by the Vermont Superfund Act could inevitably cause the price of energy to rise - making fuel less affordable and less available, and harming Indiana's ability to fulfill its sovereign duties. Bright Decl. ¶ 6.

**Response:**    Intervenor-Defendants object to this statement and to the cited declaration passage because they are speculative, lacking in foundation, and cannot be presented in a form that would be admissible in evidence. The statements discuss only hypothetical impacts of the Vermont Act, without foundation. The declarant is a fleet director for Indiana's Department of Transportation and does not discuss any foundation for his speculation about how the Vermont Act might affect fossil fuel producers. The statements are also speculative and lack foundation because they do not address how any level of increase in the price of energy, however minimal, would make fuel less available. The declarant does not explain, for example, how a hypothetical $.01 increase in the price of gasoline would make it "less available" or harm the State's ability to fulfill its sovereign duties. Intervenor-Defendants further object to this statement and the declaration because they do not define "sovereign duties." To the extent a further response is required, Intervenor-Defendants dispute paragraph 167 to the extent it is intended to suggest that the Vermont Act will or is likely to cause the price of energy to rise or make energy less available in Indiana. *See* Fullerton Decl. ¶¶ 27-42. Intervenor-Defendants do not dispute that if fuel prices rise significantly, all other things being equal, the State's ability to carry out some functions might be impacted.

36

168.    The Indiana Department of Natural Resources purchases massive quantities of electricity in performing its sovereign duties. In particular, the Department purchased not less than 37,160,769 kilowatt hours of electricity at a cost of not less than $9,163,895.00 for its protection of natural resources and related purposes in fiscal year 2025. In fiscal year 2024, the Department purchased not less than 36,279,192 kilowatt hours of electricity at a cost of not less than $8,924,799.94 for its protection of natural resources and related purposes. Declaration of Gregory A. Sorrels (Sept. 10, 2025) ("Sorrels Decl.") ¶ 2.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

169.    Such electrical usage is necessary to carry out the functions of the work of the Department and the liability imposed by the Vermont Superfund Act will inevitably cause the price of electricity to rise—making it less affordable and less available, and harming Indiana's ability to fulfill its sovereign duties. Sorrels Decl. ¶¶ 3–4.

**Response:**    Intervenor-Defendants object to this statement pursuant to Fed. R. Civ. P. 56(c)(2) and (c)(4) and D. Vt. L.R. 56(d) because: i) it cannot be presented in a form that would be admissible in evidence; ii) the declaration passages cited in support of this statement were not made on personal knowledge; and iii) the declaration does not show that the declarant is competent to testify on the matters stated. The declarant, whose background is in fleet management and who has served as Chief Financial Officer of Indiana's Department of Natural Resources for less than a year, is not competent to testify as to how the Vermont Act will affect fossil fuel producers or have any of the effects discussed in the declaration. The portions of the declaration cited, including assertions that the Vermont Act will affect energy prices and energy availability in the state, rely on speculation about the actions of third parties and are lacking in foundation.

To the extent a further response is required, Intervenor-Defendants dispute that the Vermont Act will affect fossil fuel industry employment, investments, production, or pricing, affect energy prices, or affect the availability of energy. *See* Fullerton Decl. ¶¶ 27-42.

170.    The Indiana Family and Social Services Administration purchased not less than $3,267,298 electricity in fiscal year 2025 and $3,147,261 in SFY2024. Such electrical usage is

necessary to carry out the functions of the work of the Department. Declaration of Paul M.

Bowling (Sep. 11, 2025) ("Bowling Decl.") ¶ 2.

> **Response:** Undisputed to the best of Intervenor-Defendants' knowledge except to the extent the declarant intends to state that the amount of electricity purchased the past two years is necessary for every aspect of the agency's work; such an assertion lacks foundation.

171.    The liability imposed by the Vermont Superfund Act will inevitably cause the

price of electricity to rise making it less affordable and less available, and harming Indiana's

ability to fulfill its sovereign duties. Bowling Decl. ¶ 3.

