# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| CHAMBER OF COMMERCE OF THE<br>UNITED STATES OF AMERICA and<br>AMERICAN PETROLEUM INSTITUTE,<br>　　　　　　Plaintiffs, | ) <br> ) <br> ) <br> ) <br> ) | |
| WEST VIRGINIA, et al.,<br>　　　　　　Intervenor-Plaintiffs, | ) <br> ) <br> ) | |
| v. | ) <br> ) | Case No. 2:24-cv-1513 |
| JULIE MOORE, in her official capacity as<br>the Secretary of the Vermont Agency of<br>Natural Resources, and<br>JANE LAZORCHAK, in her official capacity as<br>the Director of the Vermont Agency of<br>Natural Resources Climate Action Office,<br>　　　　　　Defendants, | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | |
| NORTHEAST ORGANIC FARMING<br>ASSOCIATION OF VERMONT and<br>CONSERVATION LAW FOUNDATION,<br>　　　　　　Intervenor-Defendants. | ) <br> ) <br> ) <br> ) | |

## INTERVENOR STATES' REPLY IN SUPPORT OF THEIR
## MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION
## TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................................... ii

INTRODUCTION .................................................................................................................1

ARGUMENT ........................................................................................................................3

I.    The States have Standing to Obtain Injunctive Relief. ........................................3

    A.  The States Have Standing as Purchasers of Fuel and Energy. .....................4

    B.  The States Also Have *Parens Patriae* Standing...........................................9

II.    Ripeness Does Not Stand in the Way of Summary Judgment. ....................................11

III.    The States have a Cause of Action to Sue.....................................................14

IV.    Federal Common Law and the Constitution's Extraterritoriality Doctrine Preempts Vermont's Climate Superfund Act. ............................................................16

    A.  Federal Common Law Preempts Vermont's Act.........................................16

        1.  Defendants Misapprehend The Preemptive Force of the Federal Common Law of Interstate Emissions. ...........................................................18

            a.  The Presumption Against Preemption Does Not Apply When a Law Concerns Interstate Emissions. ...............................................18

            b.  Defendants Cannot Distinguish *City of New York*. ...............................20

            c.  Applying the Federal Common Law Would Not Require Invalidating Broad Swaths of State Law. ...................................................26

            d.  Federal Common Law (Even When Displaced By a Federal Statute) Preempts State Statutes. ...............................................27

    B.  The Extraterritoriality Doctrine Preempts Vermont's Act. ........................29

    C.  The Foreign Affairs Doctrine Preempts Vermont's Act. ...........................37

V.    The Clean Air Act Preempts Vermont's Law. ...........................................41

    A.  The Clean Air Act Preempts the Entire Field of Interstate Air Pollution.................42

    B.  The Vermont Climate Superfund Act Conflicts With the Clean Air Act. .................44

VI.    The States are Entitled to Permanent Injunctive Relief. ...............................47

CONCLUSION....................................................................................................................48

## TABLE OF AUTHORITIES

**Cases**                                               **Page(s)**

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n,*
410 F.3d 492 (9th Cir. 2005) ................................................................... 19

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
458 U.S. 592 (1982) ................................................................... 9, 10, 11

*Allco Finance Ltd. v. Klee,*
861 F.3d 82 (2d Cir. 2017) ................................................................... 26

*Altria Group, Inc. v. Good,*
555 U.S. 70 (2008) ................................................................... 18

*Am. Elec. Power Co. v. Connecticut,*
564 U.S. 410 (2011) ................................................................... 16, 33, 44

*Am. Ins. Ass'n v. Garamendi,*
539 U.S. 396 (2003) ................................................................... 37

*Arizona v. United States,*
567 U.S. 387 (2012) ................................................................... 42

*Bell v. Cheswick Generating Station,*
734 F.3d 188 (3d Cir. 2013) ................................................................... 43

*Block v. Meese,*
793 F.2d 1303 (D.C. Cir. 1986) ................................................................... 8

*BMW of N. Am., Inc. v. Gore,*
517 U.S. 559 (1996) ................................................................... 36

*Bonaparte v. Tax Court,*
104 U.S. 592 (1881) ................................................................... 29

*Brown v. Fletcher's Est.,*
210 U.S. 82 (1908) ................................................................... 29

*C&A Carbone, Inc. v. Town of Clarkstown,*
511 U.S. 383 (1994) ................................................................... 35

*Calingo v. Meridian Res. Co. LLC,*
No. 7:11-CV-628-VB, 2011 WL 3611319 (S.D.N.Y. Aug. 16, 2011) ................................................................... 28

*Cent. GMC, Inc. v. Gen. Motors Corp.,*
946 F.2d 327 (4th Cir. 1991) ................................................................... 23

*Cipollone v. Liggett Grp., Inc.,*
505 U.S. 504 (1992) ................................................................... 22

*City of Milwaukee v. Illinois,*
451 U.S. 304 (1981) ................................................................... 18

*City of New York v. Chevron Corp.,*
993 F.3d 81 (2d Cir. 2021) ...9, 16, 17, 18, 20, 21, 22, 23, 24, 25, 26, 31, 40, 41, 43, 45, 46

*Conn. Dep't of Env't Prot. v. OSHA*,
356 F.3d 226 (2d Cir. 2004) .................................................................47

*Connecticut v. Cahill*,
217 F.3d 93 (2d. Cir. 2000) ..........................................................3, 4, 15

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ......................................................................38, 39

*Dep't of Com. v. New York*,
588 U.S. 752 (2019).............................................................4, 5, 7, 8, 9

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025)......................................................4, 5, 6, 7, 8

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) ............................................................................47

*Edgar v. MITE Corp.*,
457 U.S. 624 (1982)......................................................................30, 31

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990).............................................................................41

*Fednav, Ltd. v. Chester*,
505 F. Supp. 2d 381 (E.D. Mich. 2007) ............................................19

*Franchise Tax Bd. of Cal. v. Hyatt*,
587 U.S. 230 (2019)...........................................................................34

*Gaff v. FDIC*,
919 F.2d 384 (6th Cir. 1990) ......................................................27, 28

*Gaff v. FDIC*,
933 F.2d 400 (6th Cir. 1991) ..............................................................28

*Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*,
267 F.3d 1228 (11th Cir. 2001) .................................................35, 36

*Gov't Employees Ins. Co. v. Strut*,
758 F. Supp. 3d 140 (W.D.N.Y. 2024) ..............................................48

*Gross v. Rell*,
585 F.3d 72 (2d Cir. 2009) .................................................................48

*Hawaii v. Standard Oil Co. of Cal.*,
405 U.S. 251 (1972)............................................................................48

*Healy v. Beer Inst., Inc.*,
491 U.S. 324 (1989)......................................................................34, 35

*Hoyt v. Sprague*,
103 U.S. 613 (1880)......................................................................29, 33

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016).............................................................19, 26, 27

*Huntington v. Attrill,*
    146 U.S. 657 (1892)..............................................................................................29, 33

*Illinois v. City of Milwaukee,*
    406 U.S. 91 (1972)................................................................................................16, 27

*Int'l Paper Co. v. Ouellette,*
    479 U.S. 481 (1987)..............................................................................................25, 43

*Jackson v. Gen. Motors Corp.,*
    770 F. Supp. 2d 570 (S.D.N.Y. 2011)........................................................................25

*Kansas v. Garcia,*
    589 U.S. 191 (2020)..............................................................................................41, 44

*Kurns v. R.R. Friction Prods. Corp.,*
    565 U.S. 625 (2012)....................................................................................................46

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S 118 (2014).....................................................................................................14

*Lowry v. Baltimore & Ohio R.R. Co.,*
    707 F.2d 721 (3d Cir. 1983).......................................................................................27

*Madeira v. Affordable Hous. Found., Inc.,*
    469 F.3d 219 (2d Cir. 2006)..................................................................................41, 42

*Maryland v. Louisiana,*
    451 U.S. 725 (1981)......................................................................................................4

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)..........................................................................................4, 36, 42

*Medellín v. Texas,*
    552 U.S. 491 (2008)..............................................................................................39, 40

*Milk Control Bd. of Pa. v. Eisenberg Farm Prods.,*
    306 U.S. 346 (1939)..............................................................................................31, 32

*Movsesian v. Victoria Versicherung AG,*
    670 F.3d 1067 (9th Cir. 2012)..............................................................................37, 40

*Murphy v. NCAA,*
    584 U.S. 453 (2018)..............................................................................................42, 43

*N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff,*
    669 F.3d 374 (3d Cir. 2012)..................................................................................27, 28

*N.Y. Life Ins. Co. v. Head,*
    234 U.S. 149 (1914)....................................................................................................29

*N.Y. Progress & Prot. PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013).......................................................................................48

*N.Y. SMSA Ltd. P'ship v. Town of Clarkstown,*
    612 F.3d 97 (2d Cir. 2010).........................................................................................41

*NRDC v. NHTSA*,
 894 F.3d 95 (2d Cir. 2018) ..............................................................................7, 23

*Nat'l Org. for Marriage, Inc. v. Walsh*,
 714 F.3d 682 (2d Cir. 2013) ............................................................................11, 12

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
 538 U.S. 803 (2003) ........................................................................................12, 13

*Nat'l Pork Producers Council v. Ross*,
 598 U.S. 356 (2023) ..........................................................29, 30, 31, 32, 33, 34

*New Jersey v. Bessent*,
 149 F.4th 127 (2d Cir. 2025) ................................................................................3

*New York ex rel. Schneiderman v. Actavis PLC*,
 787 F.3d 638 (2d Cir. 2015) ................................................................................47

*New York v. DHS*,
 969 F.3d 42 (2d Cir. 2020) ....................................................................................7

*New York v. Niagara-Wheatfield Cent. Sch. Dist.*,
 119 F.4th 270 (2d Cir. 2024) ..............................................................................10

*Nixon v. Fitzgerald*,
 457 U.S. 731 (1982) ............................................................................................34

*Ohio Forestry Ass'n v. Sierra Club*,
 523 U.S. 726 (1998) ......................................................................................13, 14

*Osborn v. Ozlin*,
 310 U.S. 53 (1940) ..............................................................................................32

*Pac. Coast Dairy v. Dep't of Agric. of Cal.*,
 318 U.S. 285 (1943) ............................................................................................36

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
 461 U.S. 190 (1983) ............................................................................................14

*Pennsylvania v. West Virginia*,
 262 U.S. 553 (1923) ..............................................................................................4

*People of State of N.Y. ex rel. Abrams v. Seneci*,
 817 F.2d 1015 (2d Cir. 1987) ...............................................................................9

*Prefontaine v. Rsch. in Motion Ltd.*,
 No. 11-cv-4068-RJS, 2012 WL 104770 (S.D.N.Y. Jan. 5, 2012) .......................9

*Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*,
 10 F.4th 87 (2d Cir. 2021) ...................................................................................12

*Rice v. Santa Fe Elevator Corp.*,
 331 U.S. 218 (1947) ......................................................................................18, 19

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
 547 U.S. 47 (2006) ................................................................................................3

*S. Pac. Co. v. Ariz. ex rel. Sullivan,*
    325 U.S. 761 (1945) ................................................................................30

*S.D. Myers, Inc. v. City & Cnty. of San Francisco,*
    253 F.3d 461 (9th Cir. 2001) ...................................................................32

*Salinger v. Colting,*
    607 F.3d 68 (2d Cir. 2010) ......................................................................47

*San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon,*
    359 U.S. 236 (1959) ...........................................................................21, 23

*Shelby County v. Holder,*
    570 U.S. 529 (2013) ................................................................................34

*Sonesta Int'l Hotels Corp. v. Wellington Assocs.,*
    483 F.2d 247 (2d Cir. 1973) ............................................................. 47, 48

*Statharos v. N.Y.C. Taxi & Limousine Comm'n,*
    198 F.3d 317 (2d Cir. 1999) ...................................................................47

*Strassheim v. Daily,*
    221 U.S. 280 (1911) ...........................................................................29, 32

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) .........................................................................4, 8, 12

*Tennessee v. Dep't of Educ.,*
    104 F.4th 577 (6th Cir. 2024) .................................................................47

*Tex. Indus., Inc. v. Radcliff Materials, Inc.,*
    451 U.S. 630 (1981) ................................................................................16

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016) ..................................................................47

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ..................................................................................3

*United States v. California,*
    921 F.3d 865 (9th Cir. 2019) ..................................................................48

*United States v. Locke,*
    529 U.S. 89 (2000) ..................................................................................18

*United States v. Traficante,*
    966 F.3d 99 (2d Cir. 2020) ......................................................................13

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014) ................................................................................42

*Va. Off. for Prot. & Advoc. v. Stewart,*
    563 U.S. 247 (2011) ................................................................................15

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,*
    535 U.S. 635 (2002) ...........................................................................14, 15

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
    592 F.3d 954 (9th Cir. 2010)............................................................41

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982)...................................................................47

*West Virginia v. EPA*,
    597 U.S. 697 (2022)...................................................................44

*World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*,
    694 F.3d 155 (2d Cir. 2012).......................................................47

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992)...................................................................15

*Zschernig v. Miller*,
    389 U.S. 429 (1968)...................................................................37

## <u>Constitutional Provisions, Rules, Statutes, and Laws</u>

10 VT. STAT. ANN.
    § 596(7)............................................................................17, 30
    § 596(10)...............................................................................37
    § 596(22)...........................................................................12, 35
    § 597(1)................................................................................33
    § 598(b)............................................................................17, 46
    § 598(g)(l)..............................................................................7
    § 598(g)(2)(c)..........................................................................7
    § 599a(b)..............................................................................12

