# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA and AMERICAN PETROLEUM INSTITUTE,** | |
| *Plaintiffs,* | Civil Action No. 2:24-cv-01513 |
| And | |
| **STATE OF WEST VIRGINIA**, et al. | |
| *Intervenor-Plaintiffs,* | |
| v. | |
| **JULIE MOORE**, *et al.*, | |
| *Defendants,* | |
| And | |
| **NORTHEAST ORGANIC FARMING ASSOCIATION OF VERMONT and CONSERVATION LAW FOUNDATION**, | |
| *Intervenor-Defendants.* | |

## DECLARATION OF BENJAMIN ZYCHER IN SUPPORT OF INTERVENOR STATES' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

I, Benjamin Zycher, having personal knowledge declare that:

1.     I am a senior fellow at the American Enterprise Institute, where my expertise is energy and environmental policy.  I am also a member of the board of trustees of the Foundation for Research in Economics Education at the University of California, Los Angeles, and a member of the editorial advisory board of the journal *Regulation*.  I have held teaching roles in academia, including at the University of California, Los Angeles (1985-2000), and research positions at private research institutions, including the RAND Corporation (1985-1991 and 1998-2004) and the California Institute of Technology (1983-1985); and served for two years in the Executive Office of the President as a senior staff economist at the Council of Economic Advisers (1981-83), and in the State Department, with the Office of Economic Analysis, Bureau of Intelligence and Research (2010-12).

2.     I hold a Ph.D. in economics from the University of California, Los Angeles, and a master's degree in public policy, from the University of California, Berkeley.

3.     This declaration is done in my personal capacity and reflects neither the views of the American Enterprise Institute nor any current or previous employer or organization with which I have been affiliated, including those listed above.

4.     I have reviewed the following: Karen Perry Decl. (Sept. 12, 2025) (Arkansas); Karl Boston Decl. (Sept. 8, 2025) (South Carolina); Kenneth H. Yoakum Decl. (Sept. 9, 2025) (West Virginia); Kenneth Huston Decl. (Sept. 8, 2025) (Idaho); Kirk E. Grable Decl. (Sept. 15, 2025) (Indiana); Lee Wilkinson Decl. (Sept. 11, 2025) (Iowa); Leslie Savage Decl. (Sept. 12, 2025) (Texas); Mark Futrell Decl. (Sept. 12, 2025) (Florida); Matthew Irby Decl. (Sept. 11, 2025) (West Virginia); Matthew Sachse Decl. (Sept. 12, 2025) (Wyoming); Nathan Anderson Decl. (Oct. 3, 2025) (N.D.); Nathan Oliver Decl. (Sept. 8, 2025) (Indiana); Nolan Wiggins Decl. (Sept. 12, 2025) (South Carolina); Brian Renner Decl. (Sept 9, 2025) (Indiana); John Rogers Decl. (Sept. 12, 2025) (Utah); Jazzmin Randall Decl. (Sept. 8, 2025) (Georgia); Jason Wolfe Decl. (Sept. 11, 2025) (Wyoming); Jason Glass Decl. (Sept. 9, 2025)

(Kentucky); Nicholas W. Hayman Decl. (Sept. 10, 2025) (Oklahoma); Eric Russell Peate Decl. (Sept. 9, 2025) (Florida); Greg Bright Decl. (Sept. 15, 2025) (Indiana); Gregory A. Sorrels Decl. (Sept. 10, 2025) (Indiana); David Osburn Decl. (Sept. 11, 2025) (Oklahoma); Christopher Thacker Decl. (Sept. 12, 2025) (Kentucky); Christopher Ayotte Decl. (Sept. 15, 2025) (Nebraska); Paul M Bowling Decl. (Sept. 11, 2025) (Indiana); Paul Woods Decl. (Sept. 10, 2025) (Idaho); Robert Kilpatrick Decl. (Sept. 12, 2025) (West Virginia); Scott A. Adkins Decl. (Sept. 8, 2025) (West Virginia); Sherry Queen Decl. (Sept. 15, 2025) (Indiana); Amanda McGraw Decl. (Sept. 8, 2025) (Tennessee); Andrew Kuhlmann Decl. (Sept. 12, 2025) (Wyoming); Stefanie Higgins Decl. (Sept. 11, 2025) (Florida); Tabetha Mallonee Decl. (Sept. 10, 2025) (Kansas); Todd Cockrill Decl. (Sept. 12, 2025) (Arkansas); Trent A. Campell Decl. (Sept. 11, 2025) (Oklahoma); Documents 102-40, 102-41, 102-42, 102-43, 102-44 filed Sept. 15, 2025; Index of Exhibits to Motion for Summary Judgment Dated Sept. 16, 2025; Don Fullerton Decl. (Nov. 17, 2025); Vijay Swarup Decl. (Sept. 11, 2025); and Dustin Meyer Decl. (Sept. 10, 2025).

