# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA and
AMERICAN PETROLEUM INSTITUTE,

*Plaintiffs*,

and

STATE OF WEST VIRGINIA, et al.,

*Intervenor-Plaintiffs*,

v.

JULIE MOORE, in her official capacity as
the Secretary of the Vermont Agency of
Natural Resources, and JANE
LAZORCHAK, in her official capacity as the
Director of the Vermont Agency of Natural
Resources Climate Action Office,

*Defendants*,

and

NORTHEAST ORGANIC FARMING AS-
SOCIATION OF VERMONT and CONSER-
VATION LAW FOUNDATION,

*Intervenor-Defendants*.

Civil Action No. 2:24-cv-01513-MKL

## PLAINTIFFS THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AND AMERICAN PETROLEUM INSTITUTE'S COMBINED REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND II AND OPPOSITION TO DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT

# Table of Contents

Introduction ............................................................................................................. 1

Background ............................................................................................................. 2

    A. The Act imposes liability for global greenhouse gas emissions. .................................. 3

    B. The Act targets activity and energy producers located entirely outside Vermont. ....... 3

    C. Vermont has now revealed its timeline for the cost assessment and rulemaking required by the Act, confirming that ongoing and immediate compliance harms to Plaintiffs' members will occur for several years. .......................................................... 4

Argument ............................................................................................................. 6

    I. Plaintiffs' standing is uncontested and Plaintiffs' claims are ripe. .................................. 7

    A. Plaintiffs have established Article III standing. ............................................................ 7

    B. Plaintiffs' claims are ripe for judicial review. ............................................................ 8

    II. The Act is precluded by the U.S. Constitution and preempted by the Clean Air Act. ..... 15

    A. Under the U.S. Constitution, federal law governs liability for global greenhouse gas emissions, which precludes Vermont's Act. ....................................................... 16

    B. There is no relevant dispute about whether the Act is an impermissible regulation imposing liability for global greenhouse gas emissions. ............................................. 28

    C. The Clean Air Act preempts the Act because it imposes liability for greenhouse gas emissions originating beyond Vermont's borders. ............................................... 37

Conclusion ............................................................................................................. 48

**Table of Authorities**

**Cases**

*Allco Fin. Ltd. v. Klee*,
 861 F.3d 82 (2d Cir. 2017)...............................................................................32

*Am. Elec. Power Co. v. Connecticut*,
 564 U.S. 410 (2011).................................................... 16, 18, 20, 24, 38, 41, 44-45

*Am. Mfrs. Mut. Ins. Co. v. Am. Broad.-Paramount Theatres, Inc.*,
 388 F.2d 272 (2d Cir. 1967)..........................................................................37

*Antonyuk v. James*,
 120 F.4th 941 (2d Cir. 2024) ........................................................................11

*Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*,
 88 F.4th 344 (2d Cir. 2023) .........................................................................11

*Banco Nacional de Cuba v. Sabbatino*,
 376 U.S. 398 (1964)..................................................................................22

*BMW of N. Am., Inc. v. Gore*,
 517 U.S. 559 (1996)...............................................................................31, 33

*Bucks Cnty. v. BP P.L.C.*,
 2025 WL 1484203 (Pa. Com. Pl. May 16, 2025) ...................................................20

*Calder v. Jones*,
 465 U.S. 783 (1984)..................................................................................24

*Chambers v. TRM Copy Ctrs. Corp.*,
 43 F.3d 29 (2d Cir. 1994) ............................................................................37

*City of Charleston v. Brabham Oil Co.*,
 No. 2020-CP-10-03975 (S.C. Ct. Com. Pl. Aug. 6, 2025) ......................................20

*City of New York v. Chevron Corp.*,
 993 F.3d 81 (2d Cir. 2021)......................................1-2, 15-17, 19-21, 24-26, 28-48

*Cnty. Comm'rs v. Suncor Energy USA, Inc.*,
 2025 CO 21, 2025 WL 1363355 (Colo. 2025) ...............................................20, 41

*Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*,
 906 F.3d 41 (2d Cir. 2018)............................................................................47

*CompassCare v. Hochul*,
    125 F.4th 49 (2d Cir. 2025) ............................................................ 19

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000)...................................................................... 42

*Do No Harm v. Pfizer Inc.*,
    126 F.4th 109 (2d Cir. 2025) ........................................................... 7

*Ecogen, LLC v. Town of Italy*,
    438 F. Supp. 2d 149 (W.D.N.Y. 2006) ............................................ 11

*Exxon Shipping Co. v. Baker*,
    554 U.S. 471 (2008)................................................................... 43-44

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
    592 U.S. 351 (2021)...................................................................... 23

*Franchise Tax Bd. v. Hyatt*,
    587 U.S. 230 (2019)...................................................................... 16

*Fuld v. Palestine Liberation Org.*,
    606 U.S. 1 (2025) .................................................................... 22-23

*Grasshopper Gardens, Inc. v. PMA Mech. LLC*,
    2025 WL 2711066 (N.D.N.Y. Sept. 23, 2025) ................................ 37

*Haight v. NYU Langone Med. Ctr., Inc.*,
    2016 WL 29628 (S.D.N.Y. Jan. 4, 2016) ........................................ 27

*Hinderlider v. La Plata River & Cherry Creek Ditch Co.*,
    304 U.S. 92 (1938)................................................................... 16, 18

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)....................................................................... 22

*Honolulu v. Sunoco LP*,
    537 P.3d 1173 (Haw. 2023) .......................................................... 20

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)....................................................................... 7

*Illinois v. City of Milwaukee*,
    406 U.S. 91 (1972)............................................................. 16, 18, 39

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987).......................................................... 37, 39, 41-46

*Jensen Fam. Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*,
    644 F.3d 934 (9th Cir. 2011) ................................................................47

*Kurns v. R.R. Friction Prods. Corp.*,
    565 U.S. 625 (2012)..............................................................................30

*Labor Council for Latin Am. Advancement v. EPA*,
    12 F.4th 234 (2d Cir. 2021) ...........................................................11, 14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)..............................................................................10

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)................................................................................8

*Mallory v. Norfolk S. Ry. Co.*,
    600 U.S. 122 (2023).........................................................................22-23

*Mayor & City Council of Balt. v. BP P.L.C.*,
    2024 WL 3678699 (Md. Cir. Ct. July 10, 2024)...................................20

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007)................................................................................9

*In re MTBE Prods. Liab. Litig.*,
    725 F.3d 65 (2d Cir. 2013)................................................................9, 47

*N.Y. Life Ins. Co. v. Head*,
    234 U.S. 149 (1914)..........................................................................21, 23

*N.Y. Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013).................................................................15

*Nat. Res. Def. Council v. NHTSA*,
    894 F.3d 95 (2d Cir. 2018)...................................................................35

*Nat'l Org. for Marriage, Inc. v. Walsh*,
    714 F.3d 682 (2d Cir. 2013)...................................................................8

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023)..............................................................................22

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003)..............................................................................13

*Platkin v. Exxon Mobil Corp.*,
    2025 WL 604846 (N.J. Super. Ct. Law Div. Feb. 5, 2025) ..................20

*Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA,*
    10 F.4th 87 (2d Cir. 2021) ...................................................................10

*Romero v. Allstate Ins. Co.,*
    3 F. Supp. 3d 313 (E.D. Pa. 2014) .......................................................36

*S. Lyme Prop. Owners Ass'n, Inc. v. Town of Old Lyme,*
    539 F. Supp. 2d 524 (D. Conn. 2008) ...................................................11

*San Diego Bldg. Trades Council v. Garmon,*
    359 U.S. 236 (1959) ..............................................................................30

*Seminole Tribe of Fla. v. Florida,*
    517 U.S. 44 (1996) ................................................................................19

*Sharkey v. Quarantillo,*
    541 F.3d 75 (2d Cir. 2008) ...................................................................11

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ........................................................................ 9-11

*Tex. Indus., Inc. v. Radcliff Materials, Inc.,*
    451 U.S. 630 (1981) ........................................................................16, 18

*United States v. Articles of Banned Hazardous Substances Consisting of an
    Undetermined Number of Cans of Rainbow Foam Paint,*
    34 F.3d 91 (2d Cir. 1994) .....................................................................28

*United States v. Curtiss-Wright Exp. Corp.,*
    299 U.S. 304 (1936) ..............................................................................28

*United States v. Harris,*
    838 F.3d 98 (2d Cir. 2016) ...................................................................39

*United States v. Johnson,*
    143 F.4th 184 (2d Cir. 2025) ................................................................19

*Variscite NY Four, LLC v. N.Y. State Cannabis Control Bd.,*
    2025 WL 2313142 (2d Cir. Aug. 12, 2025)............................................8

*Walden v. Fiore,*
    571 U.S. 277 (2014)...............................................................................24

*World-Wide Volkswagen Corp. v. Woodson,*
    444 U.S. 286 (1980) ..............................................................................21

*Young v. Masci,*
    289 U.S. 253 (1933) ..............................................................................24

*Zschernig v. Miller*,
   389 U.S. 429 (1968) .................................................................22, 27

**Statutes**

10 V.S.A. § 596 .........................................................................3-4, 23, 25

10 V.S.A. § 597 ..................................................................................3

10 V.S.A. § 598 ..............................................................................9, 13

10 V.S.A. § 599c .............................................................................12, 31

42 U.S.C. § 1983 ................................................................................8

42 U.S.C. § 7545 ..............................................................................47

Pub. L. No. 100-204, Title XI, § 1103, 101 Stat. 1331, 1408 (1987), *reprinted as note to* 15 U.S.C. § 2901 .................................................................26

Vermont's Climate Superfund Act, 10 V.S.A. §§ 596 *et seq.* .......................................3

**Other Authorities**

Amanda G. Halter, et al., Climate Superfund Map, Pillsbury (Sept. 3, 2025),
   https://perma.cc/GGF9-FVPR .................................................................33

Am. Compl., *City of New York v. Chevron*,
   325 F. Supp. 3d 466 (S.D.N.Y. 2018) (No. 18-cv-182-JFK), 2018 WL
   8064051 .................................................................. 31-32, 34, 39, 42

Appellant's Br., *City of New York*, 993 F.3d 81 (2d Cir. Nov. 8, 2018) (No. 18-
   2188), 2018 WL 5905772 ....................................................25, 30, 34, 40

Black's Law Dictionary (12th ed. 2024) .........................................................41

Br. for the United States as Amicus Curiae Supporting Petitioners, *Suncor Energy
   (U.S.A.) Inc. v. Cnty. Comm'rs of Boulder Cnty.*, No. 25-170 (Sept. 11, 2025) ....................21

Br. for United States as Amicus Curiae in Support of Pet. for Reh'g, *City of
   Oakland v. BP p.l.c.*, 969 F.3d 895 (9th Cir. Aug. 3, 2020) (No. 18-16663) ..........................21

Br. for the United States as Amicus Curiae Supporting Resp., *C.H. Robinson
   Worldwide, Inc. v. Miller*, 142 S. Ct. 2866 (2022) (No. 25-1425), 2022 WL
   1670803 .................................................................................31

Compl., *Vermont v. Exxon Mobil Corp.*, No. 21-CV-02778 (Vt. Super. Ct. Sept.
   14, 2021) ................................................................................10

Decl. of Christopher Landau, Deputy Sec'y of State of the U.S., *United States v. Vermont*, No. 2:25-cv-00463-mkl (D. Vt.), ECF 50-3.............................................. 21, 26-27

Oral Arg. Tr., *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230 (Jan. 19, 2021)........................................................................................................21

Protecting American Energy From State Overreach, Exec. Order No. 14,260, 90 Fed. Reg. 15,513 (Apr. 8, 2025) ...........................................................................27

Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards, 90 Fed. Reg. 36,288, 36,298 (Aug. 1, 2025).........................................44

Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review, 89 Fed. Reg. 16,820 (Mar. 8, 2024)...........................................47

United States' Mot. Summ. J., *United States v. Vermont*, No. 2:25-cv-00463-mkl (D. Vt.), ECF 50-1 ..............................................................................................25

United States' Reply Supp. Mot. Summ. J., *United States v. State of New York*, No. 1:25-cv-03656-PKC (S.D.N.Y. Nov. 19, 2025), ECF 99 ...................................26, 27, 28

Vt. Agency of Nat. Res. & Vt. State Treasury's Off., Vermont Resilience Implementation Strategy 13 (Sept. 17, 2025), https://perma.cc/34C4-JAWW ........................5

**Introduction**

Because Vermont's Act is unconstitutional on its face, Defendants attempt to reframe the issue. As Defendants tell it, Vermont's Act is simply a remedial revenue-raising device to pay for costs the State has incurred from climate change. According to Defendants, the Act incidentally applies only to out-of-state energy producers, but it does not regulate them or affect their ongoing business because the billions of dollars in liability the Act imposes are one-time costs. That narrative is not only irrelevant, as States lack the constitutional power to impose liability for out-of-state greenhouse gas emissions in the first place, but also nonsense, as courts have long recognized that compensation regimes are a form of regulation.

