# Exhibit A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

STATE OF WEST VIRGINIA, et al.,

Plaintiffs,

v.

LETITIA JAMES, et al.,

Defendants.

LEAD CASE

1:25-cv-00168 (BKS/DJS)

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, AMERICAN PETROLEUM INSTITUTE, NATIONAL MINING ASSOCIATION, and THE BUSINESS COUNCIL OF NEW YORK STATE, INC.,

Plaintiffs,

v.

LETITIA JAMES, et al.,

Defendants.

MEMBER CASE

1:25-cv-01307 (BKS/DJS)

**Appearances:**[1]

*For Plaintiff State of West Virginia:*
John B. McCuskey
Attorney General of West Virginia
Michael R. Williams
Solicitor General
Caleb B. David
Deputy Solicitor General
Spencer J. Davenport
Assistant Solicitor General
Caleb Allen Seckman
Office of the Attorney General of West Virginia
State Capitol Complex
Building 1, Room E-26

[1] The Court names the current Attorney General, rather than the Attorney General at time of filing, where applicable.

1900 Kanawha Blvd. E
Charleston, WV 25301

*For Plaintiff State of Alabama:*
Steve Marshall
Attorney General of Alabama
Robert M. Overing
Deputy Solicitor General
Office of the Attorney General of Alabama
501 Washington Avenue
Montgomery, AL 36130

*For Plaintiff State of Arkansas:*
Tim Griffin
Attorney General of Arkansas
Autumn Hamit Patterson
Solicitor General
Office of the Arkansas Attorney General
323 Center St., Suite 200
Little Rock, AR 72201

*For Plaintiff State of Georgia:*
Christopher M. Carr
Attorney General of Georgia
Stephen J. Petrany
Solicitor General
Elijah O'Kelley
Assistant Solicitor General
Office of the Attorney General of Georgia
40 Capitol Square, SW
Atlanta, Georgia 30334

*For Plaintiff State of Idaho:*
Raúl R. Labrador
Attorney General of Idaho
Michael A. Zarian
Deputy Solicitor General
Office of the Idaho Attorney General
700 W. Jefferson St., Suite 210,
P.O. Box 83720
Boise, Idaho 83720

*For Plaintiff State of Iowa:*
Brenna Bird
Attorney General of Iowa
Eric H. Wessan

Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319

*For Plaintiff State of Kansas:*
Kris W. Kobach
Attorney General of Kansas
Anthony J. Powell
Solicitor General
Office of the Kansas Attorney General
Memorial Building, 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597

*For Plaintiff Commonwealth of Kentucky:*
Russell Coleman
Attorney General of Kentucky
Victor B. Maddox
Jason P. Woodall
Kentucky Office of the Attorney General
310 Whittington Parkway, Suite 101
Louisville, KY 40222

*For Plaintiff State of Louisiana:*
Liz Murrill
Attorney General of Louisiana
J. Benjamin Aguiñaga
Solicitor General
Office of the Louisiana Attorney General
1885 N. Third Street
Baton Rouge, LA 70802

*For Plaintiff State of Mississippi:*
Lynn Fitch
Attorney General of Mississippi
Justin L. Matheny
Deputy Solicitor General
Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205-0220

*For Plaintiff State of Missouri:*
Catherine Hanaway
Attorney General of Missouri
Louis J. Capozzi
Solicitor General

Office of the Missouri Attorney General
815 Olive Street
St Louis, MO 63101

*For Plaintiff State of Montana:*
Austin Knudsen
Attorney General of Montana
Christian B. Corrigan
Solicitor General
Montana Department of Justice
215 N. Sanders Street
Helena, Montana 59601

*For Plaintiff State of Nebraska:*
Michael T. Hilgers
Attorney General of Nebraska
Zachary A. Viglianco
Principal Deputy Solicitor General
Nebraska Department of Justice
2115 State Capitol
Lincoln, Nebraska 68509

*For Plaintiff State of North Dakota:*
Drew H. Wrigley
Attorney General of North Dakota
Philip Axt
Solicitor General
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505

*For Plaintiff State of Ohio:*
Andy Wilson
Attorney General of Ohio
Mathura Sridharan
Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215

*For Plaintiff State of Oklahoma:*
Gentner Drummond
Attorney General of Oklahoma
Garry M. Gaskins, II
Solicitor General
Office of the Attorney General of Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105

*For Plaintiff State of South Carolina:*
Alan Wilson
Attorney General of South Carolina
J. Emory Smith, Jr.
Solicitor General
Office of the Attorney General of South Carolina
Post Office Box 11549
Columbia, South Carolina 29211

*For Plaintiff State of South Dakota:*
Marty J. Jackley
Attorney General of South Dakota
Emily Greco
Assistant Attorney General
South Dakota Attorney General's Office
1302 E. Highway 14, Suite 1
Pierre, South Dakota 57501

*For Plaintiff State of Tennessee:*
Jonathan Skrmetti
Attorney General and Reporter of Tennessee
J. Matthew Rice
Solicitor General
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202

*For Plaintiff State of Texas:*
Ken Paxton
Attorney General of Texas
Brent Webster
First Assistant Attorney General
Ralph Molina
Deputy First Assistant Attorney General
Austin Kinghorn
Deputy Attorney General for Legal Strategy
Ryan G. Kercher
Chief, Special Litigation Division
Zachary Berg
Special Counsel
Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

*For Plaintiff State of Utah:*
Derek E. Brown
Attorney General of Utah
Gary T. Wight
Assistant Attorney General
1594 West North Temple, Suite 300
Salt Lake City, Utah 84116

*For Plaintiff State of Wyoming:*
Keith G. Kautz
Attorney General of Wyoming
Ryan Schelhaas
Chief Deputy Attorney General
Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002

*For Plaintiffs West Virgina Coal Association and America's Coal Associations:*
Christopher M. Hunter
Robert G. McLusky
Jackson Kelly, PLLC
1600 Laidley Tower
Post Office Box 553
Charleston, West Virginia 25322

*For Plaintiff Gas and Oil Association of West Virginia, Inc.:*
Ivan L. London
William E. Trachman
Alexander Khoury
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227

*For Plaintiff Alpha Metallurgical Resources, Inc.:*
Michael W. Kirk
Adam P. Laxalt
Brian W. Barnes
Megan M. Wold
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C., 20036

*For Plaintiff the Chamber of Commerce of the United States of America:*
Steven P. Lehotsky
Scott A. Keller
Michael B. Schon

Lehotsky Keller Cohn LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001

Jennifer B. Dickey
Kevin R. Palmer
U.S. Chamber Litigation Center
1615 G Street, NW
Washington, DC 20062

Andrew B. Davis
Lehotsky Keller Cohn LLP
750 Rialto Blvd., Suite 1-250
Austin, TX 78735

Jared B. Magnuson
Lehotsky Keller Cohn LLP
3280 Peachtree Road NE
Atlanta, GA 30305

Meredith R. Pottorff
Lehotsky Keller Cohn LLP
8513 Caldbeck Drive
Raleigh, NC 27615

*For Plaintiff American Petroleum Institute:*
Ryan Myers
American Petroleum Institute
200 Massachusetts Avenue, NW, Suite 1200
Washington, DC 20001

*For Plaintiff National Mining Association:*
Tawny Bridgeford
National Mining Association
101 Constitution Avenue, NW
Washington, DC 20001

*For Plaintiff The Business Counsel of New York State, Inc.:*
Heather Briccetti Mulligan
The Business Council of New York State, Inc.
111 Washington Avenue, Suite 400
Albany, NY 12210

*For Plaintiffs the Chamber of Comerce of the United States of America, American Petroleum Institute, National Mining Association, and The Business Council of New York State, Inc.:*
Yvonne E. Hennessey

Richard S. Hartunian
Barclay Damon LLP
80 State Street
Albany, NY 12207

*For Defendants:*
Letitia James
Attorney General for the State of New York
Ayah F. Badran
Monica Wagner
Sabita Krishnan
Laura Mirman-Heslin
Joya C. Sonnenfeldt
Assistant Attorneys General
Office of the New York State Attorney General
Environmental Protection Bureau
28 Liberty Street
New York, NY 10005

*For United States of America:*
Adam R.F. Gustafson
Acting Assistant Attorney General
Robert N. Stander
Deputy Assistant Attorney General
Justin D. Heminger
Acting Deputy Assistant Attorney General
Riley W. Walters
Counsel To The Acting Assistant Attorney General
John K. Adams
Senior Counsel To The Acting Assistant Attorney General
Ian M. Swenson
U.S. Department Of Justice
Environment and Natural Resources Division
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530

*For Amicus Curiae United States Senators Sheldon Whitehouse and Kirsten Gillibrand:*
Christopher Courchesne
Associate Professor and Director
Environmental Advocacy Clinic
Vermont Law and Graduate School
P.O. Box 96
164 Chelsea St.
South Royalton, VT 05068

*For Amicus Curiae West Harlem Environmental Action, Inc., Black Farmers United-New*

*York State, Inc., Citizens Campaign for the Environment, and Catskill Mountainkeeper*
Michelle Wu
Mitchell S. Bernard
Natural Resources Defense Council, Inc.
40 West 20th Street, 11th Floor
New York, NY 10011

Dror Ladin
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005

*For Amicus Curiae the City of New York:*
Muriel Goode-Trufant
Alice R. Baker
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiffs, comprised of twenty-two states,[2] the West Virginia Coal Association, the Gas and Oil Association of West Virginia, Inc., America's Coal Association, and Alpha Metallurgical Resources, Inc., bring this action raising federal and state constitutional challenges to New York State's Climate Change Superfund Act ("the Act"). (Dkt. No. 125, at 1-2). Plaintiffs (collectively, "West Virginia" Plaintiffs) seek injunctive and declaratory relief against Defendants Letitia James, in her official capacity as Attorney General of New York, Amanda Lefton, in her official capacity as Acting Commissioner[3] of the New York State Department of

[2] Plaintiff States include West Virginia, Alabama, Arkansas, Georgia, Idaho, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, and Wyoming. (*See* Dkt. No. 125, at 1).

[3] The Court recognizes that Amanda Lefton is no longer the "Acting" Commissioner, and the Court Clerk is directed to remove "Acting" from her title on the docket. *See* Department of Environmental Conservation, *Commissioner and Executive Team*, https://dec.ny.gov/about/commissioner-and-executive-team (last visited August 18, 2026).

Environmental Conservation, and Amanda Hiller, in her official capacity as Acting Tax Commissioner of the New York State Department of Taxation ( "New York" Defendants). (*Id.*).[4] This action has been consolidated with *Chamber of Commerce v. James*, No. 25-cv-01307 (N.D.N.Y. consolidated Oct. 20, 2025). (*See* Dkt. No. 204). [5] In that action, Plaintiffs Chamber of Commerce of the United States of America, the American Petroleum Institute, the National Mining Association, and the Business Council of New York State, Inc. (collectively, the "Chamber Plaintiffs") also raise constitutional challenges to the Act. (*See* Chamber Dkt. No. 1).

Presently before the Court are West Virginia's and the Chamber's motions for summary judgment, (Dkt. Nos. 216, 217), and New York's cross-motion for summary judgment, (Dkt. No. 230). The motions have been extensively briefed by the parties. (*See* Dkt. Nos. 216-1, 217-1, 230-1, 248, 249, 254, 264, 266). Also before the Court is New York's motion to strike the declaration of Benjamin Zycher and part of the declaration of Christopher Landau, (Dkt. No. 229), as well as West Virginia's and the Chamber's motions to strike the declarations of Don Fullerton, Justin Mankin, and Harold Hongju Koh, (Dkt. Nos. 247, 250). These motions are also fully briefed. (Dkt. Nos. 229-1, 246, 247-1, 250-1, 255, 256, 263, 265). The United States filed a statement of interest as authorized under 28 U.S.C. § 517, (Dkt. No. 222), and (with leave of Court) an opposition brief opposing New York's motion to strike, (Dkt. No. 245). The Court has also accepted briefing from amici curiae United States Senators Sheldon Whitehouse and Kirstin

---

[4] New York moved to dismiss Defendant Amanda Hiller on Eleventh Amendment grounds. (*See* Dkt. No. 230-1, at 75-76) (citing *Ex parte Young*, 209 U.S. 123, 157 (1908) ("In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act[.]")). West Virginia did not respond, and the Court agrees that dismissal is warranted, *See id.* Accordingly, all claims against Defendant Hiller are dismissed, and the Clerk is respectfully directed to terminate Defendant Hiller as a defendant in this action.

[5] Unless otherwise specified, all docket references are to the lead case, *West Virginia v. James*, Case No. 25-cv-00168 (N.D.N.Y. filed Feb. 6, 2025). When it is necessary to cite a document filed in the *Chamber of Commerce* case before consolidation, the Court cites to the docket in *Chamber of Commerce v. James*, No. 25-cv-01307 (N.D.N.Y. filed Feb. 28, 2025), as "(Chamber Dkt. No. [#])."

Gillibrand, (Dkt. No. 232); West Harlem Environmental Action, Inc., Black Farmers United-New York State, Inc., Citizens Campaign for the Environment, and Catskill Mountainkeeper, (Dkt. No. 233); and the City of New York, (Dkt. No. 235). The Court heard oral argument on July 30, 2026. For the reasons that follow, the parties' motions to strike are denied, and Plaintiffs' motions for summary judgment are granted because the Court finds that the Climate Act is preempted.