> **Response:** Intervenor-Defendants object to this statement pursuant to Fed. R. Civ. P. 56(c)(2) and (c)(4) and D. Vt. L.R. 56(d) because: i) it cannot be presented in a form that would be admissible in evidence; ii) the declaration passages cited in support of this statement were not made on personal knowledge; and iii) the declaration does not show that the declarant is competent to testify on the matters stated. The declarant is the Chief Financial Officer for Indiana's Family and Social Services Administration and is not competent to testify as to how the Vermont Act will affect fossil fuel producers or have any of the effects discussed in the declaration. The portions of the declaration cited, including assertions that the Vermont Act will affect energy prices and energy availability in the state, rely on speculation about the actions of third parties and are lacking in foundation.
>
> To the extent a further response is required, Intervenor-Defendants dispute that the Vermont Act will affect fossil fuel industry employment, investments, production, or pricing, affect energy prices, or affect the availability of energy. *See* Fullerton Decl. ¶¶ 27-42.

### Nebraska

172.    Nebraska imposes severance taxes on the mining and/or removal of nonrenewable

resources from the earth. The severance tax is imposed on oil, natural gas, and uranium.

Nebraska also imposes an additional "conservation tax" on the extraction of oil and natural gas.

Declaration of Christopher Ayotte (Sept. 15, 2025) ("Ayotte Decl.") ¶ 2.

> **Response:** Undisputed to the best of Intervenor-Defendants' knowledge.

173.    In 2023-2024 Fiscal Year, Nebraska collected Total $2,839,986.92 in natural resource severance tax. Nebraska also collected $879,764.93 in conservation tax levied on oil and natural gas. Ayotte Decl. ¶ 3.

**Response:**    Undisputed to the best of Intervenor-Defendants' knowledge.

174.    Both severance tax and conservation tax are calculated on the value of resource collected/extracted. Although value fluctuates based on market forces, a reduction in the amount of extraction is likely to cause a reduction in the severance and collection tax revenue ultimately collected by Nebraska. *Id.* at ¶ 4.

**Response:**    Intervenor-Defendants object to the statement as lacking in foundation because it does not explain why such a reduction is "likely" given that the taxes are based on value. To the extent a further response is required, Intervenor-Defendants do not dispute that if the amount of extraction decreased, and all other things remained equal including value, tax revenue could be reduced. Intervenor-Defendants dispute any implication that the Act will or is likely to reduce fossil fuel extraction. Fullerton Decl. ¶¶ 27-42.

## STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

### I.    Vermont Climate Superfund Act

1.    The Vermont State Treasurer has not completed the cost assessment required under the Climate Superfund Act, Vt. Stat. Ann. tit. 10, § 599c. The Treasurer intends to complete the assessment on or around January 15, 2027. Declaration of Sue Minter ¶ 6, ECF No. 110-4 (*Chamber* case), ECF No. 54-4 (*United States* case).

2.    The Vermont Agency of Natural Resources has not completed the proposed or final rulemakings required under the Climate Superfund Act. The Agency intends to complete the rulemakings on or around January 1, 2028. Declaration of Jane Lazorchak ¶ 5, ECF No. 110-3 (*Chamber* case), ECF No. 54-3 (*United States* case). The Agency intends to issue cost recovery demands on or around July 1, 2028. *Id.* ¶ 8.

## II.       The Economic Impact of Cost Recovery Demands

3.       The Act will have no impact on the market price of fossil fuels and will provide no incentive for any company to change its production, sales, investments, or technology. *See* Fullerton Decl. ¶¶ 33, 40-42.

4.       Under standard economic models, firms will continue to produce and sell goods (such as fossil fuels) whenever they can earn a profit—that is, so long as the sale price exceeds the cost of producing an additional unit (i.e., the "marginal cost"). Under these models, market price depends on marginal costs and does not depend on fixed costs, which are costs that do not vary with the amount of goods produced. *See id.* ¶¶ 14-20.

5.       The Act's cost recovery demands will impose a fixed cost, not a marginal cost, because they are based on greenhouse gas emissions from fossil fuels extracted or refined in the past and do not depend on companies' current or future decisions about how much to produce. *See id.* ¶¶ 15, 18, 30-31.