15 U.S.C. § 2901.........................................................................40

42 U.S.C.
    § 7401.................................................................................42
    § 7401(a)(3)...........................................................................45
    § 7401(b)(2)...........................................................................44
    § 7408.............................................................................42, 44
    § 7409.............................................................................42, 44
    § 7410.............................................................................42, 44
    § 7411(b)(1)(A).......................................................................42
    § 7411(d).............................................................................45
    § 7521(a)(1)...........................................................................42

Clean Air Act Amendments, Pub. L. 95–96, 91 Stat. 685 (1977)..................43

Clean Air Act Amendments**,** Pub. L. 101–549, 104 Stat. 2468 (1990).........43

N.Y. ENV'T CONSERVATION LAW
    § 76-0101(7)..........................................................................23
    § 76-0101(21).........................................................................23

Pub. L. No. 100–204, Title XI, §§ 1102(6), 1103(a)(4), 101 Stat. 1331, 1408 (1987) ..............40

U.S. CONST. art VI, cl. 2 ............................................................28

**Other Authorities**

Decl. of Christopher Landau, *United States v. Vermont*, No. 2:25-cv-00463 (D. Vt. 2025), Doc. 50-3...................................................................................................................40

*About 7% of Fossil Fuels Are Consumed For Non-Combustion Use in the United States*, EIA (Apr. 6, 2018), https://perma.cc/QP24-XWGY.....................................................33

James Madison, Preface to Debates in the Convention of 1787, *in* 3 Records of the Federal Convention of 1787 (Max Farrand ed. 1911).................................................34

The Federalist No. 11 (Alexander Hamilton) ................................................................34

The Federalist No. 22 (Alexander Hamilton) ................................................................35

Katherine Florey, *State Courts, State Territory, State Power: Reflections on the Extraterritoriality Principle in Choice of Law & Legislation,* 84 Notre Dame L. Rev. 1057 (2009)....................................................................................33, 36, 37

Mot. for Summ. J., *United States v. Vermont*, 2:25-cv-00463 (D. Vt. Sep. 15, 2025), Doc. 50-1........................................................................................................37, 38

Donald H. Regan, *Siamese Essays: (I) CTS Corp. v. Dynamics Corp. of America and Dormant Commerce Clause Doctrine; (II) Extraterritorial State Legislation,* 85 Mich. L. Rev. 1865 (1987).....................................................................................................33

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (2012)......................................................................................................................44

VNRC, *Climate Dispatch: Mar. 29: Senate Climate Priorities with Sen. Alison Clarkson* (YouTube, Mar. 29. 2024), https://perma.cc/6UPM-F94U .................................5

Wendy E. Wagner, *The Triumph of Technology-Based Standards*, 2000 U. Ill. L. Rev 83 (1999) ...............................................................................44, 45

## INTRODUCTION

No one in the State of Vermont has ever produced oil, natural gas, or coal. Yet Vermont seeks to impose billions of dollars of retrospective liability on people lawfully drilling, fracking, and mining.

Vermont mistakenly thinks it can extend its regulatory reach into other States merely by invoking the specter of climate change. Vermont reasons that extracting traditional fuels causes greenhouse-gas emissions that in turn cause climate change; it's climate change that's then said to harm Vermont and its citizens. But the Second Circuit has already held that States cannot wield their own law to regulate interstate greenhouse-gas emissions. The federal common law of interstate pollution and the Constitution's limits on the scope of State jurisdiction stop Vermont from doing that. And even if they didn't, the Clean Air Act's comprehensive regulatory scheme leaves no room for Vermont to impose retroactive strict liability on actions the Clean Air Act permitted.

Vermont and the Defendant-Intervenors (together, "Defendants") insist the States don't even have standing to challenge the Climate Superfund Act because the Act will not have any effect on the markets for fuels or energy. Intervenor-Defs.' Summ. J. Br., Doc. 112 at 10 (Nov. 21, 2025) ("Int.-Defs.' Response Br."). But that argument wrongly assumes producers of oil, natural gas, and coal will treat the Climate Superfund Act as a one-time fixed cost. Traditional-fuel producers will (indeed, must) assume those liabilities will continue—and they will account for that continuing liability when setting prices and production volumes. The States thus have standing to sue both as purchasers of fuel and energy and in their *parens patriae* capacity. Were that not enough, the injuries to the States' sovereign interests would give them standing even aside from the pecuniary harms.

1

Defendants' remaining threshold arguments are no more persuasive. Decades of Second Circuit precedent confirm the States have a cause of action. States can sue under *Ex parte Young* the same way that individuals can, and an individual can sue when a State officer harms him in a way that violates federal law. Likewise, prudential ripeness is no bar because additional facts do not need to be developed to decide this case. Meanwhile, Plaintiffs will suffer harm if they are forced to wait.

With the threshold issues resolved, the States are entitled to summary judgment on Counts I and II, along with a permanent injunction prohibiting enforcement of the Climate Superfund Act.

Vermont's Climate Superfund Act uses interstate greenhouse-gas emissions as a "link" in the chain of liability, tying worldwide fuel extraction to climate change in Vermont. Federal common law preempts any State effort to use interstate or global greenhouse-gas emissions as a basis to hold producers of traditional fuels liable for their out-of-State activities. "Artful" drafting of the Climate Superfund Act cannot transform a law about "global greenhouse gas emissions" into a law about how a State is going to pay for climate-infrastructure projects. The Clean Air Act also preempts the Climate Superfund Act. That statute creates a "comprehensive" scheme to regulate interstate air pollution and leaves no room for States to apply their own laws to emissions from other States. And constitutional principles like the foreign-affairs doctrine present a separate bar.

In the face of this clear precedent, Defendants must argue that the Vermont Climate Superfund Act is not related to emissions after all. But the argument contradicts the text of the statute and foreclosed by Second Circuit precedent. Vermont is using "harms stemming from emissions" of greenhouse gases to establish liability. And ultimately, if Vermont's Act has nothing to do with interstate greenhouse-gas emissions, then that characterization only dooms the law in a

different way. Vermont would then be "directly" regulating conduct that took place purely outside its jurisdiction with no even arguable connection to the State. The Constitution does not allow States to regulate purely out-of-State activity.

Because the Climate Superfund Act is unlawful in all its applications, this Court should grant the States summary judgment and a permanent injunction preventing Defendants from enforcing it. Because the States are entitled to summary judgment, the Court should deny Defendants' motions for summary judgment.

<u>**ARGUMENT**</u>

I.      **The States have Standing to Obtain Injunctive Relief.**

Although Defendants challenge the States' standing to seek injunctive relief, they do not contest that the American Petroleum Institute has standing. API's standing is enough for the case to proceed. Once a single plaintiff has standing, other plaintiffs do not need to separately establish standing to seek the same form of relief. *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006); *accord New Jersey v. Bessent*, 149 F.4th 127, 141 (2d Cir. 2025). Here, API seeks a declaration that the Vermont Climate Superfund Act is unlawful and an injunction preventing enforcement of the Act. The Court can thus grant the States summary judgment on Counts I and II without having to dig into the standing of each individual State.

If the Court nonetheless decides to inquire into the States' standing, then it should find that they have it. To establish standing, a plaintiff must demonstrate that: (1) it has "suffered an injury in fact that is concrete, particularized, and actual or imminent;" (2) "the injury was likely caused by the defendant;" and (3) "the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Defendants only dispute the States' injury in fact. As relevant here, a State can

demonstrate that injury in at least three different types of suits: "(1) proprietary suits in which the State sues much like a private party . . .; (2) sovereignty suits . . .; or (3) *parens patriae* suits in which States litigate to protect 'quasi-sovereign' interests." *Connecticut v. Cahill*, 217 F.3d 93, 97 (2d. Cir. 2000) (citations omitted).

The States have established such injury here. First, the States have suffered an injury as the purchasers of fuel and energy. Second, the States have standing to sue *parens patriae* because the Climate Superfund Act will harm their economies and denies the States their rightful place in the federal system.

### A.  The States Have Standing as Purchasers of Fuel and Energy.

 If the prices of oil, natural gas, coal, or the energy those fuels produce increase, then the States will suffer a pecuniary harm by having to pay higher prices. *See Maryland v. Louisiana*, 451 U.S. 725, 737 (1981). The Supreme Court has recognized that States can assert standing based on the increased price of fuel and energy for over 100 years. *Pennsylvania v. West Virginia*, 262 U.S. 553 (1923). And nearly two-dozen declarations submitted at summary judgment here show that States purchase and consume significant amounts of traditional fuels and energy.

Whether the States have standing as consumers of fuel and energy therefore comes down to whether it is "a substantial risk," *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)), that the Climate Superfund Act will raise prices, lower production, alter investment, or otherwise harm Plaintiffs, *cf. Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025) ("Even 'one dollar' of additional revenue . . . would satisfy the redressability component of Article III standing." (citation omitted)); *see also Massachusetts v. EPA*, 549 U.S. 497, 520 (2007) (granting States "special solicitude" in the standing inquiry). Because this suit is a pre-enforcement challenge, Plaintiffs do not need to prove

to a moral certainty that the Act will raise prices, lower production, or otherwise harm them. When a plaintiff raises a pre-enforcement challenge because he fears "future injuries," the plaintiff will have standing for prospective injunctive relief if "there is a substantial risk that the harm will occur." *Dep't of Com.*, 588 U.S. at 767 (quoting *Susan B. Anthony List*, 573 U.S. at 158).

The States easily show that the Climate Superfund Act creates a "substantial risk" that they will be forced to pay more for fuel and energy. *Id.* The Climate Superfund Act will "cost a bomb. Billions and billions of dollars." VNRC, *Climate Dispatch: Mar. 29: Senate Climate Priorities with Sen. Alison Clarkson* at 3:50-58 (YouTube, Mar. 29. 2024), https://perma.cc/6UPM-F94U. Those billions of dollars will come from the producers of oil, natural gas, and coal. To pay for Vermont's newfound need for climate infrastructure, the producers will have to raise prices, creating a pecuniary harm to consumers. *Diamond Alt. Energy*, 606 U.S. at 112 (explaining that "'predictable' . . . effects of government action" give rise to standing on a pecuniary-harm theory (citation omitted)). As economist Dr. Benjamin Zycher explains, Vermont's Climate Superfund Act "will reduce investment in and production of fossil fuels, and thus will increase the prices for such fuels paid by consumers, including state government agencies delivering government services to their respective residents." Zycher Decl. ¶ 5.

Defendants protest that the Climate Superfund Act will not raise prices, thus depriving the States of standing. According to Defendants, the producers of oil, natural gas, and coal will treat the billions of dollars in penalties under the Act as *purely* fixed costs. *See* Defs.' Consolidated Summ. J. Br., Doc. 109 at 15 (Nov. 17, 2025) ("Vermont Response Br."); Int.-Defs.' Response Br. at 8–9. And purely fixed costs, according to their economic theories, will not cause firms to increase prices, reduce investment, or otherwise change their behavior. *Id.*; *see also* Decl. of Don

Fullerton, Doc. 109-3 ¶¶ 11, 21–35 (Nov. 17, 2025) ("Fullerton Decl."). Thus, only the producers

will shoulder the burden of the Climate Superfund Act alone, with consumers not paying a cent.

Defendants' implausible assumptions are wrong as a matter of both theory and practice.

Start with theory. A rational firm would treat the cost-recovery demand as a variable cost

(i.e., a cost that will increase with each unit produced), or at least not as a "one-time" cost. *See*

Zycher Decl. ¶ 7 ("Market forces will not view the" Climate Superfund Act "as a one-time fixed

cost based on past behavior."). Indeed, Vermont's own explanation for *why* it enacted the Climate

Superfund Act explains why firms will not treat the Climate Superfund Act as a purely fixed cost.

According to Vermont, producers of traditional fuels knew by the mid-1990s that climate change

was occurring; they also knew they would bear "responsibility for th[e] harms" caused by it in

Vermont. Defs.' Mot. to Dimiss, Doc. 76-1 at 71 (Aug. 15, 2025). If any doubt ever existed about

whether Vermont would hold fuel producers "responsibl[e]" for climate change by seeking money

from them, *id.*, that doubt has now vanished. Vermont has now made clear, in no uncertain terms,

that it intends to extract billions in compensation from those who produce traditional fuels. *Id.*

Although the Climate Superfund Act limits the cost-recovery demands to past emissions, nothing

in Vermont's logic suggests the State will be content to stop with this first effort. A reasonable

producer of fuel will instead conclude that Vermont will chase compensation for emissions in 2025

and beyond. For that reason, "market forces will view the likelihood of" future liability for

emissions in 2025 and beyond "as greater than zero." Zycher Decl. ¶ 10.

As for practice, Plaintiffs have produced direct evidence that confirms the theory is correct.

Exxon will have to adjust "capital investments, production volumes, planning, prices, contracts,

and personnel" to account for the liability imposed by the Climate Superfund Act's cost-recovery

demands. Decl. of Vijay Swarup, Doc. 100-6 ¶ 27 (Sep. 15, 2025) ("Swarup Decl."). So the Court

need not even make an educated guess about what relevant third parties will do in response to this government regulation. *Diamond Alt. Energy*, 606 U.S. at 112 (explaining that a plaintiff typically needs to show that "third parties not before the court will act in response to the government regulation"). Rather, the States have direct evidence of how the regulated industry will react to Vermont's attempt to bilk them out of billions of dollars. And even if the Court thinks that response is illogical, that assessment doesn't matter.