**Summary**.

5. The Vermont Climate Superfund Act (VCSA) will reduce investment in and production of fossil fuels, and thus will increase the prices for such fuels paid by consumers, including state government agencies delivering government services to their respective residents.

6. This is true even if foreign producers increase their output to compensate fully for the decline in U.S. production.

7. Market forces — investors, producers, and consumers — will not view the VCSA, and similar legislation enacted or considered by other states, as a "one-time fixed cost based on past behavior."

8. Similarly, market forces will not view "each assessment [by the Agency of Natural Resources] [as] a fixed cost" that "does not vary with

or depend upon any current or future decision the [fossil energy producer] makes about the output to produce," with "no effect on the marginal cost of production and no direct effect on market price."

9. The penalties to be imposed upon fossil energy producers for the greenhouse gas (GHG) emissions attendant upon their extraction and/or refining of fossil fuels between 1995 and 2024 may be viewed narrowly as "fixed cost[s] based on past behavior."

10. But market forces will not view the penalties as "one-time." That is, they will view the likelihood that they will be repeated to be substantially greater than zero:

(a) The VCSA creates a "Climate Superfund Cost Recovery Program Fund" to "provide funding for climate change adaptation projects in the State" with an extensive list of project categories eligible for such funding.

(b) The *Vermont State Climate Spending: FY25 and Beyond* report states explicitly that because of the prospect of a substantial reduction in federal funding for "climate action," "**new funding sources will be necessary** if we want to continue to advance at the pace and scale needed to meet our climate goals." (**emphasis** in the original)

(c) The Vermont State Treasurer, Mike Pieciak, campaigned for that elected office on an explicit platform of "working to … address climate change." By "address[ing] climate change," he cannot have meant a reduction in Vermont GHG emissions; those are vastly too small to affect climate phenomena. He clearly means programs and projects similar to those to be created under the VCSA.

(d) Whether the State Treasurer seeks reelection to that position or election to another office, his central political incentive is to maximize the total amount that the fossil energy producers must pay, so as to maximize the direct and indirect payments to the constituencies benefiting from the various climate change adaptation projects.

(e) Because the spending programs to be financed under the VCSA are very likely to last longer than the State Treasurer's tenure in that office, his incentive is to maximize the penalties during that tenure at

4

the expense of revenues in the longer term, which would accrue to the political benefit of his successor.

(f) Even if the State Treasurer has no intention to seek reelection to that office or election to another office, market forces will view those likelihoods as greater than zero and thus that a maximization of the penalties will be pursued with a likelihood greater than zero.

(g) That dynamic will be strengthened because other elected officials — the Vermont Legislature — with their own political aspirations and policy goals enacted the VCSA. These market expectations will be increased by such statements as that from the Vermont Senate Majority Leader: "It's gonna cost a bomb. Billions and billions of dollars."

(h) No fossil energy producers to be penalized under the VCSA are located in Vermont, a condition that strengthens the central political incentives summarized in subparagraphs (10d-10g) above.

(i) Accordingly, market forces will view the attendant growth of the constituencies benefiting from the spending funded under the VCSA as inexorable, with an attendant increase in the likelihood that the VCSA will not prove to be a "one-time" policy.

11.    In short, the political implications of the spending programs created by the VCSA — the creation and expansion of numerous constituencies — mean that the market will view the VCSA as a policy that will be repeated with a likelihood greater than zero, rather than as a "one-time" exercise.

12.    Adverse effects on fossil energy investment, production and prices are virtually certain because the spending requirements specified in the VCSA will create and/or expand constituencies with strong interests in long run preservation or expansion of the spending programs.

13.    It is not correct to argue that the VCSA "has no definitive indirect effect on prices through changes in the expectations … about future liability" on the grounds that "no such hypothesis has been validated by evidence" and that "no empirical model has provided definitive evidence" about how such expectations are formed.

14.    That argument is a distraction from the central issue: New (or expanded) spending programs create or expand constituencies, an obvious and incontrovertible political effect that must shape expectations about the evolution of future policy.

15.    This central conclusion — that the market will view the likelihood of a future repeat of the VCSA as greater than zero is not "speculative." It is a conclusion driven by incontrovertible economic and political analysis.

16.    It is the "one-time" hypothesis that is so speculative as to be not credible.

17.    That similar legislation has been enacted or is being considered in at least eleven other states strengthens this market expectation.