The Act is simply a repackaging of New York City's precluded claims from *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021), and is barred under that decision. There, as here, the government sought to impose state-law liability for out-of-state greenhouse gas emissions to fund climate adaptation and resiliency projects. But the Second Circuit held as a matter of law that the Constitution precludes imposing liability under state law for global greenhouse gas emissions and, therefore, it rejected New York City's attempt to recover compensation to pay "for the past and future costs of climate-proofing its infrastructure and property." *Id.* at 88, 91-93. Such relief unlawfully intrudes on an area reserved for the federal government by the Constitution and is thus precluded. The only room for action by the States in the area of greenhouse gas emissions is the "slim reservoir" of power granted in the Clean Air Act to regulate in-state emissions—i.e., those originating within the State's borders. *Id.* at 100. And because Vermont's Act indisputably imposes liability for *global* greenhouse gas emissions, it is constitutionally precluded and, in addition, is preempted by the Clean Air Act.

Defendants attempt to avoid this result by quibbling about whether Vermont's Act "regulates" greenhouse gas emissions. But even if that issue *were* relevant to resolving this dispute, *City of New York* resolves it in Plaintiffs' favor too. There, the Second Circuit determined—as a matter of law—that it blinks "economic reality" to claim that seeking substantial compensation for global greenhouse gas emissions is not a "regulation" of greenhouse gas emissions. *Id.* at 92. That is because it is well established that both "an award of damages" and "the obligation to pay compensation" "can be, indeed [are] designed to be, a potent method of governing conduct and controlling policy." *Id.* (cleaned up).

Finally, the State Defendants now admit that Plaintiffs the U.S. Chamber of Commerce ("U.S. Chamber") and American Petroleum Institute ("API") (collectively "Plaintiffs") have standing, *see* ECF 108 at 6 n.4, which means their claims are likewise constitutionally ripe for review. And contrary to Intervenor-Defendants' arguments, Plaintiffs' facial challenge to the Act is prudentially ripe for review because it presents purely legal claims and unrebutted evidence establishes that withholding review would harm Plaintiffs. That the Agency of Natural Resources ("ANR") will not issue cost recovery demands until 2028, *see* ECF 110-2 ¶¶ 1-2, does not make the harm any less concrete or imminent. Plaintiffs' members will be forced, with certainty, to incur growing, unrecoverable compliance costs that are sufficient to establish ripeness.

The Court should accordingly deny Defendants' motions to dismiss and cross-motions for summary judgment, grant Plaintiffs' motion for partial summary judgment, declare that Vermont's Act is precluded by the U.S. Constitution and preempted by the Clean Air Act, and enjoin enforcement of the Act in any capacity against Plaintiffs' members.

## Background

Plaintiffs incorporate the background sections included in their motion for partial summary

judgment, ECF 100, and opposition to Defendants' motions to dismiss, ECF 101.

### A. The Act imposes liability for global greenhouse gas emissions.

Vermont's Climate Superfund Act, 10 V.S.A. §§ 596 *et seq.*,[1] by its own terms, imposes liability upon a select group of energy producers for global greenhouse gas emissions resulting from the use of fossil fuels extracted or refined anywhere in the world between 1995 and 2024. Specifically, the Act applies to "[c]overed greenhouse gas emissions," which means "the total quantity of greenhouse gases released into the atmosphere, expressed in metric tons of carbon dioxide equivalent, resulting from the use of fossil fuels extracted or refined by an entity during the covered period." § 596(7). This definition, on its face, applies to greenhouse gas emissions outside Vermont.

Based upon that definition, the Act directs ANR to issue "cost recovery demand[s]" to designated "responsible part[ies]," holding them strictly liable for their alleged contribution to historical global greenhouse gas emissions. § 597(3). In other words, the Act imposes strict liability and seeks compensation, through the form of punitive cost recovery demands, for the purported harms caused to Vermont by greenhouse gas emissions around the world.

### B. The Act targets activity and energy producers located entirely outside Vermont.

Vermont's Act was crafted to apply only to entities outside Vermont. That is why the Act defined "[r]esponsible party" as "any entity . . . that during any part of the covered period [of 1995 through 2024] was engaged in the trade or business of extracting fossil fuel or refining crude oil and is determined by the [ANR] attributable to for [sic] more than one billion metric tons of covered greenhouse gas emissions." § 596(22).

---

[1] Unless otherwise noted, statutory citations are to 10 V.S.A. Chapter 24A.

There are no Vermont entities that fit the Act's definition of "responsible parties." It is undisputed that (i) Vermont has no fossil-fuel production activity and no petroleum refineries, ECF 109-1 ¶ 23; ECF 112-1 ¶ 23; (ii) has never produced crude oil and has no proven reserves, ECF 109-1 ¶ 24-25; ECF 112-1 ¶ 24-25; and (iii) has no coal mines or coal-fired power plants, ECF 109-1 ¶ 26; ECF 112-1 ¶ 26. Accordingly, only companies with their headquarters, principal places of business, and fossil fuel extraction and refining operations outside of Vermont could be "responsible part[ies]" under this definition. *See* ECF 109-1 ¶¶ 23-28; ECF 112-1 ¶¶ 23-28. Indeed, Defendants do not dispute that the State of Vermont, its leaders, and others supporting the Act have made clear that the Act targets out-of-state energy producers like Plaintiffs' members. *See* ECF 109-1 ¶¶ 16-22; ECF 112-1 ¶¶ 23-28.

The Act's clarification that the definition of "responsible parties" excludes "any person who lacks sufficient connection with the State to satisfy the nexus requirements of the U.S. Constitution," § 596(22), cannot change the fact that, by design and in its effect, the Act imposes liability for only conduct and emissions outside of Vermont.

C.    **Vermont has now revealed its timeline for the cost assessment and rulemaking required by the Act, confirming that ongoing and immediate compliance harms to Plaintiffs' members will occur for several years.**

State Defendants have abandoned any argument that the injuries the Act imposes on Plaintiffs' members are speculative. *See* ECF 108 at 6 n.4; ECF 109-1 ¶¶ 4-5, 9-10; ECF 112-1 ¶¶ 4-5, 9-10. The State has fixed deadlines for the core regulatory steps that drive present and future compliance burdens for Plaintiffs' members. Vermont has stated (1) that the State Treasurer will complete the mandatory statewide cost assessment by January 15, 2027, (2) that the ANR will complete the required rulemakings by January 1, 2028, and (3) that the ANR will issue cost-recovery demands by July 1, 2028. *See* ECF 110-2 ¶¶ 1-2. Vermont has also admitted that State officials intended to target some of Plaintiffs' members. *See* ECF 109-1 ¶¶ 15-22.

Plaintiffs' members are already incurring and will continue to incur legal, technical, and strategic compliance costs to prepare for the Treasurer's assessment, the agency's rulemakings, and the inevitable cost-recovery demands. State Defendants do not dispute that these steps are necessary and imminent. *See* ECF 110-2 ¶¶ 1-2. The only remaining uncertainty is the precise amount of the liability imposed on Plaintiffs' members. But there is no question that Vermont will attempt to impose liability stretching into the hundreds of millions or billions of dollars—Vermont's own statements confirm as much. Indeed, ANR's Resilience Implementation Strategy, which the Act required ANR to submit to the Vermont legislature as a tool "to identify and prioritize climate change adaptation projects to be funded through the Climate Superfund Cost Recovery Program Fund," states that in Fiscal Year 2025 alone, "climate-related investments in Vermont, for both greenhouse gas emissions reduction and resilience projects, totaled over $524 million." Vt. Agency of Nat. Res. & Vt. State Treasury's Off., Vermont Resilience Implementation Strategy 13, 44 (Sept. 17, 2025), https://perma.cc/34C4-JAWW. But of course, the Act covers not just a single fiscal year, but a period of *30* years. And as explained in Plaintiffs' opposition to Defendants' motions to dismiss, the legislative history of the Act shows that Vermont intended the Act to impose fines stretching into hundreds of millions or billions of dollars. ECF 101 at 48 n.23.

The harm is not limited to future enforcement. It is happening now. Plaintiffs' members must retain experts, preserve and analyze decades of global production data, model potential attribution scenarios, and prepare to participate in formal rulemakings that the State has scheduled. *See* Swarup Decl. ¶¶ 23-24, ECF 100-6; Cochrane Decl. ¶¶ 15-16, 19, 100-9; Torrence Decl. ¶¶ 11-17, 19, 100-8; Martini Decl. ¶¶ 12-14, 18, 100-7. These are real, current compliance costs. They are unavoidable. And they will continue to mount into at least 2028 absent relief from this Court.

State Defendants no longer dispute that these compliance costs support Plaintiffs' standing. ECF 108 at 6 n.4; ECF 109-1 ¶¶ 4-5, 9-10; ECF 112-1 ¶¶ 4-5, 9-10.

## Argument

In their opposition to Defendants' motions to dismiss, ECF 101, and their motion for partial summary judgment, ECF 100-1, Plaintiffs explain why they have plausibly alleged facts to support each of their claims and why they are entitled to summary judgment under Counts I and II of their complaint. Defendants' consolidated briefs and related filings do not warrant a different result.

To start, Defendants admit that Plaintiffs have standing, which confirms that Plaintiffs' claims are constitutionally ripe. And although Intervenor-Defendants maintain that Plaintiffs' claims are *prudentially* unripe—a doctrine of dubious continued validity—they have not presented any evidence or argument showing that Plaintiffs' claims are unfit for review or that Plaintiffs' members would not experience hardship from delayed review. In fact, Plaintiffs' unrebutted declarations establish otherwise.

On the merits, Second Circuit and Supreme Court precedent make clear that a State may not impose retroactive, extraterritorial liability for global greenhouse gas emissions. Put simply, the Constitution precludes, and the Clean Air Act preempts, Vermont's Act on its face. Because there is no genuine dispute of material fact that the Act is unconstitutional in all of its applications, Plaintiffs are entitled to summary judgment on both counts.

Defendants disagree. Defendants assert (via cross-motions for summary judgment) that they (not Plaintiffs) are entitled to judgment as a matter of law on Plaintiffs' preclusion and preemption counts and that, at the very least, there is a genuine dispute of material fact about whether the Act impermissibly regulates emissions in all of its applications. ECF 108 at 14-15; ECF 111 at 2-4. But Defendants are wrong. The Act is facially unconstitutional for the reasons set

forth below. Moreover, Defendants have not presented any evidence that could create a *material* dispute of fact about whether the Act regulates emissions. Nor could they. Plaintiffs' claims are purely legal. Defendants' assertion that there is a fact dispute as to whether the Act regulates emissions is irrelevant and, in any event, is in direct conflict with *City of New York*.[2]

Defendants argue that they are entitled to summary judgment because Plaintiffs have failed to establish the Act is unconstitutional in all of its applications—i.e., on its face. But Defendants have not identified a single constitutional application of Vermont's Act, nor could they under binding Second Circuit precedent. And even if there were some dispute of fact as to Counts I or II of Plaintiffs' complaint—there is not—that would mean that Plaintiffs get to prove those claims at trial, not that Defendants win summary judgment.

## I.     Plaintiffs' standing is uncontested and Plaintiffs' claims are ripe.

### A.     Plaintiffs have established Article III standing.

As explained in their motion for partial summary judgment and opposition to Defendants' motions to dismiss, Plaintiffs have associational standing to bring this challenge because: (1) at least one of Plaintiffs' members has individual standing to sue in its own right; (2) challenging the Act is germane to Plaintiffs' respective purposes; and (3) members' individual participation is unnecessary in this purely legal challenge. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 118 (2d Cir. 2025); *see* ECF 100-1 at 8; ECF 101 at 8-11. Defendants do not disagree. The State Defendants now admit Plaintiffs have standing. *See* ECF 108 at 6 n.4 (conceding that "the State no longer contests the Chamber Plaintiffs' standing to bring claims" after "consideration of the declarations the Chamber submitted

---

[2] Importantly, Defendants do not dispute that, if the court grants summary judgment in Plaintiffs' favor, Plaintiffs and their members are entitled to a permanent injunction. ECF 100-1 at 24-25.

with its summary judgment motion").[3] And Intervenor-Defendants do not challenge Plaintiffs' standing. *See* ECF 112-1 ¶ 4 ("Intervenor-Defendants do not dispute that in the future the Act may cause monetary injury to those companies in the form of payment of a possible future cost assessment."). This is unsurprising given that the Act is designed to target Plaintiffs' members and that Plaintiffs submitted multiple, unrebutted declarations establishing that their members—ExxonMobil, Shell USA, Chevron, and BP—are harmed by the Act and will continue to be harmed in the future. *See* Durbin Decl. ¶ 20, ECF 100-4; Meyer Decl. ¶ 18, ECF 100-5; Torrence Decl. ¶ 21, ECF 100-8; Swarup Decl. ¶ 28, ECF 100-6; Cochrane Decl. ¶ 21, ECF 100-9; Martini Decl. ¶ 19, ECF 100-7; *see also* ECF 109-1 ¶ 4 (State Defendants do "not dispute that the Act may apply to and have some impact on Chamber members Exxon, Shell, Chevron, and/or BP").

## B.     Plaintiffs' claims are ripe for judicial review.

### 1.     Plaintiffs' claims are constitutionally ripe.

Plaintiffs' claims are also ripe. "Ripeness has both a constitutional and a prudential dimension." *Variscite NY Four, LLC v. N.Y. State Cannabis Control Bd.*, 2025 WL 2313142, at *6 (2d Cir. Aug. 12, 2025). Plaintiffs' claims satisfy both.