## II. BACKGROUND

In 2024, New York enacted the "Climate Change Superfund Act," which establishes "a climate change adaptation cost recovery program[.]" *See* Climate Change Superfund Act, ch. 679, 2024 N.Y. Sess. Laws S. 2129-B; *see also* N.Y. Env't Conserv. Law §§ 76-0101 to -0105. In adopting the Act, the New York State legislature found that:

> Climate change, resulting primarily from the combustion of fossil fuels, is an immediate, grave threat to the state's communities, environment, and economy. In addition to mitigating the further buildup of greenhouse gases, the state must take action to adapt to certain consequences of climate change that are irreversible. [ ] Meeting that challenge will require a shared commitment of purpose, huge investments in new or upgraded infrastructure, and new revenue sources to pay for those investments.

*See* Climate Change Superfund Act, S. 2129-B. The legislature further found that "[b]ased on decades of research it is now possible to determine with great accuracy the share of greenhouse gases released into the atmosphere by specific fossil fuel companies over the last 70 years or more, making it possible to assign liability to and require compensation from companies commensurate with their emissions during a given time period." *Id.* The legislative findings stated that the Act "will require companies that have contributed significantly to the buildup of climate change-driving greenhouse gases in the atmosphere to bear a proportionate share of the cost of infrastructure investments and other expenses necessary for comprehensive adaptation to

the impacts of climate change in New York state." *Id.*; *see also* N.Y. Env't Conserv. Law § 76-0103(2)(a) ("The purpose[ ] of the [climate change adaptation cost recovery program] shall be . . . [t]o secure compensatory payments from responsible parties based on a standard of strict liability to provide a source of revenue for climate change adaptive infrastructure projects within the state.").

The Act establishes a total "cost recovery amount" of seventy-five billion dollars, Env't § 76-0101(6), and requires "responsible parties" to pay their "proportional liability" for that amount, Env't § 76-0103(2)(b). A "responsible party" is defined as "any entity . . . which, during any part of the covered period, was engaged in the trade or business of extracting fossil fuel or refining crude oil and is determined by the department"—meaning the New York State Department of Environmental Conservation ("DEC")[6]—"to be responsible for more than one billion tons of covered greenhouse gas emissions." Env't § 76-0101(21). "Covered greenhouse gas emissions" means, "with respect to any entity, the total quantity of greenhouse gas emissions, expressed in metric tons of carbon dioxide equivalent, as defined in section 75-0101 of this chapter,[7] attributable to the total amount of fossil fuels extracted by that entity during the covered period"—which the Act defines as between January 1, 2000 and December 31, 2024, *see* Env't § 76-0101(9)—"as well as the total amount of crude oil refined by that entity during the covered period[,]" Env't § 76-0101(8). Under the Act, "covered greenhouse gas emissions include those emissions attributable to all fossil fuel extraction and refining worldwide by such entity and are not limited to such emissions within the state." Env't § 76-0101(8).

[6] *See* N.Y. Env't Conserv. Law § 1-0303 (providing that, "[w]henever used in this chapter, . . . 'Department' shall mean the state Department of Environmental Conservation").

[7] *See* Env't § 75-0101(2) ("'Carbon dioxide equivalent' means the amount of carbon dioxide by mass that would produce the same global warming impact as a given mass of another greenhouse gas over an integrated twenty-year time frame after emission.").

A responsible party "shall be strictly liable, without regard to fault, for a share of the cost recovery amount[.]" Env't § 76-0103(3)(a). However, the Act provides that "[t]he term responsible party shall not include any person who lacks sufficient contacts with the state to satisfy the due process clause of the United States Constitution." Env't § 76-0101(21).

Each responsible party will receive a "cost recovery demand," which represents "the portion of the cost recovery amount determined by [DEC] pursuant to the program to be owed by a responsible party for payment to the fund." Env't § 76-0101(7). The Act requires DEC to promulgate regulations as "necessary or appropriate to carry out" the Act, "including but not limited to" obtaining information enabling DEC to identify responsible parties and their "applicable share of covered greenhouse gas emissions[.]" Env't § 76-0103(4)(a)(i)-(iv). The Act directs DEC to promulgate these regulations "[w]ithin thirty months of" the Act's effective date of December 26, 2024, and to issue notices of cost recovery demand for each responsible party no later than June 30, 2028. *See id.*

## III. MOTIONS TO STRIKE

As a preliminary matter, the parties have all filed motions to strike portions of certain declarations or expert affidavits. (*See* Dkt. Nos. 229, 247, 250). New York moves to strike the Zycher Declaration, submitted by the West Virginia Plaintiffs, because it "does not meet the standards governing the admissibility of expert testimony" under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 588-592 (1993). (Dkt. No. 229-1, at 5). New York also moves to strike paragraphs 15 through 20 of the Landau Declaration "because they do not meet the requirements of" Federal Rule of Evidence 602 and Federal Rule of Civil Procedure 56(c)(4) applicable to lay testimony." (*Id.* at 5-6).

Both the Chamber and West Virginia move to strike the Declarations of New York's experts, Dr. Fullerton, Dr. Mankin, and Professor Koh. (*See* Dkt. Nos. 247, 250). West Virginia asserts that their declarations are inadmissible under Federal Rule of Evidence 702 and *Daubert*. (Dkt. No. 247-1, at 12). The Chamber contends that these declarations should be stricken under Federal Rules 401, 403, and 702(a) as "irrelevant" and "improper." (Dkt. No. 250-1, at 10-22).

"District courts have leeway on motions to strike in the context of summary judgment motions." *Nodoushani v. S. Conn. State Univ.*, 507 F. App'x 79, 80 (2d Cir. 2013). "While a court is obliged not to consider inadmissible evidence at the summary judgment stage, '[t]o the extent that an affidavit or declaration contains material that does not comply with [Federal Rule of Civil Procedure] 56(e), the [c]ourt may strike those portions, or may simply disregard them.'" *Id.* (quoting *Rus, Inc. v. Bay Indus., Inc.,* 322 F. Supp. 2d 302, 307 (S.D.N.Y. 2003)). Here, the Court finds that it is not necessary to resolve the parties' motions to strike before resolving their motions for summary judgment. For the reasons explained below, the Court does not (and need not) rely on any of these disputed affidavits to address the parties' arguments. *See CNY Fair Hous., Inc. v. Wellclover Holdings LLC*, No. 21-cv-361, 2024 WL 2049047, at *2, 2024 U.S. Dist. LEXIS 83382, at *4 (N.D.N.Y. May 8, 2024) (denying motion to strike at summary judgment where it did not "appear that the Court need[ed] to resolve the admissibility of the expert opinions before resolving the motions for summary judgment"). The parties' motions to strike are accordingly denied as moot.

## IV. MOTIONS FOR SUMMARY JUDGMENT

The West Virginia Plaintiffs move for summary judgment in their favor on Counts I and II of their Amended Complaint. (Dkt. No. 217). Count I asserts that the Act is preempted by the U.S. Constitution, while Count II contends it is preempted under the Clean Air Act. (Dkt. No.

125, at 40-52). The Chamber Plaintiffs also move for summary judgment on Counts I and II of their Complaint, (Dkt. No. 216), which are similar to Counts I and II of the complaint in *West Virginia*. (*See* Chamber Dkt. No. 1, at 39-55 (arguing that the Act is "precluded" by the U.S. Constitution), 55-60 (arguing that the Act is federally preempted under the Clean Air Act)). Both West Virginia and the Chamber believe that no discovery is necessary because these claims "involve purely legal questions." (Dkt. No. 203, at 2).

New York cross-moves for summary judgment, seeking dismissal of both complaints for lack of standing, or in the alternative, dismissing Counts I and II in each action. (Dkt. No. 230).

**A. Standard of Review**

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (per curiam) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a

reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).[8] Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

### B. Article III Standing

New York argues that none of the Plaintiffs have standing to challenge the Act because they "have not met their burden to show, based on admissible evidence, that they face certainly impending injury or that there is a substantial risk of harm." (Dkt. No. 230-1, at 26). The

[8] "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. . . . Rather, the court evaluates each party's motion 'on its own merits,' and 'all reasonable inferences' are drawn 'against the party whose motion is under consideration.'" *Roberts v. Genting New York LLC*, 68 F.4th 81, 88 (2d Cir. 2023) (quoting *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

Chamber and West Virginia disagree, and both groups of Plaintiffs have set forth multiple theories under which they assert standing to sue. (*See* Dkt. Nos. 216-1, at 15; 217-1, at 12; 248, at 14; 249, at 11).

"Even in a preemption challenge, a party must have constitutional standing which is jurisdictional." *The Wilderness Soc'y v. Kane County*, 632 F.3d 1162, 1168 n.1 (10th Cir. 2011) (citing *Indep. Living Ctr. of S. Cal. v. Shewry,* 543 F.3d 1050, 1064 (9th Cir. 2008)); *c.f. Massapequa Union Free Sch. Dist. v. N.Y. State Bd. of Regents*, 809 F. Supp. 3d 33, 89–90 (E.D.N.Y. 2025) ("A party seeking to preempt a state law or obligation must still allege a 'sufficient injury in fact' to confer standing—not anyone can assert that the state law runs contrary to the federal one.").

To prevail on the issue of standing on summary judgment, "mere allegations of injury are insufficient." *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999); *see also Lugo v. City of Troy*, 114 F.4th 80, 87–88 (2d Cir. 2024) ("[A]t the summary-judgment stage, the plaintiff[s] 'can no longer rest on [the complaint's] allegations of standing.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992))). "Rather, a plaintiff must establish that there exists no genuine issue of material fact as to justiciability or the merits." *Dep't of Com.*, 525 U.S. at 329. "[T]o demonstrate [their] entitlement to summary judgment on this issue, the plaintiff[s] must 'set forth by affidavit or other evidence specific facts' showing that there is no genuine dispute as to facts that attest to [their] standing." *Lugo*, 114 F.4th at 88 (quoting *Lujan*, 504 U.S. at 561).[9] "[O]nly admissible evidence need be considered by the trial court in ruling on

---

[9] While Plaintiffs have not specifically moved for summary judgment on the question of standing, Plaintiffs each affirmatively asserted that they have standing in their opening briefs and seek summary judgment on the merits of Counts I and II. (Dkt. Nos. 216-1, at 15; 217-1, at 12). Moreover, "it is well established that [the court has] 'an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *New Jersey v. Bessent*, 149 F.4th 127, 141 (2d Cir. 2025) (quoting *Antonyuk v. James*, 120 F.4th 941, 1039–40 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025)).

a motion for summary judgment, and a district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence." *In re Enf't of Phil. Forfeiture Judgment Against All Assets of Arelma, S.A.*, 153 F.4th 142, 167 (2d Cir. 2025), *cert. denied sub nom. Roxas v. United States*, 223 L. Ed. 2d 514 (Jan. 12, 2026).

"Under Article III of the U.S. Constitution, '[t]he judicial Power of the United States' extends only to certain 'Cases' and 'Controversies.'" *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 141 (2d Cir. 2021) (quoting U.S. Const. art. III, §§ 1–2). "The requirements of Article III standing are well established: '[A] plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). "[A] case must involve 'an injury that is concrete, particularized, and actual or imminent.'" *First Choice Women's Res. Centers, Inc. v. Davenport*, 146 S. Ct. 1114, 1122 (2026) (quoting *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 111 (2025)). "If at least one plaintiff has standing, the suit may proceed." *Bessent*, 149 F.4th at 141 (quoting *Biden v. Nebraska*, 600 U.S. 477, 489 (2023)); *see also Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019).

"This does not mean, however, that a party must wait until [it] sustains an actual injury before filing suit." *Elias Bochner, 287 7th Ave. Realty LLC v. City of New York*, 118 F.4th 505, 517 (2d Cir. 2024). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Lacewell*, 999 F.3d at 141 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). "[A]llegations of *possible* future injury are not sufficient.'" *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). A theory of standing that "relies on a highly attenuated chain of

possibilities" will not "satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410.

"As the Supreme Court has explained, the future injury asserted in a pre-enforcement challenge to a particular law must be 'the result of a statute's actual or threatened enforcement.'" *Walden v. Kosinski*, 153 F.4th 118, 131 (2d Cir. 2025) (quoting *Bochner*, 118 F.4th at 518). Where an individual is subject to the threatened enforcement of a law, "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Driehaus*, 573 U.S. at 158. "[A] plaintiff intending 'to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute,' may demonstrate standing to bring a pre-enforcement challenge to that statute by asserting a 'credible threat' of imminent enforcement, whether criminal or civil, by a government defendant." *Bochner*, 118 F.4th at 518 (quoting *Dreihaus*, 573 U.S. at 159); *see also Cerame v. Slack*, 123 F.4th 72, 81 (2d Cir. 2024).

"The identification of a credible threat sufficient to satisfy the imminence requirement of injury in fact necessarily depends on the particular circumstances at issue." *Knife Rts., Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015). At the pleading stage, "[t]he credible-threat standard 'sets a low threshold and is quite forgiving to plaintiffs seeking such preenforcement review, as courts are generally willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund." *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 138 (2d Cir. 2023). On summary judgment, Plaintiffs face a "heightened burden" to "adduce 'factual evidence' proving" a credible threat of imminent enforcement. *See Bochner*, 118 F.4th at 522.

**1. Evidence Regarding the Plaintiffs[10]**

**a. Relevant Plaintiff Associations[11]**

Plaintiff Chamber of Commerce of the United States of America is "the world's largest business federation, representing approximately 300,000 direct members" including Exxon Mobil Corporation, Shell USA, Inc., Chevron Corporation, and BP America, Inc. (Dkt. Nos. 216-2, ¶¶ 1, 3; 216-4, ¶¶ 6, 16). The Chamber "advocates on behalf of its members, including by bringing lawsuits, when necessary, to challenge the legality of federal and state regulation of business on behalf of its members and the broader business community in the United States." (Dkt. Nos. 216-2, ¶ 2; 216-4, ¶¶ 7–9).