6.       Because the Act does not affect the marginal cost of production, it will not affect the market price of fossil fuels. *See id.* ¶¶ 15, 18, 30-31. Because it will not affect the market price of fossil fuels, it will not affect the price or quantities of final energy goods produced from fossil fuels, such as electricity or motor fuels. *See id.* ¶¶ 18, 32, 41.

7.       Instead, as a one-time retroactive assessment, the Act's cost recovery demands impose a fixed cost that will be absorbed by the companies and would not be passed on to consumers. *See id.* ¶¶ 30-31.

8.       The Act is not an "economic regulation," as understood by economists, because it will not change the incentives for companies to produce and sell fossil fuels, will not change the

cost of fossil fuels to purchasers, will not change any consumer's use of energy, and will not reduce current or future greenhouse gas emissions. *See id.* ¶¶ 27-32.

9.    Because the Act will not affect the current or future marginal cost of new production, it will not affect a company's estimate of potential profit from future production, and therefore will not affect fossil fuel companies' incentives to invest in new technology or infrastructure. *See id.* ¶¶ 33-34, 42.

10.    Because the Act will not affect fossil fuel prices or production or affect consumer demand, it will not affect the future availability of fossil fuels. *See id.* ¶¶ 11, 35, 42.

## III.    U.S. Foreign Policy

11.    The principle that polluters pay for the damage that they cause is well established in international environmental law as reflected in agreements and treaties. *See* Declaration of Harold Koh ("Koh Decl.") ¶¶ 12, 16-17, ECF No. 109-4 (*Chamber* case), ECF No. 53-3 (*United States* case). The United States is a party to or signed treaties incorporating the "polluter pays" principle. *See id.* ¶ 17.

12.    There is no foreign treaty or federal statute that expressly forbids a state from requesting payment from a foreign company based on its past fossil fuel production or refining. *See id.* ¶¶ 12, 19, 31.

13.    The Act does not interfere with the federal government's ability to meet existing limited international obligations under the Framework Convention or Paris Agreement. *See id.* ¶¶ 20, 27-28. The Act does not interfere with the United States' ability to withdraw from the Paris Agreement. *See id.* ¶¶ 31-33, 35.

14.    The past two decades of international negotiations created around climate change have focused on governmental and intergovernmental obligations. *See id.* ¶ 34. The negotiations

41

have not addressed questions of corporate liability. *See id.* Because the current administration has announced its intent to withdraw from the Paris Agreement, the United States is not currently engaged in any ongoing international climate negotiations under the Framework Convention that could be disrupted. *See id.* ¶ 35.

15. The federal government's prior statements about opposing "liability and compensation for loss and damage" was in reference to provisions that would make the United States government liable to other countries. *See id.* ¶¶ 31-32. Those statements did not opine on the liability of foreign fossil fuel producers or refiners.

Dated: November 21, 2025              Respectfully submitted,

/s/ *Bridget Asay*
Bridget Asay
Michael Donofrio
STRIS & MAHER LLP
15 East State Street, Suite 2
Montpelier, VT 05602
Phone: (802) 858-4285
basay@stris.com

*Counsel for Northeast Organic Farming Association of Vermont*

/s/ *Adeline S. Rolnick*
Adeline S. Rolnick
Natural Resources Defense Council, Inc.
1152 15th Street, Suite 300
Washington, DC 20005
Phone: (202) 513-6240
arolnick@nrdc.org

Mitchell S. Bernard
Natural Resources Defense Council, Inc.
40 West 20th Street, 11th Floor
New York, NY 10011
Phone: (212) 727-4469

mbernard@nrdc.org

*Counsel for Northeast Organic Farming
Association of Vermont and Conservation
Law Foundation*


<u>/s/ Elena M. Mihaly</u>
Elena M. Mihaly
Conservation Law Foundation, Inc.
15 East State Street, Ste. 4
Montpelier, VT 05602
Phone: (802) 622-3012
emihaly@clf.org

*Counsel for Conservation Law Foundation*