A third party's reaction to a government policy can establish standing "even when the decisions are illogical or unnecessary." *New York v. DHS*, 969 F.3d 42, 59 (2d Cir. 2020). Indeed, even *illegal* actions by third parties, such as refusing to answer the census, can support standing. *Dep't of Com.*, 588 U.S. at 767. When fuel producers need to adjust prices (for *whatever* reason), entities that pay those prices will be harmed—the States included. *Id.*; *NRDC v. NHTSA*, 894 F.3d 95, 105 (2d Cir. 2018). And really, there's nothing illogical in expecting these costs to be more than a one-time problem, as even the Act itself doesn't treat cost recovery demands as one-time fixed costs. Once Vermont issues a responsible party a "cost recovery demand," it must either pay the demand in full within six months, 10 VT. STAT. ANN. § 598(g)(l), or make nine annual installments supplemented by "reasonable interest," *Id.* § 598(g)(2)(c). So the Act expects at least some producers to have this liability on the books for nearly a decade.

Defendants agree that "fossil[-]fuel producers factor climate-change related costs into their planning" and pricing models. Int.-Defs.' Response at 9. But they contend that "Plaintiffs have submitted no competent evidence that the Vermont Act *alone*, as opposed to other hypothetical liability, will change fossil fuel producers' production or pricing decisions." *Id.* This "everyone's doing it" argument is a non sequitur. Nobody argues that Vermont's Climate Superfund Act *alone* is what determines the price of oil, natural gas, coal, or energy. Market forces, State and federal

regulations, and a myriad of global conditions affect the price of fuel and energy. What matters for standing in this case is whether there is a "substantial risk" that the price of these fuels would be marginally higher in a world where the Climate Superfund Act takes effect. *Susan B. Anthony List*, 573 U.S. at 158 (cleaned up). Other market and government forces may also influence the price of fuels, but that's irrelevant to whether the States have standing to challenge *Vermont's* law.

It shouldn't need to be said that a person—or a State—has standing to sue *everyone* who causes his injury, even if multiple actors and complex factors are involved. Just this past term, the Supreme Court concluded that a group of fuel producers had standing to challenge the EPA's decision to permit California to require "automakers to alter their fleets of new vehicles" in a way that required "more electric vehicles and fewer gasoline-powered vehicles." *Diamond Alt. Energy, LLC*, 606 U.S. at 104. The Court concluded that because fewer gasoline-powered cars resulted in less gasoline purchased on the open market, the producers of gasoline had standing to sue. *Id.* at 113–14. The Court did not ask whether EPA's decision to grant California a waiver *alone*, as compared to other regulations, controlled the quantity of gasoline used. Doing so would make little sense because causation under Article III requires only but-for causation—not even proximate causation, much less sole causation. *Dep't of Com.*, 588 U.S. at 767; *see also Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.).

Defendants also contend that the States lack standing because there is no generally accepted model to determine how firms form expectations about future liabilities. Int.-Defs.' Response Br. at 9; Fullerton Decl. ¶ 25. Thus, even if it would be logical for a fuel-producing firm to respond to the Climate Superfund Act by raising prices or cutting production (which it would be), Defendants think there's no quantitative way to determine if that would actually occur. Exxon says otherwise, swearing that the company *will* have to make a variety of strategic business decisions based on the

Climate Superfund Act. Swarup Decl. ¶ 27. That's enough. Likewise, the Second Circuit has already concluded that firms would react to a compensatory judgment in a tort case by raising prices or cutting production. *City of New York v. Chevron Corp.*, 993 F.3d 81, 93 (2d Cir. 2021). The Second Circuit clearly had no concerns about concluding that firms will react rationally to liability, *id.*, so there is no need for this Court to blind itself to the obvious. At most, Defendants try to interject a sliver of uncertainty into the ultimate pricing equation. But a sliver of uncertainty is inevitable in cases that request pre-enforcement injunctive relief. That's why plaintiffs need only demonstrate a "substantial risk" of harm and not a certainty of it. *Dep't of Com.*, 588 U.S. at 767.

Defendants insist the sworn declaration is too vague to establish that "Exxon will have to reduce production volumes or attempt to increase fossil fuel prices as a result of this Act." Int.. Defs.' Response at 6–7. But, of course, Exxon cannot determine today how it will make "strategic business decisions" in the future in fine detail. Swarup Decl. ¶ 27. But no case says dollar-by-dollar implementation plans are required. Exxon has sworn it will be forced to cut output, raise prices, reduce investment, or some combination of the three because of the Climate Superfund Act. Any of those three would be good enough to establish the States' standing in this case. Exxon's "explicit assertion … is sufficient to establish … standing and is uncontradicted by the ambiguous and speculative statements relied upon" by Defendants. *Prefontaine v. Rsch. in Motion Ltd.*, No. 11-cv-4068-RJS, 2012 WL 104770, at *3 (S.D.N.Y. Jan. 5, 2012).

## B.  The States Also Have *Parens Patriae* Standing.

A State has "*parens patriae* standing" to sue for "an injury to [its] general economy." *People of State of N.Y. ex rel. Abrams v. Seneci*, 817 F.2d 1015, 1017 (2d Cir. 1987). "[A] state has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607

(1982). A State also has a *parens patriae* interest in not being "discriminatorily denied its rightful status within the federal system." *Id.*

The States possess *parens patriae* standing because, as the nearly two-dozen declarations show, their citizens rely on massive amounts of fuel and energy to power their daily lives. It is difficult to imagine a policy with a more " 'universal sting' " than one that increases the price of fuel. *New York v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 282 (2d Cir. 2024) (quoting *Alfred L. Snapp & Son*, 458 U.S. at 609). Intervenor-Defendants' primary argument against *parens patriae* standing based on increased fuel prices to consumers is the same flawed argument as above: the Act will not raise prices or reduce output. Int.-Defs.' Response Br. at 15. But as discussed above, the Act will alter prices and production of traditional fuels. So this argument fails for the same reasons.

Not only do the States have *parens patriae* standing to sue over the increased price of fuel and energy, they have *parens patriae standing* to sue over the decrease in capital investment that Act will cause. As the States's declarations make clear, they rely on the oil, natural-gas, and coal fields to power their economies. But as Dr. Zycher's declaration demonstrates, the Act will meaningfully decrease the incentives for firms to invest in extracting more traditional fuels. Even conservative estimates put the reduced capital investment around 1.6% annually. Zycher Decl. ¶ 51. Given the millions of jobs related to the traditional-fuel sector that exist in the Plaintiff States, even this putatively small decrease in investment will have significant effects.

The States also possess *parens patriae* standing because the Climate Superfund Act harms the States' "interest in securing observance of the terms under which [they] participate[] in the federal system." *Alfred L. Snapp & Son*, 458 U.S. at 607–08. As *Alfred L. Snapp & Son* held, States can sue *parens patriae* when another State violates principles of federalism that bind our country

together. *Id.* Vermont's attempt to regulate conduct within the borders of the Plaintiff States is a striking example of one State seeking to infringe on the sovereign prerogatives of another.

Defendant-Intervenors do not deny that an incursion against the sovereignty of another State creates standing. Instead, they argue that any such incursion must deny the "general population" of the State the "benefits of the federal system" and not merely harm the State itself. Int.-Defs.' Response Br. at 15–16 (quoting *Alfred L. Snapp & Son*, 458 U.S. at 608). But they misunderstand the case they quote. *Alfred L. Snapp & Son* noted that the denial of a State's rightful place in the federal system was "[d]istinct from but related to the general well-being of its residents." *Alfred L. Snapp & Son*, 458 U.S. at 607. Defendant-Intervenors' approach would collapse the distinction and make the sovereign-harm aspect of *parens patriae* standing dependent on an injury to the citizens of the State. Were that the rule, the injuries would no longer be "[d]istinct." *Id.* So the sovereign-harm theory even covers situations where no diffuse harm exists.

In any event, the States *do* suffer pervasive harm throughout their population. Put aside the nearly universal impact of higher energy prices. Vermont's law is also a massive burden on the energy industries that sustain many (if not all) of the States' economies. West Virginia depends on coal and natural gas. Texas depends on oil and natural gas. Wyoming depends on coal. And on and on. One can hardly think of a more "diffuse harm" than targeting purely out-of-state industries for crippling assessments that are designed in part to stunt their continued development.

## II.    Ripeness Does Not Stand in the Way of Summary Judgment.

Defendants' ripeness arguments largely mirror their standing arguments and should be rejected in the same way. Ripeness comes in two forms: constitutional ripeness and prudential ripeness. The first, constitutional ripeness, is simply a restatement of the requirement that harm must be certainly impending for a plaintiff to have Article III standing. *See Nat'l Org. for*

*Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013). Prudential ripeness, which is a "narrow exception" to the requirement to decide cases over which the court has jurisdiction, *Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 102 (2d Cir. 2021), may apply when the issues are both not fit for judicial review and no hardship will befall the Plaintiff by delaying review, *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). Neither form of ripeness applies here.

Counts I and II are constitutionally ripe for summary judgment, and Defendants hardly argue otherwise. *Cf.* Int.-Defs.' Response Br. at 22 ("[T]he States' claims are constitutionally unripe for review for the same reasons they lack Article III standing."). The injuries the Climate Superfund Act causes are not "conjectural or hypothetical" because the Act mandates the issuance of cost-recovery demands. *Nat'l Org. for Marriage*, 714 F.3d at 688. It gives no discretion to the implementing officials to decline to issue the demands. 10 VT. STAT. ANN. § 599a(b). It is thus certain that Vermont will seek to enforce the Act it passed and is vigorously defending, guaranteeing that the injuries described above will come to pass. Although "responsible part[ies]" have not yet been identified under the Act, that makes no difference to the States. *Id.* § 596(22). No matter which companies Vermont targets, the result will be the same for the States because the effects will be felt across the market. Thus, this case is not one in which the exact target of the regulation must be known for a case to be ripe.

Counts I and II are also prudentially ripe, to the extent that prudential ripeness even survived *Susan B. Anthony List v. Driehaus*. *See* 573 U.S. at 167 (observing that the prudential-ripeness doctrine is in "tension" with the federal courts' "virtually unflagging" "'obligation to hear and decide' cases within [their] jurisdiction" (citation omitted)). First, Counts I and II are fit for review. They require this Court to determine whether Vermont's Climate Superfund Act is

preempted on its face by the federal common law, Clean Air Act, or the Supreme Court's extraterritoriality doctrine. None of those questions require the kind of factual development in the future that makes a claim "[un]fit for judicial consideration" at the present moment. *United States v. Traficante*, 966 F.3d 99, 106 (2d Cir. 2020) (quoting *United States v. Balon*, 384 F.3d 38, 46 (2d Cir. 2004)). To the extent that any facts need to be established to hold that the Climate Superfund Act is unconstitutional, those facts are not in dispute at the summary-judgment stage. For instance, Vermont admits that it has produced no oil, natural gas, or coal, proving that it seeks to apply Vermont law to purely out-of-State conduct. Int.-Defs.' Response to the States' SUMF, Doc. 112-2 ¶¶ 9–12 (Nov. 21, 2025); Vermont's Response to the States' SUMF, Doc. 109-2 ¶¶ 9-12 (Nov. 17, 2025) ("Vt's. SUMF Resp.").

The States will be harmed if review is delayed. Hardship occurs if the challenged law or regulation either "create[s] adverse effects of a strictly legal kind" or inflicts "practical harm upon the interests that the" Plaintiff seeks to protect. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998); *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808. Both possibilities are satisfied here, and Intervenor-Defendants' reliance on *Ohio Forestry Association* is misplaced. First, the Climate Superfund Act alters the legal duties and responsibilities of the regulated parties. It mandates that they pay money. In contrast, the forest plan in *Ohio Forestry Association* did "not grant, withhold, or modify any formal legal license, power, or authority; [it did] not subject anyone to any civil or criminal liability; [it] create[d] no legal rights or obligations." 523 U.S. at 733. Indeed, the forest-management plan in *Ohio Forestry Association* was just that—a plan. It did not guarantee any specific action would happen. The Climate Superfund Act guarantees the issuance of cost-recovery demands.

13

Second, as the States explained as to standing, the Climate Superfund Act will cause traditional-fuel companies to price-in future liability to their existing financial models. Again: that necessary choice will increase the price of traditional fuels. *See* Zycher Decl. ¶ 18. Those increases will harm the States in the form of increased energy prices and decreased employment and severance taxes. Uncertainty about the validity of legislation itself can itself also impose "palpable and considerable hardship." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 201–02 (1983). And as the API's brief and accompanying declarations have clarified, fuel producers will be forced to adjust their practices until the uncertain legality of the Climate Superfund Act is determined. That expense is sufficient hardship to defeat the judge-made prudential-ripeness doctrine. *Id.*

Even if this Court concludes that hardship will not befall the States absent timely review, the States' claims are still prudentially ripe. The Supreme Court has never held that a court should dismiss because a party has failed to demonstrate one lone factor in the prudential-ripeness test. Indeed, it has applied the factors holistically to determine whether it would be prudent to abdicate its "virtually unflagging" obligation to exercise its jurisdiction when properly invoked. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S 118, 125–26 (2014) (quoting *Sprint Commc'ns v. Jacobs*, 571 U.S. 69, 77 (2013)). For instance, the lack of hardship *and* vague nature of the issues "taken together" "foreclose[d] review in" this case. *Ohio Forestry Ass'n*, 523 U.S. at 733. Here, no such combination of factors exists. At a bare minimum, this case is the kind of facial, purely legal challenge that can be adjudicated without the need for additional factual development.