18.    The penalties to be imposed by the VCSA would reduce the profitability of investment in fossil energy output, and thus would yield an increase in the price of fossil energy, whether by an amount large or small, regardless of the specific numerical assumptions applied to the analysis.

19.    For states imposing severance taxes computed on a production basis, an increase in the severance tax rate would be very likely to yield a reduction in the present value of the stream of severance tax revenues.

20.    The increases in fossil energy prices would be observed quickly, because of the incentives driving the market allocation of natural resources over time.

21.    The resulting increases in the cost of fuels consumed in the delivery of state services will be substantial for state agencies in a large number of states.

22.    Application of the U.S. Environmental Protection Agency climate model shows that the global temperature effect of greenhouse gas emissions from all U.S. natural gas and petroleum systems — a category much broader than the producers subject to the penalties specified in the VCSA — is about 0.009 degrees C, that is, nine one-

thousandths of a degree. That impact is not detectable given the normal variability of the surface temperature record.

23.    Accordingly, the stated rationale underlying the VCSA — that the fossil energy producers subject to the penalties specified in the VCSA are responsible for the purported damages in Vermont caused by anthropogenic climate change — is preposterous.

24.    That the VCSA is little more than a tool created by the legislature with which to obtain substantial amounts of new revenues — a classic "money grab" — at the expense of other states' economies is a premise vastly more supportable.

## **Introduction**.

25.    This declaration discusses the following topics:

(a) Market forces — investors, producers, and consumers — will not view the VCSA, and similar legislation enacted or considered by other states, as a "one-time fixed cost based on past behavior" or as a policy with "no effect on the marginal cost of production and no direct effect on market price."

(b) The VCSA will have the effect of reducing investment in and the production of U.S. fossil fuels, forcing fuel prices upward, even if foreign production compensates fully for the reduction in U.S. production.

(c) The attendant increase in fuel costs, even if difficult to distinguish from all other factors affecting fuel costs, will take effect quickly.

(d) The economic costs resulting from those higher fuel costs to be borne by state agencies in a large number of states will be substantial.

(c) Application of the U.S. Environmental Protection Agency (EPA) climate model applied to greenhouse gas (GHG) emissions from extraction and refining of fossil fuels by U.S. producers demonstrates that the producers targeted by the VCSA cannot have caused the purported damages assumed in the VCSA.

**Section 1: The assertions that the penalties to be imposed by the VCSA — a "one-time fixed cost based on past behavior" or a policy with "no effect on the marginal cost of production and no direct effect on market price" — will not affect future investment and production are not correct.**

26.    In *Chamber of Commerce v. Moore*, No. 2:24-cv-1513 (D. Vt.), economists Joseph E. Stiglitz *et. al.* as *amici curiae* submitted a Brief arguing that the VCSA — "imposes a one-time retrospective payment on a small set of fossil fuel companies" and that "[t]hese one-time assessments are classic 'fixed costs'" and therefore will not affect perceived production costs and market prices prospectively.[1]

27.    Similarly, in a Declaration in the same case, Don Fullerton, Ph.D., asserts that the VCSA will have "no effect on the marginal cost of production and no direct effect on market price."[2]

28.    Those arguments are not correct because of the spending requirements specified in the law.

29.    The VCSA creates a Climate Superfund Cost Recovery Program"[3] and directs the State Treasurer to calculate the total "cost to the state of Vermont and its residents" from "the emission of covered greenhouse gases during the covered period."[4]

30.    The VCSA establishes a Climate Superfund Cost Recovery Program Fund into which the penalties paid by the affected fossil energy producers are to be deposited.[5]

31.    The Program Fund is to be used to "provide funding for climate change adaptation projects in the State."[6]

---

[1] ECF No. 89.

[2] Don Fullerton Decl. (Nov. 17, 2025), paragraph 1 *supra.*, at 4.

[3] See VCSA at § 597(1).

[4] See VCSA at § 598(b) and § 599(c).

[5] See VCSA Act at § 598(h).

[6] See VCSA at § 599(a).