Constitutional ripeness is simply "a specific application of the actual injury aspect of Article III standing." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013). It "is really just about the first *Lujan* factor—to say a plaintiff's claim is constitutionally unripe is to say the plaintiff's claimed injury, if any, is not 'actual or imminent,' but instead 'conjectural or hypothetical.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Indeed, in pre-

---

[3] State Defendants concede that Plaintiffs have "standing to bring claims under *Ex Parte Young*," ECF 108 at 6 n.4, but they continue to argue that Plaintiffs lack standing to assert their claims under 42 U.S.C. § 1983. For the reasons explained in Plaintiffs' opposition to Defendants' motions to dismiss, ECF 101 at 19-20, Plaintiffs maintain that they properly asserted claims for injunctive relief under Section 1983.

enforcement challenges, the "standing and ripeness issues . . . 'boil down to the same question.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014) ("*SBA*") (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007)). Accordingly, in "most cases," a determination "that a plaintiff has Article III standing is enough to render its claim constitutionally ripe." *In re MTBE Prods. Liab. Litig.*, 725 F.3d 65, 110 (2d Cir. 2013) ("*MTBE*").

Here, State Defendants admit that Plaintiffs have standing, and as the State Defendants recognize, that "is enough to render [Plaintiffs'] claim[s] constitutionally ripe." *Id.*; *see* ECF 108 at 6 n.4. That is because Plaintiffs' Complaint alleges, and the undisputed record evidence supported by Plaintiffs' declarations establishes, how the Act causes both ongoing and future harms. ECF 1 ¶¶ 16, 55-60; ECF 109-1 ¶¶ 4-5, 9-10; ECF 112-1 ¶¶ 4-5, 9-10. For example, Plaintiffs' members are harmed by incurring unrecoverable compliance costs—such as hiring personnel, expending resources to evaluate impacts on disclosure requirements, and analyzing the State's assessments measuring worldwide extraction volumes. Plaintiffs' members are also suffering reputational damage. *See* Torrence Decl. ¶¶ 11-17, 19, ECF 100-8; Swarup Decl. ¶¶ 17, 23-24, ECF 100-6; Cochrane Decl. ¶¶ 12-16, 19, ECF 100-9; Martini Decl. ¶¶ 12-14, 16, 18, ECF 100-7. And, ultimately, they will be harmed when forced to respond to cost recovery demands. *See* § 598(f) (mandating that ANR "*shall* issue the cost recovery demands required under [the Act]" (emphasis added)).

If there were any doubt that Plaintiffs' members are subject to the Act, Governor Phil Scott dispelled it, saying explicitly that the Act was designed to target "Big Oil." ECF 1 ¶ 56. Likewise, State Defendants admit they "likely will utilize Richard Heede's data and/or research when . . . determining responsible parties," and they do not dispute that Heede "submitted data to the Vermont Legislature purporting to show that . . . Exxon Mobil Corporation, Shell USA, Inc., Chevron

Corporation, and BP America, Inc." meet the Act's emissions threshold for defining "responsible parties." ECF 109-1 ¶¶ 17-18.

What is more, the State Defendants have already brought climate-related claims against ExxonMobil and Shell entities, asserting that Vermont courts have jurisdiction over them and alleging that these companies are major sources of climate change. ECF 1 ¶ 55; *see, e.g.*, Compl., *Vermont v. Exxon Mobil Corp.*, No. 21-CV-02778, ¶¶ 2, 6, 28, 90, 128-30 (Vt. Super. Ct. Sept. 14, 2021). Again, the State Defendants admit as much. *See* ECF 109-1 ¶ 22. Thus, it is not merely plausible, but virtually certain, that Vermont will assert that those same companies have a constitutional nexus to Vermont and are subject to the Act. *SBA*, 573 U.S. at 164 ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not chimerical." (cleaned up)). Plaintiffs' claims are thus constitutionally ripe because their injuries have already begun and are certain to continue, as State Defendants concede. *See* ECF 108 at 6 n.4; *see also* ECF 110-2 ¶¶ 1-2 (State Defendants' Statement of Undisputed Material Facts noting the date certain for Vermont's rulemaking and cost-recovery demand); ECF 113-2 ¶¶ 1-2 (Intervenor-Defendants' Statement of Undisputed Material Facts noting the date certain for Vermont's rulemaking and cost-recovery demand).

### 2. Plaintiffs' claims are prudentially ripe.

Intervenor-Defendants agree the claims are constitutionally ripe but suggest they are not prudentially ripe. Unrebutted record evidence establishes the opposite.[4]

---

[4] As explained in Plaintiffs' opposition to Defendants' motions for summary judgment, ECF 101 at 13 n.8, "whether the prudential ripeness doctrine remains good law" is an open question. *Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 102 (2d Cir. 2021). The Supreme Court has suggested it is not: "[A] federal court's ability to decline jurisdiction on prudential ripeness grounds must be reconciled with the 'virtually unflagging' obligation of a court 'to hear and decide cases within its jurisdiction.'" *Id.* (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26 (2014)). But there is no meaningful way

Prudential ripeness involves "a two-prong test," asking, first, "whether the issues are 'fit' for judicial review"—i.e., "whether the court . . . would benefit from postponing review until the policy in question has sufficiently crystallized"—and second, "whether and to what extent the parties will endure hardship if decision is withheld." *Labor Council for Latin Am. Advancement v. EPA*, 12 F.4th 234, 252 (2d Cir. 2021) (cleaned up).

As to the first prong, Plaintiffs' claims here present purely legal issues that are "fit for judicial decision." *Sharkey v. Quarantillo*, 541 F.3d 75, 89 (2d Cir. 2008). "[F]acial challenges to legislative acts are ripe by their very nature." *Ecogen, LLC v. Town of Italy*, 438 F. Supp. 2d 149, 155 (W.D.N.Y. 2006) (cleaned up); *see also S. Lyme Prop. Owners Ass'n, Inc. v. Town of Old Lyme*, 539 F. Supp. 2d 524, 536 (D. Conn. 2008) ("[F]acial challenges are generally ripe the moment the challenged regulation . . . is passed." (cleaned up)). That is because, as here, a facial challenge does not depend on case-specific facts but instead requires the plaintiff to show that the law is invalid "in all its applications." *Antonyuk v. James*, 120 F.4th 941, 983 (2d Cir. 2024). Here, that is the case.

Intervenor-Defendants do not seriously dispute that Plaintiffs' constitutional preclusion and Clean Air Act preemption claims are fit for review. They briefly argue that these claims are "premised" on factual disputes. ECF 111 at 26. But even if the factual issues they raise are disputed (they are not), they are by no means *material*. For example, the assertion that there is a fact dispute about the exact amount of Vermont's cost recovery demands is immaterial because *any* penalties

_____

to reconcile them. "Federal courts have an obligation to adjudicate cases that invoke [their] jurisdiction." *Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*, 88 F.4th 344, 351 (2d Cir. 2023). That is why the Supreme Court in *SBA* expressly questioned the "continuing vitality" of the prudential ripeness doctrine. 573 U.S. at 167. This Court should not decline to resolve the merits of Plaintiffs' claims based on this dubious doctrine, especially where State Defendants have conceded that Plaintiffs have standing and where constitutional ripeness requirements are clearly satisfied.

issued based on liability for global greenhouse gas emissions exceed Vermont's authority under the Constitution and the Clean Air Act. *See infra* pp.15-48. Moreover, as explained below, Second Circuit precedent forecloses any argument that there are factual disputes as to whether the Act is an unlawful regulation. *See infra* pp.28-37.

The same is true for the remainder of Plaintiffs' claims—due process, excessive fines, commerce clause, and takings claims. These legal claims challenging the constitutionality of the Act on its face are fit for review. ECF 101 at 16-19.

Intervenor-Defendants wrongly argue that these claims are unripe because they turn on the amount of the specific penalty. ECF 111 at 24-36. But as explained in Plaintiffs' opposition to Defendants' motions to dismiss, every cost recovery demand will issue in an amount that is unconstitutional because context and Vermont's own statements confirm that the penalties will be in the hundreds of millions or billions of dollars. ECF 101 at 16-18. The Act imposes retroactive penalties for 30 years of lawful conduct, and Plaintiffs allege that the penalties will reach into the hundreds of "millions or billions of dollars." Compl. ¶¶ 165, 170. Those allegations are confirmed by Vermont's own statements and the Act's legislative history, which Intervenor-Defendants ignore entirely. As noted above, ANR stated in its Resiliency Implementation strategy that, in this year alone, "climate-related investments" in Vermont totaled over $524 million. *See supra* p.5. Just multiplying that rough estimate—which does not even consider the likely increase in such investments as a result of the Act—by 30 years yields over $15 billion, and that does not factor in "costs . . . projected to be incurred in the future . . . to abate the effects of covered greenhouse gas emissions," which the Vermont Treasurer must include in the total cost to the State. § 599c(3). That is entirely consistent with the Act's legislative history showing that lawmakers intended to impose "significant liability" near "a hundred billion dollars" through the Act. ECF 101 at 48 n.23.

Intervenor-Defendants' citation to *National Park Hospital Association v. Department of Interior*, 538 U.S. 803, 812 (2003), does nothing to rebut this conclusion. ECF 111 at 24. That case involved National Park Service ("NPS") action that amounted to "nothing more than a general statement of policy designed to inform the public of NPS' views on the proper application of the CDA." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 809 (cleaned up). And because the agency's policy statement did "not create adverse effects of a strictly legal kind," plaintiff contractors could not show that the statement caused them any hardship, so their claims were unripe. *Id.* (cleaned up). Here, the Act is a law passed by the Vermont legislature that undisputedly establishes "adverse effects of a strictly legal kind." *Id.* Unlike the policy statement in *National Park Hospital Association*, the law at issue here imposes unavoidable hardships on Plaintiffs' members.

As to the second prong, Intervenor-Defendants argue that Plaintiffs will not suffer hardship from delaying review because the Act does not require "immediate and significant change in the plaintiffs' conduct of their affairs," or "now inflict[] significant practical harm." ECF 111 at 26-27 (citations omitted). To start, there is no question that the Act's cost recovery demands will inflict serious harm on Plaintiffs' members in the form of hundreds of millions or billions of dollars' worth of penalties. Defendants have now provided a date-certain by which the payment demands will be issued, *see supra* pp.4-5, and the Act gives ANR no discretion regarding whether to issue those demands to responsible parties, § 598(f).

Likewise, the unrebutted record evidence shows that Plaintiffs' members are currently experiencing, and will continue to experience, significant practical harm and will be forced to make substantial changes in their affairs long before a cost recovery demand is due. The declarations submitted by Plaintiffs and their members show that the Act forces member companies to start incurring unrecoverable compliance costs now and in the near future. Durbin Decl. ¶¶ 16-20, ECF

13

100-4; Torrence Decl. ¶¶ 10-21, ECF 100-8; Swarup Decl. ¶¶ 17-27, ECF 100-6; Martini Decl. ¶¶ 11-19, ECF 100-7; Cochrane Decl. ¶¶ 12-21, ECF 100-9. Intervenor-Defendants quibble that these costs are "routine expenditures," ECF 111 at 29, but they do not dispute their existence, ECF 112-1 ("Intervenor-Defendants do not dispute that there is a risk of unrecoverable compliance costs to those companies."). And these costs are not "routine." It is only because of the Act's existence and resulting looming cost recovery demands that members are forced to spend time and resources on personnel, research, reorganization, planning, and other activities to prepare to comply with the Act's demands. *See* ECF 100-1 at 24; Durbin Decl. ¶¶ 16-20, ECF 100-4; Torrence Decl. ¶¶ 10-21, ECF 100-8; Swarup Decl. ¶¶ 17-27, ECF 100-6; Martini Decl. ¶¶ 11-19, ECF 100-7; Cochrane Decl. ¶¶ 12-21, ECF 100-9.

Critically, with every passing day the Act is in effect, these costs accumulate. And even if the Act permits Plaintiffs' members to "dispute cost recovery demands both administratively and in court," ECF 111 at 30, they cannot recover their lost compliance costs due to Vermont's sovereign immunity from suit—a fact Defendants do not dispute. ECF 100-1 at 24-25.

Intervenor-Defendants' reliance on *Laboratory Council for Latin American Advancement*, 12 F.4th at 234, is misplaced. There, an environmental group challenged an EPA rule for failing to address the group's concern about a chemical's commercial use. But EPA was in the process of addressing that exact concern in a different rulemaking, so the Second Circuit held that the plaintiffs' claim that EPA was attempting to "stall resolution indefinitely" on the commercial issue was prudentially unripe. *Id.* at 253. Here, a duly enacted law is *already* causing ongoing and unrecoverable compliance costs to Plaintiffs, and that same law will, by simple operation of the statute, cause hundreds of millions or billions of dollars in additional penalties as well.