Plaintiff Business Council of New York State ("BCNYS") is "the largest statewide employer association in New York, representing more than 3,300 private sector businesses and industry groups across all sectors of the State's economy." (Dkt. Nos. 216-2, ¶ 16; 216-10, ¶ 5). "BCNYS advocates on behalf of its members, including by bringing lawsuits, when necessary, to challenge the legality of New York regulation of business on behalf of its members and the broader business community in New York." (Dkt. No. 216-2, ¶ 17). Both Exxon Mobil Corporation and BP America are members of BCNYS. (Dkt. Nos. 216-2, ¶ 18; 216-10, ¶ 13).

Plaintiff American Petroleum Institute ("API") is "a national, not-for-profit trade association representing all segments of America's oil and natural gas industry" with a

[10] The facts are drawn from the parties' exhibits submitted in connection with the summary judgment motions. *See Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007). The Court also cites to the parties' statements of material facts and their responses thereto, where those facts are undisputed. (See Dkt. Nos. 216-2; 218; 230-10; 230-11; 230-12; 248-1; 249-1). In assessing the party's cross-motions for summary judgment, the Court will "draw all reasonable inferences against the party whose motion is under consideration." *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 56 (2d Cir. 2021) (quoting *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010)). The parties' submissions have also raised certain evidentiary challenges; the Court addresses challenges relevant to its analysis below.

[11] The Court has limited its analysis to certain Plaintiffs since the Court need only find that one Plaintiff has standing to permit the case to proceed.

membership of "roughly 600 companies," also including Exxon Mobil Corporation, Shell USA, Inc., Chevron Corporation, and BP America. (Dkt. Nos. 216-2, ¶¶ 6, 8; 216-7, ¶¶ 4, 16). API "advocates on behalf of its members, including by bringing lawsuits, when necessary, to challenge the legality of federal and state regulation of the oil and natural gas sector." (Dkt. No. 216-2, ¶ 7; 216-7, ¶ 7).

Plaintiff National Mining Association ("NMA") "is the leading national advocate for the mining industry" representing "more than 250 member companies involved in the extraction, processing, and supply of coal, metals, and industrial and agricultural minerals[,]" including Peabody Energy, Core Natural Resources,[12] and Alliance Resource Partners. (Dkt. No. 216-2, ¶¶ 11, 13; 216-13, ¶¶ 12–13). NMA "advocates on behalf of its members, including by bringing lawsuits, when necessary, to challenge the legality of federal and state regulation of the coal mining sector." (Dkt. Nos. 216-2, ¶ 12; 216-13, ¶ 6).

Representatives from the Chamber of Commerce, BCNYS, API, and NMA have submitted affidavits explaining the ways in which they believe the Act will affect their members. (*See, e.g.*, Dkt. Nos. 216-4, ¶ 16 (Affidavit of Chamber of Commerce Senior Vice President, Martin Durbin, stating that "New York's own actions and statements and the Act's legislative history make clear that New York will issue cost recovery demands to one or more of" Chamber members ExxonMobil, Shell USA, Chevron, and BP America); 216-7, ¶¶ 15–18 (Affidavit of API Senior Vice President Dustin Meyer, stating that "New York's targeting of API's members" including ExxonMobil, Shell USA, Chevron, and BP America, "will cause those members to face immediate and significant risk of incurring unrecoverable compliance costs" and could, "if

[12] On January 15, 2025, Arch Coal and CONSOL merged to become Core Natural Resources. (Dkt. No. 216-13, ¶ 13 n.3 (citing News Release, *Arch Resources and CONSOL Energy Announce Stockholder Approvals in Respect of Pending Merger* (Jan. 9, 2025), https://perma.cc/XN8S-YYM8)).

enforced," cause API members "to suffer significant financial losses"); 216-10, ¶ 13 (Affidavit of BCNYS Vice President Kenneth J. Pokalsky, stating that the Act's legislative history shows New York "will issue cost recovery demands to one or more of" BCNYS's members, including ExxonMobil and BP America); 216-13, ¶ 18 (Affidavit of NMA Executive Vice President and Chief Operating Officer Katie Sweeney, stating that if the Act goes into effect, "NMA members Peabody Energy, Core Natural Resources, and Alliance Resource Partners (and other NMA members New York intends to send cost recovery demands to) will incur unrecoverable costs").

**b. Alpha Metallurgical Resources, Inc.**

According to an October 2, 2013 report issued by the United States Energy Information Administration ("EIA"),[13] between 2009 to 2011—during the Act's covered period— "Alpha Natural Resources, Inc."[14] was the United States' fourth-largest producer of coal. (Dkt. No. 217-30, at 2–3). In its Annual Report on Form 10-K, published on February 29, 2012, Alpha publicly asserted that it is the "second largest among publicly-traded US coal producers as measured by 2011 consolidated revenues of $7.1 billion." (Dkt. No. 217-31, at 6). In 2023, the EIA's "Annual Coal Report" indicated that Alpha Metallurgical Resources was still the tenth largest producer of coal in the United States, responsible for 2.8% of all coal production. (Dkt. No. 217-32, at 5).[15]

---

[13] The EIA "is a semi-independent agency under the U.S. Department of Energy and is the nation's premier source for impartial energy information." *See* U.S. Department of Energy, *U.S. Energy Information Administration (EIA)*, https://www.energy.gov/us-energy-information-administration-eia (last visited Aug. 18, 2026). The Court takes judicial notice of the EIA website which states that it 'collects, analyzes, and disseminates independent and impartial energy information to promote sound policymaking, efficient markets, and public understanding of energy and its interaction with the economy and the environment.'" *See* U.S. Energy Information Administration, *About EIA*, https://www.eia.gov/about/ (last visited August 18, 2026)); *see also Hadwan v. U.S. Dep't of State*, 139 F.4th 209, 219 (2d Cir. 2025) (acknowledging, on review of motion for summary judgment, that the court may take judicial notice of documents from official government websites).

[14] In 2018, Alpha Natural Resources combined with Contura Energy, Inc. "with the resulting entity to trade as Contura Energy, Inc. on the New York Stock Exchange." (Dkt. Nos. 293, ¶ 12; 293-10, at 2). In 2021, Contura Energy, Inc. changed its name to Alpha Metallurgical Resources, Inc. (Dkt. No. 293, ¶ 13; *see also* Dkt. No. 293-11, at 2).

[15] The Court has considered New York's challenge to the admissibility of the EIA reports and the Annual Report below. *See* discussion *infra* section IV.B.3.

### 2. Legislative Materials Regarding Covered Companies

Plaintiffs cite to certain legislative materials in support of their argument for standing. Two of the Act's sponsors, Senator Liz Krueger and Assemblymember Jeffrey Dinowitz, created a memorandum dated October 20, 2023 and entitled "Approximate List of Covered Companies under the Climate Change Superfund Act." (Dkt. Nos. 216-37, 217-33); *see also* N.Y. Sponsor Memorandum, 2023-24 Legis. Sess. A.B. A03351B, https://perma.cc/4SUM-GNWB. The October 2023 memorandum was addressed to "interested parties," and cited to a "peer-reviewed article, 'Tracing Anthropogenic Carbon Dioxide and Methane Emissions of Fuel and Cement Producers, 1854-2010,'" by Dr. Richard Heede. (Dkt. No. 217-33, at 2). The memorandum stated that this article "provides the analytic basis and data that supports the practical implementation of the central principle of the Climate Change Superfund Act." (*Id.*). The memorandum further stated that "[t]his approach to calculating and attributing historic greenhouse gas emissions is a starting point for determining assessments under the legislation[,]" and included "tabulations that calculate the emissions of specific companies in rank order." (*Id.*) The memorandum concluded with a list of thirty-eight companies, which it identified as companies "in the cohort of entities that have released more than 1 billion tons of CO2 in the prescribed period and have sufficient nexus with New York State such that the state could successfully enforce an assessment under the legislation." (*Id.* at 2-3). The list of companies included, inter alia, "Exxon Mobil," "Chevron, USA," "Peabody, USA," "Contura, USA," "Arch Coal, USA," "CONSOL Energy, USA," and "Alliance Res P, USA." (*Id.* at 3).

On June 7, 2024, during Assembly floor debate, Assemblymember Dinowitz spoke publicly in support of the Act. (*See* Dkt. No. 216-2, ¶ 30); *see also* N.Y. State Assemb. Chamber Deb., 2023-24 Legis. Sess., at 305 (June 7, 2024), https://perma.cc/B4BA-8KMU. Assemblymember Dinowitz stated that "Exxon Mobil, Shell, BP, Chevron, and a whole host of

other companies . . . would have to participate in kicking in to" the fund under the Act. *Id.* (*See also* 216-3, ¶ 12; 216-6, ¶ 12; Dkt. Nos. 216-12, ¶ 13; 216-14, ¶ 9). An Assembly memorandum in support of the Act also identifies Chevron and ExxonMobil by name, stating:

> In 2022, the fossil fuel industry has taken advantage of several over-lapping global crises to earn immense profits (Chevron and ExxonMobil had combined profits for the first quarter of 2022 of over $11.8 billion), charging incredibly high prices while aggressively rejecting any responsibility for the costs of its business activities. While all the profits accrue to the companies, all the costs of climate change are paid by taxpayers. This is a market failure that needs to be addressed through policy change.

N.Y. State Assemb. Mem. in Support of Legis. A3351B, https://perma.cc/RAN5-3EBE. (*See also* Dkt. Nos. 216-2, ¶ 31; 216-6, ¶ 12; 216-12, ¶ 13).

### 3. Admissibility of the Legislative Materials, EIA Reports and Alpha's Annual Report

New York contends that the Court should not consider any of this evidence—the EIA materials, (Dkt. Nos. 217-30; 217-32), Alpha's Annual Report, (Dkt. No. 217-31), the October 2023 memorandum, (Dkt. No. 217-33), Assemblymember Dinowitz's statements, (Dkt. No. 216-2, ¶ 30), or the Assembly memorandum, (*Id.* ¶ 31)—because it is all inadmissible hearsay, (*see* Dkt. No. 230-1, at 36-37).

With respect to the materials that are clearly part of the Act's legislative history—namely, Assemblymember Dinowitz's statements during floor debate and the memorandum in support of the Act, (*see* Dkt. Nos. 216-2, ¶¶ 30-31)—the Court may properly take judicial notice of the Act's legislative history, *see Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022). New York contends that courts consider legislative history to "interpret and apply statutes"—not to determine standing. (*See* Dkt. No. 254, at 16). But New York cites no case law, and this Court is aware of none, that prohibits the Court from considering the fact that certain legislative materials exist, or that certain statements were made by legislators, in determining whether Plaintiffs have

standing to challenge the Act. New York does not dispute that these legislative materials exist. (*See* Dkt. No. 230-11, at 13, 15-16). New York also admitted that the Act's sponsors created the October 2023 memorandum. (*See* Chamber Dkt. No. 80, ¶ 75).[16]

More importantly, the Court has not considered these materials—the October 2023 memorandum, (Dkt. No. 217-33), Assemblymember Dinowitz's statements, (*see* Dkt. No. 216-2, ¶ 30), the Assembly memorandum in support of the Act, (*see id.* ¶ 31), Alpha's Annual Report on Form 10-K, (Dkt. No. 217-31), and the EIA reports, (Dkt. Nos. 217-30, 217-32)—for the truth of the matters asserted therein. "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." *See* Fed. R. Evid. 801(c) advisory committee's note; *see also United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) ("[A] statement offered to show its effect on the listener is not hearsay."); *George v. Celotex Corp.*, 914 F.2d 26, 30 (2d Cir. 1990) ("To be sure, an out of court statement offered not for the truth of the matter asserted, but merely to show that the defendant was on notice of a danger, is not hearsay.").

With respect to the October 2023 memorandum, the Chamber Plaintiffs do not cite the memorandum "to prove the precise list of covered companies, amount of emissions attributable to specific companies, or dollar amount of potential cost recovery demands." (*See* Dkt. No. 248, at 19). Rather, the Chamber argues that this document, in combination with the Act's legislative history, "demonstrate[s] legislative intent to target Plaintiffs' members, such that Plaintiffs' members have more than enough reason to credibly fear that the Act will be applied to them." (*Id.*). West Virginia similarly asserts that the EIA data, the Annual Report on Form 10-K, and the

---

[16] The Court may also take judicial notice of Alpha's Form 10-K filing "to 'establish that the matters had been publicly asserted,' rather than for the truth of their contents[.]" *United States Sec. & Exch. Comm'n v. Passos*, 760 F. Supp. 3d 95, 110–11 (S.D.N.Y. 2024) (quoting *Sec. & Exch. Comm'n v. Fiore*, 416 F. Supp. 3d 306, 328–29 (S.D.N.Y. 2019)).

2023 memorandum are admissible to show Alpha faces "a credible threat that New York will attempt to impose liability." (Dkt. No. 249, at 21).

New York argues that the Chamber "relies on the fact" that certain legislative materials "name association members as future recipients of cost demands as evidence of the truth of that fact." (Dkt. No. 254, at 16). But the statements are relevant and the Court has considered them for the non-hearsay purpose, i.e., "solely in the fact that [they were] made," as evidence of a credible fear of enforcement. *See* Fed. R. Evid. 801(c) advisory committee's note.[17] The Court accordingly considers the EIA reports, (Dkt. Nos. 217-30, 217-32), the October 2023 memorandum, (Dkt. No. 217-33), Assemblymember Dinowitz's statements, (*see* Dkt. No. 216-2, ¶ 30), and the Assembly memorandum in support of the Act, (*see id.* ¶ 31), simply for the fact that the statements were made, on the question of whether Alpha and certain members of the Plaintiff associations "legitimately fear" an enforcement action under the Act.