### III.    The States have a Cause of Action to Sue.

Equity allows injured parties to sue for equitable relief when a State officer violates federal law, whether it be constitutional, statutory, or federal common law. *See Verizon Md., Inc. v. Pub.*

*Serv. Comm'n of Md.*, 535 U.S. 635, 642–43, 645–46 (2002). And the Supreme Court has allowed States to "pursu[e] the same declaratory and injunctive relief that a private plaintiff might have sought in an action grounded on *Ex parte Young*." *Cahill*, 217 F.3d at 98; *see Wyoming v. Oklahoma*, 502 U.S. 437, 451–52 (1992). The parties agree on these points, and that agreement means that the States have the ability to sue in equity. Int.-Defs.' Response Br. at 18 ("The State Plaintiffs rely on authority that they have the same rights to sue in equity as private plaintiffs; this is true but irrelevant."); *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256 (2011) ("[T]here is no warrant in our cases for making the validity of an *Ex parte Young* action turn on the identity of the plaintiff.").

In suggesting some heightened requirement for States alone, the Defendant-Intervenors argue that only "direct" injuries count for the purposes of *Ex parte Young*. But they provide no serious support for that proposition. Int.-Defs.' Response Br. at 18 (quoting *Wyoming*, 502 U.S. at 451). Instead, they invoke only an out-of-context quotation from *Wyoming v. Oklahoma*, where the Supreme Court noted that a "direct injury" to a State made the Court more likely to hear a case in its original jurisdiction. 502 U.S. at 451. The discretionary factors relevant to whether the Supreme Court will hear a case in its original jurisdiction have nothing to do with the existence of an equitable right to sue.

Defendants' lack of support is unsurprising because the Supreme Court has never required a "direct" injury to invoke *Ex parte Young*. In the Court's own words, "[i]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need *only* conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md.*, 535 U.S. at 642–43, 645–46 (quotation marks omitted) (emphasis added). Nowhere in this test did the Court

identify the directness of the injury as playing a role in the inquiry. And ultimately, all this wrangling over a direct injury requirement proves to be academic. For all the reasons already explained, the States *have* shown direct injuries, both to their sovereign (and quasi-sovereign) interests and their fiscs.

### IV.    Federal Common Law and the Constitution's Extraterritoriality Doctrine Preempts Vermont's Climate Superfund Act.

#### A.    Federal Common Law Preempts Vermont's Act.

Specific pockets of federal common law exist where "a federal rule of decision is 'necessary to protect uniquely federal interests.'" *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 426 (1964)). Where a uniquely federal interest embodied in federal common law exists, State law cannot apply. "[D]isputes involving interstate air or water pollution" are one such area where an "unbroken string of cases has applied federal law," not State law, to resolve conflicts. *City of New York*, 993 F.3d at 91 (collecting cases). When transboundary pollution is at issue, "federal interests . . . are incompatible with the application of state law" for two reasons. *Id.* Applying State law would 1) result in emissions from a single source being regulated by up to 50 State laws at a single moment, and 2) subvert "basic interests of federalism" by allowing States to extend their powers outside of their own territory. *Id.* at 91–92 (quoting *Illinois v. City of Milwaukee*, 406 U.S. 91, 102–03, 105 n.6 (1972) ("*Milwaukee I*")); *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421 (2011) ("*AEP*").

Federal common law can retain its preemptive force even when Congress later elects to displace the federal common law with a federal statute. In such circumstances, the federal common law will no longer be the rule of decision a court will apply when the Plaintiff raises a federal cause of action, but it continues to preempt State law from applying in the case. *City of New York*, 993

16

F.3d at 98. State law can step only if the federal statute that displaced the federal common law explicitly authorizes the application of State law. Altogether, "state law does not suddenly become presumptively competent to address issues that demand a unified federal standard simply because Congress saw fit to displace a federal court-made standard with a legislative one[.]" *Id.*

The federal common law of interstate pollution preempts Vermont's Climate Superfund Act because the Act "involve[es] interstate air or water pollution." *Id.* at 91. More specifically, the Act is preempted because it seeks compensation for the putative harms caused by interstate emissions—effectively regulating interstate emissions through State law. Although the Act applies to the producers of traditional fuels, it explicitly "link[s]," *id.*, at 97, the production of those fuels to the climate-change harms it suffers through the national—indeed, global—emission of greenhouse gases, 10 VT. STAT. ANN. §§ 596(7), 598(b) (establishing liability for "[c]overed greenhouse gas emissions"). As the Second Circuit has explained, "[i]f an oil producer cannot be sued under the federal common law for [its] own emissions, *a fortiori* [it] cannot be sued for someone else's." *City of New York*, 993 F.3d at 97 (quoting *City of Oakland v. BP P.L.C.,* 325 F. Supp. 3d 1017, 1024 (N.D. Cal. 2018), *vacated on other grounds*, 969 F.3d 895 (9th Cir. 2020)).

Because the Climate Superfund Act seeks to hold producers liable for "someone else's" emissions under *Vermont* law, *id.*, federal common law preempts it. The emissions at issue here were not "released in" Vermont, nor was the original production based in Vermont. *Id.* at 92. "Instead, [Vermont] intends to hold the Producers liable, under [Vermont] law, for the effects of emissions made around the globe over the past" 30 years. *Id.*

Because the federal common law applies and conflicts with the Climate Superfund Act, Vermont's Act is preempted unless the Clean Air Act affirmatively authorizes it. *See id.* at 98–99. But Defendants do not argue that the Clean Air Act explicitly authorizes Vermont to seek

retroactive compensation based on Vermont law. Nor can they, as the Clean Air Act allows States to apply only the law of the source State to the emission of interstate air pollutants.

1. **Defendants Misapprehend The Preemptive Force of the Federal Common Law of Interstate Emissions.**

Defendants raise a bevy of arguments in their response briefs, but none of them fix the core problem with the Climate Superfund Act: it attempts to apply Vermont law to interstate emissions. The presumption against preemption does not apply in this traditional federal domain. *City of New York* is indistinguishable. No absurd consequences follow from the States' argument, which merely reflects the current state of play. And though Vermont argues displaced federal common law has no preemptive force over State statutes, substantial authority (including *City of New York*) says otherwise.

a. **The Presumption Against Preemption Does Not Apply When a Law Concerns Interstate Emissions.**

Defendants seek shelter behind the presumption against preemption, but that presumption does not apply to the Climate Superfund Act. Federal courts will only presume that State law is not preempted when a State is regulating a subject "traditionally occupied by the States." *Altria Group, Inc. v. Good,* 555 U.S. 70, 77 (2008); *United States v. Locke*, 529 U.S. 89, 108 (2000) ("[T]here is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers" if it is outside the traditional subjects of State regulation.). The Climate Superfund Act does not deal with a field traditionally occupied by the States. It is a first-of-its-kind law that applies to the production and release of greenhouse gases across State lines, which is a classic area where "state law cannot be used." *City of Milwaukee v. Illinois*, 451 U.S. 304, 313 n.7 (1981); *City of New York*, 993 F.3d at 98 (explaining that interstate air pollution is "not . . . a field in which the states have traditionally occupied" (cleaned up)). Instead of starting with a

presumption that the Climate Superfund Act is valid, this Court should start with the presumption that it is beyond the State legislature's reach as an attempt to regulate conduct in sister States. *See Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947) (collecting cases).

Defendants assert that the presumption against preemption applies because raising "revenue for projects that will protect" a State's citizens is a subject traditionally occupied by the States. Int.-Defs.' Response Br at 33 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) and *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir. 1980)). Even assuming this statute is properly characterized as a revenue-raising statute (a dubious proposition given the statute's largely punitive objective), that label does not transform interstate air pollution regulation into an area traditionally occupied by the States. *See, e.g.*, *Fednav, Ltd. v. Chester*, 505 F. Supp. 2d 381, 393 (E.D. Mich. 2007) (holding that presumption against preemption did not apply even though state was "motivated to protect the[] local environment," where the statute "b[ore] on interstate commerce" by having substantial extraterritorial effect). In other words, the presumption assumes that the State is operating "in an area where there is no history of significant federal presence." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 496 & n.1 (9th Cir. 2005). If all revenue-raising measures (no matter their design) were within the State's traditional powers, then a statute that attempted to directly fine the federal government for military operations within a State, for example, would be within a State's traditional powers. That cannot be true.

Whether a law is an exercise of a State's traditional powers must depend on both the goal of the law and the means by which it accomplishes that goal. *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 164 (2016). Thus, even presuming that the goal of the statute is raising revenue for in-State climate projects, a State cannot avail itself of the presumption against preemption if

the statute accomplishes that goal through methods outside its traditional competence. The method here is bilking out-of-State corporations for their lawful, traditional-fuel-producing activities and the interstate emissions that those fuels have generated. Nothing is traditional in that.

### b. Defendants Cannot Distinguish *City of New York*.

Defendants correctly recognize that they must distinguish *City of New York* to prevail. They try—and fail—three times to do so. First, they argue that the Climate Superfund Act does not involve a "matter previously governed by federal common law," so the federal common law has no preemptive force here. Int.-Defs.' Response Br. at 34. Second, Defendants argue that *City of New York* is distinguishable because the Act "does not impose ongoing tort liability." *Id.* Finally, Defendants argue that applying *City of New York* implicates a question of fact. None of these arguments work.

*First*, in suggesting the Climate Superfund Act does not involve a "matter previously governed by federal common law," Defendants narrow the federal common law of interstate pollution to cover only actions "to abate pollution emanating from another State." Int.-Defs.' Response Br. at 34–35 (second quoting *AEP*, 564 U.S. at 421). Because the Supreme Court "has never applied this federal common law outside the context of nuisance suits by one state to abate pollution originating in another," *id.* at 35, Defendants maintain that the federal common law of interstate emissions is not implicated by anything other than nuisance suits.

*City of New York* directly forecloses that argument. There, the plaintiff argued the federal common law did not apply because it "s[ought] damages rather than abatement." *City of New York*, 993 F.3d at 91. Or put differently, "because [New York City] seeks damages—not abatement or the imposition of pollution standards—its claims do not threaten to regulate emissions at all, let alone beyond New York's borders." *Id.* at 92. The Second Circuit disagreed. After detailing the

20

City's argument and discussing the Ninth Circuit precedent rejecting the idea that the form of relief is relevant to the preemption analysis, the Second Circuit "agree[d] with the Ninth Circuit's sound reasoning." *Id.* at 96. It thus held that "common law damages claims" met the same fate as claims to abate a nuisance. *Id.* (discussing *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 857 (9th Cir. 2012)). Both remedies would subject individual sources of pollution to a myriad of overlapping liability schemes, and the obligation to pay compensation for emissions was no less problematic than the obligation to cease emitting.[1] Ultimately, what mattered was not the form of relief but whether the suit "involve[ed] interstate air or water pollution." *Id.* at 91.

Defendants argue that *City of New York* solely concerned tort liability, and "[t]he panel in *City of New York* did not hold that all types of financial liability for past fossil fuel production amount to a *de facto* regulation of emissions." Int.-Defs.' Response Br. at 36. But again: *City of New York* adopted the reasoning in *Kivalina* "that displacement of federal common law does not turn on the nature of the remedy." 993 F.3d at 96. If the emission of greenhouse gases is a "link" in the causal chain of liability, then States cannot apply their own laws. *Id.* at 97. Much like the City of New York, Vermont "disavow[s] any intent to address emissions" but identifies "such emissions as the singular source of [Vermont's] harm." *Id.* at 91. Vermont "cannot have it both ways." *Id.* And truth be told, Vermont's law is not just *de facto* regulation but *de jure* regulation. "The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 247, (1959). Thus, "[e]ven the States' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme." *Id.*

---

[1] The plaintiff in *City of New York* did ask for abatement if the Defendants refused to pay a money judgment. But the Second Circuit analyzed the claim as one for money damages, given that was the primary request.

As a matter of first principles, Defendants' argument that the federal common law only preempts abatement and/or tort claims are also unconvincing. The argument is the mirror image of a typical (losing) preemption argument that only "positive enactments by States and localities" are subject to preemption, *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521 (1992), and this version of the argument fares no better than its fraternal twin. True, the federal common law of interstate pollution exists, as Defendants assert, "because of a need for an alternative to armed conflicts between states." Int.-Defs.' Response Br. at 35. But that point does not explain why the federal common law would be limited to preempting abatement or tort actions; wars can break out from statutes just as they can from suits. Conflicts would arise if one State applied its own laws against a polluter in another State and tried to enforce that assessment, as the Climate Superfund Act authorizes, regardless of whether the judgment was tort-based or directly enacted through a confiscatory retroactive statute. All laws are eventually enforced through force, so the idea that an order to abate a nuisance poses unique concerns under the federal common law is incorrect.

For the same reasons, *City of New York* governs even if the Climate Superfund Act "does not include injunctive relief, does not impose ongoing duties, and does not require a court to apply vague nuisance standard." *Id.* at 36. In *City of New York*, the plaintiff sought "compensatory damages for the past and future costs of climate-proofing its infrastructure and property." 993 F.3d at 88. That aim is *exactly* what Vermont purports to accomplish through the Climate Superfund Act: financial compensation to help Vermont pay for vague climate-related infrastructure projects. And while the City of New York also sought abatement "should the Producers fail to pay the court-ordered damages," *id.*, the Second Circuit analyzed this request as one for money damages. If the Court thought that compensatory damages were fine but injunctive relief was not, it would have

denied the motion to dismiss and reserved the question of injunctive relief until the Defendants refused to pay a money judgment.