32.  The definition of such projects is expansive: projects "designed to respond to, avoid, moderate, repair, or adapt to negative impacts caused by climate change and to assist human and natural communities, households, and businesses in preparing for future climate-change-driven disruptions[,] … includ[ing] implementing nature-based solutions and flood protections; home buyouts; upgrading stormwater drainage systems; making defensive upgrades to roads, bridges, railroads, and transit systems; preparing for and recovering from extreme weather events; undertaking preventive health care programs and providing medical care to treat illness or injury caused by the effects of climate change; relocating, elevating, or retrofitting sewage treatment plants and other infrastructure vulnerable to flooding; installing energy efficient cooling systems and other weatherization and energy efficiency upgrades and retrofits in public and private buildings, including schools and public housing, designed to reduce the public health effects of more frequent heat waves and forest fire smoke; upgrading parts of the electrical grid to increase stability and resilience, including supporting the creation of self-sufficient microgrids; and responding to toxic algae blooms, loss of agricultural topsoil, crop loss, and other climate-driven ecosystem threats to forests, farms, fisheries, and food systems[.][7]

33.  It is incontrovertible that spending programs create constituencies interested in a continuation and increase in such spending. Such constituencies comprise both the producers of the goods and services, in the case of the VCSA those financed with the revenues derived from the penalties specified in the VCSA, and the direct and indirect population groups benefiting from the provision of those goods and services.

34.  Stiglitz himself points out that "the political process is shaped by special interests, and the programs that emerge reflect those special interests typically more than the rhetoric that is used to justify them."[8]

---

[7] See VCSA at § 596(2).

[8] See Joseph E. Stiglitz and Jay K. Rosengard, *Economics of the Public Sector*, fourth edition, New York: W.W. Norton, 2015, p. 293, at https://perma.cc/ZX88-HEKN.

35.   That concentrated interest groups drive the creation, continuation, and growth of spending programs is a central observation of modern public choice analysis.[9]

36.   The obvious implication of this special-interest spending dynamic is straightforward: Market forces — investors, producers, and consumers — will not view the VCSA as a "one-time fixed cost based on past behavior" or as a policy that will have "no effect on the marginal cost of production and no direct effect on market price."

37.   More rigorously: Market forces will not view the likelihood that the VCSA will prove a "one-time fixed cost based on past behavior" or as a policy that will have "no effect on the marginal cost of production and no direct effect on market price" as certain.

38.   Instead, market forces will view the likelihood of a repeat of the VCSA perhaps with a different total penalty, as greater than zero, whether high or low.

39.   This perceived likelihood of additional future penalties means that investment in the discovery and production of fossil fuels will be lower than otherwise would be the case, again whether by amounts large or small.

40.   This reduction in investment means that prices will be higher than otherwise would be the case.

41.   This dynamic effect on future fossil energy production and prices will be strengthened by the fact that a number of other states — New York, California, Connecticut, Hawaii, Maine, Massachusetts,

---

[9] See, e.g., Dennis C. Mueller, *Public Choice III*, Cambridge: Cambridge University Press, 2003, pp. 472-500. See also Mancur Olson, *The Logic of Collective Action: Public Goods and the Theory of Groups*, Cambridge: Harvard University Press, 1971. For a summary discussion of why government grows inexorably, see Benjamin Zycher, "State and Local Spending: Do Tax and Expenditure Limits Work?" monograph, American Enterprise Institute, May 2013, pp. 42-45, at https://perma.cc/DU9M-LUVW.

Maryland, New Jersey, Oregon, Rhode Island, Tennessee, and Virginia — have enacted or are considering legislation similar to the VCSA.[10]

## Section 2: The VCSA will have the effect of reducing investment in U.S. fossil fuel production, forcing fuel costs upward.

42.  The International Energy Agency reports U.S. capital investment in ""fossil fuel supply" during 2024 at about $206 billion.[11] That figure includes activities in addition to extraction and refining — the production activities specified in the VCSA — so that the following discussion is biased downward in terms of the quantitative effect of the VCSA on investment incentives in the extraction and refining subsectors because the VCSA penalties will be higher proportion of investment in extraction and refining than in overall fossil fuel supply.

43.  As an illustration, assume that (a) the VCSA penalty assessments sum to $1 billion per year over the specified nine-year period, or $9 billion in total to be spent over, say, ten years, or $900 million annually.[12]

44.  *Note that the analytic conclusions presented in this Declaration are independent of any numerical example used to illustrate them.*

45.  Assume also that (a) the $206 billion annual investment would be repeated every year in the absence of the VCSA, and (b) the annual penalty of $1 billion also is repeated every year after the initial 9-year period.[13]

---

[10] See, e.g., *Grist*, "Despite Backlash, More States Are Considering Laws To Make Big Oil Pay For Climate Change," May 19, 2025, at https://perma.cc/9BD7-L2QB.

[11] See International Energy Agency, *World Energy Investment 2025*, at https://perma.cc/9BE4-GCNY.

[12] These assumptions are reasonable or even conservative: The *Vermont State Climate Spending FY25 and Beyond* Report alone contemplates a replacement of lost federal funding of at least $400 million in FY25. In any event, the central analytic principle outlined here is independent of any numerical assumptions used for illustrative purposes.