Finally, it does not cause any hardship to Defendants for this Court to adjudicate Plaintiffs' claims now. Defendants can have no "interest in the enforcement of an unconstitutional law." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (quotation omitted). Intervenor-Defendants claim that deciding these claims now will prevent Vermont from "developing the relevant methodologies and implementing an appropriate administrative process," thereby denying it "the opportunity to implement the Act 'in a manner consistent with the Constitution.'" ECF 111 at 31. But nothing in the administrative process could remedy the Act's severe constitutional defects or overturn Second Circuit precedent. And deciding this case now will enable Vermont to avoid wasting time and taxpayer money attempting to implement a plainly unconstitutional law that directly contradicts *City of New York*.

Because Plaintiffs' claims are ripe for review, the Court should deny Intervenor-Defendants' motion to dismiss and its cross motion for summary judgment.

## II.    The Act is precluded by the U.S. Constitution and preempted by the Clean Air Act.

Plaintiffs are entitled to summary judgment on Counts I and II of their Complaint for two reasons rooted in binding precedent and the Constitution. *First*, under the Constitution's basic structure and specific guarantees, only federal law may govern liability for interstate and international greenhouse gas emissions. Vermont cannot project its power beyond its borders to punish decades of lawful, out-of-state and foreign conduct or to rewrite national and global energy policy. *Second*, the Clean Air Act gives States only a "slim reservoir" of regulatory authority that is limited to greenhouse gas emissions originating within their own borders. The Act thus forecloses Vermont's attempt to impose massive retroactive liability stemming from greenhouse gas emissions originating from every other State in the Union.

**A.** **Under the U.S. Constitution, federal law governs liability for global greenhouse gas emissions, which precludes Vermont's Act.**

The U.S. Constitution precludes Vermont's Act. Interstate and international greenhouse gas emissions are uniquely federal interests and, as a structural matter, are allocated to the federal government to govern. That legal principle is confirmed by core structural limits of the Constitution on the sovereignty of other States, due process limits on extraterritorial legislation, and the federal government's exclusive control of foreign affairs. Put simply, a single State cannot project its power beyond its borders to dictate national and global outcomes, and Vermont's effort to do so is unconstitutional.

**1.** **Vermont's Act invades a field that the Constitution reserves to the federal government.**

**a.** The Supreme Court has long held that some disputes necessarily concern "uniquely federal interests." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640-41 (1981). In those areas, "our federal system does not permit the controversy to be resolved under state law." *Id.*; *see also Franchise Tax Bd. v. Hyatt*, 587 U.S. 230, 246 (2019) ("[T]he Constitution implicitly forbids" applying state law when the "interstate nature of the controversy makes it inappropriate for state law to control.") (cleaned up)). This includes interstate and international pollution disputes. *See Illinois v. City of Milwaukee*, 406 U.S. 91, 103 (1972) ("*Milwaukee I*") (federal law governs disputes involving "air and water in their ambient or interstate aspects"); *see also Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110 (1938) (similar for interstate water disputes). In such areas, the "basic scheme of the Constitution" "demands" a federal rule of decision. *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421 (2011) ("*AEP*"), *quoted in City of New York*, 993 F.3d at 90.

Relying upon these principles, the Second Circuit has already rejected attempts to use *state law* to impose liability on fossil fuel producers for global greenhouse gas emissions. In *City of New York*, the Second Circuit recognized that "[f]or over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air . . . pollution" because these disputes raise "an overriding need for a uniform rule of decision" and "basic interests of federalism." 993 F.3d at 91-92 (cleaned up). The Second Circuit held that the City's attempt to use New York's state tort law to impose liability on energy companies for "the cumulative effects of emissions made around the globe over the past several hundred years" was "simply *beyond the limits of state law*." *Id.* at 92 (emphasis added). Federal law precluded the claims because they would have imposed liability for emissions from every State and every foreign country and "implicate[d] the conflicting rights of states and our relations with foreign nations." *Id.* (citation omitted).

*City of New York*'s holding addresses preclusion of state law by federal law under the basic scheme of the Constitution. *Id.* at 90. The Second Circuit explained that in certain "few and restricted" enclaves—marked by both federal interests and a conflict between such interests and the operation of state law—federal law precludes state action. *See id.* at 89-90. And the court concluded that the area of compensation for harm allegedly caused by global greenhouse gas emissions is one of those areas. *See id.* at 91-92. In reaching that conclusion, the court focused on the uniquely federal interests involved in addressing "global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other," as well as the conflicting states' rights at play. *Id.* at 92-93. In short, the problem with a State's attempting to use its own law to impose liability for out-of-state emissions lies "in the basic scheme of the Constitution" and in "basic interests of federalism." *Id.* at 90, 92 (citations omitted).

All of those concerns are equally present in this action. The Second Circuit's holding that the Constitution precludes a state law rule of decision for out-of-state emissions thus applies equally to Vermont's attempt to impose liability under state law for global greenhouse gas emissions here.

**b.** Up against a wall of Supreme Court and Second Circuit precedent, Defendants strain to distinguish *City of New York* by arguing that it does not apply to state statutory law. *See* ECF 108 at 22-23; ECF 111 at 36-37. That argument fails because it misunderstands both the constitutional principles at issue and the operation of the Vermont Act.

*City of New York*'s holding that federal law must govern attempts to impose liability on global greenhouse gas emissions applies equally to state statutes as it does to state common-law claims. Interstate air emissions implicate federal interests that must be addressed at the federal level without regard to whether a state seeks to use statutory or common law. Decades of Supreme Court precedent confirm that, in determining whether a state law is precluded, the question is not what the source or form of state law it is; the operative question is whether "our federal system . . . permit[s] the controversy to be resolved under state law." *Tex. Indus.*, 451 U.S. at 641. And as explained above, *see supra* pp.15-17, our federal system does not permit disputes over interstate and international pollution to be resolved under any state law, whether statutory or common law. *See AEP*, 564 U.S. at 421. That is why the Supreme Court has explained, for example, that "[t]he question of apportionment of interstate waters is a question of 'federal common law' upon which state *statutes* or decisions are not conclusive." *Milwaukee I*, 406 U.S. at 105 (1972) (emphasis added); *see also Hinderlider*, 304 U.S. at 110 ("For whether the water of an interstate stream must be apportioned between the two States is a question of 'federal common law' upon which neither the *statutes* nor the decisions of either State can be conclusive." (emphasis added)).

Thus, the Constitution precludes state law, requiring that federal common law or, if enacted, a federal statute resolve the dispute. *See City of New York*, 993 F.3d at 89-90 ("[F]ederal common law functions much like legal duct tape – it is a 'necessary expedient' that permits federal courts to address issues of national concern until Congress provides a more permanent solution.").[5]

*City of New York*'s reasoning—which is necessary and thus part of its holding[6]—made clear that state claims, functioning nearly identically to the Vermont Act's liability scheme, were: (1) precluded by federal law because they intrude on uniquely federal interests; and (2) not authorized by the Clean Air Act's comprehensive scheme insofar as they concerned domestic, out-of-state emissions. *Id.* at 90-103; *see infra* pp.37-42.

Defendants cite no authority showing that *City of New York* would have come out differently if it had involved state statutory claims seeking damages for global greenhouse gas emissions

---

[5] Defendants erroneously construe *City of New York* as only involving the Clean Air Act's displacement of federal common law claims. *See* ECF 108 at 18; ECF 111 at 34-35. That is incorrect. *City of New York* recognized that federal common law in this area existed because structural constitutional principles preclude the application of state law. 993 F.3d at 98. The Second Circuit reasoned that "where a federal statute displaces federal common law, it does so not in a field in which the [s]tates have traditionally occupied, but one in which the states have traditionally *not* occupied." *Id.* (cleaned up). Therefore, it held that it would be "too strange to seriously contemplate" that state law would be "presumptively competent to address issues that demand a unified federal standard simply because Congress saw fit to displace a federal court-made standard with a legislative one." *Id.* The same structural constitutional principles that barred the City's state-law claims in *City of New York* also bar Vermont's Act here.

[6] *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66-67 (1996) (explaining the Court must "adhere . . . to the well-established rationale upon which the Court based the results of its earlier decisions"); *CompassCare v. Hochul*, 125 F.4th 49, 59 (2d Cir. 2025) (holding that the "portion[ ] of the opinion necessary to [the] result" in a previous panel decision constitutes Second Circuit "precedent" (quoting *Seminole Tribe of Fla.*, 517 U.S. at 67)); *see also United States v. Johnson*, 143 F.4th 184, 189 (2d Cir. 2025) (Menashi, J. concurring in denial of reh'g en banc) ("The holding includes the explanation as well as the result." (citing *Seminole Tribe of Fla.*, 517 U.S. at 67)).

instead of state common-law claims. Nor could they. The Second Circuit is clear that the request for "damages for the cumulative impact of conduct occurring simultaneously across just about every jurisdiction on the planet . . . is simply beyond the limits of state law." *City of New York*, 993 F.3d at 92. No distinction between common law and statutory law was drawn because that distinction does not change the result.

**c.** Supreme Court and Second Circuit precedent control the outcome of this case for the reasons explained above, but "[a] growing chorus of state . . . courts across the United States" also agree that states may not impose state-law liability for global emissions because of our Constitution's structure. *Bucks Cnty. v. BP P.L.C.*, 2025 WL 1484203, at \*6 (Pa. Com. Pl. May 16, 2025). Courts in Maryland, New Jersey, South Carolina, and Pennsylvania have all held that state-law claims seeking to impose liability for the impacts of global greenhouse gas emissions trespass into a field that only federal law can govern. *See, e.g.*, *City of Charleston v. Brabham Oil Co.*, No. 2020-CP-10-03975, at 4-5 (S.C. Ct. Com. Pl. Aug. 6, 2025); *Platkin v. Exxon Mobil Corp.*, 2025 WL 604846, at \*5 (N.J. Super. Ct. Law Div. Feb. 5, 2025); *Mayor & City Council of Balt. v. BP P.L.C.*, 2024 WL 3678699, at \*6 (Md. Cir. Ct. July 10, 2024); *Bucks Cnty.*, 2025 WL 1484203, at \*6; *but see Cnty. Comm'rs v. Suncor Energy USA, Inc.*, 2025 CO 21, 2025 WL 1363355, ¶ 57 (Colo. 2025), *petition for cert. filed*, No. 12-170 (U.S. Aug. 8, 2025); *Honolulu v. Sunoco LP*, 537 P.3d 1173, 1199-200 (Haw. 2023), *cert. denied*, 145 S. Ct. 1111 (2025). Those courts have relied upon the same premise that underlies *AEP* and *City of New York* (and that the State and Intervenor-Defendants ignore in their attempt to mischaracterize those cases): Under "the basic scheme of the Constitution," disputes about the global climate impacts of interstate and international emissions cannot be governed by fifty different state regimes. *AEP*, 564 U.S. at 421, *quoted in City of New York*, 993 F.3d at 90.

The federal Government also agrees that interstate emissions are reserved to federal law. The United States has described climate-change claims based on transboundary emissions as "inherently and necessarily federal in nature," Br. for United States as Amicus Curiae in Support of Pet. for Reh'g at 8, *City of Oakland v. BP p.l.c.*, 969 F.3d 895 (9th Cir. Aug. 3, 2020) (No. 18-16663), and has warned that such claims cannot "be subjected to potentially conflicting regulations by every state and city affected by global warming," Oral Arg. Tr. at 31, *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230 (Jan. 19, 2021); *see also* Br. for the United States as Amicus Curiae Supporting Petitioners at 12-16, *Suncor Energy (U.S.A.) Inc. v. Cnty. Comm'rs of Boulder Cnty.*, No. 25-170 (Sept. 11, 2025). In fact, the United States has now brought its own suit against Vermont's Act on these same fundamental structural grounds. *United States v. Vermont*, No. 2:25-cv-00463-MKL (D. Vt.).

In short, though Vermont "is not expressly seeking to impose a standard of care or emission restrictions on [responsible parties], the goal of its [Act] is perhaps even more ambitious: to effectively impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)." *City of New York*, 993 F.3d at 93. The Constitution does not allow a single State to impose such a global mandate.

**2.    Equal sovereignty, due process, and the foreign affairs doctrine confirm that Vermont has crossed the Constitution's structural line.**

Specific constraints in the Constitution confirm that Vermont is precluded from attempting to impose liability for greenhouse gases emitted across the United States and the world. Equal sovereignty guards each State's right to control affairs within its borders and to be free from domination by another State. *See N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161 (1914) (The "obviously . . . necessary result of the Constitution" is that a State's sovereignty is limited by the sovereignty of other States.); *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 293 (1980)

("The sovereignty of each State, in turn, implied a limitation on the sovereignty of all of its sister States—a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment."); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 154 (2023) (Alito, J., concurring) ("We have long recognized that the Constitution restricts a State's power to reach out and regulate conduct that has little if any connection with the State's legitimate interests."). Due process, and the principles of interstate federalism it embodies, limit a State's power to legislate beyond its territory. *See Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 14 (2025); *see also Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 (2023); *Mallory*, 600 U.S. at 156 (2023) (Alito, J., concurring) (noting that the Court's due process decisions "have continued to recognize that constitutional restrictions on state court jurisdiction . . . reflect 'territorial limitations' on state power" (citation omitted)). And the foreign affairs doctrine reserves to the federal Government alone the conduct of foreign relations and the setting of foreign policy. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964); *see also Zschernig v. Miller*, 389 U.S. 429, 442-43 (1968) (Stewart, J., concurring) ("Our system of government . . . imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." (citation omitted)); *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941) ("[T]he supremacy of the national power in the general field of foreign affairs . . . is made clear by the Constitution."). Vermont's Act exceeds each of these limits.