**4. Alpha and Several Members of the Plaintiff Associations Face a Credible Threat of Future Injury**

The Chamber Plaintiffs argue that they have associational standing to challenge the Act, (*see* Dkt. No. 248, at 14), and the West Virginia Plaintiffs also contend that the West Virginia Coal Association and the Gas and Oil Association of West Virginia have standing as representatives of their affected members, (*see* Dkt. No. 249, at 22; *see also* Dkt. Nos. 216-1, at 15; 217-1, at 23). "When an association asserts standing solely as the representative of its members, it 'must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.'" *Disability Advocs., Inc. v. N.Y. Coal. for*

[17] In light of this ruling, the Court has not addressed the Plaintiffs' other evidentiary theories of admissibility.

*Quality Assisted Living, Inc.*, 675 F.3d 149, 156–57 (2d Cir. 2012) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The Chamber Plaintiffs argue that they have associational standing to challenge the Act "because: (1) at least one of Plaintiffs' members has individual standing to sue in its own right; (2) challenging the Act is germane to Plaintiffs' respective purposes; and (3) members' individual participation is unnecessary in this purely legal challenge." (Dkt. No. 216-1, at 15).

New York does not argue that the associations' interests are not germane to their organizations' purposes, nor that the relief requested requires the participation of individual members in the lawsuit. (*See* Dkt. No. 230-1, at 34). Rather, New York argues that the Chamber associations "fail to establish based on admissible evidence" that their alleged injuries "are certainly impending or at least a substantial risk," because the associations "rely upon inadmissible hearsay to assert that their members are likely to receive cost demands[.]" (*Id.* at 37). New York contends that even if that evidence were admissible, "at best it shows that certain legislators believe that some association members should be responsible parties." (*Id.*).

Because New York argues that Alpha lacks standing "for the same reason" that the Chamber Plaintiffs lack standing—namely, that the parties have failed "to show based on admissible evidence" that they face "injury that is certainly impending or a substantial risk" as a result of the Climate Act—the Court considers the parties' arguments together. (*See id.* at 34).

In determining whether a party faces a credible threat of enforcement, a court is "not called on to offer a definitive or comprehensive interpretation" of the challenged statute. *See Antonyuk*, 120 F.4th at 1008. Rather, courts are to consider whether the plaintiff's conduct is "'*arguably* proscribed' by the challenged statute," not whether that conduct is "*in fact* proscribed." *See id.* (quoting *Picard v. Magliano*, 42 F.4th 89, 98 (2d Cir. 2022)). "Thus, 'if a plaintiff's interpretation of a statute is reasonable enough[,] and under that interpretation, the plaintiff may legitimately fear that it will face enforcement of the statute, then the plaintiff has standing to challenge the statute.'" *Id.*

New York does not argue that the Plaintiffs have failed to reasonably interpret the text of the Climate Act. So, the only question is whether Plaintiffs have submitted sufficient evidence to establish that Alpha and the Chamber Plaintiffs may "legitimately fear" an enforcement action under the Act. *See id.* Based on the Act's text and its legislative history, the Court answers this question in the affirmative.

Alpha is publicly documented as one of the United States' largest producers of coal during the Act's covered period. (*See* Dkt. Nos. 217-30, at 2-3; 217-32, at 5). The October 2023 memorandum authored by the Act's sponsors identifies Alpha (under its previous corporate name, "Contura, USA") as responsible for emitting 4.328 billion tons of carbon dioxide and denotes an "annual assessment" on Alpha under the Act of 68 million dollars. (Dkt. No. 217-33, at 3). The Climate Act defines a responsible party as any entity that was "engaged in the trade or business of extracting fossil fuel or refining crude oil" during the covered period and is determined by DEC to be responsible for more than one billion tons of covered greenhouse gas emissions. Env't §§ 76-0101(9), (21). The Act holds these responsible parties strictly liable for paying their share of a seventy-five billion dollar cost recovery fund. Env't §§ 76-0101(6), 76-

0103(2)(b), (3)(a). It is thus eminently reasonable that Alpha "may legitimately fear that it will face enforcement of the statute[.]" *See Antonyuk*, 120 F.4th at 1008.

New York argues that Alpha has "at best" established that "New York could potentially find that Alpha meets the first requirement" to receive a cost recovery demand under the Act—i.e., that Alpha was responsible for more than one billion tons of covered greenhouse gas emissions during the covered period—but that Alpha has not shown that it has "sufficient contacts with New York to satisfy due process" as required by the Act. (*See* Dkt. No. 230-1, at 35). Yet the October 2023 memorandum indicates that the legislators believed the listed companies not only "released more than 1 billion tons of CO2 in the prescribed period," but also "have sufficient nexus with New York State such that the state could successfully enforce an assessment issued under the legislation." (*See* Dkt. No. 217-33, at 2). And Alpha need not, for the purposes of standing, establish that it will *certainly* face an enforcement action; it is enough for Alpha to show it faces a credible threat of enforcement. *C.f. Stagg, P.C. v. U.S. Dep't of State*, 983 F.3d 589, 605 (2d Cir. 2020) (noting that the plaintiff "asserted a cognizable Article III injury at the outset of the litigation, by reason of the credible threat of enforcement raised by DOS's public statements interpreting the [challenged regulation] as covering [the plaintiff's] intended speech").

The same reasoning supports a finding that several members of Plaintiff-Associations Chamber of Commerce, API, NMA, and BCNYS—including ExxonMobil, (Dkt. No. 216-12, ¶¶ 4-5, 11-14), Chevron, (Dkt. No. 216-6, ¶¶ 5-6, 11-12), Peabody, (*see* Dkt. No. 216-5, ¶¶ 5-6, 12-13), Core Natural Resources, (Dkt. No. 216-11, ¶¶ 6-7, 13-14), and Alliance Resource Partners, (Dkt. No. 216-9, ¶¶ 5-6, 11-12)—also face a credible threat of enforcement, (*see* Dkt. No. 216-2, ¶¶ 3, 8, 13, 18). Each one of these companies was identified in the October 2023 memorandum

as a company against which New York "could successfully enforce an assessment under the legislation." (*See* Dkt. No. 217-33). Further, Assemblymember Dinowitz identified ExxonMobil and Chevron by name when speaking in support of the Act as companies who would "have to participate in kicking in to" the fund under the Act. (*See* Dkt. No. 216-2, ¶ 30). New York itself apparently concedes that "legislators and advocates have already found [the Chamber Plaintiffs'] members responsible, in part, for climate change[.]" (Dkt. No. 230-1, at 39). It would strain credulity, then, for New York to assert that none of those members face a credible threat of enforcement under an Act intended to "require companies that have contributed significantly to the buildup of climate change-driving greenhouse gases" to "bear a proportionate share" of the cost of New York's climate change adaptation expenses. *See* Climate Change Superfund Act, ch. 679, 2024 N.Y. Sess. Laws S. 2129-B; *see also Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 70 (2d Cir. 2019) ("Where, as here, 'the plaintiff is himself an object of the action (or forgone action) at issue[,] there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" (quoting *Lujan*, 504 U.S. at 561-62)).

New York has never disavowed that the Climate Act will be enforced against Alpha or the Chamber Plaintiffs' members, nor has New York identified any reason to believe that the Act will not be enforced against these entities. Instead, New York underscores the fact that the Act requires DEC to "determine which fossil fuel producers meet both the emissions requirement and the sufficient contacts requirement based on regulations that have yet to be promulgated." (Dkt. No. 230-1, at 37-38). But at this stage, the question is whether one of the Plaintiffs has established a credible fear of enforcement. And, as the Chamber observes, (Dkt. No. 216-1, at 16)—and as New York declines to dispute—the Act does not appear to give DEC any discretion

over whether to issue cost recovery demands once it finds that a company meets the Act's requirements. *See* Env't § 76-103(3)(e)(i) ("The department *shall* issue notices of cost recovery demand to all responsible parties at the times set forth in . . . this section." (emphasis added)); *c.f. Saba Cap. Cef Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*, 88 F.4th 103, 113 (2d Cir. 2023) (rejecting argument that plaintiff shareholder's alleged injury was too speculative where restrictions in corporate bylaws were "self-actuating," and plaintiff's right to vote would be "automatically encumbered" if plaintiff took its intended course of action). To require Plaintiffs to wait until the DEC promulgates regulations under which they (or their members) are subject to a cost recovery demand would essentially require Plaintiffs to show they are *in fact* subject to an enforcement action under the Act. This is not what the Second Circuit requires where a party brings a pre-enforcement challenge to a particular law. *See Antonyuk*, 120 F.4th at 1008; *Tweed-New Haven*, 930 F.3d at 70 (noting the court had "little difficulty" concluding airport was injured by the threatened enforcement of statute "directly" targeting airport, despite fact that the state had "made no overt threat" to enforce the statute).

Thus, the Court finds that there is no genuine dispute as to the facts that have been adduced by Plaintiffs to establish a credible threat of imminent enforcement. *See Bochner*, 118 F.4th at 518. West Virginia has shown that Alpha has standing to sue because it has established that Alpha may legitimately fear receipt of a cost recovery demand. *See Antonyuk*, 120 F.4th at 1008. For largely the same reasons, the Chamber Plaintiffs have shown that certain of their members "would otherwise have standing to sue in their own right[,]" and the Court finds that the Chamber Plaintiffs have established associational standing to bring suit on behalf of their members. *See Hunt*, 432 U.S. at 343. New York's motion for summary judgment on the issue of standing is therefore denied.

### C. Preemption

Plaintiffs seek summary judgment on their complaints, which allege federal preemption under the U.S. Constitution and under the Clean Air Act. (Dkt. Nos. 216, 217). Plaintiffs argue that the Climate Act is precluded by the Constitution for largely the same reasons the state common-law claims were preempted in *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021)—namely, because the Climate Act "seeks to regulate matters that the U.S. Constitution commits exclusively to the federal Government[.]" (*See* Dkt. Nos. 216-1, at 17; 217-1, at 25 ("Federal law preempts the Act. This Court needs only follow the Second Circuit's roadmap in *City of New York* to reach that conclusion.")).

New York contends that Plaintiffs' arguments "rest on the incorrect premise that the Climate Act regulates out-of-state and global greenhouse gas emissions." (Dkt. No. 230-1, at 39). New York also argues that federal common law does not preempt the Climate Act because it has been displaced by the Clean Air Act, and that the Clean Air Act does not preempt the Climate Act. (Dkt. No. 230-1, at 40, 56).

"The Supremacy Clause of the United States Constitution provides that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013) (quoting U.S. Const. art. VI, cl. 2); *c.f. Hencely v. Fluor Corp.*, 146 S. Ct. 1086, 1093 (2026) ("[W]hen a regulated party cannot comply with both federal and state directives, the Supremacy Clause tells us the state law must yield." (quoting *Martin v. United States*, 605 U.S. 395, 409 (2025)). But "[t]here is no federal pre-emption *in vacuo*, without a constitutional text or a federal statute to assert it." *Id.* (quoting *P.R. Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503

(1988)). "Instead, 'the federal restrictions or rights that are said to conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress.'" *Id.* (quoting *Kansas v. Garcia*, 589 U.S. 191, 202 (2020)).

"In most fields of activity," the Supreme Court "has refused to find federal pre-emption of state law in the absence of either a clear statutory prescription, or a direct conflict between federal and state law[.]" *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988). But "a few areas, involving uniquely federal interests, are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law, fashioned by federal courts in the absence of congressional action." *Hencely*, 146 S. Ct. at 1094 (quoting *Boyle*, 487 U.S. at 504 (internal quotation marks omitted)); *c.f. Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981) ("[In instances of] interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations . . . our federal system does not permit the controversy to be resolved under state law, either because the authority and duties of the United States as sovereign are intimately involved or because the interstate or international nature of the controversy makes it inappropriate for state law to control[.]").

"In those rare areas of 'uniquely federal interest,' the [Supreme] Court has held state law preempted when there is a 'significant conflict' between 'an identifiable federal policy or interest and the [operation] of state law,' or when 'specific objectives' of federal legislation would be frustrated." *Hencely*, 146 S.Ct. at 1094 (quoting *Boyle*, 487 U.S. at 505). The Supreme Court has "emphasized the narrowness of this doctrine," *id.*; "[n]othing in this process suggests that courts are better suited to develop national policy in areas governed by federal common law than they are in other areas, or that the usual and important concerns of an appropriate division of

functions between the Congress and the federal judiciary are inapplicable[,]" *City of Milwaukee v. Illinois* (*Milwaukee II*), 451 U.S. 304, 313 (1981). Moreover, "the mere existence of a federal interest does not intrinsically call for a corresponding federal rule." *City of New York*, 993 F.3d at 90. "There also must be a conflict between that federal interest and the operation of state law." *Id.* While "the necessary conflict 'need not be as sharp as that which must exist for ordinary pre-emption when Congress legislates in a field which the [s]tates have traditionally occupied[,] conflict there must be." *Id.* (quoting *Boyle*, 487 U.S. at 507-508).