Defendants' argument that the Climate Superfund Act does not impose "ongoing duties" or set a standard of care is also inapposite for two reasons. Int.-Defs.' Response Br. at 36. First, *City of New York* did not turn on whether the tort liability created an ongoing duty. Indeed, it recognized that the plaintiff was not "seeking to impose a standard of care or emission restrictions" in that case. *City of New York*, 993 F.3d at 93. The effect of the damages for past emissions in that case would have, nonetheless, functioned to "regulate cross-border emissions in an indirect and roundabout manner." *Id.* The Climate Superfund Act also operates in a materially similar manner as a judgment in a tort case. In either situation, the relevant government would receive money compensating it for past harms caused by climate change. The main difference is that a tort suit at least requires a finding of liability and not a mere legislative declaration. True, a defendant in a tort case may adjust his behavior after the judgment to avoid a future judgment against him for the same conduct. *NRDC*, 894 F.3d at 105. But the same is true with a legislatively enacted exactment. In both situations, future liability is contingent on a government action—either a lawsuit being filed or a law being passed. And in both situations, the past judgment will influence the decision-making process of the regulated party. Indeed, New York has already expanded its own Superfund statute by six years. N.Y. ENV'T CONSERVATION LAW § 76-0101(7), (21). In short, "regulation can be as effectively exerted through an award of damages as through some form of preventive relief." *San Diego Bldg. Trades*, 359 U.S. at 247; *cf. Cent. GMC, Inc. v. Gen. Motors Corp.*, 946 F.2d 327, 334 (4th Cir. 1991) (rejecting attempt to distinguish an injunction from an award of damages in an extraterritoriality case because damage awards "could have the same effect on [a target's operations as if [the target] were formally ordered" to engage in certain conduct).

23

At the end of the day, the Climate Superfund Act will have the effect of reducing the extraction and consumption of traditional fuels "in an indirect and roundabout manner," just like the request for compensatory damages in *City of New York*. 993 F.3d at 93. Although Vermont has putatively established liability only between 1994 and 2024, the logic it openly professes applies equally to 2025 and beyond. Traditional-fuel producers today surely know Vermont's position on their contributions and whether they should expect liability for those contributions. Swarup Decl. ¶ 27; Zycher Decl. ¶ 7-11. And less profit will dissuade profit-seeking enterprises from engaging in the activity.

That courts will not have to apply vague nuisance standards under the Climate Superfund Act also does not rescue it from *City of New York*'s grasp. For one thing, Vermont gives itself too much credit; administrators will still be faced with a difficult task of apportioning liability based on ill-defined standards. For another, legislatively declaring that producers of traditional fuels are liable instead of seeking a court declaration under established law does not transform the Climate Superfund Act into "anything other than a [law] over global greenhouse gas emissions." *City of New York*, 993 F.3d at 91. "It is precisely *because* fossil fuels emit greenhouse gases – which collectively exacerbate global warming – that" Vermont is seeking to attach liability to fossil-fuel producers. *Id.* (emphasis in original). Forcing courts to apply vague nuisance standards may be an additional evil that the federal common law prevents. But that difficulty is not the sole evil. Indeed, the plaintiff in *City of New York* also brought a trespass claim in addition to the nuisance claim; that claim was preempted all the same. Nothing about *City of New York* is unique to nuisance suits.

Finally, Defendants unsuccessfully try to distinguish *City of New York* on purported factual grounds. In doing so, they reveal their misunderstanding of what *City of New York* held and the way it evaluated the preemption question. Defendants believe that the Climate Superfund Act is

dissimilar to the tort suit in *City of New York* because it is purely retroactive, and whether a retroactive statute functions as a "regulation" is a question of fact that must be proven at summary-judgment. Based on this view, Defendants provide an expert declaration that putatively shows that the Act would not function as an "economic regulation," as that term is used by economists, because of its retroactive nature. Fullerton Decl. ¶¶ 28–32. They likewise request that this Court delay adjudication until they can develop additional facts about how the Act will operate. *See* Decl. of Adeline S. Rolnick 112-3 ¶¶ 4-7 (Nov. 21, 2025).

     This argument is unavailing for two reasons. First, whether a statute functions as an "economic regulation," as understood by *economists*, is irrelevant to understanding the preemptive scope of the federal common law of interstate pollution. What matters for preemption purposes is whether a dispute "involve[es] interstate air or water pollution," not whether the dispute will prospectively regulate those issues. *City of New York*, 993 F.3d at 91. Second, *City of New York* held that the "economic reality" of what compensatory damages would incentivize was a question of law for the Court to decide. *Id.* at 92. The case was decided on a motion to dismiss, and the complaint said nothing about the large-scale economic effects of compensatory damages. Yet the Second Circuit still held that "a significant damages award would no doubt 'compel[ ]' the Producers to develop new 'means of pollution control.'" *Id.* at 93 (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 495, 498 n.19 (1987)). Nor did the Second Circuit have any issue concluding that "City's lawsuit would regulate cross-border emissions in an indirect and roundabout manner" without the need to look beyond the complaint. *Id.*; *see also, e.g.*, *Jackson v. Gen. Motors Corp.*, 770 F. Supp. 2d 570, 577 (S.D.N.Y. 2011) (treating question of whether a given claim "related to" motor-vehicle emissions—and was thus preempted—as a question of

law). Whether a law constitutes a regulation is a legal, not a factual question. Defendants cannot seek to manufacture a factual disagreement on a legal point.

### c. Applying the Federal Common Law Would Not Require Invalidating Broad Swaths of State Law.

Defendants claim that federal common law would invalidate a whole host of seemingly innocuous laws, such as fuel "taxes, highway tolls, use/registration fees," if it is broad enough to preempt the Climate Superfund Act. Vermont notes those laws may alter the incentives to use traditional fuels, too. Vermont Response Br. at 12–13. But the States' position would not lead to this parade of horribles.

The States do not argue that all laws that have an indirect effect on the price of oil, natural gas, coal, or energy are preempted by the federal common law. Only State laws that use interstate emissions as a "link" in the chain of liability are preempted. *City of New York*, 993 F.3d at 97. If a law has an incidental effect on the production or price of traditional fuels unrelated to interstate emissions, then the federal common law does not necessarily stand in the way. That is why States can tax gasoline purchased or used in their States but not interstate emissions from the burning of that gasoline.  Those traditional laws target *intrastate* state activities.

Vermont's reliance on *Allco Finance Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017), is thus wholly inapposite. There, a utility company challenged Connecticut's decision to take actions that would increase the supply of energy and thus lower wholesale energy prices. The utility company argued Connecticut's action would alter wholesale energy prices, so the action infringed on the Federal Energy Regulatory Commission's authority to regulate interstate energy markets. *Id.* at 101. The Second Circuit disagreed, holding that the mere incidental effect of a regulation was insufficient to render it preempted. *Id.* at 101–02.

As the States have consistently explained, however, the issue in this case (at least when it comes to federal common law preemption) is not merely the effect on the markets for oil, natural gas, and coal. Rather, it's the use of interstate emissions to establish liability. As the Supreme Court explained in a different FERC case, "States, of course, may regulate within the domain Congress assigned to them even when their laws incidentally affect areas within FERC's domain." *Hughes*, 578 U.S. at 164. But "States may not seek to achieve ends, however legitimate, through regulatory means" that are preempted. *Id. AllCo* stands for the rather anodyne proposition that incidental effects of a law will not necessarily render it preempted. But *AllCo* does not give Vermont a green light to engage in regulation through preempted means.

### d. Federal Common Law (Even When Displaced By a Federal Statute) Preempts State Statutes.

Vermont (but not the Defendant-Intervenors) doubles down on the argument that displaced federal common law cannot preempt a State statute. In its view, no Supreme Court case "hold[s] that displaced federal common law—that is, where Congress has replaced federal common law with a federal statute—can nonetheless preempt a state statute." Vermont Response Br. at 22. It thinks "recognizing federal common law preemption of state statutory law would threaten to upset both the vertical and the horizontal separation of powers." *Id.* at 23.

Defendant-Intervenors rightly declined to make this argument. The Supreme Court stated in *Milwaukee I* that "state statutes" are not conclusive when the federal common law applies. 406 U.S. at 105. Even if that statement were dictum, Vermont cannot cite a single federal court that has held that federal common law—displaced or otherwise—cannot preempt State statutes. Indeed, many federal circuit courts have held the opposite, concluding that federal common law *does* preempt State statutes. *Lowry v. Baltimore & Ohio R.R. Co.*, 707 F.2d 721, 728 (3d Cir. 1983) ("[F]ederal common law, not *state statutes or decisional law*, governs whether causes of action

under the federal securities laws run with the affected securities and hence are automatically assigned to subsequent purchasers of those securities." (emphasis added)); *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 392 (3d Cir. 2012) (explaining in a case that involved a New Jersey statute that "state law can be preempted by federal common law"); *Gaff v. FDIC*, 919 F.2d 384 (6th Cir. 1990) (deciding that a substantive rule of federal common law applied and preempted state regulation in a commercial law case), *opinion modified on reh'g*, 933 F.2d 400 (6th Cir. 1991) (Mem.). And most obviously, *City of New York* directly held otherwise in this very context.

These decisions are correct as a matter of first principles. Federal common law is *federal law*, and federal law is supreme over State law. U.S. CONST. art VI, cl. 2. The Supremacy Clause does not contain an unwritten exception where the federal common law has less preemptive power than federal statutes. It certainly doesn't contain an unwritten exception where State statutes are entitled to trump some parts of federal law. And while federal common law is somewhat rare these days, Vermont has stepped directly into the heart of it by purporting to regulate interstate emissions.

The preemption analysis cannot change with displaced federal common law. Here again, *City of New York* has already held that the displaced federal common law retains its preemptive effect. 993 F.3d at 98–99. Vermont offers no reason why *City of New York*'s holding would not apply equally to State statutes. It can't. *See, e.g., Calingo v. Meridian Res. Co. LLC*, No. 7:11-CV-628-VB, 2011 WL 3611319, at *10 (S.D.N.Y. Aug. 16, 2011) (independently evaluating whether federal common law preempted New York statute even after it concluded that a federal statute displacing that common law did not). At its core, Vermont thinks that *City of New York* was

wrongly decided and asks this Court to make a frivolous distinction to avoid it. But if Vermont wants *City of New York* overturned, it must ask the *en banc* Second Circuit or the Supreme Court.

### B.  The Extraterritoriality Doctrine Preempts Vermont's Act.

If this Court were to adopt Defendants' argument that the Climate Superfund Act is not touching upon interstate emissions because it is a purely retroactive statute concerning the extraction of traditional fuels, then the Act would undoubtedly violates the Constitution's extraterritoriality doctrine. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 375 (2023) (reaffirming the existence of the extraterritoriality doctrine). That argument confirms that the law is a direct regulation of out-of-State conduct. Yet States can only regulate activity within their own jurisdiction or activity "intended to produce and producing detrimental effects" within their jurisdiction. *Strassheim v. Daily*, 221 U.S. 280, 285 (1911). As the Supreme Court has held for nearly 150 years, the "legislative power of a State to act upon persons and property within the limits of its own territory," does not extend to "persons and property" outside of its territory, *Hoyt v. Sprague*, 103 U.S. 613, 630 (1880); *see N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914) ("[I]t would be impossible to permit the statutes of Missouri to operate beyond the jurisdiction of that State."); *Huntington v. Attrill,* 146 U.S. 657, 669 (1892) ("Laws have no force of themselves beyond the jurisdiction of the State which enacts them, and can have extraterritorial effect only by the comity of other states."). So "[n]o state can legislate except with reference to its own jurisdiction." *Bonaparte v. Tax Court,* 104 U.S. 592, 594 (1881). "The several States are of equal dignity and authority, and the independence of one implies the exclusion of power from all others." *Brown v. Fletcher's Est.*, 210 U.S. 82, 89 (1908).

The Climate Superfund Act violates the basic precepts of this long-established doctrine. The Act purports to impose liability on actions—the production of traditional fuels—that were

taken wholly outside "the limits of [Vermont's] own territory." *Hoyt*, 103 U.S. at 630. Vermont

openly admits that oil, natural gas, and coal have *never* been produced in Vermont. Vt's. SUMF

Resp. ¶¶ 9–12. Thus, the Act operates exclusively outside of Vermont's borders, attaching liability

to drilling, fracking, and mining that took place exclusively in other States or even countries. 10

VT. STAT. ANN. § 596(7) (defining "covered greenhouse gas emissions"). That's unsupportable.

"With such laws in force in states which are interspersed with those having no limit on [traditional

energy production], the confusion and difficulty with which interstate operations would be

burdened under the varied system of state regulation and the unsatisfied need for uniformity in

such regulation, if any, are evident." *S. Pac. Co. v. Ariz. ex rel. Sullivan,* 325 U.S. 761, 773–74

(1945).

Defendants insist the production of traditional fuels creates "very real impacts in the State,"

Vermont Response Br. at 26–27. Thus, they say the rule that "a law that *directly* regulate[s] out-

of-state transactions by those with *no* connection to the State" does not apply. *Pork Producers

Council*, 598 U.S. at 376 n.1 (discussing *Edgar v. MITE Corp.*, 457 U.S. 624 (1982)). Vermont's

argument goes something like this: Because the downstream emissions from the eventual burning

of traditional fuels cause climate change, and climate change causes harm to Vermont's citizens,

Vermont has sufficient connection to the out-of-State activity to justify regulating it.