[13] I assume here that all figures would rise with inflation, so that these numbers are in real (inflation-adjusted) terms.

46.    Under these assumptions, the VCSA would impose an annual "penalty rate" *on the returns to* "fossil fuel supply" investment of about 0.49 percent.[14]

47.    Because investment in extraction and refining is only a part of investment in "fossil fuel supply" — pipeline investment is an example of many others — the penalty rate on extraction and refining would be greater.

48.    Let us apply the standard capital asset pricing model (CAPM) to estimate the effect of a penalty of 0.49 percent on investment in "fossil fuel supply."[15] The Institute for Energy Economics and Financial Analysis reports that fossil fuel stocks earned a return of about 5.7 percent in 2024, continuing a decade-long trend of returns lower than those for the S&P 500 as a whole.[16]

49.    This historical performance to some substantial degree may be a result of U.S. government policies, which may be changing.[17]

---

[14] The penalties imposed by the VCSA are not a tax, but it is useful analytically to think about them in this way.

[15] The capital asset pricing model is defined as $E(R_i) = R_f + \beta_i(E(R_m) - R_f)$, where $E(R_i)$ is the expected return to an investment, $R_f$ is the risk-free rate of return, $\beta_i$ is the systemic risk of the investment relative to the overall market, $E(R_m)$ is the expected market return, and $(E(R_m) - R_f)$ is the market risk premium. See, e.g., Stephen A. Ross, *et. al.*, *Corporate Finance: Core Principles and Applications*, New York: McGraw-Hill Irwin, second edition, 2009, pp. 324-365.

[16] See IEEFA, "Another bad year — and decade — for fossil fuel stocks," January 27, 2025, at https://perma.cc/QPP8-ZKFC. This is not the same as the rate of return to investment in extraction and refining, but such estimates appear to be available only in the specialized financial literature, to which I do not have access. The return to fossil fuel stocks is an unbiased estimate of the return to extraction and refining investments, in part because the latter is an important component of the former.

[17] See The White House, "Unleashing American Energy," Executive Order, January 20, 2025, at https://perma.cc/VF5L-ENZY; and Megan Bland, "4 Strategies the Trump Administration Is Using to Change Energy Policy," National Conference of State Legislatures, July 30, 2025, at https://perma.cc/74ZF-FWBL.

50.    Accordingly, let us assume a longer-run rate of return to investment in fossil fuel extraction and refining of 10 percent.[18] The penalty imposed by the VCSA represents a decline in profitability of 4.9 percent, even under the assumption of no changes in other parameters in the CAPM.[19]

51.    If we assume, conservatively, an "elasticity" of investment in fossil energy production relative to expected returns of only 0.33 — a 4.9 percent reduction in expected profitability reduces capital investment by about 1.6 percent annually — the ensuing effect on output would be about 1.6 percent because the reduction in capital investment results directly in a decline in production capacity.

52.    If we assume, reasonably, a demand elasticity for fossil energy products of 0.5 (in absolute value), a production decline of 1.6 percent would yield a price increase of about 3.2 percent. A demand elasticity of 1.0 — a generous assumption — would yield a price increase of 1.6 percent. Because there cannot persist more than one price for a given good in a given market — in particular for such homogeneous goods as fossil fuels — the price increase would be observed for all producers, both those affected formally by the penalty and those not.

53.    *Again: The analytic conclusions presented in this Declaration are independent of the numerical examples used to illustrate them.*

54.    Note also that similar policies implemented by other states would yield effects in addition to those engendered by the VCSA.

55.    The clear qualitative conclusion does not depend on the particular numerical assumptions incorporated: The VCSA, because it portends

---

[18] For the period 1928-2024, the average annual before-tax return to investment in the Standard and Poor 500, in real (inflation-adjusted) terms was 8.55 percent. For the period 1960-2024, the figure was 7.78 percent. The data on annual returns for several investment alternatives are reported by the Stern School of Management, New York University, at https://perma.cc/R32V-6DMM.

[19] Again this assumption biases downward the estimated effects of the VCSA penalties, in that the prospects of extensions of the VCSA and similar legislation in other states must increase the perceived risks inherent in investment in fossil energy production.

a continuing stream of penalties over time — that is, a likelihood greater than zero of such a continuing stream — guarantees higher prices for fossil energy, whether by amounts large or small.

56. This is true even if increased foreign production compensates fully for the decline in U.S. production: (a) the production shift overseas would increase transportation and such other costs as exchange rate risk; (b) the production shift overseas would increase production costs, because the shift, driven by public policies, would be toward higher-cost producers; and (c) there would be an increase in refining costs because the U.S. refining capital stock is optimized for a particular mix of crude oil types.