**Equal Sovereignty and Due Process.** The Act treats Vermont as sovereign over conduct—the production and refining of fossil fuels and emissions of global greenhouse gases from the use of those fossil fuels—that occurred entirely beyond its borders.[7] By asserting the power to

---

[7] Defendants do not dispute that its Act applies only to extraterritorial conduct. ECF 109-1 ¶¶ 23-28 (State Defendants do not dispute that "[n]o fossil fuel extraction or refining occurs in

impose hundreds of millions or billions of dollars in penalties based upon that out-of-state, and indeed global, activity, Vermont seeks to override the energy choices of its sister States and the federal Government and to punish lawful conduct that other States and the federal Government have chosen to permit. That is exactly the sort of unlawful projection of power that longstanding Supreme Court precedent forbids: "[W]ithout throwing down the constitutional barriers," a State may not govern conduct wholly beyond its own borders. *N.Y. Life Ins. Co.*, 234 U.S. at 161.

Defendants respond that the Act does not violate due process because it reaches only companies with a "sufficient connection with Vermont to satisfy constitutional nexus requirements," and that any extraterritorial effects are incidental. ECF 108 at 3; *see also* § 596(22). That confuses personal jurisdiction (i.e., a limitation on the *judicial* power over non-citizens) with *legislative* power over extraterritorial conduct.[8] A State cannot escape the Constitution's territorial limits on its power to regulate conduct by pointing to some forum contacts that would—according to the State—support its courts' exercise of personal jurisdiction. *Fuld* makes clear that "[s]tate sovereign authority is bounded by the States' respective borders," and that due process protects "interstate federalism," as well as individual fairness. 606 U.S. at 14; *see also Mallory*, 600 U.S. at 156 (Alito, J., concurring).

---

Vermont" and that fossil fuel extraction and refining "in the United States and worldwide occur exclusively beyond Vermont's borders"); ECF 112-1 ¶¶ 23-28 (same).

   [8] And even if the Act was within Vermont's constitutional power to enact, Vermont state-courts do not have *judicial* power to reach the conduct the Act targets—extraction and refining of fossil fuels. *See* § 596(22). A State's courts may exercise personal jurisdiction only over conduct that arises out of or relates to a company's forum-related contacts. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021) (collecting cases). Here, it is undisputed that no extraction or refining activities occur (or have occurred during the Act's covered period) in Vermont, so the conduct targeted by the Act could not have any relation to energy producers' forum-related contacts. *See supra* pp.3-4.

State Defendants' reliance on *Young v. Masci*, 289 U.S. 253 (1933), and *Calder v. Jones*, 465 U.S. 783 (1984), to establish a connection between the in-state harm and actions of fossil-fuel producers, ECF 108 at 26, is misplaced. Those cases concern personal jurisdiction and traditional torts with targeted, forum-centered conduct. No such direct, easily traceable connection exists here.

Take *Calder*. That case involved an allegedly libelous article that was written in Florida about a plaintiff in California and published in California, causing the plaintiff's injury in California. *See* 465 U.S. at 791. The defendants expressly aimed their conduct at the forum state: The sources were in California, the article was published in California (among other States), and the reputational injury was centered in California. *See id.* at 784-85; *see also Young*, 289 U.S. at 258 (applying law of New York to New Jersey resident car owner who "gave permission" for another person "to drive his car to New York" where he then collided with Plaintiff). And "*Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum." *Walden v. Fiore*, 571 U.S. 277, 290 (2014).

Energy producers operating around the world and the third-party users of their products, by contrast, do not aim greenhouse gas emissions at Vermont and cannot have such a connection given the nature of these emissions and how they interact with the global atmosphere. *See AEP*, 564 U.S. at 422 (once emitted, greenhouse gases "become well mixed in the atmosphere" (citation omitted)); *City of New York*, 993 F.3d at 92 ("[G]reenhouse gases quickly diffuse and comingle in the atmosphere" (record citation omitted)). So, nothing like the targeted connections held suitable for personal jurisdiction in cases like *Calder* exists here. Rather, as the Act itself states, it will impose liability based on global activities that allegedly contributed indirectly to in-state harm by way of emissions caused by independent acts of countless third parties all around the world. *See*

§ 596(7) (defining "[c]overed greenhouse gas emissions," as "the total quantity of greenhouse gases *released into the atmosphere*" (emphasis added)).

**Foreign Affairs.** Vermont's Act also interferes with the federal government's authority over foreign affairs. Defendants insist that the Act does not collide with any specific U.S. foreign policy and does not intrude into an area of "uniquely federal interest." ECF 108 at 30-34. And Intervenor-Defendants argue that the foreign affairs doctrine is narrow and rarely used. ECF 111 at 52-59. New York made a similar argument to the Second Circuit in *City of New York*, asserting that "[n]o federal policy or statute regulates the relief sought in this suit—compensation for local harms that result from fossil-fuel production—or purports to prevent state-law tort suits seeking such relief. . . . Absent an identifiable federal policy, there is no uniquely federal interest that can conflict with this suit for damages from the production and sale of an inherently harmful product." Appellant's Br. at 32-33, *City of New York*, 993 F.3d 81 (2d Cir. Nov. 8, 2018) (No. 18-2188), 2018 WL 5905772 ("Appellant's Br., *City of New York*"); *see also id.* at 34 ("There is also no uniquely federal interest in every case involving environmental matters. States and cities have important and obvious interests in addressing the consequences of the changing climate that are felt within their borders." (citation omitted)).

But the Second Circuit rejected this argument, explaining that State attempts to impose liability for global greenhouse gas emissions impact foreign affairs. Global greenhouse gas emissions "implicate[] the conflicting rights of states and our relations with foreign nations." *City of New York*, 993 F.3d at 92 (cleaned up). They intersect with the United States' decisions about whether and how to join treaties, how to balance energy security with climate goals, and whether to resist international "liability and compensation schemes." *Id.* at 103 n.11; *see* United States' Mot. Summ. J. at 51-56, *United States v. Vermont*, No. 2:25-cv-00463-mkl (D. Vt.), ECF 50-1

("U.S. Vt. Br."); Decl. of Christopher Landau, Deputy Sec'y of State of the U.S. ¶¶ 4-20, *United States v. Vermont*, No. 2:25-cv-00463-mkl (D. Vt.), ECF 50-3 ("Landau Decl."); *see also* United States' Reply Supp. Mot. Summ. J. at 25-31, *United States v. State of New York*, No. 1:25-cv-03656-PKC (S.D.N.Y. Nov. 19, 2025), ECF 99 ("U.S. N.Y. Br.").[9]

Deputy Secretary of State Christopher Landau addressed these issues in his declaration in support of the United States' challenge to Vermont's Act. As "the principal deputy, adviser, and alter ego to the Secretary of State, the President's chief foreign affairs advisor," Deputy Secretary Landau "assist[s] the Secretary in the formulation and conduct of U.S. foreign policy and in giving direction to all elements of the Department of State." Landau Decl. ¶ 1. Deputy Secretary Landau explained that Vermont's Act "directly conflicts with . . . U.S. foreign policy in multiple respects," *id.* ¶ 15, including that it "would increase costs for energy producers with ties to Vermont, which could in turn increase energy costs for U.S. consumers, thereby undermining crucial U.S. policy and national security interests in increasing affordable domestic energy," *id.*, and that it would impose "the establishment of liability and compensation schemes" for energy producers, *id.* ¶ 16, which "the United States has long opposed," thereby "foment[ing] new frictions in international climate negotiations by targeting fossil fuel companies for actions they took overseas," *id.*

Like New York's tort law in *City of New York*, Vermont's Act cuts across policies that affect national and international affairs. It seeks to impose liability for worldwide fossil fuel use even where the federal Government has chosen not to do so. It risks undermining the federal Government's ability to negotiate from a common national position. U.S. Vt. Br. 53-56; U.S. N.Y. Br.

_____

[9] In its challenge to New York's similar retroactive liability law, the United States explains that the similar New York law interferes both with Congress's and the President's ability to negotiate for and enter (or abstain from entering) "multilateral agreements" and their ability to fashion a "coordinated national policy" on environmental issues. U.S. N.Y. Br. at 28 (quoting Pub. L. No. 100-204, Title XI, § 1103, 101 Stat. 1331, 1408 (1987), *reprinted as note to* 15 U.S.C. § 2901).

at 29-30. And it threatens to create a patchwork of state-level liability schemes that foreign governments and companies must navigate in addition to federal policy. That is exactly the kind of "local interference" that the Supreme Court forbids. *See Zschernig*, 389 U.S. at 443 (citation omitted).

Recent Executive Orders confirm that the federal Government sees state-level climate liability regimes as a direct threat to national energy and foreign policy. *See, e.g.*, Protecting American Energy From State Overreach, Exec. Order No. 14,260, 90 Fed. Reg. 15,513 (Apr. 8, 2025). That Order explains that laws like Vermont's "try to dictate interstate and international disputes over air, water, and natural resources" and are "fundamentally irreconcilable" with federal energy objectives. *Id.* at 15,513-14. Consistent with that view, the United States has filed its own complaint challenging the Act. *United States v. Vermont*, No. 2:25-cv-00463-MKL (D. Vt.).

Last, Defendants rely upon a declaration from Harold Koh to try to escape the foreign affairs implications of the Act. But the Court should disregard that declaration in full, as it is not factual. As the United States has explained in its summary judgment briefing concerning New York's similar retroactive liability law, "[Professor] Koh does not purport to have personal knowledge, much less expertise, concerning the Trump Administration's foreign policy or conduct of foreign affairs." U.S. N.Y. Br. at 31.

The same is true for Professor Koh's declaration here. The declaration provides no relevant *evidence*, as it is largely a legal brief from an academic masquerading as an "expert declaration." Because Professor Koh lacks any personal knowledge or experience concerning the U.S. government's current foreign policy positions, negotiations, or decision-making process, this Court should disregard Koh's declaration "because it contains impermissible legal conclusions and factual assertions not based on personal knowledge." *Haight v. NYU Langone Med. Ctr., Inc.*, 2016

WL 29628, at \*5 (S.D.N.Y. Jan. 4, 2016); *United States v. Articles of Banned Hazardous Substances Consisting of an Undetermined Number of Cans of Rainbow Foam Paint*, 34 F.3d 91, 96 (2d Cir. 1994) ("It is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions."); *see also* U.S. N.Y. Br. at 31.

Moreover, it is well established that a State's law can interfere with the federal government's exclusive foreign affairs power, even without directly contradicting a particular international agreement or treaty. Indeed, the federal government possesses "the very delicate, plenary and exclusive power" over "the field of international relations," and "the President alone has the power to speak or listen as a representative of the nation." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319-20 (1936). Thus, even if Koh's interpretation of international agreements were correct, it does not change the fact that Vermont's Act attempts to intrude into an area of international importance where only the federal government may govern.

\*     \*     \*

The Constitution does not allow a single State to project its power beyond its borders to control national and global conduct. A long line of precedent establishes that federal law must govern liability for out-of-state greenhouse gas emissions. Equal sovereignty bars Vermont from overriding the policy choices of sister States and the federal Government. Due process bars Vermont from legislating extraterritorially. And the foreign affairs doctrine bars Vermont from intruding into matters that demand a single national voice. In short, multiple constitutional provisions and doctrines confirm that Vermont's Act goes too far. The Constitution allocates disputes over global greenhouse gas emissions to federal law.

**B.    There is no relevant dispute about whether the Act is an impermissible regulation imposing liability for global greenhouse gas emissions.**

Aware that Vermont's law is doomed under the Second Circuit's binding decision in *City*

*of New York*, Defendants attempt to manufacture a factual dispute about the function of the Act and its impacts. Specifically, Defendants try to characterize the Act as a compensation scheme unrelated to greenhouse gas emissions, contending that it does nothing to regulate, abate, or control emissions. Moreover, they assert that the Act does not otherwise impact energy producers' behavior because it is a one-time, retroactive fee that one expert thinks will not affect pricing or production of fossil fuels. Therefore, according to Defendants, the Act does not "regulate" greenhouse gas emissions and cannot be precluded by the Constitution or preempted by the Clean Air Act. ECF 108 at 12-15; ECF 111 at 4-9.

But this argument is based on a false premise; constitutional preclusion is not dependent upon whether a particular law is a "regulation" of emissions. Rather, as the Second Circuit recognized in *City of New York*, imposing liability for global greenhouse gas emissions is "simply beyond the limits of state law." 993 F.3d at 92. That is because the doctrine of constitutional preclusion turns on the federal interests at play and "basic interests of federalism." *Id.* at 91-92. Here, the "'overriding … need for a uniform rule of decision' on matters influencing national energy and environmental policy," is plainly implicated, as exhibited by the United States' opposition to this law. *Id.* Even accepting Vermont's assertions that this Act is a one-time, retroactive penalty that will be absorbed as a loss by America's largest energy producers, a penalty in the hundreds of millions or even billions of dollars imposed on such producers will clearly impact national energy and environmental policy. If replicated—as it already has been by New York—that influence will only grow and further implicate the basic interests of federalism that have brought 24 States into this court to challenge a sister State's law. *See id.* at 92 (noting that the filing of amicus briefs on both sides of the dispute by "the federal government, the District of Columbia, and 23 states . . . aptly illustrates that this is an interstate matter raising significant federalism concerns").