"For over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution." *Id.* at 91 (collecting cases). This is because these disputes "often implicate two federal interests that are incompatible with the application of state law: (i) the 'overriding need for a uniform rule of decision' on matters influencing national energy and environmental policy, and (ii) 'basic interests of federalism.'" *Id.* at 91-92 (cleaned up) (quoting *Illinois v. City of Milwaukee* (*Milwaukee I*), 406 U.S. 91, 105 n.6 (1972)); *c.f. Am. Elec. Power Co. v. Connecticut* (*AEP*), 564 U.S. 410, 421 (2011) ("As the Court stated in *Milwaukee I*: 'When we deal with air and water in their ambient or interstate aspects, there is a federal common law.'" (quoting 406 U.S. at 103)); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987) ("[T]he control of interstate pollution is primarily a matter of federal law[.]").

Here, the Plaintiffs bring a facial challenge to the Climate Act. (*See* Dkt. Nos. 216-1, at 15; 248, at 13; 249, at 10; 230-1, at 26). "[W]hen plaintiffs bring a facial preemption challenge to a state law, they must demonstrate that there is no possible set of conditions under which the challenged state regime could be constitutional." *Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 112 (2d Cir. 2025) (quotation omitted), *cert. denied sub nom. Nat'l Shooting Sports v. James*, No. 25-1026, 2026 WL 1717981 (U.S. June 15, 2026).

**1. The Clean Air Act**

Before addressing the parties' arguments, it is necessary to briefly review the history and scope of the Clean Air Act.

In 1963, Congress passed the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." *United States v. EZ Lynk, SEZC*, 149 F.4th 190, 194 (2d Cir. 2025) (quoting 42 U.S.C. § 7401(b)(1)). "Consistent with that mandate, the Environmental Protection Agency (the "EPA") was established in 1970 to implement programs to regulate pollution from both mobile and stationary sources under the Clean Air Act and other related statutes[.]" *City of New York*, 993 F.3d at 87 (citing *Friends of the Earth v. Carey*, 535 F.2d 165, 168–69 (2d Cir. 1976)). That role was "later interpreted to include the regulation of carbon dioxide and other greenhouse gases[.]" *Id.* (citing *Massachusetts v. EPA*, 549 U.S. 497, 528–32 (2007)).

The Clean Air Act designates EPA as the "primary regulator of greenhouse gas emissions." *AEP*, 564 U.S. at 428. "Periodically, [EPA] sets standards for common air pollutants, as necessary to 'protect the public health.'" *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 283 (2024) (quoting §§ 7409(a)(1), (b)(1)). *C.f. AEP*, 564 U.S. at 426-27 (noting that the Clean Air Act directs EPA "to establish emissions standards for categories of stationary sources that, 'in [the Administrator's] judgment,' 'caus[e], or contribut[e] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare'" (quoting § 7411(b)(1)(A))). "Each 'standard of performance' EPA sets must 'tak[e] into account the cost of achieving [emissions] reduction and any nonair quality health and environmental impact and energy requirements.'" *Id.* at 427 (quoting §§ 7411(a)(1), (b)(1)(B), (d)(1)). "EPA may 'distinguish among classes, types, and sizes' of stationary sources in apportioning responsibility for emissions reductions." *Id.* (quoting §§ 7411(b)(2), (d)). "And the Agency may waive compliance

with emission limits to permit a facility to test drive an 'innovative technological system' that has 'not [yet] been adequately demonstrated.'" *Id.* at 428 (quoting § 7411(j)(1)(A)).

As the Supreme Court has observed:

> The appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum: As with other questions of national or international policy, informed assessment of competing interests is required. Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance.

*Id.* at 427.

"The Clean Air Act entrusts such complex balancing to EPA in the first instance, in combination with state regulators." *Id.*; *see also Ohio*, 603 U.S. at 283 ("The Clean Air Act regulates air quality through a federal-state collaboration." (quoting *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 124 (D.C. Cir. 2015))). For example, when EPA sets a new standard, States have three years to submit a "State Implementation Plan, or SIP" that provides for the "'implementation, maintenance, and enforcement' of that standard in their jurisdictions." *Id.* (quoting § 7410(a)(1)). Under the Clean Air Act's "Good Neighbor Provision," state plans must also "prohibit emissions 'in amounts which will . . . contribute significantly to nonattainment in, or interfere with maintenance by, any other State' of the relevant air-quality standard." *Id.* at 284 (quoting § 7410(a)(2)(D)(i)(I)). That is, States "must design these plans with their neighbors in mind" because "air currents can carry pollution across state borders[.]" *Id.* at 283-84.

The Clean Air Act "provides multiple avenues for enforcement" of its emissions standards, including administrative penalties, civil actions against polluters, and "[i]n specified circumstances," criminal penalties. *AEP*, 564 U.S. at 425. And, if "States (or EPA) fail to enforce emissions limits against regulated sources, the Act permits 'any person' to bring a civil

enforcement action in federal court." *Id.* (quoting § 7604(a)). Moreover, "[i]f EPA does not *set* emissions limits for a particular pollutant or source of pollution, [s]tates and private parties may petition for a rulemaking on the matter, and EPA's response will be reviewable in federal court." *Id.* (citing § 7607(b)(1); *Massachusetts,* 549 U.S. at 516–517, 529). "The Act itself thus provides a means to seek limits on emissions of carbon dioxide from domestic powerplants[.]" *Id.*

The Clean Air Act also "includes a citizen-suit savings clause" and a "states' rights savings clause," which are "nearly identical" to the savings clauses in the Clean Water Act. *City of New York*, 993 F.3d at 99. The Clean Air Act's citizen-suit savings clause provides that "[n]othing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief." *Id.* (quoting § 7604(e)). The states' rights savings clause establishes "that '[e]xcept as otherwise provided[,] . . . nothing in this chapter shall preclude or deny the right of any [s]tate or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution,' except that the '[s]tate or political subdivision may not adopt or enforce any emissions standard or limitation" that is "less stringent than a standard or limitation" set by federal law.'" *Id.* (quoting § 7416). While these provisions "plainly permit states to create and enforce their own emissions standards applicable to in-state polluters," "that authorization is narrowly circumscribed, and has been interpreted to permit only state lawsuits brought under 'the law of the [pollution's] *source* [s]tate.'" *Id.* (quoting *Ouellette*, 479 U.S. at 497).

### 2. *City of New York*

The Chamber and West Virginia argue that the Second Circuit's decision in *City of New York v. Chevron Corporation*, 993 F.3d 81 (2d Cir. 2021) governs this case. (*See* Dkt. Nos. 216-

1, at 17–18; 217-1, at 25). New York, of course, disagrees. (*See, e.g.*, Dkt. No. 230-1, at 43).[18] However, all parties agree that, if the Court finds that *City of New York* is not distinguishable from this case—that is, as New York put it at oral argument, if the Court finds that "there is no meaningful or significant difference between the city's public nuisance claim in that case and New York's Climate Act"—then no set of circumstances exists under which the Climate Act would be constitutional. (*See* Dkt. No. 310, at 7). The Court thus turns to *City of New York* and its application here.

In 2018, New York City brought an action in federal court against five multinational oil companies, including BP, Chevron, ConocoPhillips, Exxon Mobil, and Royal Dutch Shell. *See City of New York*, 993 F.3d at 86-88 (citing *City of New York v. BP P.L.C.*, 325 F. Supp. 3d 466 (S.D.N.Y. 2018)). The City asserted three causes of action under New York law for public nuisance, private nuisance, and trespass, all "stemming from the Producers' production, promotion, and sale of fossil fuels." *Id.* at 88. The City "requested compensatory damages for the past and future costs of climate-proofing its infrastructure and property, as well as an equitable

[18] New York also "reserves the right to argue that *City of New York* was wrongly decided." (Dkt. No. 230-1, at 48 n.11). The Court recognizes that other courts have criticized the Second Circuit's approach to federal common law in *City of New York*. *See, e.g.*, *City & County of Honolulu v. Sunoco LP*, 537 P.3d 1173, 1199 (Haw. 2023) (declining to follow *City of New* York's reasoning and holding that court would "first need to determine whether the federal common law governing interstate pollution suits is still good law before determining whether it can preempt state law claims"); *Cnty. Commissioners of Boulder Cnty. v. Suncor Energy USA, Inc.*, 586 P.3d 161, 173 (Colo. 2025) ("Unlike the Second Circuit, for the reasons set forth above, we believe that the proper analysis is for a court first to determine whether any federal common law exists at all because 'displaced federal common law plays no part in this court's preemption analysis.'" (quoting *Honolulu*, 537 P.3d at 1199)), *cert. granted sub nom. Suncor Energy (U.S.A.) Inc. v. Cnty. Commissioners of Boulder Cnty.*, 146 S. Ct. 1605 (2026)); *see also Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 203 (4th Cir. 2022) (distinguishing the procedural posture of *City of New York* from the "heightened standard" for preemption "unique to the removability inquiry" at issue in that case, but nevertheless noting that "*City of New York* . . . fails to explain a significant conflict between the state-law claims before it and the federal interests at stake *before* arriving at its conclusions."). The Supreme Court has recently granted certiorari to address "[w]hether federal law precludes state-law claims seeking relief for injuries allegedly caused by the effects of interstate and international greenhouse gas emissions on the global climate." *See* Petition for Writ of Certiorari, *Suncor Energy (U.S.A.) Inc. v. Cnty. Commissioners of Boulder Cnty.*, No. 25-170 (U.S. Aug 8, 2025).

Whatever the merits of New York's arguments, this Court is bound by controlling Second Circuit precedent "unless and until its rationale is overruled, implicitly or expressly," by the Second Circuit or the Supreme Court. *See United States v. Polouizzi*, 564 F.3d 142, 160 (2d Cir. 2009) (citation omitted).

order ascertaining damages and granting an injunction to abate the public nuisance and trespass that would go into effect should the Producers fail to pay the court-ordered damages." *Id.* The district court dismissed the City's complaint in its entirety with prejudice, holding that federal common law and the Clean Air Act displaced the City's claims. *Id.*; *see also BP P.L.C.*, 325 F. Supp. 3d at 471–73. The Second Circuit affirmed, holding that,"[f]or many of the same reasons stated by the district court[,]" it could not "condone such an action[.]" *City of New York*, 993 F.3d at 86.

First, the court "concluded that the City's claims must be brought under federal common law[.]" *Id.* at 95. The Second Circuit reasoned that courts have consistently applied federal law to cases involving "disputes involving interstate air or water pollution[,]" "because such quarrels often implicate (i) the 'overriding need for a uniform rule of decision' on matters influencing national energy and environmental policy, and (ii) 'basic interests of federalism[.]" *See id.* at 91–92 (collecting cases). The City's lawsuit was "no different":

> To state the obvious, the City does not seek to hold the Producers liable for the effects of emissions released in New York, or even in New York's neighboring states. Instead, the City intends to hold the Producers liable, under New York law, for the effects of emissions made around the globe over the past several hundred years. In other words, the City requests damages for the cumulative impact of conduct occurring simultaneously across just about every jurisdiction on the planet. . . . Such a sprawling case is simply beyond the limits of state law.

*Id.* at 92.

The court then determined that the Clean Air Act displaced federal common law claims concerned with domestic greenhouse gas emissions, "[f]or many of the same reasons that federal common law preempts state law[.]" *Id.* at 95. The court found that, after the Supreme Court's decision in *AEP*, "it is beyond cavil that the Clean Air Act displaced federal common law nuisance suits seeking to abate domestic transboundary emissions of greenhouse gases." *Id.*

(citing *AEP*, 564 U.S. at 429). The court also agreed with the Ninth Circuit's decision in *Native Village of Kivalina v. ExxonMobil Corp.*, which held that "displacement of federal common law does not turn on the nature of the remedy but rather on the cause of action," and found it immaterial that the City sought damages rather than abatement. *Id.* (citing 696 F.3d 849, 857 (9th Cir. 2012)).

The Second Circuit also held that the Clean Air Act's displacement of federal common law did not "resuscitate" the City's state-law claims. *Id.* at 98. The court remarked that where "federal common law exists, it is because state law cannot be used." *Id.* (quoting *Milwaukee II*, 451 U.S. at 316). "Consequently, state law does not suddenly become presumptively competent to address issues that demand a unified federal standard simply because Congress saw fit to displace a federal court-made standard with a legislative one[.]" *Id.*

Finally, the Second Circuit found that "the Clean Air Act cannot displace the City's federal common law claims to the extent that they seek recovery for harms caused by foreign emissions." *Id. at* 101. Nevertheless, the court concluded that "foreign policy concerns foreclose New York's proposal here to recognize a federal common law cause of action targeting emissions emanating from beyond our national borders." *Id.*

**a. The Climate Act's Compensatory Scheme is Not Distinguishable From the State Common Law Claims in *City of New York***

In *City of New York*, the City's lawsuit seeking damages for the harms caused by greenhouse gas emissions implicated and conflicted with "federal interests that are incompatible with the application of state law," and therefore could not proceed under New York common law. 993 F.3d at 92–93. The Climate Act's express purpose is "[t]o secure compensatory payments from responsible parties based on a standard of strict liability" according to their "proportional liability" for covered greenhouse gas emissions "attributable to all fossil fuel

extraction and refining worldwide[.]" *See* Env't §§ 76-0101(8), 76-0103(2)–(3). The Climate Act, by design, contemplates the application of state law to seek damages for the harms caused by greenhouse gas emissions. *See City of New York*, 993 F.3d at 91–92. If the parties agreed that the nature of their dispute is identical to the dispute in *City of New York*, the Court might easily conclude that the Climate Act implicates, and conflicts with, the same federal interests identified by the Second Circuit. But New York urges this Court to find that the Climate Act's cost recovery demands are distinguishable from the common law claims in *City of New York*, in two important ways: (i) because the statute here is unlike the nuisance claims brought by the City; and (ii) because, whereas the City's claims were regulatory in nature, the Climate Act's compensation scheme is not.