This argument places Defendants in a Catch-22 of sorts. For the purposes of the federal

common law, they disclaim reliance on emissions and contend that the Climate Superfund Act only

concerns extraction. *See, e.g.*, Int.-Defs.' Response Br. at 38. Vermont does the same by arguing

that the Act "does not regulate emissions at all." Vermont Response Br. at 24. But for the purposes

of the extraterritoriality doctrine, they claim that the law is permissible because it is predicated on

the downstream emissions from the extraction of traditional fuels. Yet Defendants cannot claim

that the Climate Superfund Act does not concern emissions for the purposes of federal-common-law preemption while likewise claiming that the emissions from burning the fuels create an in-State effect that allows Vermont to regulate out-of-state activity. Either this Act is an emissions statute or it is not. Just like the plaintiff in *City of New York*, Defendants' logic "whipsaws between disavowing any intent to address emissions and identifying such emissions as the singular source of the [State's] harm." *City of New York*, 993 F.3d at 91. They "cannot have it both ways." *Id.*

Defendants' reliance on the Supreme Court's recent decision in *Pork Producers* is misplaced. In that case, the Supreme Court upheld a California statute that required pork sold in California to be raised in what California viewed as a humane manner. *Pork Producers*, 598 U.S. at 366, 391. The California pork law had an indirect extraterritorial effect because out-of-State pork producers would surely seek to access California's massive pork market and thus comply with California's law. *Id.* at 374. The law was nonetheless constitutional under the extraterritoriality doctrine and the Dormant Commerce Clause Doctrine because the object of California's regulation was within the State, *i.e.*, pork on the shelves of supermarkets within California. *Id.* at 375. The law did *not* operate directly on out-of-State pork producers, requiring them to follow California's laws regardless of where the pork was sold.

The difference between California's pork regulation and Vermont's Climate Superfund Act is stark. Vermont is "directly" attaching liability to out-of-state actions that were not directed at Vermont. *Edgar*, 457 U.S. at 641–43 (plurality op.); *Pork Producers*, 598 U.S. at 376 n.1 (discussing *Edgar*). An indirect regulation can be avoided, even if such avoidance may be inconvenient, such as refusing to sell pork on California's shelves. *Pork Producers*, 598 U.S. at 376 n.1. In other words, in regulating goods that hail from other states, a State addresses those harms that arise because of the products' presence or use within its borders. That is the essence of

a "local" interest. *Cf. Milk Control Bd. of Pa. v. Eisenberg Farm Prods.,* 306 U.S. 346, 351 (1939) ("One of the commonest forms of state action is the exercise of [] police power directed to the control of local conditions and exerted in the interest of the welfare of the state's citizens."). So the relevant conduct in *Pork Producers* occurred when the pork arrived in California; it was the *sale* of the pork that gave rise to liability and responsibility. In contrast, a direct regulation—a regulation that applies to the entity outside of the State without an intermediary—cannot be avoided in any way other than ceasing the out-of-state activity. *See S.D. Myers, Inc. v. City & Cnty. of San Francisco*, 253 F.3d 461, 467 (9th Cir. 2001) ("Direct regulation occurs when a state law directly affects transactions that take place across state lines or entirely outside of the state's borders." (citation omitted)). That's exactly what the Climate Superfund Act does here; the relevant conduct occurs the moment the resource is taken from the ground, and that conduct begins and ends out of state. Yet that conduct is "none of [Vermont's] concern." *Osborn v. Ozlin*, 310 U.S. 53, 62 (1940).

Without relying on the emission of greenhouse gases, Vermont also cannot establish any "connection" between the activity being punished (extracting traditional fuels) and the harm allegedly caused in Vermont (climate change). *Pork Producers*, 598 U.S. at 376 n.1. Drilling for oil, fracking for natural gas, and mining for coal outside of Vermont has no connection with any in-Vermont harms outside of the emissions that result from the eventual burning of those fuels. Without owning how it is seeking to regulate interstate emissions, Vermont has no way to tie the harm to the out-of-State action.

And even if Vermont could establish some sort of connection without relying on the emission of greenhouse gases, that would still not save the Act. States can only regulate out-of-State conduct when the conduct was "intended to produce and produc[ed] detrimental effects

within it." *Strassheim*, 221 U.S. at 285. Note the conjunctive form: while both the intent to produce an out-of-State effect and the actual production of that effect are required, both are absent here. The Act creates a strict-liability standard that ignores intent entirely (let alone the specific intent to cause harm in Vermont), 10 VT. STAT. ANN. § 597(1), and it is impossible to determine whether any particular emission caused harm in Vermont, *see AEP*, 564 U.S. at 422. As the Supreme Court has explained, "emissions in New Jersey may contribute no more to flooding in New York than emissions in China." *Id.* Indeed, it's not even possible to know whether an extracted resource will produce emissions at all. *See, e.g.*, *About 7% of Fossil Fuels Are Consumed For Non-Combustion Use in the United States*, EIA (Apr. 6, 2018), https://perma.cc/QP24-XWGY.

Perhaps recognizing that their arguments to evade the federal common law walk them right into the extraterritoriality doctrine, Defendants double down on the idea that the extraterritoriality doctrine does not exist. According to them, States can regulate outside of their own territory, so long as they abide by the Due Process Clause and Dormant Commerce Clause. This argument, however, contradicts old and new precedents alike. "[T]he extraterritoriality principle does not flow from the dormant commerce clause"—it derives "from the structure of the Constitution as a whole." Donald H. Regan, *Siamese Essays: (I) CTS Corp. v. Dynamics Corp. of America and Dormant Commerce Clause Doctrine; (II) Extraterritorial State Legislation,* 85 MICH. L. REV. 1865, 1885, 1888 (1987); *see also* Katherine Florey, *State Courts, State Territory, State Power: Reflections on the Extraterritoriality Principle in Choice of Law & Legislation,* 84 NOTRE DAME L. REV. 1057, 1060 (2009) (explaining that the extraterritoriality principle is "better understood as a prohibition rooted in general structural principles of horizontal federalism").

In *Pork Producers*, the most recent case that discusses the extraterritoriality doctrine, the Court explained that "[t]o resolve disputes about the reach of one State's power, this Court has

long consulted original and historical understandings of the Constitution's structure and the principles of 'sovereignty and comity' it embraces." 598 U.S. at 376 (citation omitted). The Court then noted that it "has invoked as well a number of the Constitution's express provisions," such as the Due Process Clause, Full Faith and Credit Clause, and Dormant Commerce Clause, to limit a State's power to regulate beyond its borders. *Id.* The Court took pains to distinguish "the Constitution's structure and the principles . . . it embraces" from those handful of specific provisions; that effort demonstrates that the Court perceives a separate doctrine that controls "the reach of one State's power." *Id.*

*Pork Producers*'s point is not novel, as the Supreme Court has explained that States cannot regulate beyond their territory based on principles of "sovereignty and comity," *id.* (citation omitted), since at least the 1880s. It's done so without relying on any specific clause of the Constitution. *See, e.g.*, *Hoyt*, 103 U.S. at 630; *Huntington,* 146 U.S. at 669. Many structural constitutional doctrines are applied this way, including the equal footing doctrine, *Shelby County v. Holder*, 570 U.S. 529, 544 (2013), sovereign immunity outside of the Eleventh Amendment, *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 245 (2019), and various official-immunity doctrines, *Nixon v. Fitzgerald*, 457 U.S. 731, 749–56 (1982).

Extraterritoriality concerns are only heightened where, as here, a State act34s against another's commercial activities. *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 335–36 (1989) (noting "the Constitution's special concern … with the maintenance of a national economic union"). The union was formed in part to create a separate sovereign that would have singular authority to regulate on a national scale. Before it, many feared that commercial relations between the States would remain "fettered, interrupted, and narrowed by a multiplicity of causes" so long as local laws could infringe on commerce among the States. THE FEDERALIST No. 11 (Alexander

Hamilton); James Madison, Preface to Debates in the Convention of 1787, *in* 3 RECORDS OF THE FEDERAL CONVENTION OF 1787 547 (Max Farrand ed. 1911). And indeed, under the Articles of Confederation, States had often jostled for commercial position, creating rivalry and disunity. "[T]he want of concert, arising from the want of a general authority and from clashing and dissimilar views in the State, ... frustrated every experiment of the kind." THE FEDERALIST No. 22 (Alexander Hamilton). The Constitution was thus meant to create the necessary "general authority" in the federal government. As a result, the extraterritoriality doctrine holds "at a minimum" that a state may not apply its law "to commerce that takes place wholly outside of the State's borders." *Healy*, 491 U.S. at 336. It makes no difference "whether or not the commerce has effects within the State," *id.* (quotation marks omitted); if the state law "control[s] conduct beyond the boundaries of the State," the law "exceeds the inherent limits of the enacting State's authority and is invalid." *Id.*

Defendants' reliance on the illusory nexus requirement in the Climate Superfund Act is once again misplaced. That requirement excludes from the definition of "[r]esponsible party" "any person who lacks sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution." 10 VT. STAT. ANN. § 596(22). It still allows Vermont to seek money for purely out-of-State activities, so long as the entity that conducted those activities has a sufficient connection to Vermont (even apart from the activities themselves). And because Vermont does not produce any traditional fuels, the Act will *only* be applied to such entities. In other words, the nexus requirement appears to be addressed to personal jurisdiction—a whole separate concept from extraterritoriality. And even if one assumed the Act targeted resources that ultimately reach Vermont (again, it doesn't), Vermont would still be impermissibly "attach[ing] restrictions to … [energy] imports in order to control commerce in other States." *C&A Carbone, Inc. v. Town of*

*Clarkstown*, 511 U.S. 383, 393 (1994). Ultimately, what matters for extraterritoriality is that every single cost recovery demand that Vermont issues will be demanding payment for activities wholly outside of Vermont. *Cf. Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1236–37 (11th Cir. 2001).

In its final move, Vermont once again argues that the Act is not subject to the extraterritorial-regulations doctrine because it "does not regulate conduct at all." Vermont Response Br. at 29. That point is unpersuasive for at least two reasons. First, as discussed throughout this brief, the Act will affect future behavior and operate as a regulation on the conduct of extracting traditional fuels from the ground. *Supra*, at 4-9. Second, the Climate Superfund Act violates the extraterritoriality doctrine because Vermont has no jurisdiction in other States. Whether or not the attempt to exercise jurisdiction over actions in other States constitutes a regulation or a purely retrospective liability scheme is immaterial. *See, e.g.*, *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 571–72 (1996) (noting the extraterritoriality concerns that arise from certain awards of punitive damages). Vermont's jurisdiction does not expand when it seeks to regulate retroactively.[2]

At bottom, Vermont cannot project its commercial regulations across state lines under the guise of "policing its own concerns." *Pac. Coast Dairy v. Dep't of Agric. of Cal.*, 318 U.S. 285, 295 (1943). The "sovereign prerogative[]" to remedy out-of-state problems (to the extent they really even exist) rests with the oil, gas, or coal-producing State or is "lodged in the Federal Government." *Massachusetts,* 549 U.S. at 498; Florey, *supra* at 1093 ("[The extraterritoriality

---

[2] Defendant-Intervenors contend that it is "self-defeating and hypocritical" for the States to observe that the extraterritoriality concerns are heightened when Vermont is seeking to punish conduct that other States encourage within their borders. Int.-Defs.' Response Br. at 51. According to Defendant-Intervenors, Plaintiff States raise money through severance taxes in addition to using tax breaks to incentivize production of tradition fuels, so they must not actually seek to promote the use of traditional fuels. *Id.* But the Plaintiff States are merely taxing activities within their own borders, in part to offset the cost of activities and impacts that happen within their borders. It is the job of Plaintiff States to balance those goals, and Vermont has no business second guessing that judgment.

doctrine] is perhaps best understood as a means of establishing order—and confining each state to its proper sphere of authority—in a federalist system."). The Climate Superfund Act offends that sovereign prerogative.

### C. The Foreign Affairs Doctrine Preempts Vermont's Act.

The federal government controls U.S. relationships with foreign countries. *See Zschernig v. Miller*, 389 U.S. 429, 442–43 (1968) (Stewart, J. concurring). The Constitution thus preempts "local interference" with international issues. *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941)). State laws "must give way if they impair the effective exercise of the Nation's foreign policy." *Id.* at 440. Although States may interact with other nations, they cannot do so if that activity will lead to more than an incidental effect on the foreign policy of the federal government. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 (2003). And even if no conflict whatsoever arises, States cannot apply their laws in areas where the State "has no serious claim to be addressing a traditional state responsibility." *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1074 (9th Cir. 2012) (en banc). The foreign-affairs doctrine preempts the Act for both reasons.

First, the Act is contrary to the foreign-policy positions of the federal government. *Zschernig*, 389 U.S. at 432–33; *Garamendi*, 539 U.S. at 419 n.11 ("[T]he Constitution entrusts foreign policy exclusively to the National Government."). The Act expressly contemplates demanding money from "foreign nation[s]" for their extraction of traditional fuels. 10 VT. STAT. ANN. § 596(10). Potential targets include companies all over the globe and even some companies owned by foreign sovereigns. And even if Vermont does not attempt to use the Act to secure payments from foreign nations themselves, it nonetheless regulates activities in foreign jurisdictions. It applies to the production of traditional fuels worldwide, regardless of their connection to Vermont. For these reasons, the federal government has sued Vermont to ensure that

it does not commandeer the foreign-policy decisions that the Constitution vests in the federal government. *See* Mot. for Summ. J., *United States v. Vermont*, 2:25-cv-00463 (D. Vt. Sep. 15, 2025), Doc. 50-1 at 51 ("Vermont's attempt to globalize its regulatory reach also collides with the Foreign Affairs Doctrine.").