57. A 1.6 percent production decline would reduce States' severance tax revenues by 1.6 percent, assuming the States calculate severance taxes based on production. West Virginia, Idaho, Kentucky, Tennessee (coal only), Utah, and Wyoming impose production-based severance taxes.[20] In principle, such states could increase their severance tax rates, but the longer-run effect on investment would be downward, so that the present value of the severance tax revenue stream would be very likely to decline.[21] For both current and future residents of the respective states, it is the present value of the revenue stream that matters.

---

[20] See Irby Decl., ¶ 5 (Sept. 11, 2025); Woods Decl., ¶ 4 (Sept. 10, 2025); Thacker Decl., ¶ 19 (Sept. 12, 2025); McGraw Decl., ¶ 8 (Sept. 8, 2025); Rogers Decl., ¶ 5 (Sept. 12, 2025); Sachse Decl., ¶ 3 (Sept. 12, 2025).

[21] Depending upon the magnitude of the increase in the severance tax rate and the resulting decline in investment in production capacity over time, the present value of the stream of severance tax revenues would be very likely to decline even if such revenues rise in the short run. For the short run — a period of time applicable only to the existing production capital stock — severance tax revenues might rise because the existing capital investments in fossil energy production are fixed costs, and are substantial relative to operating ("variable") costs. In the longer run, all investment is variable; accordingly, an increase in the severance tax rate might yield a decline in investment sufficient in magnitude to result in a decline in the present value of the stream of severance tax revenues even at the higher rate. Buchanan and Lee explain why this outcome is

## Section 3: The attendant increase in fuel costs, even if difficult to distinguish from all other factors affecting fuel costs, will take effect quickly.

58. Because the production and consumption of fossil fuels are "intertemporally substitutable" — they can be produced and consumed during the current time period or a future one — current prices are affected by expected future prices.[22]

59. If future prices are expected to rise above current prices at a rate greater than the market rate of interest, producers have incentives to produce less now and more later in the hope of receiving returns higher than those available by investing current sales revenues.[23]

60. That incentive increases prices during the current time period and reduces expected prices during the future time period.

61. The "equilibrium" expected price path rises, therefore, at the market rate of interest.[24]

62. Accordingly, the price increases to be caused by the VCSA would affect prices quickly, whatever the difficulty of distinguishing this effect from all other relevant factors.

---

likely: Political decisionmakers driven by the short time horizons inherent in the election/political cycle, prefer higher revenues and more spending in the short run at the expense of revenues and spending in the longer run when such spending would yield political benefits for their successors. See James M. Buchanan and Dwight R. Lee, "Politics, Time, and the Laffer Curve," *J. of Political Economy*, Vol. 90, No 4 (August 1982), pp. 816-819, at https://perma.cc/KNM8-S25X; and James M. Buchanan and Dwight R. Lee, "Tax Rates and Tax Revenues in Political Equilibrium: Some Simple Analytics," *Economic Inquiry*, Vol. 20, No. 3 (July 1982), pp. 344-354, at https://perma.cc/USD4-AJZP.

[22] Suppose, for example, slowly-building tensions increase the market expectation of a war and an oil supply disruption in the Middle East, at some future time difficult to predict. Prices would rise immediately even though no supply disruption yet would have occurred.

[23] Suppose the market rate of interest is, say, 5 percent. If oil producers expect prices to rise by more than 5 percent, they have an incentive to leave oil in the ground so as to earn a higher return over time.

[24] See Harold Hotelling, "The Economics of Exhaustible Resources." *The Journal of Political Economy*, Vol. 39 (1931), pp. 137-175.

**Section 4: The attendant economic costs resulting from higher fuel costs to be borne by several states will be substantial.**

63.   Many categories of public services — perhaps most — provided by state governments reasonably can be described as essential, although the levels of provision might be adjustable on the margins. That, say, public safety is an obvious example should be incontrovertible.

64.   Because state legislatures have limited budget resources and virtually unlimited spending demands from innumerable constituencies, the legislatures have powerful incentives to minimize the costs of delivering given spending programs, so that dollars not spent on one constituency can be spent on others.[25]

65.   Accordingly, any argument that higher fossil energy costs can be offset by reducing "waste" as a systematic response is a far more dubious proposition than commonly assumed.

66.   The following Table shows the respective states' (or agencies') consumption of and/or expenditures on motor vehicle fuel for the years shown, according to the respective declarations.

67.   In the interest of brevity, I do not list here the respective states' consumption of electricity generated with fossil fuel power technologies. The principle of substantial consumption and therefore substantial costs to be inflicted by the VCSA is identical. Nor do I list various states' severance tax collections based upon production.