Moreover, even if the characterization of this law as a "regulation" were relevant to the constitutional preclusion question (it's not), the Second Circuit has already held that liability under state law for global greenhouse gas emissions *is*, by definition, a form of regulation that intrudes upon an area of exclusive federal authority. *Id.* Defendants cannot escape that *legal conclusion* with its economist's (incorrect) opinion.

**1.** Defendants argue that the Act does not "regulate[ ] fossil fuels or climate emissions" because it only "creates a climate change *adaptation* program and does not concern itself with climate change *mitigation*." ECF 108 at 12; *see* ECF 111 at 4-5. Yet again, Defendants recycle a position that the Second Circuit has already rejected. The City made this same "regulation" argument in *City of New York*, arguing that "because it [sought] damages—not abatement or the imposition of pollution standards—its claims d[id] not threaten to regulate emissions at all[.]" 993 F.3d at 92. The City argued that its "complaint expressly disclaims any attempt to impose liability based on Defendants' emissions of greenhouse gases," that "[n]owhere does the complaint seek the imposition of emissions standards," and that "the City seeks only compensation for the harms it has been forced to bear by Defendants' products." Appellant's Br. at 9, *City of New York*.

The Second Circuit rejected that argument. It held that the City's assertion "ignores economic reality," that "'regulation can be effectively exerted through an award of damages,' and [that] 'the obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.'" *City of New York*, 993 F.3d at 92 (quoting *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637 (2012)).[10] As such, the Second Circuit held, as a

---

[10] The Second Circuit's holding applied decades of Supreme Court precedent holding that claims for compensatory damages constitute regulation. *See, e.g.*, *Kurns*, 565 U.S. at 637; *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 246-47 (1959) ("Our concern is with delimiting areas of conduct which must be free from state regulation if national policy is to be left

matter of law, that "a substantial damages award like the one requested by the City would effectively regulate the Producers' behavior far beyond New York's borders." *Id.*

The same is true of Vermont's Act. Just like the "substantial damages award" that the City sought in *City of New York* for past conduct, Vermont's Act seeks to impose substantial financial penalties on energy producers for global greenhouse gas emissions under a theory of strict liability. The City "requested compensatory damages for the past and future costs of climate-proofing its infrastructure and property." *Id.* at 88. Specifically, it sought "a money judgment"—that is, "[c]ompensatory damages"—"for the costs already incurred by the City," as well as "the costs of actions" it was "currently taking" and "needs to take" in the future "to protect City infrastructure and property, and to protect the public health, safety, and property of its residents from the effects of climate change." Am. Compl. ¶ 13 & pp.73-74, *City of New York v. Chevron*, 325 F. Supp. 3d 466 (S.D.N.Y. 2018) (No. 18-cv-182-JFK), 2018 WL 8064051 ("Am. Compl., *City of New York*"). Vermont's Act almost identically seeks to "recover some of Vermont's costs for responding to climate change impacts in the State" to "protect the health, safety, and welfare of its citizens." ECF 108 at 1; *see also* § 599c (Act's assessment of total cost to the State to be paid by cost recovery demands takes into account "costs that have been incurred and are projected to be incurred in the future . . . to abate the effects of covered greenhouse gas emissions").

---

unhampered. Such regulation can be as effectively exerted through an award of damages as through some form of preventive relief."); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 n.17 (1996) ("State power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute.").

    Relatedly, the United States has consistently taken the position that common-law tort suits constitute government regulation. *See, e.g.*, Br. for the United States as Amicus Curiae Supporting Resp. at 8-9, *C.H. Robinson Worldwide, Inc. v. Miller*, 142 S. Ct. 2866 (2022) (No. 25-1425), 2022 WL 1670803 ("This Court has repeatedly recognized in its preemption jurisprudence that a State's common law of torts is a manifestation of a State's 'regulatory' authority." (citation omitted)).

In short, both the City's damages claim in *City of New York* and the Act's cost recovery demands seek the same thing: compensation for costs to the government from the alleged effects of climate change attributed to global greenhouse gas emissions. As the Second Circuit has explained, this "obligation to pay compensation" is a form of "potent" regulation "governing conduct and controlling policy." *City of New York*, 993 F.3d at 92.[11] Nevertheless, the State Defendants continue to insist that Vermont's Act does not regulate emissions, asserting that "the fact that the economic effects of a law could lead to changes in behavior does not convert a statute that is fundamentally compensatory into a regulatory one." ECF 108 at 13. But the Second Circuit already rejected that very argument in *City of New York*.[12]

Defendants argue that *City of New York*'s reasoning was limited to the regulatory impact of ongoing tort duties, while the Act imposes a one-time, retroactive penalty. ECF 111 at 5. To start, the Supreme Court has recognized that both "legislatively authorized fines" and tort "damages" are forms of "economic sanctions" that can change businesses' "lawful conduct in other

___

[11] It also did not matter to the Second Circuit that the City expressly disclaimed that it was "seek[ing] to impose liability on Defendants for their direct emissions of greenhouse gasses" or "to restrain Defendants from engaging in their business operations." Am. Compl. ¶ 14, *City of New York*. It was the City's attempt to collect compensatory damages to pay for the costs of climate change that the Second Circuit held to be unlawful regulation. *City of New York*, 993 F.3d at 92.

[12] The cases cited by Vermont for the proposition that incidental effects on energy prices do not constitute a regulation, *see* ECF 108 at 13, are also inapposite. Those cases did not involve compensatory payments for climate change attributed to global greenhouse gas emissions—something the Second Circuit has already held amounts to regulation as a matter of law. *City of New York*, 993 F.3d at 92-93. Take one of those cases: *Allco Finance Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017). There, the Second Circuit held that Connecticut's renewable energy procurement program did not "regulate" the wholesale electricity market despite potential "incidental effect" on wholesale prices. *Id.* at 101. But Connecticut was regulating its own *in-state* utilities—a quintessential function of State police power. Here, Vermont, unlike Connecticut in *Allco*, is not attempting to "regulate within the domain Congress assigned to [it]," with the possibility its Act "incidentally affects areas within" the federal government's "domain." *Id.* (citation omitted). Rather, Vermont is directly imposing liability for climate change attributed to global, out-of-state greenhouse gas emissions—something that is outside of its domain and constitutes an impermissible regulation of greenhouse gas emissions under *City of New York*.

States." *Gore*, 517 U.S. at 572. And under *City of New York*, a retroactive penalty is just as much regulation of greenhouse gas emissions as a tort suit for compensatory damages. If Vermont's Act is upheld, it can easily be amended or reenacted multiple times over.[13] That means that energy producers are on notice that their ongoing production and refining can expose them to the same liability, which is a risk that they must consider. Intervenor-Defendants say that "decisions based on the possibility of new legislation would be a result of that legislation, not the Vermont Act." ECF 111 at 9. But that is not true. It is the *risk of or potential for* the *existing law* to be extended or reenacted that businesses have to take into account, just as a previous award of tort damages puts businesses on notice that there is a risk they could be sued again.[14]

And just as companies do not view tort liability in one jurisdiction in a vacuum, energy producers must take account of Vermont's Act in the context of their nationwide obligations and risks, including retroactive liability laws enacted in other States. As previously noted, New York has similarly attempted to impose $75 billion in liability on energy producers for greenhouse gas emissions, and nearly a dozen other states are considering similar legislation. *See* Amanda G. Halter, et al., Climate Superfund Map, Pillsbury (Sept. 3, 2025), https://perma.cc/GGF9-FVPR. Thus, as other States pass similar laws, the combined impact of these liability schemes on energy producers' business decisions—including those impacting their production and refining—will only increase.

---

[13] This is not mere speculation or a hypothetical risk. For example, New York enacted a very similar retroactive liability law in 2024 that imposes $75 billion in penalties to be paid by energy producers. A 2022 version of the bill included a $30 billion total cost, S.9417 § 3 (2022), which was increased a year later to $75 billion. Then, within three months of the law's enactment, New York amended the law to extend its covered period from 2000-18 to 2000-24. *See* S.2129-B § 3 (Dec. 26, 2024); S.824 § 3 (Feb. 28, 2025).

[14] For this same reason, the Court need not speculate about whether or how Vermont will amend the Act in the future; it is the *current*, *existing* risk of future liability that matters.

**2**. Trying to dodge the Second Circuit's clear holding, Defendants argue that the Act does not regulate greenhouse gas emissions because it does not impact energy producers' behavior. This is a thinly veiled attempt to reframe a question of settled law into a factual dispute. In support of this argument, Defendants rely upon an opinion by Don Fullerton, who claims in his declaration that the Act's retroactive, one-time penalty is a fixed cost that will not impact pricing or production of fuel.

But whether it is a fixed cost is legally irrelevant. It is irrelevant because (once again) the Second Circuit already rejected the same argument in *City of New York*, where the City argued that its law was not a regulation. *See* Appellant's Br. at 14, *City of New York* ("[T]his suit does not have the purpose, and would not have the effect, of regulating Defendants' direct discharges of out-of-state pollution. Rather, *the City is merely seeking a proper allocation of costs* via a tool traditionally used for that purpose: state nuisance and trespass law." (emphasis added)).

In *City of New York*, even when the factual allegations in New York City's complaint were assumed to be true and all inferences were made in the City's favor, the Second Circuit nonetheless held as a matter of law that an "obligation to pay compensation," such as a "damages award," is an effective means of regulation. 993 F.3d at 92-93 (citation omitted).[15] That was a categorical holding that requiring private companies to pay for climate change resulting from global

---

[15] Defendants note that the City also sought injunctive relief, but they leave out a critical detail: the City sought an injunction only "if the Defendants fail to pay the court-determined damages for the past and permanent injuries inflicted." Am. Compl. ¶ 13, *City of New York*; *City of New York*, 993 F.3d at 92 n.5 (acknowledging that "the City also seeks injunctive relief in the form of abatement, to be applied in the event the Producers fail to pay a potentially enormous judgment"). The Second Circuit relegated that issue to a footnote and based its key holding—that the City's attempt to impose liability for global greenhouse gas emissions constituted an unlawful regulation—on the City's claim for *damages*. *See City of New York*, 993 F.3d at 92-93.

greenhouse gas emissions—regardless of the form of the payment—impermissibly regulates emissions. Whether the cost from the Act is fixed (or not) cannot alter that legal conclusion.

The Fullerton declaration cannot supersede the Second Circuit's decision. Fullerton opines that "the Act is not an 'economic regulation,' as defined and understood by economists, because it does not intervene in the private actions of firms and individuals to change their behavior." Fullerton Decl. ¶ 11(d). But what constitutes "economic regulation" in the opinion of the State's economist does not matter; the Second Circuit held that backward-looking compensation is a *legal* regulation for purposes of the claims Plaintiffs now bring. *City of New York*, 993 F.3d at 92-93. Its holding was based on "economic reality" and "common sense" as to how such compensation awards affect behavior of regulated parties. *Id.* at 92-93 (quoting *Nat. Res. Def. Council v. NHTSA*, 894 F.3d 95, 104-05 (2d Cir. 2018)). Fullerton's opinion of the Act does not (and indeed cannot) override the Second Circuit's legal holding, which squarely addressed this exact argument.

For the reasons explained above, the Second Circuit's holding controls, and this Court should disregard Fullerton's contrary (and irrelevant) declaration.[16] If the Court were to consider it, however, Fullerton's declaration could not support summary judgment for Defendants, who do not even purport to rely on Fullerton's declaration to support their cross-motions. *See* ECF 110; ECF 110-2. Moreover, the West Virginia Plaintiffs have submitted a declaration by Dr. Benjamin Zycher that rebuts Fullerton's assertions. In his declaration, Zycher explains how the Act will likely impact energy producers' behavior, affecting both price and production of fuel. *See* Zycher Decl. ¶¶ 5, 38-39, ECF 121-1. Likewise, the U.S. Chamber and API have submitted unrebutted

---

[16] For the same reasons, the Court should deny Intervenor-Defendants' requests for discovery. *See* ECF 111 at 8; Rolnick Decl. ¶¶ 4-7. None of the "facts" Intervenor-Defendants seek to uncover through discovery will have any bearing on the legal question whether the Act is an unlawful regulation.

evidence that the Act would result in "notable consequences for ExxonMobil, its projects, and its planning" because the "significant cost recovery demands would have to be paid, and the funds to make that payment would have to come from somewhere, forcing energy producers . . . to make strategic business decisions about capital investments, production volumes, planning, prices, contracts, and personnel." Swarup Decl. ¶ 27, ECF 100-6; *see also* Meyer Decl. ¶ 17, ECF 100-5; Durbin Decl. ¶ 19, ECF 100-4. Those critical "business decisions," Swarup Decl. ¶ 27, ECF 100-6, will directly impact energy producers' fossil fuel extraction and refining activities, and consequently, any greenhouse gas emissions attributable to the use of fossil fuel produced from those activities. Thus, if the Court disagrees with Plaintiffs' position, based on *City of New York*, that the likely effects on energy producers' behavior are irrelevant to the constitutional preclusion issue, and if, in addition, the Court is inclined to consider Fullerton's declaration, the competing Zycher declaration and evidence submitted by the U.S. Chamber and API create a factual dispute that would prevent this Court from granting Defendants' cross-motions for summary judgment. Again, there is no factual dispute preventing the entry of summary judgment *for Plaintiffs* here, given the Second Circuit's controlling holding in *City of New York*.