**i. State Statutory Law vs. State Common Law**

First, New York contends that *City of New York* "did not involve preemption of a state *statute* by federal common law"; rather, the Second Circuit held that "a *common law* claim for climate damages could be brought only under federal common law." (Dkt. No. 230-1, at 53 (emphasis added)). *City of New York*, Defendants argue, is therefore distinguishable from the case at bar, and "the appropriate analysis is whether the Climate Act could be preempted by the Clean Air Act[.]" *Id.*

West Virginia and the Chamber disagree, arguing that this Court need not conduct a traditional statutory preemption analysis because "*City of New York*'s holding that federal law alone governs attempts to impose liability on global greenhouse gas emissions applies equally to state statutes as it does to state common-law claims." (Dkt. No. 248, at 24-25; *see also* Dkt. No. 249, at 45 (brief for West Virginia, arguing that "the Second Circuit didn't need to do a statutory

analysis because state law was already preempted by 'federal common law,' which 'governed [interstate pollution] in the first place'" (quoting *City of New York*, 993 F.3d at 98)).

"[A]t least since *Erie R. Co. v. Tompkins*," the Supreme Court has "recognized the phrase 'state law' to include common law as well as statutes and regulations." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 522 (1992) (citing 304 U.S. 64 (1938)). In *Norfolk & Western R. Co. v. Am. Train Dispatchers Ass'n*, for example, the Court held (while interpreting the Interstate Commerce Act) that the phrase "all other law, including State and municipal law . . . does not admit of [a] distinction . . . between positive enactments and common-law rules of liability." 499 U.S. 117, 128 (1991) (internal quotation marks omitted). Indeed, interpreting an express preemption provision in *Riegel v. Medtronic, Inc.*, the Court remarked that "[a]bsent other indication," a provision preempting "state requirements" also preempts common-law duties. 552 U.S. 312, 324 (2008) ("As the plurality opinion said in *Cipollone,* common-law liability is 'premised on the existence of a legal duty,' and a tort judgment therefore establishes that the defendant has violated a state-law obligation." (quoting *Cipollone*, 505 U.S. at 522)).[19]

New York has not identified any reason why it should matter, for the purpose of the Court's preemption analysis, that the Climate Act is a positive state enactment—a statute—as opposed to state common law. As the Chamber points out, *City of New York* "refers to 'state law' without qualification[.]" (Dkt. No. 248, at 24; *c.f.* Dkt. No. 249, at 25 ("New York provides no support for this novel theory.")). The Clean Water Act cases[20] similarly give no indication that

[19] The Court in *Cipollone* noted that, "[a]lthough the presumption against pre-emption might give good reason to construe the phrase 'state law' in a pre-emption provision more narrowly than an identical phrase in another context," in that case, "such a construction [was] not appropriate." 505 U.S. at 522; *c.f. Sprietsma v. Mercury Marine*, 537 U.S. 51, 63 (2002) (reading express preemption clause as inapplicable to common law claims). Here, as explained below, New York is not entitled to a presumption against pre-emption. *See* discussion *infra* Section IV.C.3.a.. And the Clean Air Act has no express preemption provision that is applicable to this dispute.

[20] Other courts have consistently found Clean Water Act cases to be persuasive in their preemption analyses. *See, e.g., Bell v. Cheswick Generating Station*, 734 F.3d 188, 196 (3d Cir. 2013) (finding "no meaningful difference between the Clean Water Act and the Clean Air Act for the purposes of [its] preemption analysis"); *Merrick v. Diageo Americas*

the preemptive effect of that Act would be different as applied to a state statute, rather than state common law. *See Milwaukee I*, 406 U.S. at 105 ("The question of apportionment of interstate waters is a question of 'federal common law' upon which state *statutes* or decisions are not conclusive." (emphasis added; citation omitted)); *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110 (1938) ("For whether the water of an interstate stream must be apportioned between the two States is a question of 'federal common law' upon which neither the *statutes* nor the decisions of either State can be conclusive." (emphasis added)). Accordingly, the Court does not find that *City of New York* is distinguishable because it considered state common law claims, as opposed to a state statute.

**ii. Regulatory Nature of the Climate Act**

New York's other principal argument is that the Climate Act's cost recovery demand scheme is distinguishable from the City's claims because, "[u]nlike the common law claims in *City of New York*, the Climate Act does not impose any form of forward-looking emissions reductions." (Dkt. No. 254, at 19). New York contends that, under *City of New York*, federal common law preempts a state law claim "*only if* 'the City's lawsuit would regulate cross-border emissions.'" (*See* Dkt. No. 230-1, at 54-55 (quoting 993 F.3d at 93) (emphasis added)). Because the Climate Act seeks compensation for harm from *past* emissions, New York argues that the Climate Act's retroactive compensation scheme is not "a *de facto* regulation on greenhouse gas emissions." (*See* Dkt. Nos. 254, at 20 (quoting *City of New York*, 993 F.3d at 96); 230-1, at 48 (arguing that "the Second Circuit's concerns in *City of New York* are not present here" because

*Supply, Inc.*, 805 F.3d 685, 692 (6th Cir. 2015) ("Clean Water Act precedents are persuasive with respect to the Clean Air Act because many provisions in the Clean Water Act—including the savings clauses—were modeled on the Clean Air Act, so that the two acts are often *in pari materia*[.]").

the Climate Act "has no impact on future fossil fuel production[,]" and therefore does not "regulate cross-border emissions")).

The Second Circuit explicitly rejected the City's near-identical attempt to recharacterize the nature of its suit. In *City of New York*, the City argued that while greenhouse gas emissions played a role in the case, such emissions were "only a link in the causal chain of the City's damages." *Id.* at 91 (internal quotations and citation omitted). The court disagreed with this characterization of the City's claims, and remarked:

> Artful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse gas emissions. It is precisely *because* fossil fuels emit greenhouse gases—which collectively "exacerbate global warming"—that the City is seeking damages. [ ] Put differently, the City's complaint whipsaws between disavowing any intent to address emissions and identifying such emissions as the singular source of the City's harm. But the City cannot have it both ways.

*Id.* Without reference to any record evidence demonstrating the potential regulatory impact of the Climate Act, the Second Circuit found that "a substantial damages award like the one requested by the City would effectively regulate the Producers' behavior far beyond New York's borders." *Id.* at 92.

The Second Circuit reasoned that, "while the City [was] not expressly seeking to impose a standard of care or emission restrictions on the Producers, the goal of its lawsuit [was] perhaps even more ambitious: to effectively impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)." *Id.* at 93. The Climate Act's text reflects a nearly identical goal: "[t]o secure compensatory payments from responsible parties based on a standard of strict liability" according to their

"proportional liability" for covered greenhouse gas emissions "attributable to all fossil fuel extraction and refining worldwide[.]" *See* Env't §§ 76-0101(8), 76-0103(2)-(3).[21]

Here, too, New York's cost recovery demands in the Climate Act seek damages for greenhouse gas emissions. *See id.* at 91. And here, too, while New York "disavow[s] any intent to address emissions," it identifies those emissions as "the singular source" of the harm that justifies the issuance of cost recovery demands. *Id.* Even if New York's cost recovery demands "would regulate cross-border emissions in an indirect and roundabout manner," the demands "would regulate them nonetheless." *See id.* at 93. It makes no difference that the obligation to pay compensation stems from a *past* harm, because the activity that is subject to the compensation scheme—domestic greenhouse gas emissions—is "potentially subject to the exclusive federal regulatory scheme." *See San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 247 (1959).[22]

The Supreme Court has long held that "regulation can be . . . effectively exerted through an award of damages," and "[t]he obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Kurns v. R.R. Friction Prods.*

---

[21] This conclusion—that the Climate Act's goal is "nearly identical" to the City's lawsuit—is bolstered by statements from one of the Act's sponsors, Senator Kreuger, who said:

> Too often over the last decade, courts have dismissed lawsuits against the oil and gas industry by saying that the issue of climate culpability should be decided by legislatures. Well, the Legislature of the State of New York—the 10th largest economy in the world—has accepted the invitation[.]

(*See* Dkt. No. 216-2, ¶ 32 (citing Press Release, Kathy Hochul, N.Y. State Governor, *Governor Hochul Signs Landmark Legislation Creating New Climate Change Superfund* (Dec. 26, 2024), https://perma.cc/RW9B-NMJF)).

[22] The City, in its amicus brief, similarly contends that the Climate Act "differs sharply from the nuisance theories advanced in *City of New York*" because the Act "seeks funding to remediate the effects of solely past activities[.]". (Dkt. No. 235-2, at 12-13). But in *City of New York*, the City expressly requested compensatory damages for the "*past and future* costs of climate-proofing its infrastructure and property" stemming from fossil fuel producers' "production, promotion, and sale of fossil fuels." 993 F.3d at 88 (emphasis added). And, as the Chamber points out, the City's suit sought an injunction *only* "if the Defendants fail[ed] to pay the court-determined damages for the past and permanent injuries inflicted." (*See* Dkt. No. 248, at 40 n.20 (quoting *City of New York*, 993 F.3d at 92 n.5)). The Court sees no difference between the Climate Act's scheme to remediate the effects of past greenhouse gas emissions and the City's suit for compensatory damages.

*Corp.*, 565 U.S. 625, 637 (2012) (quoting *San Diego*, 359 U.S. at 247). To that end, the Court has explained that "[e]ven the States' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme." San Diego, 359 U.S. at 247.

Nor are the Plaintiffs required, for the purposes of this Court's preemption analysis, to "establish the Climate Act's supposed regulatory effects based on admissible and undisputed evidence" as New York suggests. (*See* Dkt. No. 254, at 19). New York offers no precedent, and the Court is aware of none, which would require Plaintiffs to prove that the Climate Act *will in fact* regulate interstate greenhouse gas emissions before the Court can conclude that the Act conflicts with federal interests or is otherwise preempted. *See San Diego*, 359 U.S. at 247. ("It may be that an award of damages in a particular situation will not, in fact, conflict with the active assertion of federal authority. The same may be true of the incidence of a particular state injunction. To sanction either involves a conflict with federal policy in that it involves allowing two law-making sources to govern.").[23] The Court need not establish the Climate Act's potential regulatory effect as a matter of fact in order to proceed with its preemption analysis.

#### iii. *Hencely v. Fluor Corporation* Does Not Affect This Result

New York argues that the Supreme Court's recent decision in *Hencely v. Fluor Corporation* undermines Plaintiffs' arguments that there is a "significant conflict" between the

[23] New York also contends that this Court cannot take "judicial notice" of the "findings" in *City of New York* with respect to the regulatory effect of the state common-law claims. (Dkt. No. 230-1, at 46). But the Second Circuit did not "find" that the City's lawsuit would regulate transboundary greenhouse gas emissions. As the Chamber points out, "even when the factual allegations in New York City's complaint were assumed to be true and all inferences were made in the City's favor, the Second Circuit nonetheless held as a matter of law that an 'obligation to pay compensation,' such as a 'damages award,' is a means of regulation." (Dkt. No. 248, at 40 (quoting 993 F.3d at 92-93)). Accordingly, the submissions from economists Don Fullerton and Benjamin Zycher, which are subject to the parties' motions to strike, are not material to the Court's analysis, because the Court resolves the parties' arguments by reference to caselaw and not economic theory.

Climate Act and any "uniquely federal interest," or that the "structure of the Constitution precludes the Climate Act[.]" (Dkt. No. 273, at 2–3 (citing 146 S. Ct. at 1094-95, 97)). In *Hencely*, the Court rejected the argument that "the Constitution's structure implicitly preempts any suit against a military contractor operating in a combat zone." 146 S. Ct. at 1097. The Court reiterated that "'the federal restrictions or rights that are said to conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress[,]" and ultimately held that "no provision of the Constitution and no federal statute justifie[d] . . . preemption of the State's ordinary authority over tort suits" as would preclude the case at bar. *Id.* at 1093, 1099 (quoting *Kansas v. Garcia*, 589 U.S. 191, 202 (2020)).

New York says that, "[a]s in *Hencely*," Plaintiffs' arguments "that the structure of the Constitution precludes the Climate Act" have "no basis in the text of the Constitution." (Dkt. No. 273, at 2-3). But as the Chamber points out, *Hencely* did not hold that the "structure" of the Constitution can *never* preempt or preclude state law. (*See* Dkt. No. 274, at 4).[24] Nor did *Hencely* hold that the specific, conflicting federal interests identified in *City of New York* have no preemptive effect. Rather, the Court reiterated *Boyle*'s holding that there are "rare areas of uniquely federal interest'" in which state law is preempted when there is a "significant conflict between an identifiable federal policy or interest and the operation of state law." *See Hencely*, 146 S. Ct. at 1094 (citation omitted). Interstate pollution is, under both Supreme Court and Second Circuit precedent, one such area. *See City of New York*, 993 F.3d at 91 (collecting cases).

The Court in *Hencely* considered—and rejected—the existence of a "blanket preemption" under *Boyle* with respect to military contractors, based on a series of decisions applicable only in

[24] As the dissent in *Hencely* pointed out, "any argument that constitutional structure cannot itself preempt state law comes more than two centuries too late." 146 S. Ct. 1086, 1102–03 (2026) (Alito, J., dissenting) (reviewing preemption cases "based on constitutional structure").

the context of the United States' war powers (and otherwise not relevant here). *See* 146 S.Ct. at 1096-98. There is nothing in *Hencely* that compels the Court to disregard *City of New York*'s conclusion that the application of state law is "incompatible" with disputes involving interstate air pollution where the state law conflicts with "'the overriding . . . need for a uniform rule of decision' on matters influencing national energy and environmental policy, and (ii) 'basic interests of federalism.'" *See City of New York*, 993 F.3d at 91-92 (quoting *Milwaukee I*, 406 U.S. at 105 n.6).