Defendants agree that it violates the Foreign Affairs Doctrine when a State "tak[es] a side in a foreign policy conflict and impos[es] consequences on foreign actors based on that position." Int.-Defs.' Response Br. at 59. The Climate Superfund Act does just that. It takes the position that all major producers of traditional fuels worldwide should face financial penalties for their work. And it imposes the "consequence[]" of liability on those foreign actors, *id.*, whether they be private actors or state-owned companies like Saudi Aramco. In the simplest of ways, the Climate Superfund Act flunks Defendants' own test.

Vermont argues that the Climate Superfund Act does not expressly contradict any federal law, but the Foreign Affairs Doctrine does not require conflict with the express terms of federal law. All that Foreign Affairs Preemption requires is that the State law serve as an "obstacle to the accomplishment of [the United States'] full objectives." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quotation marks omitted). Thus, in *Crosby*, the Supreme Court held that the Foreign Affairs Doctrine preempted a State law that sought to impose a sanctions regime that varied from the one imposed by Congress and the President. *Id.* at 373–86. Congress wanted the President to have discretion to lift the relevant sanctions if conditions in the foreign country improved. *Id.* But the State law sanctions regime (that the President could obviously not lift) interfered with the President's negotiating leverage. *Id.* That interference was a sufficient obstacle for preemption purposes. *Id.*

38

Vermont attempts to distinguish *Crosby* as a case solely about federal statutes and not presidential discretion, but the statute in that case delegated broad discretion to the "President to proceed diplomatically in developing a comprehensive, multilateral strategy toward Burma." *Id.* at 374. In other words, delegations to the president, even those that are open ended, foreclose State regulation of the same subject. The relevant statutes here, as discussed below, also declare a policy position and empower the President to seek to achieve that position in the foreign-policy sphere. The preemptive force of the delegation to the President in *Crosby* also demonstrates, contrary to the Defendants' position, that "generalized negotiation directives" from Congress can preempt State law under the Foreign Affairs Doctrine in some circumstances. Int.-Defs.' Response Br. at 55.

Similarly, Defendants' attempts to analogize this case to *Medellín v. Texas*, 552 U.S. 491 (2008), fall flat. In that case, President Bush issued a memorandum that attempted to set aside State-court procedural rules in habeas proceedings under a non-self-executing international treaty. *Id.* at 498. The Supreme Court held that non-self-executing treaties could not preempt State law, and the President could not unilaterally transform a non-self-executing treaty into a domestically binding one through a declaration. *Id.* at 498–99. Thus, the Court refused to vacate the death sentence of the Mexican national who sought review.

According to Defendants, this case is like *Medellín* because the Supreme Court there refused to allow the President to use "the President's asserted [statutory] authority" to preempt State law. *Id.* at 529. But that argument does not work because the statute in *Medellín* was materially different than the climate-related statutes relevant in this case. In *Medellín*, the President attempted to rely on statutes giving him authority to represent the United States in front of the United Nations and International Court of Justice to give him the power to preempt domestic law.

*Id.* But the Supreme Court held that these statutes, which lacked any substantive content, were insufficient to give him preemptive power because they "sp[oke] to the President's *international* responsibilities." *Id.* (emphasis in original). The statutes here are much different. For instance, the Global Climate Protection Act declared that the United States should "work toward multilateral agreements" on greenhouse gas emissions, with a "coordinated national policy," including in the international arena. *See* Pub. L. No. 100–204, Title XI, §§ 1102(6), 1103(a)(4), 101 Stat. 1331, 1408 (1987) (re-printed as note to 15 U.S.C. § 2901). It does not simply authorize diplomacy but charts a clear path of international cooperation. Much like in *Crosby*, Congress has declared a goal, and a State law undermines that goal by making it more difficult to cooperate with other nations. What country will enter into a "multilateral agreement[]" with the United States on greenhouse-gas emissions when individual States can seek retroactive compensatory damages for actions taken in that country, over and above whatever might have been negotiated? 15 U.S.C. § 2901 (notes). For precisely this reason, Deputy Secretary of State Christopher Landau has stated that the Act will "undermine[] important ongoing diplomacy" and add "new frictions in international climate negotiations." Decl. of Christopher Landau, *United States v. Vermont*, No. 2:25-cv-00463 (D. Vt. 2025), Doc. 50-3 ¶ 16.

Defendants once again circle back to their refrain that the Climate Superfund Act does not regulate greenhouse-gas emissions. But that point is both wrong and irrelevant for the purposes of Foreign Affairs Preemption. It is wrong for the reasons described. And it is irrelevant because even if Defendants are correct, they are still seeking to create liability for drilling, fracking, and mining that took place on foreign soil. Indeed, if a cubic ton of natural gas was produced in Russia and burned in Germany, Vermont would include the emissions from that cubic ton of gas when calculating its cost-recovery demands.

The Climate Superfund Act is also preempted because it does not address "a traditional state responsibility." *Movsesian*, 670 F.3d at 1072, 1074. As explained throughout this case, interstate air pollution is an area traditionally reserved for the federal government. *See City of New York*, 993 F.3d at 103. And States have even less of a claim to apply their own law to global air pollution, which requires a "carefully balanced scheme of international cooperation" to combat. *Id.* At the end of the day, purporting to regulate energy-related activities across international borders is also unheard of.

Defendants continue to insist that the Climate Superfund Act addresses a "traditional state responsibility" because it raises revenue. Int.-Defs.' Response Br. at 52 (quoting *Garamendi*, 539 U.S. at 419 n.11). But as discussed above, the manner in which it raises revenue—using greenhouse-gas emissions to penalize the producers of traditional fuels—is not a traditional state responsibility. *Supra*, at 18-20. Vermont is free to seek revenue within its borders, but it cannot do so in a way that intrudes on the authority of the federal government. Vermont's contrary argument has no limiting principle; under its view, Vermont could seize all foreign assets in the State in the name of raising revenue. But that egregious action would set off an international incident—having an undeniable (and painful) effect on foreign affairs. "Courts have consistently struck down state laws which purport to regulate an area of traditional state competence, but in fact, affect foreign affairs." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 964 (9th Cir. 2010).

## V.    The Clean Air Act Preempts Vermont's Law.

"[S]tate and local laws that conflict with federal law are 'without effect.'" *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103–104 (2d Cir. 2010) (quoting *Altria Group, Inc.,* 555 U.S. at 76). Federal statutes can expressly or impliedly preempt state statutes in multiple ways. *Kansas v. Garcia*, 589 U.S. 191, 203 (2020). Sometimes a federal statute is so comprehensive that

it excludes all State regulation on the subject, creating field preemption. *See English v. Gen. Elec. Co.,* 496 U.S. 72, 78–79 (1990) (describing field preemption). And even when a statute is not so comprehensive as to regulate an entire field, it will still preempt State statutes if they cannot "consistently stand together." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006).

As the States explained in their opening brief, the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, is a comprehensive and carefully crafted statute that governs the emission of air pollution, including air pollution between States. The Act directs the EPA to set air-quality standards, 42 U.S.C. §§ 7408–7410, regulate emissions from stationary sources, *id.* § 7411(b)(1)(A), and regulate emissions from motor vehicles, *id.* § 7521(a)(1). And in *Massachusetts v. EPA*, the Supreme Court held that the Clean Air Act authorized EPA to regulate greenhouse gases as a category of "air pollutant[s]," 549 U.S. at 528–29. EPA later exercised that authority. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 308 (2014).

This scheme does not leave room for State regulation of out-of-State emissions. The Clean Air Act preempts Vermont's Climate Superfund Act under both a field-preemption theory and a conflict-preemption theory.

### A. The Clean Air Act Preempts the Entire Field of Interstate Air Pollution.

If Congress enacts a statute that evinces an intent to occupy an entire field, then States can't regulate within that field. "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive ... that Congress left no room for the States to supplement it' or where there is a 'federal interest ... so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Rice*, 331 U.S. at 230). "[I]n substance, field preemption does not involve

congressional commands to the States. Instead, like all other forms of preemption, it concerns a clash between a constitutional exercise of Congress's legislative power and conflicting state law." *Murphy v. NCAA*, 584 U.S. 453, 479 (2018).

The Clean Air Act is a "comprehensive statutory scheme" that leaves no room for State regulation outside of the statute. *City of New York*, 993 F.3d at 99. The Second Circuit described the Clean Air Act as "comprehensive" for a good reason. It covers a wide variety of air pollutants from a wide variety of sources. And it has been repeatedly amended to ensure that the regulations are finely tuned. See, *e.g.*, Clean Air Act Amendments, Pub. L. 95–96, 91 Stat. 685 (1977); Clean Air Act Amendments**,** Pub. L. 101–549, 104 Stat. 2468 (1990). This comprehensive statutory scheme "anoints the EPA as the 'primary regulator of [domestic, interstate] greenhouse gas emissions.'" *City of New York*, 993 F.3d at 99 (quoting *AEP*, 564 U.S. at 428). States must respect that decision and work within the confines of the Clean Air Act if they wish to regulate interstate emissions.

Defendants raise a bevy of counterarguments, some specific to the Clean Air Act and some repeated for the umpteenth time.

In the latter category is their argument that the Climate Superfund Act has nothing to do with greenhouse-gas emissions, so the Clean Air Act does not preempt it. The States have already made their position clear: the Act creates liability based on greenhouse-gas emissions across State lines. Its retroactivity does not change the calculus.

In the former category, the Defendants contend that field preemption cannot apply because of the Clean Air Act's State-rights and citizen-suit savings clauses. Those clauses together allow States to impose limitations stricter than those required by EPA *within their own jurisdiction*. *Id.*; *see Bell v. Cheswick Generating Station*, 734 F.3d 188, 195–96 (3d Cir. 2013); *Ouellette*, 479 U.S.

at 497. But these clauses only strengthen the case for preemption. Congress knew that without specifically allowing States to apply more stringent standards within their own borders, the Clean Air Act would have prevented them from doing so. The logical inference is thus that the Clean Air Act has a broad preemptive effect outside of these clauses, ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107–11 (2012) (explaining the negative-implication canon). And the Act doesn't fall into either clause.

The Supreme Court's analysis of the Clean Water Act in *Ouellette* also won't save the Act. Vermont Response Br. at 17 n.11. Nothing in *Ouellette* prohibits courts from looking to the federal common law to help determine the preemptive scope of the statute that displaces it. Courts routinely look to the common law to determine the meaning of statutes. Indeed, there is an interpretive canon that counsels against reading statutes to change the common law unless the text explicitly says so. *See* Scalia & Garner, *supra*, at 318–19.

## B. The Vermont Climate Superfund Act Conflicts With the Clean Air Act.

Even if this Court concludes that the Clean Air Act does not occupy the entire field of interstate air pollution, Vermont's Climate Superfund Act is still preempted because it "frustrate[s] … federal interests" in a manner inconsistent with "the text and structure of the statute at issue." *Garcia*, 589 U.S. at 208, 212 (quotation marks omitted).

Congress made an "informed assessment of competing interests" when it passed and repeatedly amended the Clean Air Act. *AEP*, 564 U.S. at 427. The Act protects our air by, among other things, setting targets on how much pollution can be present and imposing limits on pollution. 42 U.S.C. §§ 7408–7410. The Act also seeks "to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution," 42 U.S.C. § 7401(b)(2), often, through the use of technology-forcing standards, *West Virginia v. EPA*, 597

U.S. 697, 708, 726–27 (2022); Wendy E. Wagner, *The Triumph of Technology-Based Standards*, 2000 U. ILL. L. REV 83, 84 n.4 (1999). In addition to these substantive goals, the Clean Air Act respects federalism by declaring that "air pollution control *at its source* is the primary responsibility of States and local governments," 42 U.S.C. § 7401(a)(3) (emphasis added), and reserving States' discretion to create their own implementation plans within the CAA framework, *id.* § 7411(d).

Allowing States to impose retroactive, extraterritorial strict liability based on contributions to carbon emissions would scuttle Congress' "carefully drawn" regulatory scheme. *City of New York*, 993 F.3d at 100 (quoting *Ouellette*, 479 U.S. at 494). Instead of EPA serving as the "primary regulator of [domestic] greenhouse gas emissions,'" *id.* at 99 (quoting *AEP*, 564 U.S. at 428), States would assume that role by linking greenhouse-gas emissions to billions of dollars in liability. EPA's carefully calibrated regime of regulation would be substituted for an *ad hoc* regime of risk avoidance from all manner of places (similar to the way product-liability law often operates). Yet the entire supposition of the Clean Air Act is that the best way to control pollution is at its source through the setting of standards, such as the NAAQS, New Source Standards, or Existing Source Standards. 42 U.S.C. § 7401(a)(3). To be sure, the Clean Air Act sometimes contemplates that States can encourage or require emitters to reduce emissions by more than what the EPA demands, but States may only do so for those who emit *within their borders*. And by allowing States to increase the level of regulation in their own borders, the Clean Air Act implicitly prohibits them from taking actions that will reduce emissions from sources in *other* states beyond EPA's regulatory levels.