68.   The data shown in the Table demonstrate that the respective states would suffer substantial economic harm from the increase in fossil energy prices attendant upon the VCSA. Under any set of plausible assumptions about the magnitude of those price increases and demand elasticities, states would find themselves spending more for less fossil energy.

---

[25] A given program might be wasteful in that it delivers social benefits lower than the social costs of financing it; but given that the program exists and is maintained by the legislature, the legislature nonetheless has incentives to find the minimum cost of implementing it.

### State Operations Motor Vehicle Consumption/Expenditures
(millions of gallons/dollars)

| State | Consumption/Expenditures | Year | Declaration Source | Date |
|-------|--------------------------|------|--------------------|------|
| WV | 3.1/9.9 | 2024 | Kenneth H. Yoakum | 9/9/2025 |
| KS (AG office) | 0.01/0.03 | 2025 | Tabetha Mallonee | 9/10/2025 |
| GA | 13/43 | 2024 | Jazzmin Randall | 9/8/2025 |
| SC | 3.8/10.6 | FY 2024-5 | K. Boston/N. Wiggins | 9/8,12/2025 |
| FL | na/38.7 | 2024 | Stefanie Higgins | 9/11/2025 |
| IA | 2.8/8.5 | 2024 | Lee Wilkinson | 9/11/2025 |
| KY (Dept Ag) | 0.15/0.4 | FY 2024-5 | Jason Glass | 9/9/2025 |
| WY | 0.5/1.4 | 2024 | Andrew Kuhlman | 9/12/2025 |
| AR (state police) | na/14.4 | FY 2021-5 | Karen Perry | 9/12/2025 |
| IN | 8.4/25.8 | FY 2025 | Nathan Oliver | 9/8/2025 |

Source: Declarations of various State officials, identified in paragraph 4 above, in Case. No. 2.24-cv-1513.
na: Not available in the source listed.

## Section 5: Central Implications of the U.S. Environmental Protection Agency Climate Model.

69.     The VCSA does not impose a tax as a formal matter. Instead, it imposes a strict liability regime for purported damages caused by anthropogenic climate change upon fossil energy producers deemed "responsible for more than one billion [metric] tons of covered greenhouse gas emissions" from extraction and refining operations during the period 1995 through 2024.[26]

---

[26] See VCSA at § 596(8).

70.   Anthropogenic climate change is driven by shifts in atmospheric concentrations of GHG, which are determined by global GHG emissions and other complex factors.[27]

71.   For the period 1995 through 2024, total global GHG emissions were 1,313,295.3 billion metric tons, or 43,776.5 billion metric tons on average annually.[28]

72.   EPA reports that GHG emissions from U.S. "natural gas and petroleum systems" for 1995 to 2022 were a total of about 8.6 billion metric tons, or about 308 million metric tons as an annual average.[29] Let us assume 9.5 billion metric tons in total for 1995 to 2024, and thus about 317 million metric tons on average for the 30-year period. Accordingly, average annual GHG emissions from U.S. natural gas and petroleum systems were about 0.7 percent of average annual global GHG emissions, or about 5.4 percent of total U.S. GHG emissions in 2024.

73.   Let us apply the EPA climate model to estimate the temperature impact of the GHG emissions from U.S. natural gas and petroleum systems.[30] If all such emissions were reduced to zero by 2050, the

---

[27] See, e.g., Robert V. Rohi and Anthony J. Vega, *Climatology*, 4th ed., Burlington: Jones & Bartlett Learning, June 2017, esp. chapters 3, 12, and 14.

[28] See the Emissions Database for Global Atmospheric Research, 2025 Report, Edgar GHG Emissions, at https://perma.cc/7PZC-RYG5.

[29] See the EPA GHG Inventory Data Explorer at https://perma.cc/DX4T-5XN9. EPA lists the components of "natural gas and petroleum systems" at https://perma.cc/UWH5-XP87; as a whole, they are broader than only the extraction and refining of fossil fuels specified in the VCSA. Moreover, GHG emissions from U.S. natural gas and petroleum systems obviously are greater than those only from fossil energy producers deemed "responsible for more than one billion [metric] tons of covered greenhouse gas emissions" from extraction and refining operations during the period January 1, 2000 through December 31, 2024. Both of these differences make the estimated temperature effects, discussed below, of the producers targeted in the VCSA appear far greater than actually would be the case. Accordingly, these two biases are in the appropriate direction; they represent an *a fortiori* orientation.