The State Defendants further err in claiming, without support, that "the Court may grant summary judgment for the State because a factual dispute on the Act's impacts means Plaintiffs cannot demonstrate the Act will be unlawful in all its applications." ECF 108 at 15 n.10. That is not how a facial challenge or the summary judgment standard works. *See, e.g.*, *Romero v. Allstate Ins. Co.*, 3 F. Supp. 3d 313, 319-20 (E.D. Pa. 2014) ("[S]ummary judgment rules do not apply any differently where there are cross-motions pending."), *aff'd*, 778 F.3d 444 (3d Cir. 2015). If the Court determines that there is a factual dispute that precludes summary judgment, then Plaintiffs are entitled to prove at trial that the Act is unconstitutional in all of its applications. *See, e.g.*,

*Grasshopper Gardens, Inc. v. PMA Mech. LLC*, 2025 WL 2711066, at \*11 (N.D.N.Y. Sept. 23, 2025) ("A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried . . . . [T]he court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994))); *Am. Mfrs. Mut. Ins. Co. v. Am. Broad.-Paramount Theatres, Inc.*, 388 F.2d 272, 279 (2d Cir. 1967) (where neither party can satisfy the summary judgment standard, "the District Court must at a trial resolve contested factual issues"). But here, of course, there should be no need for such a trial because every issuance of a penalty demand under Vermont's Act impermissibly intrudes upon federal interests that preclude the application of state law. *See supra* pp.15-27.

### C. The Clean Air Act preempts the Act because it imposes liability for greenhouse gas emissions originating beyond Vermont's borders.

As explained in the Plaintiffs' motion for summary judgment and response to Defendants' motions to dismiss, in addition to constitutional preclusion, the Clean Air Act also preempts Vermont's Act because the latter seeks to impose liability for domestic greenhouse gas emissions originating outside of Vermont. *See* ECF 100-1 at 24; ECF 101 at 31-38. Applying the reasoning of both Supreme Court and Second Circuit precedent, Vermont's authority to impose liability for greenhouse gas emissions is limited to the "slim reservoir" of emissions originating within Vermont. *City of New York*, 993 F.3d at 100. Because the law, on its face, imposes liability for *global* greenhouse gas emissions, it exceeds the bounds of state authority under the Clean Air Act and is preempted.

Defendants' counterarguments fail to rebut that conclusion, which is required by the Supreme Court's decision in *Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987), and the Second Circuit's reasoning in *City of New York*. This Court should deny Defendants' motions to dismiss and

motions for summary judgment and grant Plaintiffs' motions because Plaintiffs have shown—and plausibly alleged—that the Act is preempted under the Clean Air Act.

**1.** To start, Defendants apply the wrong standard and analysis to Plaintiffs' Clean Air Act preemption claim. Defendants argue that the Act is within the State's "traditional authority to raise funds to protect its citizens and its environment." ECF 110-1 at 28; *see also* ECF 113-1 at 32-33. Based on that assertion, they argue that the Act is entitled to a presumption against preemption under a traditional statutory preemption analysis. Defendants are wrong on both counts.

*First*, there is no presumption against preemption because the Act does not fall "within Vermont's traditional authority." ECF 108 at 15; *see* ECF 111 at 33 (similar). Contrary to Defendants' arguments, the Act does not fall within Vermont's "traditional authority" to "raise funds to protect [Vermont's] citizens and its environment." ECF 110-1 at 28. Rather, just like the tort claims seeking the same type of compensation in *City of New York*, Vermont's Act attempts to impose liability for global greenhouse gas emissions. The Second Circuit held that imposing liability for global greenhouse gas emissions is an area "in which the states have traditionally *not* occupied." *City of New York*, 993 F.3d at 98. Instead, courts have long held that federal law must apply to "disputes involving interstate air . . . pollution." *Id.* at 91; *see supra* pp.15-21. That is true for the penalty scheme imposed by Vermont's Act as much as it was for the damages claims at issue in *City of New York*.

Intervenor-Defendants resist this conclusion, claiming that "to the extent federal common law (historically) and the Clean Air Act (presently) govern interstate air pollution, they do so by *limiting* pollution." ECF 111 at 33. They also claim that the history of federal common law governing interstate emissions applied only to "nuisance action[s] 'to abate pollution emanating from another State.'" *Id.* at 34-35 (quoting *AEP*, 564 U.S. at 421). But these arguments are just a

repackaging of the same "we're not seeking abatement" argument the Second Circuit rejected in *City of New York*. 993 F.3d at 91 (rejecting argument that "because it seeks damages rather than abatement," the City's "claims will not result in the regulation of global emissions").

Again, the Second Circuit determined that the City's claims involved an area of traditional federal law in a case where New York City, just like Vermont's Act here, sought compensation "for the costs already incurred," and those to be incurred in the future, in order "to protect . . . infrastructure and property," and "to protect the health, safety, and property of its residents from the impacts of climate change." Am. Compl. ¶ 13, *City of New York*. The Second Circuit obviously did not view the history of federal authority in this area to be cabined to abatement efforts, given that it applied that precedent to reject the City's state-law claims for *compensation*.[17]

*Second*, because *Ouellette* and the reasoning of *City of New York* speak directly to the preemption question at issue here, this Court need not resort to the traditional statutory preemption analysis.[18] Rather, under *Ouellette* and the reasoning of *City of New York*, States' authority under the Clean Air Act "is narrowly circumscribed, and has been interpreted to permit only state lawsuits brought under 'the law of the pollution's *source* state.'" *Id.* at 100 (cleaned up; quoting *Ouellette*, 479 U.S. at 497). In other words, under the Clean Air Act, Vermont may impose liability under its state law only as to greenhouse gas emissions that originate within its own borders.

---

[17] Intervenor-Defendants acknowledge that "the Supreme Court has . . . observed . . . that these interstate disputes [regarding interstate pollution] warranted federal common law because a 'uniform rule of decision' was needed to adjudicate states' 'alleged federal rights' in the quality of interstate waters," but they disregard those statements as dicta. ECF 111 at 35 (quoting *Milwaukee I*, 406 U.S. at 107). However, those statements actually reflect the Supreme Court's binding rationale for its judgment, and, in any event, this Court is "obligated to accord great deference to Supreme Court dicta." *United States v. Harris*, 838 F.3d 98, 107 (2d Cir. 2016) (cleaned up); *accord City of New York*, 993 F.3d at 99 n.10 (relying on *Milwaukee I*).

[18] Intervenor-Defendants admit that "*City of New York*'s departure from traditional preemption analysis applies only where a state operates in an area 'previously governed by federal common law.'" ECF 111 at 34 (quoting *City of New York*, 993 F.3d at 99).

Because the Act, on its face, applies to greenhouse gases emitted from every State in the Union (and from every country around the world), it falls outside the "slim reservoir" of state authority under the Clean Air Act. *Id.* at 100. Indeed, its liability scheme requires consideration of global greenhouse gas emissions and could not be interpreted or applied in a way that is limited to Vermont emissions. "The Clean Air Act therefore does not authorize" Vermont's Act, "meaning that" Vermont's attempt to impose liability for "domestic emissions [is] barred." *Id.*; *see* ECF 100-1 at 20-23; ECF 101 at 33-34.

The State Defendants argue that *City of New York* concerned the Clean Air Act's displacement of federal common law claims, which involves a different standard that should not apply here. ECF 108 at 18-19. That is incorrect. To start, the Supreme Court's decision in *Ouellette* did not involve such displacement, and its reasoning leads to the same conclusion that the Second Circuit reached in *City of New York* when presented with the argument that the Clean Air Act simply could not reach the state-law claims. After holding that federal law must control attempts to impose liability for global greenhouse gas emissions and that the Clean Air Act had displaced federal common law with respect to domestic emissions, the Second Circuit in *City of New York* considered whether the Clean Air Act authorized the City's state-law claims. *City of New York*, 993 F.3d at 90-98. The City argued that it could still bring its state-law claims because the Clean Air Act's displacement of federal common law meant that its state claims "snap[ped] back into action unless specifically preempted by statute." *Id.* at 98; *see* Appellant's Br. at 16-17, *City of New York* (The City argued that "even if the Clean Air Act displaced the judicially recast federal-common-law claims, it would not take out state law along with it. A statute that displaces federal common law leaves state law intact unless that state law has been preempted by the federal statute, which is not the case here."). Applying the Supreme Court's reasoning in *Ouellette* in light of the

history of federal authority over interstate pollution, the Second Circuit concluded that the City's *state-law claims* could survive only if they were authorized by the Clean Air Act, and because the Clean Air Act did not authorize those claims concerning out-of-state greenhouse gas emissions, the City's state-law claims "concerning domestic emissions [we]re barred." *City of New York*, 993 F.3d at 100.

The State Defendants also suggest that Plaintiffs' preemption argument is inconsistent with *AEP*'s acknowledgment after the Clean Air Act's displacement of federal common law that "the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act." ECF 108 at 22 (quoting *AEP*, 564 U.S. at 429). Not so. *AEP* did not address the Clean Air Act's impact on state-law claims seeking to impose liability for *out-of-state* greenhouse gas emissions. Rather, the remand statement in *AEP* concerned state-law claims regarding *in-state* emissions. *See* 564 U.S. at 429 (noting that "[t]he plaintiffs . . . sought relief under . . . the law of each State where the defendants operate powerplants" and that under *Ouellette*, "the Clean Water Act does not preclude aggrieved individuals from bringing a nuisance claim pursuant to the law of the *source* State" (citation omitted)).[19] *City of New York* did, however, address the Clean Air Act's application to liability under state law for out-of-state greenhouse gas emissions. *City of New*

---

[19] Moreover, the Supreme Court's use of the phrase "*inter alia*" suggests that something more must be taken into account beyond only the preemptive effect of the Clean Air Act. *Inter alia*, Black's Law Dictionary (12th ed. 2024) ("Among other things"). This could include the background constitutional principle that federal law applies unless the Clean Air Act authorizes state law. *See, e.g.*, *City of New York*, 993 F.3d at 99. And the Supreme Court's use of "preemptive effect" was in the general sense. *AEP*, 564 U.S. at 429. It was not making a specific statutory preemption holding. *See, e.g.*, *Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy USA, Inc.*, 2025 CO 21, ¶ 100 (Samour, J., dissenting); *see also id.* ¶¶ 101, 103 (explaining that "[t]he Supreme Court in *Ouellette* used the idea of preemption in a similarly general sense" and that the Second Circuit's application of *Ouellette* to determine whether New York City's state-law claims were authorized by the Clean Air Act "was spot-on").

*York*'s interpretation of the Clean Air Act, in light of *Ouellette*, with respect to the City's state-law claims has powerful force, controlling the outcome here.

State Defendants also argue that a traditional statutory preemption analysis should apply because "if Congress has chosen to fill the space of federal common law" through the Clean Air Act "and has not chosen to preempt state statutory law, it would be inappropriate for a court to second-guess that choice through federal common law." ECF 108 at 23. But that argument is inconsistent with Supreme Court precedent explaining that Congress's decision not to *expressly* preempt state law in an *area of traditional federal responsibility* "may reflect nothing more than the settled character of implied preemption doctrine that courts will dependably apply." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 387-388 (2000).

Defendants otherwise argue that *City of New York*'s interpretation of *Ouellette* should not apply because the case is distinguishable, repeating the same arguments that the Act's penalties are different from the ongoing tort liability at issue in *City of New York* and that the Act does not "control pollution." ECF 111 at 43; *see* ECF 108 at 19 (similar). But for the reasons explained above, *City of New York*'s reasoning is equally applicable to the Act's state law penalties here. *See supra* pp.18-20, 30-34. Again, in *City of New York*, the City sought the exact same type of compensation the Act attempts to collect here. *See supra* pp.31-32; Am. Compl. ¶ 13, *City of New York*. The Second Circuit's decision is no less applicable where Vermont repackages that recovery into a statutory, rather than common law, demand.[20]

---

[20] Intervenor-Defendants also argue that applying *City of New York*'s preemption analysis here would mean that "countless state laws," from "tax credits and subsidies for fossil fuel producers" to "investments in public transit" would be preempted as well. ECF 111 at 38. But the Second Circuit's decision does not require this parade of horribles. It applies to attempts to impose liability for climate change due to global greenhouse gas emissions, not any "state laws that have the potential to indirectly affect greenhouse gas emissions." *Id.*; *see City of New York*, 993 F.3d at

**2.** Even applying a traditional preemption analysis, the Clean Air Act preempts Vermont's Act. To begin, the Act invades a field occupied by the Clean Air Act—air emissions originating outside a State's borders. Here, the relevant "field" that Congress has occupied is interstate air pollution—that is, from the perspective of a single State (like Vermont), regulation of pollution originating from other States. Although States have authority to regulate emissions originating from within their borders, federal law has never permitted States to use their laws to address emissions emanating outside their borders. This is consistent with the Supreme Court's holding in *Ouellette*, where the Court rejected the contention that a savings clause of the Clean Water Act "preserve[d] the right to bring suit under the law of any affected State." 479 U.S. at 493. Rather, the Court concluded that the Clean Water Act "precludes a court from applying the law of an affected State against an out-of-state source." *Id.* at 494. The Clean Air Act's nearly identical savings clauses likewise leave no room for a State to apply its law to an out-of-state source of greenhouse gas emissions. Or, in terms of field preemption, federal law occupies the field of interstate pollution, even if the Clean Air Act's savings clauses mean that Congress has carved out limited exceptions for local pollution control. *See City of New York*, 993 F.3d at 99-100; *contra* ECF 108 at 16; ECF 111 at 39-40.