**iv. Summary**

Having determined (1) that the Climate Act is not entitled to a different preemption analysis because it is a statute, rather than a state common-law claim, and (2) that the Climate Act's cost recovery demands would work to regulate interstate greenhouse gas emissions in the same way as the City's common-law nuisance claims, there is very little daylight left to distinguish the Climate Act from the common-law claims in *City of New York*.

The Climate Act, like the City's common-law nuisance claims, is an Act designed to "impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released." *City of New York*, 993 F.3d at 93. Like the City's common-law nuisance claims, every cost recovery demand issued under the Climate Act would effectively seek "to recover damages for the harms caused by global greenhouse gas emissions[.]" *Id.* at 91. The Second Circuit found that such claims could not proceed under state law, because "a substantial damages award like the one requested by the City would effectively regulate the Producers' behavior far beyond New York's borders." *Id.* at 92. The Climate Act's scheme similarly risks "upsetting the careful balance that has been struck between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on

the other." *Id.* at 92. Every potential demand that could issue under the Climate Act, then, would conflict with the same "federal interests" identified in *City of New York* that are "incompatible with the application of state law"—namely, " 'the overriding . . . need for a uniform rule of decision' on matters influencing national energy and environmental policy, and (ii) 'basic interests of federalism.'" *Id.* at 91-92 (quoting *Milwaukee I*, 406 U.S. at 105 n.6).

**b. The Court Need Not Decide Whether the Climate Act is Preempted by the Constitution or Federal Common Law**

Plaintiffs believe that, having concluded that the Climate Act's compensatory scheme conflicts with the same federal interests identified in *City of New York*, the Court may end its analysis here, and that the Court need not go on to consider the preemptive effect of the Clean Air Act to resolve this case. West Virginia argues that "displaced federal common law[,]" in and of itself, "retains its preemptive effect." (Dkt. No. 217-1, at 26). The Chamber (separately, but relatedly) argues that "[t]he same structural constitutional principles that barred the City's state-law claims in *City of New York* also bar New York's Act here—regardless of whether Congress has enacted a statute that displaces federal common law in relation to interstate greenhouse gas emissions." (Dkt. No. 248, at 24).

New York asserts that the Climate Act cannot be preempted by federal common law, because federal common law was displaced by the Clean Air Act. (Dkt. No. 230-1, at 52). It is true that the Clean Air Act displaces federal common law claims. *See AEP,* 564 U.S. at 423; *see also City of New York*, 993 F.3d at 95 ( "In the wake of *AEP*, it is beyond cavil that the Clean Air Act displaced federal common law nuisance suits seeking to abate domestic transboundary emissions of greenhouse gases."). But in *City of New York*, it was important for the purposes of the Court's analysis to decide whether the state-law tort claims *would have been* displaced by federal common law in the absence of the Clean Air Act, because the City argued that "even if

the Clean Air Act displaces federal common law, some residual state law claims remain." *Id.* at 95 n.7. The court rejected this argument, because "'resort[ing] to state law' on a question *previously* governed by federal common law is permissible only to the extent 'authorize[d]' by federal statute." *City of New York*, 993 F.3d at 99 (quoting *People of State of Ill. v. City of Milwaukee* (*Milwaukee III*), 731 F.2d 403, 411 (7th Cir. 1984)) (emphasis added)). That is, because the question of liability for domestic greenhouse gas emissions was *previously* governed by federal common law, "resorting to state law" to establish such liability is permissible only to the extent authorized by the Clean Air Act. *See id.*

Moreover, the Second Circuit found that because the Clean Air Act does not regulate foreign emissions, the City's claims concerning those emissions required the court to apply federal common law. *See id.* at 95 n.7. This conclusion is particularly important to note here because, as discussed below, the Climate Act contemplates issuing cost recovery demands for greenhouse gas emissions "attributable to all fossil fuel extraction and refining *worldwide*[.]" *See* Env't § 76-0101(8) (emphasis added).

The Court need not resolve whether the Constitution or federal common law, standing alone, could preempt the Climate Act. Even if the federal interests "incompatible with the application of state law" that preempted the City's nuisance claims in *City of New York* do not, by themselves, justify preemption in this case, the Climate Act would in any event be preempted by the Clean Air Act for the reasons discussed below.

### 3. Following *City of New York*, the Clean Air Act Displaces Federal Common Law

Plaintiffs argue that the Climate Act is preempted because, under *City of New York*, "state regulation of greenhouse gases is permissible only as authorized" by the Clean Air Act's "comprehensive scheme," which does not authorize the Climate Act. (*See* Dkt. No. 216-1, at 27;

*see also* Dkt. No. 217-1, at 31 ("Because the federal common law applies and conflicts with it, New York's Act is preempted unless the Clean Air Act affirmatively authorizes it. [ ] It doesn't.")). Plaintiffs also assert that, under what New York calls a "traditional statutory preemption analysis," the Climate Act is both field- and conflict-preempted. (*See* Dkt. No. 248, at 45 ("If this Court nevertheless were inclined to conduct a traditional preemption analysis, it would be obliged to reach the same conclusion."); *see also* Dkt. No. 217-1, at 46 ("The Clean Air Act is a comprehensive scheme that regulates air pollution emissions between the States. It does not leave room for States to regulate out-of-State emissions outside of the Clean Air Act's parameters.")).

New York disagrees, arguing that the Climate Act is an exercise of traditional state responsibility, such that it is entitled to the presumption against preemption. (*See* Dkt. No. 230-1, at 40-42). New York also asserts that the Act is neither field- nor conflict-preempted. (*See id.* at 40-52).

**a. The Presumption Against Preemption**

As noted above, New York contends that this Court must conduct a "traditional statutory preemption analysis" to determine whether the Climate Act is preempted by the Clean Air Act. (*See* Dkt. No. 230-1, at 47). New York asserts that *City of New York* does not govern here, because the Second Circuit "distinguished between a 'traditional statutory preemption analysis' and the analysis it conducted—whether a state public nuisance claim preempted by federal common law 'snap[ped] back into action' when federal common law was displaced by the Clean Air Act." (Dkt. No. 254, at 21 (quoting 993 F.3d at 98)). Plaintiffs disagree, arguing that the Second Circuit did not employ a "traditional" statutory preemption analysis because it was unnecessary. (*See* Dkt. Nos. 248, at 24-25; 249, at 45). To begin, therefore, the Court must

clarify what New York means when it asks for a "traditional" statutory preemption analysis—and whether New York is entitled to one.

When Congress legislates in a field "which the States have traditionally occupied[,]" courts begin "with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). The "typical test for determining whether a federal statute preempts state law proceeds" from this assumption. *City of New York*, 993 F.3d at 98.

But in some cases, federal law "may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice*, 331 U.S. at 230. The Supreme Court has made clear that "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000) (citing *Rice*, 331 U.S. at 230). That is, there is no presumption that state law is "competent to address issues that demand a unified standard" if, as in *City of New York*, Congress displaces federal common law with a federal statute. *See* 993 F.3d at 98; *Milwaukee II*, 451 U.S. at 313 n.7 ("If state law can be applied, there is no need for federal common law; if federal common law exists, it is because state law cannot be used."). Accordingly, "'resort[ing] to state law' on a question previously governed by federal common law is permissible only to the extent 'authorize[d]' by federal statute." *City of New York*, 993 F.3d at 99 (quoting *Milwaukee III*, 731 F.2d at 411; then citing *Ouellette*, 479 U.S. at 492).

When New York says that this Court must conduct a "traditional statutory preemption analysis"—the "typical test for determining whether a federal statute preempts state law," *see*

*City of New York*, 993 F.3d at 98—it appears that New York asks the Court to proceed from the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress[,]" *See Rice*, 331 U.S. at 230. But because the Climate Act "regulates in an area where there has been a history of significant federal presence[,]" the Supreme Court has made clear that this assumption is "not triggered[.]" *See Locke*, 529 U.S. at 108.

In *City of New York*, as here, the City argued that the Second Circuit was required "to engage in a traditional statutory preemption analysis" because the Clean Air Act "vaporized any preemptive effect that federal common law had on state law[.]" *City of New York*, 993 F.3d at 98. The Second Circuit found that this analysis was not appropriate, however, because "federal common law governed this issue in the first place." *Id.* The court held that New York state common law did not "suddenly become presumptively competent to address issues that demand a unified federal standard simply because Congress saw fit to displace a federal court-made standard with a legislative one[.]" *Id.* ("The very reasons the [Supreme] Court gave for resorting to federal common law in *Milwaukee I* are the same reasons why the state claiming injury cannot apply its own state law to out-of-state discharges now. *Milwaukee II*[,] [which concluded that the Clean Water Act displaced federal common law,] did nothing to undermine that result." (quoting *Milwaukee III*, 731 F.2d at 410)). Like the City's state common-law nuisance claims, the Climate Act is not entitled to a "traditional statutory preemption analysis" because federal common law governed this issue in the first place. *See City of New York*, 993 F.3d at 98. The Climate Act is not, as New York contends, an "exercise of traditional state responsibility," (Dkt. No. 230-1, at 41), and it therefore is not "presumptively competent to address issues that demand a unified federal standard[,]" *City of New York*, 993 F.3d at 98.

**b. The Climate Act is Preempted Because it is Not Authorized by the Clean Air Act**

New York argues that Plaintiffs' claims fail with or without the application of the presumption against preemption. (Dkt. No. 230-1, at 43). But New York misapprehends the importance of this distinction: because the Climate Act is not entitled to a presumption against preemption, the Court is not required to conduct a "traditional statutory preemption" analysis to determine whether it is preempted by the Clean Air Act. *See City of New York*, 993 F.3d at 98. Rather, because the Clean Air Act displaces federal common law, the Court need only look to whether the Clean Air Act authorizes an emissions compensation scheme like the one enacted by New York. *See id.* at 99.

As noted above, "the Clean Air Act and the EPA actions it authorizes displace any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired powerplants." *AEP*, 564 U.S. at 424. Once Congress has occupied the field to the exclusion of federal common law, "'resort[ing] to state law' on a question previously governed by federal common law is permissible only to the extent 'authorize[d]' by federal statute." *City of New York*, 993 F.3d at 99 (quoting *Milwaukee III*, 731 F.2d at 411); *c.f. Ouellette*, 479 U.S. at 492 ("In light of this pervasive regulation and the fact that the control of interstate pollution is primarily a matter of federal law, [ ] it is clear that the only state suits that remain available are those specifically preserved by the Act." (quoting *Milwaukee I,* 406 U.S., at 107)); *Milwaukee III*, 731 F.2d at 411 ("Given the logic of *Milwaukee I* and *Milwaukee II,* we think federal law must govern in this situation except to the extent that [the governing federal law created by Congress] authorizes resort to state law.").

New York misconstrues *City of New York* when it contends that the Second Circuit "did not analyze preemption by the Clean Air Act." (Dkt. No. 230-1, at 47). The Second Circuit did

not limit its holding to a finding that state common law tort claims for greenhouse gas emissions were displaced by federal common law. *See City of New York*, 993 F.3d at 95. The court also held that the applicable federal common law was, in turn, displaced by the Clean Air Act, which "speaks directly to the domestic transboundary emissions claims" brought by the City. *Id.* The Clean Air Act therefore displaced those "federal common law claims concerned with domestic greenhouse gas emissions." *Id.* In other words, the Second Circuit has already held that the Clean Air Act displaced New York's state law claims—albeit indirectly—"[f]or many of the same reasons that federal common law preempts state law[.]" *Id.*

The Second Circuit concluded that the Clean Air Act did not "authorize the type of state-law claims" the City intended to prosecute. *See id.* at 98–100 (recognizing that the Clean Air Act's savings clause "has been interpreted to permit only state lawsuits brought under 'the law of the [pollution's] *source* [s]tate'" (quoting *Ouellette*, 479 U.S. at 497)). The "type of state-law claims" in *City of New York* were, as explained above, nearly identical to the state law claims the Climate Act is designed to facilitate. *See* discussion *supra* Section IV.C.2.a.i–ii. So, like the City's common-law nuisance claims, the "type of state-law claims" the Climate Act codifies are not authorized by the Clean Air Act. *See City of New York*, 993 F.3d at 98-100.

**c. EPA's Rescission of the 2009 Endangerment Finding Does Not Alter this Analysis**

Finally, New York argues that EPA's recent recission of its 2009 greenhouse gas endangerment finding "is inconsistent with the Parties' Clean Air Act preemption arguments." (Dkt. No. 254, at 26).

The endangerment finding was made in response to the Supreme Court's decision in *Massachusetts v. EPA*. *See* Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act ("Endangerment Finding"), 74 Fed. Reg.