Defendants once again sing the familiar refrain that the Climate Superfund Act has nothing to do with emissions. But once again, the Act is designed to remedy harms allegedly caused by

emissions, and applying billions and billions of dollars in liability to producers of traditional fuels will alter the incentives to emit.  The simple act of extraction is not claimed to harm Vermonters in any way; it's the later act of *using* the extracted resources that matters—even although Vermont has creatively focused on extraction to avoid having Vermonters pay directly. "[A]rtful" attempts to evade federal law do not work. *City of New York*, 993 F.3d at 91. The Act establishes liability for contributions to "covered greenhouse gas" emissions. 10 VT. STAT. ANN. § 598(b). And "[t]he obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012) (quoting *San Diego Bldg.*, 359 U.S. at 247). New York made an identical argument in *City of New York*, and the Second Circuit rejected it. Although "the City [wa]s not expressly seeking to impose a standard of care or emission restrictions," it would nonetheless influence the actions of the producers it sought to hold liable. 993 F.3d at 93.

Vermont also argues that *Oullette* is off point because it was concerned about the "serious interference with" the "purposes and objectives" of the Clean Water Act that would occur if States could "impose separate discharge standards on a single point source." Vermont Response Br. at 20 (quoting *Oullette*, 479 U.S. at 493). Because this case does not involve a point source, Vermont believes *Oullette*'s reasoning does not apply. But the concern about multiple standards applying to the same activity is present all the same here. If Vermont can force the owners of an oil well in Texas to pay for the harm (allegedly) caused by the emissions in Vermont, then every other State could do the same. A single well could be subject to dozens of compensatory schemes, making it impossible to determine whether that well would be an economically viable investment before being drilled. *Oullette* was concerned with multiple States attempting to assert jurisdiction over the same activity, which is exactly what Vermont claims can happen.

The Clean Air Act thus preempts the Climate Superfund Act, too.

**VI.    The States are Entitled to Permanent Injunctive Relief.**

The States are entitled to a permanent injunction. For a party to be entitled to a permanent injunction, it "must satisfy a four-factor test before a court may grant such relief." *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 160–61 (2d Cir. 2012) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)). The court must analyze whether the plaintiff has 1) "suffered an irreparable injury," 2) whether "remedies available at law" are "inadequate," 3) whether the "balance of hardships" favors an injunction, and 4) and whether "the public interest would not be disserved by a permanent injunction." *eBay Inc.*, 547 U.S. at 391; *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–13 (1982).

The States satisfy each of these factors, and Defendants do not even bother contesting them. First, the Climate Superfund Act inflicts irreparable injury for which damages are inadequate. A violation of the Constitution creates an irreparable injury. *Conn. Dep't of Env't Prot. v. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004) ("[T]he alleged violation of a constitutional right triggers a finding of irreparable injury." (quoting *Conn. Dep't of Env't Prot. v. OSHA*, 138 F. Supp. 2d 285, 291 (D. Conn. 2001))); *Statharos v. N.Y.C. Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) (same). And because "invasions of state sovereignty . . . likely cannot be economically quantified, they "cannot be monetarily redressed." *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (quoting *Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (2022)). Likewise, "the inversion of the federalism principles enshrined in the Clean Air Act" and the federal common law constitute "irreparable injury." *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016). The Climate Superfund Act threatens those sovereign interests and more with no way for the States to recoup their direct losses and the losses of their citizens. *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010); *New York ex*

47

*rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 661 (2d Cir. 2015). Without an injunction, "it becomes difficult, and sometimes virtually impossible, for a court to 'unscramble the eggs.'" *Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 483 F.2d 247, 250 (2d Cir. 1973) (citation omitted). Because injuries to large numbers of people are so difficult to remedy after the fact, federal courts routinely grant injunctions to stop widespread harms to the citizens of a plaintiff State. *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 258 (1972) (collecting cases).

The balance of hardship and the public interest also favor relief. "The Government does not have an interest in the enforcement of an unconstitutional law." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (citation omitted); *see also United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019) (same for preemption). Once this Court decides the Climate Superfund Act is illegal, it follows that enforcing the law contravenes the public interest.

What do Defendants have to say in response? Nothing. They fail to even brief the standard for a permanent injunction and thus forfeit any argument that the States are not entitled to an injunction prohibiting them from enforcing the Climate Superfund Act. *See Gross v. Rell*, 585 F.3d 72, 95 (2d Cir. 2009); *Gov't Employees Ins. Co. v. Strut*, 758 F. Supp. 3d 140, 148–49 (W.D.N.Y. 2024) (holding that a party waived its argument concerning the preliminary-injunction factors by failing to raise it).

## CONCLUSION

The Climate Superfund Act disrespects federal supremacy over interstate emissions and States' authority over activities within their own borders.  The Court should thus grant the States summary judgment and enjoin its enforcement.

Dated: December 15, 2025

/s/ Michael W. Kirk
Michael W. Kirk*
Adam P. Laxalt*
Megan M. Wold*
Brian W. Barnes*
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C., 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
mkirk@cooperkirk.com
alaxalt@cooperkirk.com
mwold@cooperkirk.com
bbarnes@cooperkirk.com

/s/ Brady C. Toensing
Brady C. Toensing
diGenova & Toensing
1775 Eye Street NW
Suite 1150
Washington, DC 20006
(202) 297-4245
Brady@digtoe.com

Respectfully submitted,

JOHN B. MCCUSKEY
ATTORNEY GENERAL OF WEST VIRGINIA

/s/ Michael R. Williams
Michael R. Williams*
  Solicitor General
Caleb B. David*
  Deputy Solicitor General
Spencer J. Davenport*
  Assistant Solicitor General

Office of the Attorney General
of West Virginia
State Capitol Complex
Building 1, Room E-26
1900 Kanawha Blvd. E
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov
caleb.a.david@wvago.gov
spencer.j.davenport@wvago.gov

*Counsel for State of West Virginia*

STEVE MARSHALL
  ATTORNEY GENERAL OF ALABAMA

/s/ Robert M. Overing
Robert M. Overing*
  Deputy Solicitor General

Office of the Attorney General
of Alabama
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
Robert.Overing@AlabamaAG.gov

*Counsel for State of Alabama*

STEPHEN J. COX
  ATTORNEY GENERAL OF ALASKA

/s/ Thomas Mooney-Myers
Thomas Mooney-Meyers*
  Assistant Attorney General

Alaska Department of Law
1031 W. 4th Ave., Ste. 200
Anchorage, AK 99501
(907) 269-5100
thomas.mooney-myers@alaska.gov

*Counsel for State of Alaska*

TIM GRIFFIN
  ATTORNEY GENERAL OF ARKANSAS

/s/ Autumn Hamit Patterson
Autumn Hamit Patterson*
  Solicitor General

Office of the Arkansas Attorney General
323 Center St., Suite 200
Little Rock, AR 72201
(501) 682-3661
Autumn.Patterson@Arkansasag.Gov

Counsel for the State of Arkansas

CHRISTOPHER M. CARR
  ATTORNEY GENERAL OF GEORGIA

Stephen J. Petrany
  Solicitor General

/s/ Elijah O'Kelley
Elijah O'Kelley*
  Assistant Solicitor General

Office of the Attorney General of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334
(470) 816-1342
eokelley@law.ga.gov

Counsel for State of Georgia

THEODORE E. ROKITA
  ATTORNEY GENERAL OF INDIANA

/s/ James A. Barta
James A. Barta*
  Solicitor General

Indiana Attorney General's Office
IGCS – 5th Floor
302 W. Washington St.
Indianapolis, IN 46204
(317) 232-0709
james.barta@atg.in.gov

JAMES UTHMEIER
  ATTORNEY GENERAL OF FLORIDA

Jeffrey Paul DeSousa*
  Acting Solicitor General

/s/ Christine Pratt
Christine Pratt (FBN 0100351)*
  Assistant Solicitor General

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
christine.pratt@myfloridalegal.com

Counsel for State of Florida

RAÚL R. LABRADOR
  ATTORNEY GENERAL OF IDAHO

/s/ Michael A. Zarian
Michael A. Zarian #12418ID*
  Deputy Solicitor General

Office of the Idaho Attorney General
700 W. Jefferson St., Suite 210,
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
michael.zarian@ag.idaho.gov

Counsel for the State of Idaho

BRENNA BIRD
  ATTORNEY GENERAL OF IOWA

/s/ Eric H. Wessan
Eric H. Wessan*
  Solicitor General

1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)

*Counsel for State of Indiana*

KRIS W. KOBACH
  ATTORNEY GENERAL OF KANSAS

LIZ MURRILL
  ATTORNEY GENERAL OF LOUISIANA

ANDREW BAILEY
  ATTORNEY GENERAL OF MISSOURI

AUSTIN KNUDSEN
  ATTORNEY GENERAL OF MONTANA

/s/ *Christian B. Corrigan*
Christian B. Corrigan*
  *Solicitor General*
Peter M. Torstensen, Jr.
  *Deputy Solicitor General*

Montana Department of Justice
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Counsel for State of Montana*

DREW H. WRIGLEY
  ATTORNEY GENERAL OF NORTH DAKOTA

/s/ *Philip Axt*
Philip Axt*
  *Solicitor General*

600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Phone: (701) 328-2210
Email: pjaxt@nd.gov

*Counsel for the State of North Dakota*

GENTNER DRUMMOND

eric.wessan@ag.iowa.gov

*Counsel for State of Iowa*

RUSSELL COLEMAN
  ATTORNEY GENERAL OF KENTUCKY

/s/ *Victor B. Maddox*
Victor B. Maddox (KBA No. 43095)*
Jason P. Woodall (KBA No. 95013)*

Kentucky Office of the Attorney General
310 Whittington Parkway, Suite 101
Louisville, KY 40222
(502) 696-5300
Victor.Maddox@ky.gov
Jason.Woodall@ky.gov

*Counsel for Commonwealth of Kentucky*

MICHAEL T. HILGERS
  ATTORNEY GENERAL OF NEBRASKA

/s/ *Zachary A. Viglianco*
Zachary A. Viglianco*
  *Acting Solicitor General*

Nebraska Department of Justice
2115 State Capitol
Lincoln, Nebraska 68509
Tel.: (402) 471-2683
Fax: (402) 471-3297
zachary.viglianco@nebraska.gov

*Counsel for State of Nebraska*

DAVE YOST
  ATTORNEY GENERAL OF OHIO

/s/ *Mathura J. Sridharan*
Mathura J. Sridharan*
  *Solicitor General*

30 East Broad Street, 17th Floor
Columbus, Ohio 43215

51

ATTORNEY GENERAL OF OKLAHOMA

*/s/ Garry M. Gaskins, II*
Garry M. Gaskins, II*
  *Solicitor General*

Office of the Attorney General of
Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for State of Oklahoma*

MARTY J. JACKLEY
  ATTORNEY GENERAL OF SOUTH DAKOTA

*/s/ Jonathan Van Patten*
Jonathan Van Patten*
  *Assistant Attorney General*

South Dakota Attorney General's Office
1302 E. Highway 14, Suite 1
Pierre, South Dakota 57501
Telephone: 605-773-3215
E-mail: jonathan.vanpatten@state.sd.us

*Counsel for State of South Dakota*

KEN PAXTON
  ATTORNEY GENERAL OF TEXAS

Brent Webster
*First Assistant Attorney General*

Ralph Molina
*Deputy First Assistant Attorney General*

Ryan D. Walters
*Deputy Attorney General for Legal Strategy*

/s/ Ryan G. Kercher
Ryan G. Kercher*
  Chief, Special Litigation Division

614-466-8980
614-466-5087 fax
mathura.sridharan@ohioago.gov

*Counsel for the State of Ohio*

ALAN WILSON
  ATTORNEY GENERAL OF SOUTH CAROLINA

*/s/ J. Emory Smith, Jr.*
J. Emory Smith, Jr.*
  *Solicitor General*

Office of the Attorney General of
South Carolina
Post Office Box 11549
Columbia, South Carolina 29211
(803) 734-3680
esmith@scag.gov

*Counsel for State of South Carolina*

JONATHAN SKRMETTI ATTORNEY GENERAL
AND REPORTER OF TENNESSEE

*/s/ James M. Rice*
James M. Rice*

Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 532-6026
matt.rice@ag.tn.gov

*Counsel for State of Tennessee*

DEREK E. BROWN
  ATTORNEY GENERAL OF UTAH

*/s/ Gary T. Wight*
Gary T. Wight (Utah Bar No. 10994)*
  *Assistant Attorney General*

52

Texas Bar No. 24060998

Kathleen Hunker\*
  *Deputy Chief, Special Litigation Division*
Tex. State Bar No. 24118415

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Ryan.Kercher@oag.texas.gov
Kathleen.hunker@oag.texas.gov

Counsel for State of Texas

KEITH G. KAUTZ
  ATTORNEY GENERAL OF WYOMING

*/s/ Ryan Schelhaas*
Ryan Schelhaas\*
  *Chief Deputy Attorney General*

Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

*Counsel for State of Wyoming*

\*admitted *pro hac vice*

1594 West North Temple, Suite 300
Salt Lake City, Utah 84116
(801) 538-7227
gwight@agutah.gov

*Counsel for State of Utah*

53

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of December, 2025, Plaintiff States's Reply in Support of Motion for Summary Judgement and Response in Opposition to Defendants Motions for Summary Judgment was served on Defendants' counsel via CM/ECF system that will forward copies to all Counsel of Record.

*/s/ Michael W. Kirk*
Michael W. Kirk

*Attorney for Intervenor States*