[30] The EPA climate model — the "Model for the Assessment of Greenhouse Gas Induced Climate Change" (MAGICC) — is at https://perma.cc/J9WS-CYQK; it is the model used by the federal government for all relevant regulatory and similar analyses. The baseline GHG concentration assumption underlying this estimate is a path for the

global temperature impact by 2100, *ceteris paribus*, would be about 0.009 degrees C, that is, about nine one-thousandths of a degree C.[31] Because the standard deviation of the surface temperature record is between 0.08°C and 0.11°C, the temperature impact of GHG emissions from U.S. natural gas and petroleum systems is not detectable.[32]

74.    The same is true *a fortiori* for the fossil energy producers penalized under the terms of the VCSA, because their GHG emissions are much smaller than those from all U.S. natural gas and petroleum systems.

75.    This means that the assumption in the VCSA that the largest fossil energy producers are "responsible" for the purported adverse effects of anthropogenic climate change borne by Vermont is not supported by the EPA climate model as applied to the EPA GHG database.[33]

---

rest of this century defined as Representative Concentration Pathway 6; on the alternative RCPs see G.P. Wayne, "The Beginner's Guide To Representative Concentration Pathways," *Skeptical Science* (2013) at https://perma.cc/9CVB-KGP3. The more important assumption here is an equilibrium sensitivity of the climate system of 4.5 degrees C; that is the maximum figure in the IPCC "likely" range reported in the Fifth Assessment Report, and higher than the maximum figure in the IPCC "likely" range reported in the Sixth Assessment Report. This assumption has the effect of biasing upward the estimated effect of a given volume of GHG emissions. For the IPCC likely" ECS ranges in the AR5 and AR6, see the AR5 at https://perma.cc/9469-NEL4, at p. 81, and the AR6 at https://perma.cc/M73R-YJX2, at p. 46.

[31] Author computations using MAGICC 7.0. In a recent paper, Lindzen, Happer, and van Wijngaarden show that my calculations using MAGICC 7.0 are essentially the same as the effects predicted by atmospheric physics theory. See Richard Lindzen et al, "Net Zero Averted Temperature Increase" (2024), https://perma.cc/CV9Z-SQC3.

[32] For the lower figure, see the National Oceanographic and Atmospheric Administration at https://perma.cc/2V27-QV9K. For the higher figure, see Hansen *et. al.* at https://perma.cc/XER3-HM8T.

[33] The assertion of substantial damage from anthropogenic climate change is not supported by the evidence. See Benjamin Zycher, "A Critique of Professor Cass R. Sunstein on the Social Cost of Carbon," March 2025, at https://perma.cc/54SD-B4Q5. See also the U.S. Department of Energy, "A Critical Review of Impacts of Greenhouse Gas Emissions on the U.S. Climate," July 23, 2025, at https://perma.cc/APP5-D6T7. For a detailed review of the science underlying the DoE report, see David R. Legates and Marlo Lewis, Jr., Comment to the Department of Energy, September 2, 2025, at https://perma.cc/H955-8YYN. See also Steven E. Koonin, *Unsettled: What Climate Science Tells Us, What It Doesn't, and Why It Matters*, Dallas: BenBella Books, 2021.

76.    Note also that "addressing climate change" by the state of Vermont clearly means programs and projects similar to those to be created under the VCSA. It does not mean reducing fossil energy production in the state. The U.S. Energy Information Administration notes that "Vermont has no crude oil reserves or production, nor does it have any petroleum refineries." "Vermont has no natural gas reserves or production," and "Vermont does not have any coal mines or coal reserves and there are no coal-fired power plants in the state."[34]

## Section 6: Conclusions.

77.    Because the penalty revenues to be determined by the State Treasurer as directed in the VCSA will be spent, the constituencies benefiting from the new or expanded programs will demand that they be maintained after the initial revenues are consumed by various programs.

78.    Market forces, therefore, will not behave as if the penalties are a "one-time fixed cost based on past behavior" or as a policy with "no effect on the marginal cost of production and no direct effect on market price." Market forces instead will behave as if the penalties will prove permanent — or that the attendant likelihood is greater than zero — the result of which will be a reduction in investment, a reduction in output, and an increase in prices.

79.    This outcome will be observed quickly, and regardless of the degree to which foreign output replaces lost domestic production.

80.    States that consume fossil energy for state operations and the production of state services will bear substantial costs.

81.    Application of the EPA climate model demonstrates that the assertion that fossil energy producers that emitted more than 1 billion metric tons of GHG in their extraction and refining operations over 1995-2024 are responsible for the purported effects of anthropogenic climate change cannot be supported analytically.

---

[34] See ECF 102-4.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: December 11, 2025                    Respectfully, submitted,

BENJAMIN ZYCHER