State Defendants argue that the Clean Air Act "does not occupy the entire field of 'interstate air pollution,'" citing a case that held that the Clean Water Act does not bar punitive damages imposed under federal maritime law. ECF 108 at 16 (citing *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008)). But that case did not address preemption: whether a State like Vermont could seek

---

91 (addressing whether attempt "to recover damages for the harms caused by global greenhouse gas emissions may proceed under New York law"). Moreover, each of the examples Intervenor Defendants cite is a law that would regulate *in-state* emissions. But Vermont's Act, on its face, imposes liability for *out-of-state* emissions.

relief, under its own law, for injuries caused by pollution from another State. As explained above and in Plaintiffs' motion for summary judgment, that question was answered in the negative in *Ouellette*. Moreover, the Second Circuit considered *Exxon Shipping Co.* in *City of New York*, but that decision did not alter its analysis of *Ouellette*. *See City of New York*, 993 F.3d at 96-97 (the City's "reliance on *Exxon Shipping Co. v. Baker* is . . . misplaced").

Intervenor-Defendants argue that Plaintiffs' field preemption theory is inconsistent with EPA's statement in a proposed rule that section 202(a) of the Clean Air Act "does not authorize the EPA to prescribe standards for [greenhouse gas] emissions based on global climate change concerns." ECF 111 at 40 (quoting Reconsideration of 2009 Endangerment Finding and Greenhouse Gas Vehicle Standards, 90 Fed. Reg. 36,288, 36,298 (Aug. 1, 2025)). Even if this provision of the Clean Air Act does not authorize EPA to prescribe certain standards based on those concerns,[21] EPA, in its proposed rule, still asserts the authority to regulate greenhouse gas emissions as pollutants, 90 Fed. Reg. at 36,297, 36,302, 36,315, and, as the Supreme Court has recognized, the Clean Air Act gives EPA exclusive authority to determine "*whether* and how" to regulate emissions, *AEP*, 564 U.S. at 426 (emphasis added).

**3.** The Act is also preempted under a traditional conflict preemption analysis. In *Ouellette*, the Court held that permitting an affected State to apply its law to pollution from another State

---

[21] The excerpt quoted by Intervenor-Defendants is out of context. In its proposed rule, EPA proposes that "[f]or purposes of [Clean Air Act] section 202(a), . . . even if GHGs [greenhouse gases] are 'air pollutant[s]' as defined on an Act-wide basis, they must meet the statutory standard for regulating emissions from new motor vehicles and engines before [EPA] may invoke [its] regulatory authority." 90 Fed. Reg. at 36,302. EPA did not say that it lacks authority to regulate greenhouse gas emissions, as Intervenor-Defendants suggest. *See, e.g.*, *id.* at 36,315 ("The bases for repeal proposed in this action would not foreclose us from regulating [greenhouse gas] emissions from new motor vehicles or engines if the Administrator determines that one or more of those gases meet the requirements for regulation under [Clean Air Act] section 202(a), as discussed herein.").

would "disrupt [the] balance of interests" that Congress had weighed in enacting the comprehensive Clean Water Act regulatory scheme and would "undermine the important goals of efficiency and predictability" in the Clean Water Act's permitting scheme. 479 U.S. at 495-96; *see City of New York*, 993 F.3d at 100. As explained in the Plaintiffs' opposition to Defendants' motions to dismiss, the same is true under the Clean Air Act, ECF 101 at 35-38, which authorized EPA to determine "whether and how" pollutants, including greenhouse gas emissions, should be regulated, *AEP*, 564 U.S. at 426. Although States have certain defined roles under the Clean Air Act, *see* ECF 100-1 at 19-20; ECF 101 at 31-32, 35, they may not impose their own liability regimes on out-of-state pollution. Permitting all 50 States to do so would lead to chaos and trigger the same policy concerns underlying the Supreme Court's decision in *Ouellette* and the Second Circuit's decision in *City of New York*—namely, that energy producers would be forced to adjust their financial and strategic business decisions according to differing, often inconsistent state laws, even if they are fully compliant with both the laws of the States in which they are operating and the Clean Air Act. *See Ouellette*, 479 U.S. at 494 (holding that "Vermont nuisance law 'stands as an obstacle' to the full implementation of the [Clean Water Act]" because it "upset[ ] the balance of public and private interests so carefully addressed by the Act" (cleaned up)); *City of New York*, 993 F.3d at 100 ("[T]he City . . . wishes to impose New York nuisance standards on emissions emanating simultaneously from all 50 states and the nations of the world. To permit such a suit would 'undermine this carefully drawn statute through a general savings clause,' and would 'seriously] interfere[ ] with the achievement of the full purposes and objectives of Congress.'" (quoting *Ouellette*, 479 U.S. at 494)).

Defendants' objections here boil down to reiterating their argument that the Act is not an emissions standard or other regulation. *See* ECF 108 at 19-20 (distinguishing *Ouellette* because it

involved a "separate, out-of-state 'regulation' of a point source also regulated by the [Clean Water Act]"); ECF 111 at 43 (*Ouellette* distinguishable because "the Vermont Act does not control pollution"). To start, whether the Act regulates greenhouse gas emissions is irrelevant to whether it is preempted by the Clean Air Act. That the Vermont Act does not specifically abate emissions or impose other pollution controls does not change the fact that it directly imposes a regime of substantial (indeed, massive) governmental penalties for global greenhouse gas emissions attributable to production and refining activities. That penalty regime alone would "effectively override" the laws and "policy choices" made by the other 49 States and would "interfere[ ] with the methods by which the" Clean Air Act is designed to govern the issue of interstate pollution, regardless of whether the Act formally "regulate[s]" greenhouse gas emissions. *Ouellette*, 429 U.S. at 494-95.

Moreover, for the reasons explained above, the Second Circuit has already held that attempts to impose liability for greenhouse gas emissions on energy producers is, as a matter of law, a regulation of emissions. *See supra* pp.28-37. Indeed, the Second Circuit's analysis of the Clean Air Act considered "both state legislation and common law claims" for compensation "under state tort law" to be the same for purposes of its ruling that state law could not govern out-of-state emissions. *City of New York*, 993 F.3d at 100; *see also Ouellette*, 479 U.S. at 491 (addressing "whether the [Clean Water Act] pre-empts Vermont common law to the extent that law may impose liability on a New York point source"). Just like the City in *City of New York*, Defendants' arguments "whipsaw[ ] between disavowing any intent to address emissions and identifying such emissions as the singular source of [Vermont's] harm." 993 F.3d at 91. Or between claiming that the Act "seeks to hold fossil fuel companies accountable for . . . consequences caused by their products," ECF 111 at 47, while saying "the Act is agnostic" to "the emission of air pollution,"

ECF 108 at 19.[22] Vermont "cannot have it both ways," and at bottom, the Act is designed to impose penalties on energy producers "for the harms caused by global greenhouse gas emissions." *City of New York*, 993 F.3d at 91. Imposing such liability conflicts with the federal Government's authority over those same emissions under the Clean Air Act.[23]

For these same reasons, Defendants' reliance upon cases holding that "indirect effects" of regulation "do not amount to obstacle preemption" are misplaced. ECF 111 at 42.[24] The Second Circuit already held that attempting to impose liability and collect compensation for global

---

[22] State Defendants also argue that the "'regulatory' effects" of the Act "would not operate directly on individual point sources regulated by the [Clean Air Act] (unlike the point source at issue in *Ouellette*), but on fossil fuel production." ECF 108 at 20-21. For one, the same could be said about the effects of the City's claims in *City of New York*, but that made no difference to the Second Circuit's holding that the City's state-law claims against energy producers were barred by the Clean Air Act. Moreover, the Clean Air Act's regulatory scheme also reaches greenhouse gas emissions associated with production activities and the content of transportation fuels. For example, EPA regulates methane emissions from upstream oil and gas production and operations, *see* Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review, 89 Fed. Reg. 16,820 (Mar. 8, 2024), and the Clean Air Act's Renewable Fuel Standard regulates the content of fuel, directing EPA to set volumes of renewable fuel blended into transportation fuels based in part on impacts on air quality and climate change, *see* 42 U.S.C. § 7545(o). In short, by imposing liability for global greenhouse gas emissions, Vermont's Act directly conflicts with the Clean Air Act's comprehensive scheme regulating emissions, including those that apply to production activities and transportation.

[23] State Defendants also reiterate that *City of New York* does not apply because it "addressed a question of Clean Air Act displacement, not Clean Air Act preemption," ECF 108 at 21, ignoring the Second Circuit's holding that the City's *state-law claims* were not authorized by the Clean Air Act, as those claims would "undermine" and "seriously interfere with" the Clean Air Act's regulatory regime, *City of New York*, 993 F.3d at 100 (cleaned up).

[24] In general, the cases Intervenor-Defendants rely on are distinguishable in that they involve (i) express preemption provisions that are not at issue here, *see Jensen Fam. Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 940 (9th Cir. 2011); (ii) other statutes not at issue here, *see Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*, 906 F.3d 41, 55-57 (2d Cir. 2018) (Federal Power Act); or (iii) issues and that do not counter *City of New York*'s reasoning. Likewise, State Defendants cite *MTBE*, 725 F.3d at 97, 101, but the Second Circuit rejected the analogy to that case, concluding that the City's claims were not "modest litigation akin to a product liability suit" like *MTBE* but, instead, were "a clash over regulating worldwide greenhouse gas emissions and slowing global climate change," *City of New York*, 993 F.3d at 91.

greenhouse gas emissions constitutes a regulation of emissions not authorized under the Clean Air Act. *See supra* pp.28-37. In doing so, it rejected the City's argument that, because the City was "not seeking to *directly* penalize emitters," it was not seeking to "regulat[e] . . . global emissions." *City of New York*, 993 F.3d at 91 (emphasis added). Rather, the Second Circuit held that "though the City's lawsuit would regulate cross-border emissions in an indirect and roundabout manner, it would regulate them nonetheless." *Id.* at 93. The City's "focus on [an] 'earlier moment' in the global warming lifecycle"—the production and sale of fossil fuels—did not change the "substance" of its attempt to seek damages from emissions. *Id.* at 97. The same is true of Vermont's Act, which seeks the exact same result that the City pursued in *City of New York*. *See supra* pp.31-32.

## Conclusion

The Court should deny Defendants' motions to dismiss and motions for summary judgment, grant Plaintiffs' motion for partial summary judgment, declare the Act to be precluded by the Constitution and preempted by the Clean Air Act, and enjoin Defendants from implementing the Act in any way against Plaintiffs' members.

Dated: December 15, 2025

Respectfully submitted,

/s/ Steven P. Lehotsky

Matthew B. Byrne
GRAVEL & SHEA PC
76 St. Paul Street, 7th Floor
Burlington, VT 05402-0369
Telephone: (802) 658-0220
Fax: (802) 658-1456
Email: mbyrne@gravelshea.com

Steven P. Lehotsky*
Scott A. Keller*
Michael B. Schon*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW,
   Suite 700
Washington, DC 20001
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: steve@lkcfirm.com
Email: scott@lkcfirm.com
Email: mike@lkcfirm.com

Jennifer B. Dickey*
Kevin R. Palmer*
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062
Telephone: (202) 463-5337

*Counsel for Plaintiff the Chamber of Commerce of the United States of America*

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: jared@lkcfirm.com

Ryan Meyers*
American Petroleum Institute
200 Massachusetts Avenue, NW,
   Suite 1200
Washington, DC 20001
Telephone: (202) 682-8000

Meredith R. Pottorff*
LEHOTSKY KELLER COHN LLP
8513 Caldbeck Drive
Raleigh, NC 27615
Telephone: (512) 693-8350
Fax: (512) 727-4755
Email: meredith@lkcfirm.com

*Counsel for Plaintiff American Petroleum Institute*

*Counsel for Plaintiffs the Chamber of Commerce of the United States of America and American Petroleum Institute*

*admitted pro hac vice*

**Certificate of Service**

I, Steven P. Lehotsky, certify that on December 15, 2025, the foregoing was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

/s/ Steven P. Lehotsky
Steven P. Lehotsky