66496, 66499 (Dec. 15, 2009). *Massachusetts v. EPA* arose from a petition filed in 1999 by numerous private organizations asking the EPA "to regulate greenhouse gas emissions from new motor vehicles under § 202 of the Clean Air Act." 549 U.S. at 510 (citation omitted). The organizations cited climate change concerns and argued that regulating greenhouse gas emissions was within the scope of EPA's rulemaking authority. *Id.* On September 8, 2003, the Environmental Protection Agency (EPA) entered an order denying the rulemaking petition, citing two reasons for its decision: "(1) that contrary to the opinions of its former general counsels, the Clean Air Act does not authorize EPA to issue mandatory regulations to address global climate change[;] and (2) that even if the Agency had the authority to set greenhouse gas emission standards, it would be unwise to do so at [that] time[.]" *Massachusetts*, 549 U.S. at 511. Petitioners in *Massachusetts v. EPA* challenged that order. *See id.*

The Supreme Court concluded that § 202(a)(1) of the Clean Air Act "authorizes EPA to regulate greenhouse gas emissions from new motor vehicles in the event that it forms a 'judgment' that such emissions contribute to climate change." *Id.* at 528. The Court held that the Clean Air Act's "sweeping definition of 'air pollutant'" was unambiguous, and included "all airborne compounds of whatever stripe[.]" *Id.* at 528-29 (internal quotation and citation omitted). Second, the Court remarked that the "alternative basis for EPA's decision— that even if it [did] have statutory authority to regulate greenhouse gases, it would [have been] unwise to do so at [that] time—rest[ed] on reasoning divorced from the statutory text." *Id.* at 532. The Court held that, "[i]f EPA makes a finding of endangerment, the Clean Air Act requires the Agency to regulate emissions of the deleterious pollutant from new motor vehicles." *Id.* at 533. EPA could "avoid taking further action only if it determin[ed] that greenhouse gases do not contribute to climate change or if it provid[ed] some reasonable explanation as to why it cannot or will not

exercise its discretion to determine whether they do." *Id.* The Court did not "reach the question whether on remand" EPA was required to "make an endangerment finding, or whether policy concerns [could] inform EPA's actions in the event that it [made] such a finding." *Id.* at 534–35.

*Massachusetts v. EPA* was decided on April 2, 2007. On December 15, 2009, EPA issued a final rule "in response to" *Massachusetts v. EPA*, and found that "six greenhouse gases taken in combination endanger both the public health and the public welfare of current and future generations." *See* Endangerment Finding, 74 Fed. Reg. at 66496.

Sixteen years later, on February 18, 2026—after the parties had filed their principal motions for summary judgment in this case—EPA issued a final rule rescinding its 2009 endangerment finding. *See* Rescission of the Greenhouse Gas Endangerment Finding and Motor Vehicle Greenhouse Gas Emission Standards Under the Clean Air Act ("Rescission Rule"), 91 FR 7686, 7688 (Feb. 18, 2026). In rescinding the rule, EPA remarked that the endangerment finding improperly "severed" the question of "whether [Greenhouse Gas ("GHG")] emissions from new motor vehicle engines contribute to GHG concentrations in the atmosphere from the question whether GHG concentrations in the atmosphere endanger public health and welfare." *Id.* at 7715. EPA also found that "regulating GHG emissions from new motor vehicles and engines under CAA section 202(a)(1) has no material impact on global climate change concerns animating the Agency's regulatory efforts since 2009, much less the adverse public health or welfare impacts attributed to such global climate trends." *Id.* at 7688. EPA concluded "that the regulation of GHG emissions falls outside the scope of air pollution problems Congress addressed when enacting CAA section 202(a)(1) and [ ] that maintaining GHG emission standards under CAA section 202(a)(1) would be unreasonable given their futility and the immense burdens they place on regulated parties, consumers, and the economy." *Id.*

New York argues EPA's finding that it has "no authority to control greenhouse gas emissions from vehicles" "cannot be reconciled with [P]laintiffs' and the United States' contention that the Climate Act is preempted by the Clean Air Act because the Clean Air Act comprehensively regulates greenhouse gas emissions." (Dkt. No. 254, at 26).

Plaintiffs disagree. West Virginia says that, "far from disclaiming authority to regulate interstate pollution wholesale, EPA determined that the *basis* for the previous endangerment finding was improper." (Dkt. No. 264, at 8) (arguing that New York "misunderstands the effect of EPA's recent rescission of the greenhouse gas endangerment finding[,]" and that "federal law continues to preempt state regulation of interstate emissions"). The Chamber likewise argues that "the rescission rule does not undermine the preemptive force of the Clean Air Act because the preemptive force turns on the legal framework Congress established, not on how EPA exercises its delegated authority at any given moment." (Dkt. No. 266, at 7).

EPA's rescission of its 2009 endangerment finding has no impact on this Court's analysis. As the Chamber observes, "[t]he critical point is that Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions from powerplants[.]" *AEP*, 564 U.S. at 426. Indeed, as Justice Ginsburg remarked, "were EPA to decline to regulate carbon-dioxide emissions altogether[,] the federal courts would have no warrant to employ the federal common law of nuisance to upset the Agency's expert determination." *Id.* Here, the Clean Air Act does not authorize New York to employ state positive law to achieve the same precluded result. *See City of New York*, 993 F.3d at 100; *Ouellette*, 479 U.S. at 495.[25]

[25] At oral argument, the parties agreed that the Court need not undertake additional preemption analysis if the Court found this case indistinguishable from *City of New York*. Indeed, New York conceded that if the Court concluded "that what the New York legislature did was to implement the city's public nuisance claim through a statute, then [ ] there are no set of facts that would make the Climate Act constitutional, and there's no additional preemption analysis before the Court to conduct." (Dkt. No. 310, at 7). The Court agrees. The Court has thus not considered the Plaintiffs' other arguments for finding the Climate Act unconstitutional (other than the potential impact of the foreign affairs doctrine, as explored below). *See also Miller v. Metro. Life Ins. Co.*, 979 F.3d 118, 124 (2d Cir. 2020) ("[T]he cardinal principle

**4. The Climate Act is Preempted by the Foreign Affairs Doctrine**

As in *City of New York*, "[t]he last issue left before us, then, is what to do about" claims arising under the Climate Act concerning foreign emissions. 993 F.3d at 100. It is not entirely clear that the Court needs to proceed with any additional analysis, as the Court has already determined that the Climate Act is not authorized by the Clean Air Act. But because the Clean Air Act does not displace claims seeking recovery for harms caused by *foreign* emissions, *see id.* at 101, and because the Court must find that the Climate Act is "unconstitutional in all its applications," *see Antonyuk*, 120 F.4th at 983, the Court finds that any cost recovery demand that could be brought under the Climate Act against a foreign producer would in any event be barred by the foreign affairs preemption doctrine.

West Virginia argues that the foreign-affairs doctrine preempts the Act because "the Act is contrary to the foreign-policy positions of the federal government[,]" and further "touches upon international relations while having 'no serious claim to be addressing a traditional state responsibility.'" (Dkt. No. 217-1, at 38-41 (quoting *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1074 (9th Cir. 2012)). The Chamber similarly argues that the Constitution "limits state authority to act on matters of foreign affairs." (Dkt. No. 216-1, at 24-26).

The United States, in its Statement of Interest, asserts that the Act "clashes with 'our nation's foreign policy goals' and 'circumvent[s] Congress's' and the President's 'own expectations and carefully balanced scheme of international cooperation on a topic of global concern.'" (Dkt. No. 222, at 11 (quoting *City of New York*, 993 F.3d at 103)). The United States also argues that the Act does not "address a traditional state responsibility, instead regulating 'a

of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further." (citation omitted)).

uniquely international problem of national concern' that is 'not well-suited to the application of state law.'" (*Id.* (quoting *City of New York*, 993 F.3d at 85–86)).

New York disagrees, and contends that "Plaintiffs and the United States fail to demonstrate that the Climate Act conflicts with any foreign policy or that the Climate Act is beyond New York's traditional state responsibility and intrudes on foreign affairs." (Dkt. No. 230-1, at 66).

The Ninth Circuit has helpfully characterized foreign-affairs preemption as encompassing "two related, but distinct doctrines" under the existing Supreme Court case law on the subject. *See Movsesian*, 670 F.3d at 1071. Under so-called "conflict" foreign-affairs preemption, "a state law must yield when it conflicts with an express federal foreign policy." *Id.*; *see also Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003) ("The exercise of the federal executive authority means that state law must give way where [ ] there is evidence of clear conflict between the policies adopted by the two."). The Supreme Court has also "made clear that, even in the absence of any express federal policy, a state law still may be preempted under the foreign affairs doctrine if it intrudes on the field of foreign affairs without addressing a traditional state responsibility." *Movsesian*, 670 F.3d at 1072; *see also Garamendi*, 539 U.S. at 419 n.11 ("If a State were simply to take a position on a matter of foreign policy with no serious claim to be addressing a traditional state responsibility, field preemption might be the appropriate doctrine[.]").

In *City of New York*, the Second Circuit determined that the Clean Air Act gives "no clear indication of an extraterritorial application." 993 F.3d at 100 (quoting *Morrison v. Nat'l Aus. Bank Ltd.*, 561 U.S. 247, 255 (2010)). "As a result, the Clean Air Act" could not "displace the City's federal common law claims to the extent that they [sought] recovery for harms caused by

foreign emissions." *Id.* at 101. Nevertheless, the court held that any federal common law claim against the fossil fuel producers not displaced by the Clean Air Act would still fail. *Id.* at 103. The court reasoned that "broad concerns over separation of powers, intrusion on the political branches' monopoly over foreign policy, and judicial caution with respect to creating (or extending) federal common law causes of action" counseled against affording extraterritorial effect to federal common law under the circumstances. *Id.*

Although this case does not involve the application of federal common law to foreign producers, the Second Circuit's reasoning still informs the analysis. The Court has already determined that the Climate Act does not address a traditional state responsibility; accordingly, the Climate Act may be preempted under the foreign affairs doctrine if it intrudes on the field of foreign affairs "even in the absence of any express foreign policy[.]" *See Movsesian*, 670 F.3d at 1072; *Garamendi*, 539 U.S. at 409 n.11. The Second Circuit has found that recognizing a cause of action "targeting emissions emanating from beyond our national borders" would "obviously sow confusion and needlessly complicate the nation's foreign policy, while clearly infringing on the prerogatives of the political branches." *City of New York*, 993 F.3d at 101–103 (holding that "condoning an extraterritorial nuisance action" would "not only risk jeopardizing our nation's foreign policy goals but would also seem to circumvent Congress's own expectations and carefully balanced scheme of international cooperation on a topic of global concern"). It is with little difficulty, then, that the Court concludes that the Climate Act intrudes on the field of foreign affairs. *See Movsesian*, 670 F.3d at 1072 (holding that state law had "'more than some incidental or indirect effect' on foreign affairs" where statute "express[ed] a distinct political point of view on a specific matter of foreign policy" (quoting *Zschernig v. Miller*, 389 U.S. 429, 434 (1968)). Cost recovery demands issued under the Climate Act would raise the same foreign

policy concerns that counseled against affording extraterritorial effect to the City's nuisance claims under federal common law. *See City of New* York, 993 F.3d at 101–03. Accordingly, the Court finds that the Climate Act is also preempted by the foreign affairs doctrine and cannot be constitutionally applied to foreign fossil fuel producers.[26]

**5. Conclusion**

The Court recognizes facial challenges are "disfavored," *see Nat'l Shooting Sports*, 144 F.4th at 107, and that they are accordingly—and intentionally—"hard to win." *See Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). But the Climate Act is an unusual and sweeping statute, designed to address the effects of climate change—a "uniquely international problem of national concern." *See City of New York*, 993 F.3d at 85. *City of New York* makes clear that the Climate Act operates in an area where federal law has governed for "over a century," in "a mostly unbroken string of cases[.]" *See id.* at 91 (collecting cases). In seeking damages "for the cumulative impact" of conduct that has occurred "simultaneously across just about every jurisdiction on the planet[,]" the Climate Act conflicts with "'the overriding . . . need for a uniform rule of decision' on matters influencing national energy and environmental policy, and . . . 'basic interests of federalism.'" *See id.* at 91–92 (quoting *Milwaukee I*, 406 U.S. at 105 n.6). The Clean Air Act does not "authorize" the Climate Act. *See id.* at 99. Finally, any cost recovery demand against a foreign producer would be preempted by the foreign affairs doctrine. Thus, the Court finds that the Climate Act is "simply beyond the limits of state law." *See id.* at 92. As the Second Circuit remarked, "it is not as if federal law is oblivious to the harms" that the Climate

---

[26] The Court notes that, while New York moved to strike portions of the Declaration of Deputy Secretary of State Christopher Landau, (*see* Dkt. No. 229), the Court does not rely on Deputy Secretary Landau's declaration in reaching its decision. The Court also does not rely on the declaration of international law professor Harold Hongju Koh, which Plaintiffs also moved to strike. (*See* Dkt. Nos. 247, 250). The Court need not consider these declarations—nor the fact that the United States has determined that it will withdraw from the United Nations Framework Convention on Climate Change, (*see* Dkt. No. 251)—to reach its conclusion that the Climate Act intrudes on the field of foreign affairs.

Act seeks to address. *See id.* at 97 n.9. Rather, it is precisely because the Climate Act operates within an area of law "in which the federal interest is so dominant" that it cannot be enforced. *See Rice*, 331 U.S. at 230.

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that the Chamber of Commerce Plaintiffs' motion for summary judgment, (Dkt. No. 216), and the West Virginia Plaintiffs' motion for summary judgment, (Dkt. No. 217), are **GRANTED** because, as set forth above, the Climate Act is preempted; and it is further

**ORDERED** that the New York Defendants' motion for summary judgment, (Dkt. No. 230), is **GRANTED** with respect to all claims against Acting Tax Commissioner Hiller; and it is further

**ORDERED** that New York's motion for summary judgment is otherwise **DENIED** in its entirety; and it is further

**ORDERED** that the parties' motions to strike, (Dkt. Nos. 229, 247, 250), are **DENIED** as moot; and it is further

**ORDERED** that the parties shall meet and confer and file a status report with the Court by September 14, 2026 explaining how they wish to proceed in this action.

**IT IS SO ORDERED.**

Dated: August 31, 2026
Syracuse, New York

Brenda K Sannes
Brenda K. Sannes
Chief U.S. District Judge